L07·1·20451

1

```
 1                              IN THE CIRCUIT OF THE
                                ELEVENTH JUDICIAL CIRCUIT IN
 2                              AND FOR DADE COUNTY, FLORIDA
 3                              CRIMINAL DIVISION
 4                              CASE NO. 03-16995
 5   STATE OF FLORIDA      )
                           )
 6         PLAINTIFF,      )
                           )
 7         -vs-            )
                           )
 8   PABLO  DIAZ,          )
                           )
 9                         )
           DEFENDANT.      )
10                         )
11                              RICHARD E. GERSTEIN BUILDING
                                1351 N.W. 12th Street
12                              Miami, Florida  33125
                                May 7, 2007
13                              9:30 a.m.
14
15
16         The above-entitled matter came on for hearing before the
     Honorable Julio Jimenez, Circuit Judge, pursuant to Notice.
17
18
19   APPEARANCES:
20         KATHERINE FERNANDEZ-RUNDLE, STATE ATTORNEY, BY
           C. CORONA AND R. GROSS,
21         ASSISTANT STATE ATTORNEYS,
           ON BEHALF OF THE STATE.
22
           BENNETT H. BRUMMER, PUBLIC DEFENDER, BY
23         M. BLACKER, SPECIALLY APPOINTED DEFENDER,
           ON BEHALF OF THE DEFENDANT.
24
25
```

RECEIVED

APR 16 2008

ATTORNEY GENERAL
MIAMI OFFICE

DOCKETED
APR 16 2008
ATTORNEY GENERAL

COPY

2

1                          I N D E X

                                      Re-          Re-
2    Witness           Direct    Cross    Direct     Cross
3    NONE
4
5
                       E X H I B I T S
6
                                         PAGE         LINE
7    STATE'S
8    NONE
9    DEFENDANT'S
10   NONE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1        (Thereupon, the following proceedings were had.)

2        THE COURT: On Page 11, Mr. Diaz, good morning.

3        THE DEFENDANT: Morning.

4        THE COURT: We are ready for trial and you have previously

5    rejected the state's offer, is that still how you feel?

6        THE DEFENDANT: Yes.

7        THE COURT: All right. And the state's offer was again, for

8    the record.

9        MRS. CORONA: I think that the final offer was 18 years

10   followed by five years reporting probation.

11       THE COURT: That was 18 years with a 10 year minimum

12   mandatory as a habitual offender.

13       MRS. CORONA: Right.

14       THE COURT: He is a habitual violent offender.

15       MR. BLACKER: I do not want my client to think that I was

16   lying to him.  I received a call on my cell phone, a message

17   from Mrs. Corona on Thursday; I believe it was done Thursday.

18   I didn't get it until Friday in which I said go to them and see

19   if they will accept 15. I went to the jail yesterday at eight

20   o'clock in the morning.  I was there for three hours. We have

21   just had a colloquy and the lawyers are sort of aghast that we

22   would take a chance with this possession by a convicted felon

23   of a weapon as there are eight or nine witnesses -- well, there

24   are nine, but eight excluding the victim who say they saw the

25   firearm in the defendant's hands and  ---

4

1       MRS. CORONA: Judge, on that time alone he is facing 30

2   years as an H.V.O., on the possession of a firearm by a

3   convicted felon.

4       THE COURT: Right. And throughout you have a lot of

5   witnesses.

6       MRS. CORONA: Judge, there is about seven or eight

7   civilian witnesses who will all say that the defendant had a

8   firearm on the day in question, and there is also a

9   surveillance video that shows the defendant with a firearm.

10      THE COURT: Okay. You know, I told your client before, we

11  try cases in this division and a lot of people wind up getting

12  a life sentence and I am to a point that I am embarrassed that

13  I sentence so many people to life, but it is usually that I

14  have no discretion. But, you know, when you look at my trial

15  log you will see one guy comes in not guilty and then another

16  guilty and they all get life and he has to know that that is a

17  reality here in this courtroom. In fact, the last case you

18  tried they found him not guilty on one count and another one

19  count where he got life.

20      MRS. CORONA: Judge, he is facing a mandatory life

21  sentence as a prison releasee re-offender.

22      THE COURT: I am not here to push any plea down your

23  client's throat and this one seems to be an interesting trial

24  especially with a lawyer like you, but he is a young guy. How

25  old are you?

5

1    THE DEFENDANT: Thirty-one.

2    THE COURT: He has got to know that life means -- and his

3    family is here -- life means life where he actually dies in

4    prison.

5    MR. BLACKER: It is not like the old days, Judge, where it

6    was 25, it's life is life. And it is upsetting me, so -- I

7    can't tell you. I mean, I am sick. I don't know if -- I have

8    got sick over this trial. I am happy to try this case, it is

9    just, it is just making me sick. I have known this man for

10   three and a half years now. Every time I go there, I like

11   talking to him, he is intelligent, but I just can't get

12   through.

13   THE COURT: He is a gentleman and I could tell that you

14   like him, but it is not -- you know, I don't make offers. I

15   don't get involved. It is going to be up to the jury. If he

16   is convicted as charged and I don't have any discretion, the

17   sentencing is just a life sentence, there is no discretion and

18   if he wins I will congratulate him.

19   MR. BLACKER: Judge, I feel like a failure because I have

20   been doing this for 37 years now, 38, and all of a sudden I

21   feel like I am loosing communication with my client because I

22   am trying to advise him appropriately and I just --

23   THE COURT: But he is presumed innocent. Mr. Diaz, again

24   sir -- let's put him under oath.

25   MR. BLACKER: May I just say one last thing. I am not

6

1    doing this in any way -- there is no pressure.  He knows you

2    are a gentleman.  You are making your own decisions.  I just in

3    talking to the lawyers here, they are astonished, Mr. Diaz,

4    astonished, Pablo, that we would go to trial on all of it, but

5    more particularly the possession count.  And you and I have had

6    discussions and I can't disclose what they are, but I just want

7    you to know that I am upset for you because I feel badly about

8    what I foresee as a possible outcome.

9         I am sorry, Judge, go ahead.

10        THE COURT:  Let's put him under oath.

11   THEREUPON:

12                       PABLO DIAZ

13   was called as a witness and after having been first duly sworn,

14   testified as  follows:

15        THE COURT: All right, sir, your name and your age.

16        THE DEFENDANT: Pablo Diaz, 31.

17        THE COURT: Mr. Diaz, you have said all along that you want

18   to go to trial, and that is fine, you are presumed innocent.

19   And like I said, you seem like a gentleman.  You have always

20   been very proper with me. We are just doing this in an

21   abundance of caution to make sure that you understand what you

22   are passing up, because if you win, fine, but if God forbid you

23   loose, you know we want to make sure that there is a record

24   here that you made the decision and that your lawyer didn't

25   fail you in any way by not communicating an offer.  Whether it

7

1    is a 15 year or an 18 year offer you still want to go to trial;

2    is that correct?

3         THE DEFENDANT: I do.

4         THE COURT: All right. You have discussed this with your

5    parents and they know the seriousness of your decision?

6         THE DEFENDANT: They do.

7         THE COURT: All right. And this is what you want to do?

8         THE DEFENDANT: Yes.

9         THE COURT: Okay.

10        MR. BLACKER: Do you want to spend a moment with me at some

11   point today this morning?  Do you need to spend any time with

12   me?

13        THE DEFENDANT: No.

14        MR. BLACKER: Okay.

15        THE COURT: All right.

16        MR. BLACKER: Judge, could I, can I ---

17        THE COURT: Have you guys gone over the motions in limine?

18        MRS. CORONA: I did, Judge.  I only have an objection to a

19   few of them. The paragraphs ---

20        THE COURT: Before we do that, on the other case, what is

21   happening with yours?

22             *              *              *

23        THE COURT: Now, the trial case.

24        MR. BLACKER: Yes, Judge.  I am Michael Blacker, 701

25   Brickell Avenue on behalf of Mr. Pablo Diaz. Judge, the other

8

1    day when we were in court someone brought you a rule change

2    from the Supreme Court about closing arguments.  Are you

3    amending that?

4         THE COURT: Yeah.

5         MR. BLACKER:  I just want to know.  Some Judges won't do

6    it until the objection and mandate period passes, but you are

7    going to mandate it?

8         THE COURT: No. No.  They said immediately.

9         MR. BLACKER:  Oh, okay, okay. Number two, there are three

10   witnesses that the state has subpoenaed that I want to ask the

11   Court to make the Court's witnesses so that I could use them.

12   Officer LaDuke, Raymond LaDuke.  He is the officer that

13   accompanied the victim back to her apartment.  Mrs. Maureen

14   Fernandez, the lead detective in this case.  And Romero -- we

15   covered this the other day, Romero Balderzon (phonetic) the

16   person in the restaurant.

17        MRS. CORONA: I don't intend to call Mr. LaDuke, he has

18   resigned.  The other two are coming, they are under my

19   subpoena.  Officer LaDuke has not been subpoenaed because he is

20   no longer a police officer.

21        MR. BLACKER: I will immediately issue a subpoena for him.

22        THE COURT: Could you get a hold of him or not?

23        MRS. CORONA: I don't have contact information for him.  I

24   didn't intend to call him.  It wasn't necessary to call him for

25   the state's case, so I didn't try to get contact information

9

1    for him, Judge.

2           MR. BLACKER:  Is he city?

3           MRS. CORONA: He is resigned.

4           MR. BLACKER: Was he city?

5           THE COURT: And you are ready to go to trial with or

6    without him?

7           MR. BLACKER: I would like to have him, but I am not going

8    to stand here and tell this Court that I am not going to go to

9    trial without him.  Actually he is an impeachment witness if

10   the victim lies about what she told him.

11          THE COURT: And Mr. Diaz, sir, you are still under oath,

12   you are ready to go to trial with or without Officer LaDuke; is

13   that correct?

14          THE DEFENDANT: Well, if my lawyer feels that we do need

15   him, I don't feel right without him because he could decide a

16   lot of things in my trial.

17          THE COURT: Well, you know, you either want to go to trial

18   or you don't. Your lawyer says that he is ready to go to trial

19   with or without Officer LaDuke. It's a matter of strategy.  Are

20   you in agreement with your lawyer's strategy?

21          THE DEFENDANT: Could I speak to my lawyer?

22          MR. BLACKER: Could I qualify one thing, Judge.  Let me

23   just, so you will know for the record, LaDuke interviewed the

24   victim on the way home from the hospital.  On the night in

25   question she told him a complete fabricated story about what

1    Pablo Diaz had done, how this whole thing started, where it had

2    occurred, the site, and the time and where it had occurred to

3    her. She said that Pablo is the one that punched her, held her

4    in a full nelson and threw her down to the ground and it is all

5    a lie. She said it took place in her apartment. It took place

6    in Publix. She then corrected her story at a later time under

7    oath and said, no, Pablo did not harm me, Pablo protected me,

8    pushed me out of the car out of harms way. If she denies

9    making the LaDuke statement, it is important that I be able to

10    impeach her on that. I won't be able to impeach her, I don't

11    think that she's going to deny it. I have her statement and I

12    am going to show it and if it doesn't refresh her recollection

13    I am going to need her. At this point the Court could get

14    involved because this trial is not going to be one day.

15        THE COURT: Yeah. But if the guy is not available he is

16    not available. For all I know he is in China.

17        MR. BLACKER: At the first ---

18        THE COURT: Carolina, will the witness come in and admit

19    she made that other statement first?

20        MRS. CORONA: Judge, it is the state's position that the

21    report is inaccurate, that the report that Officer LaDuke wrote

22    is inaccurate as it relates to what the victim said on that

23    date. She is not going to say what happens how the report

24    reflects what happened. She is going to say what she said

25    consistently in all the sworn statements, in all the actual

11

1   recorded statements, and that is what she is going to say.

2       THE COURT: And you have a report by Officer LaDuke --

3       MRS. CORONA:  Yes, Judge.

4       THE COURT: That says something different?

5       MRS. CORONA: Slightly different.  As to the main event

6   whether there was a kidnapping --

7       THE COURT: If it came down to it could you stipulate to

8   the report coming in rather than getting LaDuke here?  I want

9   to get this trial on the road here.

10      MRS. CORONA: Judge, I am not going to stipulate to a

11  report coming in to impeach her with someone else's

12  interpretation.

13      THE COURT: Except if the witness were here he would say

14  whatever the impeachment says on the report, wouldn't he?

15      MR. BLACKER: Judge, based on -- I have an outline of the

16  reports, two paragraphs, if you want to look at it. Judge,

17  based upon what the state is saying, you know, he now becomes

18  more important now that she tells the Court that the victim is

19  going to say that his report is inaccurate.  You know, I am

20  flabbergasted, frankly.  I mean, it's rare that the state would

21  first of all allow an officer unless there is some kind of

22  disciplinary proceeding against this man -- this report is

23  extremely clear.  She says that Pablo at her apartment threw

24  her down on the ground, physically assaulted her by using his

25  friend, that he was the one that assaulted her, he held her in

1   a full nelson while she was being punched by a female friend.

2   She broke free and ran to her apartment. This is a total

3   fabrication. This girl -- I was really close to filing a

4   motion to have you disqualify her as a witness because she

5   doesn't know the truth from lie and I am saying that outside of

6   the jury's presence. I am serious with you, Judge. When you

7   see this impeachment on this girl, I have a file, I am talking

8   about the June 8th report, on the morning of June 8th when he

9   returned her to her apartment. He drove her back and he wrote

10  a report and it is her statement. It's Katherine Louise's

11  statement. No. This is my paragraph.

12      MRS. CORONA: Look at this. Is this what you are talking

13  about?

14      MR. BLACKER: No. What I am saying is this is an analysis

15  of his report.

16      MRS. CORONA: This is what you wrote as what is his ---

17      THE COURT: An analysis? Where is his report?

18      MR. BLACKER: I am going to find it for you. Here is the

19  report.

20      THE COURT: Give it to her.

21      MR. BLACKER: Sure.

22      MRS. CORONA: Judge, I don't have an objection to this

23  coming in. This is essentially the story with some details.

24      THE COURT: Hold on. Hold on. Let him hear you. Repeat

25  yourself.

13

1       MRS. CORONA:  Judge, I don't have an objection to the

2   report coming in if we are un-able to get a hold of LaDuke and

3   it is necessary, obviously depending on what she says and

4   whether it is relevant to the testimony.

5       THE COURT: Okay. So Michael, are you ready to go to trial

6   either with Officer LaDuke as a witness or introducing that

7   report in place of Officer LaDuke's testimony for impeachment

8   of the victim?

9       MR. BLACKER: I am. Now, on the next to last paragraph of

10  the report -- may I just read it carefully one more time?

11      THE COURT: Oh, I thought maybe you had read it ahead of

12  time.

13      MR. BLACKER: I did.  But now that I am stipulating I want

14  to see what I am stipulating to.

15      MR. BLACKER: Judge, I need one moment with the client and

16  I am going to stipulate.  Yes, Judge.

17      THE COURT: State.

18      MRS. CORONA: Yeah, Judge.

19      THE COURT: And Michael.

20      MR. BLACKER: Yes, Judge.  We will stipulate that if the

21  officer were called that his testimony would be consistent, his

22  testimony, he wasn't there, would be consistent with that the

23  victim told him this on the morning after the events occurred.

