1   and to follow the instructions, but not to discuss the case

2   until they heard everything, or to even form an opinion about

3   the case until they have heard everything, wouldn't you?

4   Wouldn't everybody in here want that for themselves?

5       PROSPECTIVE JURY: Yes.

6       MR. BLACKER: Well, the law requires it for Pablo Diaz and

7   those that are able to do that, it will be a very easy task if

8   you just follow the instructions. This is not a difficult

9   procedure.  It is heart wrenching sometimes, but it is not

10  difficult if the instructions of the Court and the law are

11  followed.

12      You know, we talked about bias and sympathy. This is a

13  very, very difficult area for everybody.  We are all human.

14  Nobody likes crime; nobody.  I don't know anybody that likes

15  crime and there are some serious crimes charged here. And yet,

16  as a juror -- and I say this in no way by way of excuse -- as a

17  juror you should be eager to make the state, make the

18  prosecutors live up to the burden that the Court tells you that

19  they have. Make them prove each and every element of the crimes

20  charged beyond and to the exclusion of every reasonable doubt.

21  And if you have a reasonable doubt as to any of the elements of

22  the crimes, say so.  Tell your fellow jurors. Tell them the

23  reasons.  Because these are called reasonable doubts. His honor

24  told you that we are talking about abiding. He used the word

25  "abiding" twice. The word "abiding" is a difficult word, but if

99

1      some of you have religious background, you know what abiding

2      is.  It is in the Bible a lot.  It is in church a lot.  When is

3      it that you are abiding?  It is when you just can't rid

4      yourself of a feeling. It is when -- if something creeps in and

5      makes you feel differently and you could lift that feeling from

6      you, you don't have an abiding feeling.  When you have a reason

7      not to think the way that you think or to conclude about facts

8      the way that you conclude, you don't have an abiding conviction

9      either way.

10          Can everybody, can everyone in here tell me that they will

11     based upon Judge's instructions require the state to prove all

12     of the elements of case beyond and to the exclusion of every

13     reasonable doubt as to each element?  Because that is what his

14     honor told you this morning.  That is the burden of the state.

15     Some of you have been on prior juries. I have got your names

16     circled, but I want to move it along here and get everybody

17     home.  Those of you that have been on prior juries, raise your

18     hand. Okay. Anyone been on a civil jury? Thank you.  You know,

19     I watched so many TV shows about the law and I walk into the

20     room and my wife and daughter are sitting there watching this

21     stuff and I can't believe some of this stuff I have seen on

22     television.  It's great, but it is not real law.  And so we

23     have to re-train some thinking sometimes with jurors.

24          The standard in a civil case, if you had a scale of

25     justice -- you guys have all seen these scales of justice.  If

1   you had a scale of justice the standard in a civil case is a

2   mere tipping, a preponderance they call it. So you listen to

3   all the evidence, you determine what you think are the real

4   facts and if you are just swayed slightly to one side that is

5   the side that you vote for. Not so in criminal law. And this

6   is a criminal case. Criminal law is the highest standard of

7   jury's decision making in constitutional law. Criminal law

8   requires not just a tipping, but a total imbalance so that if

9   there is one reason to believe that an element of a crime has

10  not been proven, then you must find which way, Mr. Perez, if

11  there is a reasonable doubt as to one? Just a slight

12  reasonable doubt of a crime, how are you going to find?

13      MR. PEREZ:  Witness.

14      MR. BLACKER: Witness?  Well, find guilty or not guilty if

15  you have a reasonable doubt?

16      MR. PEREZ:  I don't know.

17      MR. BLACKER: Okay. All right.

18      THE COURT: Well, let me ask.  Let me make sure I

19  understand. If you have a reasonable doubt you must find the

20  defendant not guilty. You understand, Mr. Perez?

21      MR. PEREZ:  Yes, sir.

22      THE COURT: And if after hearing all the evidence, at the

23  end of the case if you have a reasonable doubt, how are you

24  going to find the defendant?

25      MR. PEREZ:  Not guilty.

101

1     THE COURT: All right. Can everybody do that?

2     PROSPECTIVE JURY: Yes.

3     THE COURT: Yes?

4     PROSPECTIVE JURY: Yes.

5     THE COURT: And if you have no reasonable doubt how are you

6     going to find the defendant, Mr. Perez?

7     MR. PEREZ:  Not guilty.

8     THE COURT: If you have no reasonable doubt.

9     MR. PEREZ:  Guilty.

10    THE COURT: Guilty. Okay.  Go ahead.

11    MR. BLACKER: Okay. Thank you.  Thank you, Judge.

12    THE COURT: So the standard in criminal law is a very high

13    standard, as the standard in civil law is just a preponderance

14    or a tipping of the scales. We do that, we do that because when

15    we accuse somebody, accuse somebody we want to make sure that

16    he has committed the crimes charged.  So therefore, all of the

17    elements carry with them a certain standard. That is the

18    standard that we have been discussing all day and that is

19    reasonable doubt; beyond every reasonable doubt.  Reasonable

20    doubt. Not fancy. Not something that you could imagine. And

21    that leads me into something interesting. So let's say the

22    defendant decides not to take the stand and you don't hear from

23    his own mouth. You may hear from defense witnesses but you

24    don't hear from the defendant's mouth his version of the

25    events. Is anybody in here going to hold that against the

102

1  defendant?

2      Okay. Hold on one second Mr. Johari.

3      MR. JOHARI: Yes.

4      THE COURT: Are you going to hold it against him?

5      MR. JOHARI: Well, I know that you announced this earlier

6  that in criminal nobody testifies, so I am not sure about that.

7  I would like to hear from him.

8      THE COURT: All right. You may want to hear from him.  That

9  may be normal, human tendency, but here in Court we have these

10  constitutional principles that we follow.  The way that I like

11  to explain it to jurors is that whatever faith you follow,

12  whether you are Jewish, Catholic, Muslim, whatever faith you

13  follow is your faith and it has certain rules.  And in your

14  place of worship you follow the rules of your religion, right?

15  In Court, this is like our temple of laws and you have to

16  follow the laws and you have to follow the rule or

17  constitutional principles in a court of law. It may not be the

18  normal, human tendency, you know.  Like we heard when Mr.

19  Blacker was asking whether some of you have children and how

20  you resolve some of your conflicts with children and Mrs.

21  Monterroso, you ask them questions and you see, well, in

22  criminal court it is different. You know, we are not here

23  disciplining children.  We are here in a court of law where

24  these special constitutional principles apply that govern our

25  criminal justice system and we have to follow these principles.

103

1   So you need to put aside that normal, human tendency to want to

2   know the other side and say, no, here there are special rules.

3   There aren't two sides, there is one side and it is the state's

4   case and you are going to look for reasonable doubt in that

5   case. If in the structure of the case that is presented by the

6   state there is no reasonable doubt, you find the defendant

7   guilty. If you find in the state's case that there is

8   reasonable doubt, you find the defendant not guilty. So in

9   criminal court there are not two sides to every story. You are

10  only here to review the case presented by the state and see if

11  there is reasonable doubt. Do you understand that?

12      MR. JOHARI: Right. But if he was honestly not guilty

13  wouldn't it be better for him to prove, to tell us out of his

14  mouth?

15      THE COURT: I have to tell you, I hear the lawyers say

16  that the biggest fear in America is the fear of public

17  speaking. I don't know if that is true or not, but I have heard

18  it said a lot that that is one of the biggest fears that people

19  have, public speaking. So imagine your future is on the line

20  and you get on the stand and you are not a good public speaker.

21  What are the odds that you are going to make it? That is

22  something that is a concern. The other thing is that you have a

23  lawyer. You have advice of counsel. Your lawyer may say, hey

24  look, sit tight, don't take the stand. At the end it is the

25  defendant's decision, but it's a constitutional right that he

104

1  has just like the rest of us. And like I said, usually in

2  criminal cases you do not hear from the defendant. Why would

3  you if the rules are that he is presumed innocent? So the

4  rules are in his favor. He is presumed innocent. He doesn't

5  have to testify. Why would you assume the burden? You

6  understand?

7       MR. JOHARI: Uh-huh.

8       THE COURT: Where are you originally from?

9       MR. JOHARI: Well, I am from the Caribbean and my dad is

10 from India.

11      THE COURT: India. And your mom is from?

12      MR. JOHARI: Peru.

13      THE COURT: And were you born there?

14      MR. JOHARI: I was born here in the United States.

15      THE COURT: And, you know, we all come -- I am originally

16 from Cuba and if you ask anybody here, everybody comes from

17 some place else or their ancestors came from some place else.

18 That is our system here and we have to follow these special

19 rules that really set us apart from all the other countries in

20 the world. You know, I was just in China with my wife and

21 before going there I asked the traveler's agency if I could go

22 visit criminal courts, that I was a Judge here. And they said,

23 no, you can't, they are not open to the public. They are not

24 open to foreigners. You know, that is something foreign to us

25 because we all know that you could go to the courthouse in any

1   town in our city and you get to see whatever is happening in

2   court because courts here are public.  But, you know, these are

3   constitutional principles.  The defendant doesn't have to say a

4   word.  You can't speculate as to what he would have said and

.5   you can't hold it against him. Most lawyers will tell their

6   client do not say a word. Why would you? The rules are in your

7   favor.  You don't have to prove anything. They have to prove

8   it, let them prove it. You don't have to say anything.

9        MR. JOHARI: It's just that I feel that, you know --

10       THE COURT: I am sorry?

11       MR. JOHARI: I think that he probably doesn't want to get

12   confused with the questions from the other attorney.

13       THE COURT: Well, that could be.  Someone could take that

14   into account and say I may not have good answers, but what I am

15   saying is you can't speculate.  You can't think why is he not

16   taking the stand; you understand?  Why? Number one, because he

17   is presumed innocent.  And number two, he has a constitutional

18   right to remain silent.  He doesn't have to say anything and

19   the question now is can you respect these constitutional

20   principles or regardless of our constitutional principles, the

21   principles of your country of birth, you think that you are

22   going to somehow suspect him if he doesn't get on the stand?

23       MR. JOHARI: I don't know.

24       THE COURT: You cannot assure us that you cannot hold that

25   against him, is that what you are saying?

106

1          MR. JOHARI: Perhaps. Yes.

2          THE COURT: Okay. We can move on. Thank you for your

3     answers, Mr. Johari.

4          MR. BLACKER: Thank you Mr. Johari. Mr. Johari, you have

5     asked the question that a lot of jurors here -- because they

6     are not public speakers, some people don't speak up. Thank you

7     for speaking up. And the point is this. When you are in the

8     jury room there is no speculation that the defendant doesn't

9     take the stand as to why or why not because the law does not

10    permit it and his honor gave you some great examples before.

11    Think about it. The ball is placed with the prosecutor here to

12    prove each and every element beyond and to the exclusion of

13    every reasonable doubt and if we think they didn't do that or

14    if the defense believes that they haven't done that, we don't

15    do a thing. We just send you back there to make the finding

16    that we believe that you are going to find. So there would be

17    no reason to put the defendant on the stand in that set of

18    circumstances. And beyond that, our constitution is such that

19    it wouldn't require an accused to take the stand. There is no

20    requirement. It is only human nature that we want to hear both

21    sides of the story, because we grew up with that. We heard

22    from this lady over here, Mrs. Monterroso and she told us how

23    she resolved conflicts and I bet that you have had that

24    experience in your life since you have had brothers and

25    sisters; I know that I have. We all agreed that you could

107

1   follow the established law when his honor instructs you that is

2   the law of the case and you are going to follow it.

3       Anyone in here have a problem with that? Anyone have a

4   problem with that? You want to create your own thinking about

5   the law.  Anyone here think that the laws, think that the law

6   is too harsh or too easy; anyone? Okay.  Okay. The calculous

7   here is simply quite easy. What is difficult is that we are

8   dealing with people's lives, both witnesses' and defendant's,

9   and as human beings it makes it wrenching for us sometimes to

10  have to decide these cases. It is necessary, however, in a

11  constitutional democracy like we have, the only constitutional

12  democracy that is older than 205 years in the history of

13  mankind, you came in here today and the first paragraph and I

14  have never tried a case before Judge Jimenez before, we know

15  each other, but we never tried a case, I have never tried a

16  case before him in his courtroom and the first thing out of his

17  mouth he said to you is that it is an honor.  And, ladies and

18  gentlemen, I tell you, I honor this profession.  I am sure that

19  the prosecutors there will also and it has been the honor of my

20  lifetime to practice law. We are living in a country in which

21  no other country even comes close in principles of democracy.

22  Yes, sometimes someone slips through the cracks, but you folks

23  in the 37 years that I have been practicing law are pretty darn

24  good as at figuring things out.

25      Now, all I want to do is I want to ask everyone here, is

108

1  there anyone here, anyone that does not think that they could

2  be fair and impartial to both sides? Anyone?

3      Is there anyone here that -- and don't be embarrassed,

4  because this is really, really a serious matter. This is a

5  criminal case and if you don't think that you could be fair

6  tell us. It's not an embarrassment, it is actually -- I respect

7  Mr. Johari greatly for what he said. I don't agree with him

8  because the principles of law that I followed for 37 years are

9  different than what he said, but I respect him for standing up

10  and telling us how he felt. So tell me now, because don't go

11  back in the jury room and have your fellow jurors tell you that

12  is not what you promised, that is not what you said. You can't

13  bring your prejudices in here. Don't tell us about things that

14  you know the Judge has already instructed you are not right.

15  Don't get embarrassed that way. Tell us now. We just won't

16  choose you. You will go on with your lives and be just as

17  happy. Is there anyone that can't follow the instructions of

18  the law that his honor is going to give you? Anyone? Anyone?

19      Everyone in here promises to hold the prosecutors to the

20  burden of proof that we have heard about so much today, that is

21  the burden of proving each element as the Court will instruct

22  you on each crime beyond and to the exclusion of every

23  reasonable doubt? Anyone can't do that? Okay.

24      Lastly, are there any reasons based upon the charges that

25  you heard, any personal reasons that you feel a little

109

1   uncomfortable that you don't feel like you would really like to

2   participate in this case and you don't feel like you could give

3   the prosecutors or the defense a real good shake or that you

4   have some predisposition about the charges themselves, or you

5   know somebody that something bad has happened to recently?  Is

6   there any personal reasons?  And I am not going to ask you what

7   they are.  I just want to know is there anyone here that really

8   does not want to be here?

9        THE COURT:  Mrs. Whiting.

10       MR. BLACKER:  Thank you, Mrs. Whiting.  You know.  I want

11  to tell you, Mrs. Whiting, I know this sounds repetitive but I

12  really respect that, because people in groups don't respond.

13  You ask somebody in a group are you really uncomfortable and it

14  is hard for people to say there is something about the case

15  that I don't want to decide, I don't like the lawyers or

16  whatever.

17       Is there anything, any emotion that has anybody here has

18  where you feel like you can't be fair and impartial; you can't

19  leave your prejudices at home and follow the instructions of

20  the Court?  Anybody thinks they are a little uncomfortable with

21  that? Anyone have any pre-disposed opinions about this case

22  from what you heard so far?

23       Anybody thinking -- well, how about this one and I will

24  sit down after this. Does anybody have the feeling like where

25  there is smoke there is fire?  He is charged with a crime,

110

1    something is wrong? Anybody have that feeling?

