*201*

```
 1                    IN THE CIRCUIT COURT OF THE ELEVENTH
 2                    JUDICIAL CIRCUIT, IN AND FOR
 3                    MIAMI-DADE COUNTY, FLORIDA
 4                    CRIMINAL DIVISION
 5                    CASE NO. F03-16995
 6
 7
 8   THE STATE OF FLORIDA,    )
 9                           )
10        Plaintiff,          )
11                           )
12   vs.                      )
13                           )
14   PABLO MANUEL DIAZ,       )
15                           )
16        Defendant.          )
17   _____ )
18
19
20
21
22
23
24                    Richard E. Gerstein Justice Building
25                    1351 Northwest 12th Street
26                    Miami, Florida
27                    May 8, 2007
28                    10:30 a.m.
29
30
31
32
33
34
35   The above-entitled cause came on for hearing before the
36   Honorable Julio Jimenez, Circuit Judge, pursuant to Notice.
37
38
39   APPEARANCES:
40
41        KATHERINE FERNANDEZ-RUNDLE, State Attorney, by
42        CAROLINA CORONA, Assistant State Attorney, and
43        ROBERT GROSS, Assistant State Attorney,
44        on behalf of the State
45
46        MICHAEL BLACKER, Esq.,
47        on behalf of the Defendant
48
49
50
```

COPY

*LO 7·1· 20451*

VOLUME 2

RECEIVED

APR 16 2008

ATTORNEY GENERAL
MIAMI OFFICE

DOCKETED
APR 16 2008
ATTORNEY GENERAL

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    A    To the house, in Brickell.

2    Q    And what happened?

3    A    She punched me in the face.  She turned around, and she

4    punched me in the face, and we started arguing.

5    Q    Do you know what you were arguing about?

6    A    No.

7    Q    Do you have any idea what she would have been mad at you

8    about?

9    A    I don't know.  I was changing behind the chairs and --

10        MR. BLACKER:  Objection.  Speculation.  Total

11    speculation.  If she knows.

12        THE COURT:  Overruled.

13        THE WITNESS:  I was changing, and, you know, her

14    boyfriend was --

15        Pablo had, I think, a towel up.  I can't remember.

16        THE COURT:  I'm sorry, you need to speak into the mike

17    and keep your voice up, because I'm having trouble hearing

18    you, and I believe the jurors are, too.

19        THE WITNESS:  OK.  I think she had a feeling her

20    boyfriend was looking at me in a lustful way or something

21    and --

22    BY MS. CORONA:

23    Q  What was Pablo doing when Attie came at you and punched

24    you?

25    A  No, nothing.

1    Q    What was -- where were you sitting?

2    A    In the back seat.

3    Q    And where was Attie?

4    A    In the front seat.

5    Q    And where was Pablo?

6    A    In the back seat, next to me.

7    Q    OK.   What happened as a result of Attie having punched

8    you in the car?

9    A    My nose was hurt.

10   Q    And what did you do?

11   A    I was kicking back.

12   Q    Did you stay in the car and they took you home?

13   A    No.   Actually, Pablo -- we got off the car.

14   Q    And how did you get home that night?

15   A    We were walking, and then he called somebody to come

16   pick us up.

17   Q    And who came to pick you up that night?

18   A    I don't remember.   A friend of his named Mark.   That's

19   all I remember.

20   Q    What happened once you got to your apartment?

21   A    Like I said, the apartment, we started arguing.

22   Q    Do you remember what you were arguing about?

23   A    No.

24   Q    How long were you in the apartment before something

25   happened?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

204

1    A   Not too long; maybe -- I don't know.  I don't remember.

2    Q   Was it less than an hour?

3       THE COURT:  I'm sorry?

4       THE WITNESS:  Less than an hour.

5       THE COURT:  You need to keep your voice up, please.  OK?

6    Be consistent.  Keep your voice up so that we can all hear.

7       THE WITNESS:  About an hour.

8  BY MS. CORONA:

9    Q   And what happened after an hour that you were in the

10  apartment and you were arguing with Pablo?

11    A   Could you repeat the question?

12    Q   What happened in that apartment after an hour?

13    A   Well, we started arguing.  He -- he went to the room.

14       MR. BLACKER:  Objection again as to the narrative.

15       THE COURT:  Overruled.

16       THE WITNESS:  He went to the room, got the gun, and

17    that's when I went running outside.

18  BY MS. CORONA:

19    Q   What gun did he get from the room?

20    A   I don't remember.  The gun that was in the drawer.

21    Q   Was that your gun?

22    A   No.

23    Q   How did the gun get there?

24    A   It was there.  I don't know.  I don't know who put it

25  there.

1   Q   Have you ever owned a gun?

2   A   No.

3   Q   Did you know the gun was there before he took it out?

4   A   No.

5   Q   And what did he say to you, if he said anything, when he

6   took out the gun?

7   A   No, he didn't say anything.

8   Q   OK.  So what happened?

9       MR. BLACKER:  Sorry, I couldn't hear the witness.

10      THE COURT:  Neither could I.

11      THE WITNESS:  He didn't say anything.

12      MS. CORONA:  Speak up.

13  BY MS. CORONA:

14  Q   OK.  So you are in the apartment.  He brings out the

15  gun, and then what happens?

16  A   I grabbed the knife, and I ran for the door, and I ran

17  outside.

18  Q   Did he follow you?

19  A   Yes.

20  Q   And what happened?

21  A   I started knocking on all the doors, going down the

22  23rd floor.

23  Q   Speak up.

24  A   I started knocking on the doors going down the

25  23rd floor.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

206

1    Q    What were you doing?

2    A    Trying to get the elevator.

3    Q    What happened once you got to the elevator.

4         THE COURT:  Excuse me.

5         Jimmy, is something going on?

6         THE BAILIFF:  I'm telling him about the volume, trying

7    to make the witness put the volume up.

8         THE COURT:  Let's do it.

9    BY MS. CORONA:

10   Q    After you ran out of your apartment and you got to the

11   elevator, what happened?

12   A    We both got in the elevator and went downstairs.

13   Q    Did anything happen before you got in the elevator?

14   A    No.

15   Q    Did anything happen in the stairwell of the 23rd floor?

16        MR. BLACKER:  Objection to the leading nature of the

17   question.  This is her witness.

18        THE COURT:  Sustained.

19   BY MS. CORONA:

20   Q    Did anything else happen on the 23rd floor?

21   A    We were arguing in the stairs, and that is where I

22   dropped the knife.

23   Q    OK.  What happened in the stairs?

24        Tell me specifically exactly what happened in the

25   stairs.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

207

1   A   We were just arguing back and forth.

2   Q   Was there physical violence that happened?

3   A   Yes.

4   Q   What?

5   A   He was hitting me.  I was hitting him back, pushing.

6   Q   Did he have the gun in his hand at that point?

7   A   Yes.

8   Q   And was he saying anything to you at that point?

9   A   He just kept saying:  Get the keys.

10      I went to get the keys.  I went to get the keys and --

11  Q   What did he need the keys for?

12  A   I think he wanted to go back inside the apartment to get

13  the money that was inside the apartment.

14  Q   Tell me about the money that was inside the apartment.

15      What money was it?

16  A   That was money we were saving up for a car.

17  Q   How much money was inside the apartment?

18  A   $3,000; something like that.

19  Q   And whose money was that?

20  A   That was money we were saving to get a car.  We were

21  planning on getting a car.

22  Q   Together?

23  A   Uh-huh.

24  Q   OK.  And when you ran out of the apartment, what

25  happened that caused you to need to get another key?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

