1      THE WITNESS:  When I lived in Kendall, yes.

2      THE COURT:  Because she's one of the jurors, and she

3  says she knows you, and that you used to go to each other's

4  house and stuff when you were in junior high.

5      THE WITNESS:  I don't know.  I didn't recognize anybody.

6      THE COURT:  All right.  Well --

7      THE WITNESS:  So it's a mistrial?

8      THE COURT:  No.  Wait outside.

9      THE WITNESS:  All right.

10      THE COURT:  Don't discuss your testimony anymore.

11      THE WITNESS:  No.  I've been in the room.  Thank you.

12      (Thereupon, Witness Catherine Ruiz exited the

13  courtroom.)

14      THE COURT:  In an abundance of caution, should we excuse

15  Ms. Gutierrez and put Ms. Aranda in the jury?

16      MS. CORONA:  Is the Defense asking for that?

17      MR. BLACKER:  There is nothing else I could ask for.

18      THE COURT:  Let's put the defendant under oath.

19      (Thereupon, the defendant was duly sworn.)

20      THE COURT:  All right.  Mr. Diaz, your full name and

21  age.

22      THE DEFENDANT:  Excuse me?

23      THE COURT:  Your full name and your age.

24      THE DEFENDANT:  Pablo Diaz, 31.

25      THE COURT:  We heard that Patricia Gutierrez went to

1   school with the alleged victim in this case.  Your lawyer

2   is asking to excuse Ms. Gutierrez and have Alexandra Aranda

3   take her place on the jury.

4        THE DEFENDANT:  Yes.

5        THE COURT:  Is that your request, as well?

6        THE DEFENDANT:  Yes.

7        THE COURT:  And State?

8        MS. CORONA:  Judge, I don't have an objection to it, in

9   an abundance of caution.

10       MR. BLACKER:  One last request:  That you quickly tell

11  Ms. Gutierrez that although she is dismissed, please do not

12  discuss the case with anybody until next week when the

13  verdict is probably in because --

14       THE COURT:  All right.  Bring Ms. Gutierrez in.  Not

15  only does she know her, but she says she feels

16  uncomfortable.

17       MR. BLACKER:  Twice she said that.  So.

18       THE COURT:  All right.

19       (Thereupon, Juror Gutierrez entered the courtroom.)

20       THE COURT:  Ms. Gutierrez, because of the unforeseen

21  circumstance, that you happen to know and have been a

22  friend of one of the key witnesses in the case, we're going

23  to -- both sides have agreed at the request of the Defense

24  to go ahead and excuse you, OK?

25       JUROR GUTIERREZ:  Sorry.

1    THE COURT: No, that's OK. I'm glad you were honest

2    with us. We're going to excuse you, and you're not to

3    discuss your testimony -- what you've heard here with

4    anybody, and to have no other contact with any of the

5    jurors. If you have any of their phone numbers or anything

6    like that, you are not to have any further contact. So we

7    will go ahead and excuse you at this time.

8    JUROR GUTIERREZ: Thank you.

9    THE COURT: If you need a letter of attendance, I

10   believe you have one here.

11   Jimmy, does Evelyn have one from this morning?

12   See if you have one.

13   THE BAILIFF: We don't, because we didn't think we were

14   going to finish.

15   THE COURT: Don't you get them in the morning?

16   THE BAILIFF: Only if we know it's going to be the last

17   day for deliberation.

18   THE COURT: What we're going to do is tell the other

19   jurors we're going to take a ten or 15 minute break now.

20   Tell them they could go for coffee and to meet you on the

21   third floor, and then you take her upstairs to get her the

22   letter. OK?

23   And just say goodbye. Don't talk about anything.

24   JUROR GUTIERREZ: Yes, sir.

25   THE COURT: And that's it. We're going to take a ten

1    or 15 minute break. I know you needed to call your wife.

2    And let's get everything ready so we could start.

3        MR. BLACKER: Maybe we should find out what she thought

4    up to now.

5        THE COURT: How could she think anything?

6        MR. GROSS: Sort of a joke, Judge.

7        THE COURT: Let's take a 15 minute break till a quarter

8    till 3.

9        (Thereupon, a brief recess was taken, after which, the

10   following proceedings were had outside the presence of the

11   jury panel:)

12       THE COURT: Bring the jury in.

13       MS. CORONA: Should we get the witness first?

14       THE COURT: Bring the witness. Where is the jury?

15       THE BAILIFF: Third floor.

16       THE COURT: Tell the witness to come in and have a seat.

17       Should we tell the jury that we discharged a particular

18   juror, because she knew one of the witnesses?

19       MR. BLACKER: And I think we should do it in a positive

20   spin. If we could tell them that it was very good for her

21   to do that.

22       THE COURT: I don't know if we need a positive spin.

23       MR. BLACKER: It helps, because they know she was honest

24   about it.

25

1          (Thereupon, Witness Catherine Ruiz entered the

2    , courtroom.)

3          THE COURT:  Come forward.

4          Bring the jurors in.

5          (Thereupon, the jury panel entered the courtroom, after

6    which, the following proceedings were had in open court:)

7          THE COURT:  Thank you.  Please have a seat.  You can

8    take any seat.  It's not assigned seats.

9          All right.  Ladies and gentlemen, we no longer have one

10   of the jurors.  This will be the jury deciding the case.

11   The other juror felt that she knew one of the witnesses and

12   felt that she could no longer do the job of a juror.  So

13   now, we are limited to the six of you.  We do not have an

14   alternate.  So it is important that all of you come back

15   until we finish this case, OK?

16         Proceed with cross-examination.

17         MR. BLACKER:  Thank you.

18         Let me apologize to the Court, to everybody for that

19   five minute/ten minute delay.  I located my papers.

20   Thereupon:

21                     CATHERINA RUIZ

22   resumed.

23                CROSS-EXAMINATION (Continued)

24   BY MR. BLACKER:

25   Q   Let's go back to the last area we were talking about.

1   We spoke about your -- you remember swimming on the beach.

2   You remember not changing your clothes; is that correct?

3       A   I do remember not changing my clothes, yes.

4       Q   You didn't take your bathing suit off -- or your bathing

5   suit off; is that right?

6           You left the wet bathing suit on?

7       A   That I remember, yes.

8       Q   Between the time that you left the beach and the time

9   that you were in the hospital, Jackson Memorial, did you

10  change your clothes at all, your pants?

11      A   No, I didn't.

12      Q   You had the same white pants on at Jackson Memorial that

13  you had on when you went swimming on the beach?

14      A   Yes, I had the pants on.

15      Q   Let me show you what has been marked as Defendant's

16  Exhibit A1 for Identification.

17          THE COURT:  You are showing her?

18          MR. BLACKER:  For identification.

19          MS. CORONA:  No objection, Judge.

20          MR. BLACKER:  Showing you A1 for Identification, and

21      asking that the exhibit be introduced as Defendant's

22      Exhibit 1, if that's what you want, or "A"?

23          You want letters, Cathy?

24          THE CLERK:  As soon as she gets it to me, I will label

25      it.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

289

1    BY MR. BLACKER:

2       Q    Do you recognize that photograph?

3       A    Yes.

4       Q    OK.   Does that photograph accurately depict what it

5    portrays to depict?

6       A    What does it portray to depict?

7       Q    You are looking at it?

8       A    That was in the hospital.

9       Q    Does it accurately reflect that?

10      A    Yes, it does.

11           MR. BLACKER:   I seek to introduce it, Your Honor.

12           THE COURT:   Without objection, it will be admitted.

13           THE CLERK:   Defense Exhibit marked for Identification

14      purposes A1 will now be Defense Exhibit A.

15           (Thereupon, the exhibit referred to was marked as

16      Defense Exhibit A, and was received in Evidence.)

17           MR. BLACKER:   Thank you.   All right.   Thank you.   May I

18      have it, please?

19      BY MR. BLACKER:

20      Q    Does looking at that photograph -- does that refresh

21      your recollection that there is no bottom part of the bathing

22      suit under those pants?

23      A    Yes.

24      Q    Does it refresh your recollection that those pants were

25      not wet at the time of that photograph?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    A    I don't know if they are wet or not, but, no, there is

2    no bathing suit there.

3    Q    If they were wet, they would be a different color than

4    the rest of the pants, wouldn't they, ma'am?

5    A    They would probably be darker.

6    Q    I'm sorry?

7    A    They would probably look darker, wet area.

8    Q    Do they look darker to you in that photograph?

9    A    No.

10        MR. BLACKER:  May I publish, Your Honor?

11        THE COURT:  Yes.

12        MR. BLACKER:  Thank you.

13   BY MR. BLACKER:

14   Q    Now, you are on the way back from the beach.  You told

15   us this morning in direct testimony that there was an argument

16   in the car with Attie; is that correct?

17   A    Correct.

18   Q    OK.  And Mr. Diaz was not part of that argument, was he?

19   A    No.

20   Q    It was with Attie?

21        What was it over?

22        Tell me what you were arguing over.

23   A    I have no idea what it was about.

24   Q    OK.  And right now, you have no idea; is that right?

25   A    I still, to this day, don't have any idea what it was

MATZ, TRAKTMAN, FELDMAN AND WILDNER

291

1    about.

2        Q   So if you told somebody previously, some official,

3    either under oath or during an official investigation that it

4    was about --

5        A   I think maybe it could have been that her boyfriend got

6    mad that -- you know -- I changed around him.  That's what is

7    the bottom line.

8        Q   In the whole global world of knowledge, is there any

9    other reason that you could think of as to why that argument

10   occurred?

11       A   I don't know.

12       Q   Do you remember telling --

13           Let me ask you a question.  Did Attie have her own

14   personal effects with her that night?

15       A   I think she had her purse with her.

16       Q   OK.  You  had your purse.  She had hers, right?

17       A   Right.

18       Q   And when they left, your nice purse was left in that car

19   along with your personal effects?

20       A   My Coach purse, yes.

21       Q   She didn't borrow any of your personal effects, did she?

22       A   They ended up staying with them.

23       Q   I know.  I'm talking about for the evening.

24       A   No.

25       Q   She had her own purse?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    A    Yes, she had her own purse.

2    Q    Do you remember telling Officer Alvarez Vega that

3    evening, on June 8th, when he drove you back to the hospital --

4         And by the way, I'm not trying to trick you.  I was

5    wrong.  I stand corrected.  It wasn't an officer who had gone.

6    It was an Officer Alvarez Vega.

7         Does that name strike a bell with you?

8         The name doesn't, right?

9         Does the name -- you have to answer.

10   A    No, it doesn't.

11   Q    The name may not, but you are familiar with an officer

12   driving you back from the hospital to your apartment, are you

13   not?

14   A    Yes.

15   Q    You said he asked you a few questions?

16   A    He asked me what had happened to me, and he told me that

17   he wasn't really supposed to take anybody home from the

18   hospital.

19   Q    OK.  And you told him, did you not, that that -- the

20   argument, you told him what the argument was about, didn't

21   you?

22        You told him, if I could refresh your recollection, that

23   you had loaned her an $800 purse, and she wasn't giving it

24   back, and that was the fight?

25   A    No.  I told him that the Coach purse stayed in the car

MATZ, TRAKTMAN, FELDMAN AND WILDNER

293

1    in the fight, but I didn't loan anybody anything.

2         MR. BLACKER:  OK.  May I approach, Your Honor?

3         THE COURT:  Yes.

4         MR. BLACKER:  Thank you.

5         Page 5, counsel.

6    BY MR. BLACKER:

7    Q   Could you take a look at that page where I've written on

8    the side, so we could save a little time, and tell me if that

9    refreshes your recollection?

10   A   The part that you wrote?

11   Q   Read the typing next to that, but at that place, because

12   I don't -- to yourself.  I'm sorry.  Read it silently.

13   A   I don't know.  This must be a mistype in there or

14   something.  I don't know.

