1   threaten him or do any sort of violence to Pablo in any

2   way?

3      A   No, I did not.

4      Q   OK.   And you -- when you were in front of the lobby,

5   were you threatening Pablo in any way, or saying anything

6   about what was going on?

7      A   No.   I just told him I wanted my things back.

8      Q   When you -- when Pablo crawled over the counter, and

9   dragged you up the stairs, were you voluntarily going with

10  him?

11     A   No, I wasn't.

12     Q   And you have been accused of potentially walking with

13  him towards the car.

14         Did you ever walk on your own, before you got --

15     A   I could hardly walk.   I didn't even have my shoes -- my

16  shoes on.   They stayed in the car.

17     Q   Was Pablo supporting you during that time?

18     A   No, he was not.

19     Q   Who was supporting you?

20     A   My father.

21     Q   And did Pablo have a job at that time?

22     A   No, he did not.

23     Q   Did he stay with you for most of the day --

24     A   Most of the day.

25     Q   -- during those times?

1          Do you know how he was supporting himself?

2     A    We spent a lot of time together.  No.

3     Q    OK.  And did you --

4          That day, after he --

5          Once you got to the cafeteria, there was one shot.  That

6     shot, can you tell me specifically where it is, where it

7     grazed you?

8     A    On the right-hand side.

9     Q    Do you know where in the car it would have hit?

10    A    No, I don't, because I remember I looked down, and there

11    was a hole right there.  It was a hole.

12    Q    In the seat, right under where you were sitting?

13    A    In the seat, right under where I was sitting.

14    Q    You didn't see the bullet there, but you saw a hole?

15    A    I saw a hole.

16         The bullet could have been --

17         I don't know.  I can't --

18    Q    Where did you see the hole?

19         Do you remember?

20    A    Right underneath me.

21    Q    On the seat, the actual part of the -- part of the seat?

22    A    Yes.

23    Q    And what has happened to you as a result of the

24    incident, besides the physical injuries?

25    A    I've been seeing myself a psychiatrist for about three

374

1   years.

2      Q   Did you have to see a psychiatrist before this

3   incident?

4      A   No.

5      Q   Do you --

6          Are you able to work at this time?

7      A   No.

8          MR. BLACKER:  Objection.  This is improper.  I

9      object.

10         THE COURT:  Sustained.

11         MR. BLACKER:  Move to strike under 104 limine

12     instruction.

13         THE COURT:  The jury will disregard the witness' last

14     sentence.

15  BY MS. CORONA:

16     Q   When you went back with Olga and Pablo, did you feel

17  safe with Olga there?

18     A   Yes.  I loved Olga.

19     Q   And when Pablo was with Olga, did he act the same way

20  that he acted on that same night, on June 8, 2003?

21     A   I don't understand.

22     Q   When Pablo was with his mother, did he act the same way?

23         Did he ever act like he did on June 8, 2003, at the

24  Fortune House and when he drove to the cafeteria, and when he

25  shot at you?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

375

1     A    Never, ever.

2     Q    And did you feel that him being with Olga calmed him

3  down?

4          MR. BLACKER:  Objection.  Leading.  Speculation of his

5     state of mind.

6          THE COURT:  Overruled.

7  BY MS. CORONA:

8     Q    Did you feel that he was calmer when he was with Olga?

9     A    Yes.  He would never do anything in front of his mother

10  like that.

11    Q    Is that why you went back with them to the Redlands?

12    A    I went back, because she called me that next morning,

13  and told me that he had a tragic car accident.

14         MR. BLACKER:  Objection.

15         No, that's all right.

16         MS. CORONA:  I have nothing further.

17         MR. BLACKER:  One area was raised that --

18         THE COURT:  Go ahead.

19                         RECROSS-EXAMINATION

20  BY MR. BLACKER:

21    Q    You say that after the shot that grazed you back was

22  fired that you looked down in the seat, and you saw a hole in

23  the seat?

24    A    Yes.  I saw a hole afterwards.

25    Q.   OK.  Tell us where the hold was.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

376

1    A    It was behind me.

2    Q    Behind you?

3    A    In the seat.

4    Q    And was it on the bottom part of the seat, ma'am, or on

5    the vertical part of the seat?

6    A    I told you, I don't understand when you keep on asking

7    me vertical or top.

8    Q    Well, OK.

9         When you are sitting in a car --

10   A    When you are sitting in a seat --

11        THE WITNESS:  May I demonstrated, Your Honor?

12        MR. BLACKER:  As a matter of fact, may I ask the

13   witness to demonstrate?

14   BY MR. BLACKER:

15   Q    OK.  When you were sitting in the seat, tell the jury,

16   were you sitting in the car like this?

17        Don't --

18        You were --

19        Were you sitting in back, like a normal person?

20   A    I was sitting down, yes.

21   Q    I didn't hear you.

22   A    I was sitting down in the back seat.

23   Q    Like I am sitting now?

24        MR. BLACKER:  For the record, sitting in the seat

25   normally.

377

1          THE WITNESS:  I don't remember the position that I was

2     sitting in at that time.

3          I was very jumpy.  I was scared.  I don't know what

4     was going to happen next.

5     BY MR. BLACKER:

6     Q    But you were certainly in a sitting position, as opposed

7     to reclining?

8     A    A sitting position.

9     Q    Sitting position?

10    A    Yes.

11    Q    OK.  Come over here, please.

12         MR. BLACKER:  And can she, Judge?

13         And point to the jury where you saw the bullet hole

14    that you told counsel you saw.

15         THE WITNESS:  Like in the middle of the seat.

16         THE COURT:  You can do this.  Go ahead.  Go ahead.

17    Go and show them.

18         Point where you picture where the bullet hole was.

19         THE WITNESS:  Around, behind me.  Somewhere around

20    behind where I was sitting.

21    BY MR. BLACKER:

22    Q    Behind where you were sitting on the bottom part of the

23    chair?

24         Would you please show the jury while you are standing up

25    here where you say that this bullet grazed you?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

