473

1  record?

2     A    Thomas Roberts.    T-H-O-M-A-S.    R-O-B-E-R-T-S.

3     Q    And again, I know it's a long time ago, but do you

4  recall June 8, 2003, where you worked at the Fortune House

5  Condo?

6     A    Right.

7     Q    What was your occupation?

8     A    Security officer.

9     Q    OK.   And was that in Miami-Dade County?

10    A    Right.

11    Q    It was?

12    A    It was.

13    Q    All right.   And we just have to say "yes" or "no" for

14  the court reporter.

15    A    Yes or no.

16    Q    You don't have to say "yes" or "no" --

17         OK.   That day, at that time, what time did your shift

18  begin?

19    A    11 o'clock.

20    Q    And do you recall an incident that took place between

21  a man and a woman that night?

22    A    Yes.

23    Q    Do you recall it vividly?

24    A    Yes.

25    Q    Do you recall seeing a woman who later became known to

474

1   you as Catherine Ruiz before that night?

2       Had you ever seen her?

3   A  I saw her before, yes.

4   Q  How many times before?

5   A  Maybe about two or three times.

6   Q  Did you know her to be a resident of the Fortune House?

7   A  Yes.

8   Q  How did you know that?

9   A  She used to come sometimes and ask me for the key to the

10  apartment.

11  Q  And why would she do that?

12  A  Because I was authorized if I knew the person to --

13  Q  Why would she need the key to her apartment?

14  A  Sometimes she would lose it or something.

15  Q  She would lose it?

16  A  Yes.

17  Q  All right.  What about the gentleman that night who later

18  became known to you as Pablo Diaz?

19  A  Yes.

20  Q  Did you ever see him before that day?

21  A  Once or twice, yes.

22  Q  And how did you see him?

23  A  Going through the hallway towards her apartment.

24  Q  OK.  Now, do you remember what Pablo Diaz looks like?

25  A  Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    Q   Can you describe him?  I'm going to ask you to look

2    around the courtroom, and if you can identify Pablo Diaz, I

3    would like you to tell me and then do that by picking out an

4    article of clothing he is wearing.

5    A   No, I can't identify him.

6    Q   OK.  But did you, that evening, or afterwards, were you

7    shown a few photos by a police officer, and did you correctly

8    identify?

9    A   Right.  Yes.

10       MR. BLACKER:  Objection as to what he did.

11       THE COURT:  Sustained as to whether it is correct or

12   not.  It's up to the jury to decide.

13   BY MR. GROSS:

14   Q   OK.  Did you identify who you believed to be the --

15   A   Yes.

16   Q   Thank you.  Now, you said you were a security officer?

17   A   Yes.

18   Q   Now, the Fortune House Condo, can you describe the

19   Fortune House Condo itself, physically out?

20   A   Physically out, it's a hotel and rental property.

21   Q   OK.

22   A   And mostly owned by the tenants.

23   Q   Is it a large condo?

24   A   It's pretty large, yes.

25   Q   Can you describe the lobby area?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   A   The lobby area is an area and then there is the front

2   desk, and then there is one, two, three -- about four

3   elevators in the back facing the front desk.

4   Q   OK.  Where is the parking facility?

5   A   The parking facility, there is about six floors you

6   could park, and then there's another garage on the side where

7   you could park, too.

8   Q   All right.  Now, in other words, to get to the 6th

9   floor, are those the first six floors, and then you live on

10  top of those?

11  A   Right.

12  Q   So the 7th floor would be above the parking garage?

13  A   Yes.  That would be apartments.

14  Q   OK.  If you wanted to get to those six floors, how would

15  you do that?

16  A   Through the garage you mean?  You would have to pass to

17  go up in and go up and you get a card, access card.

18  Q   And let me ask you, do you need an access card to get

19  into the parking garage, the elevator or the stairway?

20  A   To get into the elevator you don't need -- I don't know.

21  Let me think.

22  Q   If you recall.  I know it's been four years ago.

23  A   Yes.  It's been -- technically, you needed a card to go

24  up, I think.  I'm not sure.

25  Q   That's OK.  OK.  Let's go back to that night, June 8,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

477

1   2003.

2          How many security officers were working that night?

3   A   Two.

4   Q   Yourself?

5   A   And Ulysses.

6   Q   Ulysses.  Do you know his last name?

7   A   No, I don't recall.

8   Q   How were you stationed that day?

9   A   At that moment or --

10  Q   Or at that first -- no.  When you first came there, what

11  time did you say you started?

12  A   11 o'clock I go to the office.  You go upstairs, and

13  there's a little security office.

14  Q   And what is in that security office?

15  A   The security office, cameras, records, files and

16  regulations.

17  Q   Let's describe those cameras for the jury.

18  A   The cameras entail -- you have a layout of screens,

19  about six, I think there were at that time, and you focus with

20  the screens on certain areas.

21  Q   OK.  And do those cameras --

22  A   And they are all over the building.

23  Q   All of the building?

24  A   Not in the hallway of the apartments, but in strategic

25  areas.

478

1  Q   When you say, "strategic areas" --

2  A   Like when you go in there, the garage, you have a camera

3  there.

4  Q   Would you have a camera in the lobby area?

5  A   Yes, we did.

6  Q   OK.  Now, it was an incident that took place, you

7  stated, between a man and a woman?

8  A   Right, yes.

9  Q   That night.  When were you first aware that something

10 took place?

11 A   I was doing my rounds.  I must have been about on the

12 11th floor when Ulysses called me and said that --

13 Q   Let me stop you.  First of all, around what time was

14 that?  Do you recall?

15 A   Maybe about -- maybe 1 o'clock.

16 Q   OK.  Now, when you say you got a call, are those --

17 these security type walkie-talkie radios?

18 A   Right.

19 Q   And who did you have constant communication with?

20 A   Constant communication with the security office and the

21 front desk.

22 Q   You have both?

23 A   Yes.  There was one for the front desk.

24 Q   OK.  But you got notified by Ulysses?

25 A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

479

```
1    Q    And the security office?  And what did -- well, what
2    were you aware of when -- were you aware of what happened?
3         MR. BLACKER:  Objection.  Calls for a hearsay response.
4         THE COURT:  Sustained.
5    BY MR. GROSS:
6    Q    Where did you go after hearing the call?
7    A    I came down the elevator, and by mistake, I came down a
8    level --
9    Q    To which level?
10   A    The ground floor.
11   Q    Did you want to go to the security office?
12   A    Because he said come to the security office, something.
13   Q    So you went to the lobby?
14   A    Yes.
15   Q    And when you came to the lobby, did you take the
16   elevator?
17   A    Right.
18   Q    When the elevator opened, what did you see?
19   A    I saw a person discussing with a lady -- and there was
20   an employee at the front desk in front, and he was on the
21   other side of the front desk, and he was at the back.
22   Q    OK.  I was going to break this down.  Now, there was an
23   employee for the Fortune House behind the front desk?
24   A    Right.
25   Q    Do you recall his name?
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

480

1    A   Not -- well --

2    Q   OK.  But he -- do you recall what he looked like?

3    A   Yes.  Tall, Latin.

4    Q   OK.  And now, the couple that was involved in the

5   incident, what was their location?  Where were they

6   physically?

7    A   The gentleman was on the outside, in front of the front

8   desk.

9    Q   All right.

10    A   And she was at the back of the employee.

11    Q   Where was she?

12    A   At the back of the employee.

13    Q   In the back of the employee who is on the other side of

14   the desk?

15    A   Yes.

16    Q   OK.  Just to clarify, the employee of the Fortune House

17   who you don't recall his name -- right? -- this is the front

18   desk and this is the front door where people could enter, and

19   normally this would be the employee area; is that correct?

20    A   Right, that would be.

21    Q   Where is the female?

22    A   In the back of the employee?

23    Q   In the back of me?

24    A   Yes.

25    Q   And could you describe the conversation -- first of all,

481

```
1    do you remember -- do you speak Spanish, sir?

2    A    Yes.

3    Q    You do?

4    A    Yes.

5    Q    OK.  Were the conversations that you just described, was

6    that taking place in English or Spanish?  Do you recall?  If

7    you do --

8    A    I don't recall.

9    Q    Are you proficient in Spanish?

10   A    Yes.

11   Q    We know you are proficient in English.

12   A    Uh-huh.

13   Q    Right.  What was their conversation about, if you

14   recall?

15   A    He was demanding that she pay him back the money that

16   she owed him.