24      THE COURT: Okay.  So then that stipulation will come in if

25  it becomes relevant during the trial.

14

1       MR. BLACKER: Yes.

2       THE COURT: Okay.  So, Mr. Diaz, you still, under oath you

3   are in agreement with that stipulation by your lawyer and the

4   state?

5       THE DEFENDANT: Yes, sir.

6       THE COURT: So we could proceed to trial without Officer

7   LaDuke?

8       THE DEFENDANT: Yes.

9       THE COURT: Now, what other problems did you have?

10      MRS. CORONA: Judge, Judge, we could talk about the motions

11  in limine at this point.

12      MR. BLACKER: Okay, fine.  I just had one more motion,

13  Judge.  I will finish that at the end.  Let's do the in limine

14  motions.  Counsel wants to get to it.

15      Judge, we already discussed the first part.  Prior bad

16  acts or conduct.  We are going to discuss that they were not

17  going to have anybody mention prior bad acts, conduct other

18  than the matters.

19      MRS. CORONA: Judge, as to paragraphs one, two, three --

20      MR. BLACKER: Please, excuse me, Judge.

21      MRS. CORONA: Up until paragraph seven, the state has no

22  objection.  We don't intend to bring out any of his prior bad

23  acts or whatever his previous arrest were for. Obviously if the

24  defendant testifies we would impeach him that he has been

25  convicted of a felony, it is 11 times that he has been

15

1    convicted of a felony.  Obviously the facts and circumstances

2    of the felonies will not come in.

3         THE COURT: So one through six, no objection.

4         MRS. CORONA: One through seven.

5         THE COURT: As to paragraph 14, it says "that the tape has

6    no relevance, Judge."  The state intends to introduce these

7    phone calls made by the defendant?

8         MR. BLACKER:  Could I interrupt, because I am going to

9    withdraw that, Judge.  I thought about it again and in due good

10   faith I cannot -- this is the tape that is made by Mr. Diaz.

11   He calls the answering machine of Mrs. Ruiz and starts yelling

12   at her to get him his money back and then threatening her.  I

13   have got to withdraw that because I thought about it again it

14   is relevant to all of the charges.  Not all of them but the

15   attempted murder.  There is threats on this tape.  I need to

16   withdraw it.  It should come in.

17        THE COURT: You are withdrawing paragraph eight?

18        MR. BLACKER: Yeah.  Evidentially it should come in.  It's

19   not my decision, but I want -- the Court could at least have

20   the tape available to both parties, the original, because I

21   don't have it.

22        MRS. CORONA: So that -- I have gave you a copy of the

23   transcript actually last week, so at least counsel knows what

24   is on the tape.  But there is part of the statement where the

25   defendant alludes to burying the victim like he buried Betty

16

1  and Juan.  That part, the state intends to redact that part of

2  the statement because of the prejudicial nature of it, but

3  aside from that, all the rest of it --

4        MR. BLACKER: Okay.

5        THE COURT: Number nine.

6        MRS. CORONA: These are all having to do with the tape.

7  Eight through fourteen having to do with the tape and I believe

8  he has withdrawn that.

9        THE COURT: You have withdrawn eight through fourteen.

10       MR. BLACKER: Yes, Judge.  The recording of the statement,

11  the transcript is very short.  I am asking for the Court to

12  look at it one more time to see if there is anything else that

13  needs to be redacted.  But I think the Court has, I think that

14  counsel has covered what I need.

15       THE COURT: It is up to you guys.  I don't participate in

16  discovery.

17       MR. BLACKER: The bullet hole in the car seat.

18       THE COURT: What number are you on?

19       MR. BLACKER: Number 15, paragraph 15. This is interesting.

20  Mrs. Ruiz is the only person who claims that two shots were

21  fired. The two meddlers who came are testifying under oath that

22  there was only one shot fired. The owner of the cafeteria and

23  his wife both testified that there was only one shot fired and

24  that the shot occurred when Mr. Diaz held a pistol up to the

25  sky and shot and he saw the flash is what he testified to. She

17

1   is the only one who says that there was two shots fired and

2   both of them were fired from one car.  Everyone else, not

3   everyone, the cafeteria owner says he was outside and held it

4   up to the sky. She says, the victim says that he was in the

5   car, fired two shots directly at her, but miraculously missed.

6          MRS. CORONA: There is one bullet hole exactly where the

7   victim said that the bullet grazed her at the seat of the car.

8          MR. BLACKER: Let me quickly tell the Court, there is no

9   forensics on this and the Court well knows that there are ways

10  forensically to decide what is a bullet, what they are.  They

11  have a report, I am told, of a police officer who said that

12  they looked at the car seat and that there was a hole at the

13  top and a hole in the bottom.

14         MRS. CORONA: Judge, there is actually video evidence of

15  this part of the show, the crime scene investigation show that

16  was following around the investigation of this case and ---

17         THE COURT: And nobody is going to talk about the show in

18  front of the jury, right?

19         MRS. CORONA: We have a redacted copy for counsel so that

20  I could see what we intend to bring in with regard to that

21  show.  In that show the crime scene investigator actually is

22  videotaping the car and when he discovers the hole and traces

23  through the hole, where the hole comes out the jury could make

24  a determination whether they believe it is a bullet hole. There

25  is no audio and on the tape that we intend to show --

18

1    THE COURT: That goes to the weight of the evidence.

2    MR. BLACKER: Okay. But the relevance is questionable

3  because this was done like a year later after the crime, a year

4  later they found the car and there is a hole in the seat. And

5  let me tell you something else, Judge.  I have really been in

6  this case a lot longer than counsel, so I know that she is

7  telling you the truth.

8    THE COURT: You know, I have got to tell you, one time I

9  was right across the hall over 20 years ago with Sye and we

10  were representing this guy, there was a kilo in the trunk and

11  Sye said, well, Judge it's not like they got his prints from

12  the kilo. So the state sent it to be tested and they found the

13  guy's print on the kilo. But this was a long time afterwards,

14  but you know, things happen.

15    MR. BLACKER: Judge, in this particular case the witness

16  says in deposition like for 15 page she talks about it that the

17  bullet went near her back and that her back is all scraped up.

18  Now, it turns out that the bullet hole turns out to be between

19  her legs.

20    THE COURT: Right.  So you could impeach that.

21    MR. BLACKER: Okay. But there is, but Judge, there is no

22  relevance to a hole in the car in my opinion.  I am making a

23  record.  There is no relevance to a shot where no one else has

24  heard it and she is testifying under oath that the bullet went

25  into the back seat into the vertical part of the back seat. I

19

1    could show the Court where she says that.

2        THE COURT: Okay.  Well, we will see.  But from the looks

3    of it, you know, if they could prove it, it is up you to guys

4    to argue it to the jury.

5        MR. BLACKER: Did I understand that there is going to be

6    some film of this bullet hole, is that what it is?

7        MRS. CORONA: Yeah, it is on the video.  I gave you a copy

8    of it.

9        MR. BLACKER: I just got a copy, for the record, for the

10    record of the video.  So I will look at it tonight and ask the

11    Court to reserve on it.

12        THE COURT: Anything else further regarding any of these

13    paragraphs?

14        MRS. CORONA: As to the video and answering machine we are

15    on paragraph three, we are on page 23.

16        THE COURT: So from 15 through 21, that is fine.  And now

17    we are at 23.

18        MR. BLACKER: Yes.

19        MRS. CORONA: It is not fine.  We intend to introduce that

20    evidence so I ask that you not grant this motion in limine as

21    to the bullet hole in the car seat.

22        MR. BLACKER: Well, that is not the bullet hole, E-23 is

23    the video and answering tape. That is the video that I have not

24    seen yet, but it is a redacted video, but I am asking you to

25    reserve ruling on that because I want to look at it.

20

1       THE COURT: Wait.  You have seen the video, right?

2       MR. BLACKER: No.

3       MRS. CORONA: You have never seen the show?

4       MR. BLACKER: Never, ever.

5       THE DEFENDANT: I have never seen it either.

6       MR. BLACKER: I have never seen it.  Let me tell you

7    something.  If I lie to the Court I want you to hold me in

8    contempt.

9       THE COURT: I am not playing games.  Are you ready to go to

10   trial?

11      MR. BLACKER: That is not the point.

12      THE COURT: Well, it is the point.  You are standing here

13   and there is some sort of video and you say that you haven't

14   seen the video.

15      MR. BLACKER: I have never seen the video and I was just

16   given the video and the redacted copy this morning.  What I am

17   asking the Court to do, let me look at it, because it may be

18   perfectly admissible based on what they said in court the other

19   day that the ones who are going to testify is standing in with

20   audio and saying "that is the picture of Mr. Diaz.  That is the

21   person who did it."  If they don't say the word "kidnapping,"

22   which is something that they shouldn't be able to say, but I

23   will stipulate to avoid -- for judicial economy I will

24   stipulate that they identified him properly. The other problem

25   is that if anybody in the video said this is the way that it

21

1    occurred or does a re-enactment or anything that has any

2    hearsay or any expertise or opinion in it, then it is an

3    objection.

4        THE COURT: We already covered this the other day.  No

5    re-enactments in the live video of a photo identification.

6        MRS. CORONA: There is different parts of it.  One of them

7    is the video surveillance from the night in question with the

8    defendant and the victim on it. The other part is the crime

9    scene investigator investigating the bullet hole and going

10   through the car and there is one where the detective has the

11   witness identify the defendant from a photo lineup.  That part

12   does have audio and it is admissible and it is evidence after

13   previous identification.

14       THE COURT: Let me ask you, you haven't seen this video

15   that has all of this stuff on it, Michael?

16       MR. BLACKER: I have never seen it in my life.

17       THE COURT: Are you ready to go to trial without seeing

18   that?

19       MR. BLACKER: With what she just described.

20       THE COURT: And Mr. Diaz, is Mr. Diaz ready to go to trial

21   without seeing a video that shows bullet holes and you want to

22   see a photo identification?

23       MRS. CORONA: Judge, we could play the video on DVD and we

24   could look at it right now, everybody together, and they could

25   decide what it is.

22

1          THE COURT: We could play it on the laptop. All right.

2     Where is the panel, Jimmy?

3          THE BAILIFF: Third floor.

4          MR. BLACKER: While she is setting up, could I make a

5     comment to the Court about what happened the other day?  Judge,

6     the predecessor counsel filed a motion for severance and the

7     predecessor state attorney told me that the severance was

8     granted on the possession of a firearm by a convicted felon.

9     The other day in court, I didn't know that it was going to

10    happen, but you said that you would like to bifurcate the trial

11    and I thought about it and I had said that it sounded like a

12    good procedure.  I went back to my office and I started to

13    really think about it and I just want the Court to know that

14    if, in fact, we bifurcate under the procedure that -- the

15    Pinero procedure, because that is what happened in the case,

16    okay, okay.  I will never, ever be able to ask this jury since

17    I am un-decided about whether he is going to take the stand, of

18    whether or not they will assume any violence from his 11 priors

19    or whether they will take those into consideration as an effect

20    on his credibility or whether or not it is more likely that he

21    committed this crime because he is convicted of a prior crime

22    or is it more likely or not that he committed a violent crime

23    because he has been convicted of 11 crimes before.  And I can't

24    ask them about an instruction that you would normally give them

25    that the priors come in for a limited basis and ask them about

23

1    how they would treat your instruction on that limited basis.

2         I am precluded from properly representing this man in voir

3    dire by agreeing to the procedure outlined by the Court. I

4    thereby withdraw my agreement since a severance was already

5    granted and we don't have just a bifurcation, now we have a

6    severance and we seek to re-instate the severance. And I know

7    I am surprising the Court, and I told the Court the other day

8    that I have never been in a bifurcation, but I thought about it

9    and I can't agree to it.

10        THE COURT: Okay. All right. Well, I will bifurcate it and

11   you can generally ask, you don't have to ask about the

12   defendant or anybody else, if -- you know, there are many

13   questions that you could do in voir dire. Whether, you know,

14   just because a witness is a convicted felon, does that mean

15   that the witness cannot tell the truth. You know, would you

16   agree with me that even though a witness is a conviction felon,

17   the witness could come in here and be 100 percent truthful. So

18   there is many questions, there is many ways of doing it that

19   good lawyers like you do and it gets done, and the defendant

20   still is free to remain silent or testify if he wishes.

21        MR. BLACKER: Okay. While counsel is setting up I have --

22   let me just finish the motion. Are you ready?

23        MRS. CORONA: Yes.

24        THE COURT: Well, wait. What about this video?

25        MRS. CORONA: Judge, I haven't been able to play it.

24

1    MR. BLACKER: She is setting it up.  There is other

2    portions and then we will go to the video.  Okay, the 911 tape,

3    there is a tape at the Fortune House where a lay witness, not

4    an expert, has no training in the elements of kidnapping says

5    on the tape in an excited utterance, says on the 911 that there

6    is a kidnapping going on.  But he also said, talked about what

7    goes on up to that, but the word "kidnapping" is a conclusion

8    of law and actually is the crime charged and it should be

9    redacted out of that tape. The fact that he says it is a

10   kidnapping, a lay witness, it's not a judge standing there, it

11   is not Judge Hismith who watched this or Judge Jimenez who

12   knows the elements of kidnapping and says it and it's highly

13   prejudicial, so I am asking just that that word -- the other

14   stuff that he says, it is 911, it's exited utterance and comes

15   in.

16   MRS. CORONA: Judge, the witness is making a statement, is

17   using a colloquialism, something to describe the event.  It

18   doesn't mean -- the fact that he is calling it a kidnapping

19   doesn't mean that it meets the legal definition.  That is the

20   word that he used.

21   MR. BLACKER: But he is charged with a kidnapping.  He

22   does say that he is taking her by the hair, he is taking her up

23   the stairs, he is kidnapping her.  So Judge, I think that 403

24   demands that we not put stuff in the trial that is so highly

25   prejudicial from a witness who doesn't know the elements.

25

1      MRS. CORONA: Judge, that is like a witness saying he is

2  robbing her.  That is what they said.

3      THE COURT: I think that it is a word that has common usage

4  and I am going to allow it.  What else?

5      MR. BLACKER: Okay. Judge, not one witness identified --

6  there is no question of identity here.  We are not claiming

7  that the defendant was in Hialeah at the time of these events.

8  We are not saying that it wasn't the defendant that was

9  involved in these charges. He has tatoos and I find them --

10  personally, I don't like the tatoos and there may be jurors

11  that don't like them, and the fact that they have a photograph

12  of his tatoos, which not one witness has identified him in the

13  entire matter, 30 witnesses, not one has identified him by his

14  tatoos, just because he has them and they want to play a video

15  of his tatoos where they had him take off his shirt and they

16  played this video, that is not relevant to these charges.  If

17  there was a question of identity -- if one of the witnesses

18  said that I saw a red lion on him and he had a red lion, sure,

19  that is relevant.  Otherwise those tatoos are not relevant and

20  they are highly prejudicial.  I find -- well, the jury may not

21  like them.  His body is completely covered in tatoos.