2        Anyone know anybody that has ever been accused of a crime

3    they didn't do, out of this whole panel?  None of you have had

4    any friends or family or otherwise, someone that is accused of

5    a crime that didn't do it?

6        MRS. PEREZ:  Yes, I have.  I have.

7        THE COURT: That is Mrs. Perez.

8        MRS. PEREZ:  Yeah.  I know somebody that he was charged

9    with something that he didn't do.

10       MR. BLACKER: Okay.  Ladies and gentlemen, if chosen I

11   have a feeling that all of you will live up to your oaths when

12   you raise your hand and I think that you will all perform your

13   duties as you said that you will.  Thank you very much.

14       THE COURT: Okay. All right. Ladies and gentlemen, the

15   people on my list to come in privately are Trejo.  You may not

16   have to come in.  Perez. Chiples. Monterroso. Galvez may not

17   have to come in. Paredes. Miller. Mayorga.  Whiting may not

18   have to come in. Sokol. Batey. Jensen.  And Fuentes.

19       I am going to ask Mr. Perez to wait in the courtroom and

20   the rest of the people in may wait right by the door, because

21   this part of the trial goes rather quickly and we will be

22   calling you in quickly.  The rest of you wait outside.  No one

23   is to leave until we bring you back in and make our choices.

24   Be careful when you step out. Hold on.  Before anybody moves,

25   Mrs. Segui.

111

1       MRS. SEGUI: Could you add me to the list.

2       THE COURT: I will add you to the list. Okay. Everybody

3   wait outside.

4       (Thereupon, the jurors exited the courtroom.)

5       THE COURT: Mrs. Trejo, wait outside. You want to be added

6   to the list?

7       MRS. REGA: I have a preparation to go to the hospital on

8   Wednesday.

9       THE COURT: What is your name?

10      MRS. REGA: Last name is Rega and my first name is Leonor.

11      THE COURT: You have what?

12      MRS. REGA:  Excuse me?

13      THE COURT:  You said tomorrow you have what?

14      MRS. REGA: For the surgery.

15      THE COURT: Surgery. All right.  You could wait outside.

16      Is your English a hundred percent or no?

17      MRS. REGA: Excuse me?

18      THE COURT: Is your English one hundred percent?

19      MRS. REGA: No.

20      THE COURT: Okay. Number 38, wait outside.

21      All right. Mr. Perez, you wanted to speak to us privately.

22      MR. PEREZ:  Yeah.  I just have like a question on the last

23   question that you put.

24      THE COURT: Number 14?

25      MR. PEREZ:  I think that I put a no.  I don't know if this

112

1  has something to do or not, I was arrested for DUI back when I

2  was 17 or 18 years old. I don't know if that has something to

3  do ---

4      THE COURT: Okay. That has been over 30 years ago?

5      MR. PEREZ: Yeah. I was 18 or 19 years old.

6      THE COURT: Anything about that experience that would

7  effect you here.

8      MR. PEREZ: No.

9      THE COURT: Are you going to be against the state because

10  you were at one point charged with DUI?

11      MR. PEREZ: No.

12      THE COURT: You could be fair to both sides?

13      MR. PEREZ: Well, the case was dismissed. I just want to

14  verify that.

15      THE COURT: All right. Any further questions?

16      MRS. CORONA: No, Judge.

17      MR. BLACKER: No.

18      THE COURT: You could wait outside.

19      (Thereupon, Mr. Perez exited the courtroom.)

20      THE COURT: Jimmy, bring in Chiples.

21      Yeah. There was three that just left. Number two, Trejo,

22  I don't think that we need to bring in. Both sides agree for

23  cause on Trejo?

24      MRS. CORONA: Yes, Judge.

25      THE COURT: Mike.

113

1    MR. BLACKER: I am sorry?

2    THE COURT: Let's me deal with Mr. Chiples first.

3    (Thereupon, Mr. Chiples entered the courtroom.)

4    THE COURT: Mr. Chiples, you wanted to speak to us?

5    MR. CHIPLES: Yeah. When you mentioned the part that could

6    resolve in a miss-trial or everything, it is like about 19

7    years ago my brother was arrested for assaulting an officer but

8    he just received probation but I thought I still should say it.

9    THE COURT: Anything about your brother's situation that

10   would effect you as a juror?

11   MR. CHIPLES: No, not at all.

12   THE COURT: Because your brother was arrested, does that

13   mean that now you are going to be on the side of the defense,

14   against the state?

15   MR. CHIPLES: No. No.

16   THE COURT: Could you be fair?

17   MR. CHIPLES: Yes, sir.

18   THE COURT: Any further questions?

19   MRS. CORONA: No, Judge.

20   MR. BLACKER: No.

21   THE COURT: You could wait outside.

22   (Thereupon, Mr. Chiples exited the courtroom.)

23   THE COURT: Jimmy, bring in Monterroso.

24   (Thereupon, Mrs. Monterroso entered the courtroom.)

25   THE COURT: This is Monterroso, number 19. You wanted to

114

1  speak to us.

2      MRS. MONTERROSO: Yes. I just wanted to say the

3  questionnaire, the last question I put yes and my husband has

4  been in prison, but that wouldn't have nothing to do -- if I

5  were to be on the jury that would not ---

6      THE COURT: Let me ask you, who was charged with grand

7  theft auto, you?

8      MRS. MONTERROSO: My husband.

9      THE COURT: Have you ever been charged?

10     MR. MONTERROSO: No, not me.

11     THE COURT: He went to prison?

12     MRS. MONTERROSO: Yes.

13     THE COURT: For how long?

14     MR. MONTERROSO: For three years.

15     THE COURT: So you know what a family goes through when

16  their loved one is put away.

17     MRS. MONTERROSO: Yeah. He was one year and then the

18  second time was three years.

19     THE COURT: Let me ask you, since your husband went to

20  prison, does that mean that you are going to sympathize with

21  the accused because you know what your family went through?

22     MRS. MONTERROSO: No.

23     THE COURT: Are you sure that you are not going to be

24  defense minded because your husband was charged with a crime?

25     MRS. MONTERROSO: No.

115

1    THE COURT: You could be fair to the state?

2    MRS. MONTERROSO: Yes.

3    THE COURT: You are not against the state?

4    MRS. MONTERROSO: No.

5    THE COURT: Not against the police?

6    MRS. MONTERROSO:  No.

7    THE COURT: Any further questions?

8    MR. BLACKER: Yes.  Is there anything about the things, is

9    there anything about the position that you were in with your

10   husband with the police that has left a bad taste about the way

11   that the case was handled?

12   MRS. MONTERROSO:  No.  This was back in 1998 and it was a

13   part of his consequence.

14   MR. BLACKER: Consequence of his action. Was your husband

15   treated fairly?

16   MRS. MONTERROSO:  Yes.

17   MR. BLACKER: Was his involvement with law enforcement, was

18   he treated fairly there?

19   MRS. MONTERROSO:  Yes, he was.

20   MR. BLACKER:  As a consequence of your husband going to

21   prison, you seem to be a fair and impartial person should you

22   be selected because you do not want anyone to be un-fairly

23   handled by having prejudice and bias coming into the jury, you

24   understand what I am saying?

25   MRS. MONTERROSO:  Yes, I agree.

116

1    MR. BLACKER: When the Court says we don't want sympathy,

2    we want fairness, we want you to call it like you see it, but

3    we don't want you to be effected by your husband's situation,

4    whether he was handled properly or improperly or whether you

5    had a bad taste in your mouth about it, but that is his

6    consequence as you said.

7        MRS. MONTERROSO:  I know.  Agreed.

8        MR. BLACKER: If chosen as a juror you would be able to

9    fairly and truly honor your oath to God?

10       MRS. MONTERROSO: Totally.

11       THE COURT: Thank you.

12       (Thereupon, Mrs. Monterroso exited the courtroom.)

13       THE COURT:  Jimmy, bring in he Paredes.

14    Number two, Trejo came in, but I don't think that we need

15    her.  Both sides agree for cause?

16       MRS. CORONA: Yes.

17       THE COURT: You need to agree out loud.

18       MR. BLACKER:  Out loud, yes.

19       THE COURT: Okay. Excused for cause.

20       (Thereupon, Mrs. Paredes entered the courtroom.)

21       THE COURT: This is Mrs. Paredes.  You wanted to speak to

22    us privately?

23       MRS. PAREDES: It is about -- on question 14 you need more

24    about it or not?

25       THE COURT: Your husband was deported in 1997?

117

1     MRS. PAREDES: Yeah.  He had got a case related to drugs

2  and I don't know the whole story because I wasn't in the state

3  where he had the problem with, but the lawyer asked him to say

4  that he was guilty, because he don't have no papers he wasn't

5  legally in the country he said, he declared himself guilty and

6  he will get him to get out on parole or something like that and

7  that is what he did and then later on that went against him

8  because he was deported

9     THE COURT: Okay. Where was your husband from?

10     MRS. PAREDES: Dominican Republic.

11     THE COURT: What was he convicted of?

12     MRS. PAREDES: I am not sure.  He was like somebody with a

13  picture, like it was like a witness and someone on the picture

14  who was selling or doing drug dealing and he pointed out my

15  husband, so they -- yeah, they arrested him and then --

16     THE COURT: Your husband was convicted.  He pled guilty to

17  it.

18     MRS. PAREDES: He pled guilty and he got parole.

19     THE COURT: Okay. And you believe that your husband was not

20  guilty?

21     MRS. PAREDES: Yes.

22     THE COURT: Even though he pled guilty you believe that he

23  is innocent?

24     MRS. PAREDES:  Yes, because he did -- because the lawyer

25  said for him not to get deported he will get him like a parole

118

1   for 18 months.  Later on, I was doing his papers to get legally

2   here and it came against him.

3       THE COURT: So you were not satisfied with the outcome of

4   that case; is that correct?

5       MRS. PAREDES: No.

6       THE COURT: And he was prosecuted by the State of Florida?

7       MRS. PAREDES: No.

8       THE COURT: Where?

9       MRS. PAREDES: He was moved to so many places.  He was in

10  New Jersey.  The case that happened about the drugs that he was

11  in New Jersey and then that case he was not guilty, but still

12  they sent him to Indiana and from there he got deported.

13      THE COURT: So you are not too happy with the criminal

14  justice system in the United States.

15      MRS. PAREDES:  I won't say about that. I am not happy

16  really with the lawyer.

17      THE COURT: You are not happy with the lawyer.

18      MRS. PAREDES:  Right.

19      THE COURT: And because of what happened in your husband's

20  case you seem very effected by it.  Do you think that that

21  would keep you from being fair and impartial in this case?

22      MRS. PAREDES: No, I don't think so.

23      THE COURT: You think that you could be fair and impartial?

24      MRS. PAREDES: Yeah.

25      THE COURT: Any further questions?

119

1      MR. BLACKER: Yes. You have never seen or heard of me

2   before, have you?

3      MRS. PAREDES: No.

4      MR. BLACKER: I am sorry. I mean, I am not the lawyer,

5   right?

6      MRS. PAREDES: No. No.

7      MR. BLACKER: So the fact that --

8      MRS. PAREDES: Today was the first time I seen you.

9      MR. BLACKER: The fact that a lawyer in your opinion

10  misrepresented or told you something that didn't come to be

11  true, would you hold that against either me or ---

12     MRS. PAREDES: Oh, no.

13     THE COURT: Either Mr. Diaz or the state?

14     MRS. PAREDES: No. I trust the state. I trust the law

15  here. I mean, I think that the lawyer and my husband's lack of

16  knowledge for what his right is, he make a wrong decision, but

17  I won't put that against the state or you.

18     THE COURT: All right.

19     MR. BLACKER: So can you fairly try this case if asked to?

20     MRS. PAREDES: Well, yeah.

21     THE COURT: All right. Thank you. Wait outside and please

22  don't discuss this with everybody.

23     (Thereupon, Mrs. Paredes exited the courtroom.)

24     THE COURT. Number 23, Miller.

25     (Thereupon, Mrs. Miller entered the courtroom.)

120

1        THE COURT: Okay. Mrs. Miller, you wanted to speak to us.

2        MRS. MILLER: Yeah. I want to ask you, like if I got

3    picked not to be picked because I am a nanny and the people who

4    I nanny for are, both of the parents are going out of town and

5    none of them have anyone to take care of their kids this week

6    because they don't have anybody that lives here so they rely on

7    me and I would be a juror at any other time except this week.

8        THE COURT: All right. Any further questions? Okay. You

9    can go outside.

10       MRS. MILLER: Thank you.

11       THE COURT: Jimmy, bring in Mayorga.

12       (Thereupon, Mrs. Mayorga entered the courtroom.)

13       THE COURT: You wanted to speak to us?

14       MRS. MAYORGA: Yes. I want to expose my case because I am

15   a single mom and this morning I have to call my brother to pick

16   up, I have a 15 years old and 12 year old and I don't have

17   anybody to drop off in the school. And the other reason is it

18   is too hard for me. I just came here at six and I have to call

19   my brother to pick up my kids. And the other thing is I

20   understand and I speak English as you see, but I don't

21   understand a hundred percent the legal terms that you use. And

22   I think that this is something very serious that you have to

23   understand a hundred percent because you cannot guess, you

24   know.

25       THE COURT: You don't have to worry. I will explain

121

1   everything to you guys, right Kathy?

2        THE CLERK: Very clearly.

3        THE COURT: Where are you from?

4        MR. MAYORGA: Nicaragua.

5        THE COURT: Any further questions?

6        MRS. CORONA: No, Judge.

7        MR. MAYORGA: I am sorry, Judge, but --

8        MR. BLACKER: But, excuse me, Judge.  I thought it was the

9   lawyers that was going to do the explaining.

10        THE COURT: No.  There are cases where I do the explaining.

11   Thank you very much, ma'am.  You could wait outside.

12        (Thereupon, Mrs. Mayorga exited the courtroom.)

13        THE COURT: Jimmy, Mr. Sokol.

14        (Thereupon, Mr. Sokol entered into the courtroom.)

15        THE COURT: Mr. Sokol, you wanted to speak to us?

16        MR. SOKOL: Yes.  I wanted to make sure that both sides of

17   attorneys were familiar with my personal background and my

18   occupation so there were not grounds for a mistrial afterwards.

19        THE COURT: What is your background?

20        MR. SOKOL: I work as a journalist, but a lot of the

21   stories that I have written here in Miami over the past eight

22   years are personal columns, not straight reporting.  Meaning my

23   personal beliefs are there in black and white for the past

24   eight years or so on literally every subject under the sun.

25   Someone that bolted around could perhaps find something to make

122

1    a case on.  So, I wanted to make sure both of you are aware of

2    this so nothing pops up.

3         THE COURT: Let me ask you, do you think that you could be

4    a fair and impartial juror?

5         MR. SOKOL: I believe that I could, yes.

6         THE COURT: Anything in your background that would keep you

7    from being a fair and impartial juror?

8         MR. SOKOL: The only thing that I could think of, again,

9    if someone wanted to make a case out of this, there was an

10   intimation on the part of the prosecutor that spousal abuse is

11   going to figure into this case. As I mentioned, that is

12   something that I witnessed for quite a long period amongst my

13   parents as a child, so obviously it is not going to be as

14   clinical with me as it might be with another juror.

15        THE COURT: Let me understand.  As I understand in this

16   case there is no history of domestic abuse.  What the

17   prosecutor was referring to is the alleged incident in this

18   case, is that correct state and defense?