208

```
 1    A    The keys were inside.  We stayed locked out.

 2    Q    OK.  So in the stairwell -- from the stairwell, where do

 3   you go?

 4    A    Probably like into the elevators, because I don't

 5   remember going back to 23, all the way down.

 6    Q    Where did you go to?

 7    A    The sixth floor.

 8    Q    And what happened on the sixth floor?

 9    A    More fighting.  Same thing.  More violence.

10    Q    Where specifically did you go?

11    A    We were in the bathroom.

12    Q    And what happened in the bathroom?

13    A    Just more violence and more arguing.  And from there, we

14   went to the lobby floor, the ground floor.

15    Q    Did he threaten you with the gun at that point or any

16   point?

17    A    Yes.

18    Q    Did he threaten to kill you at any point?

19    A    Yes.

20    Q    Did he hit you with the gun?

21    A    Yes.

22         MR. BLACKER:  Objection.

23         THE COURT:  Sustained.

24         MR. BLACKER:  Move under 104 to strike, and I would

25         like you to instruct the jury.
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1          THE COURT:  Overruled.

2     BY MS. CORONA:

3     Q   Can you tell the jury specifically what happened in the

4     bathroom and what threats, if any, the defendant was making at

5     you?

6     A   No.  Specifically, that he was going to kill me, and

7     that I had to go with him, follow his directions.

8     Q   And what did you decide to do from the sixth floor

9     bathroom, women's bathroom?

10    A   Go downstairs to see if I could get help.

11    Q   Where did you end up?

12    A   To the front desk.

13    Q   Are there people that work that front desk full time?

14    A   Yes.

15    Q   And who was the person that was working that night;

16    somebody that you recognized or a familiar face?

17    A   Yes.

18    Q   OK.  When you get off from the elevator, what is your

19    condition at that point?

20        What do you look like?

21    A   I was bleeding.  My clothes was ripped.  I was wearing

22    white pants, and they were bloody.  My shirt was full of

23    blood.  My face was full of blood.  My nails were gone.

24    Q   Where did you go?

25    A   I was standing next to Pablo, next to the phone in the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   front desk.

2     Q   And why was Pablo using the phone that night?

3     A   Because I had left all of my stuff in Armando's car; my

4   purse, my I.D., my Social Security, and I wanted it back.   I

5   wanted my things back.

6     Q   So who was Pablo calling?

7     A   I think he was calling Attie's sister.

8     Q   Meanwhile, what are you doing?

9     A   I'm trying to signal Dennis from the front desk.

10     Q   Dennis is the person that you recognized that worked at

11   the Fortune House at the lobby?

12     A   Correct.

13     Q   And what do you tell Dennis to do?

14     A   Call the police.

15     Q   Do you know if Dennis called the police right then?

16     A   I think he called security, and security came

17   downstairs.

18     Q   How long would you say you were standing there before

19   anything else happened with Pablo on the phone?

20     A   A couple of minutes at the most.

21     Q   And then what happened?

22     A   I remember Thomas coming downstairs, the security, and

23   telling Dennis:   I called the police already.   They're on

24   their way.

25     Q   And then what happened?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

211

1    A    I jumped over the counter.

2    Q    OK.  What happened that you decided to jump over the

3    counter?

4    A    Pablo had the gun, and I thought he was going to do

5    something.

6    Q    Did he have the gun out when you got out of the elevator

7    in the lobby?

8    A    In his pants.

9    Q    When did he decide to actually take out the gun and put

10   it in his hand?

11   A    In front of the front desk.

12   Q    Is that right before you jumped over the counter?

13   A    Right before I jumped over the counter.

14   Q    Why did you jump over the counter?

15   A    Because I thought he was going to shoot me.

16   Q    How long were you on the other side of the counter of

17   the front desk?

18   A    Not very long, because he -- he asked me to jump back

19   over.

20   Q    What was he saying while you were on the other side of

21   the counter?

22   A    Jump back over the counter and get back on the other

23   side.

24   Q    Was he saying it like that or in a more forceful way?

25   A    No.  Just get back over the counter, or something

MATZ, TRAKTMAN, FELDMAN AND WILDNER

212

1    serious is going to happen here.

2    Q    How did you get back over the counter?

3    A    I can't remember right now.

4    Q    Do you remember getting back over the counter at some

5    point?

6         You need to answer out loud.  Do you remember coming

7    back over the counter?

8    A    Yes, I do.

9    Q    And what happened?

10   A    From there -- from there we went to the -- through the

11   stairs, back to the second floor where the garage is.

12   Q    Do you go through the stairs voluntarily?

13   A    No.

14   Q    How did you get up those stairs?

15   A    Dragged.

16   Q    By how?

17   A    My hair.

18   Q    And did he have the gun in his hand while he was

19   dragging you by the hair up the stairs?

20   A    Yes.

21   Q    Do you remember seeing the gun when he was dragging you

22   by the hair up the stairs?

23   A    Yes.

24   Q    And where did he take you up those stairs; to where?

25   A    To the second floor garage where my parking space is.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    Q    Whose case was parked there?

2    A    He had just purchased a car.  I don't remember what car

3    it was.

4    Q    Did you get into that car?

5    A    Yes.

6    Q    Did you get in the car voluntarily?

7    A    No.

8    Q    Where specifically in the car did you sit?

9         Did you sit in the front or back seat?

10   A    In the back seat.

11   Q    Where did Pablo sit?

12   A    In the driver's seat.

13   Q    Where did you go from there?

14   A    Towards somewhere on 17th; the Flagler area.

15   Q    From the car ride on the way from your condo -- which is

16   what address?

17   A    185 Southeast 14th Terrace.

18   Q    What area of town is that?

19   A    Brickell.

20   Q    And from Brickell, where did you go to?

21   A    Towards Little Havana.

22   Q    And 17th Avenue and Flagler?

23   A    Yes.

24   Q    From your apartment on Brickell, on 14th Street to the

25   cafeteria on 17th Avenue and Flagler, what was happening in

MATZ, TRAKTMAN, FELDMAN AND WILDNER

214

1   the car?

2      A   We were arguing back and forth.

3      Q   Was he violent in any way in the car?

4      A   Yes.

5      Q   And were you trying to get out of the car?

6      A   Yes.

7      Q   Why couldn't you get out of the car?

8      A   Every time I would try to open the door, he would hit

9   me.

10     Q   Once you got to the cafeteria on 17th Avenue and

11   Flagler, did he get out of the car?

12     A   Yes.  He got out of the car to drink water.

13     Q   Did you try to get out of the car at that point?

14     A   Yes, twice.

15     Q   And what happened?

16     A   He closed the door.

17     Q   How far from the car was he when he was drinking water?

18     A   A couple of feet at the most.

19     Q   Was there anybody else around in the cafeteria?

20     A   The lady from the cafeteria, the one that was in the

21   window.

22     Q   And was there also a man around there?

23     A   I think I remember a man.  I think I remember there

24   being another man there, yes.

25     Q   And what happened in the cafeteria?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

215

1    A    Nothing.  I think they noticed something was going on,

2    and he just kept on telling them not to get into it; that it

3    was a personal issue, and he didn't want problems.  Don't get

4    into it.

5    Q    What were you doing at that time?

6         Were you crying?

7         Were you screaming?

8    A    I was in the car, screaming and crying in the car, in

9    the back seat.

10   Q    Did there come a time when Pablo took the gun out again

11   in the cafeteria?

12   A    Yes.

13   Q    OK.

14   A    Well, the man came out and told him -- I don't know.

15        He said this was a man and a woman's problem, and if you

16   don't want to get shot, if you don't want problems, stay out

17   of it.

18        That is when he got back in the car and left.

19   Q    At some point, did he fire the gun in front of the

20   cafeteria?

21   A    Into the car, yes, at me.

22   Q    Where specifically did he fire the gun?

23   A    Into the back seat.

24   Q    Did you get hit by the bullet?

25   A    I think it was a graze wound, and the bullet went into

216

1   the seat.

2      Q   Do you remember sitting in the back seat and having the

3   bullet cross you?

4      A   I remember getting burned, like jumping up, yes.

5      Q   Where specifically in the body?

6      A   On my back, right here (indicating).

7      Q   You are pointing to your lower back?

8      A   My lower back.

9      Q   On the right side?

10         THE COURT:  On the right side; is that correct?

11         THE WITNESS:  On the right side.

12  BY MS. CORONA:

13     Q   Do you have a scar as a result of that graze?

14     A   Yes.

15     Q   Did he shoot another time other than that time?

16         MR. BLACKER:  Objection, Judge.

17         THE WITNESS:  I don't remember.

18         MR. BLACKER:  Leading.

19         THE COURT:  Overruled.

20         THE WITNESS:  I don't remember.

21  BY MS. CORONA:

22     Q   OK.  So the only gunshot that you remember at that point

23  is the one that was shot towards you?

24     A   Right.

25     Q   And you were never actually physically hit by the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

217

1   bullet?

2   A   Hit by the bullet, no.

3   Q   You just think you felt a burn?

4   A   Right.

5   Q   OK.   What happened after you were --

6       MR. BLACKER:   I'm sorry.   Counsel, I'm sorry, I have bad

7   hearing.

8       Judge, could I have the last question and answer read

9   back?

10      I didn't hear the answer.

11      THE WITNESS:   I'm sorry.

12      (Thereupon, the portion of the testimony referred to was

13  read by the reporter as above recorded.)

14  BY MS. CORONA:

15  Q   What happened once you got to the cafeteria?

16  A   Excuse me?

17      Once we left the cafeteria?

18  Q   Yes.

19  A   Basically the same thing; arguing back and forth in the

20  car, and me trying to get out of the car, until I finally was

21  able to jump out.

22  Q   What happened that you were able to jump out of the car?

23  A   I think the car was running out of gas.

24  Q   So what did you do?

25  A   I jumped out of the car and started running the other

218

1   way.   Like his car was going to the front.   I ran to the back.

2   I was thinking that if anything, he would have to turn around

3   to go back the other way, which is a one-way.

4   Q   What happened once you were running back?

5   A   I ran into somebody's car.

6   Q   Did you recognize these people?

7       Had you ever seen them before?

8   A   No.

9   Q   Had you seen them earlier that night?

10   A   No.

11   Q   OK.   When you jumped into their car, what were you

12   saying to them?

13   A   They're going to kill me, they're going to kill me.

14   Help me.

15   Q   And what did they do?

16   A   They helped me.   They took me to the police.

17   Q   How did you get to the police?

18   A   Well, she was planning on going to her --

19       MR. BLACKER:   Objection as to what somebody was planning

20   to do.

21       THE COURT:   Sustained.

22       Just tell us what she did.

23   BY MS. CORONA:

24   Q   Just say exactly what happened.

25   A   She was planning on going --

219

1         MR. BLACKER:  Objection to what --

2         THE COURT:  Don't -- sustained.

3         Just say what she did.

4         THE WITNESS:  She was driving until we saw -- there was

5     like a traffic stop, and some police were there, and we

6     pulled over there to the side.

7  BY MS. CORONA:

8     Q   And you were able to flag down those police officers?

9     A   Yes.

10    Q   Did you talk to the police officers that night, the

11  police officers that were actually there?

12    A   Yes.

13    Q   And what happened after you talked to the police

14  officers?

15    A   They sent for an ambulance to come.

16    Q   And when you spoke to the police officers, what was your

17  condition like?

18    A   The same.  Basically bleeding.

19    Q   Were you still very nervous about what had happened?

20    A   Yes, very nervous.

21    Q   And they called for an ambulance?

22       Where did it take you?

23    A   To Jackson Memorial Hospital.

24    Q   Did you stay at Jackson?

25       Were you treated at Jackson?

220

```
1    A    No, I wasn't.  I left.

2    Q    Why did you leave Jackson?

3    A    Because I was there for like a long time, two hours,

4    three hours, and I felt like I wasn't being helped the way I

5    should.  I was nervous, and I wanted to go home.  I didn't

6    want to go to the hospital, be there, and I just left.

7    Q    How did you leave?

8         How did you get home?

9    A    A police officer drove me home.

10   Q    Drove you back where?

11   A    To the Fortune House.

12   Q    And once you got to the Fortune House, did you discover

13   anything; any voice mails that were left?

14        MR. BLACKER:  Objection.

15        THE COURT:  Overruled.

16   BY MS. CORONA:

17   Q    Did you discover any messages that were left on your

18   voice mail?

19   A    Yes.

20   Q    What kind of message was left on your voice mail that

21   night?

22   A    Threatening message.

23        MR. BLACKER:  Objection.  Characterization.

24        THE COURT:  Overruled.

25
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   BY MS. CORONA:

2   Q   Who had called you that night?

3   A   Pablo.

4   Q   How many times had he called you?

5   A   About five.

6   Q   And in the messages, what was he saying?

7   A   I was wondering how much skin I could peel off of your

8   daughter for the money that was left on the bed.

9       THE COURT:  Sorry, could you repeat that slowly?  Sorry.

10  Repeat it slowly and loudly so we could all hear it.

11      MR. BLACKER:  Objection.  Excuse me.  The best evidence

12  is the tape.  Her recollection of what it said is improper.

13  The tape should either be played or no question should be

14  asked of this witness on what was said on the tape.

15      THE COURT:  Overruled.

16  BY MS. CORONA:

17  Q   Go ahead and say what happened.

18  A   I wonder how much skin could be peeled off your daughter

19  for the money that's left on the bed.

20      MR. BLACKER:  Judge, may I request a sidebar?

21      THE COURT:  Yes.

22      (Thereupon, counsel for the respective parties

23  approached the bench, and the following proceedings were had

24  outside the hearing of the jury panel:)

25      MR. BLACKER:  Counsel didn't have a redacted copy of

1    this until this morning. She showed it to me. I did not

2    read it. But as I was saying, Mr. Gross provided me with

3    a copy about ten minutes ago. I see there is an inaudible

4    mark that was previously inaudible that has now been marked

5    and written in with the daughter's name in it, and I would

6    like to know how that occurred, who did that, and under

7    what circumstance.