15   Q   Does it refresh your recollection?

16   A   No, it doesn't.

17   Q   What you told him?

18   A   No.  And actually, the officer -- I don't know.  I don't

19   know, OK?

20   Q   OK.  All right.

21   A   I will let you run the ball game.  Go ahead.

22   Q   OK.  Nonetheless, you had an altercation with Attalia

23   Bello?

24   A   OK.

25   Q   And a verbal argument, correct?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

294

1    A    Yes.

2    Q    During the argument, do you remember her saying, "I will

3    teach you for looking at my boyfriend"?

4         Having been so beautiful that the boyfriend is looking

5    at you?

6         Anything of that nature that refreshes your

7    recollection?

8    A    No, not so many words were said.  It was basically

9    punching and kicking.

10   Q    Do you remember saying that; that you believed the

11   argument came when you changed your clothes at the beach and

12   Pablo was holding up a towel 25 feet away from Armando, her

13   boyfriend?

14        Do you remember saying that?

15        Do you remember?

16   A    It was chairs there, and I was covered, yes.  I was

17   being covered when I was changing.

18   Q    OK.  Did you change or didn't you?

19   A    I changed.  I must have changed, yes.

20   Q    You must have changed?

21   A    I am talking about something that happened four years

22   ago, and I cannot give you every single detail.

23   Q    OK.  I'm not trying to confuse you.

24   A    Because I just told you about the bathing suit, and then

25   I saw the picture.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1     Q    What I'm saying, you might have changed into the bathing

2    suit before you went swimming and not changed afterwards.

3         Is that what you are saying?

4         Because I could stand to be corrected.  You might have

5    put on the bathing suit before you went swimming to go

6    swimming and then not change after you got out is all I'm

7    saying.

8         Does that refresh your recollection?

9     A    Yes.

10    Q    OK.  All right.  OK.  So you left the beach?

11    A    Uh-huh.

12    Q    Did you stop at a store that sold pocketbooks and

13   sunglasses, and ask to get out of the car?

14    A    No.

15    Q    Did you?

16         You did not?

17    A    No.

18    Q    Did you return to the car with a pair of sunglasses?

19    A    No.

20         MS. CORONA:  Objection.

21         THE COURT:  To?

22         MS. CORONA:  Relevance of this testimony.  I would ask

23   to go sidebar.

24         THE COURT:  You need a sidebar?

25         MS. CORONA:  Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1          (Thereupon, 'counsel for the respective parties

2   approached the bench, and the following proceedings were had

3   outside the hearing of the jury panel:)

4          MS. CORONA:  Judge, I think Defense is going to try to

5   get into an occasion that the victim stole a pair of

6   sunglasses, which is unsubstantiated.

7          What I am asking is that you prevent him from asking if

8   she stole a pair of sunglasses.  It has nothing to do with

9   the charges right now.

10         MR. BLACKER:  She stole a pair of sunglasses, and

11  Armando is a police officer.  Let me finish, counsel.

12         He said:  What are we doing with this bitch?  I could

13  get in trouble for that.  Pablo has cocaine.  I'm not going

14  to get on the cocaine, but what are we doing with this

15  bitch?

16         And Attie punched her out.  That's what happened.

17         THE COURT:  You could ask her if this had anything to

18  do with the sunglasses.  If she says no, you have to eat

19  the answer unless you are going to impeach her.  If she

20  says that, that's it.

21         Don't ask her if she stole pair of sunglasses.  Ask her:

22  Did this have anything to do with the pair of sunglasses?

23         If she says, "no," that's it.

24         If she says, "yes," then you could get into it.

25

297

 1          (Thereupon, the sidebar conference was concluded, after

 2   which, the following proceedings were had in open court:)

 3   BY MR. BLACKER:

 4     Q    Did the altercation with Attalia Bello have anything to

 5   do with a pair of sunglasses?

 6     A    No.

 7     Q    OK.  So you stopped at Publix?

 8     A    We stopped at Publix.

 9     Q    Correct.  And you -- you -- Pablo and Ms. Bello went

10   inside?

11     A    Yes.

12     Q    You stayed in the car with Armando?

13     A    Yes.

14     Q    They came back out?

15     A    Uh-huh.

16     Q    You were still in the back seat of the vehicle?

17     A    No.  I think I got out and I started walking towards

18   that way, but they were already walking out.

19     Q    They were walking out, and Attalia Bello walked up to

20   you?

21          Did she say anything before she punched you?

22     A    Actually, we were in the car.

23     Q    So you got back in the car?

24          That's what I thought.  You got back in the car.

25          When you approached them as they were coming out, you

1   were in an argument with her already?

2       This was totally unexpected?

3   A   Totally unexpected.

4   Q   It was out of the blue?

5   A   It came out of the blue.

6   Q   And are you sitting in the car, and she turned around,

7   and out of the blue, without uttering one word, without you

8   knowing why she is doing this, she punches you in the face?

9       How many times did she hit you?

10  A   I can't remember.  I don't know.

11  Q   And you were fighting her back, right; is that correct?

12  A   Correct.

13  Q   OK.  And Pablo, seeing this, helped get you out of the

14  car, did he not?

15  A   He opened the door, uh-huh.

16  Q   He was helping you at that time; is that right?

17  A   Yes.

18  Q   He wasn't hindering you, was he?

19  A   No.

20  Q   He didn't hold your arms behind you in a full Nelson, so

21  she could punch you, did he?

22  A   No.

23  Q   Do you remember telling Officer Vega that he -- you got

24  into a fight with a friend of Pablo's at your apartment?

25  A   At my apartment?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

299

1     Q    Yes, ma'am.

2     A    No.  It was not in the apartment.

3     Q    OK.  Do you remember you said Pablo held you down in a

4    full Nelson?

5     A    That's not true.  That is incorrect.          .

6     Q    That it's not true, but do you remember telling anybody

7    that?

8     A    No.  That is not correct.

9     Q    OK.  Do you remember -- you don't remember saying that

10    the -- that to the officer; is that correct?

11    A    Because I didn't say it, no.

12         MR. BLACKER:  OK.  Excuse me one second.  I'm sorry,

13         ladies and gentlemen.

14    BY MR. BLACKER:

15    Q    And during the argument, Pablo never punched you, did

16    he?

17    A    No.

18    Q    OK.  As a matter of fact, you just described his actions

19    as being helpful?

20         He got you out of the car, didn't he?

21    A    Correct.

22    Q    Do you remember -- OK.  Sorry.  Page 14 of the

23    statement, please.

24         MS. CORONA:  Which statement, counsel?

25         MR. BLACKER:  Page 14 of the statement on June 8th, the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

300

```
 1        night of the incident.
 2             I'm sorry, about June 12th.
 3    BY MR. BLACKER:
 4     Q   Would you read silently the first few paragraphs, and
 5    see if that refreshes your recollection that you told Officer
 6    Vega --
 7     A   Who is Officer Vega?
 8             Officer Morin, I believe it was Morin there who was --
 9     Q   The officer that drove you back from the hospital, that
10    is his statement?
11     A   That is his statement?
12     Q   I understand.  That is his statement?
13     A   OK.  Yes.
14     Q   Doesn't refresh your recollection that you told him?
15     A   No.
16     Q   OK.  Did you ever tell anyone else -- do you remember
17    telling anyone under oath that -- I'm sorry.  Just let me --
18    let me show you one other item.
19             Does this refresh your recollection of what you told
20    Officer Vega on the night in question?
21             Just read it silently, please.
22     A   Uh-huh.
23     Q   Who --
24     A   No.  No.
25     Q   Doesn't?
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

301

```
 1    A    No.

 2    Q    OK.  Do you remember 12 days later giving a statement to

 3    Detective Morin?

 4    A    When she pulled me over that night.

 5    Q    I'm sorry?

 6         Do you remember just asking -- talking about a

 7    statement?

 8         Do you remember doing that?

 9    A    I'm trying to remember what day you are talking about.

10         What are you speaking about?

11         Because I spoke to Morin on several occasions.

12    Q    But the first time that you actually gave -- gave a

13    formal statement, do you remember that was on --

14    A    What's the date?

15    Q    June 20th.

16    A    The day that she pulled me over?

17    Q    The day she pulled you over.  I'm sorry.

18    A    It was the day that she pulled me over?

19    Q    Yes, ma'am.

20    A    Uh-huh.

21    Q    Do you remember that?

22    A    Yes.

23    Q    OK.  And did you tell her that Pablo held you in a full

24    Nelson?

25         You don't --
```

302

1    A    No.  I told her I was mad, because I felt like, you

2    know, he wasn't doing anything there at the time, but --

3    Q    OK.  But we know that now.  The question is:  12 days

4    after this occurred, did you tell the lead investigator in

5    this case, Detective Morin, that Pablo held you down and you

6    couldn't understand why he was holding you down?

7    A    No.

8    Q    By the way, were you sworn in on this statement, on this

9    taped statement?

10   A    I think she swore me in that day, but I don't remember.

11   Q    So it was a sworn statement?

12   A    A sworn statement.  It was not a tape recorder.

13   Q    Does this look like a transcription of that statement to

14   you?

15   A    Uh-huh.

16        MR. BLACKER:  OK.  Page 13, counsel.  OK, Line 5, just

17   for a beginning.

18   BY MR. BLACKER:

19   Q    (Reading)

20        "I come outside.  I sit by the car."

21        This is your statement.

22        "The next thing I know, they come sit with us inside

23   the car.  And we drive off.  As soon as we drive off, she

24   turns around and punched me directly in the face."

25        Back down to Line 20.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

303

1     "At this time, Pablo was holding me down.  I don't know.

2     She got me another punch in the mouth, which almost made my

3     earring come -- the tongue ring that I have come through."

4     A    Yes.

5     Q    That was your under oath statement on June 20th, 12 days

6     after the occurrence; is that correct?

7     A    Uh-huh.  That is not correct.

8     Q    Do you remember that statement?

9     A    No.

10    Q    So someone --

11    A    He opened the door and he helped me get out.

12    Q    But somebody must have a -- are you saying that somebody

13    took your statement and mistyped it or mischaracterized it in

14    that statement?

15    A    Yes.

16    Q    Mischaracterized it?

17    A    Yes.

18    Q    Do you remember on September 29th, the tall lawyer that

19    took a statement from you in a proceeding here?

20    A    Yes, I remember him.

21    Q    Do you remember?

22    A    Yes, I remember.

23    Q    OK.  And he took a statement, and that statement was

24    under oath, was it not?

25    A    Uh-huh.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

304

1    Q    OK.  And remember, before, I asked you if you had smoked

2    any marijuana while you were on the beach?

3    A    Uh-huh.

4    Q    OK.  Let me show you this, and see if you -- see if that

5    refreshes your recollection that, in fact, you did smoke

6    marijuana.

7    A    OK.

8·   Q    Just read that.

9    A    Yes, I told you --

10        MR. GROSS:  What page is that?

11        MR. BLACKER:  Page 10, counselor.  On September 29th.

12        THE WITNESS:  Uh-huh.

13        MR. BLACKER:  OK.

14        THE WITNESS:  Uh-huh.

15   BY MR. BLACKER:

16   Q    Does it refresh your recollection that you did smoke

17   marijuana?

18   A    Yes.

19   Q    In addition to going to the Wet Willy's?

20   A    Yes.

21   Q    OK.  And do you remember telling this lawyer that Pablo

22   held you down at Attie was hitting you?

23        This is on September 29, 2004, a year later or a year

24   and a couple of months.

25        You don't remember telling him?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

305

```
 1          THE COURT:  You need to answer.