378

```
 1    A   On my back.

 2    Q   Point to it, if you can, on your back.

 3    A   It's a little bit deeper.

 4    Q   Above your hip?

 5    A   Above my --

 6        Like where my buttocks is.

 7    Q   Above your buttocks on the right side?

 8        THE COURT:  Is that visible or not?

 9        Ms. Ruiz, is the mark visible?

10        THE WITNESS:  Yes.

11  BY MR. BLACKER:

12    Q   Do you want to show it to the jury?

13    A   Yes.

14        THE COURT:  Go ahead.

15  BY MR. BLACKER:

16    Q   If you would like to use this and point it out to the

17  jury, please.

18    A   Do you have a mirror or something?

19        Like a little bit --

20    Q   Please show the jury again this scar you are talking

21  about.

22    A   I would have to look in the mirror to see exactly where

23  it is.

24        It's on my buttocks, right here.

25        I can't just like --
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

379

1        I'm not going to pull down my pants.

2    Q   You are unable to show the jury the scar at this time

3    without a mirror?

4    A   Yes.

5        MR. BLACKER:  We have nothing further.

6        Thank you.

7        THE COURT:  Anything further, Ms. Corona?

8        MS. CORONA:  No, Judge.

9        THE COURT:  Thank you, Ms. Ruiz.

10       THE WITNESS:  You're very welcome.

11       THE COURT:  You are excused.

12       (Witness excused.)

13       THE COURT:  Anything further, State?

14       MS. CORONA:  Can I call one more witness for today?

15       The State calls Dennis Flores.

16       She has a statement or something in her hand.  Take them

17   back.

18       MR. BLACKER:  We would like to reserve the right to call

19   Ms. Ruiz.

20       THE COURT:  Get Ms. Ruiz back in here.

21       MR. BLACKER:  I would ask the Court to reserve the right

22   to recall her.

23       THE COURT:  Ms. Ruiz, come in here.

24       All right.  Ms. Ruiz, come in.

25       The Defense attorney has reserved the right to recall

380

1    you as a witness, so you need to make yourself available

2    through the State.

3        I am ordering you to return if we call you.  I would

4    need you back here.  You need to return.  OK?

5        THE WITNESS:  OK.

6        THE COURT:  Ms. Corona has a way of getting a hold of

7    you?

8        THE WITNESS:  Yes.

9        THE COURT:  Thank you.  You are excused.

10       THE WITNESS:  You're welcome.

11       THE COURT:  Mr. Flores.

12       He does not need an interpreter?

13       MS. CORONA:  No, Judge.

14       THE COURT:  Will we be out of here by 5:30?

15       MS. CORONA:  I hope so.

16       MR. BLACKER:  This will be a short witness for me,

17   Judge.

18       I have my questions written out, as well.

19       THE COURT:  Come forward.

20       Put him under oath.  Let's go.

21   Thereupon:

22                        DENNIS FLORES

23   was called as a witness, and having been first duly sworn, was

24   examined and testified as follows:

25       THE COURT:  Have a seat over here, please.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

381

1                          DIRECT EXAMINATION

2    BY MS. CORONA:

3        Q    Can you introduce yourself to the members of the

4    jury?

5        A    Yes.  Dennis Flores.

6        Q    What do you do for a living, Mr. Flores?

7        A    I am self-employed.

8        Q    On June 8, 2003, what did you do for a living?

9        A    At that time, I was working at the Fortune House as a

10   receptionist/night or day auditor.

11       Q    And what was your role there?

12       A    Basically, just working with the guests at night, and,

13   you know, close the shift.

14       Q    And the Fortune House, what kind of a hotel is it?

15       A    It is a hotel/condo.

16       Q    Which means that people live there year round?

17       A    Yes.

18       Q    And what was your shift at the time?

19       A    It was from --

20            I believe we had just reopened that night.  I think it

21   was from 11 p.m. to 6 p.m. -- to 6 a.m.

22            I'm sorry.  6 a.m.

23       Q    Is there a video surveillance at the Fortune House?

24       A    Yes, ma'am.

25       Q    Do you know what's surveilled?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

382

1   A   There is one camera that I know was in the reception

2   area.

3   Q   And is that the area where you worked?

4   A   Yes.

5   Q   Did you know somebody by the name of Catherine Ruiz

6   during that period of time?

7   A   I knew her by just Cathy.

8   Q   How did you know her?

9   A   Well, I used to --

10      I would just see her coming in or out.

11  Q   What kind of relationship did you have with her?

12  A   Not much.  Just basically hello.

13  Q   You knew her just basically because she lived there?

14  A   Yes.

15  Q   Did you know a person by the name of Pablo Diaz at that

16  time?

17  A   No, I didn't.

18  Q   Had you ever seen him before that night?

19  A   No.

20  Q   When did you realize on this night that something was

21  wrong with Catherine Ruiz and Pablo Diaz?

22      MR. BLACKER:  Objection.

23      THE COURT:  Overruled.

24  BY MS. CORONA:

25  Q   When did you realize that something was going on?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

383

1    A    When actually it was.

2    Q    Tell me when you first saw them that night.

3    A    OK.  I saw them at first when they --

4         They came down in the service elevator, and they walked

5    right out.

6         And she asked me if they could use the phone downstairs

7    in the lobby.

8         And then --

9         I mean, that was the first time I saw her -- them that

10   night.

11   Q    And at that point, did she indicate to you that she

12   needed help in any way?

13   A    Yes.

14        She first asked me if they could use the phone to --

15        Because there's actually two reception desks in the

16   lobby.

17        So as soon as they got on the phone, she approached my

18   reception desk and she asked me --

19        And she just went like:  Call the police.

20        And so I kept talking to her, and I went back inside the

21   office.

22   Q    Let me ask you something.

23        How much time had passed by the time -- from the time

24   that they got out of the elevator to the time that she told

25   you to call the police?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

384

1    A    It was no more than maybe five minutes or so.  It was

2    very fast.

3    Q    OK.  So almost immediately after they got there and used

4    the phone, she asked you to call the police?

5         MR. BLACKER:  Objection.  Mischaracterization.

6         THE COURT:  Sustained.

7    BY MS. CORONA:

8    Q    What did she look like when she got off of the

9    elevator?

10        What was her condition, physical?

11   A    To me, I think she looked OK.

12        I mean, I only noticed --

13        I noticed a minor scrape here, and that she was missing

14   a nail.

15        She got to -- like very close to me, to the reception

16   desk, and she actually asked me to call the police.

17   Q    That's when you noticed the injuries?

18   A    Right.

19   Q    OK.  And after she asked you to call the police, what

20   happened?

21        Were you able to call the police right away?

22   A    Actually, when she asked me, they went inside the office

23   in the back.

24        And I called the security.  I called the security guard

25   upstairs and told them to try to call the police, because the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

385

1   girl was apparently having -- you know -- a misunderstanding,

2   and she was hurt.

3      Q   Did you see what was going on with Catherine outside

4   while you were inside calling the police?

5      A   No.  I only heard the commotion.

6          And when she said, "Dennis, help me," that is when I

7   went back outside, and she was in the back of the counter.

8      Q   Did you actually witness her jump the counter yourself?

9      A   No, I didn't.

10     Q   When you saw her, then, she was already on the other

11  side?

12     A   She was already inside, yes, when I went outside.

13     Q   And what did you see?

14         What did you see the defendant doing, Pablo Diaz?

15     A   Nothing.

16         He was just telling her:  Give me my money.  Give me my

17  money.

18     Q   Did she have a weapon?

19     A   No.

20     Q   What happened after that?

21     A   They kept --

22         They just kept arguing.

23         And he was just requesting his money.

24         And the security guard, you know, told him to calm down

25  and --

386

1          That was --

2     Q    Did you at any time see Mr. Diaz with a weapon?

3     A    Not at that point.

4     Q    When did you first see a weapon?

5     A    I saw it when he was -- actually, I'm --

6          Like between everything that happened, after I went

7     outside.

8          I don't remember how she got back on the counter, but

9     like the minute that she was like almost getting back outside

10    the counter, that's when --

11         That is when he actually pulled out the gun.

12    Q    OK.  Were you behind the counter with her at that point

13    when he pulled out the gun?

14    A    Yes, I was.

15    Q    And you actually saw him?

16         What was he doing with the gun?

17    A    He was just struggling with her, and swinging the gun

18    around.

19    Q    How far are you away from them -- were you at that

20    point?

21    A    I would say maybe three, four feet away.

22    Q    How far away were you from the gun, itself?

23    A    I would say about the same distance.

24         He was right there, and I was over here.

25    Q    When he had the gun in his hand, did it appear that

387

1   he was able to use it readily the way that he was holding

2   it?

3      A    Probably.

4      Q    What kind of gun was it?

5           Do you remember?

6      A    I'm not that familiar with guns, but I think it was a

7   nine millimeter.

8           I think someone said "yes" to me when I said, "nine

9   millimeter," when I called 9-1-1.

10          But I don't know.  To me, it looked like an automatic

11  weapon.

12     Q    OK.  Once he was waiving the gun, did he physically drag

13  her over the counter?

14          I know you said he was struggling with her.

15     A    Yes.  He dragged her by the hair.

16          He was trying to like actually get her over the

17  counter.

18     Q    What was she doing?

19     A    Holding onto the reception --

20     Q    Did it appear that she wanted to go back over the

21  counter with him?

22     A    Maybe just not let go.

23     Q    And what happened after he got her over the counter?

24     A    OK.  When she fell on the floor, he kept dragging her,

25  like towards the elevator.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

388

1       And then they made --

2       He started pulling her, as if they were going to the

3   garage on the ground level.

4       That's when I went back inside.  I went back inside and

5   called 9-1-1.

6   Q   Did you see him take her up the stairs?

7   A   No, I didn't.

8   Q   OK.  Did you call --

9       When did you call 9-1-1 at that point after they

10  disappeared?

11  A   Right at that point, actually, when he was able to get

12  her out of the condo.

13      She was already on the floor.  And when she was on the

14  floor and he was dragging her, that's when I went back inside

15  and I called 9-1-1.

16  Q   He was dragging her till you lost sight of them?

17  A   Right.

18  Q   Do you know where they went?

19  A   No.

20  Q   How long did it take the police to get there from when

21  they left?

22  A   I took them a while.  I would say about --

23      I don't know.

24      I would say maybe ten, 15 minutes.

25  Q   Were you able to direct the police where to go?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

389

1   A   No.

2   Q   Did you know where they had gone at that point?

3   A   Pablo and Catherine?

4   Q   Right.

5   A   Well, when I came back outside and the cops came, I am

6   pretty sure they had already went up the stairs.

7       But to me --

8       I mean I thought they had gotten on the -- down the

9   lobby to the garage in the ground level.

10      But when I came back outside, the police was already --

11      The security guard had already told them that they went

12  back upstairs.

13  Q   Did you know what car they were driving, or what car

14  they were in that night?

15  A   I had no idea.

16  Q   Do you know what car they used in the past?

17  A   No.

18  Q   At some point, were you shown a series of photographs

19  and asked if you recognized the person that had dragged Cathy

20  over the counter, and pointed the gun at you and her on that

21  night?

22      Were you asked if you could identify anybody?

23  A   Yes.

24  Q   And were you able to do so?

25  A   Yes, I was.

390

1    Q   How much after --

2        How much time after the incident were you asked to do

3    that?

4    A   I guess it must have been a couple of hours later.

5    Q   OK.  And to what certainty did you think the person that

6    you identified was, in fact, the same person that dragged

7    Cathy, that was in the Fortune House that night, that dragged

8    Cathy over the counter, and had the nine millimeter gun that

9    you are describing?

10   A   I mean, very good.

11       I mean, it happened just now, you know, hours before

12   that.

13       I would remember well.

14       MR. BLACKER:  I am sorry, Mr. Flores, I cannot hear

15   you.

16       THE WITNESS:  I mean, I could remember his face, because

17   it had just happened around a couple of hours prior.

18   BY MS. CORONA:

19   Q   Showing you what has been marked as State's Exhibit 1A

20   for Identification, have you had an opportunity to listen to

21   this tape today?

22   A   Yes.

23   Q   And is that your voice on the tape?

24   A   Yes.

25   Q   Is that the call that you made to 9-1-1 on the night

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   of the incident at the time that you just described?

2   A   Yes.

3       MS. CORONA:   The State moves State's Exhibit 1A --

4   that limited portion of State's Exhibit 1A into

5   evidence.

6       THE COURT:   No objection?

7       MR. BLACKER:   Is this the photo I.D. tape?

8       MS. CORONA:   9-1-1 tape.

9       MR. BLACKER:   No objection.

10      THE COURT:   It will be admitted.

11      THE CLERK:   State's Exhibit 1A for Identification will

12  now becomes State's Exhibit Number 19.

13      (Thereupon, the exhibit referred to was marked as

14  State's Exhibit Number 19 and was received in Evidence.)

15      MR. BLACKER:   Subject to the reading of the

16  transcript, but I think I will not have a problem with it.

17  BY MS. CORONA:

18  Q Showing you what has been marked as State's Exhibit 1D for

19  Identification, have you had an opportunity to look at that

20  today?

21  A   Yes, I did.

22  Q   And is that --

23      The first portion of it, is that a fair and accurate

24  representation of your cameras and the way that this focused

25  on your security desk at the Fortune House on June 8, 2003?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

392

1   A   Yes, it is.

2   Q   And another portion of this, is that you on the tape

3   when you are asked to identify the witness or the defendant

4   from the photographic lineup?

5   A   If it's --

6       I'm sorry, can you repeat that?

7   Q   So the part of this DCVD, that shows you identifying the

8   person to the police out of the photographic lineup?

9   A   Yes.

10      MS. CORONA:  The State will move State's Exhibit 1D

11  for Identification into evidence.

12      THE COURT:  All right.  Any objection?

13      MR. BLACKER:  May I have a moment with counsel for one

14  second?

15      THE COURT:  Yes.

16      MR. BLACKER:  Previous objections, but no new

17  objections.

18      THE COURT:  It will be admitted.

19      THE CLERK:  State's Exhibit 1D for Identification will

20  now become State's Exhibit 20.

21      (Thereupon, the exhibit referred to was marked as

22  State's Exhibit Number 20 and was received in Evidence.)

23      MS. CORONA:  Judge, asking permission to publish on the

24  parts relevant to this witness right now.

25      THE COURT:  Go ahead.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

393

1       You can introduce the whole thing.  Why don't you

2    play the whole thing.

3       MR. GROSS:  We have the ability to like play scenes.

4       THE COURT:  All right.

5       No, no, move it this way so we can all see it.  In

6    fact, you can put it there, between the two railings,

7    so everybody, including the defendant, can see it.

8       You can reposition yourselves.  All right.

9       (Thereupon, the tape recording referred to was published

10   in open court, after which, the following proceedings were

11   had:)

12      MR. BLACKER:  Does this exhibit have a number, madam

13   clerk?

14      THE COURT:  20.

15      MR. BLACKER:  Thank you.

16      THE COURT:  And for the purposes of the record,

17   State's Exhibit 20 itself will serve as the record for

18   purposes of appeal.

19      Is that correct?

20      MS. CORONA:  That's OK.

21      MR. BLACKER:  You mean the DVD?

22      THE COURT:  The actual exhibit, so the court reporter

23   does not have to take it on the spot.

24      MR. BLACKER:  Correct.  We agree with that.

25

394

1    BY MS. CORONA:

2       Q   Showing you what has been marked as State's Exhibit 2D

3    for Identification, is that your signature on this paper?

4       A   Yes, ma'am, it is.

5       Q   Is that, in fact, the same paper and signature that is

6    shown on the video?

7       A   Yes.

8       Q   Is that a fair and accurate representation of what was

9    shown to you on that day?

10      A   Yes.

11          MS. CORONA:   The State moves State's Exhibit 2D for

12      Identification into evidence.

13          THE COURT:   Any objections?

14          MR. BLACKER:   I will take it up on cross-examination.

15          THE COURT:   It will be admitted.

16          THE CLERK:   State's Exhibit 2D for Identification will

17      now become State's Exhibit 21.

18          (Thereupon, the exhibit referred to was marked as

19    State's Exhibit Number 21 and was received in Evidence.)

20    BY MS. CORONA:

21      Q   Mr. Flores, calling your attention now to State's

22    Exhibit 5.  It has already been entered into evidence.

23          Is this is a still photograph --

24          THE COURT:   Let me see the lineup.

25

MATZ, TRAKTMAN, FELDMAN AND WILDNER

395

1   BY MS. CORONA:

2      Q   Is this a still photograph of something that was

3   depicted also in the video and can you describe for the jury

4   where you are in this photograph?

5      A   Yes.   That is me right here.

6      Q   OK.   And Catherine is the person standing next to you?

7      A   Yes, right here.

8      Q   At this point, is the defendant pointing a gun at you in

9   the photograph?

10     A   No, he isn't.

11     Q   Was this how far you were away from him when he was

12  pointing the gun?

13     A   Actually, she was over -- right over here, and I was

14  like standing right behind this little counter, and he was

15  standing right where she is.

16     Q   OK.   And the gun was how far away from you at that

17  point?

18     A   From here to here.

19     Q   Were you afraid of him or of being shot potentially at

20  that point?

21     A   Yes.

22         THE COURT:   What exhibit is that?

23         MS. CORONA:   State's Exhibit 5.

24         THE COURT:   Ms. Corona, would you ask the witness --

25  because I see what may be different signatures.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

396

1          Could you please clear up which is his signature

2     on State's Exhibit 21, the photo lineup?

3   BY MS. CORONA:

4     Q   Can you show me which actually is your sign on this

5     paper?

6     A   The one on the top.

7          THE COURT:  Show it to the jury.

8          The one on the top there, is that yours?

9          THE WITNESS:  Yes, sir.

10  BY MS. CORONA:

11    Q   The person that you identified, is this the same person

12    that you saw that pointed a gun at you and Ms. Ruiz on June 8,

13    2003?

14         MR. BLACKER:  Objection.  I did not hear any

15    evidence as to that.

16         THE COURT:  Sustained.

17         MR. BLACKER:  That is a question that assumes facts

18    not in evidence.

19  BY MS. CORONA:

20    Q   The person that you identified, was that the same person