17   Q    And do you recall how much?

18   A    Maybe about $500.

19   Q    OK.  And what was her response?

20   A    Her response was very nervous and saying a few things.

21   I don't recall.

22   Q    OK.  Now, I'm going to ask you about the gentleman, the

23   defendant who you later knew to be Pablo Diaz.  That's why you

24   are here.  Can you describe -- I am going to ask you what his

25   demeanor was.  Do you recall how he acted that night?
```

482

1   A   He was very excited, and shouting at her.

2   Q   He was shouting at her?

3   A   Yes.

4   Q   Do you recall what he stated?  Well, you already did.  Do

5   you recall if he was wearing a shirt?

6   A   No.

7   Q   I'm sorry?  Your answer?

8   A   No.

9   Q   He was not wearing a shirt?

10   A   No.

11   Q   OK.  And other than that conversation, what else did you

12   observe?

13   A   Things were happening pretty fast in the sense that I

14   think the employee moved to one of the sides, and he dragged

15   her by her feet and brought her over to the --

16   Q   The employee moved to his right?

17   A   Yes.

18   Q   And the female, Catherine Ruiz, what did she do?

19   A   I don't know.  Technically, it was very fast.

20   Q   OK.

21   A   So she came to this side of the counter, and he grabbed

22   her feet.

23   Q   He grabbed her feet?

24   A   And pulled her over, yes.

25   Q   Was Catherine Ruiz, that female that you just described,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 already standing on the other side?  How did he grab her feet?

2  A  That --

3  Q  Did he lunge over?

4  A  Pardon?

5  Q  Did he lunge over to grab her feet?

6  A  It has to be.  I mean to say I don't recall.

7  Q  OK.

8  A  But it happened so fast.

9  Q  I'm sure it did.  Did you realize or see if you -- if he

10 was successful to drag her back onto the other side?

11  A  Yes.

12  Q  He was?

13  A  Yes.

14  Q  Did he grab just her feet?  Do you remember?

15  A  I don't remember.

16  Q  OK.  What happened once -- when she was -- once she was

17 on the other side?  We should call it the right side of the

18 desk, the correct side.  What happened?

19  A  The correct side, yes.  He grabbed her, and he was still

20 shouting and demanding something.

21  Q  OK.

22  A  Very nervous in the sense that then he started producing

23 a revolver.

24  Q  Let's -- now, Mr. Roberts, you are -- are you very

25 familiar with guns?

484

1    A    Not really, no.

2    Q    Not really?  You are using the word, "revolver" as

3 another word for "gun"?

4    A    Yes.

5    Q    Do you know the difference between a semiautomatic

6 pistol, double action, seven rounds, or -- you know, you are

7 using the word, "revolver" --

8    A    Yes, I always use that word.

9    Q    OK.  But you don't recall if it was actually a revolver

10 or not?

11   A    I don't recall, no.

12        THE COURT:  I'm sorry?

13 BY MR. GROSS:

14   Q    Do you recall if it was actually a revolver?

15   A    No.  I use the word, "gun," as a revolver, really, yes.

16   Q    OK.  When you say he produced the revolver, you just

17 stated that Catherine is now on the other side.  What exactly--

18 if you recall, what exactly did he do?

19   A    He got out the gun and --

20   Q    When you say, "got out the gun," where did he get the gun

21 from?

22   A    That was fast, too, in the sense that I don't know

23 whether I was looking somewhere else, or it was fast and he got

24 it out, but I don't know from what location.

25   Q    Can you describe the gun other than -- you just said a

485

1  revolver.  What color was it?

2    A   It was silver.

3    Q   Was it large?

4    A   Well, about -- (indicating).

5    Q   Can you do that again?

6    A   Yes, sir.

7        MR. GROSS:  Let the record reflect --

8  BY MR. GROSS:

9    Q   Can you estimate how many inches you are holding your

10  hands about?

11   A   Maybe about seven.

12       MR. GROSS:  OK.  Also, let the record reflect that the

13    witness on the witness stand is putting his hands apart,

14    and he stated seven inches apart.

15  BY MR. GROSS:

16   Q   So he produced this gun.  What did he do after he

17  produced it?

18   A   He put it towards her, and then he dragged her away.

19   Q   When you say he put it towards her, did he do it

20  violently?  Did he say something?  "Put it towards her" is very

21  vague.  What exactly did he do?

22   A   He was angry, yes.

23   Q   Did he point it at her?

24   A   Yes.

25   Q   When he pointed it at her, did he say anything to her?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

486

```
1    A    I don't recall the words.

2    Q    How far away were you from him at that time?

3    A    A few feet, maybe, about.

4    Q    Would you estimate the distance from myself to you at

5 this point?

6    A    No.  Nearer.

7    Q    Tell me when to stop.

8    A    There.

9    Q    Right here?  Can you estimate how close we are right now

10 to each other?

11   A    About five or six feet.

12        MR. GROSS:  Let the record reflect that the prosecutor is

13   now standing in front of the witness stand, within feet of

14   the court reporter.

15 BY MR. GROSS:

16   Q    You previously stated that he pointed the gun at her?

17   A    Yes.

18   Q    Who else was in that room at the same time?

19   A    The front desk employee.

20   Q    The front desk employee and yourself?

21   A    And myself, yes.

22   Q    When Mr. Diaz pointed that gun at Catherine Ruiz, did he

23 look at you?

24   A    I don't think so, no.

25   Q    Did he look at Dennis Flores?
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

487

1    A    Dennis?

2    Q    I'm sorry.  I used his name.  The person who was the
3 employee at the front desk, if you recall?

4    A    No.  He was concentrating more on the girl.

5    Q    At that time?

6    A    Yes.

7    Q    OK.  What did you do next?

8    A    Next, I surmised that the security officer, the security
9 area called the police.

10   Q    You came there to call the police?

11   A    No.  I didn't call them.  I was hoping the security
12 officer and the mezzanine officer would call.

13   Q    What did you do next?

14   A    What I did next, just stayed there and told him if there
15 were any problems, get out the hotel.

16   Q    So you told Mr. Diaz if you have any problems -- at that
17 time when he had the gun?

18   A    Yes.  To leave the area.

19   Q    Would you consider that a problem?

20   A    Yes, because of the -- having a gun.

21   Q    Yes.  And what is the next thing that you saw?

22   A    Next thing I saw, he took her towards the -- one of the
23 garage entrances, I surmised, and then they left the scene.

24   Q    How did he get to the garage?

25   A    You can get there two ways.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

488

1    Q   How did they do it?

2    A   I didn't -- there was a pause there.  When I was -- I

3  heard the police outside, and so I went outside to indicate

4  what was happening.

5    Q   So as soon as they were outside, out from your view, what

6  did you do?

7    A   Go with the police and tell them how to handle -- enter

8  the building.

9    Q   OK.  What do you do now for a living?

10   A   Apartment rentals.

11   Q   Apartment rentals?

12   A   Yes.

13   Q   And you left the employment of the Fortune House, didn't

14 you?

15   A   Correct?

16   Q   And why did you --

17       MR. BLACKER:  Objection.  Immaterial and irrelevant,

18   unless it relates to this case.

19       THE COURT:  Overruled.

20       MR. GROSS:  I strike that.  One moment while I set up

21   the --

22 BY MR. GROSS:

23   Q   I'm now going to show you a video.

24       THE COURT:  Isn't that the photo identification video,

25   the one you are pointing at?

489

1       MR. GROSS:  No, Your Honor.

2       THE COURT:  OK.

3   BY MR. GROSS:

4   Q   Where is this area; do you recall?

5   A   The front desk.

6   Q   It's the front desk?

7   A   Right.

8   Q   Where is this?  Can you describe this to the jury?

9   A   These are different areas in the hotel where we have the

10  security cameras.

11  Q   OK.

12  A   Yes.

13  Q   And at the hotel, are you able to -- is it special

14  equipment there to actually view?

15  A   You can increase the area by putting it in, but

16  basically, that's the security.