22      MRS. CORONA:  Judge, whether or not they are stipulating

23  to identity is not the question.  The fact is that the

24  defendant is without a shirt in the video surveillance and the

25  tatoos are visible.

26

1    THE COURT: What do you mean the video surveillance?

2    MRS. CORONA: From the Fortune House the video occurred --

3    THE COURT: In the hotel.

4    MRS. CORONA: Right. Him dragging the victim over the

5    counter. The tatoos are visible.

6    MR. BLACKER: I can't object to them. I thought there was

7    another film where you had him stand up in a photo lineup.

8    MRS. CORONA: There is film of that, but a photograph of

9    him with the tatoos, yes, I intend to show that, so ---

10   THE COURT: So that the jury could see that that is the

11   same guy. Okay. So that will be denied.

12   THE COURT: Anything further?

13   MR. BLACKER: Yes, quickly. Two last things. The girls at

14   the cafeteria that saw what was going on called 911 and they

15   are told to get a tracking number and then at the end of the

16   tape they talk about there is a rape. This is not a rape,

17   Judge. No one talked about a rape. And they said that the guy

18   with the gun in the Mustang.

19   THE COURT: Did they say it in Spanish and English?

20   MRS. CORONA: They said it in Spanish.

21   THE COURT: Because in Spanish Roto (phonetic) is

22   kidnapping, it's not rape.

23   MR. BLACKER: It is kidnapping and he transcribed it to

24   rape.

25   THE COURT: In Spanish it is kidnapping.

27

1    THE DEFENDANT: Excuse me. Excuse me.

2    MR. BLACKER: Oh, okay. The Shenandoah rapist was still at

3    large then and they saw him tussling with the girl on the

4    street and they thought that he was raping her. There is no

5    rape. There is nothing going on here.

6    THE COURT: Whatever it is, but I am just warning you

7    because in Spanish Rato is a kidnapping it is not a rape. If

8    that was the word used, the interpreter will say that means a

9    kidnapping.

10    MR. BLACKER: But at that time he was just fighting with

11    her, so -- but anyway, the English translation in the

12    translation is "raped" on the call. And the second thing is at

13    the end of the call the operator is saying that we have a guy

14    with a gun in a black Mustang. All I am saying is that is

15    totally un-related.

16    MRS. CORONA: Judge, the 911 operator, they are

17    communicating and for one that communication obviously doesn't

18    come in, but I think that is where it goes. They are saying

19    that -- they are saying that -- they may be saying that he

20    raped her, all of that is not admissible, but while we are on

21    this subject the state intends to introduce the 911 tape and we

22    have an interpretation that was translated by an official court

23    interpreter. I am going to ask if the defense is going to

24    stipulate or does he want the interpreter to come in and

25    actually testify that the interpretation that we have, that he

28

1   has a copy of ---

2       THE COURT: I am sure that he will go over it and he will

3   probably stipulate.

4       MR. BLACKER: Those kinds of things, no, no.

5       THE COURT: All right. Anything further?

6       MR. BLACKER:  Last thing. Supposedly the four guards that

7   Mr. Diaz was holding at bay while he was taking the victim up

8   the stairs, one of them and only one of them heard him say --

9   two of them heard him say, "I will kill you if you call the

10  police."

11      I can't do anything about that

12      THE COURT: Right.

13      MRS. CORONA:  And I don't have any intention to go into

14  that other statement.

15      THE COURT: Right.  Right.  The "I don't want to go back to

16  jail," leave that out.

17      MR. BLACKER:  That statement.  Thank you.

18      THE COURT: Now, set up to look at that thing.

19      MR. GROSS:  Actually, it does not play on laptop.  It

20  does, however, play on your J.A.'s computer.

21      THE COURT: Okay. You want to go to see it?

22      MR. BLACKER: I want to go see it, but I know my client is

23  going to want to go see.  How do we do that?

24      THE COURT:  Corrections, could you cuff him and the two of

25  you take him to my office to see it.

29

1      THE BAILIFF: I was going to say do you need like a T.V. We

2  will probably need it later.

3      MR. BLACKER: Judge, the only last thing prior to trial in

4  preparing for trial I realize that Natalia Bayo is probably the

5  kind of person that might want to come in and tell the truth

6  finally and I know that the Court wants to hear the truth, so I

7  am going to ask you to submit a material witness arrest for her

8  since we have a stipulation, but it doesn't cover whether or

9  not they were all so intoxicated.  So that is the honest reason

10  why Ruiz is saying this crazy stuff to this police officer.

11      THE COURT: Okay. As to Natalia Bayo, both sides stipulated

12  to go with what she would say at trial with the stipulation; is

13  that correct?

14      MR. BLACKER: Yes.

15      THE COURT: Mr. Diaz, you are still in agreement to go to

16  trial with that stipulation if she cannot come in in person?

17      THE DEFENDANT: I want to do what my lawyer wants to do.

18      MR. BLACKER: I am not withdrawing.  I stipulate, but I am

19  saying in an effort to get her so that the total truth comes

20  in.

21      THE COURT: But I want to make sure that he is ready to go

22  to trial if we do it with the stipulation if the woman doesn't

23  come in.

24      MR. BLACKER: If we can't find her we have to be ready

25  because she is unavailable.

30

1    THE COURT: If we can't find her you are ready to stipulate

2    and proceed with the stipulation, correct?

3    MR. BLACKER: Yes.

4    THE COURT:  Correct, Mr. Diaz?

5    THE DEFENDANT: Yes.

6    THE COURT: Did she get served, Cathy?

7    THE CLERK:  On the rule to show cause, I have no service

8    back.

9    THE COURT: We need her served on the rule to show cause.

10   We could re-issue the rule.

11   MR. BLACKER: I spoke with liaison.  They need a place to

12   go look for her and I am going to go up to the 6th floor in a

13   few minutes as soon as we catch a break and I am going to tell

14   them there is no place, you have to put her out on the all

15   points and see if you could raise her.  That is all we could

16   do.

17   THE COURT: First, she needs to be served with the rule

18   before we could issue a warrant for her arrest, Cathy.

19   THE CLERK: It is up to you.  You could issue a writ of

20   bodily attachment.

21   MR. BLACKER: That is what I want, Judge.

22   THE COURT: Even though she has never been served?

23   THE CLERK: You could do it.

24   MR. BLACKER: I am going to suggest that because they

25   interfere with my process server, they -- he was out there 29

31

1    times and they misled him.  And the first 28 they stated she

2    lives here and then they said that she is not here and then

3    maybe under your powers to get this witness here --

4        THE COURT: So we will issue a writ of bodily attachment.

5    We will issue one. We will issue one on Natalia Bayo.

6        THE CLERK: How much bond did you want? No bond or --

7        THE COURT: I want no bond.

8        MR. BLACKER: Okay.  On her behalf I would say if she is

9    arrested on a Friday I would ask for $150,000 bond so not to

10   keep her on the weekend, but no bond.

11       THE COURT: The trial will be over by Friday?

12       MR. BLACKER:  I hope so.

13       THE COURT: Are you ready to see that tape? Let's go.  Can

14   we take him?  Do we cuff him in the back?

15       (Thereupon, court stood in brief recess.)

16       MR. BLACKER: Judge, I viewed the video with the Court and

17   counsel and the defendant.  I am going to object to the video

18   at the hotel for one reason.  There are videos at the hotel.

19   It is six panels that are at the right time that the jury could

20   view. This is a grotesque enactment of just a few frames that

21   the state has of their own to make it look different than the

22   actuality. It is an enactment of the real facts. Yes.  Those

23   photographs exist, but they exist in context with the others.

24   In none of the others can you see the weapon and the state

25   plays theirs and I am going to play mine and it is just

32

1    improper, Judge.

2        THE COURT: Okay. The question is not that that is the

3    issue. The question is are you ready to go to trial after

4    having seen -- what is that, a CD or --

5        MRS. CORONA: It is a DVD.

6        THE COURT: Are you ready to go to trial?

7        MR. BLACKER: Could I object to one more thing?  The

8    bullet. The bullet enactment.  Because I don't know, I got a

9    report from Infonte saying that he looked at the car saying --

10   now, if he is going to claim that that is a bullet hole, that

11   is an area of expertise and I filed a 701 motion on that.  It

12   is clear that it is in violation of the Rule 701 and 702. If he

13   is going to say that he is coming in here as an expert, I never

14   got expert notice.  I got no reports as an expert.  The test

15   and the results, it is the subject of expertise to have a

16   bullet hole in car.

17       THE COURT: Is he coming in as some sort of ballistic

18   expert or a crime scene officer?

19       MRS. CORONA:  The crime scene officer in the course of his

20   duties he could say what he believes it to be in his training

21   and experience.  It is a jury determination at the end whether

22   they think it is a bullet hole or not.

23       THE COURT: He is not saying that he is some sort of

24   expert, he is a crime scene and he found a hole in a car and it

25   is up to you to cross examine him the way that you want. But

1  again, are you ready to go to trial?

2      MR. BLACKER: Could I?  I have to speak with the client.

3      THE COURT: We have the panel outside.

4      MR. BLACKER: I hear you. Quickly, Judge.  I do not have a

5  deposition of Infonte.  I would like to know if there is one

6  that the state has or his report was tendered before I came

7  into the case in 7/28/03.  The clerk will tell you when I came

8  in.  And I must tell you, Judge, I didn't depose this patrolman

9  and I am going to take the blame for it, but I didn't do it and

10  I don't know why. I actually can tell you that I probably saw

11  this report.

12      THE COURT: Anyway, are we ready to go here?  I have a

13  panel outside.  I want to bring them in and I want to pick a

14  jury.

15      MR. BLACKER:  Judge, let me re-visit my situation. It

16  becomes very important now -- I am arguing to the Court that

17  any opinion or inference that he could draw from this bullet

18  requires special knowledge, skill, and experience and that is

19  the gist of my objection, that he has not been listed.  I don't

20  recollect any witness in this whole case being listed as Mr.

21  Infonte. I take depositions from witness that are listed.  Now,

22  I might have missed a discovery, but I don't see it in there.

23  If there is one, I will stand corrected, but I believe not.  I

24  did have the report and I will tell the Court that I have it

25  and I have seen it, but there is Mr. Kafca's writing as I have

34

1    come to know that on this file.

2         MRS. CORONA:  Judge, on July 4th of 2004, category B

3    witnesses that are listed, Officer Green, Officer Infonte,

4    Officer Briggs and Officer Brodnack.

5         MR. BLACKER: If he is an expert, he is coming in as an

6    expert, obviously he is a category A witness.

7         THE COURT:  Is he coming in as an expert?

8         MRS. CORONA:  No, Judge.

9         THE COURT: What is he going to come in and say, that it is

10   a bullet hole?

11        MRS. CORONA:  Judge, he is going to say it is consistent

12   with what his experience is as a crime scene investigator.

13        MR. BLACKER: Let me take his deposition during the trial.

14        THE COURT: I have no problems with that.

15        MRS. CORONA:  Judge, I will bring him in if he wants to

16   take a deposition.

17        MR. BLACKER: Judge -- you will bring him?

18        THE COURT: Okay.  State, are you ready to go?  Are you

19   ready to go to trial?  You have seen the four minute DVD that

20   you wanted to see.

21        MR. BLACKER: Judge, if the Court will grant me a period

22   of time to depose this witness, I will order the transcript

23   immediately so that I can have an instantaneous transcript, we

24   are ready. I would like to know what he is going to say. It was

25   -- the audio was silent.  He is going to come and be a live

1  witness. I have no idea what this man is going to say. I will

2  announce ready. I know that the Court is anxious to get

3  moving.

4      THE COURT: You can talk to him and depose him or whatever

5  you want, but you are ready and Mr. Diaz, are you ready to go?

6      THE DEFENDANT: If my lawyer is ready I am ready.

7      THE COURT: Okay. You are ready? You saw the little video

8  there with your lawyer and the Court and since we didn't have

9  equipment here we all went and saw it in my chambers. Having

10 seen it are you ready to go?

11     THE DEFENDANT: Yes.

12     THE COURT: And any objections that we did something

13 outside of a public courtroom in that we went into my chambers

14 to look at it on the computer screen?

15     MR. BLACKER: No.

16     THE COURT: All right. And Mr. Diaz, you also are waiving

17 any objections to the Court having done something in chambers

18 in that we all just went over there off of the record and

19 looked at the video?

20     THE DEFENDANT: Yes.

21     THE COURT: All right. All right. Let's go. Let's have him

22 join his lawyer.

23     All right. Here is the motion in limine, Kathy. Let's go.

24     MR. BLACKER: Judge, could you tell me how the numbers

25 work?

1          THE COURT: It is a list. Look on the back.

2          MR. GROSS: Your Honor, could I bring up one quick

3     scheduling issue?

4          MR. BLACKER: He needs to go to the bathroom real quick.

5          THE COURT: Could you go in the jury room? Close the door,

6     please.

7          (Thereupon, court stood in brief recess.)

8          THE COURT: Ready to go? Okay.  Call Jimmy, please.

9          (Thereupon, the jurors entered the courtroom.)

10          THE COURT: All right. Thank you.  Kathy, please swear in

11     the panel.

12          (Thereupon, the jury panel was duly sworn.)

13          THE COURT: Okay. Everyone please have a seat. Good

14     morning, ladies and gentlemen. My name is Julio Jimenez.  I am

15     a Circuit Court Judge and I welcome you to my courtroom.  At

16     the outset let me apologize to all of you for the inconvenience

17     of taking you out of your lives and into ours here for jury

18     selection, but you as you may recall from your days in grammar

19     school and high school, jury service is one of the highest and

20     most important duties of American citizenship. Of course, the

21     highest form of service to one's country is to fight in a war

22     as we have our men and women fighting in Iraq and Afghanistan

23     and dying on a daily basis. I thank God that all of you are

24     here for jury duty rather than there fighting in a war.

25          The right to a trial by jury is the most important right

1    that we have as American citizens. It has been with us since

2    the inception of the republic over 200 years ago. It originated

3    in England about 450 years ago.  As you could see, it is alive

4    and well here.  You saw how many jurors we had upstairs and as

5    you sit here this morning you are not alone.  All over the

6    country your follow men and women are being questioned by

7    lawyers and judges because even though it is a cumbersome right

8    because it requires the participation of society, it is the

9    most, most important right that all of us have as American

10   citizens.

11        Now, all of you met my bailiff, Jimmy.  Jimmy is

12   responsible for the courtroom and for the jury.  Seated to my

13   right is Angie. She is the official court stenographer.  This

14   is a court of record and everything that is said is taken down

15   by her; our questions as well as your answers. And if you

16   wonder, it is some form of shorthand on that little machine and

17   miraculously it gets everything down that we say.

18        Seated in front of me is Kathy.  She is the official court

19   clerk and she is my favorite clerk and she has been out for

20   three weeks and I am glad to have her back.  I really, really

21   missed her.  I even had a little gift for her when she came

22   back, something I got for her in China.  My wife and I were

23   just in China. The official court clerk keeps the minutes of

24   the trial. She takes charge of all the exhibits and swears in

25   the witnesses and she takes care of all the court files and

38

1    paperwork.