19        MRS. CORONA: That is correct, Judge.

20        THE COURT: Okay. So this is not that case where you are

21   going to be hearing of any past abuse.  It is the case itself

22   you are going to be trying, if you are selected as a juror, you

23   are going to be trying this case to determine if, in fact, this

24   gentleman committed the crime or not. Do you understand?

25   Knowing that there is no history of domestic abuse, would that

123

1    ---

2         MR. SOKOL: No.  I sincerely will do my best to be as fair

3    and impartial as I can.

4         THE COURT: Okay.  Okay. Any further questions?

5         MR. BLACKER: I have a question. Mr. Sokol, draw upon your

6    sensibilities as a journalist and you tell us that you infuse

7    some of your personal beliefs into your column.  Do you think

8    that you really could put aside all of your personal history?

9    Obviously you are a skilled man and craftsman with words.

10   Could you put that aside?  Could you promise us that you will

11   put all of your -- any prejudice or bias aside and bring your

12   common sense in here and you will listen to these facts?

13        MR. SOKOL: Well, I don't like prejudice or bias, but what

14   I do with the reporter is say this happened and that happened

15   and he said this and she said that.  What I do in a column is

16   what, in effect, a juror would do and what I do is after

17   weighing all the "he says and she says," I am going to tell you

18   which one is lying.

19        THE COURT: So you are used to making judgement calls all

20   the time.

21        MR. SOKOL: Well, which is the reason why I think that I

22   could be fair and impartial.  The difference in writing here or

23   writing an article would be rendering a verdict. All I want to

24   say again is that I receive letters all the time from people

25   saying that I am prejudice, how could I have written something

124

1    like that, so if readers could do that, certainly if I was an

2    attorney -- and I have written about them plenty times -- and I

3    was looking for grounds for a mistrial and if I was in one of

4    your shoes and someone like me came up and I would say -- like,

5    for example, I have written quite a lot about the huge rise in

6    crime rates in Little Havana after the Merielle boat lift. Now,

7    if I was an attorney defending a Cuban exile accused of a

8    certain crime and he was found guilty, afterwards I might say

9    this guy is prejudice against Cuban Americans who are arrested.

10   He obviously thinks that anybody who is arrested, was accused

11   of a crime, there is no way that I could see that.  Obviously,

12   I disagree.  I think that I am being very fair.  So I don't

13   want to make a mistrial and I want to make sure that you are

14   aware of this beforehand so no one could come in and try to use

15   that afterwards for grounds for a mistrial.

16        THE COURT: Any further questions? All right.  All right.

17   So if the state puts on a case you would evaluate the case and

18   if they prove their case beyond a reasonable doubt you could

19   find the defendant guilty?

20        MR. SOKOL: Certainly.

21        THE COURT: And if they fail to prove the case beyond a

22   reasonable doubt you would find him not guilty?

23        MR. SOKOL: Certainly.

24        THE COURT: And you are going to base that decision on the

25   facts that you see and hear in court?

125

 1          MR. SOKOL: Yes.

 2          THE COURT: Thank you.  You could wait outside.

 3          MR. SOKOL: Is he trying to goggle me right now?

 4          MR. GROSS:  Yeah.  I don't have access.

 5          (Thereupon, Mr. Sokol exited the courtroom.)

 6          THE COURT: All right. Mrs. Batey, please Jimmy.

 7          (Thereupon, Mrs. Batey entered the courtroom.)

 8          THE COURT: Mrs. Batey, you wanted to speak to us?

 9          MRS. BATEY:  Yes, sir.  When I answered the questionnaire

10   the last question it said about your family, I have been

11   divorced 20 years and my ex-husband had been arrested. When I

12   was filling that out I wasn't even thinking.

13          THE COURT: Okay. What was he arrested for?

14          MR. BATEY:  He had been -- he was in prison for lewd and

15   lascivious.

16          THE COURT: Okay. And do you know what sentence that he

17   got?

18          MR. BATEY:  He was in, he was in ---

19          THE COURT: Do you know how much he got?

20          MR. BATEY:  I don't know how much.  He was sent to prison

21   for three and a half years.

22          THE COURT: Okay. And was the victim a relative?

23          MR. BATEY:  No.  I don't know anything about it.  It was

24   before I met him.

25          THE COURT: Before you met him?

126

1    MRS. BATEY: All of this happened.

2    THE COURT: Let me ask you, anything about that experience

3    that would effect you here?

4    MR. BATEY: Um, I think that it would just help me more

5    objectively only because I could see experience on both sides

6    of the sword, but only because I wanted to be clear that I

7    wasn't saying any falsehood because I just wasn't thinking

8    about this person being in my family because they have been out

9    of my life for some years.

10    THE COURT: Okay. Any further questions?

11    MR. BLACKER: I have a question, Mrs. Batey. Mrs. Batey,

12    you were not with this gentleman when he went through this

13    experience.

14    MR. BATEY: He was on the other side of the experience, on

15    the other side of the experience.

16    THE COURT: Meaning that while he was in jail you were

17    waiting for him?

18    MR. BATEY: No. I met him while he was in prison through

19    the church, through the ministry experience.

20    MR. BLACKER: Is there anything that happened during that

21    experience which had embittered you towards either side in

22    which you could not render a fair and impartial jury verdict?

23    MR. BATEY: I don't think so. I don't think so.

24    THE COURT: You are a minister?

25    MR. BATEY: Yes.

127

1    THE COURT: And a Hospice chaplain?

2    MR. BATEY: Yes.

3    THE COURT: Is that where people are dying?

4    MRS. BATEY: Yes.

5    THE COURT: And have you ever been a minister or somehow

6    associated with the ministry?

7    MRS. BATEY: I did for about six months I did Bible study

8    in the jail in Broward county, but not as a position, as a

9    volunteer.

10   THE COURT: And as a minister you believe in forgiveness?

11   MRS. BATEY: Yes.

12   THE COURT: And if selected for a jury could you do the

13   job? Can you decide the case based on the cold, hard facts and

14   if someone is proven guilty by the state find them guilty?

15   MRS. BATEY: Yes.

16   THE COURT: And would you leave the matter of punishment to

17   me?

18   MR. BATEY: Yes.

19   THE COURT: So you would not find somebody not guilty just

20   because you were afraid of whatever sentence they may be

21   getting?

22   MRS. BATEY: That's right.

23   MR. BLACKER: I have one more question. I just noticed

24   that you have a brother who is a police officer.

25   MRS. BATEY: No, my nephew.

128

1          MR. BLACKER: Do you discuss his police work with him?

2          MRS. BATEY: Never.  I have no idea about any aspect of his

3     work. I know the kind of work he does, but I don't know

4     anything about it.

5          MR. BLACKER: Okay.  Thank you.

6          THE COURT: All right. Thank you.  You could wait outside.

7          (Thereupon, Mrs. Batey exited the courtroom.)

8          THE COURT: Jimmy, Mr. Jensen, number 33.

9          (Thereupon, Mr. Jensen entered the courtroom.)

10         THE COURT: Mr. Jensen, you said that you wanted to speak

11    to us.

12         MR. JENSEN: Yeah.  Just real quick on the questionnaire I

13    forgot to put down that about 20 or 22 years ago I got arrested

14    for a drug charge and I just wanted to let you know.

15         THE COURT: Okay. What happened?

16         MR. JENSEN: It got no actioned.

17         THE COURT: And what drug was it?

18         MR. JENSEN: Cocaine and valium.

19         THE COURT: Okay.  Was it a matter of personal possession?

20         MR. JENSEN: Yeah, but it wasn't on my possession.

21         THE COURT: Well, I mean, it wasn't a trafficking amount or

22    anything like that.

23         MR. JENSEN: No, no, no.

24         THE COURT: Anything about your experience or the DUI that

25    would effect you here?

129

1    MR. JENSEN: No.

2    THE COURT: Are you going to be more defense oriented

3  because you too were charged with a crime?

4    MR. JENSEN: No.

5    THE COURT: No?  You could be fair to the state?

6    MR. JENSEN: Sure.

7    THE COURT: And anything about police officers that would

8  cause you a problem here?

9    MR. JENSEN: No.  None whatsoever.

10    THE COURT: Any other questions?

11    MR. BLACKER: No, Judge.

12    THE COURT: You are a chef?

13    MR. JENSEN:  Yes, sir.

14    THE COURT: All right. You could wait outside.

15    MR. JENSEN: Thank you.

16    THE COURT: Jimmy, Demburg, number 17.

17    (Thereupon, Mrs. Demburg entered the courtroom.)

18    THE COURT: Mrs. Demburg.

19    MRS. DEMBURG: Yes.  How are you.

20    THE COURT: You wanted to speak to us?

21    MRS. DEMBURG: Yeah, I wanted to speak to you.

22    THE COURT: Go ahead.

23    MRS. DEMBURG: My problem is that I would like to be here

24  for jury whatever, the problem that I have is I have a very,

25  very sick sister in Israel.  She has cancer and she supposed to

130

1   call me any minute of the day and if I have to go there, so I

2   am afraid if I will be here how I could, how I can do both

3   things together?  That is all. If it is a possibility ---

4        THE COURT: Do you have a plane ticket to Israel now?

5        MRS. DEMBURG: No, I don't have.  I am waiting for them to

6   call me.

7        THE COURT: When do you think that you are traveling to

8   Israel?

9        MRS. DEMBURG: I don't know.  They could call me today or

10  tomorrow or -- I am not sure.  That is why I am afraid to be

11  busy with this.  If she have to go, she is very, very, very

12  ill.

13       THE COURT: Do you work?

14       MRS. DEMBURG: I do.

15       THE COURT:  What type of work do you do?

16       MRS. DEMBURG: I am a beautician.

17       THE COURT: How long has your sister been seriously ill?

18       MRS. DEMBURG: She is sick for 10 years, but now she has

19  metastasized in her body, so I may have to travel any day.  I

20  am not sure when.  I am waiting for a phone call.

21       THE COURT: Any further questions, state?

22       MRS. CORONA: No, Judge.

23       MR. BLACKER: I do have a question.

24       THE COURT: Go ahead.

25       MR. BLACKER: Mrs. Demburg, do you think that the fact that

131

1    your sister is very ill, and I am sorry to hear that, would

2    that effect your ability to put your full attention into this

3    matter that you would have your full attention here or would

4    that, perhaps you would not concentrate?

5        MRS. DEMBURG: Of course.  It is effects all of my mental

6    situation and everything differently, but I am trying to keep

7    myself together, but everyday we don't know what is going to

8    happen.

9        MR. BLACKER: We are very sorry.

10       MRS. DEMBURG: That is why I am afraid to be here.  Maybe

11   I have to travel in a day or two or five.  I am waiting every

12   moment for that.  That is all what I have to tell you.

13       THE COURT: Thank you. You could wait outside.

14       MRS. DEMBURG: Thank you so much.

15       (Thereupon, Mrs. Demburg exited the courtroom.)

16       THE COURT: And Jimmy, 11, Segui.

17       (Thereupon, Mrs. Segui entered the courtroom.)

18       MRS. SEGUI: I just want to mention, remember when you

19   asked if anyone was going on a flight anywhere that would be a

20   reason, I am not going on a flight anywhere but I do

21   professional pet sitting and my clients are going out of town

22   on Wednesday and I have already signed, like signed an

23   agreement that I was going to take care of their pets while on

24   vacation and I just don't want this to interfere with that.

25       THE COURT: What kind of pets are we talking about?

132

1    MRS. SEGUI: It is a dog that takes medication, so it has

2    -- and it has to be taken out frequently because or else it

3    will pee in the house or destroy the house.  That is why they

4    are hiring a pet sitter.

5        THE COURT: Your boyfriend is in a federal prison camp?

6    MRS. SEGUI: Yes.

7        THE COURT: What is he there for?

8    MRS. SEGUI: Drug related.

9        THE COURT: Would that effect you here as a juror the fact

10   that your boyfriend is in prison?

11    MRS. SEGUI: No.  Cause this isn't a drug related case.

12   Even though, I guess I would also like to mention that I kind

13   of do feel uncomfortable on I don't know if it is a normal

14   reaction to feel like angry and sick when I heard what you were

15   saying about what the charges were.

16       THE COURT: So you thought -- the charges kind of turned

17   you off?

18   MRS. SEGUI: Yeah.

19       THE COURT: All right. Any further question?

20   MRS. CORONA: No, Judge.

21   MR. BLACKER: No.

22       THE COURT:  Wait outside.

23   MRS. SEGUI: Thank you.

24   (Thereupon, Mrs. Segui exited the courtroom.)

25       THE COURT: Both sides will agree for cause?

133

1    MR. BLACKER: Yes. Yes.

2    THE COURT: Let's go over the cause ones. Number two, of

3    course. Number five, Lemour, the sleeping juror. Both sides

4    agree for cause?

5    MR. BLACKER: Judge, I was looking for a juror that was

6    sleeping, but I will agree with you on this one.

7    THE COURT: And number 11 is for cause. Number 15, Mayorga,

8    is she for cause? English. Both sides agree?

9    MR. BLACKER: Hold on a second. Mayorga, she is the one

10   that first came in here. Yes.

11   THE COURT: Number 21, Esther Galvez, both sides agree for

12   cause?

13   MRS. CORONA: Yes, Judge.

14   MR. BLACKER: Judge, number 17, what did you do with her?

15   THE COURT: I skipped that. Number 21, Galvez, both sides

16   agree for cause?

17   MR. BLACKER: Yes, yes.

18   MR. GROSS: Yes, Your Honor.

19   THE COURT: Number 23, Miller, the nanny. Both sides agree

20   for cause?

21   MRS. CORONA: Yes.

22   MR. BLACKER: Yes.

23   THE COURT: Number 24, Johari, cause.

24   MR. BLACKER: Judge, let me find her on here.

25   THE COURT: No, it is a man. The one that wants to hear

134

1    from your client.

2         MR. BLACKER: Yeah.

3         THE COURT: For cause?

4         MR. BLACKER: Yes.

5         THE COURT: Number 28, Cruz, English.

6         MR. BLACKER: Yes.

7         THE COURT: Both sides agree for cause?

8         MRS. CORONA: Yes, Judge.

9         THE COURT: Speak up, guys.

10        MR. BLACKER: Did she have a problem and she announced it?

11        THE COURT: Yes.

12        MR. BLACKER:  Okay.

13        THE COURT: And number 30, Whiting, both sides agree for

14   cause?

15         MR. GROSS: Yes.

16         MR. BLACKER: Absolutely.  She raised her hand on

17   everything.

18        THE COURT: Number 32, Alicia Martinez for cause.

19        MRS. CORONA: Yes, Judge.

20        MR. BLACKER: English.

21        THE COURT: Yes. And number 37, Perez for cause.

22        MR. BLACKER: I am not going to strike him for cause,

23   Judge, or agree to strike him for cause unless the Court could

24   enlighten me as to that.

25         THE COURT: English.

135

1       MR. BLACKER: He said that he couldn't speak English? Do I

2    have to agree? I like him.

3       THE COURT: He doesn't speak English. What could I do.

4       MR. BLACKER: Okay.

5       THE COURT: English. He is out. Number 38, Leonor Rega,

6    English and surgery tomorrow. Both sides agree for cause?

7          MRS. CORONA: Yes.

8          MR. BLACKER: Yes.

9       THE COURT: And number 40, Fuentes, English. Both sides

10   agree?