8        There has been inaudible for four years, and on the

9    day of trial --

10       THE COURT: I heard it.

11       MS. CORONA: Well, the transcript is for the jury to

12   follow along; not actual evidence. The jury can make its

13   own determination as to the transcript.

14       THE COURT: Does it say that word?

15       All right. If there's a problem, if it's not there, you

16   point out --

17       MR. BLACKER: In other words, let the record be clear.

18   It is counsel saying that she knew -- heard a word,

19   "Conciana" on the tape; is that correct?

20       MS. CORONA: I wasn't the one that created the

21   transcript. This transcript was created by somebody else

22   other than myself. Maybe that person did not hear the

23   word. And when I listened to it, that it was it says;

24   wrote it in.

25       MR. BLACKER: I would ask the Court to allow me to

223

1    listen to the original tape in evidence during the lunch

2    period.  I need to hear this.  I have never heard the

3    original.

4        MS. CORONA:  I will introduce it through the witness.

5        THE COURT:  Why didn't you listen to it yesterday or

6    last night?

7        MS. CORONA:  I gave him the copy of that last week.

8        MR. BLACKER:  A copy is one thing.  I want to hear the

9    original.  We're not going to be going into the lunchtime

10   with her.  So.

11       THE COURT:  She knows not to say anything about this guy

12   being in jail?  OK.

13       (Thereupon, the sidebar conference was concluded, after

14   which, the following proceedings were had in open court:)

15   BY MS. CORONA:

16   Q   Once you got back to your house and you listened to

17   those phone messages, what did you do?

18   A   I don't remember.  The first thing I did do, I went to

19   the bathroom and came back.

20   Q   At some point, did you get a phone call from Pablo Diaz'

21   mother?

22   A   Yes, I did.

23   Q   What time was that?

24   A   I don't remember what time.  I woke up.  I got back from

25   the hospital like at 4 or something, 5 o'clock in the morning,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

224

1    so maybe 10.

2       Q    What did she ask you to do?

3       A    To meet her.

4       Q    Did you decide to go meet her?

5       A    Yes.

6       Q    Why did you decide to go meet her after everything that

7    had happened?

8       A    Because she was very good to me.  She was very good to

9    me, and she was really worried.

10      Q    Do you have a good relationship with her?

11      A    Yes, I did.

12      Q    Did something happen to Pablo that she told you about

13   that·made you a bit concerned at that time?

14           MR. BLACKER:  Objection.  Leading.

15           THE COURT:  Sustained as to what the mother told her.

16   BY MS. CORONA:

17      Q    Where did you decide to meet Pablo Diaz' mother?

18      A    Shorty's Barbeque.

19      Q    How did you get there?

20      A    The train.

21      Q    Once you got there, who was there?

22      A    Her and Pablo.

23           THE COURT:  Could you keep your voice up?

24           THE WITNESS:  Yes.

25           THE COURT:  Who was there?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

225

```
 1          THE WITNESS:  Her and Pablo.

 2    BY MS. CORONA:

 3    Q    Did you speak to them there that day?

 4    A    I spoke to her.

 5    Q    What did she tell you?

 6    A    Nothing.  Basically, we were speaking about the incident

 7    in the car.

 8    Q    And as a result of speaking to her, did you decide to

 9    actually go back to her house?

10    A    Yes.

11    Q    And is that a house where Pablo also lived?

12    A    Yes.

13    Q    Is that a house where you had been to previously?

14    A    Yes.

15    Q    And had you stayed at that house before?

16    A    Yes.

17    Q    What made you decide to go back to that house with them

18    after everything that had happened the night before?

19    A    I was scared.

20    Q    What made you scared?

21    A    I was scared for my daughter; scared for myself; what

22    could happen if I didn't go back; confused.

23    Q    What did you think was going to happen if you did not go

24    back?

25    A    Anything could have happened.
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

226

1    Q   So when you went back there, what did you do at that

2   house?

3    A   I was -- Olga and me were talking.  We would go pick

4   vegetables outside, eat dinner; regular, normal, everyday --

5    Q   So after that incident, there was no other violence

6   after that?

7    A   No.

8   ·Q   When you were staying with Olga and Pablo, there was

9   nothing else that happened at that point?

10       Did you feel comfortable at that house?

11   A   Yes.

12   Q   Until when?

13  ·A   Until I felt something wrong.

14   Q   Do you remember at what point it was that you felt

15  something wrong?

16   A   I had been there already for a· couple of days, yes.

17       MR. BLACKER:  Sorry, I didn't hear that answer.

18       THE COURT:  I can't hear her, Ms. Corona.  Please ask

19   her to keep her voice up.

20       MS. CORONA:  Please keep your voice up.

21       MR. BLACKER:  I need to hear the answer though.

22       THE COURT:  Ask her the question again.

23  BY MS. CORONA:

24   Q   How long were you there until you started feeling

25  uncomfortable?

227

```
 1    A    A few days.

 2    Q    What happened after you started feeling uncomfortable?

 3    A    I left to my mother's house.

 4    Q    How did you get there?

 5    A    The cab.

 6    Q    Who gave you money for the cab?

 7    A    Pablo.

 8    Q    Did you ever see Pablo or Olga after you left there that

 9 day?

10    A    No.

11    Q    After the incident?

12    A    No.

13    Q    During this time, you knew that you were -- somebody was

14 looking for you, detectives on this case were looking for you?

15         Did you know that?

16    A    Yes.

17    Q    Why didn't you want to talk to the detectives at that

18 time?

19    A    I didn't want to --

20         MR. BLACKER:  Objection.  Irrelevant.

21         THE COURT:  Overruled.

22 BY MS. CORONA:

23    Q    Why did you not want to talk to the detectives at that

24 time?

25    A    Because I didn't want any police involvement.
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

228

1    Q   Is there any reason why you did not want the police

2    involved?

3    A   I was scared.

4        MR. BLACKER:  Objection.  Irrelevant.

5        THE COURT:  Overruled.

6        THE WITNESS:  I was scared and didn't want any

7    involvement, and I thought I was facing things by being

8    back, and I didn't want the police involved at all.

9    BY MS. CORONA:

10   Q   At what point did you decide to get the police involved?

11   A   I was on a traffic stop by a detective, and a couple of

12   officers, and they took me down.

13   Q   So you didn't actually decide; the police found you?

14   A   Yes.

15   Q   And once they found you, did they tell you what you had

16   to say, or what story you had to give to them in order to

17   prosecute Pablo Diaz?

18   A   They had my --

19       MR. BLACKER:  Objection.  Calls for hearsay.

20       THE COURT:  Overruled.

21       THE WITNESS:  They had me go down with them to the

22   fourth building for some kind of tape recording.

23   BY MS. CORONA:

24   Q   And you gave a statement to them that day?

25   A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

229

1   Q   And in that statement, did anything on that statement --

2   was that because the detectives called you to say that, or is

3   that what actually happened?

4   A   No.   That is what happened.

5   Q   Did they insinuate what you should say, or what story

6   you should say on that day?

7   A   No.

8   Q   And why did you decide then not to cooperate -- now

9   cooperate with the detectives on this day?

10   A   Excuse me?

11   Q   Why did you decide to cooperate with the detectives on

12   that day?

13   A   For my daughter.

14       MS. CORONA:   May I approach the witness?

15   BY MS. CORONA:

16   Q   Showing you what has been marked as State's Exhibit 1W,

17   1X, 1Y and 1Z for Identification.

18       Do you recognize these photographs?

19   A   Yes.

20   Q   What are they?

21   A   My apartment.

22   Q   Is this a fair and accurate representation of what your

23   apartment building and the actual stairway looked like on the

24   date of June 8, 2003?

25   A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

230

1        MS. CORONA:  State moves State's Exhibits 1X, 1Y, 1W

2   and 1Z for Identification into evidence.

3        THE COURT:  Any objection?

4        MR. BLACKER:  I would like to voir dire as to the time

5   they were taken.

6        THE COURT:  Go ahead.

7        MR. BLACKER:  Thank you.

8        Were those the pictures taken before you were -- arrived

9   home from the hospital with the police officers?

10       THE WITNESS:  I don't know when they were taken.

11       MR. BLACKER:  OK.  Does the -- do the pictures reflect

12   the condition of the apartment when you first left the

13   apartment and the door slammed shut, prior to you coming

14   back, when you and Pablo exited the apartment?

15       THE WITNESS:  Basically.

16       MR. BLACKER:  OK.  When you say, "basically," do they

17   accurately --

18       THE WITNESS:  Yes.  That is my apartment.

19       MR. BLACKER:  OK.  Do those pictures accurately reflect

20   the condition of your apartment as you and Pablo exited

21   the apartment, and the door slammed shut, and you don't

22   have a key to get back in?

23       THE WITNESS:  Yes.

24       MR. BLACKER:  OK.  Thank you.

25       I have no objection.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

231

1          THE COURT:  They will be admitted.

2          THE CLERK:  State's Exhibits marked for Identification

3     purposes, 1W, 1X, 1Y and 1Z will now become State's Exhibit

4     Numbers 1 through 4, consecutively.)

5          (Thereupon, the exhibits referred to were marked as

6     State's Exhibit Numbers 1, 2, 3 and 4 respectively, and were

7     received in Evidence.)

8          MS. CORONA:  May I have the witness step down?

9          THE COURT:  Yes.

10    BY MS. CORONA:

11    Q    Step down for a second.

12         Can you show the members of the jury where exactly this

13    photograph -- where you were standing at when this whole

14    incident started?

15         THE COURT:  Listen, you need to speak up, because the

16    court reporter needs to hear everything.

17         MR. BLACKER:  I would like also to see where the witness

18    is graphically depicting on the photographs.

19         THE COURT:  Why don't you go stand over there.

20         MR. BLACKER:  I would be happy to.  Thank you.

21    BY MS. CORONA:

22    Q    Show them again.

23    A    Inside the door.

24    Q    This door, is that the front entry door?

25    A    Correct.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

232

1    Q    And where was Pablo?

2    A    In the other room.

3    Q    And in this -- which direction is the room in this

4    photograph?

5    A    It goes through here, in front of a closet.

6    Q    Where did he come out of?

7    A    The room.

8    Q    Where did he go towards?

9         Show me specifically.

10   A    Towards this way.

11   Q    And that is when you ran out?

12   A    Yes.

13   Q    And in this photograph, what is that a photograph of?

14   A    My bedroom.

15        THE COURT:  I can't hear you.

16        THE WITNESS:  My bedroom.

17   BY MS. CORONA:

18   Q    And the money that's on the -- that bed there is the

19   money that he's talking about; the $3,000 that you were saving

20   for a car?

21   A    Yes.

22   Q    And what is this?

23   A    A hallway.

24   Q    Is that the hallway that leads to the room?

25   A    Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

233

1    Q    And that on the floor, do you know what that is?

2    A    No.

3    Q    Go ahead and sit down.

4         THE COURT:  Let me see the pictures again.

5         MS. CORONA:  I want to publish those pictures to the

6    jury.