 2          THE WITNESS:  No.

 3          MR. BLACKER:  Page 14, counsel.

 4     BY MR. BLACKER:

 5     Q    (Reading)

 6          "What happened to that, from the second punch it kind

 7     of like went -- pierced through my skin."

 8          You were talking about your tongue ring.

 9          "There was still more blood coming out of your mouth?

10          "Yes.

11          "At that point, Pablo was trying to get you out of the

12     car?

13          "No.  He holds me down while she was punching me.

14          "He was holding you in this car?

15          "Yes.

16          "He was not trying to get you out of the car at all?

17          "No.

18          "At no point?

19          "He held me in the car."

20     A    No.  What happened, happened and what didn't happen,

21     didn't happen.

22     Q    OK.

23     A    He helped me get out of the car that day.  As a matter

24     of fact, he even called somebody to come pick us up.

25     Q    But that is your sworn statement of September 29, 2004;
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

306

1    isn't that right?

2    A    Right.

3    Q    OK.   And you remember giving me a sworn statement on

4    April 11, 2006, just last year?

5    A    Uh-huh.

6    Q    And in that statement -- I know this is tedious.

7         MR. BLACKER:   Can I just hand her this one?

8         Because I have two copies, Judge.

9         Can I have her keep this, just to read from?

10        I have two copies.

11        THE COURT:   Go ahead.

12        MR. BLACKER:   Thank you.

13   BY MR. BLACKER:

14   Q    Here you go.

15   A    What page?

16   Q    Do you remember telling me that you -- also that Pablo

17   held you down?

18   A    No.

19   Q    OK.   I will withdraw that.   OK, withdrawn.

20        But you maintain that, because I have a copy -- thank

21   you.

22        Now, so you got in this fight with Attie.   You are

23   bleeding.   Pablo calls his friend.

24        You go back in the apartment?

25   A    Uh-huh.

307

1    Q    And I'm -- I imagine you are upset at --

2         Please, give me a second, please.

3         OK, let's back up for a second.

4         Pablo helps you out of the car.  He calls a friend.  You

5    are riding back to your apartment.

6         At that moment in time, Pablo hasn't done anything to

7    you; is that right?

8    A    Correct.

9    Q    He hasn't beaten you?

10        You've not even arguing with him; is that correct, at

11   that moment?

12   A    Correct.

13   Q    You are a little upset, because you've lost your Coach

14   pocketbook, your wallet, your Chanel glasses, correct?

15   A    Uh-huh.

16   Q    Your sandals?

17   A    Uh-huh.

18   Q    OK.  Some important things, I mean, personal effects,

19   right?

20   A    Uh-huh.

21   Q    Very upset.  You have also been beaten, you know, for no

22   reason; is that right?

23   A    Yes.

24   Q    You just answered audibly.  This young lady is taking it

25   all down, so speak into the microphone, please.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

308

1        You are upset.  Pablo is calming you down, is he not?

2    A   Yes.

3    Q   I will call Attie.  She did a stupid thing.

4        He is telling you that, right?

5        He is telling you:  "Calm down, honey, I will make it

6    right and get everything back for you"?

7    A   Uh-huh.

8    Q   And I will even -- you know -- make it up to you.

9        Isn't that what he's doing?

10   A   No, I don't remember that.

11       MS. CORONA:  Objection.  Self-serving.

12       THE COURT:  Overruled.

13   BY MR. BLACKER:

14   Q   Isn't he trying to calm you, and he goes:  "I've had a

15   very difficult time"; is that right?

16   A   Right.

17   Q   He took off his shirt, wiped up all your blood, let you

18   use it was a blood receptacle, correct?

19   A   Correct.

20   Q   And he is just being a boyfriend?

21   A   That was before we got picked up; while we were walking.

22   Q   Correct.  Now, you get picked up.  You have moments

23   where you are feeling better, you are communicating with him,

24   and then also, you get upset; isn't that correct?

25   A   I don't recall too much.  I was really upset.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

309

1   Q   OK.  At the moment you got picked up, you thought

2  everything was all right between you and Pablo, correct?

3   A   I wasn't even thinking that.

4   Q   But I mean everything was all right?

5   A   Everything was fine.

6   Q   OK.  OK.  Now, let me ask you a few things about Jackson

7  Memorial Hospital.  You didn't get treated at Jackson?

8      Did they give you any medication to take, or any

9  needles?

10   A   When I -- No, I don't have an I.V., but they gave me

11  some medication when I first got there.

12   Q   Medication.  Maybe salve that they rubbed on your

13  bruises?

14   A   Yes.  Some pain medication.

15   Q   What kind of pain medication; do you know?

16   A   I don't remember, but I remember a lady came and gave me

17  some pills, so I could calm down.

18   Q   OK, OK, all right.  So now, you get back out of the

19  hospital and -- OK.

20      You get back to the apartment, and you are there about

21  an hour before the altercation occurs between you and Pablo?

22   A   I don't remember how long I was there before the problem

23  started.

24   Q   I thought you said on direct testimony this morning that

25  it was an hour, but I could stand corrected.  I'm sorry.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

310

1      OK.  You are in the apartment for a period of time; is

2  that correct?

3      A    Uh-huh.  Obviously.

4      Q    And Pablo was in the bedroom?

5      A    I -- at that specific time --

6           Are you talking to me about --

7      Q    He is in the bedroom, counting some money on the bed; is

8  that correct?

9      A    Yes.

10     Q    You come into the bedroom.  You see him in the bedroom,

11  correct?

12     A    Yes.

13     Q    She has to type all of what you are saying, so we need

14  audible answers that she could hear.  That is why she is --

15          You walked into the bedroom.  He's counting money.

16  Correct?

17     A ·  Correct.

18     Q    Your attitude with him is now changing a little bit?

19          You feel like he didn't protect you from her?

20          Was that one of the things you were thinking?

21     A    That was one of the things that I was thinking, right.

22     Q    You walked back into the kitchen and then you come out

23  with a knife, didn't you?

24     A    No, that's not correct.

25     Q    It's not correct?

311

1   A   No.

2   Q   OK.  Tell us what happens when you see him counting this

3   money.

4   A   Nothing.  We were just normally talking.  I was in the

5   kitchen and he was in the room.

6   Q   OK.  And now, did the -- how did the anger with Pablo

7   start?

8   A   I don't remember.  I remember some words were said, and

9   before you know it, it was -- I was running down the hall, and

10  we got locked out.

11  Q   OK.  So let's -- let's return for a moment, please, if

12  we can.

13      All right.  So you were having an argument; is that

14  right?

15  A   Obviously, we were arguing over something, yes.

16  Q   And you're having an argument.  This is the guy you have

17  been with on a daily basis for five weeks; is that right?

18  A   Uh-huh.  Correct.

19  Q   You don't know why you were upset, but there was an

20  argument, and the next thing you know, Pablo produces a

21  weapon?

22  A   Correct.

23  Q   And he's walking towards the kitchen with a pillow, the

24  weapon stuffed in the pillow, acting as if it is a silencer,

25  correct?

312

1    A    Correct.

2    Q    Is that your testimony?

3    A    Yes.

4    Q    And you, in order to defend yourself from somebody with

5    a weapon, you run to the kitchen?

6    A    I was in the kitchen.

7    Q    Pardon?

8    A    I was already in the kitchen.

9    Q    He was coming down the hallway towards the kitchen with

10   the weapon, correct?

11   A    Right.

12   Q    You see him coming down the hallway with a weapon in the

13   pillow, and you reach into the -- you reach into the kitchen

14   to gain a knife to protect yourself; is that what you did?

15   A    I grabbed a knife and I ran out the door.

16   Q    You took a knife and you ran out the door?

17   A    And I started knocking on every 23rd floor door.

18   Q    OK.

19   A    And pushing for elevators.

20   Q    OK.  Did you actually see the gun in the pillow, or you

21   just knew it was a gun, because he reached in a little drawer?

22   A    I saw it, because I saw him turn the corner.  The

23   apartment has a corner.  You showed it in the picture earlier.

24   Do you remember?

25   Q    OK.  Remember when you told us before about the bedroom,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  you told us about the pillow, and I asked you if the pictures

2  of your home -- remember, there were pictures of your home?

3     A   Yes.

4     Q   I will return to that as soon as we get them marked.

5         So you ran out of the apartment, and Pablo ran after

6  you, and the door sprung shut, because it's another spring to

7  close that, correct?

8     A   And the spring closed it.

9     Q   It closed by -- automatically, by spring?

10    A   No.  It closed automatically.  A hotel door in the

11 condo, it is one of the big doors.  It just goes "clank."

12    Q   And are you telling us that you didn't have any argument

13 about the money?

14    A   No.

15    Q   He didn't ask you to return --

16        He said:  OK, I'll leave.  I just want to get my money.

17        Is that what he said?

18    A   I don't remember.  I don't remember what the argument

19 was about.

20    Q   OK.  And -- do you remember telling the lawyer on

21 September 29, 2004 that they money was your savings, and he

22 had given it to you, and it was to buy a car, because you all

23 didn't have a car?

24    A   Yes, we didn't have a car.

25    Q   Didn't he have the Cavalier?

314

1    A   He had just got the Cavalier a couple of days before

2    this happened.

3    Q   Right.

4    A   It was just -- it was transportation until we got the

5    car we wanted to get.

6    Q   I see.  And you did -- you wouldn't give him back the

7    money, even if you were breaking up, even though it was his

8    money; is that correct?

9    A   Probably not.

10   Q   You at the time weren't working?

11       You weren't making money, were you?

12   A   No.  I worked on and off, volunteering for my father.

13   Q   OK.  And so you're out in the hall, knocking on doors,

14   and you say that he's beating you now?

15   A   We had a fight in the stairwell.

16   Q   In the stairwell?

17   A   Uh-huh.

18   Q   And he hit you?

19   A   Uh-huh.

20   Q   And did he cause your hole in the nose to reopen and

21   start bleeding profusely?

22   A   It started bleeding again, yes.

23   Q   Profusely?

24   A   Profusely.  I can't tell you profusely.  It's like --

25   Q   I will withdraw that word.  I'm sorry.  I'm not trying

MATZ, TRAKTMAN, FELDMAN AND WILDNER

315

1   to confuse you.  I just wanted to know.  If someone was

2   looking at you, could they see the blood trickling from your

3   nose?

4   A   Yes.

5   Q   Was there any other blood coming out?

6       You described it on direct that you were full of blood?

7   A   Yes.

8   Q   From the whole night together?

9   A   Right.

10  Q   By the time you got down -- you went to the sixth floor,

11  and you chose to go to the sixth floor, knowing there was a

12  camera there, but when you pushed the button on the sixth

13  floor, you also knew that on the first floor, not only were

14  there cameras -- you knew there were cameras there, correct?

15  A   There were cameras all over the building.

16  Q   You knew that there were cameras on the first floor?

17  A   Right.

18  Q   And you also knew that there would be a security guard

19  and people down on the first floor, human beings?

20  A   Correct.

21  Q   But you chose the sixth floor?

22  A   Can you imagine somebody's state of mind at that time,

23  what I had been through?

24      Press six or one; whichever one comes first, whichever

25  finger get to where -- light up whatever number.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

316

1    Q    I'm asking you to just answer the question.

2    A    Either six or one, two.  I don't know.  I had to find

3    which one to press.

4    Q    OK.  And you get down to six, and you say that Pablo

5    took you into the bathroom and smashed your head into the

6    porcelain bowl?

7    A    Uh-huh.

8    Q    I'm sorry?

9    A    Yes.

10   Q    Causing you to bleed even more profusely, correct?

11   A    Causing me to bleed more profusely?

12   Q    Causing you to bleed even more heavily?

13   A    Correct.

14   Q    And anybody -- it's even more visible than -- anyone

15   that could see Catherine Ruiz that night within the next few

16   moments would know instantly that she was bleeding and needed

17   help, correct?