21    that was at the Fortune House on June 8, 2003, depicted in the

22    video surveillance that you saw with a gun in his hand?

23    A   Yes.

24         THE COURT:  And pointing the gun at whom?

25         MS. CORONA:  And pointing the gun at him and Ms. Ruiz.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1          THE COURT:  Well, ask the witness who was --

2          The allegation is that he was pointing the gun.

3          Who was he pointing the gun at?

4     BY MS. CORONA:

5     Q    Who was he pointing the gun at?

6     A    It was like he was struggling with her, and just

7     swinging the gun.  And it wasn't pointing at me, but like

8     struggling with Cathy, trying to get her from behind the

9     counter and going with the gun, like this, swinging it around.

10    Q    And the person that you identified, is that the same

11    person that we are talking about?

12    A    Yes, ma'am.

13         MS. CORONA:  I have no further questions.

14         THE COURT:  Cross-examination.

15         MR. BLACKER:  Thank you.

16                         CROSS-EXAMINATION

17    BY MR. BLACKER:

18    Q    Good afternoon, Mr. Flores.

19    A    Good afternoon, sir.

20    Q    You observed Catherine Ruiz, the person you know by

21    Cathy Ruiz exit the elevator of the building which you were

22    working at the Fortune House?

23    A    Yes, sir.

24    Q    On the night in question?

25    A    What was that?

398

1    Q   On the night in question?

2    A   Yes.

3    Q   She was not bleeding?

4    A   I didn't notice major bleeding; just that scratch on her

5    chest.

6    Q   Was her clothing like relatively intact?

7    A   I can't remember very well.  I think so, yes.

8    Q   OK.  All right.

9        She walked out of the elevator, and inquired of you as

10   to whether or not she and who you now know as Mr. Diaz could

11   use like the courtesy phone in the lobby?

12   A   That's right.

13   Q   And that's a courtesy phone; is that correct?

14   A   Correct.

15   Q   And Mr. Diaz began making some calls?

16       Not a call, but some calls; is that correct?

17   A   Correct.

18   Q   And it wasn't until a later time when you got close with

19   her that you see this little -- like a fingernail scratch on

20   her chest?

21   A   Correct.

22   Q   It wasn't bleeding, was it?

23       It was just red?

24   A   It was --

25       It just had like blood on the scratch, itself, but

MATZ, TRAKTMAN, FELDMAN AND WILDNER

399

1   not --

2   Q  OK.  And she didn't have any blood coming out of her

3   nose?

4   A  I can't remember.

5       I didn't notice.  I don't remember.

6   Q  When you say you can't remember, you have looked at

7   photographs now.  You just saw State's Exhibit --

8       You have seen --

9       Let me show you.  Well, how about blood out of her

10  mouth?

11  A  No.

12  Q  She wasn't bleeding heavily at all, was she?

13  A  No.

14  Q  As a matter of fact, the only blood that you can tell

15  this jury that you ever saw on Ms. Ruiz was from a little

16  scratch across her chest, a fingernail scratch as you

17  described it, correct?

18  A  A scratch here, and missing nail.

19  Q  And fingernail missing?

20  A  Right.

21  Q  OK.  As a matter of fact, as far as you are concerned,

22  she looked fine, didn't she, health wise?

23  A  Yes.

24  Q  OK.  She was acting normally; not hysterical in any

25  way?

*400*

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA
CRIMINAL DIVISION
CASE NO. F03-16995

*L07-1-20451*

*AGOO*

THE STATE OF FLORIDA,        )
                             )
        Plaintiff,           )
                             )
vs.                          )
                             )
PABLO MANUEL DIAZ,           )
                             )          VOLUME 3
        Defendant.           )
_____)

Richard E. Gerstein Justice Building
1351 Northwest 12th Street
Miami, Florida
May 8, 2007
10:30 a.m.

**RECEIVED**

**APR 1 6 2008**

**ATTORNEY GENERAL**
**MIAMI OFFICE**

The above-entitled cause came on for hearing before the
Honorable Julio Jimenez, Circuit Judge, pursuant to Notice.


APPEARANCES:

        KATHERINE FERNANDEZ-RUNDLE, State Attorney, by
        CAROLINA CORONA, Assistant State Attorney, and
        ROBERT GROSS, Assistant State Attorney,
        on behalf of the State

        MICHAEL BLACKER, Esq.,
        on behalf of the Defendant

401

1    A      No.  I just --

2           I thought the both of them were just probably drinking

3    or something.  That's what I thought.

4    Q      She wasn't hysterical, or screaming when she got out of

5    the elevator?

6    A      No.

7    Q      She actually accompanied Mr. Diaz to the phone, the

8    courtesy phone, and was standing there with him for the period

9    of time, right?

10   A      Right.

11   Q      And you remember having your deposition taken in this

12   case by other counsel on September 20, 2004, correct?

13   A      Correct.

14   Q      And you remember you were under oath at that time, were

15   you not?

16   A      Yes, I was.

17   Q      On September 20th, Mr. Flores, of 2004, which is

18   approximately a year and two months after these events that we

19   are talking about today, was your memory better on

20   September 20, 2004 than it is today of the events that

21   occurred on June 8, 2003?

22   A      It is probably --

23          It's probably worse now, because it's been a few years

24   later.

25   Q      Time has eroded --

MATZ, TRAKTMAN, FELDMAN AND WILDNER

402

1    An elapse of time has eroded some of your critical

2    memory, hasn't it?

3    A   Yes.

4    Q   And now, when you were interviewed by the police is

5    probably the time in which your memory was the best, isn't

6    it?

7    A   Correct.

8    Q   And then as time went on, certainly on September 20,

9    2004, your recollection of the facts that you are testifying

10   to here today would appear to be better than today; isn't that

11   correct?

12   A   Yes.

13   Q   And that was probably --

14       Do you remember telling the person that you -- that

15   took your -- in the proceedings, in the sworn proceedings on

16   September 20, 2004 that Ms. Ruiz was normal, she wasn't

17   hysterical, she didn't come out of the elevator screaming or

18   anything like that, and you said no?

19       Do you remember that?

20   A   Yes.

21   Q   OK.  And you were also asked if you could see the man,

22   and you were asked if the man was also fine and you said yes.

23       Do you remember that?

24   A   Yes, I do.

25   Q   OK.  And then you told us today on direct, and again,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

403

1   memories erode and they fade with time, and we know that.

2        You were asked --

3        MR. BLACKER:  Page 10, counselor.

4   BY MR. BLACKER:

5   Q   On September 20, 2004, you were under oath, the same

6   oath you are today, were you not?

7   A   Yes, I was.

8   Q   You were asked from the time she came down on the

9   elevator to the time that she jumped over the counter, how

10  much time passed.

11       And you said:  I would say more than 20 minutes.

12  A   More than 20.  That was probably -- that was more

13  accurate back then.

14  Q   OK.  So the truth is that more than 20 minutes passed in

15  your mind on September 20th as opposed to your five minute

16  testimony today; is that right?

17  A   That's right.

18  Q   OK.  Now, while she --

19       She made some calls also, didn't she?

20  A   I can't remember.

21  Q   OK.  While he was on the phone, did he ever turn his

22  back away from her, where she could have left through one of

23  the four doors that were in the lobby?

24       Was there ever a time that you could picture -- you

25  know, it's a vivid event in your mind now.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

404

1        Could you ever picture him talking on the phone, talking

2    to somebody where she was free to roam and leave if she so

3    chose?

4    A    I'm not really sure because --

5        Where I was standing, that reception, you couldn't see

6    much in the area where they were calling from.

7    Q    OK.  But at the point that Mr. Diaz was on the phone,

8    there wasn't any stress in this situation, was there?

9    A    No, there wasn't.

10   Q    OK.  And while he was on the phone, she was -- and she

11   was having a conversation with you, she was free to leave, was

12   she not?

13       She wasn't under any restraint that you saw, was she?

14   A    No.

15   Q    She could have actually gotten on the elevator, gotten

16   back in the elevator and left, couldn't she?

17   A    Yes, I assume so.

18   Q    Did you ever --

19       I don't know if you are the one, but my memory escapes

20   me now, but witnesses in the case have said that she was

21   constantly needing extra keys, because she always forgot her

22   keys.

23       Did you have access to provide her with keys to her

24   apartment?

25   A    No, I don't.  That was security.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

405

1    Q    But did they have access to do that?

2    A    The security guard, yes, they keep a copy of --

3    Q    And there were two security guards down there, weren't

4    there?

5    A    Yes.   They were on the -- like one level up.

6    Q    OK.   Now, when she jumped over the counter, wasn't your

7    impression of the defendant's body language like, "Why did you

8    do that?   Why would you do something like that?"

9    A    I'm not really sure.

10   Q    OK.   You said right before she jumped over the counter

11   was about 20 minutes from the time they exited the elevator,

12   correct?

13   A    Right.

14   Q    So this is not something that occurred --

15        MR. BLACKER:   Judge, may I inquire about the time

16   that we are trying to accommodate?

17        THE COURT:   Are you almost finished?

18        MR. BLACKER:   Ten.

19        THE COURT:   Ten minutes.   All right.

20        MR. BLACKER:   12 minutes.

21        THE COURT:   OK.

22   BY MR. BLACKER:

23   Q    Up to the time she jumped over the counter, things were

24   calm, and then you heard --

25        You have testified today that Mr. Diaz says, "I want

406

1   my money, get my money"; correct?

2    A   Right.

3    Q   Didn't he also say -- maybe this will refresh your

4   recollection -- I want you to -- "I want to go back up and

5   get the money off the bed," and he called her a crack whore,

6   didn't he?

7        Do you remember him saying she was a crack whore?

8    A   I don't remember that.

9    Q   OK.  And now, let's talk about this:  When he asked for

10   the money, she said, "I don't have his money," right?

11       And she says --

12       He says, "It's up on your bed."

13       Remember that?

14    A   No.

15    Q   OK.  And he produces a weapon, according to you, right?

16    A   Right.

17    Q   You didn't see the weapon in the video, did you?

18    A   No, I didn't.

19    Q   OK.  You didn't see the weapon in any of these

20   photographs of the -- as they were going up the stairs that

21   was on that video, did you?

22    A   No.

23    Q   And she's on the counter.

24       Which hand did he have the weapon in?

25    A   Must have been his right hand.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

407

1    Q   I need to go back with you for one minute and ask you

2    something.

3        She was -- whispered the words to you, "Dennis, call

4    the police"?

5        She said this quietly, right?

6    A   Yes.

7    Q   But Roberts, he·said, "Did somebody call the police

8    here?"

9        He said it out loud, didn't he?

10       Do you remember him saying that?

11       Well, let me be --

12       Well, maybe you will remember this:

13       When this occurred, Pablo Diaz had not pulled any weapon

14   out yet?

15       Pablo Diaz attempted to leave through the front door of

16   the lobby, walked over here, trying to escape, or get out,

17   but -- not escape at that point, but get out, and it was

18   locked.

19       Isn't that correct?

20   A   Yes, it is.

21   Q   He is trying to make an effort to leave the premises,

22   but he couldn't, because they were locked?

23   A.  The doors were locked.

24   Q   And that is before he ever produced a weapon.

25       Isn't that correct?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

408

1    A   Yes, that is correct.

2    Q   All right.  So now, we're back at the point where he is

3  reaching and you said he had which hand now, if you remember?

4    A   I'm not sure.

5    Q   OK.  Good.

6         Tell us that.  That's good.

7         Don't tell us an answer unless you are sure, OK?

8         So with one hand, he is trying to pull her over the

9  counter.

10       With the other hand, he has the gun.

11       Was he pointing it at anybody in a particular direction?

12   A   No.

13   Q   Did he look at you and say, "I'm going to kill you"?

14   A   No.

15   Q   As a matter of fact, Mr. Flores, he never threatened

16  you, did he?

17   A   No.

18   Q   And in fact, you did not feel threatened, did you?

19   A   Not threatened.  I was just afraid.

20       But he never threatened me.

21   Q   OK.  But you didn't feel threatened by the gun at all,

22  did you?

23   A   By a missing bullet, that is why I was afraid.

24   Q   OK.  Let's go back to your testimony of September 20th.

25       Have you had a chance to talk to counsel before

409

1    testifying here today?

2    A    Yes.

3    Q    How many times have you spoken with counsel for the

4    State?

5    A    In the morning and on the break.

6    Q    Did you go over your testimony with her?

7    A    I got a copy.

8    Q    You got a copy of your depo?

9    A    Right.

10   Q    So you know where we are going with this, don't you?

11   A    Yes.

12   Q    You've read it?

13   A    Yes.

14   Q    OK.  You start describing the -- about him pulling out

15   a gun.

16        He's trying to get her from the counter.

17        This is your answer:

18        "She falls on the floor.  He starts dragging her

19   towards the elevator.  Then they go -- as you know, he

20   starts pulling her down this hallway, as if they are

21   going to the parking spaces, parking lot underground.

22   As soon as he approaches the service elevator, that is

23   when I went inside.  I didn't know what is going to happen

24   to her."

25        That is your testimony.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1       "Question:  He didn't threaten you?"

2       You answered:

3       "No.

4       "You didn't feel threatened by the gun at all?"

5       Your answer:

6       "No.  Only when he was fighting, when he was moving

7   her -- moving around.  I was like I don't know if he" --

8       And then the attorney cut you off, and he says:

9       "His aggression was towards her from what you are

10  describing.  His aggression was not towards you.

11      "Never.  Never."

12      "Never" is your answer.

13      He finally pulled her down all the way.

14      And you start talking about going to call 9-1-1.

15  Nothing about any threatening, right?

16      No threats?

17  A   Right.

18  Q   Is that, your September 20th testimony more clear and

19  true than what you are thinking today?

20  A   Yes.

21  Q   Now, you said she looked drunk.  You told us that she

22  looked a little drunk?

23  A   Yes.

24  Q   From your experience with her, every time you saw her,

25  didn't she look a little drunk?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

411

1   A   I can't remember.

2       MS. CORONA:  Objection, Judge, as to every time.

3       THE COURT:  Sustained.

4  BY MR. BLACKER:

5   Q   When you say, "a little drunk," was she slurring her

6  words a little bit?

7   A   Yes, a little bit.

8   Q   Was she tipsy, falling?

9   A   No.

10   Q   Not falling, but unstable on her feet?

11   A   No.

12   Q   OK.  You didn't see Mr. Diaz threaten Mr. Thomas in

13  any way, did you?

14   A   No, not that I remember.

15   Q   And you didn't see Mr. Diaz threaten Mr. Bigotti, the

16  other person there, the valet that worked at the hotel, did

17  you?

18   A   No.

19   Q   As a matter of fact, the truth is that the only person

20  that you felt was in danger was Catherine Ruiz; isn't that

21  correct?

22   A   Correct.

23   Q   That may have been threatened?

24   A   Correct.

25   Q   OK.  And again, on Page 19, just to make it clear

412

1    here -- I have a lousy copy here.

2        Let's see what we can do.

3        THE COURT:  Is that for impeachment?

4        He hasn't denied anything.

5        MR. BLACKER:  Right.  You are right, Judge.

6        Sorry.

7    BY MR. BLACKER:

8    Q   He never threatened you personally, did he?

9    A   No.

10   Q   OK.  Now, you read your deposition; is that correct,

11   sir?

12   A   Yes, I did.

13   Q   And your deposition, you read it in preparation for

14   today, right?

15   A   Right.

16   Q   And on September 20th, you told us under oath that he

17   was talking about the money, and that she was a crack head,

18   and a prostitute.

19       Do you remember that?

20   A   I don't remember that.

21   Q   You don't?  OK.

22       Here it is.  All right.

23       One last question.  I want to make this very clear.

24       Before the weapon was produced by Mr. Diaz as he was

25   demanding his money, something occurred.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

413

1        I'm trying to refresh your recollection that one of the

2    guards -- might not have been Thomas -- verbally stated to

3    some other personnel working at this place, "Did you call the

4    police?"

5        It wasn't whispered, like you've told us today, like

6    Catherine Ruiz said to you, "Call the police," but she said it

7    under her breath, right?

8        She came up to you. She said, "Dennis, call the

9    police"?

10       She didn't want him to hear it?

11   A   That was at the very beginning.

12   Q   But when she first --

13       You said the very beginning, after 20 minutes, she

14   didn't ask you to call the police when she got out of the

15   elevator?

16   A   No, no.

17   Q   She asked for the phone?

18   A   Right.

19   Q   And 20 minutes later, she mouthed, "Call the police,"

20   and she leaped over the counter.

21       Isn't that correct?

22   ·A   Right.

23   Q   Now, I'm talking about as she is over the counter,

24   somebody, personnel at the Fortune House --  And I know it

414

1    wasn't you, but somebody came in and verbally expressed --

2    expressly stated, "Have you called the police?"

3         Not to you, but generally to the personnel.

4         And upon hearing that, hearing that, Mr. Diaz ran to the

5    front door and tried to make a getaway, get out. Let's put it

6    that way.

7         Didn't he, only to find it locked?

8         Now, you may not remember them saying that out loud, but

9    he did go to the front door and try to get out, didn't he?

10    A   Yes, he did.

11    Q   And you don't know --

12         Are you telling us he did do that, but you don't know

13    what precipitated him doing that?

14    A   Correct.

15    Q   But you do know that he did not have the gun out at that

16    time?

17    A   At that time, he did not.

18         MR. BLACKER: nothing further. I tender the witness.

19         THE COURT: Anything further?

20         MS. CORONA: Just a couple of questions.

21                   REDIRECT EXAMINATION

22    BY MS. CORONA:

23    Q   Let me just clarify with you, Mr. Flores.

24         When Kathy and the defendant get out of the elevator,

25    he -- they go right towards the phone?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

415

 1    A    Right.

 2    Q    And after they go towards the phone, right when the

 3  defendant is using the phone, that is --

 4         That is when she asked you to call the police?

 5    A    Yes.

 6         Like when he got the phone, she approached the

 7  reception, and was standing right at the corner, behind the

 8  wall.

 9         That is when she told me like call the police.

10    Q    And maybe 20 minutes passed between the time that she

11  called the police till the time that she like actually jumped

12  over the counter, or 20 minutes passed before she even told

13  you to call the police?

14    A    I think it is maybe before she told me to call the

15  police.

16         THE COURT:  Sorry, I did not understand the answer.

17         Can you explain your answer?

18         THE WITNESS:  Yes, Your Honor.

19         I said that after they got on the phone, I think that