17  Q   But if you withdraw the tape, could you play it on any

18  VCR?

19  A   You could.

20  Q   Do you know that for sure?

21  A   That's for sure.  I have seen it done.

22  Q   And that is in the security area?

23  A   Area.

24  Q   All right.  Is that where Ulysses was that day?

25  A   Right.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

490

```
 1   Q   Do you recognize this?  Where is this area?

 2   A   This area is in front of the front desk lobby area.

 3   Q   OK.  And that is -- still, if you could just walk me

 4 through this.

 5   A   That's her and him pulling her over, down.

 6   Q   You say "her" and "him."  Are these the same two people

 7 that you saw that day?

 8   A   Yes.

 9   Q   And is this the employee that day?

10   A   Yes.

11       MR. GROSS:  Let the record reflect that this is the

12   bottom portion of the video.

13 BY MR. GROSS:

14   Q   Is that the man?

15   A   That's the person, yes.

16   Q   Who is this handsome man right there?

17   A   That's me.

18   Q   That's not a gun, is it?

19   A   No.

20   Q   And so you -- approximately how far are you from that

21 man, if you could tell from the screen?

22   A   About seven or eight feet.

23   Q   Is this when you were asking him, "If you have a problem,

24 go outside"?  Is that what's happening?

25   A   Yes.
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

491

1   Q   Does he have a gun in his hand at that time?

2   A   At that time, yes.  He should have it, yes.

3   Q   I know it's very -- could you see the gun from here?

4   A   Yes.

5   Q   You can?

6   A   Yes.

7   Q   In your -- what is he doing right now?  Could you tell?

8   A   The moment he put her on the other side of the counter,

9   that is when he produced the gun.

10   Q   The moment she was on the other side?

11   A   Yes.

12   Q   OK.  What are they doing right there; do you recall?  If

13   you recall.

14   A   No.

15   Q   These are the same two people?

16   A   Yes.

17   Q   Where is the -- do you know by looking at this where we

18   are relative to the front, to the front entrance?

19   A   The front entrance is towards the left there.

20       MR. GROSS:  May I ask the witness to step down, please?

21       THE COURT:  Yes.

22       MR. GROSS:  Thank you.

23   BY MR. GROSS:

24   Q   Sir, just by pointing, stand over here so they can see.

25   A   The front entrance is --

492

1      MR. GROSS:  Let the record reflect that the witness is

2   pointing to the left-hand side of the screen.

3 BY MR. GROSS:

4   Q   Where would the stairs be?

5   A   Those are the stairs there.

6   Q   So you need an access card just to get to that area?

7   A   No.

8   Q   Were you shown this video before?

9   A   Yes.

10   Q   You have seen it?

11   A   Yes.

12   Q   When did you see it?  When was the first time you saw it?

13   A   When the police came and recalled up the -- took out the

14 tape and wanting to see it.

15   Q   When did that -- they do that?

16   A   That same night.

17   Q   And where -- you know the layout.  Are these stairs --

18 where are the stairs in relation to the front lobby?

19   A   The front lobby is here, and the stairs are --

20      MR. GROSS:  Let the record reflect that the witness is

21   pointing to the right of the screen.

22 BY MR. GROSS:

23   Q   And do you know right now what he's doing?  Why is she

24 just laying there?  Do you know?  Where are you right now?

25   A   I'm outside with the police when all of this was

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 happening.

2   Q   While this is happening, so you don't see this?

3   A   No.

4   Q   You are outside.  OK.  Just take a seat.  Thank you.

5       How long after that night did someone come to you and ask

6 you to identify the defendant, Pablo Diaz, from the series of

7 photographs?

8   A   Must have been a few hours.

9   Q   That day?

10  A   That same night, yes.

11  Q   That same night?

12  A   That same night.

13  Q   Do you recall the officer's name?

14  A   No.  No.

15  Q   And when Ms. -- we'll call this a lineup for -- just for

16 the time being.  When this was done, were you alone?

17  A   Just myself.  The officer told everyone else to get out

18 of the office.

19  Q   He told everyone else to get out?

20  A   Yes, and with me alone.

21  Q   When he showed you the photo -- all right.  Did he tell

22 you which person to pick out?

23  A   No.

24  Q   Did you pick someone else?

25  A   Yes.

494

```
 1    Q    Were you hesitant in picking out someone?

 2    A    No.

 3    Q    How quickly did you pick someone else?

 4    A    A few seconds.

 5    Q    Did the officer tell you that you better pick someone out

 6 here?

 7    A    No.

 8    Q    Did he tell you that the person is definitely in there?

 9    A    No.

10    Q    I now show you what's been pre-marked for identification

11 as 2J.  Do you recognize this?

12    A    Yes.  I signed it.

13    Q    Well, how do you recognize it?

14    A    Well, I wrote here, and then I signed.

15    Q    And you signed it?

16    A    Yes.

17    Q    Is that your sign?

18    A    Yes.

19         MR. GROSS:  Your Honor, at this time, the State would

20    like to move what has been previously  marked as 2J into

21    State's evidence.

22         THE COURT:  Any objection?

23         MR. BLACKER:  Thank you, Your Honor.  Not at this time.

24         THE COURT:  It will be admitted.

25         THE CLERK:  State's Exhibit 2J marked for I.D. purposes
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

495

1    now becomes State's Exhibit Number 23.

2         (Thereupon, the exhibit referred to was marked as State's

3    Exhibit Number 23 and was received in Evidence.)

4         MR. GROSS:  Thank you.

5    BY  MR. GROSS:

6    Q   And who did you pick out in the photo?  If you could just

7    point to the location.  The top left?

8    A   Top left.

9    Q   And all the physical characteristics of the -- all the

10   people in here, are they very similar?

11   A   Slightly similar, yes.

12   Q   But you had no problem picking out the person?

13   A   No problem.

14        MR. GROSS:  No further questions at this time.

15        THE COURT:  All right.  Cross-examination.

16                      CROSS-EXAMINATION

17   BY  MR. BLACKER:

18   Q   Thomas David Roberts; is that correct?

19   A   Yes.

20   Q   Good morning.

21   A   Good morning.

22   Q   My name is Michael Blacker.  How are you?

23   A   Fine, thank you.

24   Q   Have we ever spoken before?

25   A   No.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  Q   We've never spoken in this proceeding or any other

2  proceeding, have we?

3  A   No.

4  Q   Thank you.  Let me take you back to your testimony here

5  today and you could tell us about the first observations you

6  made on June 3rd.  Correct?

7  A   Correct.

8  Q   And I need to put it in the time sequence.

9      So had Ms. Ruiz and the gentleman that you say was there,

10 had they already been situated in this lobby at the time you

11 saw them -- first saw them?

12 A   Correct.

13 Q   You didn't see them come off the elevator, did you?

14 A   No.

15 Q   When you first saw them, can you tell me where they were?

16 A   The gentleman was on the lobby side, and she was in the

17 back of the counter.

18 Q   Could you observe her?

19 A   Yes.

20 Q   Was she bleeding from the nose?

21 A   No.

22 Q   Was she bleeding from the mouth?

23 A   No.

24 Q   Was she a bloody mess?

25 A   No.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

497

1   Q   You said, if I believe -- if I listened and heard you

2 correctly, that they were -- he was excited, and he was

3 demanding some money from her; is that correct?

4   A   Correct.

5   Q   And what was her response to his demand for the money?

6   A   She was nervous, but she wasn't saying much, really, no,

7 from what I can recall, you know.

8   Q   And between her body language and what she said, did you

9 get the impression that she was going to give him the money, or

10 she wasn't going to give him the money?

11   A   Wasn't going to give him the money.

12   Q   OK.  And was this gentleman threatening you in any way?

13   A   No.

14   Q   Was he threatening Mr. -- the hotel employee -- is that

15 Dennis Flores, that was back behind the desk?

16   A   That's it, yes.

17   Q   Was he threatening Mr. Flores in any way?

18   A   No, no.  He was concentrating on her.

19   Q   OK.  He was -- in fact, his attention was on her; is that

20 correct?

21   A   Correct.

22   Q   OK.  Now, I don't know where you were -- let me just try

23 and set this up.  Where were you prior to entering the lobby

24 when you saw them?

25   A   I was on the -- I think I recall the 11th floor, coming

498

1 down the elevator.

2   Q  Prior to the production of the weapon, did you see the

3 man go to the front door and try and exit the building, but the

4 door was locked?

5   A  No.

6   Q  You didn't see that?

7   A  I didn't see that.

8   Q  You didn't see that, or you don't remember seeing it?

9   A  I didn't see it.

10   Q  Fine.  But you were not in there until the woman was

11 already on the other side of the desk; is that correct?

12   A  Right.

13   Q  So if that occurred prior to your being there, you would

14 have no way of seeing it?

15   A  No.

16   Q  Now, you had seen the gentleman that was there that night

17 at the apartment building on numerous occasions prior to that

18 night, had you not?

19   A  Yes, right.

20   Q  And had he ever been a problem before?

21   A  No.

22   Q  Was he respectful and polite on all occasions?

23   A  Yes.

24   Q  And when he was pulling her, she was shouting, was she

25 not?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   A   Right, yes.

2   Q   Do you remember what she was shouting?

3   A   No, no.

4   Q   You know, you used the word, "revolver" for a gun.   Did

5   the gun have one of those round barrels, sort of in the middle

6   of the gun which you twirl?

7   A   No.

8   Q   It didn't is what you are saying?

9   A   Rather square it was.

10   Q   You used the word, "revolver," as you told us before, for

11   the word, "gun"?

12   A   Yes.

13   Q   Now, the revolver or the gun, was it pointed at anyone

14   other than the girl, that you are aware of?

15   A   Only the girl.

16   Q   Now, prior to today, did you meet with the attorneys --

17   the attorney that just examined you prior to me, did you speak

18   with him?

19   A   Yes.

20   Q   Prior to today?  And when would that have been?

21   A   I think the day before yesterday, I think, or yesterday.

22   Yesterday, yes.

23   Q   And yesterday -- I'm sorry to step on your words.   And

24   how many times have you met with an attorney for the State, if

25   you remember, in this case?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

500

1   A   In the case -- OK.  Maybe once or twice.

2   Q   OK.  And your meeting -- in your meeting where you spoke

3   with him, how long do you think that meeting was?

4   A   About five or six -- five minutes.

5   Q   And did they give you -- you've already sworn in this

6   proceeding previously.  You have had some sworn testimony

7   taken, correct?

8   A   Yes.

9   Q   Not by me, but another person, correct?

10  A   Yes.

11  Q   And in that, did they ask you to review your sworn

12  testimony, your prior sworn testimony?

13  A   Yes.

14  Q   And you reviewed it?

15  A   I reviewed it.

16  Q   Thank you.  Now, you mentioned to Mr. Gross on direct

17  examination that this girl often came to you for a spare key,

18  because she was losing her keys?

19  A   Yes.

20  Q   On the occasion that you could observe her, did she look

21  to you to be always sober, or were there occasions when you

22  thought she was --

23      MR. GROSS:  Objection, Your Honor.

24      THE COURT:  Overruled.

25

MATZ, TRAKTMAN, FELDMAN AND WILDNER

501

1 BY MR. BLACKER:

2   Q   --where she might be somewhat inebriated?

3   A   Friendly.

4   Q   Now, let me show you State's Exhibit 5 through 11, I

5 believe, sir, and you tell me, if you would, look at me and

6 tell me if you see what you've described as a revolver in any

7 of those photographs.