2        This is the case of the State of Florida versus Pablo

3    Manuel Diaz. Mr. Diaz, if you would please stand up, sir, and

4    Mr. Blacker, if you would please introduce yourself.

5        MR. BLACKER: Yes, good morning, ladies and gentlemen.  My

6    name is Michael Blacker and this is Pablo Manuel Diaz and I

7    will be representing Mr. Diaz.

8        THE COURT: Thank you. Please have a seat, gentlemen.  And

9    if I could have the prosecutors please identify themselves.

10       MRS. CORONA:  Good morning.  My name Carolina Corona and

11   along with Robert Gross, we represent the People of the State

12   of Florida.

13       THE COURT: Thank you.  You may have a seat.  Now, does

14   anyone recognize the defendant or any of the lawyers, the

15   staff, or me?

16       MR. SARDINAS:  Sir, I do.

17       THE COURT: Hold on for one second.  That is Mr. Sardinas.

18       MR. SARDINAS: Yes, sir. Mr. Cardona used to work for me,

19   the bailiff.

20       THE COURT: Jimmy?

21       MR. SARDINAS: Yeah.

22       THE COURT: All right. And in what capacity?

23       MR. SARDINAS: He was a security guard when I was at

24   General Hospital for a number of years.

25       THE COURT: All right.  And would that effect you in any

39

1    way as a juror in this case?

2         MR. SARDINAS:  No, sir.

3         THE COURT: You understand that you could not talk to Jimmy

4    about the case or the facts of the case?

5         MR. SARDINAS: Yes, sir.

6         THE COURT: All right.  Thank you. Anyone else? Anyone else

7    that recognizes anyone in here?

8         And seated back here is Maria Maldard (phonetic). She is a

9    college student and she is interested in becoming a lawyer, so

10   I told her to come see some trials.  She is doing a summer

11   internship with me.

12        Now, at this time I am going to ask one of the prosecutors

13   to please call the names of possible witnesses, please listen

14   closely and see if you recognize the names of any of those

15   witness.

16        MRS. CORONA:  Kathy Ruiz. Ulysses Lopez. Dennis Florez.

17   Jose Louise Igarde (phonetic). Thomas Roberts. Lizbia Moralez

18   (phonetic). Joanna Rodriguez. Antonio Bladazon (phonetic).

19   Illucio Igude (phonetic). Frank Acosta.  Olga Diaz.  Max

20   Santos. Olsa Bayo. Jessica Rodriguez.  Officer Vega with the

21   City of Miami. Detective Estopinan with the City of Miami.

22   Hector Infonte.  Officer Brodnack.  Officer Davis. Detective

23   Maylene Mourin. Officer LaDuke. Detective Shalaci (phonetic).

24   Officer Velazquez. Officer Medias. Officer Balladares. Officer

25   Cogin. Officer Ruiz.  Officer Serano. Officer Yen.  And Adrian

1    Nunez from the Metro-Dade Crime Lab.

2        THE COURT: Okay. Does anyone here recognize the names of

3    any of those witnesses? Let the record reflect that there is no

4    response. And notice that I said "possible witnesses".  Mrs.

5    Corona read off a long list of witnesses. I doubt that half of

6    them will come in here and testify, but you are just being

7    asked to see if you recognize any of those witness, okay.

8        Now, are all of you U.S. citizens?

9        PROSPECTIVE JURY: Yes.

10       THE COURT: Is there anyone here who has a language problem

11   and would have trouble following along with this case in

12   English? Anyone doesn't speak English? Okay.  All right. Let me

13   see back there. That is Mrs. Martinez.

14       MRS. MARTINEZ: Yes.

15       THE COURT: Where are you from?

16       MRS. MARTINEZ: Cuba.

17       THE COURT: And how long have you lived in the United

18   States?

19       MRS. MARTINEZ: Twenty-five years.

20       THE COURT: What type of work do you do?

21       MRS. MARTINEZ: Huh?

22       THE COURT: What type of work do you do?

23       MRS. MARTINEZ: Speak in Spanish.

24       THE COURT: What type of work do you do?

25       MRS. MARTINEZ: Cashier.

41

1          THE COURT: Okay.  Where?

2          MRS. MARTINEZ: In Sadanos supermarket.

3          THE COURT: Okay. Okay. Who else? Mr. Perez, did you have

4     your hand up?  Where are you from?

5          MR. PEREZ: Cuba.

6          THE COURT: How many years have you lived in the United

7     States?

8          MR. PEREZ: Fourteen.

9          THE COURT: Fourteen. What type of work do you do?

10         MR. PEREZ: Mechanic.

11         THE COURT: Okay. Who else? Who else had their hand up back

12    there?  Rene Fuentes.

13         MR. FUENTES: Uh-huh.

14         THE COURT: Where are you from?

15         MR. FUENTES: Cuba.

16         THE COURT: How long have you lived in the United States?

17         MR. FUENTES: Thirteen years.

18         THE COURT: Thirteen? What type of work do you do?

19         MR. FUENTES: Drawing, you know.

20         THE COURT: Drawing, like a draftsman?

21         MR. FUENTES: Yeah.

22         THE COURT: Your English is not good?

23         MR. FUENTES:  Yes.

24         THE COURT: Anyone else? That is Anna Cruz.

25         MRS. CRUZ:  Yeah.

42

1   THE COURT: Where are you from?

2   MRS. CRUZ: Cuba.

3   THE COURT: How long have you lived in the United States?

4   MRS. CRUZ: Five years.

5   THE COURT: What type of work do you do?

6   MRS. CRUZ: I am a case manager.

7   THE COURT: Where?

8   MRS. CRUZ: At Miami Behavioral.

9   THE COURT: Okay. And is most of your work in Spanish or

10 what?

11   MRS. CRUZ: Yeah.  I speak English, but you know, not

12 sound very good.

13   THE COURT: Okay.  But do you think that you could be a

14 juror or not?

15   MRS. CRUZ: I think that my English is not too good.

16   THE COURT: Not good enough? Okay. Anyone else?  Please

17 contact the jury pool and find out why they sent four jurors

18 who don't speak English.  That is 10 percent. Now, is there

19 anyone here who has any moral, religious, or ethical impediment

20 to sitting in judgement and deciding the guilt or innocence of

21 another human being? Okay.

22   Let the record reflect that there is no response.

23   This case, state, you think might be over by Wednesday or

24 Thursday at the latest?

25   MRS. CORONA:  Yes, Judge.

43

1        THE COURT: Okay.  Knowing that this is such a short trial

2    and knowing that it is your civic duty to serve on these cases,

3    is there anyone here who has any compelling reason such as

4    surgery scheduled for tomorrow or Wednesday or a plane ticket

5    to London tonight or something of that magnitude where you

6    could not serve and give us your undivided attention to this

7    case? Anyone? All right.

8        Let the record reflect that there is no response.

9        This part of a trial, ladies and gentlemen, is the part

10   that you don't see on TV.  It happens in every case.  To select

11   a jury we always go through this question and answer period and

12   I don't see it because it can be boring. That is all we are

13   going to do today.  All we are going to do is select a jury.

14   We are going to take lunch between one and two and resume in

15   the afternoon. All the questioning is going to be done

16   professionally and courteously. No one is going to be given the

17   third degree. No one is going to be put on the spot. And I want

18   all of you to relax and let's try to make the best of what we

19   have to do here.

20       This part of the process is called voir dire. Voir dire is

21   a French phrase and it is used in jury selection and it means

22   to speak the truth.  The whole purpose of voir dire is for us

23   to ask you questions and determine if you are the proper jurors

24   for this case or if you are pre-disposed in favor of one side

25   or another. In order to be fair and impartial you could not be

44

1    pre-disposed.  If you feel that you are from the get go on the

2    side of the state, obviously you cannot be fair and impartial.

3    Notice, the first thing that we did was place all of you under

4    oath. The whole integrity of the jury system depends upon

5    jurors being honest with us about their answers here in court

6    and in their questionnaires.

7         I always like to tell jurors something that occurred here

8    in Miami to highlight the importance of honesty. We had a

9    columnist from the Miami Herald that was called for jury duty

10   and like you she had to answer a questionnaire and there was a

11   question number 14, which is, "have you or a close friend or

12   family member ever been arrested or accused of a crime. She

13   wrote "no." And she actually got to serve on a jury. Actually

14   afterwards it came to the attention of the Court that her

15   father had been convicted in federal court and served five

16   years in prison. Not only that, she had testified as a defense

17   witness for the father, so she was intimately familiar with the

18   facts. The lady was in a very difficult position and was held

19   in contempt of court and she appeared for a sentencing.  She

20   was lucky enough to not go to jail. Instead, the Judge let her

21   off with a $5,000 fine which she had to pay on the spot and

22   placed her on 18 months of probation and the Judge required

23   that she go around talking to high school students about the

24   importance of being honest in jury selection. And it appears to

25   me that all of you are a very responsible group of citizens

45

1    here today and I am sure that we are not going to have any

2    problems.  I just tell that story to again emphasize the

3    importance of honesty.

4         Knowing that, how many of you have had jury service

5    before? All right. So the majority of you have never been

6    called to jury service so you are not familiar with this forum

7    and I know that some of you have filled out this form and you

8    are being rushed and you are trying to see what is happening.

9    So what I try to do is I always give jurors the opportunity to

10   come in and speak to us privately regarding any topic

11   whatsoever. It could be regarding prior jury service. It could

12   be maybe someone has been the victim of an awful crime like a

13   rape and you don't want to share that with 40 strangers, you

14   want to come in privately, or a daughter was raped or something

15   like that.  You need to share that with us, but you don't need

16   to do it publically. And that at the end of our, all my

17   questioning and the questioning of the lawyers we are going to

18   have to have the group wait outside and we are going to bring

19   in the individual jurors.  It will be in front of the lawyers,

20   the defendant, my staff, and me, and you come in and you tell

21   us privately whatever it is that you need to discuss with us.

22        At this point, is there anyone that wants to be on my list

23   to come in privately and speak to us regarding any topic

24   whatsoever? Okay. I see some hands.  Okay. Mrs. Trejo, two.

25   And Perez, number three. Chiples, number six. Monterroso,

46

1    number 19. Mrs. Galvez, number 21.  Paredes, number 22. Miller,

2    number 23. And Mayorga, number 15. Blondie Whiting, number 30.

3    And Sokol, number 27.  And number 39, Batey. Mr. Jensen, number

4    33.  And Mr. Fuentes.  You don't need to answer any more

5    questions. There was another hand over there. That is Demburg,

6    number 17. All right.  And those will go rather quickly once we

7    do them.

8        Now, let me talk to you about witnesses.  This is the

9    witness stand. Any one can come in here and swear to tell the

10   truth and can be a witness. There is no requirement that there

11   be two witnesses for anything. I have heard a couple of jurors

12   say that the Bible requires two eye witnesses.  Well, the law

13   does not.  If that were the case we could not prosecute

14   one-on-one crimes. So there is no requirement that there be two

15   witnesses for anything. There is no limit as to the number of

16   witnesses. A case could consists of one witness, 10, a hundred,

17   a thousand; there is no limit.  And, in fact, last year I had a

18   case with one witness and the witness testified and was cross

19   examined and the lawyers argued the case and I gave the jury

20   the case and they decided the case. A witness, like I said,

21   could be anyone that could tell the truth.  It could be a child

22   as long as the child understands the importance of telling the

23   truth. It could be a senior citizen; a male or a female.  A

24   member of any race.  A member of any occupation. No one gets

25   any greater credibility by virtue of what they do.  So-called

47

1    people of God like a priest, a rabbi, a minister, a deacon, a

2    nun, a consecrated woman, no one gets any greater credibility

3    by virtue of what they do.  Everyone comes in here on an equal

4    footing.  No one gets any less credibility by virtue of their

5    status.

6         So, for example, a prostitute does not get any less

7    credibility just because she is a prostitute. If she comes in

8    here she will testify and at the end of the case you will

9    determine what credibility you want to give her testimony.  You

10   can take into account that the lady is a prostitute, of course,

11   but it is up to you to determine her credibility. Likewise, a

12   convicted felon, just because someone is a convicted felon does

13   not mean that they could not tell the truth.  So if a convicted

14   felon comes in here and testifies, at the end of the case you

15   are going to consider his or her testimony just like you would

16   that of any other witness and you can take into account the

17   fact that the person is a convicted felon. Yes, of course.  But

18   that doesn't mean that the person is a convicted felon and

19   can't tell the truth. It is up to you on an individual basis to

20   determine the credibility of each witness.

21        Does everybody understand?

22        PROSPECTIVE JURY: Yes.

23        THE COURT:  All right.  Now, often times in criminal cases

24   witnesses are police officers. Would you all agree with me that

25   police officers are regular human beings like the rest of us?

48

1   Yes.

2       PROSPECTIVE JURY: Yes.

3       THE COURT:  And anyone here who has a relative who has had

4   a police officer? Okay.  I see some hands.  And all of you that

5   have relatives that are police officers, you know, that they

6   are just like the rest of us. They could be right and they

7   could be wrong, right? Yes? Everybody agree?

8       PROSPECTIVE JURY: Yes.

9       THE COURT: They could tell the truth, they could lie, like

10  anybody else? Yes.

11      PROSPECTIVE JURY: Yes.

12      THE COURT: Okay. All right.  So let me ask.  Anyone here

13  who has had a bad experience with a police officer? That is

14  usually a question that a lot of people raise their hands and

15  that is one of those questions that calls for honesty and needs

16  to be addressed.  Any of you have had a bad experience with a

17  police officer please raise your hand. Okay.  I see -- let me

18  just go in order.  I see here Mr. Caldwell, you had a bad

19  experience with a police officer.

20      MR. CALDWELL: A minor like -- I just -- it came off

21  negative.

22      THE COURT: What type of situation was it?

23      MR. CALDWELL:  I was just with a friend and we got pulled

24  over and he automatically was just disrespectful, but I mean

25  everything was settled finally after that.

49

1    MR. CALDWELL: Okay.

2    THE COURT: Would that experience with that particular

3    police officer effect you as a juror in this case?

4    MR. CALDWELL:  No, sir.

5    THE COURT: And we had a hand back there.  That is Mrs.

6    Whiting.  You had a bad experience with a police officer.  Can

7    you share that with us?  You want to do that privately? All

8    right. We will do that privately.

9    Anyone else that has had a bad experience with a police

10   officers?  This is the time to tell us.  Yes.  If you are going

11   to say something you have to say it out loud; yes or no or any

12   answer.  Now, I find it difficult with 40 people that there

13   aren't more people that have had a bad experiences with a

14   police officer.  If anyone can think of one, please, this is

15   the time to let us know, all right.

16   Now, let me talk to you a little bit about evidence.  The

17   bulk of the evidence in any case is testimonial evidence.  It

18   is words.  People sit here and then they testify, they are

19   cross examined.  That is evidence. That is most evidence in any

20   criminal case.  In some cases that is the only evidence. All

21   you do is you have people come in here and testify and that is

22   all the evidence. Another form of evidence is physical

23   evidence. Physical evidence is anything that is introduced by

24   way of exhibits such as a pen, a piece of paper, a stapler, a

25   gun, a rifle, a knife, a piece of wood, a piece of carpeting,

1    hair, videotape, DNA, fingerprints, anything physical in

2    nature.  That is introduced as state's exhibit 1 for

3    identification and when it is accepted by me and marked as

4    state's exhibit one, that becomes evidence.  There is no

5    requirement that there be physical evidence in any case. In

6    some cases there is physical evidence and in other cases there

7    is no physical evidence.  And for the record, Mr. Lemour is

8    asleep. That is number five, Mr. Lemour.  Mr. Lemour, Mr.