11         MRS. CORONA: Yes.

12         MR. BLACKER: Yes, Judge.

13      THE COURT: So we have like 37. We have like 36 or 37 if

14   you count the lady. You want to strike her for cause?

15         MR. BLACKER: Demburg?

16         THE COURT: Demburg.

17         MR. BLACKER: Okay.

18      THE COURT: I will strike her for cause but if we need her

19   I will bring her back.

20         MR. GROSS: Yes, Judge.

21      THE COURT: Because she doesn't know. You know, we could

22   always have an alternate.

23      Okay. Do you need more time with your client?

24      MR. BLACKER: Just a few minutes. We pretty well know

25   what we want. You said that there is back striking?

136

1      THE COURT: Yeah.  Yeah, by law.

2      (Thereupon, court stood in brief recess.)

3      THE COURT: Okay. All right. Defense is here.  State is

4  here. Back striking, whether it is odd or even, okay.  Number

5  one, Torres, defense.

6      MR. BLACKER: We will accept.

7      THE COURT: State.

8      MR. GROSS: Accept.

9      THE COURT: Number three Perez, defense.

10      MR. BLACKER: We will accept as long as we could back

11  strike.

12      THE COURT: Yeah. State.

13      MR. GROSS: Accept.

14      THE COURT: Number four, state, Caldwell.

15      MR. GROSS: Accept.

16      THE COURT: Defense.

17      MR. BLACKER: Accept.

18      THE COURT: Number six, James Chiples, state.

19      MR. GROSS: Accept.

20      THE COURT: Defense.

21      MR. BLACKER: Accept.

22      THE COURT: Number seven, Cuckler, defense.

23      MR. BLACKER: Accept.

24      THE COURT: State.

25      MR. GROSS:  Accept.

137

1        THE COURT: Number eight Shoup.

2        MR. GROSS:  Accept.

3        THE COURT: Defense.

4        MR. BLACKER: Preemptory challenge.

5        THE COURT: Number nine, Sanz-Perez, defense.

6        MR. BLACKER: I want to make sure.  I know it is the law,

7    but both sides can accept and someone could always go back and

8    back strike?

9        THE COURT: Yeah.

10        MR. BLACKER: Okay. Accept.

11        THE COURT: And state.

12        MR. GROSS: Accept.

13        THE COURT: That is six.  Defense, any back strikes?  I ask

14    you first because it is an odd number.

15        MR. BLACKER: Could I have a moment?

16        THE COURT: Yes.

17        MR. BLACKER: Judge, you are going to allow me to back

18    strike but it doesn't have to the first one.

19        THE COURT: Now you could back strike anyone you want.

20        MR. BLACKER: We are going to strike number nine, Your

21    Honor, as a preemptory.

22        MR. GROSS: State accepts 10, Your Honor.

23        THE COURT: Okay, Deutsch.

24        MR. BLACKER: Okay, accept.

25        THE COURT: State.

138

1      MR. GROSS: Accept.

2      THE COURT: Defense.

3      MR. BLACKER: We are on 10 now?

4      THE COURT: Yes.

5      MR. BLACKER: Accept.

6      THE COURT: How many is that? Six.  State, any back

7  strikes?

8      MR. GROSS: One moment, Your Honor.  Your Honor, the state

9  would use its first preemptory on juror number four.

10      THE COURT: Number 12, Erika Espinosa, state.

11      MR. GROSS: Accept.

12      THE COURT: Defense.

13      MR. BLACKER: Accept.

14      THE COURT: Okay. State, any back strikes?

15      MR. GROSS: Your Honor, state uses its second preemptory on

16  juror number 12, that would be Espinosa.

17      THE COURT: Number 13, Henry Delgado, defense.

18      MR. BLACKER: Number 13?

19      THE COURT: Yes.

20      MR. BLACKER: Accept.

21      THE COURT: Okay. Defense, any back strikes?

22      MR. BLACKER: Yes. Okay.

23      THE COURT: Ready?

24      MR. BLACKER: Yes, Your Honor, preemptory for number seven,

25  Cuckler. That is our third preemptory, I believe.

139

1      THE COURT: Now, number 14, Castillo.

2      MR. GROSS:  Accept.

3      MR. BLACKER: Accept.

4      THE COURT: Okay. State, no back strikes?

5      MR. GROSS: No.

6      THE COURT: Did you say no?

7      MR. GROSS: No.

8      THE COURT: No back strikes?

9      MR. GROSS: No back strikes.

10     THE COURT: Defense. Defense, we have a jury?

11     MR. BLACKER: I am going to back strike -- okay.  I don't

12  believe that we have stricken number 12.

13     THE COURT: The state did.

14     MR. BLACKER: State did 12. Sorry.  How about 13?

15     THE COURT: No.

16     MR. BLACKER: Nobody struck 13?

17     THE COURT: No.

18     MR. BLACKER: They are struck now.

19     THE COURT: Number 16, Charles Harris, state.

20     MR. GROSS:  Accept.

21     THE COURT: Defense.

22     MR. BLACKER:  Accept.

23     THE COURT: State, any back strikes?

24     MR. GROSS: Yes, Your Honor.  State would use its third

25  preemptory on juror number 16, Charles Harris.

140

1       THE COURT: Number 18, Yiselis Perez, state.

2       MR. GROSS: Accept.

3       THE COURT: Defense.

4       MR. BLACKER: Accept.

5       THE COURT: Okay. State any back strikes?

6       MR. GROSS: No.

7       THE COURT:  Defense, any back strikes?

8       MR. BLACKER: Yes.  Can I ask for a clarification on

9   something.

10      THE COURT: Yes.

11      MR. BLACKER: Are seven, eight, and nine already gone?

12      THE CLERK: Yes.

13      MR. BLACKER: So remaining are one, three, six, 10 and 14.

14      THE COURT: And 18. Fourteen is the lady here at the end.

15      MR. BLACKER: Defendant will strike Deutsch, number 10.

16      THE COURT: Okay. Number 19 Sonia Monterroso, defense.

17      MR. BLACKER: Accept.

18      THE COURT: State, number 19, state.

19      MRS. CORONA: State will exercise a preemptory challenge on

20   number 19.

21      THE COURT: Number 20, Sofia Plaza, state.

22      MR. GROSS: Your Honor, the state would use its next

23   preemptory on juror number 20.

24      THE COURT: Okay.  Number 22, Luisa Paredes, state.

25      MR. GROSS: Your Honor, state would move for a cause

141

1    challenge for juror number 22.  As you know she was the juror

2    that came in and her husband was deported and she said that she

3    didn't believe that he was guilty.

4         THE COURT: Denied for cause.

5         MR. GROSS: State would then use its next preemptory

6    challenge on juror number 22.

7         THE COURT: Number 25, Elianna Roc, defense.

8         MR. BLACKER: Accept.

9         THE COURT: State.

10        MR. GROSS: Accept, Your Honor.

11        THE COURT: Defense, any back strikes?

12        MR. BLACKER: Any back strikes? Yes.  Could I have a moment

13   with my client?

14        THE COURT: Yeah.

15        MR. BLACKER: Eighteen is still viable; is that correct?

16        THE COURT: Eighteen is in.

17        MR. BLACKER: The defendant will strike preemptorily number

18   six, Mr. Chiples.

19        THE COURT: Number 26, Alejandro Halley, state.

20        MR. GROSS: Accept.

21        THE COURT: Defense.

22        MR. BLACKER: Accept, Your Honor.

23        THE COURT: Okay. State, any back strikes?

24        MR. GROSS: No back strike, Your Honor.

25        THE COURT: Defense, any back strikes?

142

1       MR. BLACKER: Back strike ---

2       THE COURT: The state said no back strikes.

3       MR. BLACKER: They said they would go back and back strike.

4       THE COURT: No.  They said no back strikes.  Do you have

5   any?

6       MR. BLACKER: We are on number 26?

7       THE COURT: Yes.

8       MR. BLACKER: Okay. Number 26, okay.  We will preemptorily

9   challenge number three.

10      THE COURT: Number 27, Brett Sokol, defense.

11      MR. BLACKER: Strike.  Judge, I would like to ask you to

12  strike him for cause. I know what he said.  However, what he

13  said if you really, really think about it, what he said was ---

14      THE COURT: I heard what he said. State, how do you feel?

15      MR. GROSS: Great juror, Your Honor. The state has no

16  problem accepting the juror.

17      THE COURT: Okay.

18      MR. BLACKER: Judge, what he really said was I report the

19  facts, but I call the shots and I tell you how it really is and

20  then I am getting a lot of letters that I am very prejudice.

21      THE COURT: Denied for cause.

22      MR. BLACKER: We will take the preemptory challenge.

23      MR. GROSS: How many preemtories challenges on each side?

24      THE CLERK: You have six.  You have used eight.

25      THE COURT: Let's pick a jury out of this group. Number 29,

143

1    Christopher Tabor.

2         MR. BLACKER: We will accept him.

3         THE COURT: State.

4         MR. GROSS: Accept for now. Accept, Your Honor.

5         THE COURT: Okay. Defense, any back strikes?

6         MR. BLACKER: Yes. Okay. Could I just ask now what we have

7    viable. We have one, we have 14, 18, 20.

8         THE CLERK: Twenty is gone. You have one, 14, 18, 25, 26

9    and 29.

10        MR. BLACKER: Okay. I need a moment, Your Honor.  If

11   necessary I am bringing back this pregnant girl.  Let me ask

12   how many more jurors we have on this venire that are not

13   stricken.

14        THE COURT: Six.

15        MR. BLACKER: Six.

16        THE COURT: And there is the Israeli that I could bring

17   back.

18        MR. BLACKER: That is seven. All right.   We are going to

19   strike number 18 preemptorily, Your Honor.

20        THE COURT: Okay. Carlos Garcia, defense. Defense, Carlos

21   Garcia.

22        MR. BLACKER: What number?

23        THE COURT: 31.

24        MR. BLACKER: Preemptory challenge.

25        THE COURT: I am sorry, you are striking?

144

1      MR. GROSS: They are done, right?

2      MR. BLACKER: We are done.

3      THE COURT: Number 33 Scott Jensen, defense. Number 33,

4   Scott Jensen, defense. Mr. Blacker, number 33, Scott Jensen.

5      MR. BLACKER: Accept.

6      MRS. CORONA: We will strike Mr. Jensen.

7      THE COURT: Number 34 Jesus Sardinas, state.

8      MRS. CORONA: Accept.

9      THE COURT: Defense.

10      MR. BLACKER: Let me look. Judge, may I ask the Court to

11   ask Mr. Sardinas in here. His wife works for Miami Dade

12   police.

13      THE COURT: All right. Lewy, could you get Jimmy. Jimmy,

14   get Sardinas in here.

15      (Thereupon, Mr. Sardinas entered the courtroom.)

16      THE COURT: Either side would like to question him?

17      MR. BLACKER: I would. Mr. Sardinas, your wife works for

18   the Miami Police Department.

19      MR. SARDINAS: Yes, she does accountant work.

20      MR. BLACKER: Does she get involved with discussions with

21   any of the police officers about their work?

22      MR. SARDINAS: No, sir.

23      MR. BLACKER: How about you? Do you socialize or go to

24   the police functions?

25      MR. SARDINAS: No, sir.

145

1          MR. BLACKER: We don't mind.

2          MR. SARDINAS: No, no.  The only thing is that we attend

3     to get a certificate when there is an office one, when they

4     have parties at some people's house or somebody gets married.

5          MR. BLACKER: What we need to know and we don't care --

6          MR. SARDINAS: No, no.  I am telling you.

7          MR. BLACKER: Is whether or not you discuss police matters

8     with any of the police officers, the cases, things that

9     happened.

10         MR. SARDINAS:  No.  She is not involved in any of that.

11    She is just in the accounting part.

12         MR. BLACKER: Do you speak with any of the people about

13    their job?

14         MR. SARDINAS:  No.

15         MR. BLACKER: Do you think anything about her work that

16    would make it difficult for you to reach a verdict in this

17    case?

18         MR. SARDINAS:  No, I don't think so.

19         MR. BLACKER: And you have -- when you say about the

20    lawsuit, the hospital that you were working at was involved in

21    a lawsuit, it was a civil case?

22         MR. SARDINAS:  It was a civil case.

23         MR. BLACKER: Nothing difficult about that?

24         MR. SARDINAS:  Just somebody walked across the line and

25    tripped over a bumper and since I was director of the

146

1   facilities I got called in.

2       MR. BLACKER:  Do you really want to be a juror on this

3   panel?

4       MR. SARDINAS: I would be willing to, yes.

5       MR. BLACKER: Is there anything about your life experience

6   that would make it easier or more difficult for you to sit in

7   judgement of the facts of this case?

8       MR. SARDINAS:  No.  The only thing that I have to offer is

9   I have been an administrator for a very long time, so I deal

10  with a lot of people and a lot of different personalities.

11      MR. BLACKER:  Anything that may prejudice or bias you as

12  far as your lifelong -- you could set that aside and live up to

13  the oath that you are going to take?

14      MR. SARDINAS:  Yes, sir.

15      MR. BLACKER: Thank you.  I have nothing further.

16      THE COURT: Mr. Sardinas, like today Jimmy asked me if he

17  could go down to the cafeteria and perhaps have lunch with you

18  since you know Jimmy and I told him no, I did not want him

19  having lunch with a prospective juror. If you are selected for

20  this jury even though you know Jimmy from when he worked with

21  you or for you, I am going to ask Jimmy to not, you know, not

22  have lunch with you, not discuss anything with you.  Would that

23  present a problem for you?

24      MR. SARDINAS: No, sir.  I expect Jimmy to be totally

25  professional with his job.

147

1      THE COURT: All right. Any further questions? No? Thank

2  you.  You could wait outside.

3      (Thereupon, Mr. Sardinas exited the courtroom.)

4      THE COURT: All right.  Okay. With Mr. Sardinas, you wanted

5  him brought in.  Any problems?

6      MRS. CORONA:  No, Judge, we accept.

7      THE COURT: State, any back strikes?

8      MRS. CORONA:  Judge, we will exercise a preemptory

9  challenge on juror number 29, Mr. Tabor.

10      THE COURT: Juror number 29. And that takes us now to

11  Patricia Gutierrez, defense.

12      MR. BLACKER: That is number what, Your Honor?

13      THE COURT: Thirty-five.

14      MR. BLACKER: She is -- her answers to number 13 I think

15  needs some inquiry from the Court or us.

16      THE COURT: Okay. Jimmy.

17      THE CLERK: He just went outside.

18      THE COURT: Jimmy, number 35, Patricia Gutierrez.

19      (Thereupon, Mrs. Gutierrez entered the courtroom.)

20      THE COURT: Mr. Blacker.

21      MR. BLACKER: Yes.  Good afternoon, Mrs. Gutierrez.

22      MRS. GUTIERREZ: Good afternoon.

23      MR. BLACKER: I notice that you said on your juror

24  questionnaire that you have two brothers who are police

25  officers.

148

1    MRS. GUTIERREZ: Correct.

2    MR. BLACKER: You are close with your brothers?

3    MRS. GUTIERREZ:  Yes.

4    MR. BLACKER: Do you socialize with your brothers as well

5    as go to holiday functions.

6    MRS. GUTIERREZ:  Yeah.

7    MR. BLACKER: Do they talk to you about being a police

8    officer, their experiences?

9    MRS. GUTIERREZ: Little bit.

10    MR. BLACKER: You could tell us.

11    MRS. GUTIERREZ: A little bit.  Because I am from Sunrise,

12    doesn't say much.  The one in Miami Beach, he is pretty new.