7         THE COURT:  Yes.  Hold on for one second.  All right.

8    BY MS. CORONA:

9    Q    Showing you what has been marked as State's 1F, 1E, 1J,

10   1H, 1I, 1G and 1K.

11        Can you look at these and tell me if you recognize them?

12   A    Yes.

13   Q    How do you recognize them?

14   A    This is the building.

15   Q    Is that you in the photographs?

16   A    Yes.

17   Q    Is that a fair and accurate representation of what

18   happened to you that night?

19   A    Yes.

20        MS. CORONA:  The State moves State's Exhibits 1F, 1E,

21   1J, 1H, 1I, 1G and 1K for Identification into evidence.

22        THE COURT:  Any objection?

23        MR. BLACKER:  I would like to voir dire the witness.

24        Have you seen these photographs before?

25        THE WITNESS:  Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

234

1       MR. BLACKER:  When?

2       THE WITNESS:  The last time that I went to the State

3  Attorney's Office.

4       MR. BLACKER:  How long ago?

5       THE WITNESS:  It was a few months.

6       MR. BLACKER:  OK.  And do you know how they were made?

7       THE WITNESS:  No.

8       MR. BLACKER:  You said that they were fair and accurate

9  depictions of what happened to you that night?

10      THE WITNESS:  Correct.

11      MR. BLACKER:  And do -- you have now seen a copy of the

12  video tape in which -- a complete copy of it?

13      THE WITNESS:  No, I haven't.

14      MR. BLACKER:  Those are the only pictures that you've

15  seen of the events that occurred that night?

16  THE WITNESS:  That I remember right now, yes.

17      MR. BLACKER:  I have nothing further.

18      THE COURT:  All right.  No objection.

19      THE CLERK:  State's Exhibits marked for Identification

20  purposes, 1E, 1F, 1G, 1H, 1I, 1J and 1K will now become

21  State's Exhibit Numbers 5 through 11, consecutively.

22      (Thereupon, the exhibits referred to were marked as

23  State's Exhibit Numbers 5, 6, 7, 8, 9, 10 and 11,

24  respectively, and were received in Evidence.)

25      THE COURT:  When Cathy was sick for three weeks, the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

235

1       other clerks just didn't say it the same way she does.

2           THE CLERK:  That's them, not me.

3           THE COURT:  Ms. Corona.

4           MS. CORONA:  Thank you, Judge.

5           Can I have -- ask the witness to step down again?

6           THE COURT:  Yes, but we're going to have a problem here.

7       Any chance that you could talk to her there where she has

8       the mike and the jurors can see?

9           Because you're going to be passing the pictures and

10      discussing one picture at a time, and handing it over to

11      the jury.

12      BY MS. CORONA:

13      Q   Can you describe to the jury what's happening in each of

14      those photographs?

15          MR. BLACKER:  Objection.  The photographs speak for

16      themselves.

17          THE COURT:  Overruled.

18          THE WITNESS:  OK.  That's me here, and that's Pablo.

19      BY MS. CORONA:

20      Q   Is that when you were jumping over the counter, or

21      coming back?

22      A   That's coming back.

23      Q   And in this photograph?

24      A   OK.  That's me, and that's Pablo.

25          MR. BLACKER:  Judge, we'd ask to have them identified

MATZ, TRAKTMAN, FELDMAN AND WILDNER

236

1     for the record.

2   BY MS. CORONA:

3     Q   State's Exhibit 5, is there anybody else in this

4   photograph?

5         Who is that?

6     A   That's Dennis, the front clerk.

7     Q   OK.  At this point, does Pablo have a gun in his hand?

8     A   Yes.

9     Q   Can you see the gun in this photograph?

10    A   Yes.

11    Q   Can you show me where it is?

12    A   On the left hand --

13        THE COURT:  Sorry, which hand?

14        THE WITNESS:  The left hand.

15        THE COURT:  Let me see that again.

16        MR. BLACKER:  May I see it, counsel?

17        I will pass it on.

18  BY MS. CORONA:

19    Q   OK.  Referring to State's Exhibit 10, what is this?

20    A   That's the stairwell that leads up to the security

21  office.

22    Q   Is that you on the floor there?

23    A   Yes.

24        MR. BLACKER:  May I have a continuing objection to the

25  depiction by the witness of what's going on in the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

237

1    photographs?

2        THE COURT:  Yes, of course.  Overruled.

3        MR. BLACKER:  Thank you.

4    BY MS. CORONA:

5    Q   OK.  These next four photographs -- actually, can you

6    describe what's going on there?

7    A   That's the outside, the bottom of the -- also the bottom

8    of the stairs in the middle, in the middle, still arguing,

9    fighting and getting dragged by the stairs.

10   Q   When you say, "arguing," were you arguing back?

11   A   Screaming, trying to get help.

12   Q   Were you physically violent with him in any way at this

13   point?

14   A   No.

15   Q   Showing you what has been marked as State's Exhibit 1N

16   for Identification.

17       Do you recognize that?

18   A   Yes.

19   Q   Is that the car that you used the night of the incident?

20   A   Yes.

21   Q   Is that the car that you were pushed into the back seat

22   of?

23   A   Uh-huh.

24       MS. CORONA:  The State would like to move into evidence

25       1N for Identification.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

238

1        THE COURT:  Any objection about the car?

2        MR. BLACKER:  Of the car, no.

3        THE COURT:  It will be admitted.

4        THE CLERK:  State's Exhibit marked for Identification

5    purposes 1N will now become State's Exhibit Number 12.

6        (Thereupon, the exhibit referred to was marked as

7    State's Exhibit Number 12 and was received in Evidence.)

8        MR. BLACKER:  May I have a sidebar without the

9    court reporter for a moment, very quickly, about the

10    exhibit?

11        THE COURT:  All right.  Are you sure you don't want the

12    reporter?

13        MR. BLACKER:  Yes.  I'm positive.

14        (Thereupon, counsel for the respective parties

15    approached the bench and conferred with the Court outside the

16    hearing of the court reporter and the jury panel, after which,

17    the following proceedings were had in open court:)

18    BY MS. CORONA:

19    Q    The car in the photograph, is it in the same condition

20    as it was the day that it was used?

21        Is that --

22    A    No.

23        THE COURT:  Sorry, can't hear you.

24        THE WITNESS:  No.  It looks crashed.

25        THE COURT:  I believe the parties have agreed that this

MATZ, TRAKTMAN, FELDMAN AND WILDNER

239

1    is a photograph of the car about a year later; is that

2    correct, Ms. Corona?

3         MS. CORONA:  Correct.

4         THE COURT:  Is that correct, Mr. Blacker?

5         MR. BLACKER:  Correct, Your Honor.

6         THE COURT:  Ladies and gentlemen of the jury, keep that

7    in mind.

8    BY MS. CORONA:

9    Q   Showing you what has been marked as State's Exhibits 1R,

10   1S, 1T, 1U and 1V.  Take a look at those photographs and tell

11   me if you recognize them.

12   A   Yes.

13   Q   OK.  What are these photographs of?

14   A   When I was in the hospital.

15   Q   Is that a fair and accurate depiction of the way that

16   you looked on June 8, 2003, after the incident with Pablo

17   happened?

18   A   Yes.

19        MS. CORONA:  The State moves State's Exhibits 1R, 1S,

20   1T, 1U and 1V into evidence.

21        THE COURT:  Any objection?

22        MR. BLACKER:  No, Your Honor.

23        THE COURT:  They will be admitted.

24        THE CLERK:  State's Exhibits marked for Identification

25   purposes 1R, 1S, 1T, 1U and 1V will now become State's

240

1    Exhibit Numbers 13 through 17, consecutively.)

2         (Thereupon, the exhibits referred to were marked as

3    State's Exhibit Numbers 13, 14, 15, 16 and 17, respectively,

4    and were received in Evidence.)

5    BY MS. CORONA:

6    Q    Do you remember where the photographs were taken?

7    A    Inside of the actual hospital room that I was in.

8    Q    After you had already flagged down the officers and were

9    transported?

10   A    Correct.

11   Q    What injuries specifically did you have?

12   A    I had a bashed in nose, hematoma, bleeding.

13   Q    Speak up.

14   A    Bleeding, hematoma.  Like I told you, my nails were like

15   by the cuticle, broken.  Some were bleeding.  Bruises.

16   Q    Showing you State's Exhibit 12, explain to the members

17   of the jury what injury that is.

18   A    That was a tongue ring that went through my lip.

19   Q    OK.  And State's Exhibit 14?

20   A    Those are hematomas.

21   Q    Do you know when those happened?

22   A    These, falling on the stairs.

23        MR. BLACKER:  I didn't hear that answer.  I'm sorry.

24        THE WITNESS:  Those were probably from the stairs.

25

MATZ, TRAKTMAN, FELDMAN AND WILDNER

241

1   BY MS. CORONA:

2       Q   State's Exhibit 15?

3       A   Scratches.

4       Q   That's on your chest?

5       A   Correct.

6       Q   And this one, State's Exhibit 16?

7       A   Scratches and bruise.

8       Q   And in this -- finally, Number 17?

9       A   The nails.

10      Q   Do you know how that happened?

11      A   Trying to defend myself.

12      Q   Do you ever get treated after you left Jackson for the

13  injuries you received?

14      A   No.  My father is a doctor.  He helped me.

15      Q   Ms. Ruiz, showing you what's been marked as State's

16  Exhibit 1B for Identification.

17          Have you had an opportunity to look -- listen to this

18  tape today?

19      A   No.

20      Q   Did you have an opportunity to listen to the tape?

21      A   Oh.  This morning, from the Miami Police.

22      Q   From the answering machine?

23      A   No, from the answering machine, no.

24      Q   Have you had an opportunity to listen to this tape in

25  the past?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

242

1    A    Many years ago.

2    Q    And the person on the tape that you listened to, is that

3    Pablo Diaz?

4    A    Yes.

5    Q    OK.  And is that voice on the tape a fair and accurate

6    representation of the tape from that answering machine that

7    Pablo Diaz left on your machine the night of the incident?

8    A    Yes.

9         MS. CORONA:  The State moves State's Exhibit 1B for

10   Identification into evidence.

11        THE COURT:  Any objection?

12        MR. BLACKER:  Yes.  Those previously made.  I would like

13   to voir dire the witness.

14        THE COURT:  All right.

15        MR. BLACKER:  Thank you.

16        You say you listened to the tape many years ago?

17        THE WITNESS:  Yes.

18        MR. BLACKER:  When you listened to the tape, did you

19   also have a transcript which helped you with the verbiage

20   on the tape?

21        THE WITNESS:  I don't remember a transcript.

22        MR. BLACKER:  You don't remember ever having a

23   transcript?

24        THE WITNESS:  I played them in my house.

25        MR. BLACKER:  I'm sorry?

1      THE WITNESS:  I played them in my house, and I don't

2   remember the next time that I heard them.