18   A    Correct.

19   Q    And did you bleed from the mouth, also, where your

20   tongue ring had been ripped?

21   A    Probably was bleeding from there, because the tongue

22   ring went through.

23        THE COURT:  Excuse me, Ms. Ruiz.  Let me ask you to

24   please stop playing with the pen you are holding.  Thank

25   you.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

317

1    BY MR. BLACKER:

2       Q   I will withdraw it and ask another question.

3           Your tongue ring that had been ripped from that morning,

4    from in the mouth, also the area was further damaged by your

5    head being smashed in the porcelain toilet, and it also

6    started to bleed heavily, did it not?

7       A   Yes.

8       Q   And this is the second other thing.  Your nose, you knew

9    that as an additional area of bleeding heavily, that would be

10   readily observable to anybody seeing Catherine Ruiz within the

11   next few moments; is that correct?

12      A   Correct.

13      Q   OK.  And you say he also hit you in the mouth with the

14   gun?

15      A   Uh-huh, correct.

16      Q   And that, I guess -- and you tell us -- did that further

17   increase the flow of blood?

18      A   Correct.

19      Q   And was the blood coming off of your chin at that point,

20   or just dripping?

21          Was it flowing, or dripping?

22      A   I can't remember.

23      Q   OK.  And you were hysterical, is the way you describe

24   it; isn't that correct?

25      A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

318

1    Q   That's the word you used; isn't that correct?

2    A   Correct.

3    Q   You were full of blood.  That is another word you used,

4    correct?

5    A   Uh-huh, correct.

6    Q   And you showed up in the lobby; from the sixth floor,

7    you went down to the first floor?

8    A   To the first floor, correct.

9    Q   And your face was full of blood?

10   A   Uh-huh, correct.

11   Q   All right.  and Pablo --

12       By the way, when you were on the outside of your

13   apartment, waiting on the elevator, he wanted to not argue and

14   go down and get a key so he could get back in the apartment,

15   did he not?

16   A   No.  That's not how it was.

17   Q   It's not?

18   A   No.

19   Q   OK.  Did you want to go down and get a key, and get back

20   in the apartment, so he could leave?

21   A   Leave, no.

22   Q   OK, OK.  And when the elevator doors opened, according

23   to you, you immediately -- I'm sorry.  Withdrawn.

24       Immediately, upon them opening, you walked out in this

25   hysterical, bloody state and said to Dennis Flores, "Call the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

319

1  police"?

2      You mouthed those words; is that your testimony?

3  A  I don't know how it happened.  I don't know if we first

4  went over to the phone and I was telling Dennis, or I was

5  trying to get in touch with Dennis, or I don't remember.  But

6  I remember I told Dennis to call the police, somebody,

7  security or the police.

8  Q  Ms. Ruiz, we've already discussed four statements that

9  you've given in this case.  In addition to those four

10  statements, prior to testifying today, you met with this State

11  Attorney, did you not?

12  A  On what date?

13  Q  I didn't hear you.

14  A  On what date?

15  Q  On any date prior to today.

16  A  I have met with Laura Penn and Petagay (phonetic) Fancy.

17  Q  You never met with Ms. Corona or Mr. Gross prior to

18  today?

19  A  No, I haven't -- didn't.

20  Q  Do you have copies of any of your statements that you

21  have given previously in this case?

22      You have spoken with them on the phone?

23  A  Yes.

24  Q  Did you --

25      Did they tell you to review your statement so you could

MATZ, TRAKTMAN, FELDMAN AND WILDNER

320

1   be sharp, and clever, and be able to answer questions today?

2   A   Yes.

3   Q   OK.  And so you know what is contained in these

4   statements, your previously sworn statements, don't you?

5        All right.  And you know that you have on previous

6   occasions testified that immediately upon leaving the

7   elevator, you told someone to call the police?

8        And let me read it to you.  Isn't that true?

9   A   Correct.

10  Q   OK.  For example, Page 28, on September 29th.  Let me

11  ask you this, and I will go back to it if we need to.

12       In your review of your statements on September 20th --

13  September 29, 2004, and April 11, 2006, you swore previously

14  that immediately upon the elevator doors opening, you mouthed

15  -- you told somebody to call the police; is that correct?

16  A   Correct.

17  Q   OK.  And you were under the same oath as you are now; is

18  that right?

19  A   Correct.

20  Q   Let me ask you this:  If you  made the statement on

21  September 29th of '04, and it's now May 8th of '07, when was

22  your memory more fresh; back in September, when you made your

23  first sworn statement, or one of your statements, or today

24  when -- what period is your recollection better?

25  A   From back then.  That's probably less time.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

321

1    Q    OK.

2    A    But it still doesn't change the fact of knowing what

3    happened.

4    Q    Sorry?

5    A    It does -- still doesn't change the incident of what

6    happened.

7    Q    OK.  All right.  Let's move on a little bit.

8         Now, you are in the lobby as long as 15 to 20 minutes

9    totally, peacefully?

10   A    I don't believe we were there that long, but I could

11   have been mistaken, but I don't think we were there that long.

12   Q    Sorry?

13   A    I could be mistaken, but I don't believe we were there

14   that long, 15 or 20 minutes, I don't think.

15   Q    All right.  Let me show you a series of pictures.  2

16   through 15 for Identification.  Actually, thumb through these.

17   Thumb through them quickly and tell us if you recognize those

18   pictures.

19   A    This is my bedroom, and this is my --

20   Q    Are those all pictures which accurately depict your

21   apartment as you left it when you left the apartment on

22   June 8th with the knife in your hand, and heading out the

23   vestibule where the elevators are located?

24   A    Yes.

25   Q    Accurately portrayed that; is that correct?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1         Show us a picture of the hallway leading to the kitchen.

2   Let me show you State's Exhibit --

3         Do not mix these up, please.

4         State's Exhibit 3, State's Exhibit 2.

5   A   This is the hallway.

6   Q   Right, OK.  Would you look on the back and tell me what

7   number you're talking about when you describe something?

8         And speak up, please.

9         What number are you talking about?

10        State's Exhibit 3.  You are saying State's Exhibit 3

11  depicts the hallway?

12  A   Oh, the hallway is -- I'm sorry -- State's Exhibit 2.

13  Q   OK.

14  A   Is the hallway.

15  Q   And you are saying that Pablo came out with the gun next

16  to the pillow, and as he got to the kitchen and you saw him,

17  you grabbed the knife, and you ran out the vestibule outside

18  of your apartment, correct?

19  A   I ran out the door.

20  Q   Out the door.  OK.  And he -- how far did he carry the

21  pillow?

22        Did he take it all the way out in the hall, or did he

23  drop it at some point?

24  A   I don't remember where he left it.

25  Q   You don't remember where he left it?

323

1      But you saw him coming down the hallway with it, didn't

2 you, right next to the gun?

3    A   I remember that he had it inside the apartment.

4    Q   Right.  But he --

5    A   I don't remember him having it outside.

6    Q   Let's put it this way:  The first time that you saw

7 Pablo with a gun was outside your bedroom, wasn't it, outside

8 of the bedroom?

9      He came to the bedroom with the gun and pillow?

10   A   Correct.

11   Q   Is that the first time that you saw him with the gun,

12 right?

13     The first time that you saw him that night, with the gun

14 being held by the pillow?

15   A   Correct.

16   Q   He was already outside of your bedroom?

17   A   Yes.

18   Q   OK.  So how many pillows did you have on your bed?

19   A   Usually have four pillows, three pillows.

20   Q   Four pillows or three pillows?

21     It was one off of the bed, from your bed, that you

22 recognize?

23   A   Yes, it was.  I mean, I don't have pillows anywhere

24 else, on my bed.

25   Q   OK.  Here is a picture of the hallway, State's Exhibit

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  Number 3, and here is a better picture of the hallway with the

2  kitchen, correct?

3      Pillow, I mean pillow, State's Exhibit Number 2?

4  A   Uh-huh.

5  Q   And here is another, Exhibit A for Identification.

6      MR. BLACKER:  Which I would move all of these exhibits

7  in, counsel.  They are all of the apartment.  I would like

8  to move them all in, if you don't mind.  They are all my

9  exhibits.  Excuse me.

10  BY MR. BLACKER:

11  Q   You don't see a pillow in this hallway, do you?

12  A   No.

13  Q   And you don't know -- you remember seeing one in this

14  vestibule outside your apartment, when you were fighting with

15  the elevator?

16  A   In the hallway?

17  Q   Yes.

18  A   No.

19      MR. BLACKER:  OK.  May I publish, Your Honor?

20      THE COURT:  Were they admitted?

21      THE CLERK:  No.  Which ones; State or Defense?

22      THE COURT:  What are we talking about?

23      MR. BLACKER:  The two you are holding are State's 2 and

24  3, and Ms. Corona is reviewing the ones that I want to

25  introduce.

325

1        MS. CORONA:  I have no objection.

2        THE COURT:  All right.  So hand those to the jury.  And

3    the others will be admitted.  Let the clerk mark them.  Why

4    don't you --

5        MR. BLACKER:  While she is doing that, let me ask a

6    question, because I want to move it along.

7        THE COURT:  Hold on.  The clerk needs to mark them.

8        THE CLERK:  Defense Exhibits marked for Identification

9    purposes A2 through A15 will now be Defense Exhibits

10    "B" through "P," consecutively.

11        (Thereupon, the exhibit referred to was marked as

12    Defense Exhibits B, C, D, E, F, G, H, I, J, K, L, M, N, and O,

13    respectively, and were received in Evidence.)

14        MR. BLACKER:  Thank you.

15        THE CLERK:  You could talk.  Thank you.  I'm done.

16    BY MR. BLACKER:

17    Q    OK.  Let me just show you State's Exhibit 2 -- State's

18    Exhibit 2.  This black object there, is that a -- is that a

19    garbage bag?

20    A    I think it is a trash bag.

21    Q    A trash bag, like a black plastic trash bag, correct?

22    A    Correct.

23    Q    All right.

24        THE CLERK:  I made a mistake.  It is "B" through "O";

25    not "P."  "B" through "O."

MATZ, TRAKTMAN, FELDMAN AND WILDNER

326

1   BY MR. BLACKER:

2      Q    OK.  Now, have you ever been convicted of a crime?

3      A    Have I ever been arrested or --

4      Q    No.  Convicted.

5      A    I don't know what "conviction" -- as in jail time or --

6           MS. CORONA:  Can we go sidebar?

7           (Thereupon, counsel for the respective parties

8    approached the bench, and the following proceedings were had

9    outside the hearing of the jury panel:)

10          MS. CORONA:  Judge, I believe the question is:  Have you

11     ever been convicted of a crime of dishonesty.

12          She has a petty theft conviction.  It was an

13     adjudication withhold.

14          THE COURT:  Does he know the answer, or no?

15          MS. CORONA:  I don't know that he knows the answer.

16          MR. BLACKER:  I'm sorry, counsel.  A cocaine conviction.

17     So I --

18          MS. CORONA:  A withhold.

19          MR. BLACKER:  I need to go over this with you, anyway,

20     which you can note this area.  I did not see a felony

21     conviction; however, in deposition, she said that she

22     snorted cocaine once when she was 18.  That is what she

23     said.

24          She has been arrested twice for possession of cocaine,

25     subsequent to her 18th birthday.  She has pled guilty.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

327

1       THE COURT:  So.

2       MR. BLACKER:  Twice to those offenses.  That means that

3   is impeachable evidence.  Not of the crime.  I'm just going

4   to show it to her to refresh her recollection.

5       THE COURT:  It doesn't matter.  It doesn't matter.  It

6   doesn't matter if she was -- because whether she's been

7   convicted for a felony or crime of moral turpitude, and she

8   doesn't know what to say.