20    is then 20 minutes passed before she asked me to call the

21    cops.

22  BY MS. CORONA:

23    Q    Were you sitting in the reception desk that whole time?

24    A    Most of it, yes.

416

1    Q    And when the gun was finally taken out, were you -- you

2    said you felt afraid, even though maybe you were not

3    personally threatened, but you were afraid that maybe the gun

4    would fire and you would get shot?

5    A    Correct.

6    Q    And you said that there were actually bullets that you

7    saw?

8    A    No.

9         MS. CORONA:  Your Honor, I ask to publish the 9-1-1 tape

10        that has already been entered into evidence, just as it

11        relates to this witness.

12        THE COURT:  All right.

13        (Thereupon, the 9-1-1 tape was published in open court.)

14        MR. BLACKER:  Your Honor, I object.  This tape is not

15        the subject of cross, but in lieu of her calling him back,

16        I will withdraw the objection.  But technically, I did not

17        ask him anything about this on cross.

18        MS. CORONA:  I have no further questions.

19        THE COURT:  OK.  Defense?

20        MR. BLACKER:  Yes, I'm finished with the witness.

21        MS. CORONA:  Yes, Judge.

22        THE COURT:  Thank you, Mr. Flores.  Jimmy, would you

23        move that, please?  Make sure you give the DVD back to the

24        clerk.

25        All right.  Ladies and gentlemen, at this time, we are

MATZ, TRAKTMAN, FELDMAN AND WILDNER

417

1   going to recess for the evening, and I am going to ask all

2   of you to be up on the 7th floor tomorrow at 9:30, OK?  All

3   of you are ordered back, and it is important that everyone

4   returns tomorrow at 9:30 on the 7th floor.  Ladies, watch your

5   step when you come off the jury box.  Sometimes, I have

6   known women to get caught up in the carpet there.  At 9:30,

7   we will start shortly thereafter.  Good night.

8        (Thereupon, the jury panel exited the courtroom, and the

9   following proceedings were had outside the presence of the

10  jury panel:)

11       THE COURT:  Here is an exhibit.  I don't know -- you

12  know, I'm of the old school.  I believe put on the tape,

13  put on the little bit and stop it, and ask the witness,

14  "What did you say there."  Play a little bit more, stop it

15  again.  Right, Michael?  Isn't that the way we grew up

16  doing it?  You play a little bit of the tape, and stop it,

17  and ask the witness what was said, then play a little bit

18  more.  But when you play these tapes, you know, you can't

19  hear anyway.  For purposes of the record, the tape itself

20  will serve as the record; is that correct?

21       MR. BLACKER:  It is.

22       THE COURT:  All right.  See you guys tomorrow at 9:30.

23       (Thereupon, the proceedings were adjourned.)

24

25

418

CERTIFICATE

STATE OF FLORIDA            )
COUNTY OF MIAMI-DADE        )

I, PAMELA Y. KILPATRICK, Notary Public for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings and that this transcript is a true and complete record of my stenographic notes.

DATED this 30th day of January, 2008.

PAMELA Y. KILPATRICK,
Shorthand Reporter and Notary Public,
State of Florida at Large

My commission expires:
August 19, 2009

MATZ, TRAKTMAN, FELDMAN AND WILDNER

419

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA
CRIMINAL DIVISION
CASE NO. F03-16995

*L07-1-20451*

THE STATE OF FLORIDA,          )

          Plaintiff,           )

vs.                            )

PABLO DIAZ,                    )

          Defendant.           )
_____)

*COPY*

*DOCKETED APR 16 2008 ATTORNEY GENERAL*

Richard E. Gerstein Justice Building
1351 Northwest 12th Street
Miami, Florida
May 9, 2007
9:30 a.m.

**RECEIVED**

APR 16 2008

**ATTORNEY GENERAL
   MIAMI OFFICE**

Trial in the above-entitled cause was resumed before the
Honorable Julio Jimenez, Circuit Judge, pursuant to Notice.

APPEARANCES:

          KATHERINE FERNANDEZ-RUNDLE, State Attorney, by
          CAROLINA CORONA, Assistant State Attorney and
          ROBERT GROSS, Assistant State Attorney,
          on behalf of the State

          MICHAEL BLACKER, Esq.,
          on behalf of the Defendant

MATZ, TRAKTMAN, FELDMAN AND WILDNER

420

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| Jose G. Bigotti | 432 | 449 | 466 | 471 |
| Thomas Roberts | 472 | 495 | | |
| Rodimiro A. Baldizin | 513 | 531 | 535 | 536 |
| Johanna Rodriguez | 541 | 559 | 578 | |
| Lesbia Morales | 582 | 597 | 618 | |
| Ilusion Abud | 619 | | | |
| Ofc. Tarkeka Broadnax | 625 | 646 | | |
| Ofc. Francisco Theye | 656 | 664 | | |
| Ofc. Hector Infante | 670 | 700 | 719 | |

421

1       (Thereupon, the following proceedings were had outside

2   the hearing of the jury panel:)

3       THE COURT:  You have motions?

4       MR. BLACKER:  I did.  Judge, LeDuke (phonetic) and

5   Alvarez-Vega are not available.  Alvarez-Vega, I was told

6   this morning something about a funeral in Orlando.

7       MS. CORONA:  It's a relative that needs a bone marrow

8   transplant.

9       MR. BLACKER:  Sorry.  We have his report.  It's a couple

10  of pages long narrative.

11      We are going to stipulate to his report coming into

12  evidence.

13      THE COURT:  Is that correct, State?

14      MS. CORONA:  That is what we had previously talked about

15  with LeDuke.  And it isn't this report.

16      Officer Alvarez-Vega, I don't have an objection to

17  stipulating to that report, the report that we had previously

18  agreed would come into evidence.

19      THE COURT:  Is that the LeDuke report?

20      MS. CORONA:  It's what we thought was the LeDuke report,

21  but it is the Alvarez-Vega report.

22      THE COURT:  Let's put the defendant under oath.

23      (Thereupon, the defendant was duly sworn.)

24      THE COURT:  Your name and age?

25      THE DEFENDANT:  Pablo Diaz.  39.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

422

1    THE COURT:  You heard the stipulation between your lawyer

2    and the State that they are going to produce this report by

3    Alvarez-Vega, or Officer LeDuke, or whatever it is, and they

4    are -- they are agreeing to that.

5    THE DEFENDANT:  Yes.

6    THE COURT:  Are you in agreement with that, as well?

7    THE DEFENDANT:  Yes.

8    THE COURT:  What else?

9    MR. BLACKER:  The other report, the LeDuke report, it's

10   what we were going to put in about him, and he's not

11   available.

12   If the Court wants to inquire about what efforts the

13   State has made to find him, that is fine.  If not, we would

14   like to put his report in, as well.

15   MS. CORONA:  I don't know if his report has any relevant

16   testimony.

17   The reason that we are admitting in Officer Alvarez

18   Vega's is because the defense used it to impeach the witness,

19   and it says that if Alvarez-Vega came to testify, he would

20   testify consistent with his report.

21   I don't know if LeDuke says anything inconsistent with

22   the defendant's testimony.

23   MR. BLACKER:  The LeDuke report says if you want to

24   prosecute.  She said no.

25   THE COURT:  That is irrelevant.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

423

1        MR. BLACKER:  We're seeking it anyway.  If it is

2   declined --

3        But Alvarez-Vega's report, we have agreed upon.

4        Next, Your Honor, I don't have the wherewithal for the

5   original video of the Fortune House.

6        THE COURT:  Plus even the victim, herself, said on the

7   stand that she didn't want to prosecute.

8        MR. BLACKER:  You are right, she did.  The original video

9   of the Fortune House, the one I have, Judge, I put it in a

10  couple of machines in my home.  It's so jumpy that the jury

11  wouldn't be able to watch it for ten seconds.

12       The State has a good copy.  It is not a good video to

13  begin with, and I am asking that as far as the evidence in

14  the case, they could always get it back after the case, and

15  we will put a copy in, that the original goes back to the

16  jury room of the Fortune House video; not the little few

17  snippits that they introduced yesterday.

18       This is the entire video of the entire 30 minutes of what

19  occurred.  It has times on there.

20       It's relevant.  It's got action on there that's real; not

21  blown up actions in still form.

22       You will see what I am saying.

23       MS. CORONA:  I don't have an objection to that, but the

24  reason that the State wasn't intending on introducing that

25  video is because it is jumpy.  Like, there's 24 frames a

MATZ, TRAKTMAN, FELDMAN AND WILDNER

424

1    second.  It jumps from camera to camera each second.

2    THE COURT:  Go through one of your witnesses introducing

3    it anyhow, and, you know, bring out through the witness that

4    it's jumpy, that you can't see it that good.  That's why

5    normally, they slow it down the way you have.  But introduce

6    it so they have the original, anyhow.

7    MS. CORONA:  OK.

8    MR. BLACKER:  Because that was the point I'm going to

9    make; that the equipment that would slow that down, I have --

10    don't have any in my home or office.  The State has access to

11    that.  Just for purposes of jury deliberations, I am asking

12    that this equipment be made available to allow them to slow

13    it down, so they could utilize this piece of evidence.

14    That's only fair.

15    THE COURT:  Ms. Corona, he is saying he wants the

16    equipment.

17    MS. CORONA:  Judge, we don't have the equipment here, but

18    in the office.  But we can't --

19    MR. BLACKER:  Judge, it's across the street.  This man is

20    on trial for his life.

21    THE COURT:  Maybe they could take the original and slow

22    it all down.

23    MS. CORONA:  We tried to do that, Judge.  We can't do it.

24    MR. GROSS:  The actual equipment across the street is not

25    the right equipment.  It is only able to slow it down to the

1   certain number of frames or the seconds, which is actually

2   not the original security equipment that you need.

3       THE COURT:  That is why it's not that clear.

4       MS. CORONA:  It's not that it's not clear.  It jumps from

5   one frame a second to another very quickly.

6       THE COURT:  All right.  So if your motion is to have them

7   introduce the original, they could introduce it.

8       And will you do that, State, and just bring out with the

9   detective how jumpy they are and that's how they are?

10      MR. BLACKER:  Judge, I will try to get together with

11  Mr. Gross today -- he seems to know what he is talking about

12  -- to see if I could buy some equipment in the meantime that

13  the Court will admit in the jury room that will slow it down

14  properly.  I don't have that kind of equipment.

15      And lastly, Your Honor, we could do this at lunch.  It is

16  not absolutely necessary.  I want to make a motion to dismiss

17  Count III, the aggravated assault.

18      You want to bring the jury in and we do it at the

19  appropriate time?

20      THE COURT:  Go ahead.

21      MR. BLACKER:  After the jury was sworn in, jeopardy had

22  already attached.  The Court, on its own motion or its own

23  intervention, talked to the State, discussed with the State

24  about changing their -- the Information to include an

25  additional object.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

426

1      THE COURT: Let me correct you.

2      What the Court did was bring up to the State that

3  Count III -- because when I read it to the jury, I was

4  surprised at Count III, the aggravated assault with a firearm

5  count, where we renumbered as Count III -- that used to be

6  Count VI on the Information -- said that Manuel Diaz, on or

7  about June 8, 2003, in the County and State aforesaid, did

8  unlawfully, feloniously and intentionally threaten, by word

9  or act, to do violence to the person of another, to wit,

10  Dennis Flores, coupled with an apparent ability to do so, and

11  did some act, to wit, point a firearm at Catherine Ruiz,

12  which created a well founded fear in such other persons that

13  such violence was imminent.

14      And I still see more things that the State should amend.

15  State, are you paying attention?

16      The problem that I saw is that you had that he -- he

17  threatened Dennis Flores, coupled with an apparent ability to

18  do so, and did some act, to wit, point a firearm at Catherine

19  Ruiz.

20      So I had a problem -- the problem that you are talking

21  about with the different people.

22      So the State, I asked you, are you going to amend, or

23  what are you going to do? Because who is the victim?

24      They said the victim was Dennis Flores. And what they

25  wanted to do was amend it by saying: Pointing a firearm at

427

1  Catherine Ruiz and/or Dennis Flores, which created a well

2  founded fear in such other person that such violence was

3  imminent.

4       So the other person, is it still Dennis Flores?

5       MS. CORONA:  Right.

6       THE COURT:  And should you even amend the Information to

7  say that?  Because this jury needs to know, and I need to

8  know, and I need to have the jury know what the charge is,

9  and what it is that they need to find.

10      So my question to you, Ms. Corona, is:  Do you want to

11 amend it further to add that it created a well founded fear

12 in Dennis Flores that such violence was imminent?

13      MS. CORONA:  To respond to counsel's argument, I don't

14 think that substantially changes in any way.  The victim

15 remains the same, and the actions remain the same.  The facts

16 remain the same.  The preparations for the State are exactly

17 the same.

18      THE COURT:  And I allowed you to amend it to show it was

19 Catherine Ruiz and/or Dennis Flores.  The testimony has been

20 that he was waving the gun at the hotel desk with Catherine

21 Ruiz and Dennis Flores there.  And Dennis Flores has

22 testified that he was afraid that a bullet would go off.

23      MS. CORONA:  Right.

24      THE COURT:  Now, this other part, "which created a well

25 founded fear in such other person," who is "such other

428

1    person"?

2        MS. CORONA:  Judge, it refers to Dennis Flores.

3        THE COURT:  Amend it so that at least the defense is

4    clear as to who the victim is, and the jury is clear as to

5    who's supposed to feel the fear; if it's Catherine Ruiz or

6    Dennis Flores.

7        MR. BLACKER:  Judge, we seek a copy of any amendment that

8    is made, both made previously from today and a copy of that

9    amended charge, and to --

10       Well, let me finish my argument, if I can, for the

11   record.

12       After the Judge observed --

13       After you made your observation as to that count, the

14   aggravated assault count, you allowed the State to amend

15   subsequent to the swearing of the jury.

16       And in the middle of the first witness, the victim's

17   testimony, the State amended after jeopardy had attached.

18   The State amended and added another object of the -- that was

19   threatened by the actions of the defendant.

20       For three and a half years, the only object that was

21   threatened in that count was Catherine Ruiz.  She was the

22   person who was the victim of that crime, but she was the one

23   that was alleged to have been threatened.

24       And now the Court has allowed --

25       THE COURT:  On the contrary, in the Information, the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

429

1    threat was always:  Threatened by word or act to do violence

2    to the person of another, to wit, Dennis Flores.

3        MR. BLACKER:  But threatening Catherine Ruiz.

4        THE COURT:  By threatening Catherine Ruiz, which created

5    a well found fear in such other person that such violence was

6    imminent.

7        Look at how much the defense understood the charge that,

8    in fact, in deposition by the handsome lawyer that you say

9    took the depo, he kept asking Dennis Flores whether he was in

10   fear, whether he was threatened.  So the defense knew what

11   the State meant in the Information.

12       So I have allowed the --

13       At the Court's discretion to allow the amendment to the

14   Information, I have allowed the amendment, and your objection

15   is noted for the record.

16       MR. BLACKER:  Without speaking -- not speaking motions,

17   one, we object to the Court interceding in the matter and

18   directing the State in this matter.

19       THE COURT:  I did not direct the State.  I inquired of

20   the State, because this Court is the one that is trying the

21   case, and I need to make sure if there's any errors in this

22   Information that they be corrected, and I am doing it to

23   protect your client.

24       MR. BLACKER:  We can do it, Judge, it is my belief, prior

25   to jeopardy attaching, and when the -- it's not substantive,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

430

1   as it is here.

2       Number two, I move to dismiss that count.  In lieu of a

3   dismissal, I ask that the Court enter a mistrial in the case,

4   and as the Court has already read an Information to this

5   jury, they are under the belief that only the person -- if

6   they were listening carefully -- that Catherine Ruiz is the

7   only person named in that one count.

8       There are only three counts here, and now, when you

9   charge them, you are going to read an Information which

10  contains an additional substantive person, who may have been

11  threatened.

12      THE COURT:  I am not going to read the Information

13  anymore.  I will read them the elements, and that is it.  I

14  am not going to read them the Information.

15      So, the jury, when they hear these charges, they just

16  hear them.  They don't know anything until they get the

17  elements, and they get the elements in the jury room with

18  them.

19      So your objection is noted, and your motion is denied.

20      MR. BLACKER:  Thank you.

21      THE COURT:  Now, where is Jimmy with the jury?

22      MR. BLACKER:  I did not go over jury instructions.  I

23  have a feeling that we are not going to get to it.

24      THE COURT:  You will be surprised.

25      MR. BLACKER:  Maybe we will.  We are trying to move it

MATZ, TRAKTMAN, FELDMAN AND WILDNER

431

1    along.  But if we do it during lunch, I will go over it, and

2    I will really be ready for you.  But I am not ready now to

3    discuss it.  I ran through them real quickly.  And we could

4    talk in chambers about it with counsel.

5        THE COURT:  I would like to move on my schedule, not

6    everybody else's schedule.

7        Jimmy, do you have the jury?

8        THE BAILIFF:  Yes, finally.

9        THE COURT:  Bring them right out here.

10       Wait.  The defendant is in the jury room.

11       Bring in the jury.

12       (Thereupon, the jury panel entered the courtroom, after

13   which, the following proceedings were had in open court:)

14       THE COURT:  Please have a seat.

15       And let the record reflect that the defendant is present,

16   as he has been throughout the trial.

17       State, call your next witness.

18       MR. GROSS:  The State calls Jose Gutierrez Bigotti.

19       THE COURT:  Swear in the interpreter.

20       (Thereupon, the Official Court Interpreter was duly

21   sworn.)

22       THE INTERPRETER:  Alina Galvez, official court

23   interpreter.

24       THE COURT:  Do both sides stipulate to the qualifications

25   of Alina to translate in here, the trial?

432

1    MS. CORONA: Yes, Judge.

2    MR. BLACKER: Yes.

3  Thereupon:

4                    JOSE GUTIERREZ BIGOTTI

5  was called as a witness, and having been first duly sworn, was

6  examined and testified through the interpreter as follows:

7    MR. GROSS: Your Honor, if you could just remind the

8    witness, because I think his English is fairly proficient,

9    just in every question to speak Spanish, through the

10   interpreter.

11   THE COURT: Do you understand, Mr. Bigotti?

12   Answer in Spanish, even though you understand the

13   question when the question is made in English. Wait until

14   the official court interpreter has translated it for you.

15   That way, we can make sure that you understand 100 percent

16   the question.

17   THE WITNESS: OK.

18                    DIRECT EXAMINATION

19  BY MR. GROSS:

20   Q   Good morning, Mr. Bigotti.

21       Could you please state your name, and spell it for the

22  record?

23   A   Jose Gutierrez Bigotti, B-I-G-O-T-T-I.

24   Q   I know it's a long time ago, but back in June 2003,

25  were you working at a condo called the Fortune House?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

433