8   A   No.

9   Q   Thank you.  Let me ask you, the gentleman that left the

10 courtroom before you testified here today, a big, tall,

11 strapping fellow named Bigotti, do you remember him?

12   A   Yes.

13   Q   He worked for the Fortune House during the period that

14 you worked there?

15   A   Yes.

16   Q   Was he present during the occurrence that you testified

17 to today, this occurrence in the lobby?

18   A   Not at my time when this was happening.

19   Q   He wasn't there?

20   A   No.

21   Q   But nonetheless, a video was made of some of the

22 occurrences, and it is refreshed, is it not, in that exhibit

23 that you just looked at; is that correct?  What I'm saying,

24 Mr. Roberts, is the occurrence that you are describing for us

25 today is reflected not in its entirety, but in a portion of

1 those photographs, isn't it?

2   A   A portion, yes.

3   Q   So if he got any information from what occurred, he may

4 have seen the video, could he not?  He had access to the video

5 of what occurred that night, didn't he?

6        MR. GROSS:  Objection.  Speculation, Your Honor.

7        THE COURT:  Sustained.

8 BY MR. BLACKER:

9   Q   When the police arrived and you viewed the video, wasn't

10 there a big, tall guy, Bigotti, in the room viewing it?

11  A   No.

12  Q   You don't remember?

13  A   I don't remember.

14  Q   Now, in the video -- you are the security guard, so one

15 of your duties was to look at the video and determine that

16 there was peacekeeping at the Fortune House, right?

17  A   Right.

18  Q   OK.  And when you reviewed the video either that night or

19 any other night, you know that the girl, Ms. Ruiz and Mr. Diaz

20 had stopped off on the 6th floor; isn't that correct?  It's

21 shown on that video?

22  A   No, I don't recall.

23  Q   OK.  Do you remember when the police arrived that they

24 viewed the video, that they went up -- the police went up to

25 the 6th floor where --

503

1  A  Oh, yes.  The police went up.

2  Q  They went up there?

3  A  Yes.

4  Q  The crime scene people, correct?

5  A  Right.

6  Q  With their cameras and things?

7  A  Yes.  They went up.

8  Q  In order to record and pick up any evidentiary matter

9  that might be there; isn't that correct?

10  A  Right.  Correct.

11  Q  And they also went into Apartment 2302, did they not, and

12  took photographs of her apartment?

13  A  20 --

14  Q  I think it was 23?

15  A  No.  Farther up, I think it is.

16  Q  Let me just show you.

17  A  6th floor or something.

18  Q  Sorry.

19  A  6th floor or something, was it?

20  Q  The 6th floor was the gym place, the gym, but she lived in

21  2302?  Do you remember them going up to her apartment to do a

22  crime scene investigation there?

23  A  2302?

24  Q  I believe that was --

25  A  The 23rd floor, yes, they went up there.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

504

1   Q   And did you accompany them when they went?

2   A   No.

3   Q   But you know they were there because you could see them

4 on your security screen?

5   A   They told me they went up there.

6   Q   Oh, they told you.  OK.  And let me ask you, is it your

7 testimony that whoever had a gun, if -- did not point it at

8 Dennis Flores; is that what you told us?

9   A   Right.  That is what I could recall.

10       MR. BLACKER:  Thank you very much.

11       THE COURT:  Nothing further of this witness?

12       MR. GROSS:  Nothing further.

13       THE COURT:  Thank you, Mr. Roberts.

14       Ladies and gentlemen, let's take a five minute bathroom

15   break.  Do not discuss the case amongst yourselves.  Go in

16   the jury room right behind you.

17       (Thereupon, the jury panel exited the courtroom, and the

18 following proceedings were had outside the presence of the jury

19 panel:)

20       THE COURT:  OK, five minutes.

21       (Thereupon, a brief recess was taken, after which, the

22 following proceedings were had outside the presence of the jury

23 panel:)

24       THE COURT:  You may have a seat.  Do we need to take

25   something up?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

505

1     MR. BLACKER: We do. Mr. Baldizin is the next witness

2    for the State. His ex-wife I --

3     THE COURT: What is her name?

4     MR. BLACKER: Ms. Abud. And I found that out yesterday

5    by asking counsel -- well, two days ago, when she -- the

6    name was on the witness list. That name was unfamiliar to

7    me. It turns out Ms. Abud was Baldizin's ex-wife, who was

8    at the cafeteria that night. She has testified as to one

9    shot. I don't want to have misrepresented to the jury that

10    she is going to say that. But as I said in opening

11    argument, I did not subpoena her, because I didn't know who

12    she was. I saw the witness list, but it didn't mean anything

13    to me. Mr. Kafka (phonetic), a predecessor counsel, took

14    the depo, and in this depo, she says it is one shot.

15    The problem is Baldizin didn't want to give me her

16    address. I just introduced myself to him. This is the

17    second time I meet him, and he did not want to give me her

18    address. He said she is not a witness. So I'm asking the

19    Court in -- the case is drawing near to the end. I'm going

20    to need this witness. I'm asking the Court to have them

21    give me the address, or ask him to have her come out here,

22    so I won't have to send out a process server and get her

23    served.

24     THE COURT: This is the first time I heard about it,

25    this witness. Could you get Ms. Abud?

506

1      MS. CORONA: She didn't actually see anything for
2  herself. She was in the back of the cafeteria.
3      MR. BLACKER: She heard one shot. When you shoot a gun
4  at 1 o'clock in the morning --
5      MS. CORONA: And that is what this -- what this witness
6  is going to testify.
7      THE COURT: Baldizin will say that he heard one shot?
8      MR. BLACKER: They both heard one shot. He saw the shot.
9      THE COURT: We still need both of them. Come forward.
10 Please come forward. Let's swear in the official court
11 interpreter.
12      (Thereupon, the Official Court Interpreter was duly
13 sworn.)
14      THE COURT: And Madam Interpreter, your name?
15      THE INTERPRETER: Carolina McLaws, M-c-L-A-W-S.
16 Official court interpreter.
17      THE COURT: Do both sides stipulate to the qualifications
18 of the official court interpreter?
19      MR. BLACKER: Yes, sir.
20      MS. CORONA: Yes.
21      THE COURT: Swear in the witness.
22 Thereupon:
23                    RODIMIRO ANTONIO BALDIZIN
24 was called as a witness, and having been first duly sworn, was
25 examined and testified through the interpreter as follows:

MATZ, TRAKTMAN, FELDMAN AND WILDNER

507

1    THE COURT:  Sir, your name?

2    THE WITNESS:  Rodimir Antonio Baldizin.

3    THE COURT:  I understand that your wife is Ms. Abud?

4    THE WITNESS:  Yes.

5    THE COURT:  Does she live with you?

6    THE WITNESS:  Not anymore.

7    THE COURT:  Do you know her address?

8    THE WITNESS:  Yes.

9    THE COURT:  OK.  What is her address?

10   MS. CORONA:  Can we do it outside the presence of the

11   defendant and the defendant's family?

12   MR. BLACKER:  Absolutely.

13   THE COURT:  No.  We're in a public courtroom.  What is

14   the address?

15   THE WITNESS:  1845 Northwest 11th Street.

16   THE COURT:  And is that an apartment?

17   THE WITNESS:  No.  It's a house.

18   THE COURT:  All right.  Now, anything further?

19   MR. BLACKER:  I'm going to ask you to ask this gentleman

20   to have her appear in court.

21   THE COURT:  Can you contact her?

22   THE WITNESS:  Yes.  For what objective?

23   THE COURT:  For her to come to court.

24   THE WITNESS:  She didn't see the incident.

25   THE COURT:  Did she hear the incident?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

508

1          THE WITNESS:  No.  I told her about it.

2          THE COURT:  All right.

3          MR. BLACKER:  Can I ask one question?  Because it's

4      about her.  It's relevant to the case.  When you were

5      discussing this with your wife, didn't she say she heard

6      one shot?

7          THE WITNESS:  Yes.  But she heard it.  She didn't see

8      anything.  Even in --

9          THE COURT:  How many shots did you hear?

10         THE WITNESS:  I remember one.

11         THE COURT:  All right.

12         MR. BLACKER:  Can we stipulate?  If we can't stipulate,

13     I need her.

14         MS. CORONA:  Stipulate to what?  That there was only

15     one shot?  I'm not going to do that.

16         MR. BLACKER:  Stipulate what she would say, like we did

17     with Alvarez-Vega.  What she would say.  Well, then, I need

18     her.

19         THE COURT:  All right.  Can you serve her?

20         MR. BLACKER:  I will try.

21         THE COURT:  Can you contact her today and tell her to

22     come here today?

23         THE WITNESS:  I don't know if we're going to be able --

24         THE COURT:  Could you contact her today?

25         THE WITNESS:  But I don't know if she would be able to

1    come or not.

2        MS. CORONA:  She has never been subpoenaed.  If the

3    defense wants to subpoena her they -- I never intended to

4    call her as she didn't witness anything for herself.

5        THE COURT:  Michael, you will just call her in --

6        MR. BLACKER:  It would take four minutes -- less than

7    four minutes.

8        THE COURT:  You can call her for her to say she heard

9    one shot?

10       MR. BLACKER:  Yes, sir.

11       THE COURT:  What is the issue if this is the man that

12   saw it and he only heard one shot?