9    Lemour, I understand that, my bailiff tells me that your

10   English is not good.  You speak English?

11        MR. LEMOUR: Yes.

12        THE COURT: Where are you from?

13        MR. LEMOUR: Haiti.

14        THE COURT: How long have you lived in the United States?

15        MR. LEMOUR: Sixteen years.

16        THE COURT: Sixteen. You understand 100 percent English?

17        MR. LEMOUR: Yeah.

18        THE COURT: One hundred percent?

19        MR. LEMOUR: Yeah.

20        THE COURT: But you were asleep as I was talking.

21        MR. LEMOUR: Yes.

22        THE COURT: All right.  Now, I was talking about physical

23   evidence.  Some cases lend themselves to physical evidence and

24   some do not. For example, if you have a woman walking in

25   Tropical Park and someone passes by and swipes her purse and

51

1  runs away and the purse is never found, that case does not lend

2  itself to the collection of physical evidence. There are other

3  cases where there is physical evidence. Sometimes it is

4  collected, other time it's not. It could be as a matter of

5  strategy, the police officer didn't think that it was

6  necessary. Other times they over-looked it. It is on a case

7  by case basis. At the end of the case you are going to consider

8  all the evidence, whether it is physical or testimonial and

9  determine the facts in the case.

10  Another form of evidence is circumstantial evidence.

11  Circumstantial evidence is proof of a set of circumstances

12  which tends to prove a fact. For example, at one o'clock when

13  we go to lunch you decide that you want to get some fresh air

14  and you go look outside and you see that it is bright and

15  sunny, beautiful day. But when you look out you notice there

16  is water on the ground and water on the cars. That water that

17  you see is circumstantial evidence that it rained. You didn't

18  see it rain. It is bright and sunny, but you know that it

19  rained. That is a form of circumstantial evidence. But whether

20  it is testimonial, which is most of the evidence in any case,

21  physical evidence, or circumstantial evidence, it's all

22  different forms of evidence. It is like ice cream. Whether it

23  is vanilla, chocolate, or strawberry it is all evidence.

24  Lately, we have all of these CSI shows, crime scene

25  investigation shows and themes and sometimes people come to

52

1    court and they think that it's going to be like CSI.  And I

2    want to remind everybody that CIS is make believe.  Real life

3    is not what you see on those shows. For example, you see the

4    Law and Order show.  They do a lot -- Judges do a lot of things

5    in chambers.  They decide motions in chambers.  Well, in

6    criminal court that doesn't happen because everything -- there

7    is a constitutional requirement that everything be done in a

8    public courtroom. A Judge does not decide motions in chambers.

9    Everything is done out in public.  If you serve, if you are

10   selected for the jury you cannot go into that jury room and

11   draw any expertise from anything that you saw on TV.  You can't

12   say, well, wait a minute, I saw it on CSI, that is make

13   believe. They told me that there was an episode that a corpse

14   was found floating on a lake and they were able to photograph

15   the pupil and get a picture of the person, of the last person

16   that the corpse saw alive. We don't have any of that, any of

17   that evidence.

18       Testimony is going to be presented by way of a life

19   witness who will come in here and be qualified about his or her

20   qualifications and will be allowed to render an opinion.  An

21   expert is like any other witness.  You may believe or

22   disbelieve any part of the testimony.

23       Now, let me ask, is there anyone here who has any physical

24   impediment to sitting here, whether it be a sight problem or a

25   hearing problem that would make it difficult for you to be a

53

1    juror? Anyone? Okay. Mrs. Chuckler.

2         MRS. CHUCKLER: Yeah.  I do have a hearing problem and I do

3    have a lot letter in the room and it is very hard to hear.

4         THE COURT: Have you been able to hear everything that was

5    said?

6         MRS. CHUCKLER: There was some things that I did not hear.

7         THE COURT: What type of work do you do?

8         MRS. CHUCKLER: I am an office manager.

9         THE COURT: Let me ask you, if you were selected for this

10   jury at any point that you do not hear something could you

11   raise your hand?

12        MRS. CHUCKLER:   I could.

13        THE COURT: You think that you could resolve the problem?

14        MRS. CHUCKLER: That would be fine.

15        THE COURT: Now, I am at the point that I am going to read

16   to you the information. The information is a document that is

17   filed by the state informing the defendant of the official

18   charges against him. The information is not evidence and you

19   are not to be influenced in any way by the fact that it was

20   filed. It is just a piece of paper that says what they are

21   accusing him of. Prior to the filing of an information the only

22   thing that has happened is that the defendant has been

23   arrested. The fact that someone has been arrested means

24   absolutely nothing in our criminal justice system. If it did,

25   we wouldn't need jurors, we wouldn't need Judges.  Police would

54

1    arrest them and try them and that would be the end of it, but

2    that is not the way that it works. Someone is arrested and then

3    they come to trial.  But here today when we start the trial the

4    defendant starts from ground zero. The state has to build a

5    case against him. Before reading you the information, though, I

6    want to make sure that I preface it with some remarks.

7         In order to be a juror you don't have to be in favor of

8    crime. Whatever the charges are that are read you are not going

9    to like them. These are criminal charges. It's okay not to like

10   whatever the defendant is charged with. He is charged with

11   crimes. Every defendant that goes to trial in a criminal case

12   is charged with crimes and the jurors are not going to like the

13   crimes that he is charged with. The question is whether you

14   could be fair and impartial. That is the only thing that we

15   want to know.  If someone -- let me give you an idea. If

16   someone were charged with trafficking in heroin, you don't have

17   to be in favor of legalizing heroin to be a juror in that type

18   of case. If that were the case we could never pick a jury for a

19   heroin trafficking case. Heroin is bad.  It kills people. The

20   only question in a heroin trafficking case is whether you could

21   be fair and impartial or is there something in your background

22   or your recent history that would prevent you from being fair

23   and impartial.  For example, in a trafficking in heroin case,

24   if God forbid you had a son pass away from a heroin overdose a

25   year ago, obviously you cannot be fair and impartial in that

55

1    type of case. But just the fact that you don't like heroin, I

2    don't like heroin, no one likes heroin. It is against the law.

3    Same thing in murder cases. In order to be a juror in a first

4    degree murder case you don't have to be in favor of murder.

5    Murder is bad. The question is can you sit there and be fair

6    and impartial and listen to the facts and decide if the state

7    has proven its case or not.

8         Does everyone understand?

9         PROSPECTIVE JURY: Yes.

10    THE COURT: Yes. Okay. Now, let me read you the

11    information in this case. The State of Florida versus Pablo

12    Diaz. This is in the Circuit Court of the 11th Judicial Circuit

13    in and for Miami, Dade County, Florida, spring term, 2003,

14    State of Florida versus Pablo Manuel Diaz, defendant, in the

15    name and by the authority of the State of Florida, Katherine

16    Fernandez-Rundle, the state attorney for the 11th judicial

17    circuit, prosecuting for the State of Florida in the county of

18    Miami Dade, under oath information makes that Count One, Pablo

19    Manuel Diaz on or about June 8th of 2003 in the county and

20    state aforesaid did unlawfully and feloniously perpetrate or

21    attempt to perpetrate a felony, to wit: Kidnapping, and did

22    commit, aid or abet an intentional act that was not an

23    essential element of the felony and that could have but did not

24    cause the death of another, to wit: Katherine Joe Ruiz by

25    shooting at Mrs. Ruiz and during the commission of the offense

1 said defendant possessed a firearm or destructive device in

2 violation of Florida statute.

3   Count two, in the aforesaid assistant state attorney under

4 oath further information makes that Pablo Manuel Diaz on or

5 about June 8th of 2003 in the county and state aforesaid

6 without lawful authority did then and there forcibly, secretly

7 or by threat confine, abduct or imprison another person, to

8 wit:  Katherine Joe Ruiz against that person's will with the

9 intent to inflict bodily harm upon or to terrorize the victim

10 or any other person and during the commission of the offense

11 said defendant possessed a firearm or a destructive device and

12 during the commission of the offense said defendant discharged

13 a firearm or destructive device, in violation of Florida

14 statute.

15   In Count three, in the aforesaid assistant state attorney

16 under oath further information makes that Pablo Manuel Diaz on

17 or about June 8, 2003, in the county and state aforesaid did

18 unlawfully, feloniously and intentionally threatened by word or

19 act to do violence to the person of another, to wit:  Dennis

20 Florez, coupled with an apparent ability to do so and did some

21 act, to wit: Point a firearm at Katherine Ruiz which created a

22 well-founded fear in such other person that such violence was

23 imminent and during the commission of the offense said

24 defendant possessed a firearm or destructive device.

25   Now, so the charges here are attempted felony murder,

57

1   kidnapping, and aggravated assault with a firearm.  Knowing

2   that it is your civic duty to serve on these cases and knowing

3   that this is such a short trial, is there anyone here who could

4   not be fair or impartial in this case with these charges? Okay.

5   Let the record reflect that there is no response.  Well, we

6   have one, Mrs. Whiting. You could not be fair and impartial?

7        MRS. WHITING: Uh-huh.

8        THE COURT: Okay. We may talk to you privately. Anyone

9   else?

10        MR. BLACKER: Judge, I didn't get that number.

11        THE COURT: Mrs. Whiting, number 30.

12        MR. BLACKER:  Thank you.

13        THE COURT: Now, at this time I want to go over some very

14   basic concepts of criminal law that apply to this case. These

15   are concepts of criminal law and constitutional law.  It's

16   important that you be able to follow these principles in order

17   to be a juror in this case. First and foremost, there is a

18   presumption of innocence.  The defendant in every criminal case

19   is presumed to be innocent until the state proves each element

20   of the charges against him. This presumption of innocence

21   remains with the defendant throughout the trial. The accused is

22   currently cloaked with a presumption of innocence and as he

23   sits here you must presume or believe him to be innocent. Can

24   all of you do that? Can everyone here presume him innocent?

25        PROSPECTIVE JURY: Yes.

58

1       THE COURT: Yes? Okay. Let's me see if you know what that

2   presumption of innocence means in real life. If you had to

3   decide this case right now, it won't happen, we are going to

4   have a trial, but if you had to decide this right now what

5   would your verdict be; guilty or not guilty?

6       MRS. TORRES: At this point, not guilty.

7       THE COURT: Did you say not guilty?

8       MRS. TORRES: Yes.

9       THE COURT: And Mrs. Torres is correct. That is exactly

10   what the presumption of innocence means. If you had to decide

11   this case right now, since he is presumed innocent you would

12   have to find him not guilty. Does everyone understand?

13       THE DEFENDANT: Yes.

14       PROSPECTIVE JURY: Yes.

15       THE COURT: Can all of you do that?

16       PROSPECTIVE JURY: Yes.

17       THE COURT: In order to overcome the defendant's

18   presumption of innocence these two prosecutors have the same

19   burden that prosecutors have all over the country. They have

20   the burden of proving him guilty beyond a reasonable doubt.

21   Notice that I said that they have the burden of proving him

22   guilty beyond a reasonable doubt, not beyond all doubt, not

23   beyond a shadow of a doubt.  Those are terms that you hear on

24   TV. In real courts in the United States they have to prove him

25   guilty beyond a reasonable doubt. Does everybody understand?

59

1    Yes? Okay.

2         So what is a reasonable doubt?  Leave it to lawyer to

3    define it in the law. Wait until you hear this. A reasonable

4    doubt is not a mere possible doubt, a speculative, imaginary or

5    forced doubt. Such a doubt must not influence you to return a

6    verdict of not guilty if you have an abiding conviction of

7    guilt. On the other hand, if after carefully considering,

8    comparing, and weighing all the evidence there is not an

9    abiding conviction of guilt or if having a conviction it is one

10   which is not stable or one which waivers and vacillates then

11   the charge is not proved beyond every reasonable doubt and you

12   must find the defendant not guilty because the doubt is

13   reasonable. So what does the state have to prove beyond a

14   reasonable doubt? What they have to prove beyond a reasonable

15   doubt are the elements of the crimes I read to you, those three

16   crimes. Well, at the end of the case I am going to tell you

17   what the elements of those crimes are. And the state needs to

18   have proved them, otherwise the defendant's presumption of

19   innocence sticks and you must find him not guilty.

20        The elements of a crime are like the -- the way I like to

21   explain it is it is like the ingredients to a cake. Let's say

22   we had a standard formula for a chocolate cake. It would

23   include chocolate.  What else?  Flour, backing powder, sugar,

24   eggs, if that is all that a cake needs.  Let's say that we have

25   five elements to make a chocolate cake. Those are the five

60

1    elements. The state would have to prove each one of those

2    elements to you beyond a reasonable doubt. So if the charge was

3    a chocolate cake and the state failed to prove sugar, then they

4    haven't proven to you a chocolate cake. So those are the

5    elements like the ingredients to a recipe, the ingredients to a

6    crime. State has to prove those ingredients beyond a reasonable

7    doubt.

8        Does everybody understand?

9        PROSPECTIVE JURY: Yes.

10       THE COURT: Now, in the chocolate cake example, let's say

11    it was a chocolate cake, Boston cream cake with custard in the

12    middle. Well, it is still a chocolate cake that they need to

13    prove.  The custard, no.  Just that it is a chocolate cake.

14    What if it is a German chocolate cake.  No. You only have to

15    prove a chocolate cake. They only have to prove the elements of

16    a crime.  Non-elements they don't have to prove.

17       So we have learned that the defendant is presumed innocent

18    and the state has to prove him guilty of a crime. Does the

19    defendant have a burden to prove anything?  The answer to that,

20    ladies and gentlemen, is that he does not.  In America an

21    accused has no burden whatsoever.  In the Old Soviet Union or

22    Cuba or Zimbabwe where you have to come forward and defend

23    yourself in front of some sort of tribunal.  Here in the United

24    States an accused has no burden whatsoever. The lawyers and the

25    accused could sit here and read the paper.  Of course, it won't

61

1    happen. Mr. Blacker is not going to do that.  He is a fine

2    lawyer, but he has no burden of proof.  His client has no

3    burden of proof. They don't need to present witnesses.  They

4    don't need to present any evidence, and the defendant doesn't

5    have to testify.  These are rights that do not only belong to

6    Mr. Diaz, they belong to each one of us as American citizens.

7    We all have those same rights.  The state has the burden of

8    proving their case.  The defense has no burden whatsoever. The

9    defendant doesn't have to testify.  He has a constitutional

10   right to remain silent. And to let you in on a little secret,

11   usually in criminal cases you do not hear from the defendant.

12   Why would you if they are presumed innocent and they have a

13   constitutional right to remain silent?