13    MR. BLACKER: He tells you a little bit about his cases

14    and what is going on?

15    MRS. GUTIERREZ: Yes.

16    MR. BLACKER: Does he leave you with a flavor?  Do you get

17    the idea that justice is or is not being served truly and in a

18    true sense from his stories?  He tells you that somebody did

19    something, certainly not everybody here, but I am just saying,

20    do you get that flavor from him when he tells you that

21    something is going on that is not told in court or something

22    happens in certain cases where it is not exposed properly or

23    justice isn't served properly, whether or not he or she served

24    properly?

25    MRS. GUTIERREZ: No.  I think it is served properly.  He

149

1    never says anything.

2         THE COURT: The fact that your brother is a police officer,

3    would that effect you in any way here?

4         MRS. GUTIERREZ: No, sir.

5         MR. BLACKER: You would be able to render a fair and just

6    verdict in this case?

7         MRS. GUTIERREZ: Yes.

8         MR. BLACKER: Thank you.

9         THE COURT: Any further questions?

10        MR. BLACKER: You are a specialist for a private company?

11        MRS. GUTIERREZ:  It is called Paychecks.  It is a private

12   ---

13        MR. BLACKER: It is a private company that you work for?

14        MRS. GUTIERREZ:  Yes.

15        THE COURT: Thank you, Mrs. Gutierrez.

16        (Thereupon, Mrs. Gutierrez exited the courtroom.)

17        THE COURT:  Any challenges?

18        MRS. CORONA: No, Judge.

19        THE COURT: All right.  Defense, any challenges? I need an

20   answer.

21        MR. BLACKER: I am thinking, Judge, for the last two. No.

22   I can't think of any.

23        MRS. CORONA: Judge, we accept the panel.

24        THE COURT: We have a jury then. All right. And should we

25   pick one or two alternates?

150

1    THE CLERK: I think that you only have two left. You have

2    two people left for alternates.

3    MR. GROSS: But Your Honor there will only be one. The

4    state would move for cause for 39.

5    THE COURT: Okay. So Alessandra Aranda, number 36, one

6    challenge per side on the alternate. Can Aranda be the

7    alternate?

8    MRS. CORONA: Yes.

9    MR. BLACKER: Who else is left, Judge?

10   THE COURT: Mrs. Batey, but they said that they would

11   strike her, so we could either have Aranda or just no

12   alternate.

13   MR. BLACKER: Give me one second. Accept number 36, Your

14   Honor.

15   THE COURT: All right. Let me go over the jury. It is

16   Maritza Torres, number one. Norma Castillo is number two.

17   Elianne Roc, number three. Alejandro Halley, number four.

18   Jesus Sardinas, number five. And Patricia Gutierrez, number

19   six. And the alternate is Alessandra Aranda.

20   MRS. BLACK: Judge, I was following you from the wrong way

21   because I was following from the number that we challenged

22   someone for cause.

23   THE COURT: Okay. Number one juror would be Maritza Torres,

24   number one. Number two juror would be Norma Castillo, who is

25   number 14. Number three juror would be number 25, Eilanne Roc.

151

1    Number four juror would be juror number 26 Alejandro Halley.

2    Number five juror would be Jesus Sardinas, number 34. Number

3    six jurors would be Patricia Gutierrez, juror number 35. And

4    the alternate would be Alessandra Aranda. Both sides are in

5    agreement with the jury as selected?

6            MRS. CORONA: Yes, Judge.

7            THE COURT: Michael.

8            MR. BLACKER: Yes, Judge. Did you say number five is Mr.

9    Jesus Sardinas?

10           THE COURT: Yes. And number six is Patricia Gutierrez.

11           MR. BLACKER: And the alternate is Mrs. Aranda.

12           THE COURT: Mrs. Aranda, yes. Both sides satisfied with the

13   jury as selected?

14           MR. BLACKER: Yes, sir.

15           THE COURT: Mr. Diaz.

16           THE DEFENDANT: Yes.

17           THE COURT: Are you satisfied with this jury as selected?

18           THE DEFENDANT: Yes, Your Honor.

19           MR. BLACKER: I am satisfied within the number of

20   preemptories that you granted us I would renew my request for a

21   few more preemptories viewing the serious nature of this case

22   and the implications in terms of the sentencing.

23           THE COURT: All right. Denied. And Mr. Diaz, are you

24   satisfied with the jury as selected?

25           THE DEFENDANT: Yes.

152

1     THE COURT: Okay. And let me take a two minute break and I

2    will be right back and what we are going to do is we are going

3    to nouns the jury and I am going to talk to them for five or 10

4    minutes, tell them to be here at 9:30. I need everybody here on

5    time to tomorrow, okay.

6     I am going to have the jury come in. Lewy, do me a favor

7    and call Jimmy and tell him to sit the jurors in the back. I

8    will be in in a minute.

9        (Thereupon, court stood in brief recess.)

10        (Thereupon, court was reconvened.)

11      (Thereupon, the jury entered the courtroom.)

12     THE COURT: Let the record reflect the defendant's presence

13    as he has been throughout the jury selection.

14     Ladies and gentlemen, we were able to select a jury.  It

15    was rather easy with such a wonderful group of people.  As I

16    call your name please come forward and have a seat in the jury

17    box. If you did not get selected please don't feel offended, we

18    are only picking six out of 40.  So the odds are that you are

19    not going to be selected. Number one, Maritza Torres. Norma

20    Castillo.  Elianne Roc. Alejandro Halley.  Jesus Sardinas.

21    Patricia Gutierrez. Alessandra Aranda.  And Mr. Halley, let me

22    ask you, are you related to Michelle Halley?

23     MR. HALLEY:  Yeah, that is my aunt.

24     THE COURT: Yeah, I happen to know her and her husband

25    Carlos and my daughter is Catia and she went to Lords

153

1    (phonetic) and I know Maria went to Lords too.  She is now in

2    college.  The fact that you may know some of the same people

3    that I know, would that effect you in any way as a juror?

4         MR. HALLEY:  No.

5         THE COURT: You could be a fair and impartial juror?

6         MR. HALLEY:  Yes.

7         THE COURT: Could you listen to the facts and decide the

8    case based on the facts?

9         MR. HALLEY:  Yes.

10        THE COURT: Any objection by the lawyers?

11        MRS. CORONA: No, Judge.

12        MR. BLACKER: None, thank you.

13        THE COURT: So too the rest of the people from the

14   audience, Jimmy will take you outside and he will, I think that

15   he has the certificate of attendance here and he will take

16   everybody outside and then he will give you those and hand

17   those out, all right.  Thank you all for being here.  I hope

18   that you enjoyed the afternoon.

19        (Thereupon, the jurors not selected the exited the

20   courtroom.)

21        THE COURT: All right. Any objection to swearing in the

22   jury?

23        MRS. CORONA: No, Judge.

24        MR. BLACKER: No, none, Your Honor.

25        THE COURT: Okay, Kathy.

154

1   (Thereupon, the jury was duly sworn as the jury to try the case

2   of the State of Florida versus Pablo Diaz.)

3       THE COURT: Thank you.  Please have a seat. I am going to

4   talk to you for about five minutes and then we are going to

5   recess for the evening until tomorrow morning, okay.  As you

6   could see, sometimes it gets cold for you guys.  Not us because

7   we have robes, but bring a sweater.

8       Ladies and gentlemen of the jury, you have been selected

9   and sworn as the jury to try the case of the State of Florida

10  versus Pablo Manuel Diaz, the defendant.  This is a criminal

11  case. Pablo Manuel Diaz is charged with three counts, attempted

12  felony murder, kidnapping, and aggravated assault with a

13  firearm. The definition and the elements of these offenses will

14  be explained to you later.  It is your solemn responsibility to

15  determine if the state has proved its accusations beyond a

16  reasonable doubt against Mr. Diaz. Your verdict must be based

17  solely on the evidence or lack of evidence and the law.

18      The information, the charging document that I read to you

19  earlier is not evidence and it is not to be considered by you

20  as any proof of guilt.  It is the Judge's responsibility to

21  decide what laws apply to this case and to explain those laws

22  to you. It is your responsibility to decide what the facts of

23  this case may be and to apply those laws to the facts.  Thus,

24  the province of the jury and the province of the Court are well

25  defined and they do not over-lap. This is one of the

155

1   fundamental principles of our system of justice.

2       Before proceeding further it will be helpful if you

3   understand how a trial is conducted.  Tomorrow morning at the

4   beginning of the trial the attorneys will have an opportunity

5   if they wish to stand before you and make an opening statement.

6   The opening statements gives the attorneys a chance to tell you

7   what evidence they believe will be presented during the trial.

8   What the lawyers say is not evidence and you are not to

9   consider it as such.

10      Following the opening statements witnesses will be called

11  to testify under oath. They will be examined and cross examined

12  by the attorneys. Documents and other exhibits also may be

13  produced as evidence. After the evidence has been presented the

14  attorneys will have the opportunity to make final arguments.

15  Following the arguments by the attorneys the Court will

16  instruct you on the law applicable to the case. After the

17  instructions are given the alternate juror will be released and

18  you will then retire to consider your verdict.  You won't know

19  who the alternate juror is until the end of the case. Just

20  because we have an alternate juror does not mean that you could

21  have the luxury of sleeping in late and not showing up. I

22  recently had a juror do that to me and I had  to send a couple

23  of Metro officers to bring her to court.  The alternate is for

24  emergency, it is not a luxury.  It is for an emergency.  I am

25  ordering that you have to come back until the end of this

156

1    trial.  You should not form any definite or fixed opinions on

2    the merits of the case until you have heard all the evidence

3    and the arguments of the lawyers and my instructions on the

4    law. Until that time you should not discuss this case among

5    yourselves.

6         During the course of the trial the Court may take recesses

7    during which you will be permitted to separate and go about

8    your personal affairs. During these recesses you will not

9    discuss this case with anyone or permit anyone to say anything

10   to you or in your presence about the case. If anyone attempts

11   to say anything to you or in your presence about this case tell

12   them that you are on the jury trying the case and ask them to

13   stop. If they persist, leave them at once and immediately

14   report the matter to Jimmy who will advise me. This case must

15   be tried by you only on the evidence presented during the trial

16   and in your presence and in the presence of the defendant, the

17   attorneys and the Court. Jurors must not conduct any

18   investigations of their own.

19        Accordingly, you must not visit any of the places

20   described in the evidence and you will not read nor listen to

21   any reports about this case, although none is expected.  You

22   are not to do any investigation in any manner whatsoever,

23   whether it be on the internet or in any way. Further, you must

24   not discuss this case with any person and you must not speak

25   with the attorneys, the witnesses or the defendant about any

157

1    subject until your deliberations are finished. As I told you

2    earlier, whenever we recess I am going to have you meet Jimmy

3    some place else or he will tell you where to meet him and it

4    will never be out here. That way I minimize any contact that

5    you may have with the lawyers or the witnesses.

6         In every criminal proceeding a defendant has the absolute

7    right to remain silent. At no time is it the duty of a

8    defendant to prove his innocence.  From the exercise of a

9    defendant's right to remain silent a juror is not permitted to

10   draw any inference of guilt and the fact that a defendant did

11   not take the witness stand must not influence your verdict in

12   any manner whatsoever.

13        The attorneys are trained in the rules of evidence and

14   trial procedure and it is their duty to make all objections

15   they feel are proper. When an objection is made, you should not

16   speculate on the reason why it is made. Likewise, when an

17   objection is sustained or upheld by me you must not speculate

18   on what might have occurred had the objection not been

19   sustained nor what a witness might have said had he or she been

20   permitted to answer.

21        So with that said, we are going to recess for the evening.

22   Jimmy is going to take you and he is going to have you fill out

23   a form with your name your phone number, your cell phone number

24   and your work number.  He is also going to give you one of my

25   cards in case, you know, God forbid something should happen on

158

1   the way here in the morning and you could contact us. And

2   again, you are ordered not to discuss this case among

3   yourselves or with anyone else. What that means is that you

4   cannot discuss it with your loved ones, with your friends. Mr.

5   Halley, and I single you out because you are the youngest, you

6   can't get on the cell phone -- I know, I have three kids myself

7   and it is like it is their alter ego that cell phone. You

8   can't pick up the cell phone and call your buddies and say,

9   hey, I am on a jury. You know, this is very serious to both

10  sides and you cannot discuss this case with anyone or among

11  yourselves. Very important all throughout. And the other thing

12  that I would mention is about note taking. If anybody wants to

13  take notes we have to provide the opportunity to all of you.

14  This is a short trial. You know, it is up to you whether you

15  want to take notes or not. Sometimes it is better just to

16  concentrate on what is going on rather than taking notes

17  because you are not an official court reporter and there is a

18  problem with notes when you take notes that goes through a

19  process of interpretation. You hear it and interpret it and

20  write it and if you do take notes what will happen is whenever

21  there is a recess you are going to put your notes in an

22  envelope that we will provide like this and you are going to

23  leave your notes on the chair. You cannot take them with you.

24  You can't take them with you over night. You can't take them

25  into the jury room. At the end of the case when it is time to

159

1  deliberate you may take your notes into the jury room, but only

2  for your benefit. You cannot pass them around because you are

3  not official court reporters and that note taking has gone

4  through the process of interpretation. So, you know, it is up

5  to you if you decide to take them or not. If one of you wants

6  to take them, I will make the opportunity available to

7  everybody. Personally, I would recommend that you pay

8  attention to the testimony and the evidence rather than so much

9  note taking, because it is a short trial and this is not one of

10  these trials that is going to last weeks or anything like that.

11  Any objections by the lawyers to the Court's instructions on

12  the note taking?

13         MRS. CORONA: No, Judge.

14         THE COURT: And defense.

15         MR. BLACKER: No.

16         THE COURT: And Mrs. Roc, you raised your hand.

17         MRS. ROC: Yes, Judge. If I can't come back tomorrow it

18  is a problem? Because I have the to Atlanta because I have my

19  -- this morning they called me and she tell me my brother in

20  the hospital. So if I can't come back tomorrow it is a

21  problem?

22         THE COURT: Yeah. Yeah. Why didn't you say anything

23  before?

24         MRS. ROC: I don't --

25         THE COURT: Why did you not say anything before?

160

1    MRS. ROC: No. I think today it is going to finish today

2    I don't have to come back tomorrow.

3    THE COURT: But you heard that it would last until like

4    Wednesday or Thursday. That is what I told everybody. It's

5    important that you come back tomorrow and you come back until

6    the case is finished.

7    MRS. ROC: Three days?

8    THE COURT: It will be finished Wednesday, at the latest

9    Thursday. That is why we have this, you know. It wasn't for

10   fun that I was asking all of these questions. It's to find out

11   if all of you have had anything, any conflicts, and you didn't

12   raise your hand. You have been selected for this jury.

13   MRS. ROC: Okay. Okay. I finish and I go home.

14   THE COURT: Okay. So everybody, and I repeat it, everybody

15   is ordered to come back to court until this case is over.

16   Anyone that fails to return could be held in contempt of the

17   court and sanctioned accordingly. Okay.

18   MRS. ROC: Yeah.

19   THE COURT: Anything further? Anything further? We are in

20   recess until tomorrow. We are going to start trial at 9:30. I

21   want everybody here by nine on the 7th floor. They could have

22   coffee and be ready and we will bring you down at 9:30, all

23   right. Have a nice evening and watch your step coming out of

24   the jury box.