3      MR. BLACKER:  Oh.  You played it in your house, and

4   since then, you have not gone over that tape with one--

5   one of the State Attorneys; is that what you can recall?

6      THE WITNESS:  That, I can't recall.

7      MR. BLACKER:  So today is the first time you see that

8   tape again; is that correct?

9      THE WITNESS:  Yes.

10      MR. BLACKER:  And so the question is:  Did you ever

11   see a transcript that was made, supposedly?

12      THE WITNESS:  Oh, a transcript, a paper, yes.

13      MR. BLACKER:  When did you see that?

14      THE WITNESS:  When Laura Penn was my State Attorney.

15      MR. BLACKER:  OK.  And did you -- did she tell you that

16   there were some words that were inaudible on that

17   transcript that could not be heard?

18      She wanted to sit with you and see if you could

19   discern, if you could make out the words that she said

20   were inaudible?

21      THE WITNESS:  That's possible.  We met several times.

22      MR. BLACKER:  OK.  Do you remember it -- that

23   happening?

24      THE WITNESS:  I don't remember.  I remember her giving

25   me a copy.

244

1        MR. BLACKER:  Do you remember -- let me show you a copy

2    and see if this refreshes your recollection.

3        May I, Judge?

4        May I approach?

5        THE COURT:  Yes.

6        MR. BLACKER:  Thank you.

7        This is not in evidence, so don't read anything off of

8    this, please.

9        Are there any -- are there any words on there that are

10   marked "inaudible"?

11       THE WITNESS:  Inaudible?

12       MR. BLACKER:  Inaudible.

13       THE WITNESS:  Yes, there are.

14       MR. BLACKER:  Do you remember having seen a transcript

15   that had the word, "inaudible," previously?

16       THE WITNESS:  No, I didn't.

17       MR. BLACKER:  Do you remember ever telling Laura Penn--

18   helping her translate the words from "inaudible" to actual

19   words, in other words?

20       THE WITNESS:  I don't remember.

21       MR. BLACKER:  The inaudible words, helping her discern

22   what those words were?

23       THE WITNESS:  No.

24       MR. BLACKER:  You never did that?

25       THE WITNESS:  No.

245

1    MR. BLACKER:  Thank you.

2    No further questions.

3    THE COURT:  No objection other than previously noted.

4    We -- it will be admitted.

5    MS. CORONA:  I ask that you allow me to give the jurors

6    a copy of the transcript, but it's not in evidence.

7    THE COURT:  Yes.

8    Ladies and gentlemen, the transcripts that you are being

9    handed are not in evidence, so at the end of the trial, you

10   don't get them into the jury room.  They are just aids for

11   you in listening to the tape.

12   So at the end of the case, when you get the case to

13   deliberate and you have all of the evidence with you, the

14   transcript will not be among that evidence.

15   THE CLERK:  State's Exhibit marked for Identification

16   purposes 1B will now become State's Exhibit Number 18.

17   (Thereupon, the exhibit referred to was marked as

18   State's Exhibit Number 18, and was received in Evidence.)

19   MR. BLACKER:  Judge, can I ask that you have -- ask

20   the jurors to turn them over?  Because I have a sidebar

21   objection.

22   THE COURT:  Turn them over.  Don't look at them at

23   this second.  Jurors, please turn them over.  Don't look at

24   them at this time.

25

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1      (Thereupon, counsel for the respective parties

2   approached the bench, and the following proceedings were had

3   outside the hearing of the jury panel:)

4      MR. BLACKER:   Judge, my understanding is that the

5   prosecutor listened to the tape and determined that the

6   word that's written, "Conciana," was in lieu of the

7   inaudible symbol that had been there previously for almost

8   four years.  So in doing that, she has now placed herself

9   to become a witness in this case.  She could no longer

10   represent the State in this case.  She is now a witness.

11      I am choosing to call her.  I want to call her as a

12   witness.  I want to find out what she did and how she did

13   it; how she determined that.  I'm entitled.

14      This is a very important matter.  We are talking about

15   the skinning of the daughter of this woman.  It goes to

16   emotionally affect the jury.

17      In addition, 404 being material -- excuse me.  I

18   supplied that to the State.  Florida Statute 90.04 is

19   another crime, a threatening crime.  I seek to keep it out.

20   I have never been given notice of this crime.  I seek to

21   keep it out on that basis.

22      Based on these two things, I think it is objectionable.

23   I think the word, "Conciana" which is written in there

24   should come out, and the word, "inaudible" should be

25   replaced in its place.

1      Under 404, this was the first time that she was

2      redacting them.  I never saw the word, "Conciana" until

3      the trial actually started.

4          THE COURT:  Objection overruled.

5          MR. BLACKER:  One last thing before you go.

6          THE COURT:  I don't want any mention that you heard it.

7      You know it may just -- the tape, itself, it's either there

8      or it's not there.  It doesn't matter who used the word or

9      heard it or not if it does belong there.  If it doesn't

10     belong there --

11         MR. BLACKER:  OK.  Now, I inadvertently, before I

12     started the trial, forgot to invoke the sequestration rule

13     as to witnesses.  I seek to have the invocation of

14     sequestration.  It is just the first witness in the case,

15     so I am requesting that.  I'm asking the Court to invoke

16     the rule.  We had discussed it amongst us.

17         THE COURT:  OK.  Let's go.

18         (Thereupon, the sidebar conference was concluded, after

19     which, the following proceedings were had in open court:)

20         THE COURT:  All right.  For the record, the witness

21     sequestration rule has been invoked.

22         Ladies and gentlemen of the jury, what that means is

23     that the witnesses in the case have to wait outside, and

24     they cannot discuss their testimony among themselves.  They

25     can only discuss their testimony with the lawyers, and

1    that is individually.  The lawyers cannot go and talk to

2    all of the witnesses together.  They can speak to each

3    witness individually, and the witnesses, when they go

4    outside, they cannot tell other witnesses what was asked,

5    or anything like that.  That way, no one can get together

6    and go over their story.

7        What exhibit is the tape?

8        THE CLERK:  18.

9        THE COURT:  State's Exhibit 18.

10       (Thereupon, State's Exhibit 18 was published in open

11   court.)

12       THE COURT:  Excuse me.  Stop the tape.  Excuse me.

13   Stop the tape.  Perhaps, you know -- well, no.  You can

14   play it.  But perhaps if the witness can hear it, you can

15   play a little bit, stop it, and then ask the witness what

16   it says so it makes sense, because otherwise it's not

17   going to make sense to anybody.  OK?

18       MR. BLACKER:  But Judge, they have a transcript.

19       THE COURT:  Rather than playing the whole thing, I

20   would rather you go little by little, so we could hear

21   what is actually being said and you can --

22       (Thereupon, State's Exhibit 18 was further published in

23   open court.)

24   BY MS. CORONA:

25   Q    Is that $3,600 he is referring to?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

249

1      THE COURT:  Who is talking?

2      THE WITNESS:  The money on the bed.

3      THE COURT:  Hold on.  Who was talking there?

4      THE WITNESS:  Pablo.

5   BY MS. CORONA:

6   Q   Is this the night of the incident?

7   A   Yes.

8      THE COURT:  And what was being said?

9      THE WITNESS:  Can you --

10  BY MS. CORONA:

11  Q   And he is referring to the $3600.  What $3600 is he

12  referring to?

13  A   The money of the car.

14  Q   Who is Conciana?

15  A   Conciana is my daughter.

16  Q   How old was Conciana at the time that this happened?

17  A   She's eight now, so that's four years.  Four.

18      THE COURT:  Wait a minute.  It was said on the tape?

19  BY MS. CORONA:

20  Q   Was that said on the tape?

21  A   It would help if I could have a copy.

22      MR. BLACKER:  Let me interrupt.  The witness is even

23  requesting a transcript.

24      THE WITNESS:  Well, I don't need it.  I mean --

25      MR. BLACKER:  Judge, the transcript is an aid or piece

1    of evidence, number one.  My objection is the best evidence

2    is the tape, itself.  If the jury needs an aid, that is

3    fine, but to allow the witness to say what is on the tape

4    while -- is improper.

5    THE COURT:  The objection is overruled.  The witness no

6    longer has the transcript, but, you know, a piece of

7    evidence means nothing except it is an -- well, if the

8    witness could explain what is being said, if she can.  If

9    she cannot, she cannot.

10    (Thereupon, State's Exhibit 18 was further published in

11    open court.)

12    BY MS. CORONA:

13    Q   What is at 89 on Coral Way?

14    A   89 and Coral Way is my father's doctor's office.

15    THE COURT:  Wait a minute.  Was that what was being

16    said?

17    Listen to the part that was playing.

18    Can the witness tell what was being said?

19    THE WITNESS:  That he is not afraid to go over there.

20    BY MS. CORONA:

21    Q   What is he referring to when he says that?

22    A   Starting trouble over at my dad's place.

23    THE COURT:  Something said about someone with a name?

24    THE WITNESS:  Conciana, my daughter.

25    THE COURT:  Well, ask the witness.  The jury and the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    Court have a right to know what is on that tape.

2  BY MS. CORONA:

3    Q  What is he threatening to do to your daughter, Conciana?

4    A  Peel her skin off.

5    MR. BLACKER:  Objection.  Leading question.

6    THE COURT:  Overruled.

7    (Thereupon, State's Exhibit 18 was further published in

8  open court.)

9    THE COURT:  Stop it.  Have the witness tell us what is

10  being said on that tape.  And for the record, whenever the

11  tape is played, the actual tape represents the record for

12  purposes of appeal.  The court reporter will not be taking

13  that down.

14    Do both sides understand?

15    MR. BLACKER:  No objection.

16    MS. CORONA:  Yes.

17    THE COURT:  What was played, can the witness tell us

18  what was said?

19    THE WITNESS:  Basically that he was going to go to my

20  dad's place and start trouble; that he just wanted the

21  $3600 back in return.

22  BY MS. CORONA:

23    Q  And he refers to his big fist being pretty straight.

24  What does that mean to you?

25    A  At his -- first, once he punched me in the car.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

252

1      THE COURT:  I could not understand.

2      THE WITNESS:  First, when he first punched me in the

3  car.

4      THE COURT:  Repeat all that, Ms. Corona, because I did

5  not understand.  Whatever the witness said, I did not

6  understand.

7      (Thereupon, State's Exhibit 18 was further published in

8  open court.)

9  BY MS. CORONA:

10  Q   What does -- what is that?

11      What does he mean by that?

12  A   He hits pretty straight and --

13  Q   Catch you coming in and out of the building.  What kind

14  of threat is that to you?

15      MR. BLACKER:  Objection.  Mischaracterization.

16      THE WITNESS:  I didn't hear the question.

17      THE COURT:  I couldn't hear anything else, either.  I

18  couldn't hear the question, and I couldn't hear the answer,

19  and there was an objection.  Let's do it slowly.  There is

20  no rush.