9       MR. BLACKER:  OK.  Do you want me to withdraw it?

10      THE COURT:  Why don't we have the jury go out.

11      MS. CORONA:  Yes.

12      THE COURT:  Let's go out, and we will take a little

13  break.

14      MR. BLACKER:  He mentioned it in opening.

15      (Thereupon, the sidebar conference was concluded, after

16  which, the following proceedings were had in open court:)

17      THE COURT:  All right.  Ladies and gentlemen, at this

18  point, we're going to take like a ten minute break.  Go

19  into the jury room.  Do not discuss the case amongst

20  yourselves.

21      Would any of you like to -- let me ask, would any of you

22  like to go to the cafeteria or something?

23      All right.  Go into the jury room.  Do not discuss the

24  case.

25

1     (Thereupon, the jury panel exited the courtroom, and the

2     following proceedings were had outside the presence of the

3     jury panel:)

4          THE COURT:  Now, I believe the answer to the question --

5          MS. CORONA:  Have you ever been convicted of a crime of

6     dishonesty?

7          And that's petty theft, and that's it.  One conviction.

8          THE COURT:  So the answer is one?

9          MS. CORONA:  Right.

10         THE COURT:  OK, one.  OK.

11         MS. CORONA:  The petty theft counts as a crime of

12    dishonesty, but it's not a felony.

13         You've never been convicted of a felony, but that one

14    time of petty theft, so when he asks the question, the

15    answer is:  Yes, one time.

16         MR. BLACKER:  For the record, it's not an appropriate

17    question.  It has to be felony punishable by a year and a

18    day or more.

19         THE COURT:  Or a crime of moral turpitude, and if that's

20    the question, she will say:  Yes, once.

21         THE WITNESS:  Yes, once.

22         MS. CORONA:  What's the answer?

23         THE WITNESS:  Yes, once.

24         THE COURT:  You are going to say it in front of the

25    jury.  All right.  Do not discuss you testimony with

MATZ, TRAKTMAN, FELDMAN AND WILDNER

329

1    anyone else.  We are on break for ten minutes.

2         (Thereupon, a brief recess was taken, after which, the

3    following proceedings were had:)

4         THE COURT:  Bring in the jury.  Come on.

5         (Thereupon, the jury panel entered the courtroom, after

6    which, the following proceedings were had in open court:)

7         THE COURT:  Please have a seat.  Let the record reflect

8    that the defendant is present.  Please continue.

9    BY MR. BLACKER:

10   Q    Ms. Ruiz, I think that the question pending is:  Have

11   you ever been convicted of a crime, and if so, on how many

12   occasions?

13   A    Once, yes.

14   Q    OK.  Now, during the break, I looked up something that

15   we were unclear on before.

16        I asked you before if, in fact, you remember immediately

17   asking the security guard to call the police the minute you

18   got out of the elevator.

19        Do you remember that?

20   A    Yes.

21   Q    And you said you didn't remember.

22        Do you remember that you said you may have or you may

23   not have?

24        Is that what you said?

25   A    I don't remember if I went to the phone first, or I went

330

1   to the front desk first.

2   Q   OK.  Do you remember my deposition of you, my proceeding

3   with you on April 11, 2006, at the very beginning in front of

4   you, and I spoke to you in the very beginning -- did I not? --

5   and I told you that I was going to ask you some questions

6   under oath and if you didn't understand the questions to

7   please ask me to rephrase them, and that if you were

8   uncomfortable answering the question, if it is not clear to

9   you, I would change the question, and if you answer a question

10  on that date, under oath, I would assume that your answer was

11  correct and truthful as far as you knew?

12       Do you remember?

13  A   Correct.

14       MR. BLACKER:  Page 50, counselor.

15  BY MR. BLACKER:

16  Q   (Reading)

17       "As soon as the door opens, you went -- jumped behind

18  the front desk?

19       "Yes" was your answer.

20       "Question:  There was no like ten minute period in which

21  everything was calm?

22       "Answer:  No.  No.

23       "Question:  Everything was immediate, as soon as you got

24  out of the elevator?

25       "Answer:  As soon as I got out of the elevator," was

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    your answer.

2        "Question:  You went and jumped over the front desk?

3        "Answer:  Yes.

4        "Question:  What did you say?

5        "Answer:  Nothing."

6        And then on September 29, 2004, you were asked --

7        MR. BLACKER:  Page 28, counselor.

8        "Question:  Before you alerted the gentleman at the

9    front desk to call the police, how long had you been in the

10   lobby before that happened?

11       "Was that immediate?"

12       Your answer was:

13       "Answer:  Immediate."

14       Now, the argument that you were having with Pablo that

15   you were unclear on before, do you remember -- does it refresh

16   your recollection that the argument that you were having with

17   Pablo was about getting your stuff back?

18       That is what precipitated this whole thing, was that you

19   were angry with Pablo because you didn't -- he didn't get your

20   stuff back for you quickly enough; is that correct?

21   A    Correct.

22   Q    All right.  Now, you are in the lobby for however long,

23   and Pablo -- you jump on the counter, and you say, call the

24   police, and you jump over the counter to the other side of the

25   desk?

332

1    A    Correct.

2    Q    And Pablo tries to make an exit out the front lobby

3    door, but it's locked?

4         Remember that?

5    A    No, I don't remember.

6    Q    You don't remember that?

7    A    No.

8    Q    OK.  And he takes you up the stairs into the car when

9    you get out of the elevator, this secured area in the parking

10   lot area --

11        Excuse me.  To get in the car, didn't you run alongside

12   with him?

13   A    Running alongside with him, no.

14   Q    You didn't?

15   A    No.

16   Q    OK.  And so you get in the car, and he goes to this

17   cafeteria that you described; is that right?

18   A    Yes.  I believe he was thirsty or something.

19   Q    He was thirsty.  How about you?

20   A    No, I didn't drink anything.

21   Q    OK.  That's interesting.  Let me ask you a question.

22   Have you -- over the years, have you been taking prescription

23   medicine, any prescription medicine?

24        MS. CORONA:  Objection, Judge.

25        THE COURT:  Sustained.

1        MR. BLACKER:  Judge --

2        THE COURT:  You want to go sidebar?

3        MR. BLACKER:  OK.  Let me rephrase it then, and maybe

4    we could save some time.

5    BY MR. BLACKER:

6    Q    In 2003, were you on any prescription medicine that was

7    psychotropic, like Zanax, or anything of that nature,

8    prescribed medication?

9        MS. CORONA:  Objection.

10       THE COURT:  Sustained.  You want to go sidebar?

11       MR. BLACKER:  Please.

12       (Thereupon, counsel for the respective parties

13   approached the bench, and the following proceedings were had

14   outside the hearing of the jury panel:)

15       MS. CORONA:  Judge, he's got the victim's prior drug

16   use, and it has nothing to do with that.  If he wants to

17   ask about prescription medication that night, if there was

18   psychotropic medication that night.

19       THE COURT:  Do you know the answer to her question?

20       MS. CORONA:  No.

21       MR. BLACKER:  Judge, illegal drugs -- legal drugs, they

22   affect her ability to recall and to think, and in this

23   particular case, if they -- with this witness, you can't

24   remember the first thing about this night, really.

25       THE COURT:  If she was under the effects of medication,

1    this would affect her perception on that night.

2         MR. BLACKER:  She has already admitted to drinking.

3         THE COURT:  You can ask her.

4         (Thereupon, the sidebar conference was concluded, after

5    which, the following proceedings were had in open court:)

6    BY MR. BLACKER:

7    Q    Other than the marijuana and the alcohol, were you on

8    any drugs or prescription that evening which might affect your

9    ability to recall and remember?

10   A    No.

11   Q    OK.  We were at the cafeteria.  You are at the

12   cafeteria.  That is where we are now in the testimony.

13        And you say that Pablo shoots two bullets into the car

14   while he's inside the car; is that correct?

15   A    No.

16   Q    No?

17   A    One bullet into the seat.

18   Q    I'm sorry?

19   A    One bullet that grazed me, and one into the seat that

20   made a hole in the seat.

21   Q    OK.  Listen carefully so we can communicate, if we can.

22        Your testimony on direct, I believe, was that while

23   Mr. Diaz was inside of the vehicle, he fired two shots.

24        Yes?

25        You can't go "huh."  You have to answer "yes" or "no."

1    A    I remember the one that went into the seat.  I cannot

2    tell you if it was two.  Right now, I can remember the one

3    that went into the seat that grazed me.

4    Q    OK.  Do you remember testifying -- I don't think I was

5    clear enough with you before on this preview.

6         When you were getting prepared to testify here today,

7    did you read your prior testimony?

8    A    Yes.

9    Q    You did?

10   A    Yes.

11   Q    OK.  Do you remember telling me -- telling the lawyer on

12   September 29, 2004, under oath, that Mr. Diaz shot two times

13   at you?

14        One whizzed by your ear, and one grazed you while he was

15   in the car?

16        Let me finish the question and then answer audibly for

17   this young lady, please.

18        Do you remember telling me that?

19   A    Yes.

20   Q    OK.  Now, do you remember telling me on -- let me

21   withdraw that.

22        The September 29th testimony was not me.  It was to

23   another lawyer.

24        Do you remember that; a big tall guy?

25   A    Yes, I remember him.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

336

1    Q   And April 11, 2006 was a proceeding in which -- do you

2    remember telling me that he shot while inside the car; he shot

3    two bullets and one grazed your back in the upper back --

4    correct? -- and went into the vertical part of the seat in the

5    back of the car?

6        And let me be graphic for you so we could get that

7    clear.  Is that correct?

8    A   Correct.

9    Q   And the second shot whizzed by your ear, he missed it --

10   he was aiming for you but he missed?

11   A   Correct.

12   Q   And when he was pointing the gun at you, he was about a

13   foot away, wasn't he?

14       He was pretty close, wasn't he?

15   A   Yes.

16   Q   So your testimony is from a foot away, he grazed you one

17   time and missed you the second; is that correct?

18   A   Correct.

19   Q   OK.  And let's talk about where you were sitting.  You

20   were sitting in between the center and right-hand side of the

21   right passenger seat, in the rear of the vehicle?

22   A   I don't remember if I was sitting on the left-hand side

23   of the car or the right-hand side of the car.

24   Q   OK.  Based upon where the bullet that grazed you went by

25   you, where would we expect to find the bullet hole, if there

MATZ, TRAKTMAN, FELDMAN AND WILDNER

337

1  was one, on the vertical part of the seat if you're sitting in

2  a seat?

3     And for the record, I'm making a 90-degree perpendicular

4  angle.

5  A  I don't know.  Right behind the seat.

6  Q  Behind the seat?

7  A  Right behind.

8  Q  Let the record reflect that the witness pointed to the

9  bottom portion of the vertical section of the chair she is

10  sitting in; is that correct?

11  A  That's correct.

12  Q  So bear with me a minute, because I'm trying to get it

13  right for the jury.

14     If you are sitting in a seat facing -- and aim, pointing

15  to this direction, and that is the vertical, and that is the

16  bottom of the seat --

17  A  OK.

18  Q  -- based upon where the bullet grazed you, show the

19  jury, if you would, where.  Just point, if you would, where

20  you think this bullet should have gone in if you are sitting

21  here and Mr. Diaz would have been to your left.

22     Right?

23  A  He was on my left.

24  Q  Your left.

25     Right?

338

1    A    I think I was in the middle or on the right.

2    Q    OK. Where would the bullet have gone in the seat?

3    A    I don't know. I don't know.

4    Q    OK.

5    A    I have no idea where it would have gone.

6    Q    Do you know where the gas tank was on that car?

7    A    No. Actually, he had just got it a couple of days

8    before.

9    Q    OK. You said now that the bullet, the bullet that

10   grazed you is behind your right hip?