```
1    A    Yes.

2    Q    What was your job there?

3    A    Valet parking.

4    Q    Was that in Miami-Dade County?

5    A    Yes.

6    Q    And are you still working there today?

7    A    No.

8    Q    Where do you work?

9    A    I work for SunTrust Bank.

10   Q    And what do you do for SunTrust?

11   A    I'm a teller.

12   Q    OK.  Were you working the evening of June 8, 2003?

13   A    Yes.

14   Q    And what time was -- did your shift begin?

15   A    It would start at 11 o'clock at night.

16   Q    Do you remember an incident that took place between a

17   man and a woman?

18   A    Yes.

19   Q    And do you recall seeing the woman before that

20   evening?

21   A    Yes.  Several times.

22   Q    And do you know if she lived there?

23        THE INTERPRETER:  If she lived there?

24        MR. GROSS:  Yes.

25        THE WITNESS:  Yes, I think so, because I would see
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

434

1      her often.

2    BY MR. GROSS:

3      Q   But you don't know for sure?

4      A   No.  Of course not for sure, because I didn't know her

5    as talking to her.

6      Q   What was your relationship with her?

7      A   Nothing.

8      Q   OK.  I'm going to direct your attention to the man

9    that night.  Did you see him before that evening?

10     A   Never.

11     Q   That was the first time?

12     A   Yes, that I see him, yes.

13     Q   Did you later learn his name?

14     A   When I spoke to the police.

15     Q   Can you describe his --

16         First of all, do you recognize that person here today,

17   if he's here?

18         If you could just look around.

19     A   Pablo Diaz.

20         I don't think he's here.

21     Q   Could you just look around the courtroom?

22     A   No.  No, I don't see him.

23     Q   OK.  Were you able to I.D. him that evening out of a

24   photo lineup?

25     A   It wasn't that night.  It was some days later when I

435

1   saw the photographs.

2       Q   OK.  Can you describe his physical height?

3       A   Not exactly.  I would say that he's about this height

4   right here; a little shorter than myself.

5       Q   And how tall are you?

6       A   Six meters.  One meter -- 92.

7       Q   I'm sorry?  Six meters?

8       A   I'm sorry.  One meter, one meter, 92 centimeter.

9       Q   And would you --

10          I guess if you knew the equivalent, you would say it

11  -- right? -- in feet?

12      A   Six feet.

13      Q   OK.  Thank you.

14          So the gentleman was a little shorter than yourself?

15      A   Yes.

16      Q   And do you know if he was black or white?

17      A   White.

18      Q   And I take that back.

19          What were you doing right before the incident?

20      A   Talking to Dennis in the front.

21      Q   Who is Dennis?

22      A   The witness, the person -- the front desk.

23      Q   OK.  What did he do at the front desk?

24      A   He was the person who greeted the guests, yes.

25      Q   Now, as the valet, did you spend time outside and

MATZ, TRAKTMAN, FELDMAN AND WILDNER

436

1    inside?