13       MR. BLACKER:  Because the State is going to argue in

14   closing strenuously that he is wrong; that there were two

15   shots fired, and Cathy Ruiz is correct.

16       MS. CORONA:  He doesn't have to have her to hear the

17   shots.  She's going to say there was one shot.

18       THE COURT:  Anyway, you have her address.  If you serve

19   her and get her in --

20       MR. BLACKER:  May I have a moment to call my office and

21   get her in?

22       THE COURT:  Yes.

23       MR. BLACKER:  Thank you.

24       THE COURT:  What is her name?

25       MS. CORONA:  I-L-U-S-I-O-N Abud.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

```
1       THE COURT:  Sir, tell this lady we want her here in
2   court.  If she doesn't appear in court, it could eventually
3   wind up with the police going to pick her up.  All right.
4   We don't want to get that far.  All right.  So I would
5   rather that she come in here.  You contact her and tell her
6   just to come in here, and her testimony will take like a
7   minute or two, and that would be it.  That way, we don't have
8   to go through hoops, and she won't, either.  You understand?
9       THE WITNESS:  Yes.
10      THE COURT:  So please help us out.
11      THE WITNESS:  OK.
12      THE COURT:  Before we get the jury, the other thing is--
13  I want both sides to listen.  The juror that the employer
14  said was going to fire her, I talked to her employer and
15  told the employer that it was against the law.  You can't
16  fire somebody because they are on jury duty.  And she said
17  that the lady had started working there on Friday and didn't
18  say anything to her.  And I told her, well, if, after this
19  lady is finished with this trial today and tomorrow, if we
20  hear that she was fired, it could result in contempt
21  proceedings against you.  And I gave her my name and number,
22  and told her to contact the lawyer.  All right.  I'm going
23  to get the juror, though, and both sides have no problem
24  that I spoke to her employer.  And it's up to the juror to
25  decide if she is fired, and if she contacts us, we could
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

511

1    hold contempt proceedings.  Both sides in agreement?

2        MR. BLACKER:  Yes.  Thank you for following up on that.

3        MS. CORONA:  Yes.

4        THE COURT:  Jimmy.

5        (Thereupon, the jury panel entered the courtroom, after

6    which, the following proceedings were had in open court:)

7        THE COURT:  Thank you.  Everyone please have a seat.  And

8    let the record reflect that the defendant is present.

9        Before we continue with the trial, Ms. Aranda, I wanted

10   to let you know that I talked to Ana Rodriguez and told her

11   that you were on the jury, and you could not be fired for

12   being on the jury.  It's against the law.  I told her that.

13       JUROR ARANDA:  Thank you, sir.

14       THE COURT:  I told her that if I heard that you were

15   fired, it could result in contempt proceedings against her,

16   where she could wind up in jail.  She said she wouldn't

17   believe that that could happen; that it was never her

18   intention.

19       JUROR ARANDA:  That is what she told me.  To be

20   professional, I went straight to her, and that is what she

21   told me.

22       THE COURT:  What she told me is that you started working

23   there on Friday.

24       JUROR ARANDA:  No.  I worked all the week before.

25       THE COURT:  Anyway, that's not what she said.  Anyway,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

512

1    I told her that this trial should be over today or

2    tomorrow, and if you are fired because you were selected for

3    the jury and you contact my office, we will institute

4    contempt proceedings against her, and we would have the --

5    　　JUROR ARANDA: She even told me that I was crazy; that

6    there is no law that would arrest me if I didn't come.

7    　　THE COURT: There is a law, and we would be glad to give

8    you a copy of it. But you have our card. If you are fired

9    because of this reason, all you need to do is contact us,

10   and we will institute contempt proceedings against her, and

11   have her served by the police, and if necessary, brought here

12   voluntarily or involuntarily and deal with her. OK?

13   　　JUROR ARANDA: Thank you, sir.

14   　　THE COURT: All right. Let's continue with the trial.

15   　　State, your next witness.

16   　　MS. CORONA: The State calls Rodimiro Antonio Baldizin.

17 Thereupon:

18   　　　　　　　　　　RODIMIRO ANTONIO BALDIZIN

19 was called as a witness, and having been previously duly sworn,

20 was examined and testified through the interpreter as follows:

21   　　THE COURT: OK. Please have a seat over here.

22   　　For the record, both sides have stipulated to the

23   official court interpreter, and she is under oath; is that

24   correct?

25   　　MS. CORONA: Correct, Judge.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

513

1        THE COURT:  Mr. Blacker.

2        MR. BLACKER:  I'm sorry, sir?

3        THE COURT:  Both sides have stipulated to the

4   qualifications of the official court interpreter, and she

5   has been placed under oath; is that correct?

6        MR. BLACKER:  Yes, sir.

7        THE COURT:  All right.

8                        DIRECT EXAMINATION

9   BY  MS. CORONA:

10   Q   Can you please state your name for the record?

11   A   Rodimiro Antonio Baldizin.

12   Q   What do you·do for a living, Mr. Baldizin?

13   A   I install tile and marble.

14   Q   And in June of 2003, did you also have a business,

15  another business?

16   A   Yes.

17   Q   What kind of business was it?

18   A   A cafeteria.

19   Q   Where was this specific cafeteria located?

20   A   1745 West Flagler Street.

21   Q   And what were the hours of operation of this business?

22   A   From 8 in the morning until 3 in the morning.

23   Q   What hours were you there at this business?

24   A   Always after 6 in the afternoon.

25   Q   June 8, 2003, did something happen at or near your

MATZ, TRAKTMAN, FELDMAN AND WILDNER

514

1  business?

2  A   Yes.

3  Q   What happened?

4  A   An incident.

5  Q   Where were you when something started happening?

6  A   I was inside.

7  Q   What did you see?

8  A   I was called because I was told that -- there was a

9  friend of mine close to the window, so I went there, and he

10 caught my attention; that since he was sent -- wasn't there any

11 longer.  There was a car that stopped.

12 Q   Did you actually see the car pull up?

13 A   Yes.

14 Q   And what did you see when the car pulled up?

15 A   A person that was arguing with a woman.

16 Q   Was the person still in the car when you first looked

17 out?

18 A   Yes.

19 Q   Where was the woman sitting?

20 A   In the back seat.

21 Q   Was there anybody in the front seat?

22 A   Yes.

23 Q   Who was in the front seat?

24 A   The driver.

25 Q   So he was in the driver's seat?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

515

```
 1    A    Correct.

 2    Q    What did the car look like; do you remember?

 3    A    Yes.  It was a small four-door car.

 4    Q    Do you remember what color it was?

 5    A    No.

 6    Q    Do you know if it was a light or dark car?

 7    A    I don't remember at this time.  I don't remember, but it

 8 was a small car.

 9    Q    The two people that you saw inside the car, did you

10 recognize these people as friends of yours or anybody that you

11 had ever seen before?

12    A    Never.

13    Q    So what called your attention to them?

14    A    That they started arguing.  He started arguing.

15    Q    OK.  Could you hear what he was saying?

16    A    Yes, because they were very close.

17    Q    What was he saying to her?

18    A    That she was a prostitute.

19    Q    Anything else?

20    A    Yes.  That she slept with one and with another one.

21    Q    What was the tone of his voice when he was saying these

22 things to her?