14        It's like in baseball.  I am a baseball fan.  You know, it

15   is four balls, three strikes. If you are playing a weaker team

16   you don't say, hey, let's increase it.  Let's make it four

17   strikes. No.  Those are the rules. Well, the rules are that he

18   is presumed innocent.  So usually you will not hear from the

19   defendant and if you don't hear from the defendant you cannot

20   speculate as to what he would have said. You can't go into the

21   jury room and say, well, wait a minute, why didn't the guy

22   testify? Why? Because he has a constitutional right to remain

23   silent.  The state has the burden of proving him guilty beyond

24   a reasonable doubt.  How many of you have been on criminal

25   juries? Okay.  Two or three people. And those who were, let's

62

1   see, Mr. Shoup, Mrs. Castillo, and Mr. Chiples. Anyone else?

2   And on a civil jury? Civil? Okay.  We have a couple of people.

3   We have Mr. Jensen and Mrs. Batey.

4       In civil court the burden of proof is a lot different.  It

5   is simply a preponderance or the greater weight of the

6   evidence.  So in civil court the scales of justice simply have

7   to tip in favor of one side and that side wins, whereas here in

8   criminal court it is beyond a reasonable doubt. Why is the

9   standard of proof here that much higher? Well, the reason is

10  that in civil court you are suing for money.  The loosing party

11  has to pay.  It is a pay up and it is a matter of dollars and

12  cents.  Whereas here in criminal court we are talking about

13  someone's liberty.  That is why the burden of proof is a lot

14  higher.

15      As I said, this is the witness stand. When witnesses come

16  in here to testify there are some ground rules.  Let me tell

17  you what those are. First, the jurors cannot ask them any

18  questions. You are not allowed to ask question. You are not

19  allowed to make any comments regarding the testimony.  You

20  can't turn to the person next you to and say, hey, get a load

21  of him. You can't do that.  No responses.  You can't say

22  anything. Here in court or during the break or when we are in

23  recess, you cannot say anything about the testimony. The thing

24  is if you say something, you haven't heard all the facts and

25  you could influence the other person.  So it is important that

63

1   you not say anything regarding the testimony or the evidence

2   that you see in court.  Some of the things that the jurors may

3   properly consider about a witness is the demeanor of the

4   witness. How the witness acted on the stand. Do they appear to

5   be telling the truth. Their frankness. Their intelligence.

6   Their interest in the outcome of the case. Do they have a stake

7   here in the proceeding. Do they have something to gain or loose

8   as a result of their testimony.  Their means and opportunity to

9   know the facts about which they testify.  Were they eye

10  witnesses.  Did they see it.  Did they hear it. Their ability

11  to remember matters.  Do they have a good memory or faulty

12  memory.  Is there a reason or is it just a passage of time.

13  Are we talking about minor points.  Those are things for jurors

14  to consider. Whether the witness ever made an inconsistent

15  statement. Did the witness at some other time say something

16  different than what he or she said in court and there is some

17  significance to it, or is it a minor point.  And finally the

18  reasonableness of all the testimony in light of all the

19  evidence. Don't consider any one piece of evidence in a vacuum.

20  Consider everything together as a whole. At the end, I am going

21  to ask those of you who are selected when you go in there to

22  deliberate to use your common sense.  When evaluating the

23  evidence you must use your common sense, the same common sense

24  that you use in your daily activities.  In your jobs, in your

25  homes you make judgement calls all the time.  Well, we don't

64

1   expect you to come in here with a lobotomy.  You are regular

2   people out there and will use your common sense when you weigh

3   the evidence.  What you cannot consider is any bias or any

4   sympathy.  You cannot decide this case because you feel

5   sympathy for a victim or for the defendant. The question of

6   sentencing, that has nothing to do, that is of no concern to

7   the jury. The jurors cannot speculate on what would happen to

8   the defendant if the defendant is found guilty. You can't bring

9   that up. You can't say, well, hey, but wait a minute.  What is

10  going to happen to that guy if we find him guilty.  That is not

11  your concern.  You are supposed to decide the cold, hard facts.

12  That is, you decide is he guilty or not guilty; that is it.

13      At the end of the case when you reach a decision and you

14  advise us that you have a verdict, I am going to get security

15  to be here to receive your verdict.  Once we have enough

16  security in here we will bring you out. If you find the

17  defendant not guilty, I am going to thank you and you are going

18  to go home. If you find the defendant guilty, again, I am going

19  to thank you and you are going to go home. Again, your job is

20  done.  It's finished.  You don't come back for sentencing.

21  It's all over. We thank you and you go home and then I do a

22  sentencing in a month or two where I hear from both sides prior

23  to sentencing.  You are not supposed to decide this case

24  because you like the lawyers on one side more than the lawyers

25  on the other side. You are going to decide it on the facts. If

65

1    you are selected for this jury at the end you are going to go

2    into the jury room in private to deliberate, to discuss the

3    case. What I suggest is that you keep an open mind until the

4    end of the case and go into the jury room with an open mind.

5    Discuss the case generally with your fellow jurors and any

6    differences of opinion you have to try to hash them out among

7    yourselves.  I cannot participate in your decision.  I cannot

8    go into the jury room. In fact, don't let anything that I say

9    or do in the trial make you think that I preferred one verdict

10   over another.  I have been doing this long enough to not get

11   involved. I leave it up to the jurors. All I do is preside over

12   the trial to make sure that it is a fair trial in accord with

13   the rules of evidence and trial procedure.  The decision is the

14   jury's, it is not mine. I don't even guess at it anymore. Every

15   now and then I hear of some jurors that go into the jury room

16   and don't want to participate.  They don't want to deliberate.

17   They don't want to discuss it. Well, I need to know right now

18   if there is anyone hear that is going to be guilty of some form

19   of adolescent behavior.  I want to know right now. If you just

20   can't do it, if you tell me, hey, look, I don't work good in

21   groups, I am not going to go in there or at the end I may go

22   into the jury room and begin to sing or something to that

23   effect, tell me now, okay.  This is a very serious case.  Both

24   for the defendant and for the state, and I do not want any

25   behavior like that. If there is anyone here that is not up to

66

1    the job, let us know now. Anyone? Okay. Let the record reflect

2    that there is no responses.

3         Now, as you hear the testimony we don't want you to arrive

4    at any fixed opinion. Listen to whatever is presented and see

5    whatever is whatever is presented. Do not arrive at a fixed

6    opinion. Wait until you have heard all the evidence and the

7    arguments of the lawyers and my instructions on the law before

8    you decide this case.  When you go home, you cannot discuss

9    this case with your loved-ones, your friends, your neighbors.

10   You can't even discuss the case amongst yourselves.  It is very

11   important that everybody follow these rules.  You can't talk to

12   each other, whether it is two or three or all of you, you

13   cannot discuss the case until the end of the case when I tell

14   you it is okay.

15        About 10 trials ago I had -- we selected a jury, sent them

16   home, and the next day they appeared and they hadn't heard any

17   of .the evidence, but one of the jurors told -- in fact, two of

18   the jurors told my bailiff that one of the jurors had discussed

19   the facts, and so I had to inquire and those two jurors came in

20   here and told me that one juror the next morning showed up and

21   said I know that the defendant is guilty.  And they said, how

22   can you say that?  We haven't heard any of the evidence.  She

23   said, because he looks guilty. Can you believe that?  And they

24   were so offended that they told the bailiff and I had to

25   inquire and we could not continue with that case because she

67

1    had not followed my orders.  My orders are that you are not to

2    discuss this case among yourselves or with anyone else until I

3    tell you that it is time to go into that jury room and

4    deliberate and arrive at an opinion, okay. And I caution you at

5    that time that we do not have a simultaneous transcript of

6    these proceedings.  So if you have a question regarding the

7    facts, I am going to tell you that you are to rely on your own

8    recollection regarding the facts. If you have a question

9    regarding the law, you are going to have all the jury

10   instructions, the law that pertains to this case in the jury

11   room with you.  So if you have a question regarding the law, I

12   am going to tell you that you have all the law that pertains to

13   this case in those instructions.

14       Will all of you follow the law that I tell you pertains to

15   this case? Yes.

16       PROSPECTIVE JURY: Yes.

17       THE COURT: Anyone here that has their own sense of justice

18   and is not going to follow the established law? Okay. Let the

19   record reflect that there is no response.

20       The attorneys are trained in the rules of trial procedure

21   and evidence and it is their duty to make all legal objections

22   that they feel are proper. When an objection is made, you must

23   not speculate as to why it was made and you must not speculate

24   as to what the witness would have said. Speaking of the

25   lawyers, what the lawyers say is not evidence. I will give you

68

1    an example. Let's say a witness is on the witness stand and the

2    witness is asked, Madam, isn't it true that the car was blue,

3    and the witness said, no, the car was gray. What is the

4    testimony?  What is the evidence? That the car was gray. Not

5    what the attorneys say. What the attorneys say is not evidence.

6    It is what comes from the witnesses or the witness stand, okay.

7    From time to time during the trial we are going to have a side

8    bar conference where we are going to go over here and discuss

9    matters of law outside of your presence. Please don't feel

10   offended.  Anything having to do with the law, I do side bar.

11   It is not done in front of the jury because the law is my

12   domain.  Just like at the end when you decide the facts, you

13   are going to do that in private, away from us.

14       Now, at this time the lawyers will have an opportunity to

15   question you until one at which time we will take our lunch

16   break. I would suggest to the lawyers that on a case like this

17   they take not more than a half an hour to an hour aside. If you

18   need more time, of course I need to allow you to have it.  Who

19   is going to do it for the state? Mrs. Corona.

20       MRS. CORONA: Good afternoon, ladies and gentlemen. Okay.

21   My name is Carolina Corona.  Like I said before, I represent

22   the People of State of Florida and my role in the courtroom

23   today is to present the evidence today and for the following

24   week to present the evidence and to prove the charges that the

25   Judge explained to you earlier.  Your role is going to be the

69

1   people that are chosen to make decisions that are going to

2   determine what facts are based on the evidence that is

3   presented and make a decision based on those facts. The Judge's

4   role is to obviously preside over the case.  And I know that

5   the Judge has spoken about this before, but is there any reason

6   knowing that potentially the defendant, this defendant that is

7   sitting here in court today, may go to jail as a result of your

8   decision, is that going to effect you in any way when you go

9   back into the jury room? Do you think -- Mrs. Torres.

10       MRS. TORRES: No, it's not.

11       THE COURT: Looking at the defendant in court, I want all

12   of you guys to look at the defendant in court here.  Is there

13   any reason that just by looking at him you think that you won't

14   be able to make a determination just because it is something

15   about the way that he looks.  Maybe he looks like someone that

16   you know.  Maybe he looks like -- you think that it is

17   impossible that he would have done something like this?  Does

18   anybody think that?  Mr. Garcia, did you have your hand up?

19       MR. GARCIA: No. No.

20       MRS. CORONA: Okay. No?  Okay.  How about knowing that the

21   defendant may have family members here or that the family may

22   come -- I don't know that they will be here but if I bring

23   family along, will that effect your decision in any way knowing

24   that this is somebody's son? Is that in any way going to effect

25   you, Mr. Caldwell?  You are shaking your head no. Mr. Lemour.

70

1      THE COURT: You guys can skip Mr. Lemour. He has been

2  asleep for most of the voir dire. I am not going to waste my

3  time.

4      MRS. CORONA: I am going to ask you a general question.

5  Honestly, this is the most important thing. I want you to

6  answer and we need to know the answer and we need to know the

7  truth about whether or not you are going to have any bias

8  coming into this. Mrs. Trejo.

9      MRS. TREJO: I have had had families in prison, so, you

10 know, I don't know.

11     MRS. CORONA: Okay. The fact that you have a family member

12 or somebody that was in prison, is that going to effect you

13 when you go back into the jury room and try to make a

14 determination as to the guilt or innocence of this person?

15     MRS. TREJO: No.

16     MRS. CORONA: Does anybody else agree with Mrs. Trejo that

17 maybe they have someone that went to prison, a family member

18 that they have had this experience before and as a result of

19 this experience they think when they go back into this jury

20 room they are going to say man, I know that he is guilty, but I

21 just can't imagine sending somebody to jail for a decision that

22 I made? Does anybody else feel that way? Mrs. Whiting. Okay.

23 Okay. Anybody else?

24     Now, the Judge said also my job is to present evidence and

25 the evidence comes in different forms and one of the forms is

71

1　testimonial evidence. What is testimonial evidence, Mr.

2　Chiples?

3　　　MR. CHIPLES: It is evidence from the witness list and the

4　evidence.

5　　　MRS. CORONA: The testimonial evidence is what the witness

6　says it is, what comes out of the witness' mouth and the

7　physical evidence is the whatever we present in the form of

8　physical evidence. And like the Judge said, this is not CSI.

9　The crime scene doesn't drive around in Hummers with nice

10　things, I guarantee you that is not what happened and a lot of

11　the technology that they have on CSI we don't have. And

12　potentially there will not be forensic evidence in this case.

13　The facts are that there won't be forensic evidence in the form

14　of DNA, fingerprints. There is not all the other things that

15　may exists sometimes. Is that going to effect your decision in

16　any way if the state -- let me ask it this way. Let me ask

17　you, Mrs. Chuckler, the state presents evidence in the form of

18　testimony and whatever we present and you think with the

19　evidence, that is enough. If it convinces you that this person

20　did it, will the fact that there is no fingerprints or DNA or

21　any of that other stuff that you know exists, is that going to

22　effect your decision where you say I know he did it, but I wish

23　there was DNA or fingerprints on this case and without that I

24　am not going to make a decision.

25　　　MRS. CHUCKLER: No.

72

1          MRS. CORONA: Does anybody feel that way?

2          MRS. GALVEZ: Yeah.

3          MRS. CORONA: That is Mrs. Galvez.  What is it?

4          MRS. GALVEZ: I have a case and as a person I like to have

5     more depending on physical evidence to make a decision.

6          THE COURT: But let me ask you, if there is no physical

7     evidence can you decide the case based on whatever evidence

8     there is?

9          THE COURT: There is no requirement in the law that there

10    be physical evidence.

11         MRS. GALVEZ: No requirement.

12         THE COURT: There is no requirement that there be physical

13    evidence. At the end of the case the lawyers may argue the

14    amount of physical evidence in the case or the lack of physical

15    evidence should cause you to have a reasonable doubt, but it is

16    up to you to decide, but there is no requirement that there be

17    physical evidence. Like I said, in some cases there is physical

18    evidence, other cases there is not, but whatever is presented

19    by the state at the end of the case you are going to have to

20    decide if the state has proven it's case or not.

21         Do you think that you could do that, Mrs. Galvez?

22         MRS. GALVEZ: Well, he said it is only that, but I would

23    think that wasn't it, no requirement without physical evidence,

24    I didn't know that.

25         THE COURT: Okay. But now knowing that it is not necessary

73

1   that it be physical evidence, it is on a case by case basis,

2   can you decide the case based on whatever evidence is

3   presented; yes or no?

4       MRS. GALVEZ:  I don't know what to say.

5       THE COURT: Okay.

6       MRS. CORONA: Does anybody else agree with Mrs. Galvez and

7   think that if there is no physical evidence they will not be

8   able to make a determination because there is no, I guess,

9   conclusive, scientific evidence?