25   (Thereupon, the jury exited the courtroom and was excused.)

161

1      THE COURT: All right. Anything further?

2      MR. BLACKER: Very quickly, Judge. Judge, I would ask you

3 to remind the jurors that we are not allowed to even say hello

4 to them, because I am used to the federal system and I passed a

5 couple of them today and I didn't even look at them.

6      THE COURT: I told them.

7      MR. BLACKER: But if we could keep doing it because I

8 don't want them to think we are being impolite.

9      THE COURT: I told them and that is it. We will see

10 everybody tomorrow. Now, in opening statements you are not

11 conceding any crimes or anything like that. If you are going

12 to concede anything, let me know so I could go over it with

13 your client and make sure that he agrees, okay.

14      MR. BLACKER: Okay. Thank you.

15      THE COURT: We are in recess until tomorrow. Everyone be

16 here before 9:30 and that way we will get started promptly at

17 9:30.

18      (Thereupon, court stood in recess for the evening.)

19

20

21

22

23

24

25

162

1                           CERTIFICATE

2

    COUNTY OF DADE    )

3

    STATE OF FLORIDA )

4

5

6

7

8           I, the undersigned, do hereby certify that the foregoing

9   is a true and correct record of proceedings had in the case of the

10  State of Florida Versus Pablo Manuel Diaz, Case No. 03-16995,

11  before the Honorable Julio Jimenez, Circuit Judge, at the time and

12  place herein set forth.

13

14          Dated at Miami, County of Dade, State of Florida, this

15  12th day of February, 2008.

16

17

18

19

20

21                              _Angelina Porter_
                                ANGELINA PORTER

22                              SHORTHAND REPORTER

23

24

25

163

```
 1                              IN THE CIRCUIT COURT OF THE ELEVENTH
 2                              JUDICIAL CIRCUIT, IN AND FOR
 3                              MIAMI-DADE COUNTY, FLORIDA
 4                              CRIMINAL DIVISION
 5                              CASE NO. F03-16995
 6
 7                                  L07-1-20451
 8       THE STATE OF FLORIDA,    )
 9                                )     COPY
10            Plaintiff,          )
11                                )
12       vs.                      )
13                                )
14       PABLO MANUEL DIAZ,       )
15                                )            VOLUME 1
16            Defendant.          )
17       _____)
18
19
20
21
22
23
24                              Richard E. Gerstein Justice Building
25                              1351 Northwest 12th Street
26                              Miami, Florida
27                              May 8, 2007      RECEIVED
28                              10:30 a.m.
29                                              APR 16 2008
30
31                                          AT ...NEY GENERAL
32                                             MIAMI OFFICE
33
34
35       The above-entitled cause came on for hearing before the
36       Honorable Julio Jimenez, Circuit Judge, pursuant to Notice.
37
38
39       APPEARANCES:
40
41            KATHERINE FERNANDEZ-RUNDLE, State Attorney, by
42            CAROLINA CORONA, Assistant State Attorney, and
43            ROBERT GROSS, Assistant State Attorney,
44            on behalf of the State
45
46            MICHAEL BLACKER, Esq.,
47            on behalf of the Defendant
48
49
50
```

(Stamp: DOCKETED APR 16 2008 ATTORNEY GENERAL)

MATZ, TRAKTMAN, FELDMAN AND WILDNER

164

1                              I N D E X

2

3    Witness                Direct    Cross    Redirect    Recross

4    Catherine Ruiz           198      265       371        375

5    Dennis Flores            381      397       414

165

1   (Thereupon, the following proceedings were had:)

2      THE COURT:  Good morning.  We're here in the case of the

3   State of Florida versus Pablo Diaz.  Please announce your

4   appearances for the record.

5      MR. BLACKER:  Michael Blacker.  761 Brickell Avenue.

6      MR. GROSS:  Robert Gross, on behalf of the Miami -- State

7   of Florida.

8      THE COURT:  The defendant is present?

9      MR. BLACKER:  Sorry.  I had five minutes of housekeeping.

10   I will do it whenever you want.  There is one matter that

11   they will talk about in opening that I think we should

12   probably do which is, number one, he will talk about --

13      There is the witness who is no longer a police officer.

14   The answer given by the State is very -- I'm asking the Court

15   to require them, the police, to leave their forwarding

16   address.  They all get pensions.  They are associated with

17   the police department.

18      It is the State's duty to find this man.  He is no longer

19   a police officer, but he could be made by the Court -- I'm

20   asking you to have them use their best efforts.

21      I have seen this problem before.  As soon as the police

22   officer has something bad to say about the case, and he is no

23   longer with the force, the State says:  We don't know where

24   he is.

25      They know where he is, and they could find out a lot

166

1    better than I can in the middle of the trial.

2         THE COURT:  Yesterday, for the first time, you mentioned

3    wanting to call that officer.  You know, you had a long time

4    also to subpoena the officer to find out through whoever it

5    is their availability to the department, their pension, place

6    and address for them.

7         They said they don't have a way of contacting him.  They

8    will make their best efforts.

9         State, Robert, do you hear me?

10        Make your best effort.  Make -- talk to the lead and

11   maybe the lead could find the guy.  That is all we could ask

12   for.

13        MR. BLACKER:  When I spoke with Ms. Corona last week, he

14   was one of the names on her list, and yesterday, she read it

15   out to the jury, this officer.

16        THE COURT:  She read it out to the jury because you said

17   you wanted to call him.  She read it out just because if he

18   happens to be a Defense witness, and I called her sidebar,

19   and I said:  Call out the Defense witnesses.  Just don't say

20   that they are Defense witnesses.

21        MR. BLACKER:  Judge, it was yesterday the first time they

22   wanted Officer Leduc.  He is the one that took the statement

23   from Catherine Ruiz.  For the first time yesterday, I found

24   out that the State is alleging that he erroneously made you a

25   report on stuff she didn't tell him.  For four years, I was

167

1   under the belief that that report was accurate, including the

2   deposition that says it is accurate.

3   　　THE COURT:  Yesterday, when we had the situation, both

4   sides stipulated to have the report used.  You stated you

5   could use the report to impeach her if she doesn't say the

6   same thing that's on the report.

7   　　MR. BLACKER:  But as part of the report, he filled out a

8   form, and on that form -- there is a form, and we will talk

9   about that later.

10   　　THE COURT:  Bring the jury right out here.  Let's go.

11   　　MR. BLACKER:  There is one thing that we need to talk

12   about.  You want to do it right now?

13   　　THE COURT:  Yes.  I am all years.

14   　　MR. BLACKER: · OK.  The State took the 9-1-1 tape -- I'm

15   sorry, strike that.

16   　　The State took the tape in which Mr. Diaz allegedly,

17   later that morning, calls up Catherine Ruiz and threatens

18   her, and is saying certain things.  They took that tape.

19   　　There were other calls over there, very pertinent calls

20   that I need pursuant to 98.108, which says if they introduce

21   a recording, a photograph, a -- hold on.  Let me just get it

22   for you.

23   　　MR. GROSS:  Is this the rule of completeness?

24   　　MR. BLACKER:  Sort of, yes.  I don't need to be a wise

25   guy.  It's as to introduction of related writings and

168

1   recordings.  When a writing or recorded statement, or part

2   thereof introduces an adverse -- one second, Judge.  My

3   client is asking me a question.  OK.  Sorry.

4      May require him or her at a certain time to introduce any

5   other -- writing of the recorded statement for it to be

6   considered contemporaneously.

7      We are alleging she is a drug addict.  She is denying it.

8   We have other evidence to prove it.

9      One of the middle calls on that tape says:  Hi.  This is

10  Robert or Frankie -- I forget the name -- Can you get that?

11  I love you.  Please get that.  I need it.  Goodbye.

12     The jury needs to hear that, because I want to ask her

13  about that, what is that call.

14     THE COURT:  Tell me about this again.

15     MR. BLACKER:  Mr. Diaz supposedly calls her and threatens

16  her.

17     THE COURT:  Calls and threatens the victim of the

18  incident?

19     MR. BLACKER:  Of the incident, like 3:30 in the morning.

20  She is not there.  It's on a recording.

21     She's at the hospital.  The recording says, you know,

22  supposedly, a threat.  It's all typed up.

23     The next call right after that -- there are three or four

24  calls from Pablo, I believe, but one of the next calls is, we

25  believe, officially, a drug dealer trying to get drugs to

MATZ, TRAKTMAN, FELDMAN AND WILDNER

169

1    her or bring her drugs.

2         And it says:  Bye.  I love you.  Get that.  I need that.

3         And he says his name.

4         I'm paraphrasing, but, you know, that's what it is.  I am

5    entitled to ask her about that.  That is the conclusion of

6    the transcription.

7         THE COURT:  State.

8         MR. GROSS:  One, I believe the completeness doctrine --

9    one second, Mr. Blacker -- the burden is for the Defense to

10   actually prove tampering, that the State is actually

11   withholding evidence, and the State will provide case law,

12   but as far as whether or not we want these documents coming

13   in, if we could just wait for Ms. Corona.  I don't think

14   there is a problem.

15        THE COURT:  It's not the defendant's call.  It's somebody

16   else's.

17        MR. GROSS:  I understand that.

18        THE COURT:  So normally, the State would object to that.

19        MR. GROSS:  The State does object to that.  If we could

20   just pass --

21        MR. BLACKER:  She does object to it.

22        THE COURT:  Is the State sure what the State wants to do,

23   Robert?

24        MR. GROSS:  The State is sure it's going to object.

25        THE COURT:  Hold on for something?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

170

1    MR. BLACKER:  There is a related recording.

2    THE COURT:  All right.  Are you ready for opening

3    statements?

4    MR. BLACKER:  Oh, yes.

5    MR. GROSS:  Yes.

6    THE COURT:  Here is the princess.

7    Have you talked with your victim and witnesses?

8    MS. CORONA:  I have.  I will instruct -- she is in the

9    back right now.

10   As to the tapes that we talked about yesterday, I don't

11   know if Your Honor has made a decision, but I have come up

12   with a transcript that redacts the information that is

13   inadmissible.

14   THE COURT:  Is your witness here?

15   You were objecting -- he was objecting, but you weren't

16   here.

17   MS. CORONA:  Judge, the only thing that's relevant out of

18   this answering machine statement is the defendant's

19   statement.  Everything else is hearsay by the witness.

20   That's not going to come in.  That has no bearing.

21   THE COURT:  Michael wants to introduce some other call

22   that's by what he believes --

23   MR. BLACKER:  Judge, under 108 --

24   THE COURT:  He wants to introduce the --

25   MS. CORONA:  Judge, there is the rule of completeness

MATZ, TRAKTMAN, FELDMAN AND WILDNER

171

1    where there is part of the statement that is introduced, and

2    these are phone calls that's separate and apart from one

3    another.  The fact that it happens to be on the same tape

4    doesn't make it admissible.  It is hearsay and does not come

5    in for good reason.

6        They don't say what he thinks they say, but just to show

7    the bad character of the witness and people calling her

8    saying:  Cathy, I love you.  Call me.

9        It has no bearing on the case, whatsoever.

10       MR. BLACKER:  We're not claiming bad character.  We are

11   claiming about her about to recollect the facts and

12   circumstances.

13       This woman has given four statements.  She has perjured

14   herself in the two that are sworn, and she has lied in the

15   other two, directly diametrically opposed testimony.  I will

16   probably file a 603 motion very soon on her as I prepare for

17   her cross-examination today.  She doesn't know how to tell

18   the truth.

19       The point is drugs that affected her.  All of the

20   security guards are saying she was always drunk or stoned

21   when she came down.

22       THE COURT:  Whatever is relevant, whatever is proper,

23   then you can introduce it in the case.  You can.

24       At this point, this call is staying out.  The call where

25   that other supposed dope dealer calls, that's staying out.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    That's irrelevant.  If it becomes relevant somehow during the

2    trial or on cross-examination, then we will revisit it.

3        MR. BLACKER:  One last thing.  Advisory, all witnesses,

4    and especially Catherine Ruiz -- I'm sure counsel has done

5    this -- they are not to mention, as the Court ruled, any

6    prior wrongs, conducts or claims that the defendant may have

7    committed other than those charged here, and not mention any

8    prior convictions he may have suffered.

9        THE COURT:  Of course.  We have already covered that.

10       MS. CORONA:  Let me make sure, then, that it is clear,

11   and that the transcripts of the 9-1-1 call have been redacted

12   by the State, as discussed yesterday, about the part where I

13   actually deleted the part that it talks about him burying her

14   like he buried the other people.

15       THE COURT:  For the record, are you satisfied with the

16   redaction except for the part that you wanted to bring in

17   about this call by some supposed drug dealer, what you stated

18   on the record?

19       MR. BLACKER:  She showed it to me this morning, but I

20   didn't read it, because it's a page and a half, but if it's

21   what she says it is, yes.

22       But the tape, of course, has to be redacted or not

23   introduced, and maybe we could stipulate to that.

24       THE COURT:  Has it been redacted?

25       MS. CORONA:  The tape has been redacted.

173

1      THE COURT:  And does it say "redacted," like Scott Miller

2    did to me once?

3      MS. CORONA:  No.

4      THE COURT:  All right.  On your case, I should be

5    finished with this case on Wednesday.  We could pick a jury

6    on Thursday, and if you guys are game, unless something

7    changes, then we could move it up, OK?  Is that OK?

8      Let's go.  Where is Caroline?

9      Ready for the jury?  Let's bring them in.

10      (Thereupon, the jury panel entered the courtroom, after

11    which, the following proceedings were had in open court:)

12      THE COURT:  Good morning.  Please have a seat.

13      Let the record reflect that the defendant is present, as

14    he has been throughout the trial.

15      Ms. Aranda, my bailiff said that you had lost your job?

16      JUROR ARANDA:  Yes, sir.

17      THE COURT:  Is that because you were selected as a juror,

18    or were there other reasons?

19      JUROR ARANDA:  For coming the three days.

20      THE COURT:  OK.  How big of a company is that?

21      JUROR ARANDA:  It has like ten teachers..

22      THE COURT:  So it's a school?

23      JUROR ARANDA:  A daycare.

24      THE COURT:  With about ten teachers?

25      JUROR ARANDA:  Yes.

174

1    THE COURT:  What is the name of the daycare?

2    Do you have the information?

3    JUROR ARANDA:  Yes.  I have a card.

4    THE COURT:  Give it to my bailiff, and we will see if

5    there is anything that we could do.  Under some

6    circumstances, it is easier for employers to fire people

7    because they are doing jury duty, but not under all

8    circumstances.  But we will find out, and we will check with

9    the County and see.

10    All right.  And now, yesterday, we spoke about taking

11    notes, and I suggested that you guys do it without notes, but

12    it's up to you.

13    Does anybody want to take notes?

14    THE JURY PANEL (Collectively):  No.

15    THE COURT:  Let the record reflect that no one wants to

16    take notes.

17    And ladies and gentlemen, yesterday, I explained to you

18    that today, the lawyers would have an opportunity to make

19    their opening statements.  Remember that what the lawyers say

20    is not evidence, but please listen closely to the opening

21    statements.  They are intended to -- for the lawyers to let

22    you know what they believe the evidence will show.