21  BY  MS. CORONA:

22  Q   What does it mean to you when he says, "I will catch you

23  coming in or out of the building"?

24  A   He'll try to do something to me coming in or out of the

25  building.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

253

1     Q    And he threatened you like that earlier that night?

2     A    Like that, no, not that I know.

3          (Thereupon, State's Exhibit 18 was further published in

4    open court.)

5          THE COURT:  Ask the witness to tell what is being said.

6          THE WITNESS:  I will talk to your dad.

7          And then he says:  I will fuck you up.

8          I don't know.

9    BY MS. CORONA:

10    Q    Did -- had he ever met your dad before that day?

11    A    Yes.

12    Q    Did he know where your dad worked?

13    A    Yes.

14    Q    Where does your dad work?

15    A    89 and Coral Way.

16    Q    What does he do?

17    A    Pediatrics and adolescent medicine.

18    Q    Does he have his own practice?

19    A    Yes, his practice.

20         (Thereupon, State's Exhibit 18 was further published in

21   open court.)

22   BY MS. CORONA:

23    Q    In that statement, he's making some allegation about

24   you.

25         What is he saying?

254

1    A    That I was smoking crack.

2    Q    Why would he say something like that?

3    A    I have no idea.

4    Q    Did he ever see you smoking crack before?

5    A    No.

6    Q    Did you ever smoke crack with him before?

7    A    No.

8    Q    Did you ever shoot at a dope dealer's house, like he

9    alleges that you did in this?

10   A    No.  I don't know how to shoot a gun.

11   Q    Did you ever own a gun before?

12   A    No.

13   Q    Had you ever shot a gun before?

14   A    No.

15        (Thereupon, State's Exhibit 18 was further published in

16   open court.)

17   BY MS. CORONA:

18   Q    What does he say there?

19   A    That he is going to raise hell; that I owe him $3600.

20   Q    And he is going to give you to tomorrow night to what?

21   A    That I have -- I -- he have until tomorrow night to bury

22   me.

23   Q    What does that mean to you?

24   A    Violence.

25   Q    Had he threatened you before to bury you and where he

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   was going to bury you?

2   A   Yes.

3   Q   What did he tell you?

4       MR. BLACKER:  Objection.  94.04 and --

5       THE COURT:  Let's go sidebar.

6       MR. BLACKER:  Please.

7       MS. CORONA:  Can the witness go to the bathroom?

8       She needs to use the bathroom.

9       THE COURT:  Ladies and gentlemen, leave the transcripts

10  out here.  Let's take a ten minute break, and you all go

11  into the jury room right behind you.

12      You are not to discuss the case amongst yourselves.

13  Leave the transcript on your chair.

14      And the witness, you are not to discuss your testimony

15  with anyone, including the lawyers, because you are on the

16  witness stand.

17      THE WITNESS:  OK.

18      (Thereupon, the jury panel exited the courtroom, and the

19  following proceedings were had outside the presence of the

20  jury panel:)

21      THE COURT:  There was an objection.

22      MR. BLACKER:  Yes.  Judge, we already made a motion in

23  limine about 404B.

24      THE COURT:  Right.  What was it that the witness had

25  said?

256

1        MR. BLACKER:  She asked the witness:  Was he threatening

2    you?

3        She said:  Yes.

4        And how about other occasions which he was threatening

5    you?

6        MS. CORONA:  That evening, previously.  I'm referring

7    to that same night.

8        THE COURT:  So that is why I overruled the objection.  I

9    felt that it dealt with the same night.  Just make sure

10   that the question -- that it dealt with the same night.

11       The witness is not to say anything about any prior bad

12   acts of the defendant on another night or in your

13   relationship, OK?

14       Do you understand?

15       THE WITNESS:  Nothing about --

16       MS. CORONA:  Any other bad things that happened.

17       THE COURT:  You are only supposed to testify about what

18   happened that evening, and things about that evening,

19   whatever it is that the prosecutor will be asking you.

20       Do you understand?

21       THE WITNESS:  Yes.

22       THE COURT:  And you are not to say anything about he is

23   in jail or anything to that effect.

24       Do you understand?

25       THE WITNESS:  Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

257

1     THE COURT:  Anything further?

2     MR. BLACKER:  Priors.

3     THE COURT:  Or anything about any prior criminal record

4  on his part.

5     Do you understand?

6     THE WITNESS:  Yes.

7     THE COURT:  All right.  Bring in the jury.  Get the

8  jury.

9     Count III goes to the victim?

10    Count III, is it Flores or Ms. Ruiz?

11    MS. CORONA:  Dennis Flores.

12    THE COURT:  Not -- and the aggravated assault, did you

13  see how -- let me -- so you have it?

14    Here, look at Count III.

15    MS. CORONA:  I ask that you add "and/or."

16    THE COURT:  To wit, threatened by word or act to do

17  violence to the person of another, to wit, Dennis Flores,

18  coupled with an apparent ability to do so, and did some

19  act, to wit, pointed a firearm and threatened Catherine

20  Ruiz.

21    MS. CORONA:  And/or Dennis Flores.

22    MR. BLACKER:  Judge, it's now four years we have been

23  defending this case under the Information the way it was,

24  except about a year ago.

25    THE COURT:  I know how long it's been.  Just tell me

MATZ, TRAKTMAN, FELDMAN AND WILDNER

258

1    the short of it.

2       MR. BLACKER:  The short of it, it can't be amended

3    after the jury has been sworn like this and testimony --

4       THE COURT:  Sure, it can.

5       MR. BLACKER:  Only if -- in my opinion, only if the

6    evidence conforms to a change in the pleadings.

7       So far, there has not been one word about any

8    aggravated assault of any witness.  So to change it, I

9    would then ask --

10      THE COURT:  Hold on for a second.  The Information

11   currently reads:  The defendant threatened either by word

12   or act to do violence to the person of another, to wit,

13   Dennis Flores, coupled with an apparent ability to do so,

14   and did some act, to wit, pointed a firearm a Catherine

15   Ruiz, which created a well founded fear in such other

16   person that such violence was about to take place.  I guess

17   pointing a gun at Catherine Ruiz would scare the pants off

18   of Dennis Flores, thinking if he points it at her, I feel

19   the aggravated assault here.

20      MS. CORONA:  I would ask to add "and/or Dennis Flores."

21   It doesn't substantially change at all.  The defendant

22   knows -- counsel knows this is Ruiz and Dennis Flores.

23      THE COURT:  Catherine Ruiz and/or Dennis Flores.  I will

24   amend it in the Information.

25      Do you have an objection?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

259

1    MR. BLACKER:  Of course.

2    THE COURT:  Your objection is overruled.  It will be

3    amended.

4    MR. BLACKER:  May I make a motion for the record?  I

5    move for a mistrial.  We have no time to prepare for this.

6    We can't take a deposition.  I'm not prepared to defend

7    that Dennis Flores had a gun pointed at him, and that was

8    the cause of the aggravated assault.  I ask that you either

9    take a break in the trial and allow me to redepose

10   Mr. Flores, or declare a mistrial.  And if you want to

11   amend the Information.

12   THE COURT:  OK.  Your motion for mistrial is denied.

13   And, yes, when Mr. Flores comes, you can talk to him and

14   depose him if you want, and although that has already been

15   covered in deposition, whether or not he pointed a gun at

16   Mr. Flores, I don't even know why you want to waste your

17   time redeposing him.

18   MS. CORONA:  For the record, this actual change was a

19   substance of the motion to dismiss, which counsel argued

20   and the State traversed, and this charge was the only one

21   that stayed, because counsel knew that Dennis Flores had a

22   gun pointed at him, so I don't believe that there is any

23   prejudice to the Defense as to that charge.

24   THE COURT:  Anyway, you are free to take his

25   deposition.  Get the jury out.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

260

1          MR. BLACKER:  I want you to know the last statement

2     of counsel is somewhat inaccurate.

3          (Thereupon, the jury panel entered the courtroom, after

4     which, the following proceedings were had in open court:)

5          THE COURT:  Thank you.  Please have a seat.

6          Continue.  Remember that at 12:15, I need to leave.

7     BY MS. CORONA:

8     Q    You were talking about this line here, the message that

9     Mr. Diaz left here.  It says that he's going to give you until

10    tomorrow night to bury you, and I asked you where -- had he

11    threatened you like that, that night?

12         Had he threatened you that he was going to bury you that

13    night?

14    A    Yes.

15    Q    What specifically did he tell you besides what was on

16    the tape?

17         What -- did he tell you why he was going on --

18         Did he tell you where he was going to take you to bury

19    you?

20    A    To the Redlands.

21    Q    What is in the Redlands?

22    A    The house -- his parents' house.

23    Q    What type of house is it?

24    A    It was like a farm, kind of, acre, like some acres on a

25    farm.

261

1    Q    And at that point, did he threaten to kill you that

2    night before, in this message?

3    A    Yes.

4    Q    Again, there, what is he saying?

5    A    I want my money.

6         If you want to play it again for me, please.

7         (Thereupon State's Exhibit 18 was further published in

8    open court.)

9         THE WITNESS:    That I was a beast, and that he wanted

10        his money before tomorrow afternoon.

11   BY MS. CORONA:

12   Q    Tomorrow afternoon, what was he going to do if he didn't

13   have his money?

14   A    I didn't hear that.

15        (Thereupon, State's Exhibit 18 was further published in

16   open court.)

17   BY MS. CORONA:

18   Q    In that message, what is he saying?

19   A    That I have a certain amount of time to give the money

20   back before I was going to be buried and to call his mother.

21   Q    And you had a relationship with his mother that you

22   would call her on the phone?

23   A    Yes.

24   Q    Did she always treat you well?

25   A    Very well.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1        (Thereupon, State's Exhibit 18 was further published in

2    open court.)

3    BY MS. CORONA:

4        Q   Do you know what that means?

5        A   Yes.  Bring him up.  Bring him up.

6        Q   What does that mean?

7        A   Frank.

8        Q   Was that Pablo?

9        A   Yes.

10       Q   And that night, he was saying bring who up?

11       A   Bring up a friend of his, Frank.

12       Q   Why?

13       A   Frank wanted to talk to me.

14       Q   That night?

15       A   No.  The next day.

16       Q   That night, did you talk to Pablo between any of those

17   messages?

18       A   What day was that; June 8th or June 9th?

19       Q   June 8th.  This is at 3:30 in the morning, after you got

20   back from the hospital.

21       A   No, I didn't talk to him.

22       Q   When was the first time you talked to Pablo after you

23   jumped out of the car and went to the police?