11        You have a scar on your right hip; is that what you are

12   saying?

13   A    I put Maderma on it, but you can see the mark.

14   Q    No, I understand. I'm asking you the location.

15   A    On the right-hand side.

16   Q    Of your back?

17   A    Of my back.

18   Q    OK. And that's the front seat?

19   A    In the front seat.

20   Q    He was in the front seat, and he shot at you, you said?

21   A    In the front seat.

22   Q    Yes?

23   A    In the front seat that I can recall, yes.

24   Q    OK. Which hand was the gun in?

25   A    I don't know.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

339

1    Q    OK.  And you were sitting in the seat, in the position

2    that a normal passenger would be?

3         In other words, you would have been sitting, facing

4    forward, to the front of the car; is that correct?

5    A    I think I would say sitting towards the front.

6    Q    Say that again.  I didn't hear you.

7    A    I think I was facing towards the front, yes.

8    Q    You weren't kneeling, or laying down, were you?

9    A    No, I was not.

10   Q    You were sitting as a passenger would in the rear of the

11   car, whether it's the center or the right, correct?

12   A    Correct.

13   Q    Thank you.  OK.  And were the windows of the car rolled

14   up or down?

15   A    I don't know.

16   Q    Was the air conditioning in the car on that night?

17   A    No.  We didn't have gas that day.  Remember, I don't

18   think -- I think the windows were down.

19   Q    The windows were down?

20   A    Probably.

21   Q    OK.  You went to the hospital after the girls picked you

22   up, correct?

23   A    After they picked me up.

24   Q    The police escorted you to the hospital, took you to the

25   hospital?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

340

1    A    Correct.

2    Q    And you refused treatment there; is that right?

3    A    I left, yes.  After being there for about four hours,

4    three hours, and they were basically doing nothing.

5    Q    All right.  Well, do you know what they did give you at

6    the hospital?

7    A    No.  They gave me some pain medication, and that's it.

8         My parents came to see me, and that's about it.

9    Q    OK.  Your mother came, and when you decided to leave,

10   she insisted you stay, did she not?

11   A    That I stay, correct.

12   Q    And there was a doctor there at the hospital who wanted

13   to treat you, and you decided to leave despite his

14   recommendation; isn't that correct?

15   A    Correct.

16   Q    And you went home with an Officer Alvarez-Vega?

17        We now know it's Alvarez-Vega.  And the officer

18   accompanied you home, correct?

19   A    Yes.

20   Q    And when you went into your home, the money that had

21   been on the bed when Mr. Diaz was counting it --

22   A    Excuse me?

23   Q    When Mr. Diaz was counting it --

24   A    Uh-huh.

25   Q    -- was still on the bed; isn't that correct?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

341

1    A    Correct.

2    Q    Now, then, you listened to the -- when you were home,

3    did you listen at that time to the answering machine messages?

4    A    No.  I went to sleep.

5    Q    You went to sleep, and you woke up the next morning and

6    listened to them?

7    A    I went to sleep like at -- must have been like 4 or 5

8    when I got back from the hospital.  Somewhere between 3 and 5.

9    And I got up maybe around 9 or 10.

10   Q    Did you hear the phone ringing at all that night?

11   A    No.

12   Q    OK.  So when you got up, you actually played your

13   messages?

14   A    Yes.

15   Q    OK.  Now, you read these transcripts this morning and

16   listened to the tape, did you  not?

17   A    Yes.

18   Q    And you heard Mr. Diaz on the 3:31 a.m. --

19        MR. BLACKER:  May I give the witness a copy, please?

20   Thank you.

21        Give you aid to the State's exhibit -- oh, boy, I guess

22   I'm not going to have it.

23        I'm sorry, Cathy, what exhibit is that, the

24   transcription?

25        1C.  It's not entered.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

342

1   BY MR. BLACKER:

2   Q   Looking at State's Exhibit 1C for Identification, you

3   see here on there, I think, 3:31 a.m. call, he says:  I

4   remember you, crack head?

5   A   Yes.

6   Q   What is a crack head?

7   A   Someone who smokes crack.

8   Q   Do you know what crack is?

9   A   Yes.

10  Q   What is it?

11  A   A drug.

12  Q   And is it a kind of drug, like sort of -- I guess for

13  lack of a better word -- sort of innocuous, like marijuana or

14  a real powerful drug?

15  A   I think it is a disgusting drug, and I don't know what

16  this has to do with anything.

17      MS. CORONA:  Objection, Judge.

18      THE COURT:  Overruled.

19  BY MR. BLACKER:

20  Q   I'm sorry?

21  A   Why do you think because I watch Intervention --

22  Q   You watch Intervention.

23      Do you remember about a week before this event occurred,

24  Mr. Diaz found in your apartment --

25      MS. CORONA:  Objection, Judge.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1       THE COURT: Overruled.

2   BY MR. BLACKER:

3   Q  -- some small glass pipes in a pouch?

4       MS. CORONA: Objection.

5       Can we go sidebar?

6       (Thereupon, counsel for the respective parties

7   approached the bench, and the following proceedings were had

8   outside the hearing of the jury panel:)

9       THE COURT: This is as to her credibility. She is

10   saying something else. Overruled.

11       MS. CORONA: He has nothing to substantiate these claims

12   he is making.

13       She is saying somebody found a crack pipe. He's not --

14       THE COURT: Admit or deny it. Overruled.

15       (Thereupon, the sidebar conference was concluded, after

16   which, the following proceedings were had in open court:)

17       MR. BLACKER: Thank you.

18   BY MR. BLACKER:

19   Q  Do you remember a short time before the events that

20   we're talking about here on June 8th, Mr. Diaz found a pouch

21   containing four or five glass small pipes in your apartment?

22   A  No. That's incorrect.

23   Q  Do you remember that pouch in your apartment?

24   A  No, I don't have a pouch.

25   Q  You don't remember Mr. Diaz in possession of a pouch

1   with four or five glass pipes?

2   A   No.

3       MR. BLACKER:  OK.  I need a moment.  Sorry.

4       I will come back to that.

5   BY MR. BLACKER:

6   Q   Did you ever have a conversation with Mr. Diaz in which

7   he told you that he would rather give you some money than have

8   you smoke crack?

9   A   I don't smoke crack and I don't remember that

10  conversation.

11  Q   You never had a conversation with him like that?  OK.

12  A   Give me money for what?  I don't need money.

13  Q   OK.  It says in the next sentence:  Remember, you don't

14  take care of your kid.

15  A   I have one kid.

16      THE COURT:  Who says this?

17      Wait a minute.

18      MR. BLACKER:  Diaz, supposedly, at 3:31 a.m.  This is

19  the conversation we're talking about.

20      THE COURT:  Is there an objection here?

21      MR. GROSS:  Objection.  The State has no idea what you

22  are reading from.

23      THE COURT:  Sustained.

24      MR. BLACKER:  Reading from the transcript that the Court

25  wanted the jury to hear.

345

1      THE COURT:  The State presents evidence.  The Court

2  does not.

3      MR. BLACKER:  But this morning, it was interesting that

4  the jury was --

5      THE COURT:  So you -- this isn't from someplace else?

6      You are reading from the transcript?

7      OK, go ahead.

8      MR. BLACKER:  Certainly, Judge, certainly.

9      THE COURT:  Go ahead.

10  BY MR. BLACKER:

11   Q   Remember, you don't take care of your kids.

12       You say you have one child, right?

13   A   One child.

14   Q   And at that time that you were living with Mr. Diaz,

15  your child was being taken care of by your mother?

16   A   She was in my mom's house.

17   Q   OK.  And --

18   A   What better place?

19       My father is a pediatrician; her grandfather.

20   Q   And Mr. Diaz, on the very next sentence, says:  I'm

21  going to talk to Juan.