2        A    Yes, exactly, yes.

3        Q    Now, during this entire incident, were you basically

4    in the lobby the whole time, or outside the whole time?

5        A    During the incident, I was inside.

6        Q    You were inside where?

7        A    In the lobby, talking to Dennis at the front desk.

8        Q    OK.   What was the first thing that you recall about

9    that incident?

10       A    That they started like to argue.

11       Q    OK.   Now, did the --

12            Do you recall if the woman spoke English or Spanish?

13       A    I don't remember.

14       Q    Do you recall if the man spoke English or Spanish?

15       A    I think he was talking in Spanish, because I think he

16   was the one doing the most talking.

17       Q    OK.   And you obviously speak Spanish, right?

18       A    Yes.

19       Q    Was there a time you did not understand anything that

20   was said?

21       A    Yes.

22       Q    You did not understand?

23       A    No, there were things I did not understand, and there

24   were things that I did understand.

25       Q    OK.   And --

                    MATZ, TRAKTMAN, FELDMAN AND WILDNER

437

1       MR. BLACKER:  Excuse me, I'm sorry.  I did not hear

2    that answer.

3       THE WITNESS:  There were things that I understand, and

4    things that I did not understand.

5       MR. BLACKER:  Thank you.

6  BY MR. GROSS:

7    Q  Now, you said that they were arguing?

8    A  Yes.

9    Q  Can you, for the jury, just go into further detail of

10  what that means?

11    A  I don't recall exactly anymore why they were arguing.

12  The only thing I do remember was for sure that he was saying

13  -- claiming of her to give her (sic) his $4,000.

14    Q  I'm sorry, I can't -- I couldn't hear you.  Could you

15  just repeat that last answer?

16    A  That I don't recall exactly everything he was saying.

17  The only thing I do remember for sure is that he was asking

18  her for $4,000.

19    Q  At any point, did you see the woman or the victim jump

20  over the security desk?

21       MR. BLACKER:  Objection to the characterization.

22       THE COURT:  Overruled.

23       THE WITNESS:  Yes, I did see her jump over, yes.

24  BY MR. GROSS:

25    Q  For how long was she behind that desk?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

438

1    A   I don't know, because when I saw the problem, I saw

2   him pull out the pistol and I ran away.

3    Q   We will get there in one moment.

4        Just if you can --

5        THE COURT:  It will be this morning, right?

6        MR. GROSS:  If the State has its way.

7   BY MR. GROSS:

8    Q   How long was she behind the desk?

9    A   I don't know.

10    Q   OK.  Now, were you scared at any point until then?

11    A   Up to that point, no.

12    Q   I'm sorry.  Before --

13        At that point, were you scared?

14    A   No.  Not up to that moment.  No.

15    Q   All right.  Now, what happened next?

16    A   I went out.  I think that's when I called 9-1-1 from

17   my cell.

18    Q   And what did you tell the police?

19    A   What was going on.

20    Q   OK.  That there was an argument, and someone jumped

21   over the desk?

22    A   Yes.

23    Q   OK.  What did you see next between the man and the

24   woman?

25    A   That he had her outside between the front desk and

439

1    the elevators.

2    Q   Slow it down.

3        How does she get back to the other side of the desk?

4    A   I don't know, because I was outside of the hotel.

5    Q   OK.  And when you saw --

6        When you saw the man, can you describe him?

7        Was he wearing a shirt?

8    A   I don't remember.

9    Q   OK.  Did you see if he had anything in his hand?

10   A   Yes.

11   Q   And what exactly did he have in his hand?

12   A   A big pistol.

13   Q   How far away were you from him?

14   A   Exactly like you are.  Sorry.  Exactly like you and I.

15   Q   OK.  Now, if you had to approximate -- I know you're

16   going to say something metric -- but how far would it be from

17   me to you?

18   A   In feet?

19   Q   Yes.

20   A   16.

21   Q   16?

22   A   16, 20.

23   Q   OK.  Were you able to see this large gun very clearly?

24   A   Yes.  In his hand.  Yes.

25   Q   Do you know about guns?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

440

1        Are you familiar?

2    A   No.

3    Q   Can you describe the gun?

4    A   It was silver-plated.

5    Q   And do you know the difference between a revolver and

6  an automatic?

7    A   Yes, I do know that.

8        Yes, it was something automatic.

9    Q   And what exactly was this man, Pablo Diaz, what was he

10  doing with this gun?

11    A   Pointing everywhere.

12    Q   When you say, "everywhere," first tell me who else,

13  other than yourself, Mr. Bigotti and Dennis Flores was present

14  in this lobby.

15    A   No one else.  Just both of them, and Dennis and I.

16    Q   OK.  So you --

17        Are you saying it was just Dennis, yourself and both

18  the victim and the defendant?

19    A   Yes.

20    Q   When you say --

21        You just said that he waved the gun around.

22        Was he waving it towards anyone other than the victim?

23    A   Yes, because he was holding --

24        With one hand, he was hitting her, and with the other

25  one -- and with the other one, he had the gun.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

441

| | | |
|---|---|---|
| 1 | Q | Were you scared at that point? |
| 2 | A | Yes.  At that time, yes, very much. |
| 3 | Q | Why were you scared? |

4    A    Because he said that if I were to call the police, he

5    was going to kill us.

6    Q    Did he say that to you?

7         Did he say that --

8    A    To both of us; like to Dennis and myself.

9    Q    He said if you called the police he'd kill you?

10   A    Yes.

11   Q    Did you believe him?

12   A    Yes.  It was best to believe him.

13   Q    I would think so.

14        Now, describe the way that Pablo Diaz was hitting

15   Catherine Ruiz, the victim.

16   A    Very hard.

17   Q    Can you please --

18        MR. GROSS:  Your Honor, may I have the witness stand

19   up?

20        THE COURT:  Yes.

21   BY MR. GROSS:

22   Q    Can you please stand up to show --

23        I'm not going to ask you to beat me up.  This will be

24   a demonstration where I will have a very poor likeness of the

25   victim, Catherine Ruiz.  I will be that female that night.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

442

1          I want you to show me exactly what that victim, as

2     best you can --

3          THE COURT:  You can move over so that nothing

4          happens to poor Pam.

5          MR. BLACKER:  I object to the characterization of

6          Ms. Ruiz.  She has a name.  This is a continuing

7          objection to the characterization.

8          THE COURT:  All right.  Overruled.

9     BY MR. GROSS:

10     Q   You are Pablo Diaz that night.  I want you to go like

11    this, imitating a gun.  OK?

12         THE COURT:  Can he turn to the side, so the jury can

13         see it?

14         MR. GROSS:  Sorry.

15    BY MR. GROSS:

16     Q   We have to do this before the jury again.

17         Now, what exactly are you doing to the female, the

18    victim, Catherine Ruiz, to the best of your ability?

19     A   What I recall or remember is that he had her on the

20    floor, and he was like leaning over her, hitting her.

21         THE COURT:  All right.  You want him on the floor, so

22         you could demonstrate?

23    BY MR. GROSS:

24     Q   Let's pretend that I'm on the floor.  Let's say this

25    is --

443

1          What exactly was Pablo Diaz doing?

2          This is the female?

3     A    Yes.

4          THE COURT:   Why don't you get on the floor, Mr. Gross.

5          MR. GROSS:   They don't pay us enough here for the

6     suits, Your Honor.

7          THE WITNESS:   The only image I remember for sure of

8     that exact moment was he was like this, squatting, like

9     this.   I don't want to knock this down.

10         And he was hitting her.   And he said that:   If you

11    call the police, I will kill you.

12    BY MR. GROSS:

13    Q    With your left hand -- not with your left hand, but

14    this is Pablo Diaz' left hand.

15         Did you see Pablo Diaz strike her?

16    A    Yes.

17    Q    How many times?

18    A    Many, many.   I didn't count them.

19    Q    And how long did that go on?

20    A    Might have been ten, 15 minutes.

21    Q    Take a seat.   Thank you very much.

22         Ten or 15 minutes?

23    A    Yes, yes.

24    Q    Did he ever let go of that gun?

25    A    I don't think so.

444

1    Q   Did he ever put it away?

2    A   No.   I don't remember having seen him put it away.

3    Q   Are you sure it's a gun?

4    A   Yes, yes, yes.  At least that's what it looked like,

5    yes.

6    Q   He --

7        As you said before, he started taking her somewhere

8    after that?

9    A   Yes.

10   Q   Describe exactly what you saw.

11   A   There were --

12       After the elevators, there's -- there's some stairs.

13   So I heard him taking her upstairs.

14   Q   You heard her taken up the stairs?

15   A   I heard him.

16   Q   Now, what --

17       How do you hear someone taking someone up the stairs?

18   A   Oh, because he continued hitting her.  Yes.

19   Q   Did you hear her scream at any point?

20   A   I don't recall exactly.

21   Q   So how do you know that he was hitting her?

22   A   Because you could hear the punches.

23   Q   For how long?

24   A   Say minutes or so.  As long as it took him to walk the

25   stairs.  And he was grabbing her, because I think she

MATZ, TRAKTMAN, FELDMAN AND WILDNER

445

1    couldn't walk anymore.

2        Q    What did you do?

3        A    I remained in the lobby and wait for the police.

4        Q    You stayed in the lobby?

5        A    Yes.  I probably -- I don't recall exactly if I went

6    outside and would go back in and out, because the front desk

7    is right at the exit to the building.

8        Q    Did you call the police again?

9        A    No, I don't think so.

10           MR. GROSS:  One moment, Your Honor.

11   BY MR. GROSS:

12       Q    Earlier, you said that you recall a police officer

13   showed you some photos?

14       A    A few days later.

15       Q    Approximately how many days later?

16       A    Three, four, five days.  I don't know.  I don't think

17   more than a week had gone by.

18       Q    And do you recall the officer or detective who asked

19   you?

20       A    Yes.  Estopian.

21       Q    Detective Estopian?

22       A    Yes.

23       Q    And when he asked you to I.D. this photo, was there

24   anyone else with you?

25       A    At the time I saw the photos?

446

1    Q    Yes.

2    A    No, I don't remember.

3    Q    Well, what I'm asking, Mr. Bigotti, I know that other

4    -- there were other witnesses here that also I.D.'d out of the

5    photo lineups.

6         Was that person standing next to you, or you're by

7    yourself?

8    A    No, he was with me.  Yes.

9    Q    OK.  I'm sorry.  That's my fault.

10        The officer -- Detective Estopian, he was with you,

11   right?

12   A    Of course.  Of course.

13   Q    It was just the two of you?

14   A    At that time, I think so.

15   Q    OK.

16   A    Yes.

17   Q    When he showed you those photos, did he tell you which

18   photo to select?

19   A    No, he did not say.

20   Q    Did he say you'd better select someone from this group

21   of photos?

22   A    Can you repeat that?

23   Q    Yes.  Did he tell you that you'd better select someone

24   from these photos?

25   A    No.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

447

1    Q   Did he tell you that the person was definitely there?

2    A   No.  The only thing he said was -- he asked if I

3  recognized that person within that group of photographs, and I

4  -- as soon as I saw -- I saw the photograph, and it looked

5  like him, and I pointed it out.

6    Q   In how long?  Seconds?

7    A   Seconds.  I recognizing him right there and then.

8    Q   Why did you select that picture?

9    A   Because, undoubtedly, it was him.

10    Q   I'm sorry, what was that?

11    A   Because, undoubtedly, it was him.

12    Q   Undoubtedly?

13    A   Yes.  Without a doubt, it was him.

14       MR. GROSS:  One moment.

15  BY MR. GROSS:

16    Q  Mr. Bigotti, I now show you what has been previously

17  marked as State's Exhibit 2H for Identification.

18       Do you recognize it?

19    A   Well, four years have gone by since then, but I would

20  say it's this one.

21    Q   Well, there is writing on the top of this page; is

22  that right?

23    A   Yes.

24    Q   Does that help you recognize it?

25    A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

448

1    Q   Is that your signature on the top?

2    A   Yes, it's my signature.

3        MR. GROSS:  OK.  Your Honor, the State now moves what

4    has been previously marked as State's Exhibit 2H into

5    evidence.

6        THE COURT:  Was that previously admitted?

7        MR. GROSS:  I don't think so, Your Honor.

8        THE COURT:  Let me see it.

9        MR. GROSS:  Yes, Your Honor.

10       THE COURT:  OK.  Any objections?

11       MR. BLACKER:  I will wait for cross-examination, at

12   that point.

13       THE COURT:  It will be admitted.

14       THE CLERK:  State's Exhibit 2H marked for I.D.

15   purposes now becomes State's Exhibit Number 22.