23    A    Upset.

24    Q    What was the female doing while this was happening?

25    A    She was just crying.
```

516

1   Q   Did you ever see him use physical force against her at

2  that point?

3   A   Yes.

4       MR. BLACKER:  Objection.  Leading, Your Honor.

5       THE COURT:  Overruled.

6       THE WITNESS:  Yes.

7  BY MS. CORONA:

8   Q   What did you see happen?

9   A   He pulled her out of the back seat of the car, and he

10  started saying things to her; the same things I told you

11  before, that she was a prostitute.  And he went to the side --

12  he pulled her.

13  Q   And then what did he do?

14  A   She walked on the sidewalk.  He followed her.  He told

15  her to get back into the car.  He shot into the air.

16  Q   When did she get out of the car?  How was she able to get

17  out of the car?

18  A   He pulled her out.

19  Q   OK.  After he pulled her out of the car, was she able to

20  walk away on her own?

21  A   Yes.

22  Q   Did she look like she was trying to get away from him and

23  the car?

24  A   Yes.  That's correct.

25  Q   What was her condition at that time?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

517

1        MR. BLACKER:  Objection.

2        THE COURT:  Overruled.

3        MS. CORONA:  What he observed, Judge.

4        THE WITNESS:  That she was frustrated.  She was afraid.

5 BY  MS. CORONA:

6    Q    How far was she able to get before the male caught up

7 with her?

8    A    About 20 feet.

9    Q    And what did he do once he caught up with her?

10   A    He grabbed her from the hair.

11   Q    And then what did he do?

12   A    He wanted to get her inside the car.

13   Q    Was he able to get her back in the car?

14   A    Yes.

15   Q    OK.  And you said he shot the gun.  Did you see when he

16 took the gun out?

17   A    Of course, I did.

18   Q    When did he take the gun out?

19   A    When they were arguing before getting her in the car.

20   Q    She was outside of the car when he took the gun out?

21   A    Yes.

22   Q    And when was it that he actually shot the firearm in

23 front of the cafeteria?

24   A    It wasn't in front of it.  It was to one side of the

25 vehicle.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

518

| | | |
|---|---|---|
| 1 | Q | Did you physically see the gun in the man's hand? |
| 2 | A | Yes. |
| 3 | Q | And you saw when he actually shot the gun? |
| 4 | A | Yes. |
| 5 | Q | And after he shot the gun, what did he do? |
| 6 | A | He pointed at me. |
| 7 | Q | And what did he say, if he said anything? |
| 8 | A | He told me:  Look, this is not with you. |
| 9 | Q | So did he directly point the gun at you? |
| 10 | A | Correct. |
| 11 | Q | Did you feel threatened at that point? |
| 12 | A | Of course I did. |
| 13 | Q | Were you afraid for your life? |
| 14 | A | Yes. |

15    MR. BLACKER:  Objection.  Irrelevant in this case.

16    THE COURT:  Sustained.

17    MR. BLACKER:  Ask for 104.

18    THE COURT:  The jury will disregard the witness' last

19  answer.

20 BY MS. CORONA:

21    Q  How did the girl get back into the car, the female that

22 you saw outside the cafeteria?

23    A  He put her inside, using force.

24    Q  How specifically?  Tell me exactly how it happened.

25    A  He pushed her inside.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

519

1   Q   Was she struggling to try to get out?

2   A   Yes.

3   Q   And what did he do once he got her inside the car?

4   A   He hit her.

5   Q   Did you see how he was hitting her?

6   A   Yes.

7   Q   How?

8   A   With the fist.

9   Q   Did he still have the gun in his hand at that point?

10  A   Yes.

11  Q   Did the -- tell me about this gunfire that you heard --

12  about what you heard, and you actually saw.  How far were you

13  when this shot actually happened with the man and the gun;

14  closer than you and I are, or farther than you and I are?

15  A   Farther.

16  Q   How much farther?  About how many feet in the courtroom?

17  A   From about here to where the man is where -- or a little

18  bit closer.

19      MS. CORONA:  OK.  Would you say about 30 feet, counsel?

20      THE WITNESS:  More or less.

21  BY MS. CORONA:

22  Q   From the 30 feet away, could you specifically see the gun

23  in his hand?

24  A   Yes.

25  Q   Do you know what kind of gun it was, if it was a revolver

MATZ, TRAKTMAN, FELDMAN AND WILDNER

520

1 or if it was an automatic gun?

2   A   It was a pistol.

3   Q   Not a revolver?

4   A   No.

5   Q   And once he shot in the air, could you hear it from where

6 you were?

7   A   Yes.

8   Q   What did you hear?

9   A   The shot.

10   Q   Were there other people around in the cafeteria at the

11 time?

12   A   Yes.

13   Q   Who else was there?

14   A   The girls that worked for me, and clients.

15   Q   And what did they do once they heard the shot fired?

16   A   I put all of them inside.

17   Q   Why did you put all of them inside?

18      MR. BLACKER:   Objection.   Irrelevant.

19      THE COURT:   Overruled.

20      THE WITNESS:   Because I was afraid that something might

21   happen to them.

22 BY MS. CORONA:

23   Q   Can you describe to me the man that was outside the

24 cafeteria that day, what he looked like?

25   A   Yes.   He was wearing blue jeans and no shirt.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

521

1    Q    Did you see if he had any tattoos?

2    A    No, I didn't see.

3    Q    Did you see if he was -- what was his physical condition

4 like, his attitude?

5    A    I don't understand.

6    Q    Did he appear to you to be agitated, sweating?

7    A    Yes.  He was upset with anger.

8    Q    Did you call the police at some point during this

9 incident?

10   A    Yes.

11   Q    Have you had an opportunity to listen to the call that

12 you made when you actually called the police that day?

13   A    No.

14   Q    Yesterday, were you able to listen to the call that you

15 made that's on the cassette tape?

16   A    No, I didn't have a chance.

17        MS. CORONA:  Judge, I'm going to ask to play what's

18        already been admitted into evidence as State's Exhibit 19

19        as it relates to this witness.  And I have copies of the

20        interpretation of this 9-1-1 call made by the witness that's

21        been interpreted by the certified court interpreter, and I

22        ask that be admitted into evidence at this point.

23        THE COURT:  The tape was introduced into evidence?

24        MS. CORONA:  The 9-1-1 tape was introduced as it related

25        to another call.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

522

1       THE COURT:  Another call.  How about this call?  That one

2   is there, too?

3       MS. CORONA:  It's the same tape, yes.

4       THE COURT:  You have everything on one tape?

5       MS. CORONA:  Right.

6       THE COURT:  Play it, and he can tell us if he recognizes

7   this as his own call, and the tape itself will serve as the

8   record for purposes of appeal.

9       MS. CORONA:  Well, Judge, actually, the tape is in

10  Spanish, and the -- there is an interpretation made by a

11  certified court interpreter that we have agreed previously

12  to the interpretation.  The interpretation should be what

13  the jury relies upon, but you can ask the jury to listen to

14  the condition of the witness while he calls 9-1-1.

15      THE COURT:  So the transcript that you have in English

16  will be actually introduced in evidence?

17      MR. BLACKER:  Judge, wait a second.  The transcript

18  introduced?  We need a sidebar.

19      THE COURT:  All right.

20      (Thereupon, counsel for the respective parties approached

21  the bench, and the following proceedings were had outside the

22  hearing of the jury panel:)

23      THE COURT:  Yes.  You want to introduce the transcript?

24      MS. CORONA:  Yes.

25      MR. BLACKER:  The transcript, it's not even translated.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

523

1      THE COURT:  Is this translated?

2      MR. BLACKER:  The recording is in Spanish.  It's the

3  translation that is only in English, only the English words.

4  It is only an aid to the jury, a transcript.  It is not

5  evidence.

6      THE COURT:  So why don't you play the tape with -- do you

7  have enough copies for the jury?

8      MS. CORONA:  May I make an argument?  If it's in

9  Spanish, the translation is what is evidence, the English

10  translation, because the jury cannot rely on their own

11  interpretation of the Spanish language.  So we have to rely

12  on the certified court interpreter's interpretation.  I asked

13  previously -- asked him previously, and he told me he was not

14  going to --

15      THE COURT:  Both sides wait.  This is State's Exhibit 2P

16  for Identification.  Both sides have stipulated to the

17  translation; is that correct?

18      MR. BLACKER:  Correct.

19      THE COURT:  Now, the only question is whether it comes

20  into evidence or not.

21      MR. BLACKER:  Can I have a moment?

22      THE COURT:  We have the statement in another language.

23  They don't understand it.  So in those cases, the stipulated

24  translation is what's introduced into evidence.  The tape is

25  also introduced, but this is introduced.  But the jury can

524

1   have it, because if they play that tape, they don't

2   understand a word.

3        MR. BLACKER:  I stipulated that she didn't have to come

4   in.  The point is what normally happens, as the Court knows,

5   is they have an interpreted translation, Spanish on one side

6   and its translation there on the right-hand side of the page,

7   so that those members of the jury can, that want to rely on

8   the words that make sure that it is correct.  What I meant

9   to stipulate to is that no certified court interpreter is

10   going to change any words.

11        THE COURT:  Look.  I just want to get the show on the

12   road here.  If you have no real beef with the translation,

13   you stipulated that the translation is proper and correct,

14   let her introduce it.

15        MR. BLACKER:  I asked counsel to stipulate that the wife

16   was going to say there was one shot.

17        MS. CORONA:  That has nothing to do with -- he's picking

18   a fight with me.

19        MR. BLACKER:  I'm picking a fight over that because I've

20   stipulated to normal things and ask that counsel -- so we

21   would have this witness coming in, that poor little woman,

22   all over town, and she knows what he's going to say, but it's

23   OK.  So we're going to stipulate to much more.