10      MR. PEREZ: Why there is no fingerprints when he was using

11  a gun?  Why there is no fingerprints?  Didn't they find the

12  gun?

13      MRS. CORONA: I can't really answer those questions, but

14  there is a possibility that if there is no gun involved, if

15  there was no gun recovered, that is a reason there would be no

16  fingerprints or DNA evidence or because for some reason the

17  police thought that it wasn't necessary based on the facts and

18  circumstances.  Is that going to have an effect on you?

19      MR. PEREZ: No.

20      MRS. CORONA:  What about the fact that there potentially

21  may not be a gun recovered and the defendant is charged with

22  ---

23      MR. PEREZ:  I don't know.  I don't know.  Like her, it is

24  the first time I have been here and I don't know.  I don't know

25  how I am going react, so I don't know.

74

1    THE COURT: Well, let me interject myself.  Let's say that

2  you had in any case, not in this case, in another case you had

3  two witnesses come in here and say the person fired a gun. The

4  gun was never recovered, but you still have the testimony of

5  those people and they testified and are cross examined and you

6  believed them.

7    MR. PEREZ: Okay.

8    THE COURT: Can you still decide the case based on the

9  evidence?

10    MR. PEREZ: In that case, yes.

11    THE COURT: All right.

12    MRS. CORONA: Does anybody think that they could not agree

13  with Mr. Perez?

14    THE COURT: Actually or agree, and actually agrees with

15  Mrs. Galvez that if there is not physical evidence that they

16  could not make a decision regardless of the form of testimonial

17  evidence or whatever other exhibits presented by the state?

18  Nobody. Okay.  Now that we are talking about guns, how many of

19  you are gun owners or you have a license to carry a gun?  Okay.

20  Okay.  And I am asking generally, is there ever a reason or

21  what do you have to carry a gun for?

22    MR. SARDINAS: I carry a gun for protection, but I have had

23  a license for a number of years.

24    MRS. CORONA: Has anybody had an opportunity to use a gun

25  to take it out or anything?

75

1      MR. SARDINAS: No.

2      THE COURT REPORTER: Identify the juror please.

3      MRS. CORONA: I am sorry, that is Mr. Sardinas. Actually,

4  Mr. Garcia and Mr. Jensen also raised their hands, right. And I

5  am asking as a general statement, not as to just these people

6  in particular, but does anybody think that there is ever a time

7  when a gun should be allowed to be used? Obviously, we provide

8  guns in a society. We accept it and you have a license to

9  carry a gun, you are allowed to. What reasons would you think

10  are okay for somebody to pull a gun on somebody else?

11     MR. PEREZ: If somebody is to protect their children.

12     THE COURT: Mr. Perez.

13     MR. HALLEY: Self-defense

14     THE COURT: That was Mr. Halley.

15     MRS. CORONA: Besides, if somebody is threatening your

16  life, the safety of yourself, besides the safety of yourself or

17  your children is there any other reason that anybody could

18  think of that would be okay for somebody to use a weapon or

19  draw a weapon on somebody?

20     MR. BLACKER: I would like to reserve a motion, Your Honor.

21     THE COURT: Okay.

22     MRS. CORONA: Has anybody had an experience with domestic

23  violence? Maybe not personally, but somebody that they know,

24  read any materials about it, seen any documentary about

25  domestic violence? Nobody? Okay. Mrs. Sanz-Perez, what do you

76

1    know about domestic violence?

2         MRS. SANZ-PEREZ: I go to the school and I have been

3    working with counseling for the last two years and I was the

4    officer on the school ground and I did come into contact with a

5    lot of mothers and children who have been victims of domestic

6    violence.

7         MRS. CORONA: So you have actually worked and heard of

8    these stories about the women who are involved in abusive

9    relationships?

10        MRS. SANZ-PEREZ: Yes.

11        MRS. CORONA: Have you ever heard of these women that you

12   have been in contact with who have been abused in the past and

13   still go back to the abuser?

14        MRS. SANZ-PEREZ: I have heard of that.  That is not

15   surprising.

16        MRS. CORONA: Do you know why?

17        MR. BLACKER: Objection.  I would like to reserve a

18   motion.

19        THE COURT: No.  Objection overruled.

20        MRS. CORONA: Go ahead.

21        MRS. SANZ-PEREZ: She loves the guy so she keeps going

22   back.  That is her reason.  It is how valid for her it is.

23        MRS. CORONA: Is there anyone else that can think of

24   someone is describing like Mrs. Sanz-Perez? Mr. Sokol.

25        MR. SOKOL: There is a history of domestic violent in my

77

1    family.

2         MRS. CORONA: You have had experience in your family?

3         MR. SOKOL: No, my parents, I have witnessed it.

4         THE COURT: Do you think -- now I will ask you, Mr. Sokol,

5    that the fact that the women goes back to the abuser, does that

6    make her any less of a victim due to the fact that they keep

7    going back?

8         MR. SOKOL: Less of a victim?

9         MRS. CORONA:  Yes.  Does it make her, the person less

10   culpable?

11        MR. SOKOL: No.

12        MRS. CORONA: Does anybody think that it makes them less of

13   a victim because they continue to go back to the abuser?

14        MR. SOKOL: No.

15        MRS. CORONA: Okay. Likewise, there is going to be

16   potentially witnesses that are going to be called here that you

17   may or may not like and the Judge told you this is not a

18   popularity contest.  This is not about whether you like me or

19   you like Mr. Gross or Mr. Blacker.  This is about what the --

20   if what the witnesses are saying is the truth and the fact that

21   this person comes here and maybe rubs you the wrong way or said

22   something that you don't like or did something that you don't

23   like, is it going to effect the way that you judge their

24   credibility? What do you think, Mr. Harris?

25        MR. HARRIS: Can you repeat the question, please.

78

1          MRS. CORONA: Okay.  If somebody comes in here and you

2    maybe don't like them as a person or like something that they

3    said, is that going to effect the way that you judge their

4    credibility?

5          MR. HARRIS:  No.

6          MRS. CORONA: Anybody think if a witness comes here and you

7    heard things about this witness that the witness has done in

8    the past that you don't necessarily agree, is that going to

9    effect the way that you judge their credibility as it relates

10   to the facts and circumstances of this case in this particular

11   incident? Mr. Delgado, I am picking on you.

12         MR. DELGADO: No, ma'am.

13         MRS. CORONA: Okay.  And you may hear allegations of drug

14   use that maybe some one or more of the witnesses were involved

15   using drugs, maybe in the past or potentially on the night of

16   the incident.  Is that going to effect the way that you judge

17   this person's credibility, the witness' credibility?  Mrs.

18   Plaza.

19         MRS. PLAZA: No.

20         MRS. CORONA: Does anybody think that the person used drugs

21   in the past or the on the day of the incident that that makes

22   them less of a victim or that that lessens their credibility

23   because they used drugs in the past?  Let me ask you, Mr.

24   Deutsch. Did I say it right?

25         MR. DEUTSCH: Deutsch.

79

1       MRS. CORONA: What was the answer?

2       MR. DEUTSCH: No. It would depend on what drugs they are

3    using.

4       MRS. CORONA: It would depend on what drugs they are

5    using.

6       MR. DEUTSCH: Like if it was like marijuana or something a

7    lot more serious.

8       MRS. CORONA:  What would depend on that?  What effect

9    would it have?  I mean, let's say you heard --

10       MR. DEUTSCH: I mean, if it is cocaine or something it may

11    go into someone being under different influences.

12       MRS. CORONA: How do you think it would influence you?

13       MR. HALLEY: I don't know if I would trust them as a

14    witness.  I don't know if I would take into account everything

15    that he is saying as absolutely true or his -- what he

16    remembers of the incident, whatever it is if he was, per se, on

17    cocaine that day or at that time.  I don't know if I would take

18    what he is saying as true.

19       MRS. CORONA: Let me tell you this.  You could obviously

20    use that in determining and deciding the truth of the person,

21    whether or not the person was on cocaine, but let me tell you,

22    would you feel like the fact that the person was on cocaine

23    they couldn't possibly know what was going on or they couldn't

24    remember accurately because they were on cocaine or whatever it

25    is that the evidence shows?

80

1   MR. HALLEY: No.

2   THE COURT: So, you know, I guess the question that Mrs.

3 Corona is asking is whether you are going to judge them poorly

4 because they use drugs.

5   MR. HALLEY: No, I would not.

6   THE COURT: No.  Whether it effects their perception in any

7 way, of course you could consider that.

8   MR. HALLEY: Okay. That was what I was saying.

9   THE COURT: If somebody is on LSD or something out of their

10 mind, of course you could consider that. If the testimony is

11 that LSD is such a drug that can cause that, and may have

12 caused it in the particular person; you understand?

13   MR. HALLEY: Yes.

14   MRS. CORONA: That was Mr. Halley.

15   You are also going to hear from a few civilian witnesses

16 and they are going to be there testifying about things during

17 the commission of the crimes alleged. People say stories and

18 sometimes people say stories in a different way.  The fact that

19 somebody recounts the details of what happened somewhat

20 differently than the way that somebody else did, is that going

21 to effect your ability to judge whether the facts in question

22 occurred?  I guess that doesn't make sense.

23   MR. SHOUP:  No.

24   MRS. CORONA: Let me give you a hypothetical situation.

25 Let's say that you were all invited to a wedding. The 14 of you

81

1  were invited to a wedding and you are all sitting at the table

2  together and I ask you, did the bride and groom kiss.  And I

3  ask each and every one of you and all of you say, yeah, yeah,

4  the bride and groom kissed.  And when I asked you how many

5  times Mrs. Torres says 10. Mrs. Trejo says three. Mr. Chiples

6  says once.  Everybody has a different number of times.

7  Everybody has a different number of times. The question is did

8  the bride and groom kiss. Everyone, even though everybody said

9  10 different answers, is there any question whether or not the

10  bride and groom kissed?

11       PROSPECTIVE JURY: No.

12       MRS. CORONA: Does anybody think that because there is 14

13  different answers, because there is a conflict in the testimony

14  we might as well just throw out that the bride and groom

15  kissed.  We may as well not believe that the they kissed.

16       PROSPECTIVE JURY: No.

17       THE COURT: What if they said I saw them kissing by the bar

18  or I saw them kissing by the dance floor, is that going to make

19  a difference as to the question of if the bride and groom

20  kissed?

21       PROSPECTIVE JURY: No.

22       MRS. CORONA: That is what I mean by inconsistency.  Three

23  witnesses could re-count the story differently.  One witness

24  could re-count the story differently sometimes.  Let me ask

25  you, Mrs. Segui, you say stories to your friends and your

1  family. Do you always re-count them the same way when you

2  re-count them?

3      MRS. SEGUI: You mean when I tell a story do I tell it

4  different to the person that I tell it to?

5      MRS. CORONA: Yeah.

6      MRS. SEGUI: Maybe a little bit differently.

7      MRS. CORONA: The basic details remain the same, but

8  maybe you don't add something or you said something in the past

9  and the fact that you said something one way or differently to

10  another witness in the past or said the story one way and a

11  different way to another person, the fact is that the main

12  ingredients were still there, but some of the details are

13  different. Is that going to effect the way that you judge

14  their credibility, Mrs. Segui?

15      MRS. SEGUI: No.

16      THE COURT: How about you, Mrs. Espinosa.

17      MRS. ESPINOSA: No.

18      MRS. CORONA: Okay. The Judge read you the allegations from

19  in the case and he read you what the charges were and he said

20  kidnapping was one of the charges and there is legal

21  definitions for each of the charges that are brought about.

22  And he -- I know that we use kidnapping in the colloquial sense

23  of the word and it is not the legal sense of the word, so the

24  Judge is going to explain to you at the end and he is going to

25  read to you what the elements of each charge are. The question

1    that I had is that, who has ideas of kidnapping? What do you

2    think kidnapping is Mrs. Mayorga.

3    MR. MAYORGA: When you keep somebody without their

4    permission like in a house, when you don't let them out.

5    MRS. CORONA: Okay. So everybody has a general

6    understanding of what these terms mean. My point is that

7    knowing that you have this basic understanding, are you going

8    to be able to follow the law as the Judge provides them for

9    you? Because it may not be exactly how you think about it when

10    you say the word "kidnapping," are you going to be able to

11    follow his instructions that the Judge reads to you?

12    MR. MAYORGA: Yeah.

13    MRS. CORONA: Anybody think that they cannot -- that

14    kidnapping has to be snatching a child or something like that,

15    that is how it has to be?

16    PROSPECTIVE JURY: No.

17    MRS. CORONA: Mrs. Paredes.

18    MRS. PAREDES: No. It's just what the legal definition is.

19    THE COURT: Yeah. If I may, there is kidnapping for ransom

20    like the ones that we see on TV and the FBI, kidnapping a child

21    for ransom. There is also kidnapping to inflict bodily harm or

22    terrorize someone. That is another form of kidnapping. And you

23    will get the elements at the end, but it doesn't have to be for

24    ransom. There are other forms of kidnapping. There is also

25    kidnapping to facilitate a crime or something like that, okay.

84

1  In this particular case it is alleged as to inflict bodily harm

2  or terrorize the victim.

3      MRS. CORONA: Given the things that we have talked about

4  now, does anybody have any reason to think that they would not

5  be fair and impartial jurors in this particular case?

6      Mrs. Castillo, is there any reason that you could think

7  of?

8      MRS. CASTILLO: No.

9      MRS. CORONA: Anybody here? Thank you guys for your time

10 and I will talk to you when the trial begins. Thank you.

11     THE COURT: All right. And Mr. Blacker.

12     MR. BLACKER: Thank you, Your Honor. May it please the

13 Court, Mr. Diaz, ladies and gentlemen. As I told you my name

14 is Michael Blacker. I represent Mr. Diaz in this matter and

15 really what we are looking for here is people that can seek the

16 truth. Every one of you who becomes a juror is going to be

17 sworn to an oath. His honor spoke at the beginning of this

18 trial, at the beginning, about it really is an honor to be a

19 juror in this country. We live in the longest standing

20 constitution of democracy in the history of mankind. Well, one

21 of the reasons is aside from the people that say the court

22 system is too slows. Justice is too slow, it is not right,

23 aside from that, one of the major reasons that everyone agrees,

24 sociologist, scientist, is because America has a jury system of

25 justice. Like his honor said, this isn't Russia. This isn't

85

1    England. Which they are close, but we have the best system.

2    All we are asking for you to do is to seek the truth here.

3    Listen to the evidence, look at the documentary evidence,

4    compare everything and determine by the standard that his honor

5    gives you beyond and to the exclusion of every reasonable doubt

6    the facts of this case. Because you are the judges of the facts

7    of this case. His Honor will instruct you on the law and the

8    construction of a trial is very simple. The facts are deemed by

9    citizens from the community who have like mindedness. What is

10   that like mindedness?

11       We all know you have prejudices of some kind.  We like and

12   dislike things. Whether it's chocolate pudding or certain types

13   of cake, we all have certain interests, biases, and prejudices.

14   All we are saying to you as a panel is to agree with us that

15   for the next few days that we try this matter that you will set

16   aside those prejudices and listen as a group to the evidence,

17   go back into the jury room and apply the law that his honor

18   tells you exists in this case and come up with a fair and

19   truthful and honest verdict from the bottom of your heart and

20   not because you came in here with some prejudice.