23    Mr. Gross.

24    MR. GROSS:  Thank you, Your Honor.  May it please the

25    Court, Defense.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

175

1    Good morning.  Ladies and gentlemen, yesterday, the

2    Honorable Julio Jimenez and both counsel spoke to you

3    yesterday during voir dire, and they told you this wasn't

4    going to be Miami C.S.I.

5    But you know what?  The facts of the case make for a --

6    is made for a TV thriller.  And like a preview for any show,

7    an opening statement for a trial shows you what the State

8    will prove.  They will show you its evidence, and they will

9    show you beyond a reasonable doubt in their opening statement

10   exactly how this defendant, Pablo Diaz, committed the three

11   crimes charged.

12   Ironically, most of the actions that take place in this

13   trial take place in a luxury condominium in Miami called the

14   Fortune House.

15   Members of the jury, trust me when I tell you that no one

16   on that date. June 8 --

17   MR. BLACKER:  Objection.  Reserve a motion.

18   THE COURT:  All right.  Overruled.

19   MR. BLACKER:  May I reserve the motion?

20   THE COURT:  Yes.

21   MR. GROSS:  Trust me when I tell you that no one was

22   fortunate on that day.

23   The defendant, that man, Pablo Diaz, struck terror in the

24   hearts and souls of approximately 12 people on that day; 12

25   people on that day.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

176

1    Catherine Ruiz, his girlfriend and the main victim, that

2    Saturday, Catherine and Pablo's two friends, they went on a

3    double date.  They went on a double date to South Beach to

4    take in the sand and some drinks.  They were going to have a

5    good time.  But something happened while they were in South

6    Beach.  There was an argument, a disagreement.

7    The female, one of Pablo's friends, got jealous.  She got

8    jealous.  She thought that her boyfriend, another one of

9    Pablo's friends, was staring at the victim, Catherine Ruiz.

10    For some unknown reason, that man, the defendant, Pablo

11    Diaz, puts the victim, Catherine Diaz -- I'm sorry --

12    Catherine Ruiz, rather, in a headlock, and that female hits

13    her in the nose repeatedly, and in the face, which ultimately

14    caused a break in her nose and a bloody lip.

15    Well, now, they are on South Beach.  They need a way

16    home.  They do -- they give them a ride, but they drop them

17    off at Publix.  They want no part of Catherine and Pablo.

18    What does Pablo do next?

19    He calls a friend.  They get a ride back to the Fortune

20    House.  And this is where it gets interesting.

21    See, Catherine was upset, right?

22    She was upset that not only did Pablo not defend her, but

23    also, their friend left and took off with her glasses and

24    purse still in the car.

25    If you add that with the fact that they had been drinking

177

1  and that they have a volatile relationship, that really

2  infused the event.

3      Pablo lost it.  He took a firearm, a chrome plated nine

4  millimeter loaded gun.  He took it from where he keeps it by

5  Catherine's bed stand.  He took that gun.  He took a pillow.

6  He was going to act like it was a silencer.  He pointed it.

7  He pointed it at Catherine Ruiz, and he said:  If you don't

8  give me the money, the $3,000, the $3600 that I gave you for

9  a down payment on a car -- what did that man say?

10     I'm going to fucking kill you.

11     That's what he said.

12     Catherine did not know what to do.  She grabbed a knife

13 from the kitchen and ran out.  She dropped that knife.  She

14 dropped the knife in the stairway.

15     Pablo Diaz was right behind her, right on her heels.

16     Catherine didn't know what to do.  She went for the

17 stairway.  She led him down to the sixth floor.

18     Why the sixth floor?

19     Because there is surveillance cameras there.

20     Catherine Ruiz, who lived at the Fortune House, knew that

21 there were surveillance cameras on the sixth floor, because

22 the gym, the locker rooms, the pool and the bathrooms were

23 there.

24     She ran into the bathroom.  Pablo ran after her.  The

25 defendant slammed Catherine Ruiz' head right up against the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

178

1    toilet.  He stuck that same nine millimeter chrome plated gun

2    in her mouth.

3        The next thing that man did was brought here down to the

4    lobby.  You see, the door closed after Pablo.  That door

5    locked.

6        Now, Pablo desperately wanted to go back upstairs for his

7    gun; maybe even to hurt Catherine Ruiz, because, after all,

8    he did have a loaded nine millimeter pistol on him, and

9    threatened her.

10       They went down to the lobby.  Again, it gets even better;

11   not for Pablo Diaz, but as far as the story goes.  They get

12   to the lobby, and Catherine sees Mr. Flores, Dennis Flores.

13   He's working the desk.  That's his job at this luxury

14   condominium.

15       Dennis Flores sees her.  He doesn't recognize -- Dennis

16   Flores only recognized this man once or twice, because he had

17   been staying there intermittently over the course of one

18   month.

19       What does Catherine Ruiz do?

20       She mouths the words:  Call the police.

21       She doesn't want to make that man any angrier, because

22   she's terrifically scared of what he is capable of.

23       Well, Dennis Flores calls the -- does the right thing.

24   He retreats behind the little office.  He goes into that

25   office, and he calls security, and they call 9-1-1.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

179

1    And in the meantime, he comes out, and Catherine Ruiz is

2    standing there next to him, Pablo Diaz.  She tries to get on

3    the other side of the security desk, jumps the security desk.

4        Well, this infuriates Pablo Diaz.

5        And now, by this time, there are security officers,

6    Mr. Bigotti is there -- I'm sorry -- Mr. Robert Thomas.

7        And there is a valet, Mr. Bigotti.

8        He takes out that pistol.  He points it at all of them

9    and says:  If any of you call the police, I'm fucking killing

10   you.

11       Again.

12       And by the way, ladies and gentlemen, unfortunately for

13   this man, this was captured on surveillance video.  This is

14   not over.  This is far from over.

15       The State will have witnesses, and you will see for

16   yourselves on the surveillance video that that man grabs

17   Catherine Ruiz' hair, like a rag doll, first over the

18   counter, and he is successful.  He powerfully grabs her back

19   over the counter, and now drags her up one flight of stairs

20   by the hair -- you will see it -- to the parking garage.

21       There is a car registered in Pablo Diaz' friend's name.

22   Well, they get in that car.  Unfortunately, the police, who

23   do respond, go after a BMW by mistake.  That allows Pablo

24   Diaz, who has a firearm in his right hand, and the steering

25   wheel in his left, and one eye on Catherine Ruiz in the back

MATZ, TRAKTMAN, FELDMAN AND WILDNER

180

1    seat to go free, to get away.

2        They don't get far.  Well, causing all that terror makes

3    the defendant very thirsty.  This defendant needed something

4    to drink.  He stopped by a coffee shop on 17th and Flagler,

5    and once there, he steps out of the car.  He wants to go get

6    some water.

7        Catherine Ruiz is trying to get out of the car.  She is

8    screaming.  She is making a scene.

9        Pablo Diaz shuts the door on her, pushes her back, goes

10   to get some water, comes back.

11       Catherine Ruiz, again, attempts to get out of the car.

12       He takes that nine millimeter chrome loaded weapon and

13   fires two shots; one coming inches away from her skin,

14   passing right through the rear seat of what is the chassis of

15   that car, and you will also see on surveillance that hole.

16       The other shot was over her head, and Catherine Ruiz

17   loses her hearing momentarily.

18       Guess what?

19       There are more witnesses.  The coffee shop -- in this

20   coffee shop, there is a witness that not only sees this man

21   shoot a firearm, but he comes out to confront him.

22       And you know what?

23       In line with the story so far, this man says:  Mind your

24   own business.

25       That is what he says.  But there are more witnesses.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

181

1          Two good Samaritans are driving by, and they see this.

2     At first, they  just see a confrontation in the car.

3          Lesbia Morales and Johanna Rodriguez are driving in a

4     black SUV.  They stop.  They pull over.  They look to see

5     what is going on.  They circle the block, because they can't

6     believe what's going on.

7          Lesbia Morales, a hero, gets out of the car and walks by,

8     just to investigate.

9          Then this man, Pablo Diaz, again, in line with the rest

10    of the story, says:  Mind your own business.

11         And another -- by the way, every single State witness

12    that observed that man was able to I.D. him in the photo

13    lineup except Johanna Rodriguez, who stayed in the car.

14    Every one.

15         And you will even see one of those lineups conducted on

16    surveillance video.

17         You will also hear 9-1-1 tapes, and the State will play

18    them for you.  They are consistent with these terrible,

19    heinous acts.

20         And I have to tell you, my co-counsel, Carolina Corona,

21    did tell you that this is not about a popularity contest.

22    You don't have to like the witnesses.

23         MR. BLACKER:  Objection.

24         THE COURT:  Overruled.

25         MR. GROSS:  You just have to weigh their credibility, and

182

1   you are here to judge the facts, to go by the law presented

2   to you by Judge Jimenez.

3       You will hear that -- Catherine Ruiz, some of you will

4   not embrace her.  She has a cocaine possession conviction in

5   her past.

6       And you will hear something so crazy to some of us.  I

7   know that when I first heard it, I said:  This is nuts.

8       She went back to him the next day.  Of course, she went

9   to Jackson Memorial first to take care of all the injuries

10  caused by him, but like a true domestic violence victim, she

11  went back to him the next day.

12      It sounds crazy, doesn't it?

13      It's not.

14      And you will see when she takes that stand just how much

15  of a victim she is.  You see, no one deserves what happened

16  to Catherine Ruiz.  There is no self-defense in this case.

17  She didn't deserve that.

18      MR. BLACKER:  Objection as to his remarks.

19      THE COURT:  Sustained.

20      MR. GROSS:  You will look at the evidence.

21      MR. BLACKER:  Move under 104 to instruct the jury not to

22  consider the remarks.

23      THE COURT:  Ladies and gentlemen, this is, as I said

24  earlier, this is opening statements, intended to let you know

25  what the evidence will show.  This is not closing argument,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

183

1    so please disregard the prosecutor's argument.

2        Just tell them what you are going to show, and let's wrap

3    it up.

4        MR. GROSS:  Look at the evidence, and what you will see

5    is that the State has easily met its burden.  It is a high

6    burden of proving each and every element beyond a reasonable

7    doubt.

8        And you will find that this defendant, Pablo Diaz, is

9    guilty.  He is guilty of one count of aggravated assault with

10   a firearm, one count of armed kidnapping, and one count of

11   attempted first-degree murder.  Thank you.

12       THE COURT:  Thank you, Mr. Gross.

13       Mr. Blacker.

14       MR. BLACKER:  May it please the Court, Pablo Manuel,  Mr.

15   Gross, Ms. Corona.

16       Good morning, ladies and gentlemen.

17       THE JURY PANEL (Collectively):  Good morning.

18       MR. BLACKER:  This is the part of the trial, as you have

19   been told, where you hear the evidence from the attorneys,

20   and which is not evidence.  You hear what we expect the

21   evidence will reveal.

22       In this particular case, the alleged victim, Catherine

23   Ruiz, I believe the evidence will reveal has given two police

24   interviews about this case to official -- two official police

25   interviews where she knew to tell the truth.  She has given

MATZ, TRAKTMAN, FELDMAN AND WILDNER

184

1    two sworn statements in two prior proceedings under oath,

2    just like she will be today, and on every single occasion,

3    those statements pervasively are lies, misstatements.  In

4    fact, she lies about things that are so minute in this case,

5    as well as large things, as well as important things.  She

6    lies about almost every single fact, and you will see it from

7    the witness stand today, with her inconsistent testimony, her

8    inconsistent statements to the police.

9        For example, on the night of the incident, June 8, 2003,

10   she's interviewed by a police officer, and she tells him that

11   Pablo participated in this beating.

12       Let's go back a little bit.  Ms. Ruiz and Mr. Diaz were

13   living together for five weeks as lovers.  They invited some

14   friends over on a Friday.  They spent the whole day, Friday

15   and Friday night together.

16       Saturday, 36 hours later, they are still together, and

17   they decided to go to Miami Beach.

18       Ms. Ruiz -- parenthetically, when we tell you what the

19   evidence is going to reveal, you need to hold us to that

20   burden.  Each and every one of you need to hole the attorneys

21   -- even though this is not evidence, you need in your mind to

22   say:  Mr. Blacker said this and I'm holding him to it.

23       Now, something may happen on some insignificant or any

24   inconsistent fact that someone changes their testimony today

25   from what it previously was, for example, but I can't help

MATZ, TRAKTMAN, FELDMAN AND WILDNER

185

1   it.  But you need to hold the State to their burden of what

2   they said happened here, and you need to listen to me now,

3   and you will hear a big difference, and you will decide from

4   the witness stand.

5       This woman is going to say that she thought the friend --

6   they were a police officer and his girlfriend -- that the

7   police officer's girlfriend was jealous of him looking at her

8   while she changed her bathing suit.  It's an insignificant

9   fact, has nothing to do with the crime here.

10      But you know what?

11      She never even changed a bathing suit.  There was no

12  changing of bathing suit.

13      She said she went swimming.

14      She didn't go swimming.  Nobody went swimming.

15      It's a little thing, but we will get to the bigger

16  things.  So this whole jealousy undercurrent doesn't go.

17      It's a fact that she went into the glass store and stole

18  a $500 pair of glasses.

19      MS. CORONA:  Objection.

20      THE COURT:  Sustained.  This is not argument.

21      MR. BLACKER:  OK.  Whatever the reason, without calling--

22  whatever the reason, when they left the beach after being

23  together for about 44 hours, the police officer pulled over

24  in the Publix.

25      Mr. Diaz and his girlfriend of the police officer whom

MATZ, TRAKTMAN, FELDMAN AND WILDNER

186

1   he has known for a long time go into the Publix.  They come

2   out.  They get back in the car.  Mr. Diaz is sitting there.

3   The girl reaches over and smashes Catherine Ruiz in the face

4   on numerous occasions, breaking her nose, ripping a tongue

5   ring out of her tongue, and she's profusely bleeding.

6       Pablo, not holding her like they state, said, the

7   evidence is going to reveal, pushes her out of the car and

8   cares for her; takes his shirt off, wipes all the blood off

9   her nose, and they are left there by these other two.

10       Ms. Ruiz -- or Ms. Ruiz is concerned with -- you know

11   what?  Her Chanel glasses, her Coach pocketbook.

12       She is not concerned that this woman beat her up for no

13   apparent reason.  She wants to go back to the apartment.  And

14   while they are on the way, she has -- she is wanting Pablo to

15   call this woman to return her items.  That is her concern.

16   She has a broken nose, but that is her concern.

17       They go to the apartment.  Pablo goes to the bedroom.  He

18   is taking out some money that's over $4,000.  He's counting

19   it.

20       This woman sees him.  Now, there is going to be

21   conflicting evidence, and this is why we chose you, because

22   you're going to have to decide this conflicting evidence.

23   There is going to be conflicting evidence about Ms. Ruiz, the

24   alleged victim, and a crack cocaine problem.  You're going to

25   decide.

187

1       Her actions are such that -- they are so bizarre that she

2    may be a crack cocaine addict.  She will admit to some drug

3    use, but not crack cocaine.

4       However, she comes from the kitchen.  She sees Pablo on

5    the bed, counting the money.  During that period, she's going

6    through these kind of periods:  Oh, I'm in pain.

7       He consoles her.  Call Attie (phonetic).

8       He said he didn't call Attie, the girl who punched her,

9    but she's calm.  And then she's excited.  Calm, and then she

10   is excited.