24       A   The next day, when his mom told me that he had tried to

25   kill himself, to go to the Redlands, to go over at Shorty's

263

```
 1   Barbecue when I got down south.

 2   Q   What happened that Pablo tried to kill himself?

 3   A   Supposedly, he was in a car accident.

 4   Q   Do you know if that is true or not?

 5   A   No, I don't.

 6   Q   Did you see the car on the next day?

 7   A   No, I just saw it for the first time in the pictures.

 8   Q   Did you ever see the car again after you jumped out of

 9   it?

10   A   No.

11   Q   Did Pablo tell you that he crashed the car?

12   A   Yes.

13   Q   What did he tell you happened?

14       MR. BLACKER:  Objection; irrelevant, about what

15   happened to the car.

16       THE COURT:  Overruled.

17   BY MS. CORONA:

18   Q   What did Pablo tell you happened to the car?

19   A   That -- he told me that -- I don't know if --

20       THE COURT:  I'm sorry, I can't hear what you said.

21       THE WITNESS:  I spoke to Olga, and --

22       MR. BLACKER:  Objection.

23       THE COURT:  Sustained as to what Olga said.

24       THE WITNESS:  I don't remember if it was himself or his

25   mother, but somebody told me that the car had been in an
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

264

1    accident.

2    BY MS. CORONA:

3    Q   Do you see the person that we are referring to as Pablo

4    here in the courtroom today?

5    A   Yes.

6    Q   Can you look at him, and identify him by an article of

7    clothing and tell me what he is wearing?

8    A   A pair of glasses, and like a beige shirt.

9        MS. CORONA:  Let the record reflect that the witness

10   has identified the defendant.

11       THE COURT:  All right.  Is venue an issue in the case?

12       MS. CORONA:  I don't believe so, but --

13   BY MS. CORONA:

14   Q   Did this happen in Miami-Dade County, everything that

15   we're talking about?

16   A   Uh-huh.

17       THE COURT:  You need to answer.

18       THE WITNESS:  Yes.

19   BY MS. CORONA:

20   Q   Were you afraid of Pablo on the night of June 8, 2003?

21   A   Yes.

22       MS. CORONA:  I have no further questions.

23       THE COURT:  Cross-examination.

24       MR. BLACKER:  Judge, may I have a moment to set up?

25   Thank you.

265

1                           CROSS-EXAMINATION

2     BY MR. BLACKER:

3        Q    Good afternoon, Ms. Ruiz.

4        A    Good afternoon.  Good afternoon.  Huh?  Oh.

5        Q    In 2003, you had been living with Pablo for

6     approximately five weeks, had you not, prior to this incident?

7        A    Excuse me?

8             Five weeks, something like that.

9        Q    Yes.  And you've been involved as lovers with Mr. Diaz,

10    have you not?

11       A    Correct.

12       Q    And you'd been spending a lot of time together; every

13    day, weren't you?

14       A    Yes.

15       Q    And you were not working at the time, were you?

16       A    No.

17       Q    And he was spending a lot of time with you at your

18    apartment and in the Redlands house of his mother; isn't that

19    correct?

20       A    That's correct.

21       Q    Now, that is how you came to know his mother; isn't that

22    right?

23       A    Correct.

24       Q    And during that time, on occasion, you would bring your

25    daughter over, and you would socialize that way; isn't that

266

1   true?

2   A   Correct.

3   Q   And you socialized at the Redlands house with your

4   daughter, with Pablo, Olga Diaz, their family; isn't that

5   correct?

6   A   Yes.

7   Q   You were having a relationship?

8   A   Correct.

9   Q   And during that relationship, Pablo had treated you with

10   respect?

11   A   Yes.

12   Q   Pablo had never had an episode of anger or dismay,

13   manifested any of the things that he did on July -- June 8th?

14   A   Nothing like that, no, never.

15   Q   The relationship was -- was calm and a loving

16   relationship?

17   A   Yes.

18   Q   OK.  And on June 7th, a friend of Pablo's, Attalia Bello

19   (phonetic) and Armando, her boyfriend, came over to your house

20   and spent the entire day of June 7th with you, did they not?

21   A   Yes.

22   Q   And they spent the night of June 7th with you, did they

23   not?

24   A   Yes.

25   Q   And they spent the entire day of June 8th with you, did

267

1    they not?

2        A    Yes.

3        Q    Went out for breakfast?

4        A    Yes.

5        Q    Had a few drinks?

6        A    Yes.

7        Q    Went back to the apartment, your apartment?

8        A    Correct.

9        Q    Pablo had his personal effects there, some of his

10   personal effects?

11       A    Yes.

12       Q    OK.   And prior to that day, you had met Attalia, Attie,

13   had you not?

14            You call her Attie, do you not?

15       A    Attie.

16       Q    You had known her prior to that, hadn't you?

17       A    I knew her cousin.

18       Q    Sorry?

19       A    I knew her cousin.

20       Q    Had you ever met her prior to June 7, 2003?

21       A    I was probably introduced to her by Pablo before

22   June 7th, yes.

23       Q    You don't remember going out with her prior to June 7th?

24       A    No.   As in going out, no.

25       Q    How long had you spent with Attie prior to that?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

268

1    A    The time that I know Pablo.

2    Q    So you knew her for five weeks?

3    A    I had seen her during that time.

4    Q    OK.  But when you say "seen her," she was in your

5    company, in your social company during that five-week period,

6    correct?

7    A    Correct.

8    Q    For about how many times?

9    A    I saw her a couple of times.

10   Q    OK.  And when you saw her, you talked with her?

11   A    Yes.

12   Q    There was no hostility between the two of you, was

13   there?

14   A    No.

15   Q    Everything was perfect, wasn't it?

16   A    Normal.

17   Q.   Normal.  She was Pablo's friend, and she, as a result of

18   that, became an acquaintance of yours, correct?

19   A    Correct.

20   Q    No harsh words spoken?

21   A    No.

22   Q    No argument?

23   A    No.

24   Q    OK.  Had you ever gone out with her for brunch, or

25   shopping, or anything of that nature?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

269

1    A    No.

2    Q    OK.  You had prior contact with Mr. Diaz' family, and

3    you enjoyed their company during that five weeks; is that

4    right?

5    A    Yes.

6    Q    OK.  And so on the 8th of June, you -- you, the four of

7    you in Armando's vehicle headed towards South Beach; is that

8    correct?

9    A    Correct.

10   Q    And when you got -- and about what time was that?

11        Just give us a time frame.

12   A    I can't remember.  It was probably nighttime.

13   Q    OK.  And during that nighttime, you guys stopped off;

14   all four of you stopped off and had a few drinks at the Wet

15   Willy and a couple of bars?

16   A    I think it was Wet Willy or Fat Tuesday.

17   Q    You went to a couple of bars, didn't you?

18   A    No, not a couple of bars.

19   Q    Just one bar?

20   A    We went and got a drink, and walked to -- OK.

21   Q    OK.  Do you know how many drinks you had?

22   A    One or two drinks.

23   Q    OK.  And everything was pleasant and fine; no problems

24   with anybody?

25   A    There was no problems, actually.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

270

1    Q    All four of you walked on the beach?

2    A    Yes.

3    Q    And it was nighttime, dark?

4    A    Dark.

5    Q    And you say -- withdrawn.

6         You smoked a joint with Pablo that night?

7    A    I don't recall.

8    Q    OK.  Would it refresh your recollection -- withdrawn.

9         You don't recall if you smoked any marijuana?

10   A    No, not that night.

11   Q    OK.  All right.  Let's go back a little bit.  Let's

12   sidetrack.

13   A    OK.

14   Q    The night of the event of June 8th, you were brought

15   home by an officer, right?

16   A    Yes.

17   Q    Was he a nice officer?

18   A    Yes.

19   Q    And he was helpful to you?

20   A    Yes.

21   Q    He started in his officials duties asking you about the

22   events as they occurred in this case, did he not?

23   A    He asked me a couple of questions about what happened.

24   Q    Were you fine in answering them?

25   A    Sure.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

271

1    Q   OK.  And then on June 20th, when the police surrounded

2    your car, when you were leaving, you had a conversation with

3    Detective Morin, correct?

4    A   Uh-huh.

5    Q   You gave a statement to Detective Morin, did you not?

6    A   Well, yes.  She took me downtown.

7    Q   OK.  Do you remember in that statement whether or not

8    you told her that he was smoking a little marijuana?

9    A   Yes.  She had asked me:  Do you smoke?

10   Q   And -- OK.  And you remember this after -- there was a

11   nice attorney, a good looking guy; not me, a tall guy that had

12   a proceeding with you, a sworn statement -- took a sworn

13   statement from you.

14        Do you remember that?

15   A   I remember having another sworn statement with another--

16   Q   And that was on September 29, 2004?

17   A   I can't recall the date, but I remember speaking to

18   another attorney.

19   Q   OK.  And you told that attorney that you had a few

20   drinks at Wet Willy's, and you smoked some marijuana.

21        Do you remember that?

22   A   OK, I smoked.

23   Q   And when you gave a sworn statement to me on April 11,

24   2006, do you remember that?

25   A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

272

1   Q   You've seen me before?

2   A   Yes.

3   Q   That's the only time you and I have ever chatted,

4   haven't we?

5   A   Yes.

6   Q   You were under oath on those statements, correct?

7   A   Yes.

8   Q   Even with the other attorney, the tall, good looking guy

9   and the short fat guy, you were under oath on both occasions,

10  weren't you?

11  A   Yes.

12  Q   And you were under the same oath you are today, weren't

13  you?

14  A   Correct.

15  Q   OK.  And does that refresh your recollection that you

16  smoked marijuana that night?

17  A   It could have been, yes, and I had a drink that night.

18  Q   How long did you stay on the beach that night?

19  A   We were there for maybe an hour or two.

20  Q   OK.  Now, did you actually go swimming on the beach?

21  A   We went in the water, yes.

22  Q   We?

23      Who went in the water?

24  A   I went in the water and Pablo went in the water.

25  Q   You went in the water?

1    A    Yes.

2    Q    So you were wearing --

3    A    I changed in a bathing suit.

4    Q    OK.  And you went swimming?

5    A    Uh-huh.

6    Q    And then you came out, and you changed out of the

7    bathing suit, or did you leave it on?

8    A    No.  I left it on.

9    Q    You left it on?

10   A    Yes.  I think I left it on and just put the pants on,

11   yes.

12   Q    What color was the bathing suit?

13   A    I don't recall.

14   Q    Was it a bright color, or was it white?

15   A    No.  I don't recall what color it was.

16   Q    If you were wearing a bathing suit and it was wet, so

17   you wet the pant that you were wearing, right?

18   A    Correct.

19   Q    And you would have been able to see that bathing suit

20   on; is that correct?

21   A    Yes.

22   Q    I mean if -- you know, if you are wearing something wet