22       Juan is your dad?

23   A   Yes.

24   Q   He is the doctor?

25   A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

346

```
 1    Q    What do you think --

 2         What was he saying there?

 3         What is he going to talk to him about?

 4    A    I don't know.

 5    Q    You don't know?

 6    A    No.

 7    Q    OK.  And then he says:  I want my mom to pick up $3600.

 8         He's claming the money that was on the bed was his;

 9  isn't that right?

10    A    Probably, yes.  Has to be.

11    Q    And you had your own money.  You didn't need his money,

12  did you?

13    A    No, I didn't need his money.

14    Q    OK.  But you weren't about to give it back to him, were

15  you?

16    A    No, I wasn't.

17    Q    And -- OK.

18         Let me ask you this question:  During the five weeks

19  that you were with him, you didn't pay any of the bills for

20  the dinners, and dance, and fancy nights, did you?

21    A    Neither was he paying the $2,000 rent or mortgage

22  payments on my apartment.

23    Q    Your dad was paying that, wasn't he?

24    A    He does pay it.

25    Q    Was he paying that or not?
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

347

1    A   Yes.

2    Q   You weren't paying that, either?

3    A   No.

4    Q   So Mr. Diaz was living in your apartment, not paying

5   rent, but picking up all of the other bills in terms of your

6   daily social calendar; isn't that correct?

7    A   I have my own money.

8        What is it that you are getting to so that I understand

9   you?

10   Q   OK.  Mr. Diaz was spending his money on entertaining and

11  having a good time with you, supposedly, for the last five --

12   A   He had, yes.

13   Q   OK.  That's all I'm asking.

14   A   Was he given the --

15   Q   And it says here he wants you to give the $3600 -- if

16  you look at the 3:31 a.m. call to his mom, before you smoke it

17  up in crack or something like that?

18   A   Or something like that.

19   Q   Is he referring to crack cocaine again?

20   A   I don't know what he's referring to.

21   Q   OK.

22   A   Because I don't smoke crack.

23   Q   Did someone smoke crack?

24   A   Who?

25   Q   Does someone; not you?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

348

1   A   I live by myself with my daughter.

2   Q   I didn't hear you.

3   A   My daughter and me stay with ourselves.

4      Who is someone?

5      Who is that someone?

6   Q   If someone was using crack cocaine, can you smoke it?

7   A   Can you smoke it?

8      Can it --

9   Q   Can it be smoked?

10   A   Yes.

11   Q   OK.  And he says:  I'm going to drop a dime.

12      What does "drop a dime" mean?

13   A   I don't know.

14   Q   Doesn't it mean -- telling somebody something?

15   A   I never heard that in -- that, I never heard it like

16 that.

17   Q   You never did?

18   A   No.

19   Q   Like the old pay phones used to cost a dime.  When

20 someone drops a dime on somebody, they are going to tell and

21 rat you out.

22   A   Yes.  Learning something new every day.  I never heard

23 it like that.

24   Q   Now that you know what it is --

25   A   OK.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

349

1    Q    -- did you, in fact -- did he have any information that

2    he could dime you out; he could tell somebody about you?

3    A    No.

4    Q    He didn't?

5    A    No.

6    Q    OK, OK.   The very next morning -- I'm sorry.

7         Seven minutes later, he calls and he says he's going to

8    call Juan's office.   He's going to call over there, and he is

9    going to raise hell, because you owe him money.   Right?

10   A    Uh-huh.

11   Q    He is threatening you, to call your father to raise

12   hell.   What kind of hell is he going to tell your father

13   that's going to get you in trouble?

14   A    I don't know.   I have -- I didn't have any idea.

15   Q    No idea?

16   A    No idea.

17   Q    OK.   And I want to go back to something.   You told us

18   that you're in the kitchen when you look out the doorway, down

19   the hallway, and here comes Mr. Diaz with a gun and a pillow.

20        If he wanted to kill you, he could have killed you right

21   that minute, couldn't he?

22   A    Oh, for sure.

23   Q    Right?

24   A    Oh, for sure.

25   Q    He didn't fire off a bullet then, did he?   Correct?

350

1    A    Correct.

2    Q    OK.  Now, we're going back to the cafeteria.

3         Isn't it true, ma'am, that when Mr. Diaz -- if he did

4    fire a bullet, he fired it into the air, at the sky, and not

5    inside the vehicle?

6    A    No.

7    Q    OK, OK.  So you knew when you were listening to these

8    calls that if Mr. Diaz wanted you dead and he didn't get his

9    money back on the evening before -- before you went to the

10   hospital, if he wanted you dead, he could have killed you when

11   you were in your apartment, couldn't he?

12   A    If he could have gotten through security, probably.

13   Q    He was in your apartment.  There was no security.  It

14   was you and Mr. Diaz.

15   A    I thought you were telling me about another occasion.

16   Q    No.  On this occasion.

17   A    He is telling that night if he wanted to kill me, he

18   could have, if he wanted to, yes.

19   Q    And he could have killed you while you were down in the

20   lobby of that hotel.  You are saying he had a gun in his hand.

21   Correct?

22   A    It shows that in the video.

23   Q    Oh, it does?

24        We will talk about that in a minute, but you are telling

25   the jury that he could have, if he had a gun, could have

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  killed you then.  Right?

2      A    If he wanted to kill me, he could have killed me.

3      Q    Right.  And so when it came time for him to, in the car,

4  a foot away from you, if he wanted to kill you at that moment,

5  he could have killed you, couldn't he?

6      A    He could have killed me.

7      Q    And the entire time that you were driving away from the

8  cafeteria, before you escaped his presence, he could have

9  killed you then, because you are telling us he had a gun; is

10  that right?

11      A    On one of the pictures that you gave, there was a gun on

12  top of the --

13      Q    I did not hear that.

14      A    Didn't you see on one of the pictures that she gave me,

15  there was a gun on top of the bed?

16      Q    I'm going to -- the gun on top of the bed?

17      A    I saw something silver.  I don't know.  On top of the --

18  I don't know.  Maybe it's just me.

19          You want to look through it again?

20          MR. BLACKER:  Can I have the exhibit?

21          THE WITNESS:  But, yes, if he wanted to, he could have.

22  BY MR. BLACKER:

23      Q    OK.  Yes.  I'm just going to show you the picture, so we

24  could clear it up.

25          You don't have to take time with them.  While we are

352

1   talking, you might want to look at them again.

2        He talks about the call at 3:30 -- 46 -- and he can't

3   believe that after he spoiled you and treated you nicely what

4   you are doing to him.

5        Do you remember that?

6   A   Yes, I remember that.

7   Q   Is he referring to the way in which he treated you prior

8   to that night and spoiled you, quote/unquote?

9   A   He treated me good.

10  Q   OK.  And he tells you to go and -- and give the money to

11  his mother.  Right?  Yes?

12  A   Yes.

13  Q   OK.  And did you say you saw a gun in this photo, any of

14  these photos?

15  A   Oh, I thought -- it's an open cell phone.

16  Q   OK.  Do you stand corrected?

17      It wasn't a gun?

18  A   It wasn't.

19  Q   OK.  All right.  Now, you get out the hospital.  You

20  decide to leave.  You go home.  You wake up.  You listen to

21  this tape, and you wake up about 10:30.  And a few minutes

22  later, you get a call of Olga Diaz.

23      Are you sure that she called you, or did you call her?

24  A   I don't remember who called who.

25  Q   You don't remember.  OK.

353

1          And she tells you:  I'd like to speak --

2          She arranges to meet you -- right? -- and you agree?

3     A    Yes, I agree.

4     Q    And you go to Shorty's, where Shorty's is at the

5     Metrorail.  Correct?

6     A    Correct.

7     Q    And you wait for her in a bar there -- didn't you? --

8     around Dadeland North?

9     A    Shorty's Barbecue.

10    Q    And that is at Dadeland, and there is a bar at Dadeland

11    Mall, and that is where --

12    A    Houligan's.  I think it was Houligan's.

13    Q    That's right.  Didn't you wait for her in there?

14         She called the cell phone, and you came out?

15    A    Yes.

16    Q    Did you come out and had a beer in your hand?

17         Didn't you?

18    A    No.  I didn't have a beer.

19    Q    You didn't have a drink in Houligan's?

20    A    I had a drink in Houligan's when I was waiting for them

21    to come down from down south.

22    Q    And she got there about 11:30 in the morning.  Correct?

23    A    Excuse me?

24    Q    11:30 in the morning she got there?

25    A    I don't remember what time I saw her there.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

354

1    Q    OK.  And in the car is Pablo Diaz, correct?

2    A    I think Pablo was in the car.

3         THE COURT:  I didn't hear you.

4         THE WITNESS:  I think Pablo was in the car at that

5    time, but I don't remember.

6    BY MR. BLACKER:

7    Q    OK.  And again, when you were reviewing your sworn

8    testimony here, didn't you read on every --

9    A    I had my daughter this weekend.  I went through it, but

10   it wasn't like a --

11   Q    OK.  All right.  You are not saying he wasn't there?

12        It turns out that he was, wasn't he?

13   -A   He probably was.

14   Q    Probably was.  You remember driving back to the Redlands

15   house with them?

16   A    Yes.

17   Q    After a discussion with Olga and with Pablo?

18   A    I remember talking to Olga.  I'm not sure if Pablo was

19   there.  I can't remember.

20   Q    OK.  All right.  Let's just do one look at the document

21   that's in front of you, that transcript.  Look on page -- if

22   you would, ma'am, look on Page 74 -- I'm sorry -- 75.

23   A    Yes.

24   Q    OK.  You remember this being answered -- 74.  Excuse me.

25   I was right.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

355

1        "Question:  You were speaking to his mother?  His

2   mother is a very special person.  That's her only son."

3        So that's a question.

4        "He's in the car, right.  Plus he had left me messages

5   on my answering machine, he's going to peel my daughter's

6   skin.  So what was going to happen to my daughter, I was

7   kind of scared, so I wanted to see what they were up to.

8   This is her only son.

9        "You go to the meeting --

10       "Question:  You go to the meeting.  Where is Pablo

11  sitting in the car?

12       "The front seat.

13       "With his mom?

14       "Uh-huh."

15       Is that -- you remember he was there now, right?

16  A    He must have been in the car.

17  Q    Please speak up.

18  A    So then he must have been in the car that day.

19  Q    OK.  And you decided not to talk to Pablo, because you

20  were mad at him?

21  A    No.  I didn't speak to him.

22  Q    You didn't speak to him?

23  A    No.

24  Q    And you decided to go and do some gardening with

25  Mrs. Diaz?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    A    Yes.

2    Q    And you -- you're telling us -- you told us this morning

3    when Ms. Corona examined you that you went there because you

4    were nervous about these messages, but you knew -- you were

5    nervous, but you knew that Mr. Diaz could have killed you on

6    all of those occasions when you say he had a gun in his hand.

7    Correct?

8    A    Correct.

9    Q    And you also --

10        Now, you told the State this morning that he said he was

11   going to take you out to the Redlands and bury you.

12        Didn't he in one of those messages?  Isn't that correct?

13        And you knew he was going to the Redlands -- you were

14   going to the Redlands with Mr. Diaz in the car, didn't you?

15   A    Correct.

16   Q    But you went?

17   A    Yes, I did.

18   Q    To do some gardening?

19   A    Yes, I did.

20   Q    OK.  And when you got there, you didn't speak to Pablo,

21   did you?

22   A    That I remember, I didn't speak to him.

23   Q    I can't hear you.

24   A    That I remember, I didn't speak to him in the car ride

25   on the way home or when I first got into the house.

357

1   Q  OK.  You didn't speak to him, but you slept in his room

2  that night, didn't you?

3   A  I slept in the room.

4   Q  And stayed with him as if nothing had ever happened that

5  night, didn't you?

6   A  Yes.

7   Q  And you stayed with him for the next ten nights, didn't

8  you?

9   A  I don't remember exactly how many days it was, but I

10  know it was days, I think, that I was there.

11   Q  Well, in reviewing the transcript, you always said, as

12  you said here this morning on direct examination that you only

13  spent one night with Mr. Diaz, didn't you?

14      You've always maintained that?

15   A  There was more than one.

16   Q  Until this moment, haven't you always, in this case, in

17  all of your sworn statements, told us that, under oath, that

18  you spent one night at Mrs. Diaz' house?

19   A  It was more than one night.

20   Q  I can't hear you.

21   A  It was more than one day.

22   Q  It was more?

23   A  Yes.

24   Q  It was ten, wasn't it?

25   A  I don't know.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

358

1     Q   And you lived as lovers for ten more days the day this

2     incident occurred, didn't you?

3     A   Would you lower your voice?

4     Q   Yes, I will lower my voice.

5     A   Thank you very much.

6     Q   I'm just getting a little excited.  Excuse me.

7         And when I asked you in deposition about -- I showed you

8     toll records and which calls were made to your mother,

9     numerous calls, eight to ten calls were made to your mother

10    from Mrs. Diaz phone.  You told me it must have been someone

11    else, didn't you?

12    A   I used to call my mom with star 67, so she would know I

13    was still alive.

14    Q   I know.  But you were telling us you went there one

15    night.  So you told me if there were calls made on the 8th, and

16    the 9th and the 10th that day, they weren't from you.  This was

17    somebody else?

18        Didn't you tell me that in deposition?

19    A   I don't remember.

20    Q   You don't remember?

21        MR. BLACKER:  I need a moment, please.

22        I will come back to it.  I will make a note.  I don't

23    want to hold up the proceedings anymore.

24    BY MR. BLACKER:

25    Q   And you stayed at Pablo's house for ten days, and you

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   weren't talking to your mother?

2       When you called her, you dialed star 67, so she would

3   not know where you were at?

4   A   That is correct.

5   Q   And the reason you did that is because you knew

6   Detective Morin was looking for you to speak to you; isn't

7   that correct?

8   A   I wasn't interested in speaking to the police.

9   Q   Is that correct; yes or no?

10  A   Yes, it is.

11  Q   And you also knew your mother, every time you spoke with

12  her, told you to call Detective Morin; isn't that correct?

13  A   Correct.

14  Q   And she had no idea that you were staying with Olga and

15  Pablo Diaz at a home and having a wonderful time socializing

16  with them, did she; your mother, that is?

17  A   No, she didn't know.

18  Q   You kept it a secret from her, because if she knew, she

19  would have told Detective Morin where you were.  Correct?

20  A   Correct.

21  Q   And you even brought your daughter out to Mrs. Diaz'

22  house on Father's Day, didn't you, ma'am -- isn't that

23  correct? -- to spend the day with Pablo and his daughter?

24  A   I don't remember.

25  Q   You don't remember?

360

1    A    No, I don't.

2    Q    And you socialized with a man named Frank Acosta, a

3    friend of yours and a friend of Pablo's, the man that was

4    staying at your apartment on the night when he got home?

5    A    He spoke to me.  And he had to speak to me.  That is

6    where I said I did -- I ring him up somewhere around here that

7    we -- I was ringing up Frank to go upstairs.

8    Q    I'm not talking about that night now.  During the ten-

9    day period that you were at Mr. Diaz' house -- Mrs. Diaz'

10   house, Olga Diaz' house -- please excuse me -- you socialized

11   with Frank Acosta, a plumber?

12        You went out with Frank and Pablo to various places

13   during that period, did you not?

14   A    No, I didn't go out.

15   Q    Did you go --

16   A    I hardly had any of my stuff with me.

17   Q    All right.  While you were at Mrs. Diaz' house, you were

18   free to come and go as you wanted?

19        No one was threatening you or holding you down?

20   A    No, they weren't.

21   Q    And you told Pablo, when he asked you about the $3600

22   that the police had seized it, that they got it, didn't you?

23        You didn't want to give it back to him?

24        You have to answer.

25   A    No.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

361

1 Q You didn't want to give it back, but you told him, as an

2 excuse, you didn't want to tell him that you had it, because

3 he might get mad?

4 A I don't remember what I told him.

5 Q You didn't tell him that the police had taken it when

6 they went in to search your apartment?

7 A Bring out the papers from that.  That's from the --

8 before and tell me, because I don't remember exactly what you

9 are telling me.  I don't remember what I told him.

10 Q You didn't review the documents too well, but you are

11 asking me to bring out the papers from before now?

12 A Because I'm telling you --

13 Q Oh, OK.

14 A Because I'm sure you have it there.

15 Q Well, what did you tell Mr. Diaz about his money?

16  I'm sure he inquired, did he not?

17 A I don't remember.  That's what I'm telling you.

18 Q But you certainly didn't give it back to him, did you?

19 A No, I didn't.

20 Q OK.  And during that ten days, do you remember going

21 back to Miami-Dade County from the Redlands on three or four

22 occasions, sometimes driven by Mr. Diaz' mother when she

23 accompanied you back to your apartment?

24 A Yes.

25 Q OK.  So you went and came back to Olga Diaz' home as

MATZ, TRAKTMAN, FELDMAN AND WILDNER

362

1   you pleased; isn't that true?

2   A   I went and came back as I had my stuff with me.

3   Q   And do you remember testifying previously in the case

4   that not only were you there only one night, but you realized

5   after that one night that you never wanted to see these people

6   again, and that is when you went back to your apartment with

7   the intention of never seeing Mr. or Mrs. Diaz again?

8   A   I had the intention, but I didn't do it.

9   Q   You had the intention, but you didn't do it.

10       OK.   But you stayed there for ten days, happily.

11  Correct?

12       No one threatened you, did they?

13  A   No.

14  Q   No one harmed you in any way, did they?

15  A   No.

16  Q   You were having a relationship with Pablo again, weren't

17  you?

18  A   Yes.

19  Q   OK.   And when you went back on the day that Detective

20  Morin -- not Detective Morin -- but the police surrounded your

21  car -- when you were back on that day, you had asked for some

22  cab fare and Olga Diaz gave it to you, didn't she?

23  A   Yes.

24  Q   You took a cab to your apartment, like you had during

25  that ten-day period, didn't you?

363