16       (Thereupon, the exhibit referred to was marked as

17   State's Exhibit Number 22 and was received in Evidence.)

18       MR. GROSS:  Thank you.

19   BY MR. GROSS:

20   Q   The gentleman that you pointed to, was it the person

21   in the first position?

22   A   Yes.

23   Q   OK.  And there was no doubt in your mind?

24   A   No, no, no, never.

25   Q   And did that officer then say, yes, you correctly

MATZ, TRAKTMAN, FELDMAN AND WILDNER

449

1    identified the defendant?

2         Do you know?

3    A    I don't remember if he said that.

4         MR. GROSS:  And one last moment, Your Honor.

5         No further questions at this time.

6         THE COURT:  OK.  Cross-examination.

7         MR. BLACKER:  May it please the Court, Mr. Diaz,

8    counsel for the State.

9         Good morning, ladies and gentlemen.

10        THE JURY PANEL (Collectively):  Good morning.

11                   CROSS-EXAMINATION

12   BY MR. BLACKER:

13   Q    Mr. Bigotti, my name is Michael Blacker.  Have you

14   ever talked to me before?

15   A    No.

16   Q    You have given sworn testimony in this case before,

17   have you not?

18   A    Yes.

19   Q    OK.  And let me also direct your attention back to

20   June 8th of 2003.

21        And you saw a woman you knew as Catherine Ruiz and a

22   gentleman exiting the elevators, did you not?

23   A    No.

24   Q    Did you see them in the lobby?

25   A    Yes.  They were already in the lobby.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

450

1    Q    When was the first time you saw them in the lobby?

2         Where were they; what part of the lobby?

3    A    I don't remember exactly where they were.

4    Q    Was either one of them on the phone?

5    A    Yes.  I don't recall.  I think it was her.

6    Q    OK.  And was everything calm?

7    A    Up to that moment, yes.

8    Q    OK.  And when you --

9         You had a view of her?

10   A    Of both of them.

11   Q    OK.  And when you viewed her, did you see any blood

12  coming out of her face or anywhere; nose, mouth or anywhere?

13   A    Prior to the argument, no.

14   Q    OK.  And did she have --

15        Did she look to you calm, or was she agitated?

16   A    She was calm.

17   Q    And she was using the telephone?

18   A    Yes.

19   Q    And when she was using the telephone, where was

20  Mr. Diaz?

21   A    Next to her.

22   Q    OK.  Was he threatening her in any way at that time?

23   A    I don't remember.  I think they were like kind of like

24  arguing, because of the money.

25   Q    OK.  All right.  So are you saying that while she was

451

1   on the phone, he was arguing with her about money?

2       A   Yes.

3       Q   OK.  And would you characterize it as when you view

4   them for -- at the beginning that there was nothing unusual

5   about them?

6       A   No, there was nothing strange.

7       Q   OK.  And he was saying to her, "Give me my $4,000,"

8   correct?

9       A   Yes, yes.

10      Q   And what was she saying, or how was her body language?

11          What was her response to that?

12      A   She would not answer, and she would go like this, like

13  she didn't care.

14      Q   OK.  Now, at that moment, at that point, you left, and

15  you went up to the second floor to replace your battery,

16  didn't you?

17      A   Yes.

18      Q   OK.  And let's find out how long, if you can remember,

19  you had observed Ms. Ruiz and Mr. Diaz standing near the

20  telephone, utilizing the telephone and arguing over the $4,000

21  before you went up to get the battery.

22      A   I don't remember how much time went by.

23      Q   Approximate for us, if you could.

24      A   It's just that I cannot even approximate to remember.

25      Q   Was it seconds or minutes?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

452

1    A    Furthermore --

2    Q    Was it minutes?

3    A    Could have been minutes.  No.  Minutes.

4    Q    OK.  And nothing was unusual?

5         Everything was calm for some minutes; is that correct?

6    A    Yes.  Yes.

7    Q    Would you --

8         If you had to answer, would you say it was less or

9    more than five minutes that everything was calm?

10   A    More than five minutes.

11   Q    OK.  More than five and less than ten?

12   A    Could be maybe between five and ten.

13   Q    OK.  Thank you.

14        All right.  So you leave.  They are still arguing

15   about the money.

16        She is responding to his demands for the money in a

17   negative way; is that correct?

18   A    Can you repeat that?  OK.

19   Q    Fine.  No problem.

20        As a matter of fact, Mr. Bigotti, because we have a

21   language difference, which I respect, if there is any question

22   I ask you that you don't fully understand, please ask me to

23   rephrase it so that you do understand it, because if you do

24   answer it, we're going to accept your answer as being correct

25   and truthful to the best of your knowledge.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

453

1    A    Of course.  Of course.

2    Q    Thank you.

3         My question is, to characterize what was occurring, he

4    was asking --

5         He was demanding $4,000?

6    A    Yes.

7    Q    She was answering him in a negative manner -- both

8    body language and voice -- that she wasn't going to give him

9    the $4,000?

10        Was that your understanding?

11   A    Yes.

12   Q    OK.  And at that moment, you leave the lobby area.

13   You go up to the second floor, and you go in to change the

14   battery in your radio?

15        How long did it take you to get from the lobby to the

16   second floor?

17   A    It might have taken 30 seconds, because it was one

18   floor.

19   Q    OK.  And how long did you stay up on the second floor?

20        Ulysses Lopez was up on the second floor.  Did you

21   talk with him?

22   A    I might have spoken to him.  I don't remember.

23        But the place, the spot where I changed the battery

24   was Ulysses' security spot there.

25   Q    OK.  And as you returned --

MATZ, TRAKTMAN, FELDMAN AND WILDNER

454

1      Tell me if I'm wrong, because I'm trying to understand

2  your testimony.

3      As you returned, you saw, as you re-entered the lobby,

4  Ms. -- a person you knew as Ms. Ruiz leaping over a counter;

5  is that correct?

6      A   I remember that I saw her jumping over the counter,

7  but I don't recall if it was exactly the precise time that I

8  was coming back from changing the battery.  I don't remember.

9      Q   OK.  I'm not asking about the time.  But do you

10  remember anything that occurred after you returned to the

11  lobby, prior to her jumping over the counter in this lobby?

12      Did anything change -- exchange between the two of

13  them, or between her?

14      A   Yes.  That they were already arguing.

15      Q   Right.  They were arguing before you left?

16      A   Yes, yes.

17      Q   When you returned, were they still arguing?

18      A   Yes, yes, yes.

19      Q   OK.  And at that point, it was just a verbal argument,

20  was it not?

21      A   Yes, verbal, yes.

22      Q   How long --

23      And during that verbal argument, when you returned,

24  did --

25      Was she continuing to say, both in body language and

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   verbally that she was not going to give him $4,000?

2      A   Yes.

3      Q   And he was demanding the $4,000?

4      A   Yes, he was demanding it.

5      Q   Was he telling her --

6          Was it clear to you that he was telling her that that

7   was his money?

8      A   He didn't say exactly -- exactly, actually that it was

9   his money, but he -- he was asking her for it, because I

10  suppose it was his.

11     Q   OK.  Did he say like:  "That money is up on the bed in

12  the apartment, and I want it.  Let's go up and get it"; things

13  of that nature?

14     A   Yes, he did say that it was in the apartment.

15     Q   And what did she say to that?

16     A   She would not answer.  She would just like --

17         I don't know.

18     Q   She was answering in the negative?

19         She was saying no, she wasn't --

20     A   Obviously, she was not going to give it to him,

21  because he was already mad that she wasn't doing anything.

22     Q   Now, prior to testifying here today in court, did you

23  review your prior testimony in this proceeding?

24     A   I read it a little bit.  I didn't have enough time to

25  read it completely.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

456

1      Q    OK.   You were --

2           It was in English.   Were you helped with the

3    interpretation, or did you read it yourself?

4      A    No.   To read -- I can understand when I read.   I can

5    understand everything.

6      Q    OK.  And how far did you get in the proceeding --

7           Let me just tell you that your proceeding is 26 pages

8    long of -- actually it's -- I'm sorry.  Actually, in the

9    substance, it's 24 pages long.  Let me show it to you.

10          How far did you get in it when you were reviewing it?

11     A    Up to this right here, this spot.   Seven.

12     Q    And what page is that, sir?

13     A    Seven.

14     Q    Seven.   OK.  And when were you given this document to

15   review prior to testifying here today?

16     A    Yesterday.

17     Q    Yesterday.  And between yesterday --

18          And what time yesterday?

19     A    No.  Yesterday, it was given to me like around 10:30.

20     Q    10:30 at night?

21     A    No.  In the morning.

22     Q    OK.

23     A    Because I was here yesterday, and was unable to

24   testify.

25     Q    And you came here to court yesterday?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

457

1    A    Yes, yes.

2    Q    And you brought this with you?

3    A    No.  That was given to me here yesterday.

4    Q    At 10:30?

5    A    Yes.

6    Q    And you only read seven pages of it?

7    A    Yes, because -- yes.  I was talking with another

8    person.

9    Q    But you knew that you were supposed to testify

10   yesterday?

11   A    Yes.

12   Q    And you knew --

13   A    Well, besides -- besides that --

14        MR. GROSS:  Objection, Your Honor.  Argumentative.

15        THE COURT:  Overruled.  Let him finish his answer.

16        Go ahead.

17        THE WITNESS:  I read up to Page 7, and I just looked

18        at the rest.  I didn't read them exactly several times,

19        but, yes, I did look through it.  I remember what I said,

20        so I'm just here.

21   BY MR. BLACKER:

22   Q    OK.  So let's --

23        Can we go back a little bit?

24   A    Yes, yes.

25   Q    You carefully read the first seven pages?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

458

1     A    Yes.

2     Q    But you also looked through the rest of the

3     deposition?

4     A    Exactly.

5     Q    And because it coincides with your memory of the

6     events, you said it refreshed your recollection of what

7     occurred?

8     A    Yes.

9     Q    And what you testified to, you didn't have to read it

10    as carefully, because it was already material that you had

11    digested in your brain; is that correct?

12    A    Yes, yes.

13    Q    OK.  But you did have a chance, and you did look at

14    the entire testimony?

15    A    Yes, I did have an opportunity, yes.

16    Q    Thank you.  OK.

17         Now, you're coming back into the lobby.  They are

18    still arguing about the money?

19    A    Yes.

20    Q    And some moments later, you observe Catherine Ruiz

21    jump onto and over the counter at the front desk; is that

22    correct?

23    A    Yes, that's true, yes.

24    Q    All right.  And you then observed a person you say is

25    Mr. Diaz go over to the counter, and pull her back, or try

MATZ, TRAKTMAN, FELDMAN AND WILDNER

459

1   or at that time to pull her back over the counter from where

2   she originally came; is that correct?

3       A   Yes, that's true, yes.

4       Q   And is she saying anything at that time that you

5   remember?

6       A   No, I don't recall what he was saying to her.

7       Q   OK.  And as he was pulling her back, you testified

8   today, I believe -- and correct me if I'm wrong.

9           As he's pulling her back, he's also attempting and

10  producing what you said was a large weapon, correct?

11      A   Yes.

12      Q   When you say "large weapon," how long was the barrel

13  of that weapon?

14          Point out for the jury approximately how long the

15  barrel was.

16      A   Like this.

17      Q   Ten inches?

18      A   More or less.

19      Q   Ten inches.  And what color was it?

20      A   Silver.

21      Q   Silver?

22      A   Platinum.

23      Q   OK.  And the handle, sir, what color was that handle?

24          Do you remember?

25      A   I don't recall.  I think it was also silver,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

460

1  platinum.

2      Q   Also silver.  Thank you.  OK.

3          And as he produces the weapon, he's also pulling her

4  back; is that correct?

5      A   Yes.

6      Q   OK.  And at that moment, if I heard your testimony

7  correctly, he says:  If you call --

8          Who did he look at when he said, "If you call the

9  police, I will kill you"?

10         Anybody?

11     A   Dennis and myself.

12     Q   He looked over at you?

13     A   To both of us.

14     Q   OK.  Let me ask you, when he was --

15         She was struggling to maintain her position on the

16  other side of the counter, was she not?

17     A   Yes, yes.

18     Q   And during that struggle, he was, I imagine, only

19  using one hand in trying to resist her struggle; isn't that

20  correct?

21     A   Yes.  But I think at some point, he put it away, and I

22  think he pulled her out with both hands, because I think he

23  was -- would put it away, pull it out.

24     Q   Put it away, pull it out.  OK.  But was he --

25         Was the weapon moving about as a result of his

MATZ, TRAKTMAN, FELDMAN AND WILDNER

461

1 struggle with her, or was he actually pointing it at various

2 individuals?

3     A   As a result of pulling her, exactly.

4     Q   OK. And the moment he said, "If you call the police,

5 I will kill you," you left the lobby, did you not?

6     A   Yes.

7     Q   You left the lobby to go call the police?

8     A   Yes.

9     Q   And you could no longer see what was occurring in that

10 lobby; could you, sir?