24        THE COURT:  Both sides have stipulated to this

25   translation?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

525

1     MR. BLACKER:  Correct.  I'm stipulating.

2     (Thereupon, the sidebar conference was concluded, after

3  which, the following proceedings were had in open court:)

4     MS. CORONA:  At this time, the State moves State's

5  Exhibit 2P for Identification into evidence, the translation

6  that was discussed at sidebar.

7     THE COURT:  Both sides stipulate to the translation?  It

8  will be admitted.

9     THE CLERK:  2P marked for I.D. becomes State's Exhibit

10  Number 24.

11     (Thereupon, the exhibit referred to was marked as State's

12  Exhibit Number 24 and was received in Evidence.)

13     MS. CORONA:  At this time, I'm going to hand out copies

14  of this translation to the jury so they could follow along

15  in English, because the tape is in Spanish.

16     THE COURT:  Speaking of the jurors, did Jimmy send you

17  the chocolate bars?  Everybody shared?

18     THE JURY PANEL (Collectively):  Thank you.

19     (Thereupon, the tape recording referred to was published

20  in open court.)

21  BY MS. CORONA:

22  Q   Is this your voice on the tape?

23  A   Yes.

24     THE COURT:  Are you going to ask him what was said?

25

1  BY MS. CORONA:

2     Q    Do you remember what you were saying on that tape, what

3  you just listened to?

4     A    Yes.  Now I remember.

5     Q    Can you tell me what it was that you were telling the

6  police at that time?

7     A    There was a person that fired a shot and he had a woman

8  there.

9     Q    Were you nervous when you were calling the police at this

10 time?

11    A    Yes.  Well, yes, you could say I was.

12    Q    Did you also tell the police that the guy was beating the

13 girl?

14    A    Yes.

15    Q    Where did he go once he put her in the car while beating

16 her?

17    A    Who?  Him?

18    Q    Right.

19    A    In the front side, and they left.

20    Q    Do you know which direction they went in?

21    A    On Flagler.

22    Q    Did the police ever arrive to your business as a result

23 of the 9-1-1 call?

24    A    Yes.

25    Q    Did they find a bullet casing actually near the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

527

1 business, around the place where the man fired the shot?

2 A    Yes.

3 Q    Did you direct them to where to go find that?

4 A    Yes.

5 Q    Showing you what has been marked as State's Exhibits 2L

6 and 2K, we will start with 2L for Identification.  Do you

7 recognize this?

8 A    Yes.

9 Q    And is that a fair and accurate representation of the

10 outside of your business on June 8, 2003?

11 A    Yes.

12    MS. CORONA:  State moves State's Exhibit 2L for

13 Identification into evidence.

14    THE COURT:  Any objection?

15    MR. BLACKER:  Without objection.

16    THE COURT:  It will be admitted.

17    THE CLERK:  2L marked for I.D. purposes now becomes

18 State's Exhibit Number 25.

19    (Thereupon, the exhibit referred to was marked as State's

20 Exhibit Number 25 and was received in Evidence.)

21    THE COURT:  Let me see it.

22    MS. CORONA:  May I ask the witness to step down to show

23 the photograph to the jury?

24    THE COURT:  Yes.

25

MATZ, TRAKTMAN, FELDMAN AND WILDNER

528

1 BY MS. CORONA:

2   Q   Can you show the members of the jury where on the

3 photograph your cafeteria is located, or where it would be had

4 it been on the photograph?

5   A   Well, it's not exactly here, because it's the part that's

6 next to the cafeteria.

7   Q   Show me where the car with the man beating the female was

8 parked.

9   A   Here, where the patrol car is.

10   Q   Close to where this car is parked in the photograph?

11   A   Correct.

12   Q   And show the members of the jury where the female went

13 when she was able to get out of the car, and where he caught up

14 with her.

15   A   To this side of the sidewalk.

16   Q   In which direction was she walking?

17   A   Towards 16th.

18   Q   Is that shown on the photograph?

19   A   This one is 17th, and it's going towards 16th.

20   Q   And where did he catch up with her? It's not shown in

21 the photograph?

22   A   No, because it's a little bit farther.

23   Q   When he caught up with her, how did he get her back to

24 the car?

25   A   He grabbed her from the hair and pulled her inside the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

529

1 car.

2   Q   And you see here where this arrow is, there is a

3 Number 1.  That is where the bullet casing was found, correct?

4   A   Yes.

5   Q   It was -- is that where the person was standing when he

6 actually shot the gun at the time you actually saw him shoot

7 the gun?

8   A   He was to one side of the car.  The vehicle was parked

9 like this, and he was to the side.  But he shot towards the

10 air.  That's where the -- went to what place where it is.

11   Q   So you are saying the casing rolled from where he -- it

12 was?

13   A   That's correct.

14   Q   Have a seat.

15   A   Thank you.

16   Q   At some point, were you asked if you would be able to

17 identify the man that shot and was beating the woman in front

18 of your business?

19   A   Yes.

20   Q   And did the police come to you with a series of

21 photographs and ask you to pick the person out, the person that

22 you saw that day?

23   A   Yes.

24   Q   And were you able to do so?

25   A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

530

1    Q    And the person that you chose, when the police showed him

2  to you, are you certain that, that was, in fact the same person

3  that was in front of your business beating the woman, who shot

4  in the air that day?

5    A    Yes.

6    Q    Showing you what has been marked as State's Exhibit 2E

7  for Identification.  Do you recognize this?

8    A    Yes.  My signature is there.

9    Q    And this is your signature up here?

10   A    Yes.

11   Q    And can you tell me which person you identified in this

12 photographic lineup with number --

13   A    Number 1.

14        MS. CORONA:  The State moves State's Exhibit 2E for

15   Identification into evidence.

16        THE COURT:  Any objection?

17        MR. BLACKER:  None so far, Your Honor.

18        THE COURT:  It will be admitted.

19        THE CLERK:  2E marked for I.D. purposes becomes State's

20   Exhibit Number 26.

21        (Thereupon, the exhibit referred to was marked as State's

22 Exhibit Number 26 and was received in Evidence.)

23 BY MS. CORONA:

24   Q    Is there any question that that person was, in fact, the

25 person that was in front of your business that day,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 Mr. Baldizin?

2   A   Yes, it was him.

3       MS. CORONA:  I have no further questions.

4       THE COURT:  All right.  Cross-examination.

5       MR. BLACKER:  May it please the Court, counsel, Mr. Diaz.

6                 CROSS-EXAMINATION

7 BY MR. BLACKER:

8   Q   Good afternoon, Mr. Baldizin.

9   A   Good afternoon.

10   Q   When you were just over here with this photograph of

11 State's Exhibit Number 25, and you were asked -- taking a look

12 at the little white thing on the street, which reflects that

13 this was a bullet casing there, and she -- and the prosecutor

14 asked you where the person who fired the shot was standing, you

15 said that the casing flew out of the gun, correct?

16   A   Yes.

17   Q   Was the person who shot the firearm closer to your store

18 or farther away from your store from this casing?

19   A   About 15 feet from there.

20   Q   Right.  But he was closer to your store, wasn't he?

21   A   Yes.

22   Q   OK.  15 feet closer than the casing is shown in this

23 photograph, State's Exhibit 25; is that correct?

24   A   Yes, that's correct.

25   Q   Thank you.  And if he was 15 feet closer to your store,

1 you had a pretty good view of what was going on, didn't you?

2    A    Of course, I did.

3    Q    Do you remember whether or not the person who's in the

4 car was up or down?

5    A    They were down.

6    Q    And how close to where you were observing from was the

7 front of the vehicle in question?

8    A    How close?  Well, about 25 feet.  It was close.

9    Q    And what was she saying when he was calling her a

10 prostitute and being angry with her, if anything?

11    A    She never said anything.

12    Q    And when you saw the weapon being fired -- I'll withdraw

13 that.  I just want to clear up one point.  You told the jury

14 that your store was not -- actually, your cafeteria was not

15 actually in State's Exhibit 25, isn't it?

16    A    No, it's not.

17    Q    But it's right next door to the store that's pictured on

18 the left-hand corner of State's Exhibit 25, isn't it?  It was

19 right next door?

20    A    Yes.

21    Q    It was directly west of the store that's shown in --

22 depicted in the picture; is that correct?

23    A    Yes.

24    Q    Now, this picture that you can't tell from State's

25 Exhibit 25, on the night in question, how was the lighting

533

1 outside the restaurant?  Could you see clearly?

2   A   Of course I could.

3   Q   You could see clearly; isn't that correct?

4   A   Yes.

5   Q   And it was nighttime?

6   A   Yes.

7   Q   And when you observed the firing of the shot, you heard
8 one shot, didn't you?

9   A   I saw when he fired.  I didn't -- I hear it.  I saw it
10 and I heard it.

11   Q   You hear one shot, did you not?

12   A   Yes.

13   Q   And what you saw, did you see when the gun was fired that
14 there was a flash, like a little tiny bit of fire as the gun
15 was fired?

16   A   Yes.

17   Q   And when you saw the flash, was the gun pointed up
18 towards the sky?

19   A   Yes.

20   Q   And the woman was in the car, wasn't she?

21   A   No.  He had not put her inside the car yet.

22   Q   But he was -- she is away from where he was shooting?
23 She wasn't above his head, was she?

24   A   No.

25   Q   The whole time that you observed them when they first

MATZ, TRAKTMAN, FELDMAN AND WILDNER

534

1 arrived, you said you saw them, right?

2   A   Yes.

3   Q   You saw the entire episode between them that occurred

4 between them, did you not?

5   A   Yes.

6   Q   And you saw when they left?

7   A   Yes.

8   Q   You saw the entire thing, didn't you?

9   A   Just when he fired, I stopped watching, because I had to

10 pull everyone inside the store, because I was afraid something

11 might happen to them.

12   Q   Very good.  And how long did that take you in time to

13 tell everyone to get back?

14   A   I don't know.  I wouldn't be able to tell you, because