21       Now, his honor touched on witnesses, for example, when

22   judging witnesses. In the State of Florida the witnesses that

23   are going to speak, mostly all of them have already testified

24   under oath in this matter in some form and they have said

25   things under oath, the same oath that they are going to take on

1    that witness stand, on more than one occasion some of them. And

2    you are going to judge them and you are going to look at them

3    and see their demeanor and see whether you think that they are

4    telling the truth or whether they have said something on a

5    prior occasion that may be relevant and now he is saying

6    something different.  Maybe on two occasions they said things

7    which are different. This is how you judge whether or not they

8    are credible; whether or not they are believable; whether or

9    not you would put your honor and faith in accepting what they

10   say is true. Because if you can't accept what a witness says is

11   true you have to look elsewhere for the truth.

12        Now, the information as his honor has told you is a

13   charging document. Is there anyone in here that thinks that the

14   information, which is just what it says, it is a charging

15   document stands for something more than that? It is not

16   evidence. It will not come into evidence. You will never see it

17   again.  It is just, we have a constitutional form of

18   government.  We inform those that are accused of the charges

19   against them.  That is what that document is. Anyone have a

20   problem with the fact that that is not evidence?  The evidence

21   comes from the witness stand as his honor told you.

22        Presumption of innocence.  We all talk about presumption

23   of innocence and we say, we mouthed the words and everyone goes

24   yeah, yeah, I presumed him innocent, but I have a sneaking

25   suspicion that because you are jurors and because Pablo is

1    sitting over there you won't just start and see what he did. He

2    must have done something. I think that you all think that a

3    little bit, so let's talk about it.

4        Without me looking, because I am sorry I am getting off of

5    a very bad cold and I lost an ear drum yesterday so I may be

6    talking too loud, and if I am just let me know, anyone have

7    more than one child? Okay. Let's try, just because -- okay.

8    Mrs. Monterroso, how old are your children?

9        MRS. MONTERROSO:  Three and five.

10        MR. BLACKER: Do they ever have conflicts?

11        MRS. MONTERROSO:  Yes.

12        MR. BLACKER: When they have a conflict they run to mommy?

13        MRS. MONTERROSO: Yes.

14        MR. BLACKER: When they come to mommy how do you resolve

15    the conflicts?

16        MRS. MONTERROSO: It depends.

17        MR. BLACKER: Could I make a few suggestions and you tell

18    me yes or no.  You will listen to both of them tell you what

19    the conflict is about.

20        MRS. MONTERROSO: I do.

21        MR. BLACKER:  You listen to both of them tell you what

22    they didn't do and then you watch carefully and you see which

23    one is moving in a way that they look guilty.  Oh, she is

24    guilty, right?

25        MRS. MONTERROSO: Yes.

1    MR. BLACKER: You know your children, so you are careful

2    about what you say when they come to you about a conflict

3    because not only are you looked up to to resolve that conflict,

4    you are teaching them when they come to you in conflict how to

5    be good adults, aren't you? You listen to both sides, right?

6    MRS. MONTERROSO: Right.

7    MR. BLACKER: Is that correct?

8    MRS. MONTERROSO: Yes.

9    MR. BLACKER: Any other way you do it?

10    MRS. MONTERROSO: No, that is about it.

11    MR. BLACKER:  In addition to what I have said?

12    MRS. MONTERROSO: Pretty much, I pretty much make a

13    determination.

14    MR. BLACKER:  So when you listen to your two children

15    that are in conflict you make a decision based on what they

16    have to say, how they act, their demeanor, what you know about

17    this.  Unfortunately, you are not going to know a lot about the

18    witnesses in this case as prior to when they testify, but you

19    will get a good idea.  We all bring our common sense into this

20    courtroom and we are going to determine the truth, but here is

21    the point. Remember his honor stated the burden rests with the

22    state.  The burden rests with these prosecutors to prove beyond

23    and to the exclusion of every reasonable doubt the essential

24    elements of every charge in this case and his honor is going to

25    tell you what those elements are.  And so your decision is, you

89

1    are going to go back there and you are going to say there is

2    three essential elements to this charge and this one was proven

3    beyond a reasonable doubt and this one wasn't, it is not

4    guilty; or all of them were proven, guilty. That is your job.

5    But you have to have reasons and you have to have a foundation

6    to say that.  And part of that foundation is his honor also

7    told you that they have the total burden and that we could sit

8    here and draw pictures, we could read the Superman magazine for

9    the next day or so.  We don't have to say a word. We don't have

10   to do one thing in this case. I don't have to cross examine one

11   witness in this case. I don't have to present one piece of

12   evidence in this case. The burden rests with them. And if these

13   prosecutors don't support the charges sufficiently, I don't

14   have to say a word.  And we all know that. And so therein lies

15   the rub, doesn't it?

16        In a normal context when we decide conflicts we usually

17   listen to both sides.  Well, you may not hear both sides in

18   this case. So tell me, Mrs. Monterroso, now that I have picked

19   on you a little bit and I will get to the rest of you in a

20   little bit, tell me how you are going to resolve conflicts here

21   if you don't hear from Mr. Pablo Diaz?  How are you going to

22   decide who is telling the truth and what the facts of this case

23   are?

24        MRS. MONTERROSO: To the best of my knowledge and based on

25   the evidence.

90

1      MR. BLACKER: Okay. And you are going to look at the

2   witnesses carefully and you are going to see whether one

3   witness says something that the other witnesses say is not

4   true.  For example, let me give you an example.  Let's say a

5   witness says I got off of the elevator and I immediately ran up

6   to somebody and I said I am in trouble, call the police, and

7   let's say that there is three or four security guards and

8   valets sitting there.

9      MRS. CORONA: Objection, Judge.  Pre-trying the case.

10     THE COURT: Overruled.  Go ahead.

11     MR. BLACKER:  And they saw this event take place and they

12  all say to the man, and again, it is -- there are slight

13  differences that everything was totally calm for 15 to 20

14  minutes.

15     MRS. CORONA: Objection, Judge.

16     THE COURT: Overruled.  I will let you finish.

17     MR. BLACKER: Okay. These are the kinds of conflicts that

18  we are talking about.  These are the kinds of conflicts that

19  every single one of you as a juror if selected is going to have

20  to deal with because you may not hear from the defendant. All I

21  am saying is you are going to have to determine the truth from

22  the witness stand and to do that you are going to have to

23  listen carefully to the evidence to see who is consistent in

24  their testimony; who has observed and was in a position to

25  observe carefully those events about which they are testifying.

91

1  Who in fact strikes you as having said things on other

2  occasions which are inconsistent of what they are saying on the

3  stand now, and generally, who you think is telling the truth

4  about the events because it is consistent with other witnesses.

5      THE COURT: Mr. Blacker, we are going to take our lunch

6  break now. I hate to interrupt you.

7      MR. BLACKER: No problem.

8      THE COURT: Ladies and gentlemen, we are going to take our

9  lunch break now. It is one o'clock. We will be in recess

10  until two. Now, in this case you will see -- if you are

11  selected for the jury I like to minimize all contact between

12  you guys and the lawyers and the witnesses and the defendant's

13  family, if any. So I want you to meet Jimmy at two o'clock on

14  the third floor rather than out here. That way you won't see

15  any witness. You won't be running into the lawyers. If you

16  see the lawyers in the cafeteria they will ignore you. Don't

17  feel that they are being unfriendly. It's just that they are

18  going to try their case in here and not out there by smiling or

19  being sweet to you. So we will be on lunch break until two

20  o'clock where you will meet Jimmy on the third floor. Thank

21  you.

22      (Thereupon, the jurors exited the courtroom.)

23      THE COURT: Everyone remain in the courtroom. Family

24  remain in the courtroom. All right. The family, the lady, do

25  you understand English? Do they understand English? The young

92

1    girl she could explain that they are not to have any contact

2    with the jury. And Maria, that is an intern, you are not to

3    have any contact with the jury either, okay.

4         All right. We are in recess until two.

5         You guys took a look at Count 3?  Because in Count three

6    it say threatened Florez and then pointed a gun at Katherine

7    Ruiz who is the victim.  In that count you are going to need to

8    amend that or amend the information. You have got two different

9    people. I don't know if it is Florez or Ruiz. Not the

10   kidnapping, the aggravated assault.

11        (Thereupon, court stood in recess for lunch.)

12        (Thereupon, court was reconvened.)

13   THE COURT: Jimmy, you said two were missing?

14   THE BAILIFF: Two were missing when I brought them down.

15   THE COURT: Go upstairs again and see if they are there.

16   MR. BLACKER: Judge, I reserved a motion.  If you want to

17   take them up later, you can.

18   THE COURT: Go ahead.

19   MR. BLACKER: Yeah.  There were a couple of questions,

20   counsel asked if there were any reasons for pulling a gun.

21   Well, counsel knows that there are such reasons.

22   THE COURT: Are there what?

23   MR. BLACKER: She asked the jury is there any reason that

24   you could think of for pulling a gun.  There are such reasons

25   and she did explicate the reasons.

93

1    THE COURT: But there is nothing improper about the
2    question.
3    MR. BLACKER: In this case it is improper.  I have to move
4    to strike the venire. It is very improper.  She has placed in
5    those jurors' mind every single one of them, not just the few
6    in the box that are listening, the fact that there are no
7    reasons -- she is saying that the defendant has to come forward
8    and give you a reason why he pulled the gun.  Because there is
9    going to be testimony that a gun was pulled.  That is a very
10   highly improper question.
11   THE COURT: She didn't say that.  You are reading too much
12   into it.  She asked are there reasons for people who use a gun
13   and some of them said for protection or whatever, self-defense,
14   there is nothing improper about the question. Your objection is
15   noted and overruled.
16   MR. BLACKER: Thank you.  She asked the question about
17   conduct in the past.  Judge, it is -- whether that would effect
18   the credibility of any witness. Clear.  And secondly, she said
19   if because a witness remembers facts differently at various
20   times, would that effect your determination of credibility.
21   Clearly counsel knows that those are considerations in
22   credibility. Those are determinations that the jury has to
23   draw. When asking a question like that and getting those kinds
24   of answers, it is highly improper.
25   THE COURT: Okay. Your objection is overruled.  Anything

94

1   else?  Regarding this domestic violence, is there a history of

2   domestic violence and will the state be going into that?

3       MRS. CORONA: Well, Judge, it explained -- the victim went

4   back to the defendant's house and she went back and stayed with

5   him for a time period after this incident.

6       THE COURT: Okay. But you are not going to get into any

7   prior domestic violence between the defendant and the victim.

8       MRS. CORONA: No, Judge.

9       MR. BLACKER: I am pondering it, because I was a little

10  surprised too with the bullet.  Police officers -- I take it

11  that there are no experts that are going to come in here and

12  talk about why women or men go back to abusers.  Is that -- can

13  I -- am I right or wrong?

14      MRS. CORONA: Did I list anybody like that? There is

15  nobody listed like that.

16      MR. BLACKER: So then, Judge, again, this is the thing.  A

17  statement like that without any understanding of other reasons

18  -- are there reasons why someone would go back to an abuser is

19  implying that he abused her and it is improper for this jury's

20  consideration.

21      THE COURT: Yeah, yeah.  But I believe that you mentioned

22  before the lack of credibility in the state's case because of

23  the fact that the victim went back to the defendant after the

24  incident.

25      MR. BLACKER: I did.

95

1    THE COURT: So I guess if that is what the state is

2    addressing, they are addressing the arguments that you are

3    going to properly be making to this jury.

4    Okay.  Bring them in, Jimmy.

5    THE BAILIFF: All rise.

6    THE COURT: Tomorrow we start at 9:30. Don't be late.

7    (Thereupon, the jury entered the courtroom.)

8    THE COURT: Okay. Thank you.  Please have a seat and let

9    the record reflect that the defendant is present as he has been

10   throughout the trial.  Ladies and gentlemen, did Jimmy treat

11   all of you to pizza?

12   UNIDENTIFIED JUROR:  He says Friday.

13   THE COURT: You didn't treat them today, Jimmy?

14   THE BAILIFF:  I told them when they deliberate.

15   THE COURT: Mr. Blacker.

16   MR. BLACKER: Thank you.  May it please the Court. Mr.

17   Diaz, Mrs. Corona, Mr. Gross, ladies and gentlemen of the jury,

18   the perspective jury.  We left at a good point. We have been

19   talking about how do we figure out the truth and we had spoke

20   about the prior inconsistencies with prior statements that are

21   in conflict with what is said.

22   Now, how someone acts on the witness stand, although some

23   people, maybe they have been nervous and you may take that into

24   consideration, but you get a general feeling about who is

25   telling the truth and who isn't.  Because this is a case about

96

1  inconsistencies.  This is a case about major conflicts in

2  testimony.

3      MRS. CORONA: Objection, Judge.

4      THE COURT: Sustained.

5      MR. BLACKER: When we talk about that, I was talking to

6  Mrs. Monterroso about her children and how she figures out

7  conflicts.  And there may be a time in which you do not hear

8  from one side or another, which disables you from hearing both

9  sides of the case.

10     Does anyone have an idea of how they would try to

11 determine credibility in that case? Okay. Perhaps, let me say

12 that what you could do is you could follow your oath and your

13 honor as a juror and you could listen carefully and you could

14 pay attention and you could not discuss the case with anybody

15 until you are back in the jury room deciding the case and you

16 could put your hearts and souls in this matter, which is what

17 we ask you to do for a few days and put aside your prejudices

18 so that you could make a determination of the truthfulness of

19 the facts in this case. That is how we do it. We do it with --

20 limited with that is the physical evidence and the testimonial

21 evidence from the witness stand.

22     Can everybody in here promise me that if you are selected

23 as a juror and you take the oath as a juror that you will, in

24 fact, put your heart and soul into this matter as you promised

25 today to do so and try this case fairly as you are required to

97

1   do?

2        PROSPECTIVE JURY: Yes.

3        MR. BLACKER: Could everybody say that to themselves and

4   to us? Not just me, but the prosecutors as well? Everybody is

5   entitled to a fair trial in this courtroom.

6        Now, his honor touched upon discussions and opinions

7   before all the evidence is in. Sometimes it is like a football

8   game. Some teams get way ahead in the first quarter and you go

9   for a beer or some pretzels and you come back and Lord and

10   behold the other team is making a come back. Trials are like

11   that. That is why we don't want anybody to form an opinion, to

12   form a conclusion or to discuss the case with the other jurors

13   during the pendency of the matter because all the evidence

14   isn't in. Once the evidence is in his honor will instruct you

15   on the law, which you will under oath promise to follow and you

16   will also then be at liberty to discuss the case during your

17   jury deliberations. There will be ample time to discuss the

18   case.

19        Can everyone in here affirmatively state that if they are

20   chosen as jurors that they will not discuss this case until it

21   is appropriate to do so amongst yourselves?

22        PROSPECTIVE JURY: Yes.

23        MR. BLACKER: And when you think about it, if you found

24   yourself in a position where you were accused rightfully or

25   wrongfully you would want a jury not only to honor their oath