11    ·  She sees him counting the money.  She walks back in the

12   kitchen.  For whatever reason, ladies and gentlemen,

13   unexplainable, perhaps you will have to decide why, she comes

14   out of the kitchen with a knife.

15      She says:  Get out of my apartment.

16      She saw him counting the money.  She stared at it, went

17   back in the kitchen and came back with a knife.

18      Pablo got up, went towards her.

19      She ran out of the apartment.

20      As they ran out of the apartment, the spring on the door

21   closes and they were stuck in the vestibule where the

22   elevators are.

23      Now, Catherine Ruiz says:  I was bleeding profusely.  I

24   pushed the button on the sixth floor.

25      She is going to tell you because there's security

MATZ, TRAKTMAN, FELDMAN AND WILDNER

188

1   cameras there.

2       But she also knew on the first floor, if she would have

3   pushed the first floor that they are -- there are not only

4   security cameras on the first floor in which you will see

5   from the videos of the first floor, but there are many, many

6   people there.  There are security guards and valets.

7       She pushes the sixth floor.  She says Pablo has her in

8   the bathroom and he is pummeling her.  By the time he got

9   through, there was blood everywhere, and she was bleeding

10  profusely, and when he finally got down, she got off the

11  floor, and she ran out and says:  Call the police.

12      This is her testimony.  You will hear it.

13      Unfortunately, the four security guards all say that for

14  20 minutes, there was no blood.  There was a little scratch

15  on her chest, which she probably got from the fight that she

16  had before.  No blood.  Everything was calm.

17   ·   Pablo and her were using the phone, trying to call

18  somebody to bring them their stuff back, and they told the

19  security guard that.  20 minutes.

20      They are in the lobby.  Everything is peaceful.  He is

21  trying to get her stuff back.  No blood.  No beating on the

22  sixth floor.

23      She leaps -- she walks over to one of the guards.

24  Perhaps, maybe you will find the remembers the $4,000

25  upstairs in her stupor.

189

1    "Call the police," she mouths.

2    She jumps over the counter. Pablo grabs her, pulls her

3    back, tells everyone: This is between us.

4    Now, counsel said that there was a gun. You will see a

5    video. You will see two individuals. You will see a video

6    that the State had an expert prepare in a shortened version,

7    and then you are going to see the real video of actually what

8    happened.

9    This luxury condo that Ms. Ruiz was living in had a video

10   security camera, and it's so chopped up, it's not a video.

11   It's actually six or seven different areas of the place that

12   keeps coming up. I want you to take a look at it, and I want

13   you to see if you see a gun.

14   Nonetheless, she leaps up on the counter, and he pulls

15   her out. He drags her by the hair up the stairs. He knows

16   she wants his $4,000. And then he has now severed what was a

17   loving relationship in which he supported her for five weeks.

18   Fancy dinners, clubbing. Neither one of them were working.

19   They took the time off to have a love affair.

20   And all of a sudden, she sees a little money on the bed,

21   and she wants out.

22   You will see he never touches her in the car. That fight

23   was between her and this woman, for whatever reason. He

24   didn't initiate it, start it. All he did was help her.

25   They drive to a cafeteria. You are also going to hear

190

1    about Ecstasy.  When you are excited, you like to have water.

2    They drive to a cafeteria for water.  He gets out of the car

3    to get water.

4       She's screaming.  They get into an altercation.  The

5    owner of the cafeteria comes out.  This is right on

6    17th Avenue, five feet from them.

7       Pablo tells him:  It's not your business.

8       Counsel says he fires two shots at the victim.  You heard

9    him say that.

10      Well, the owner and his wife are there, and these two

11    girls who stopped by and saw the tussle going on are there,

12    and all three of them-- you know what?

13      The evidence is all three of them heard one shot.

14      And you know what?

15      That shot was a shot up in the sky.  The owner saw the

16    flash of light, saw the gun being held up in the light and

17    heard one shot, not two.

18      Ms. Ruiz -- excuse me.  I'm sorry to mischaracterize her.

19    Ms. Ruiz is going to tell you that Pablo Diaz shot a bullet

20    at her from the front seat of the car, and that it grazed her

21    back above her buttocks to the lower middle right hand of the

22    portion of her back while she was sitting in the car.

23      Sometimes, you have to use your imagination.  She is

24    sitting in a car, and she is grazed with a bullet on her

25    back.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

191

1    Now, you are going to need to determine how a hole in the

2    seat, which was not even tested as -- chemically tested or

3    any other scientific test, just some hole in the seat can be

4    determined to be a bullet.

5    No bullet was found on -- one casing was found outside

6    the car, and that's the casing of the gun that was shot in

7    the air. No bullet casing was found in the car where they

8    were, and no other casing found outside the car. So we know

9    one bullet was shot, and that is the bullet that

10   Mr. Baldizin (phonetic), the owner of the cafeteria actually

11   saw.

12   Some of the things in this case when you hear from the

13   witnesses, there will be -- you're going to have to sift

14   through some of it to find the gems, and the good thing is

15   there are some gems here, so I will remind you now, and at

16   closing, about the gems.

17   For example, Mr. Diaz drives off. Ms. Ruiz jumps into

18   the car, jumps on the car of the two girls, goes to the

19   hospital, refuses treatment, won't let the doctors treat her,

20   not given any medication, not treated in any way, despite the

21   doctor and her mother begging her to stay there for

22   treatment.

23   Broken nose, tongue ring out, bleeding. She demands to

24   leave the hospital. They can't keep her there.

25   On the way home -- a police officer is taking her home.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

192

1    She tells the story that -- she said that Pablo held her in

2    an arm lock; tells him a lot.  You are going to hear that.

3    That is the first official statement she makes, and it was

4    Pablo that did it; that it happened right outside her

5    apartment.  She pushed Pablo down and ran back into the

6    apartment.

7         This happened at Publix, the fight with Attie.  The fight

8    with the friend happened on 37th Avenue and Flagler, at the

9    Publix, in the Publix parking lot.

10        She tells the police officer it happened in her

11   apartment, and that he chased her in the apartment, and she

12   tells this story.  She tells the whole story.  You are going

13   to hear it, and so you know it is a total lie.

14        This is a nightly event.  Doesn't have any drugs in her

15   that were administered to her by the hospital, because she

16   refused treatment, so has no excuse for making up -- for

17   lying like that; especially when she is supposedly the

18   victim.

19        He asked her:  Are you going to prosecute this case?

20        She says:  No.

21        And he makes a report to that effect.  That is Officer

22   Rovilla (phonetic).

23        The next morning, at 10:30 in the morning, she has a

24   conversation with Pablo's mother and agrees to meet with

25   Pablo's mom, and she goes and Pablo is there.

1       Now, this frightened victim supposedly goes and sees

2   Pablo there, gets in the car, and that very night, sleeps in

3   his bed; said he was very calm.

4      But she didn't see much of him.  She went for one night.

5   She is going to tell you that.  She went there to do

6   gardening, to do gardening with Pablo's mom, and she didn't

7   seem like -- she didn't seem like she was sleeping on the

8   couch and she only spent one night.

9      Unfortunately for her, when you sift through as

10  archeologists through the sand, you will come up with a gem,

11  and the gem here is a piece of physical evidence; numerous

12  pieces of physical evidence in this case.  Tape recordings,

13  toll records, which will reveal the truth to you.  She was at

14  Pablo Diaz' mother's house for ten days.

15     You are going to hear three witnesses tell you that they

16  socialized with her.  They went over there for Father's Day,

17  which occurred the following Sunday, brought their children.

18  She had her daughter at Ms. Diaz' house with Pablo, living

19  with him as lovers, as if nothing happened, refusing to

20  contact the police, does not want to press charges.  She was

21  there for ten or eleven days.  She says one night, and she

22  didn't talk to him, and she slept on the couch.

23     However, during this period of time, there were about 15

24  calls to her mother and her father, and her -- Coral Gables

25  Police Department to speak to family and friends.

194

1   Pablo Diaz never called, nor his mother ever called

2   Catherine Ruiz' mother in his life. Wouldn't know her number

3   if he had to. He doesn't know who made the calls. But she

4   said she didn't.

5   Ten days, she's there. She went, left there four or five

6   times with friends to go on social outings with Pablo, to go

7   on social outings on the June 20th date.

8   Could I have a moment?

9   Ladies and gentlemen, on June 20th -- before June 20th,

10  she learns that the police officer, the lead detective in the

11  case is looking for her, and is threatening her. And the

12  police officer told the security guard: If you ever see this

13  girl come back in the apartment, call me.

14  Well, she went back in the Fortune House on the 20th of

15  June, Catherine Ruiz did, by herself. Asked for cab fare,

16  and Ms. Diaz gave it to her.

17  This is not the first -- this is the third or fourth trip

18  that she has made back to Miami, but this is the first time

19  that the security guard remembered to call the police. They

20  called the police, and a bunch of cop cars pulled her over,

21  and they taped her statement.

22  Detective Miranda, she says, threatened her and said:

23  You don't want to be a witness? I will arrest you as a

24  material witness in the case, but I will do something better.

25  I will take your child.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

195

1    How could she take her child?

2    She could take her child if she is a crack addict, or

3    drug addict or drug user.

4    MS. CORONA:  Objection.

5    THE COURT:  Overruled.

6    MR. BLACKER:  That is how she could take the child.  She

7    can't take the child because she refused to testify.  She

8    could ask the court of law to make her a material witness,

9    and put a bond on her to make sure she comes, but she can't

10   take the child.

11   And Catherine Ruiz is going to tell you, and has done so

12   on numerous sworn statements, which -- I don't know -- you

13   will decide whether or not she has the honor to come in here

14   and respect this court and tell the truth.  You will decide

15   that, not me, but she has stated under oath on many occasions

16   that that is the only reason why she became a State witness

17   in this case, because she was threatened, and so she became a

18   witness.

19   Ladies and gentlemen, it's -- the case is -- the province

20   of the case is in your hands.  You're going to hear all the

21   evidence.

22   You're going to hear evidence from, like I said, the

23   security guard, that everything was totally peaceful.

24   You're going to hear evidence from the owner of the

25   cafeteria, one shot fired, not at the victim.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

196

1    Pablo is charged with attempted murder.  I believe the

2    Court is going to instruct you that you have to find that

3    there was an attempted murder here.  When someone puts a gun

4    in the air, if there was a gun, and you so find -- and shots

5    hit in the air, I doubt that they are expecting that that

6    bullet is going to kill anybody.

7    When three people come in here and tell you -- four

8    people come in here and tell you that they heard one bullet,

9    they saw one bullet -- two will say they found -- saw one

10   bullet.

11   And then Catherine Ruiz is coming in and telling you that

12   bullet grazed her back, and the hole is in the bottom of the

13   seat, between her legs.  You're going to have a difficulty

14   with that.  I think you will have difficulty with that

15   charge.

16   The aggravated stalking.  The guards, as a whole, are

17   going to tell you that none of them were threatened by

18   Mr. Diaz; that if there were any threats, they felt they went

19   towards her.  So that's the aggravated assault.

20   The kidnapping charge, I don't know.  I always thought

21   kidnapping was something where you take somebody to commit

22   another crime.

23   MS. CORONA:  Objection, Judge.

24   THE COURT:  Sustained.

25   MR. BLACKER:  OK.  That charge, you're going to have to

197

1   think and decide if Mr. Diaz moved Ms. Ruiz against her will

2   from one place to another.

3       If you so find, what crime did he do it to commit?

4       What was he thinking, or was he thinking: "I would like

5   to get my money back, I'll get the woman calmed down.  She

6   will give me the money back, everything will be fine, she

7   will go her way and I will go mine"?

8       It's a lot of money.  She's trying to steal it.  She may

9   be a crack addict or think about using it.

10      What crime was he thinking about committing when he took

11  her out of the building?

12      I think you will find there was none.  I think you will

13  find that this is an unfortunate set of circumstances in

14  which somebody's not going to allow another person to steal

15  like that after they've been good to them and done nothing to

16  harm them except be their lover, and be there for them, and

17  provide for them.

18      You will hear her tell you that; that he provided for

19  them for five weeks, terrific for her and her child.

20      And I think you will go back there and live up to the

21  honor with which we treat trials in this country, and you

22  will be fair, and you will be impartial, and you will judge

23  fairly the evidence before you.  Thank you very much.

24      THE COURT:  Thank you, Mr. Blacker.

25      State, call your first witness.

198

1        MS. CORONA:  The State calls Catherine Ruiz.

2        THE COURT:  While we are getting the first witness,

3    ladies and gentlemen, today, there is a change in plans for

4    lunch.  We're going to take lunch between 12:15 and 2,

5    because I have to go to a luncheon.

6        MR. BLACKER:  May I have a moment with my secretary?

7        THE COURT:  Yes.

8        MR. BLACKER:  Thank you.

9        THE COURT:  Have the witness come forward.

10   Thereupon:

11                     CATHERINE RUIZ

12   was called as a witness, and having been first duly sworn, was

13   examined and testified as follows:

14        THE COURT:  Make sure the mike is on.

15                   DIRECT EXAMINATION

16   BY MS. CORONA:

17   Q    Good morning, ma'am.  Can you please introduce yourself

18   to the members of the jury?

19   A    Hi.  Catherine Ruiz.

20   Q    How old are you?

21   A    31.

22   Q    Do you have any children?

23   A    Yes, one.

24   Q    How old?

25   A    Eight years old.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

199

1   Q   How old is she?

2   A   Eight.

3   Q   What is her name?

4   A   Carticiana (phonetic) Jimenez.

5   Q   Do you know a person by the name of Pablo Diaz?

6   A   Yes.

7   Q   How did you come to know him?

8   A   Through a mutual friend.

9   Q   When did you first meet him?

10  A   About six years ago.

11  Q   Six years ago.  So in June of 2003, how long had you

12  known him for?

13  A   Like about two years, a year.

14  Q   And how long --

15      Did you actually have an intimate relationship with him?

16  A   Yes.

17  Q   When?

18      How long did that go on for?

19  A   About a month.

20  Q   On June 8, 2003, possibly June 7th, the evening of

21  June 7, 2003, what happened?

22  A   We went out to the Beach, me, Attie, Armando and --

23      MR. BLACKER:   I would ask that she not give an answer in

24  the narrative.  It's improper.

25      THE COURT:   Overruled.  Let's repeat your question and--

MATZ, TRAKTMAN, FELDMAN AND WILDNER

200

1   BY MS. CORONA:

2   Q   What happened on the evening of June 7, 2003?

3   A   We were at the Beach, and later we went to the apartment,

4   and that's where the incident started.

5   Q   OK.   What happened at the Beach with Attie; actually

6   between you and Attie?

7   A   Everything was fine until we got in the car, and then we

8   had an argument inside the car; me and Attie inside the car.

9        THE COURT:   Me and who?

10       THE WITNESS:   Attie.

11       THE COURT:   A woman?

12       THE WITNESS:   Yes.

13  BY MS. CORONA:

14  Q   Can you tell me who Attie is?

15  A   A friend of Pablo's.

16  Q   Was she a friend of yours at the time?

17  A   No.

18  Q   And who else was with you besides Pablo and Attie?

19  A   Her boyfriend.

20  Q   So at the Beach it was only the four of you?

21  A   Yes.

22  Q   OK.   When did -- something happened between you and Attie

23  at one -- what point in the night?

24  A   In the car, when we were on the way back to --

25  Q   Were on the way back where?

MATZ, TRAKTMAN, FELDMAN AND WILDNER