23   and you put something dry over it, it's going to wet up the

24   dry item; isn't that correct?

25   A    Yes.

274

1    Q   OK.  And we would have been able to see the outline of

2  your bathing suit in your white pants, wouldn't we?

3    A   Correct.

4    Q   If you were wearing a bathing suit, correct?

5    A   Correct.

6    Q   OK.  And is -- you left your bathing suit on, and you

7  came out, and you said Pablo went swimming, as well?

8    A   I think he went in the water.  I don't recall.

9    MR. BLACKER:  OK.  And may I have a moment, Your Honor?

10    Thank you.  Judge, I need a moment to find my

11  documents.  Could I have a moment with my secretary, Judge?

12    What time did you say we were going to lunch?

13    THE COURT:  12:15.

14    MR. BLACKER:  Judge, I'm so sorry.  I had outlined each

15  and every deposition here, such as this, and I actually

16  think as I was gathering my documents in my home, I left

17  them at home.  I would like to be able to call my daughter.

18    No, here is one.  There is probably another one here.

19  I'm sorry, I just couldn't find it.  Please excuse me.  OK.

20  I'm sorry, ladies and gentlemen.  I'm sorry, Your Honor.

21    THE COURT:  That's OK.

22    MR. BLACKER:  I'm sorry, counsel.

23    THE COURT:  You want us to take a lunch break now?

24    MR. BLACKER:  Yes.  I need to have her deliver them to

25  me.  I would look carefully.

275

1    THE COURT:  That's OK.

2    MR. BLACKER:  I'm really sorry.  Thank you.

3    THE COURT:  It is 12:08.  We're going to take our lunch

4  break now.

5    First of all, to the witness, you are on the witness

6  stand, so you are not to discuss your testimony with

7  anyone, including the prosecutors.

8    Do you understand?

9    THE WITNESS:  OK.

10   THE COURT:  And ladies and gentlemen, you are not to

11  discuss this case with anyone, or amongst yourselves, OK?

12   Jimmy -- where is Jimmy?

13   Jimmy will tell you where to meet him at 2 o'clock.

14  We're going to take a longer break today, because I have

15  this luncheon that I have to go to at APF Chang's, so I'm

16  not complaining.  It is one over here on -- all right.  So

17  if you want to, after you finish with lunch and you want

18  to relax, you could always go upstairs to the seventh floor

19  if you want to.

20   Would that be better; maybe pick them up on the

21  seventh floor, Jimmy?

22   THE BAILIFF:  Yes.

23   THE COURT:  OK.  He will pick you up on the seventh

24  floor at 2.

25   So you are not to discuss this case, and go to lunch.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

276

1    (Thereupon, pursuant to a lunch recess, the jury panel

2  exited the courtroom, after which, the following proceedings

3  were had outside the presence of the jury panel:)

4    THE COURT: All right. You have to be back here at 2.

5    (Thereupon, a lunch recess was taken, after which, the

6  following proceedings were had outside the presence of the

7  jury panel:)

8    THE COURT: Thank you. Please have a seat.

9    So two things. One is the transcript of the tape.

10  Maybe we could make one a court exhibit.

11    Do you have them?

12    THE CLERK: I already have a transcript in. It was

13  State's Exhibit -- it wasn't admitted into evidence. It is

14  a State's exhibit. It is 1C.

15    THE COURT: But it's not in evidence?

16    THE CLERK: No.

17    THE COURT: For the record -- "

18    Michael, let me see the transcript. For the record,

19  your objection that you had regarding the name, Conciana, I

20  heard it clearly on the tape when it was played here in

21  front of the jury that Conciana was the word used on the

22  tape.

23    But anyway, we have for appellate purposes a copy of the

24  transcript.

25    MR. BLACKER: Thank you.

277

1        THE COURT:  Now, the other thing is there is one of the

2    jurors, Gutierrez, who said to Jimmy that she recognizes

3    the witness, Ms. Ruiz; that she may have gone to school

4    with her.

5        Do the lawyers want me to inquire?

6        MR. BLACKER:  Yes.

7        THE COURT:  All right.  Jimmy, bring in Gutierrez.

8        MR. GROSS:  Your Honor, could we wait?

9        MR. BLACKER:  Before you do that --

10        THE COURT:  Bring them down to the second floor.

11        MR. BLACKER:  Go ahead, Robert.

12        MR. GROSS:  I just wanted to wait for Carolina.  Thank

13    you.

14        MR. BLACKER:  Today, while Mr. Diaz was being brought

15    over to court, he ran into the victim of the 200 case,

16    which he is the defendant, and they -- it was nasty.  It

17    was -- you know -- kind of strange.

18        He told the guard -- that is Mr. Diaz did -- we're not

19    supposed to be together.

20        And he said:  I cannot do anything about it.

21        I am asking the Court to enter an order that this

22    defendant, Pablo Diaz, should not be placed in the company

23    at any time with Evan Mitchell, a victim in a case where

24    there was a jailhouse stabbing, and Mr. Mitchell lost some

25    body parts, because it could be a very bad, menacing

MATZ, TRAKTMAN, FELDMAN AND WILDNER

278

1      situation with Mr. Mitchell and Mr. Diaz.

2          THE COURT:  Where did he run into him?

3          THE DEFENDANT:  In the fourth floor, where they put

4      everybody in the wing there in the hallway together to be

5      called out.

6          THE COURT:  In the main jail?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Louie, can you do something about that?

9          CORRECTIONS OFFICER:  I could put it on the jail card to

10     be kept separate from Evan Mitchell.

11         MR. BLACKER:  Please.

12         CORRECTIONS OFFICER:  It should be done if it's on

13     there.

14         MR. BLACKER:  The last thing, very quickly, Officer

15     Infante that says it may be a bullet hole, I have his

16     report.  I'm asking to set aside -- I'm trying to make

17     arrangements with counsel, but before they call, if I could

18     take his depo, I would like to speak with him and take

19     notes, but I would run this thing through, but I do need to

20     speak with him, and it's moving along -- the trial, that is

21     -- is moving along, and by the end of it, I would like to

22     speak to Mr. Infante before he takes the stand.

23         MR. GROSS:  Shouldn't be a problem.

24         MR. BLACKER:  Thank you.  And I will come early or stay

25     later.  How is that?

279

1        THE COURT:  All right.  When does he testify?

2        MR. GROSS:  I believe it should be -- I know you are not

3    staying late, but we were scheduling it for tomorrow.

4        THE COURT:  So --

5        MR. GROSS:  Hopefully, we will get him in tomorrow.  We

6    are scheduling him now.  Maybe tomorrow afternoon.

7        THE COURT:  Schedule it so he comes in early and speak

8    to him.

9        MR. GROSS:  I will.

10        THE COURT:  There is Ms. Corona.  For the record, when

11    she walked in late that I called her "princess."  It's not

12    out of endearment.  It was because she was like; like, you

13    know princesses get to come in late.

14        Right, Ms. Corona?

15        MS. CORONA:  Yes, Judge.

16        THE COURT:  All right.

17        MR. BLACKER:  Could I ask you a question, Judge?

18        I car pooled with my wife today, because I haven't seen

19    her in two weeks, so if we could spend some time together.

20    If we're going to work late, I would ask you to take a five

21    minute break around 3 o'clock to make arrangements to get

22    home.

23        THE COURT:  We're going to quit at 5:30.

24        MR. BLACKER:  I need to call her.

25        THE COURT:  Carolina and Michael, the situation that I

280

1    have with the juror is Juror Gutierrez told Jimmy, my

2    bailiff, that she recognizes the witness; that she believe

3    she went to school with her.

4        Furthermore, when she said that the father was a doctor,

5    she believes that the one she went to school with, her

6    father was a doctor, too.

7        Let's bring in Ms. Gutierrez.

8        (Thereupon, Juror Gutierrez entered the courtroom.)

9        THE COURT:  Have a seat.

10       MS. CORONA:  Could we address something else?  Because

11   the witness is concerned because her mother was subpoenaed

12   to come in court.

13       THE COURT:  Can we deal with Ms. Gutierrez?

14       Ms. Gutierrez, please have a seat.

15       Let the record reflect that the defendant is present.

16       Ms. Gutierrez, the bailiff told me that you said that

17   you recognize the witness as someone that you went to

18   school with?

19       JUROR GUTIERREZ:  Yes, sir.

20       THE COURT:  And that also, the fact that her dad is a

21   doctor rings a bell with you?

22       JUROR GUTIERREZ:  Yes.

23       THE COURT:  Let me ask you, would that in any way affect

24   you as a juror in the case?

25       JUROR GUTIERREZ:  It's a little weird.  Being honest,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    it's a little weird.

2         THE COURT: It's a little weird?

3         JUROR GUTIERREZ: A little uncomfortable. It's not

4    going to affect me, but it's a little uncomfortable.

5         THE COURT: Do you feel uncomfortable about it?

6         JUROR GUTIERREZ: To be honest, yes.

7         THE COURT: At the end of the case, you're going to make

8    a decision with the other people, and the question is: Can

9    you decide this case based on the facts, or are you going

10   to be concerned with the fact that you know this person,

11   and she may know you?

12        What's going to be?

13        JUROR GUTIERREZ: I should be OK.

14        THE COURT: You should be OK?

15        JUROR GUTIERREZ: Yes.

16        THE COURT: Any questions that the lawyers want to ask?

17        MR. BLACKER: Please.

18        Not to probe, Ms. Gutierrez, did you know this person

19   personally before today?

20        JUROR GUTIERREZ: Yes. I went to -- if it's her, like

21   it's too much of a coincidence. I went to junior high with

22   her, and I used to go to her house, and we used to be good

23   friends.

24        THE COURT: Oh, OK.

25        JUROR GUTIERREZ: She used to live like down the street

282

1    almost from me, and I used to go to her house, and we would

2    play in her pool.  So.

3        THE COURT:  What junior high school did you go to?

4        JUROR GUTIERREZ:  Arvida Middle School.  Arvida.

5        THE COURT:  Why don't you wait outside.

6        (Thereupon, Juror Gutierrez exited the courtroom.)

7        THE COURT:  Jimmy, get us the witness.  The witness.

8        MS. CORONA:  She's in the satellite office.

9        THE BAILIFF:  Yes.

10       THE COURT:  Let's find out if that is, in fact, her.

11       MR. BLACKER:  While we are waiting, I did make a motion

12   this morning, reserved a motion from the Court about the

13   opening argument of counsel, where he on two occasions --

14       THE COURT:  OK.  Come forward.  Yes, turn it off.

15       (Thereupon, Witness Catherine Ruiz entered the

16   courtroom.)

17       All right.  Come forward.  Stand at the podium there.

18   You are still under oath.

19       Let me ask you, does -- there is a juror there by the

20   name of Patricia Gutierrez, and she says that she went

21   to --

22       What junior high school did you go to?

23       THE WITNESS:  Different schools here.  I went to Ponce.

24   I went to Gulliver.  I mean, I switched around schools.

25       THE COURT:  Did you ever go to Arvida?

MATZ, TRAKTMAN, FELDMAN AND WILDNER