```
1   A    Yes.

2   Q    OK.  Speak up, please.

3        And during that ten -- I'm sorry?

4   A    I think I took a cab, either to my house or to my -- I'm

5   not sure.

6   Q    But wherever you were, you wound up in your apartment,

7   correct; your apartment at the Fortune House?

8   A    I wound up there.

9   Q    Well, as you were leaving there, didn't you get stopped

10  by the police?

11  A    On 27th Avenue.  Yes.

12  Q    OK.  And when you were stopped by the police, they took

13  you directly to see Detective Morin?

14  A    She was there.  No.  She was --

15  Q    She was there?

16  A    It was 15 to 20 cop cars --

17  Q    OK.  And she told you -- she threatened you.  She told

18  you to do things, didn't she?

19       She told you that she was going to -- she could put you

20  under arrest as a material witness if you resisted?

21  A    Something about a material witness.

22       What is that?

23       Is that what she told me?

24  Q    She told you that.  Right?

25  A    Yes.
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

364

1    Q    And she also told you something else?

2         She told you she could take your daughter from you if

3    you didn't give her a statement, didn't she?

4    A    Yes, she did.

5    Q    OK.  And she told you that, in the same breath, that she

6    told you she knew you were doing crack cocaine, and if you --

7    she would take your daughter from you?

8    A    No.  She didn't tell me that.

9    Q    But didn't she tell you that you were a cocaine addict?

10   A    No.

11   Q    And that she would take your daughter?

12   A    No.  She told me:  Look, if anything, I will have you

13   drug tested, and, you know, if you smoke or whatever.

14        And I told her:  I don't want any problems with my

15   daughter.

16        And she -- then she said:  Give me a statement about

17   what happened that night, the truth about what happened that

18   night.

19   Q    And that was when you came and gave her the statement of

20   June 20th, isn't it?

21   A    I think that was the first time -- the first statement

22   that I ever gave.

23   Q    And you told her --

24        That's the night you told her that Pablo had you in the

25   full Nelson while Attie was beating you, didn't you?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

365

1    A    I told her that.

2    Q    And that was the night you told her that it was only a

3    thousand dollars; it wasn't $3600.  It was only a thousand

4    dollars on that bed?

5    A    I don't remember.  I don't know how much money was on

6    the bed.  I don't know how much was in or out of the drawer.

7    Q    If you didn't know how much it was, how could you tell

8    her how much was there?

9    A    I don't know.  I gave her a ballpark figure.  I was very

10    nervous.

11    Q    You were nervous?

12    A    Yes.  She had --

13         The people that were in the car were arrested.  It was

14    like crazy.  It was 15 cop cars behind me.  Like, it was

15    crazy.  It was like Channel 7.

16    Q    When you gave the statement to Ms. Ruiz -- Ms. Morin, it

17    wasn't 15 police officers surrounding you, was it?

18    A    The way she pulled me in the car, that is what made me

19    nervous.

20    Q    And after that --

21    A    After that, I was in the -- uh-huh.

22    Q    Let me finish, and I won't step on your words, and you

23    don't step on mine.

24         After you agreed to give her a statement, everything was

25    nice and calm?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1        You were now on her side.  She must have been calmed.

2  She must have calmed you, didn't she?

3    A   She was very  nice.

4    Q   So she was very nice after you agreed to give her a

5  statement, and she took you back to police headquarters,

6  didn't she?

7        And she put on the tape recording?

8    A   That was on Northwest --

9    Q   Wherever that is.

10       And wherever she took you was in a comfortable

11  surrounding, wasn't it?

12    A   Yes.

13    Q   It lessened your nervousness and anxiety, didn't it?

14       You have to answer.

15    A   Correct.

16    Q   OK.  So you were calm, were you not?

17    A   At that point, yes.

18    Q   Where you had --

19       Had you taken any substance that night to affect your

20  ability to recall or to remember?

21    A   No.

22    Q   OK.  And you claim that Mr. Diaz had only given you a

23  thousand --

24       You claim that the money had been given to you; that it

25  was your gift and that is why you didn't give it back.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  Correct?

2    A    Yes.  It was my gift to get a car.

3    Q    You had already listened to the tape, State's Exhibit A3

4  -- State's Exhibit 3.

5        You had already listened to that tape.  You knew that

6  Mr. Diaz was not giving you a gift.

7        He was demanding his money back, wasn't he?

8    A    You could say whatever you want.

9        No, that's not how it is.  That is not how it is.

10    Q    He wasn't demanding his money back?

11    A    Yes, in the tape, in the thing.

12    Q    That happened on the night of June 8th.

13        We are talking about June 20$^{th,}$ already 12 days later.

14    A    OK.  You lost me.

15    Q    On June 8th, you knew -- you were conscious that

16  Mr. Diaz was not making any gift to Catherine Ruiz; isn't that

17  correct?

18    A    I already had the gift.  The gift had already been

19  given.

20    Q    Nonetheless, you were aware that he was demanding his

21  money back; isn't that correct?

22    A    Yes, I was aware of that.  Obviously, it's on the tape.

23    Q    And you told her it wasn't $4,000; it was only $1,000?

24    A    I don't know how much it was.

25        Now, I know how much it is.  At that time, I probably

MATZ, TRAKTMAN, FELDMAN AND WILDNER

368

1   didn't know how much it was, and I just told her something to

2   just tell her:  Look, it was like $1,000, $2,000.

3   Q   You told her under oath, you made a statement to her,

4   and you told her before the statement, you said:  Look, I'm

5   going to give you a statement.  I want you to not do anything,

6   any of the -- follow through on any of the threats.

7        She promised not to do that if you gave a statement and

8   became a witness.

9        So you were greatly calmed.  You had no reason to lie to

10  this woman, did you?

11  A   No, I didn't.

12  Q   And she told you before the statement that if you don't

13  know something, don't say you do.

14       Tell me what the truth is.  Correct?

15  A   Correct.

16  Q   All right.  And you claimed again that it was only

17  $1,000, did you not?

18  A   If that's what it says on the transcript.

19       MR. BLACKER:  Page 22, counsel.  OK.  Page 21 at the

20       bottom.

21  BY MR. BLACKER:

22  Q   (Reading)

23       "And at that point that's when he" --

24       And you answered:

25       "That's when he went ahead and started saying, no,

1     that he wants the $4,000 back from the down payment he was

2     going to give me for the car, which was really -- that's

3     not the total.

4          "How much was the total?

5          "It was $1,000 that he had given me to get a down

6     payment for a car.

7          "So he didn't give you $4,000?" she asked.

8          "No, at no point."

9          And that's the night, under oath, that you told him --

10    and we're not going to rehash it again -- that he had been the

11    one that held you down while Attie punched you, and beat you,

12    and broke your nose; isn't that correct?

13    A    No.  I told you he opened the door to help me out.

14    Q    But you told her that he had caused you, in a way, to

15    get pummeled by Attie, because he was holding you in a full

16    Nelson, so you couldn't protect yourself?

17         That is what you told her under oath, isn't it?

18    A    OK.

19    Q    You also told her the stuff about him slamming your face

20    into the toilet, and causing you to bleed heavily?

21    A    That was on the 6th floor.  Uh-huh.

22    Q    Do you remember you told her about that?

23    A    Yes.

24    Q    You told her how you immediately got out of the

25    elevator, alerted security, didn't you?

370

1    A    I told Dennis to call the police.

2    Q    And you told her that it was in the driver's seat --

3    A    Or call security.  I know Thomas came downstairs right

4    away, which is the security officer.

5    Q    And you told her that night on the 20th of June, the

6    closest day that you ever gave a statement in this case, you

7    told her that he fired two shots while he was in the car at

8    you, didn't you?

9         THE COURT:  You need to answer.

10        THE WITNESS:  Correct.

11        MR. BLACKER:  I need a moment, Your Honor.  I'm sorry.

12    I'm sorry, ladies and gentlemen.

13        May I have a moment with my client, Your Honor?

14        THE COURT:  Yes.

15        THE WITNESS:  My daughter is getting out of daycare at

16    5:30.  I have no one to pick her up.  She is downtown.  I

17    can come back tomorrow if you need me to, but I have to be

18    through by 5:30.

19        THE COURT:  The witness is saying that she has to pick

20    up her daughter by 5:30.

21        THE WITNESS:  If you need me for tomorrow --

22        THE COURT:  We're almost finished.

23        Anything further, Mr. Blacker?

24        MR. BLACKER:  Not at this time.

25        I tender the witness.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

371

1          THE COURT:  Any redirect?

2          MS. CORONA:  Briefly.  A few questions, and that's

3     it.

4          THE WITNESS:  You don't need me for tomorrow?

5          MS. CORONA:  We will be done today.

6                    REDIRECT EXAMINATION

7     BY MS. CORONA:

8     Q    Ms. Ruiz, you have been accused a couple of times of

9     doing crack cocaine, or those messages stated that you did

10    crack cocaine.

11         Have you done crack in your life?

12    A    No.

13    Q    Is there any reason for Pablo Diaz to believe that maybe

14    you had done crack before?

15    A    No.

16    Q    And that night of the incident, when you were -- before

17    you got -- actually, the point that you got in the elevator

18    and in the lobby, did you threaten Pablo in any way?

19    A    No.

20    Q    At any point in that night?

21    A    I even dropped the knife when I grabbed the knife, and I

22    ran out the door.

23    Q    At what point did you drop the knife?

24    A    Like running down the stairs, I dropped the knife.

25    Q    From the point that you dropped the knife, did you