11     A   No, I could not see, no.

12     Q   Correct me if I'm wrong, but I thought you said ten

13 minutes ago that after he pulled her over --

14     A   But it is just that I would go out, and then after

15 calling the police, I came back in.

16     Q   OK. After he made the comment, you left, did you not?

17     You went out to the valet of the hotel?

18     A   Not valet. The entrance, which is outside the

19 building.

20     Q   OK. The building?

21     A   Yes, yes.

22     Q   And you -- are you saying that you are -- are you

23 saying that you actually saw other activity inside; is that

24 what you are inferring to us now?

25     A   But it was very -- I was outside for a very short

462

1  time.  The time that it took me to call.  And then I went back

2  inside to see what was going on, and so to see how Dennis was

3  doing, who was my partner.

4      Q   Let me ask you a question, and you give me an

5  approximation.

6          How long in time after the weapon occurring to you was

7  produced did he actually leave up the stairs?

8      A   Might have been -- I don't know.  15 minutes.

9      Q   OK.  15 minutes.  So there's five to ten minutes

10  before the altercation occurred, and another 15 minutes after

11  it occurred?

12     A   Yes, I think so.

13     Q   And in what period of time -- during what period of

14  time do you know the police were called?

15     A   While he had taken her out of -- from the front desk.

16     Q   OK.

17     A   9-1-1 was called after that.

18     Q   OK.  So about 15 minutes before they left the

19  premises?

20     A   Yes, yes.

21     Q   OK.

22         MR. BLACKER:  Page 16 of his deposition.

23  BY MR. BLACKER:

24     Q   You told the jury, I believe, that you saw him strike

25  her, correct?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

463

1    A    Yes.

2    Q    All right.  Page 16.  Do you remember on January 4,

3    2005, a gentleman took some sworn testimony from you?

4    A    Yes.

5    Q    Not me.  Right?

6    A    No.

7    Q    Another gentleman.  And on January 4th of 2005, your

8    memory of the events that you are testifying to today, was it

9    better in January '05, or is it better today, May of '07, of

10   the events that occurred in 2003?

11   A    It was better in January 2005.

12   Q    So if your testimony in '05 conflicts with your

13   testimony today, the truth is that it probably is more correct

14   in '05; is that correct?

15   A    Yes, yes, without a doubt.

16   Q    All right.  Page 16.

17        "Question:  The lobby of the hotel?"

18        Your answer:

19        "Answer:  Yes.

20        "Question:  There was no one else?

21        "Answer:  No.

22        "Question:  When you are outside, can you see what

23   is happening inside?

24        "Answer:  No.  I cannot.  Couldn't.  And I wasn't

25   paying attention to that.  I was waiting for the police,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1     anxiously.

2          "Question:  After he drew the gun and you waited, and

3     he made a comment to you and to Flores, you then leave,

4     and after that, you don't see anything else that happened

5     in this lobby, right?

6          "Answer:  I didn't know anything else.  But what I do

7     know, I also observed, there are some stairwells that lead

8     to the security, and they have access to the parking lot,

9     and I saw him get her up those stairs, and that was it."

10         Does that refresh your recollection a little bit that

11    you didn't see anything else when you left the lobby except

12    him dragging her up the stairs, as you have described it?

13    A    Yes.

14    Q    Now, during the time that you were in this lobby, when

15    you say that Mr. Diaz had a weapon in his hand, and was

16    struggling with the girl -- right? -- seconds before you

17    leave, was his concern with the security guard and the valet,

18    or was his concern with the girl, singularly on the girl?

19    A    On the girl.

20    Q    His problem was with whom?

21    A    With the girl.

22    Q    Now, you say when he addressed himself to you, you say

23    he addressed the comment to you, was that at the time that he

24    was struggling with the girl, and the gun was just going

25    around during the struggle?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

465

1     A    I was following the struggle.  Yes, during the

2     struggle, yes, yes.

3     Q    And is it your testimony that the aggression, if there

4     was any, was directed to the girl; is that correct?

5     A    I did not understand that.  Can you repeat it?

6     Q    Yes.  The aggression displayed, according to you, by

7     Mr. Diaz, was directed at the girl, was it not?

8     A    Yes, towards the girl, yes.

9     Q    OK.  Now, I want you to try and remember for me if you

10    can before any gun was ever produced, when it became clear

11    that Ms. Ruiz was not going to give the $4,000 to Mr. Diaz, do

12    you remember him before she leapt over the counter running to

13    the front door to try and exit the building, and the door was

14    locked?

15    A    It was clear to me that she was not going to return

16    the $4,000 when he had already told her several times, "Give

17    me back my $4,000."  And to her, it was like that they were

18    saying -- I don't know -- "Give me a glass of water,"

19    something like that.  She did not care about anything.  She

20    looked as if she didn't care about it.

21    Q    Fine.  With that knowledge, considering that

22    knowledge, before she jumped on the counter or over the

23    counter, whichever she did, Mr. Diaz knows she's told him

24    she's not giving him the money, and isn't it true that he ran

25    or walked quickly to the front door of the lobby, tried to

MATZ, TRAKTMAN, FELDMAN AND WILDNER

466

1   make an exit from the building, but the door was locked?

2       A   Who?  Him?

3       Q   Mr. Diaz.

4       A   I don't remember.  I don't remember.  I really don't--

5           Trying to get out?

6       Q   Since I've asked you that question, now, when you are

7   trying to remember the events, does that refresh your

8   recollection that he, in fact, did do that?  Do you remember?

9           Try and imagine what happened before she jumped over

10  the counter.

11          MR. GROSS:  Objection.  Asked and answered, Your

12      Honor.

13          THE COURT:  Overruled.

14  BY MR. BLACKER:

15      Q   Is your memory refreshed that that, in fact, occurred;

16  that he did try and exit the building?

17      A   No, I don't remember.  No, I really don't remember.

18          MR. BLACKER:  I have nothing further.  Thank you,

19      sir.

20          THE COURT:  Anything further?

21          MR. GROSS:  A short rebuttal.

22                      REDIRECT EXAMINATION

23  BY MR. GROSS:

24      Q   How are you doing, Mr. Bigotti?

25          Earlier, the defense counsel said that while Pablo

MATZ, TRAKTMAN, FELDMAN AND WILDNER

467

1     Diaz had that weapon out and was punching the victim,

2     Catherine Ruiz, that his words, I believe -- and I think you

3     answered "yes," and I just want to clarify --

4             MR. BLACKER: Objection to the form of the question.

5             THE COURT: Overruled.

6     BY MR. GROSS:

7       Q   Now, when he pointed the gun at yourself and Officer

8     Flores, was that as a result --

9             THE COURT: Officer Flores?

10            MR. GROSS: Dennis Flores. Thank you, Your Honor.

11     BY MR. GROSS:

12       Q  --the security guard at the front desk, was that only

13     as a result of the struggle, the initial struggle a few

14     minutes before, from getting Catherine Ruiz over the desk, or

15     did he point the gun at you and Dennis Flores independently?

16            MR. BLACKER: Excuse me. Before he answers it, I

17            will object; assuming facts not in evidence, and

18            multiple complex question.

19            If the witness can answer, fine. But I don't think

20            he can.

21            THE COURT: Overruled. If the witness can answer.

22            THE WITNESS: OK. For several moments, a period of

23            time, the gun was going like this, as a result of the

24            struggle with her or the fight with her.

25            But at the precise moment in which he said if you

468

1     kill the police -- excuse me, I'm sorry -- "If you call

2     the police, I will kill you," he pointed like this,

3     towards us, like threatening us, like if we were to call

4     the police, he was going to fire.  And at that precise

5     moment --

6  BY MR. GROSS:

7     Q  He didn't go into like an epileptic seizure and start

8  waving his hand around and pointing it at you, and pointing it

9  at Dennis Flores when he said that, right?

10     A  Yes, yes.

11     Q  OK.  Mr. Bigotti, this happened in 2003.  That's four

12  years ago?

13     A  Yes.

14     Q  Were you scared for your life at that time?

15     A  Yes.  At that time, he said that if we were to call

16  the police, he was going to kill us.  I did not get very

17  scared, and then afterwards --

18     MR. BLACKER:  Objection.  I ask for the 104 limine

19     instruction to the jury in case --

20     THE COURT:  Sustained.  Denied.

21  BY MR. GROSS:

22     Q  Do you remember seeing the surveillance video of the

23  events that you just described?

24     A  Yes.

25     Q  When I asked you on direct examination if you were

MATZ, TRAKTMAN, FELDMAN AND WILDNER

469

1   able to see the stairs, you said you heard the beating going

2   up to the stairs.  Is that what you said?

3       A   Yes.

4       Q   But on the surveillance video, what were you able to

5   see, if you recall?

6       A   The part that I saw on the video was the front desk

7   where she jumped over, and then he pulls her out and all that.

8   Yes.  But the part about the stairs, I did not see that part

9   on the video.

10      Q   You did not?

11      A   No, I did not see it.

12      Q   OK.  And you said earlier also that you were not very

13  familiar with guns?

14      A   No, I'm not very familiar with them, no.

15      Q   So when you say "big," and "ten inches," are those

16  defense's words or your words?

17          Do you know exactly how many inches?

18          MR. BLACKER:  Objection to the characterization.

19          THE COURT:  I'm sorry.  Hold on.  I'm sorry.

20          MR. BLACKER:  Objection to the characterization of

21      "defense's words."

22          THE COURT:  Overruled.  Ask the question again.

23  BY MR. GROSS:

24      Q   How many inches do you believe -- do you know the

25  barrel is?

470

1    A    Of course.

2    Q    You do?

3    A    I can -- I can point it out with my finger.  I can

4    measure it, but the measurement, I could be wrong, because I'm

5    not very familiar with the inches, so I'm going to say

6    something wrong.

7    Q    It is your estimation, because there is something

8    called a barrel, and the slide just above the hand and --

9         THE COURT:  Do me a favor.  Why don't you ask him what

10        the size of the gun was.

11        MR. GROSS:  Yes.  Thank you.

12   BY MR. GROSS:

13   Q    Can you please describe to the jury the size of the

14   gun?

15   A    It was like this.  Like this, more or less, the

16   barrel.

17        MR. GROSS:  No further questions.

18        THE COURT:  For the record, that is approximately nine

19        or ten inches.

20        MR. GROSS:  Yes.

21        MR. BLACKER:  Judge, they raised the video.  I want to

22        show the witness the pictures and ask one question about

23        it.

24        THE COURT:  All right.

25        MR. BLACKER:  Thank you.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

471

1                          RECROSS-EXAMINATION

2     BY MR. BLACKER:

3        Q    Let me show you a series of exhibits, State's Exhibits

4     5 through 11.  Take a look at these pictures and tell us --

5     let me set the stage for it.  That is the video of the front

6     lobby at the Fortune House, is it not?

7        A    Uh-huh.

8        Q    And in those pictures are depicted two people, and I

9     even believe there may be a date on there.  June 8th of '03; is

10    that correct?

11       A    Yes.

12       Q    Hold up the picture for the jury where you see the gun

13    in Mr. Diaz' hand.

14       A    All of the pictures?

15       Q    Whatever picture that you see a gun in his hand, that

16    big, ten-inch gun, you show it to the jury.

17            THE COURT:  What is the exhibit?  Let me see that.

18       Mr. Blacker, that is State's Exhibit what?

19            MR. BLACKER:  For the record --

20            THE COURT:  I can't see.  State's Exhibit 5.

21            MR. BLACKER:  I will publish if I can, Judge.

22            THE COURT:  Go ahead.

23    BY MR. BLACKER:

24       Q    Any other picture here with a gun in his hand?

25       A    Let me check again.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

472

1      MR. BLACKER:  Sure.  State's Exhibit 5.  Thank you.

2      THE COURT:  Did the witness answer your last question?

3      MR. BLACKER:  No, he did not.

4  BY MR. BLACKER:

5      Q   Do you see any other pictures with a gun in it?

6      A   No.

7      MR. BLACKER:  Thank you.  Thank you.  I have nothing

8  further.

9      THE COURT:  Mr. Gross, anything further?

10     MR. GROSS:  I was going to put the pictures -- you

11  want the pictures?  Thank you.  No further questions.

12     THE COURT:  All right.  Thank you, Mr. Bigotti.

13     State, call your next witness.

14     MR. GROSS:  Your Honor, the State calls Thomas

15  Roberts.

16  Thereupon:

17                        THOMAS ROBERTS

18  was called as a witness, and having been first duly sworn, was

19  examined and testified as follows:

20      THE COURT:  Please have a seat over here.

21                        DIRECT EXAMINATION

22  BY MR. GROSS:

23     Q   Good morning, Mr. Roberts.

24     A   Good morning.

25     Q   Can you please state your name and spell it for the

MATZ, TRAKTMAN, FELDMAN AND WILDNER