15 when something like that happens, when someone fires, I kind of

16 -- I cannot tell you the time.

17   Q   You immediately, upon the firing of the weapon, you took

18 it upon yourself to protect your fellow employees and your life

19 at the time, correct?

20   A   Correct.

21   Q   And you told them -- you turned around, and you told them

22 to get back.  You protected them, correct?

23   A   Yes.

24   Q   And then your attention turned back to the events as they

25 were occurring out on the street that you are describing for

1 us today; isn't that correct?

2   A   Yes.

3   Q   Is that correct?

4   A   Yes.

5   Q   So it was just a matter of seconds that you turned away;

6 isn't that correct?

7   A   Correct.

8   Q   Did you ever see the man with the gun fire any bullets

9 into the car from inside the car when he was inside the car?

10   A   No.  He never fired inside the car.

11   Q   Did you ever see the man with the gun fire into the car

12 from even outside the car?

13   A   No.

14   Q   In fact, there were no bullets fired into that car, were

15 there?

16   A   No, he didn't fire inside the car.

17       MR. BLACKER:  Thank you, Mr. Baldizin.

18       MS. CORONA:  I have a couple of questions.

19                   REDIRECT EXAMINATION

20 BY MS. CORONA:

21   Q   Mr. Baldizin, after you heard the first shot, you went

22 inside the cafeteria, and you protected your people, right?

23   A   Correct.

24   Q   And after the defendant and the victim, the male and the

25 female were back inside the car, you don't know what happened

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 inside the car after that, right?

2   A   No, because they left.

3   Q   So it's possible that there was another gunshot fired,

4 but you did not physically see, yourself?

5   A   Inside the car, no.  But it could have happened outside.

6   Q   You think there could have been another shot outside the

7 car?

8   A   Maybe.  I think so.

9       MS. CORONA:  I have no other questions.

10      MR. BLACKER:  She just raised a point.  Let me just

11   clear that up.  Thank you.

12                   RECROSS-EXAMINATION

13 BY MR. BLACKER:

14   Q   While they were -- while that car was in your sight, you

15 saw and heard one shot; is that correct?

16   A   Yes.

17   Q   When that car left your sight, you don't know what

18 happened, do you?

19   A   No.  After they left, no.  But everything that happened

20 in front of the cafeteria, yes.  And everything I have said is

21 the truth.

22   Q   And what you saw in front of the cafeteria was one shot

23 being fired into the air at the sky; is that correct?

24   A   Yes.

25   Q   You never saw any shots or ever heard any more shots

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 that night; is that correct?

2   A   Yes.

3   Q   And you never saw or heard a shot being fired inside,

4 into the car while you were observing --

5   A   No.   Inside the car, no.

6   Q   It didn't happen, did it?

7   A   I don't remember.

8       MR. BLACKER:   Thank you.

9       THE COURT:   Anything further?

10      MS. CORONA:   No, Judge.

11      THE COURT:   All right.   Thank you, sir.   All right.   In

12   fact, have him wait for a second.   Have a seat.

13      Ladies and gentlemen, at this time, we are going to take

14   our lunch break.   It's 1 o'clock.   Meet Jimmy at 2 o'clock

15   where he tells you.   And you're not to discuss this case

16   amongst yourselves.   Go ahead.

17      (Thereupon, the jury panel exited the courtroom, and the

18 following proceedings were had outside the presence of the jury

19 panel:)

20      THE COURT:   Hold on.   I will repeat for everybody in the

21   courtroom, no one is to have any contact with the jurors; the

22   defendant's family or anyone else, OK?   Thank you.   We're in

23   recess.

24      Mr. Baldizin, please tell Ms. Abud to come here.   What

25   time?   4?

538

1          MR. BLACKER:  Whenever, Judge.  Yes.

2          THE COURT:  You have how many more witnesses?

3          MS. CORONA:  Judge, probably four.  Yes.  Two civilians.

4     Three crime scene.  That should be relatively quick.  And a

5     detective, who should be quick, also.

6          THE COURT:  All right.  Have the witness at 4, I would

7     say.  Can you tell her that?

8          THE WITNESS:  Yes, I can tell her.

9          MR. BLACKER:  Can I just tell the witness I'm not trying

10    to harass his wife?  I want her here for one minute to say

11    how many shots she heard, and then she could go.

12         THE COURT:  That will be the gist of the testimony

13    regarding how many shots.

14         MR. BLACKER:  I know she didn't see anything; just what

15    she heard.  It is very important to this case.

16         THE WITNESS:  All right.  The point is that she knows

17    what I've told her.

18         THE COURT:  You said that she heard one shot?

19         THE WITNESS:  Yes.

20         THE COURT:  All right.  So then we need her here at 4.

21         THE WITNESS:  OK.

22         THE COURT:  Thank you.  Would you be kind enough, sir --

23    would you be kind enough to bring her, yourself?

24         THE WITNESS:  I have to go to work.

25         THE COURT:  Well, will you give us a hand?  We

539

1   appreciate it.

2       THE WITNESS:  I haven't been working for the past three

3   days.

4       THE COURT:  Please give us a hand.  Thank you.

5       We're in recess.

6       (Thereupon, a lunch recess was taken, after which, the

7   following proceedings were had outside the presence of the

8   jury panel:)

9       THE COURT:  Did you review your instructions?

10      MR. BLACKER:  I did not.  I previewed three, and a lawyer

11  stopped me and asked me about giving some advice.  I kept

12  telling him I was in trial.  And he stopped me and he

13  wouldn't let me go for 15 minutes.  And I only took a 15

14  minute lunch, and that is when he was talking to me.

15      Judge, I called my office.  There was no one at

16  Ms. Abud's residence.

17      THE COURT:  Close the jury room door.

18      MR. BLACKER:  I told them to pay whatever it is to serve

19  her at 12 o'clock tonight and get her here at 9:30 in the

20  morning if she is served here today.  Just giving you an

21  update, and would ask that the Court inquire as to the effort

22  to find Mr. LeDuke.  And I will go up to civil sheriff during

23  the next break and see what effort has been done with

24  Ms. Bello.

25      THE COURT:  Are we ready for the jury?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

540

1        MR. BLACKER:  Yes.

2        THE COURT:  Bring in the jury.

3        (Thereupon, the jury panel entered the courtroom, after

4    which, the following proceedings were had in open court:)

5        THE COURT:  Please have a seat.  Let the record reflect

6    that the defendant is present, as he has been throughout the

7    trial.

8        State, who is your next witness?

9        MR. GROSS:  The State calls Johanna Rodriguez to the

10   stand.

11       THE COURT:  Put the interpreter under oath.

12       (Thereupon, the Official Court THE Interpreter was duly

13   sworn.)

14       THE INTERPRETER:  Norma Lopez.

15       THE COURT:  Do both sides stipulate to the official court

16   interpreter's qualifications?

17       MR. GROSS:  Yes, Your Honor.

18       MR. BLACKER:  I do.

19       THE COURT:  Swear in the witness.

20   Thereupon:

21                    JOHANNA RODRIGUEZ

22   was called as a witness, and having been first duly sworn, was

23   examined and testified through the interpreter as follows:

24       THE COURT:  Let's go.

25       MR. GROSS:  The State calls Johanna Rodriguez.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1          THE COURT:  She's right there.

2                      DIRECT EXAMINATION

3  BY MR. GROSS:

4    Q   Good afternoon, Johanna.

5    A   Good afternoon.

6          MR. GROSS:  Also, if you could just admonish the

7  witness to answer in Spanish.

8          THE WITNESS:  All right.

9  BY MR. GROSS:

10   Q   Could you state your name and spell it for the record?

11   A   Johanna Rodriguez.  J-O-H-A-N-N-A.  R-O-D-R-I-G-U-E-Z.

12   Q   So you are a construction worker?

13   A   Yes, sir.

14   Q   What do you do for a living?

15   A   I'm working in a demolition company.

16   Q   Wow.  A long time ago, back in 2003, there was an

17 incident that bring you here.  Do you recall that incident?

18   A   Of course.

19   Q   And that was June 8, 2003?

20   A   Yes.

21   Q   Now, I'm going to ask you to describe what you were doing

22 that night right before the incident.

23   A   I was at my brother's house.

24   Q   With who?

25   A   With my brother, his wife, his kids, and my friend,

542

1 Lesbia.

2 Q The last one was who?

3 A Lesbia.

4 Q Then where did you go afterwards?

5 A I went to take my friend home.

6 Q And your friend is?

7 A Lesbia.

8 Q Last name?

9 A Morales.

10 Q Morales. Thank you. Were you in Miami-Dade County?

11 A Of course.

12 Q And approximately what time of night was that?

13 A I'm not sure exactly. It was after 11 o'clock at night.

14 Q Were you driving?

15 A Yes, sir.

16 Q And what kind of vehicle were you driving?

17 A Mitsubishi Montero sport.

18 Q Is that an SUV?

19 A Yes.

20 Q And it was just the two of you in the car?

21 A Yes.

22 Q Can you describe the weather conditions that night, if

23 you recall?

24 A It was not raining. It was dark.

25 Q Well, I'll get to that. When you first noticed

543

1 something suspicious, where were you?

2   A   I was passing by Flagler.

3   Q   And what street?

4   A   Between 18th and 17th Avenue.

5   Q   So Flagler and 17th Avenue, approximately?

6   A   Correct.

7   Q   Now, how far away was your vehicle from the action?

8   A   When I passed, I was on the right-hand side lane.

9   Q   OK.  Were you on the right or left?  First, let's stop.

10 What did you see?

11   A   There was a car parked on the right-hand side, and I saw

12 a person, a man in the back door, and I could see clearly who

13 it was.  He was injuring someone.

14   Q   Now, that vehicle that you saw, could you describe that

15 car?

16   A   Four doors.  I'm not sure about the color.

17   Q   Was it an older car?

18   A   More or less.

19   Q   Now, what door did you say was open?

20   A   The back door on the passenger's side.

21   Q   The back passenger's door?

22   A   The left side.

23   Q   The left side would be the driver's side?

24   A   Yes, of course.

25   Q   What exactly did you see happen?

MATZ, TRAKTMAN, FELDMAN AND WILDNER