544

1    A    The guy was like pushing a person, but at the time, he

2 was hitting the person.

3    Q    Was this person, this man -- that man you later found out

4 to be Pablo Diaz?

5         MR. BLACKER:  Objection.  Objection.  Leading.

6         THE COURT:  Sustained.

7 BY MR. GROSS:

8    Q    Did you later find out that person's name?

9    A    Yes.

10    Q    What was the description of that man, physically, if you

11 recall?

12    A    White, had no hair, didn't have a shirt on.  He had a

13 tattoo.  I don't remember on which arm.

14    Q    Were you able to identify him from a series -- did

15 someone show you a series of photographs and you were able to

16 I.D. someone?

17    A    Yes.

18    Q    I want you to look around the courtroom today and I want

19 you to tell me if you see someone who fits that description.

20    A    No.

21    Q    And I know this is approximately three or four years ago,

22 right?

23    A    Yes.

24    Q    Now, what happened?  This person, was he standing outside

25 of the vehicle?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

545

1   A   He was always outside.

2   Q   Was he looking into the vehicle?

3   A   He was looking inside the vehicle, and he looked afraid

4 of anybody seeing him.

5   Q   What exactly was he doing with his hand?

6   A   Hitting.

7   Q   Do you know if he was hitting, punching, slapping?  What

8 exactly was he doing?

9   A   I just saw the arms.

10   Q   Now, when you were in your car with Ms. Morales, what did

11 you do?

12   A   I told her:  Look, that man is hitting someone.

13   Q   What did you do next?

14   A   Lesbia called 9-1-1.

15   Q   Who called 9-1-1?

16   A   I dialed.  She talked.

17   Q   And then what did you do?

18   A   I'm sorry.  When I told her that the man was hitting

19 someone, I said:  I'm going to call --

20       MR. BLACKER:  Objection if it is going to be anything

21   the other lady said to her, but I don't understand Spanish.

22       THE COURT:  Overruled.

23 BY MR. GROSS:

24   Q   Please answer the question.  I'll pose it again.  What

25 exactly did you tell the 9-1-1 operator?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

546

1    A    That a man was hitting a person.

2    Q    And what did you do next?

3    A    We tried to get the tag of the car.

4    Q    Did you pull alongside of this vehicle?

5    A    We stopped, but then we continued and we went around to

6 see the tag of the car.

7    Q    You said you went around.  Went around what?

8    A    We went around the block to get out on Flagler again.

9    Q    And once you were on Flagler again, what did you do?

10   A    We looked at the car.  The person had closed the doors,

11 and he took off, and we followed this person in order to get

12 the tag.

13   Q    Was there any time -- did you get out of the car?

14   A    Never.

15   Q    Did Ms. Morales, Lesbia Morales get out of the car?

16   A    Yes.

17   Q    When did she get out of the car?

18   A    Before calling 9-1-1.

19   Q    Let's go back to that, OK?  All right.  So right when you

20 see what you described as Pablo Diaz hitting --

21        MR. BLACKER:  Objection.  Assuming facts not in evidence.

22        THE COURT:  Sustained.

23 BY MR. GROSS:

24   Q    After you saw this person who later became known to you

25 as Pablo Diaz --

547

1        MR. BLACKER:  Objection.  Assuming facts not in evidence.

2        THE COURT:  Sustained.  After you saw this person -- go

3    ahead.

4  BY MR. GROSS:

5    Q   Anyway, what exactly did Lesbia do after you saw this

6  happen?

7    A   She got down from the car.

8    Q   And this is while you were parked where?

9    A   Around 20 feet from his car.

10   Q   In the rear of --

11   A   In front.

12   Q   You were in front of the car?

13   A   Yes.

14   Q   Were you looking in your rear view mirror?

15   A   No.

16   Q   Did you see Lesbia get out of the car?

17   A   Yes.

18   Q   Did you turn your head?

19   A   Yes.

20   Q   What did Lesbia do?

21   A   I don't know what she said or what she did.

22       MR. BLACKER:  Objection to what Lesbia said.

23       THE COURT:  Sustained.  Don't tell us what Lesbia said.

24  BY MR. GROSS:

25   Q   Just tell the Court, please, what Lesbia did, what you

MATZ, TRAKTMAN, FELDMAN AND WILDNER

548

1 saw.

2    A    She walked close to the car.  I saw her come back.  She

3 got back into the car, and she said --

4         MR. BLACKER:  Excuse me.

5 BY MR. GROSS:

6    Q    Now, without ever saying what anyone said, Lesbia Morales

7 got back into your car, right?

8    A    Yes.

9    Q    Was she nervous?

10   A    A lot.

11   Q    Was she upset?

12   A    Very nervous.

13   Q    Was she hysterical?

14   A    More or less.

15   Q    What did she say?

16        MR. BLACKER:  Objection to what she said.  It's hearsay.

17        THE COURT:  Overruled.

18 BY  MR. GROSS:

19   Q    What did she say?

20   A    Take off, because that man is armed.

21   Q    Take off, because that man is armed.  What did you take

22 that to mean?

23   A    That he had a pistol.

24   Q    Did you see a gun?

25   A    Never.

549

1  Q   Did you hear a gunshot?

2  A   Never.

3  Q   What did you do next?

4  A   We called 9-1-1.

5  Q   Now, were you able to see who was in the back seat?

6  A   No.

7  Q   And was there a time that someone showed you a photo of

8 the person who was in the back seat?

9  A   Yes.

10  Q   And were you able to identify that person from a series

11 of photographs?

12  A   Yes.

13  Q   What did you do next?

14  A   I don't understand.

15  Q   After Lesbia Morales came in your car and said that

16 person was armed, what did you do?

17  A   We called 9-1-1.

18  Q   Again, or that was the first time?

19      THE COURT:  Go ahead and answer.  She needs to answer.

20  She did -- did she call again or was that the first time

21  she called 9-1-1?

22      THE WITNESS:  That was the first time.

23 BY MR. GROSS:

24  Q   Then what did you do?

25  A   I dialed 9-1-1.  Lesbia talked to the person at 9-1-1.

550

1    Q    And after that?

2    A    Lesbia told me the lady says that we have to get the tag

3    from the car.

4    Q    What did you guys do next?

5    A    We went around the block to get out on Flagler again.

6    Q    Then what did you do?

7    A    We were going slow.  We tried to stop behind the car.  We

8    were afraid.

9    Q    Were you scared?

10   A    Yes.

11   Q    And why did you follow this car?

12        MR. BLACKER:  Objection, Your Honor, as to the last

13   question.  It's irrelevant.

14        THE COURT:  Overruled.

15        MR. BLACKER:  Why she followed, whether or not she is

16   scared.

17        THE COURT:  Overruled.  Please answer the question.

18        THE WITNESS:  Can you repeat it?

19   BY MR. GROSS:

20   Q    Yes.  Were you scared?

21   A    Yes.

22   Q    Why did you follow the car?

23   A    I was trying to help.

24   Q    What happened?

25   A    When he looked at my car again, he pushed the person,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

551

1 closed the door and started the car.  We tried to get the tag.

2  Q  Is there a time when the defendant -- when Pablo Diaz

3 actually spoke to Ms. Morales, if you know?

4  A  I did not hear it.

5  Q  Did Ms. Morales tell you --

6      MR. BLACKER:  Objection, Your Honor.

7      THE COURT:  Overruled.

8      THE WITNESS:  Yes.

9 BY  MR. GROSS:

10  Q  And what did she tell you that Pablo Diaz said?

11      MR. BLACKER:  Objection, Your Honor.  That's --

12      THE COURT:  Sustained.

13      MR. BLACKER:  -- secondary hearsay.

14      THE COURT:  Sustained.  More because of the proffered

15  issue.  Is that what the lady is going to testify?

16      MR. GROSS:  She is.

17      THE COURT:  Overruled.

18 BY MR. GROSS:

19  Q  What did Ms. Morales tell you that Pablo Diaz said?

20  A  She said that he told her that that was a problem for --

21 couple's problem, and she didn't have to get into it.

22  Q  Did she also tell you that she heard a gunshot?

23  A  No.

24  Q  After you pulled over again and tried to get his tag,

25 where did you go?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

552

1    A    We followed the car at a certain distance, not too close.

2    Q    Then what?

3    A    I got the tag.  We tried not to follow the person

4  anymore.

5    Q    Right.

6    A    Then the street light turned red.  There were two cars

7  behind him and then we were behind those two cars.

8    Q    Let me slow it down.  Were you behind the defendant's

9  car?

10   A    Two cars away.

11   Q    Behind or in front?

12   A    Behind.

13   Q    You were two cars behind.  All right.  And what happened?

14   A    At that moment, my brother calls me to see if I was all

15  right.

16   Q    After that?

17   A    All of a sudden, we hear the back door of my car opening.

18   Q    Did you know who it was that got in?

19   A    Not at that moment.  I heard screams coming from a lady.

20  She closed the door, and she was saying:  Please help me, help

21  me, help me, they're going to kill me, they're going to kill

22  me.

23   Q    Now, describe -- was that person nervous?

24   A    Yes, a lot.

25   Q    Was she hysterical?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

553

1    A    Yes.

2    Q    Did she mention a gun?

3    A    Yes.

4    Q    What exactly did she say?

5    A    He has a weapon, he has a weapon, he's going to kill me.

6 He wants to kill me.

7    Q    Is that all?

8    A    The man got out of the lane of cars.

9    Q    I'm just asking -- I'm sorry.  That's my mistake.  Is

10 that all she said?

11   A    Yes, sir.

12   Q    Was that person that you later found out to be Catherine

13 Ruiz the person who got in your car?

14   A    Yes.

15   Q    Were you here yesterday?

16   A    Yes.

17   Q    Did you see that person yesterday?

18   A    Yes.

19   Q    Was that the same person that came in this court

20 yesterday?

21   A    Yes.

22   Q    Now, what happened when Catherine Ruiz got in the back of

23 your car that night?

24   A    She was screaming.  When I saw the car that came out of

25 the lane where he was, I don't know for what reason, the right

MATZ, TRAKTMAN, FELDMAN AND WILDNER

554

1  lane, there were no cars on the right-hand lane, and I took

2  that lane, and he started following us.

3     Q   When you say he started following, that was the

4  defendant, where she came out of that car?

5     A   Just the defendant.

6     Q   Where did you go to?

7     A   At that moment, I was still talking to my brother and he

8  was -- I was telling him:  Please help us, because they're

9  going to kill us.

10     Q   Where did you go?

11     A   My brother was saying he was at the pool place.

12     Q   But where did you go?

13     A   I was going to 12th and 4th Avenue.

14     Q   How far did you drive originally?  This happened at 17th

15  and Flagler?

16     A   Two miles.

17     Q   And what did you see over there at 4th -- and what street

18  did you say?

19     A   12th Avenue and 4th Street.

20     Q   What was at 12th and 4th?

21     A   A pool place.  But I did not stop.

22     Q   When did you stop?

23     A   Crossing Flagler at 12th Avenue we saw three patrol cars.

24     Q   12th Avenue and what; do you recall?

25     A   And 2nd Street.

555

1   Q   What happened at 12th and 2nd?

2   A   There were three police cars there.  We stopped there,

3   and I stopped and I started screaming:  Please help us.

4   Q   And was there a time when Ms. Ruiz ran up to the police

5   officer?

6   A   No.

7   Q   Did she stay in your car?

8   A   Yes.

9   Q   Who got out of the car?

10  A   I did.

11  Q   Were you the one who spoke to the officer?

12  A   Yes.

13  Q   And you told that officer what?

14  A   To help me, because there was a woman that was hit, and

15  there was a man coming that wanted to kill us.

16  Q   One moment.  I now show you what has been previously

17  marked for State's identification as 2I.  Do you recognize it?

18  Do you recognize this photo?

19  A   Yes.

20  Q   What is it?  Is that what the officer who came to your

21  house --

22  A   No.

23  Q   This is the photo of the person that came to your house--

24  I meant to say, does an officer ever come to your house and

25  show you these photos?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

556

1   A   Yes.

2   Q   Before we get into that, when did the officer actually

3 show you these photos?

4   A   Two weeks after.

5   Q   Two weeks after.  Do you recall the officer's name?

6   A   No.

7   Q   When the officer showed you the photos, were you with

8 someone, or were you alone?

9   A   I was alone in a room.

10   Q   Is it a female or male officer?

11   A   A male.

12   Q   Did that man tell you the person who committed the crime

13 actually was in here?

14   A   Yes.

15   Q   Did the person say you'd better pick someone out?

16   A   No.

17   Q   Were you able to pick someone out?

18   A   Yes.

19   Q   Again, I show you what has been previously marked as

20 State's Exhibit 2I for Identification.  This is the photo?

21   A   Yes.

22   Q   How do you recognize it?

23   A   By his face.

24   Q   Do you see your signature?

25   A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

557

1  Q  And it's above which photo?

2  A  This guy.

3  Q  Is that the first one on the left, on the top?

4  A  Yes.

5      MR. GROSS:  Your Honor, at this time, the State wishes

6  to move what has been previously marked as 2I for

7  Identification into evidence.

8      THE COURT:  Any objection?

9      MR. BLACKER:  I will deal with it on cross-examination,

10  Judge.

11      THE COURT:  It will be admitted.

12      THE CLERK:  2I marked for I.D. purposes now becomes

13  State's Exhibit Number 27.

14      (Thereupon, the exhibit referred to was marked as State's

15  Exhibit Number 27 and was received in Evidence.)

16  BY MR. GROSS:

17  Q  Also, that same day that the officer showed you the

18  photos of the male, did he also show you pictures of the

19  female?

20  A  Yes.

21  Q  I now show you what has been previously marked as 2F for

22  Identification.  Now, do you recognize this?

23  A  Yes.

24  Q  What is this?

25  A  The girl.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

558

1   Q   How do you recognize it?

2   A   By the face, the hair.

3   Q   But is your signature on this page?

4   A   Yes.

5   Q   And you remember signing it?

6   A   Yes.

7        MR. GROSS:  Your Honor, at this time, I move into

8   evidence what has been previously marked as 2F for

9   Identification, State's evidence.

10       THE COURT:  Any objection?

11       MR. BLACKER:  Can I reserve the objection and deal with

12  it on cross-examination?

13       THE COURT:  It will be admitted.

14       THE CLERK:  Mark it?  2F marked for I.D. purposes now

15  becomes State's Exhibit Number 28.

16       (Thereupon, the exhibit referred to was marked as State's

17  Exhibit Number 28 and was received in Evidence.)

18       MR. GROSS:  One moment.  No further questions at this

19  time.

20       THE COURT:  Do you wish to publish this?

21       MR. GROSS:  Yes, Your Honor.

22       THE COURT:  Cross-examination.

23       MR. BLACKER:  May it please the Court, Mr. Diaz, counsel,

24  ladies and gentlemen.

25

MATZ, TRAKTMAN, FELDMAN AND WILDNER

559

1                    CROSS-EXAMINATION

2  BY  MR. BLACKER:

3     Q    Good afternoon, Ms. Rodriguez.

4     A    Good afternoon.

5     Q    You and I have never spoken before, have we?

6     A    No.

7     Q    You've given prior sworn testimony in this proceeding,

8  but not with me; is that correct?

9     A    Yes.

10    Q    OK.  When you left your brother's home on that evening,

11 it was just another normal ride home; isn't that correct?

12    A    Of course.

13    Q    Approximately how fast were you going down Flagler

14 Street, west on Flagler Street when you first saw what you

15 described to the prosecutor as the activity on the left rear

16 door of the car?

17    A    30 miles.

18    Q    30 miles an hour?

19    A    More or less.

20    Q    And how far were you from the back of that car when you

21 first saw the activity that you are starting to describe for us

22 today?

23    A    I saw it before I passed.

24    Q    Yes, but how far back were you when you first saw the

25 activity?  Were you right next to the car?  About how far?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

560

1    A    About 30 feet.

2    Q    30 feet.  And you were doing 30 miles an hour?

3    A    Yes.

4    Q    So how long did it take you from 30 feet back to actually

5  pass the car?  You were driving, weren't you?

6    A    Yes.

7    Q    And you took your eyes off the road to see this activity;

8  is that correct?

9    A    It was very fast.

10   Q    Very fast.  How long would you say that you observed this

11 activity?

12   A    Three, four seconds.

13   Q    Three, four seconds.  And during that time, you were able

14 to observe that this was a white man, correct?

15   A    Yes.

16   Q    With no shirt on?

17   A    Yes.

18   Q    And he was in the back left-hand side of the car?

19   A    Yes, sir.

20   Q    By the way, do you remember what kind of car it was?

21   A    Not exactly.

22   Q    Do you remember the color of the car?

23   A    Not exactly.

24   Q    You don't remember the color of the car; is that what you

25 are saying?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

561

1   A   No.

2   Q   Did you see the man or the car for a longer period of

3 time?

4   A   Of course.

5   Q   Of course, what?  You saw the car longer?

6   A   The man.

7   Q   You saw the man longer.  And in three or four seconds

8 that you saw him, he was hitting somebody?

9   A   Yes.

10   Q   And in that three- or four-second period, how many hits,

11 slaps?  You said you saw his forearms.  Would you say -- tell

12 the ladies and gentlemen of the jury what you saw.

13   A   Two.

14   Q   Two?

15   A   Like that.

16   Q   And was it at that time that you pull over in front of

17 the car, or you went around the block?

18   A   I don't remember.

19   Q   And when he was slapping or hitting at the woman, as

20 you've described it, was he facing towards the north, towards

21 the interior of the car?

22   A   Yes.

23   Q   Let me show you what has been marked and entered into

24 evidence as State's Exhibit 25.

25       MR. BLACKER:  May I approach, Your Honor?  Thank you.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

562

1 BY MR. BLACKER:

2    Q    Does that photograph depict the area in which we are

3 talking about there?

4    A    Yes.

5    Q    By the way, how was the lighting?

6    A    It was more dark than clear.

7    Q    More dark than clear.  In fact, as far as you recollect,

8 it was really dark, wasn't it?

9    A    Not too dark.

10   Q    Not too dark.

11        MR. BLACKER:  Page 10, counsel.

12 BY MR. BLACKER:

13   Q    Do you remember testifying in this case on March 3, 2004?

14   A    Yes.

15   Q    And in March of 2004, was your memory better in March, or

16 is it better today?

17   A    Yes.

18   Q    Well, which one?

19   A    In March.

20   Q    OK.

21   A    Of 2004.

22   Q    Page 10.

23        Question:  So you have -- withdrawn.

24        "Question:  So you have now a view of waist high of what

25 is happening inside the car?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

563

1     "Answer:  I couldn't see well what was going on in the

2 car, because it was really dark.  But I could observe the man

3 outside."

4     Do you remember that?

5  A  Yes.

6  Q  All right.  So you see that man slapping at this girl,

7 and you -- you don't remember whether you stopped your vehicle

8 or not; is that right?

9  A  In front.

10  Q  OK.  And in that three or four seconds, you also are able

11 to see a tattoo on the man?

12  A  Yes.

13  Q  And do you remember where the tattoo was?

14  A  I don't remember which arm had it.

15  Q  And were you able also -- I don't know if we entered this

16 -- which direction was the man facing as you drove by west on

17 Flagler Street?

18  A  His back was turned, going like this.

19  Q  His back was turned?

20  A  Yes.

21  Q  So you saw the back of his head?

22  A  Sometimes, he was looking and like searching, and I saw

23 the fact.

24  Q  OK.  All right.  Let's go back, then.  We're going to

25 stay with this point in time, OK?  As you were driving by in

MATZ, TRAKTMAN, FELDMAN AND WILDNER

564

1  the three or four seconds that you said you could observe the

2  activity at the car, did you see the man's face?

3     A    Yes.

4     Q    Saw his face.  And when did you see his face; before you

5  got to the car, or after you passed it, or while you were

6  alongside it?

7     A    Before I stopped.

8     Q    Before you stopped, you got a clear look at his face; is

9  that what you are saying?

10    A    More or less.

11    Q    More or less.  And then at some point, you drove around.

12 You parked you car in the same direction that his car was, or

13 that car was that the girl was in?

14    A    Yes.

15    Q    But you didn't look in your rear view mirror, did you?

16    A    No.  I was looking at Lesbia as she was getting down.

17    Q    So you weren't looking at the man, were you?

18    A    Not when I stopped.

19    Q    So you -- the only time you saw the man was when you

20 drove by for that three or four seconds; is that correct?

21    A    Yes.

22    Q    And at the same time you saw his face, you saw his

23 tattoo, you saw he was wearing jeans?

24    A    I don't remember.

25    Q    Oh.  You saw that he was white?

565

1  A  Yes.

2  Q  That he had no hair?

3  A  Yes.

4  Q  Did he have a beard?

5  A  I don't think so.

6  Q  Did he have glasses?

7  A  No.

8  Q  OK.  You saw that he wasn't wearing glasses?

9  A  No.

10  Q  Do you know if he was wearing shoes or socks?

11  A  No.

12  Q  And it was in that three- or four-minute period --

13 withdrawn.  In that three- or four-second period that you were

14 able to identify that person so that when they came with the

15 photo lineup, you could identify him quickly; is that correct?

16  A  Yes.

17  Q  It was in that period, that three to four seconds that

18 you made the determination of who that man was?

19  A  Yes.

20  Q  Which enabled you to identify him when the police came to

21 your home; is that correct?

22  A  Yes, sir.

23  Q  All right.  And did the police call you and make an

24 appointment to come and show you this photo lineup?

25  A  Yes.

566

1   Q   They did?

2   A   Yes.

3   Q   Did they talk to you on the phone?  Did they tell you

4 anything about the case?

5   A   No.

6   Q   Did they tell you who the person was that was under

7 arrest?

8   A   No.

9   Q   Did they tell you that they got their man?

10   A   Never.

11   Q   No.  OK.  They told you nothing; just made an

12 appointment?

13   A   Yes.

14   Q   And a police officer shows up at your house on the

15 appointment day; is that correct?

16   A   Yes, sir.

17   Q   And did he already have this piece of paper already put

18 together?

19   A   Yes.

20   Q   This was already like this, without your signature, of

21 course?

22   A   Yes.

23   Q   Is that correct?

24   A   Yes.

25   Q   State's Exhibit 27, we're referring to now for the

567

1 record. And did he have any single pictures in his little

2 photo lineup book?

3    A    I don't remember.

4    Q    There wasn't only this photograph that he had with him,

5 was it?

6    A    No.

7    Q    He had other photographs?

8    A    Yes.

9    Q    And he -- the other photographs, some of which were of

10 the defendant, weren't they?

11   A    I don't know.

12   Q    The other photographs, he showed you some of them, didn't

13 he?

14   A    I don't remember.

15   Q    You don't remember. How long was he in your presence?

16   A    I don't know. More than half an hour. I don't know.

17   Q    More than an hour? An hour?

18   A    And he was there half an hour.

19   Q    And he was polite and nice?

20   A    Yes.

21   Q    And he told you that he was there on official business,

22 so that you could help forward this case that you were helping

23 out in?

24   A    Yes.

25   Q    You knew the importance of the -- of what he was asking

568

1 you, did you not?

2   A   Of course.

3   Q   And you don't remember if he showed you -- let me ask you

4 this:  Did he show you any photographs, any single photographs

5 or combination of photographs, other than this?

6   A   No.

7   Q   No.  When he arrived, he arrived at your home?

8   A   Yes.

9   Q   Did he tell you that he had brought you a photo lineup?

10  A   Yes.

11  Q   And he told you that the perpetrator was on here; is that

12 correct?

13  A   Of course.  No.  I'm not sure.

14  Q   Didn't you just tell Mr. Gross not 15 minutes ago that he

15 had told you that he brought the person that committed the

16 crime in this photo lineup?  Didn't you just say that 15

17 minutes ago?

18  A   Yes.

19  Q   Well, why are you unsure?  Are you unsure of how to

20 answer because the question may be important, or are you unsure

21 of whether or not he told you that?

22  A   I'm not sure.

23  Q   Now, you knew that the perpetrator was somehow on this

24 photo lineup, correct?

25  A   I don't remember.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

569

1       MR. GROSS:  Objection, Your Honor.  Asked and answered

2    four times.

3       THE COURT:  Overruled.

4 BY MR. BLACKER:

5    Q   And I don't remember -- and I don't have a note on it.

6 I'm sorry.  But did you tell Mr. Gross that the man who you saw

7 for three or four seconds was bald?  Didn't you tell him that

8 he had no hair?

9    A   He didn't say anything about the physique of the guy.

10   Q   No.  Mr. Gross, the prosecutor, when he asked you about

11 the hair, did you say that he did not have any hair?

12   A   Yes.

13   Q   He did not have any hair.  Is there anyone on State's

14 Exhibit 27, other than the person identified as number one, who

15 does not have any hair?

16   A   No.

17   Q   They all have hair except number one; isn't that correct?

18   A   Yes.

19   Q   All right.  So this police officer arrives at your house

20 and shows you the photo lineup?

21      MR. BLACKER:  May I publish, Your Honor?

22      THE COURT:  Yes.

23      MR. BLACKER:  Thank you.

24 BY MR. BLACKER:

25   Q   And he sits you down, and he shows you these photographs

570

1 just like they are today; is that right?

2   A   Yes.

3   Q   And you don't remember if he showed you any others; is

4 that correct?

5   A   No.

6   Q   And how long did it take you to identify

7 Photograph Number 1 as being the person that you saw for three

8 or four seconds?

9   A   Immediately.

10   Q   Immediately?

11   A   Yes.

12   Q   And you just pointed him right out, huh?

13   A   Yes.

14   Q   Is that because he's the one that doesn't have any hair

15 in the photograph and that is what you remembered?

16   A   No.   The face.

17   Q   The face?

18   A   A little bit.

19   Q   What's a little bit?

20   A   The profile.

21   Q   The profile.  Let's talk about that.  As I understand it,

22 you are in the driver's seat, which makes you actually farther

23 away from the other side of Flagler; is that correct?

24   A   Yes.

25   Q   You are traveling 30 miles an hour, correct?

1    A    Yes.

2    Q    And in a period of three seconds, you glance over, and

3 you see an individual with his back to you who is slapping a

4 woman; is that correct?

5    A    Yes.

6    Q    He wasn't looking at traffic.  He was looking at the

7 woman, wasn't he, as he was doing this?

8    A    He was more moving his face.

9    Q    As he was slapping her, he was moving his face?  He is

10 slapping twice, you said?

11   A    Yes.

12   Q    So one time -- if he slapped her one time, he would have

13 been away from you.  And the second time would have been

14 towards you; isn't that correct?

15   A    Yes.

16   Q    And so you saw him when he slapped her one time?  As he

17 came to you, did he keep his face there, or did he move back,

18 facing her?

19   A    Can you repeat that?

20   Q    Yes.  How long was his face turned towards you when he

21 slapped her on that one occasion that you just told us about?

22   A    A few times.  Like that.

23   Q    A few times.  How long on each occasion when he turned

24 his head did you have an ability to see his face in time?

25   A    Four seconds.

572

1    Q   Ma'am, you told us that the entirety of your visual on

2  what was happening was four seconds.  You also told us that

3  part of the time, he's turned away from you.

4        MR. GROSS:  Objection.  Asked and answered.

5    Argumentative.

6        THE COURT:  Overruled.

7  BY MR. BLACKER:

8    Q   And now, you're telling us for the entirety of the time

9  you saw him, he was facing you; is that what you're telling us?

10   A   Not in front of me.

11   Q   I understand that.  Your view of his was a profile; is

12 that correct?

13   A   Yes.

14   Q   Any of these pictures on this exhibit a profile?

15   A   No.

16   Q   Did you know whether or not he had a beard on the night

17 in question?

18   A   No.  I'm not too sure.

19   Q   But this person here has a moustache and a little hair

20 growing under his chin.  Was that consistent with what you

21 remembered the night in question?

22   A   I did not see it.

23   Q   You did not see what?

24   A   The moustache.

25   Q   And you didn't see him straight on, did you?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

573

1    A    Not straight on.

2    Q    You only saw him from the side, and if you saw the entire

3  situation for four seconds, how long did you see his profile?

4    A    Two seconds.

5    Q    Two seconds.  All right.  And in the two seconds that you

6  were able to see his profile, you knew the importance of this

7  photo identification, didn't you?

8    A    Of course.

9    Q    It was explained to you?

10    A    Yes.

11    Q    That it would be used for court purposes?

12    A    Of course.

13    Q    To let the jury believe that what you were saying in

14  court was consistent with the truth, didn't you?

15    A    I saw his face, but not completely his profile.

16    Q    Ms. Rodriguez, how long have you seen me?  How long have

17  you been in my presence?  How long have you been in my

18  presence?

19    A    About 40 minutes.

20    Q    40 minutes.  And it's a lot lighter in here than it was

21  on that night, isn't it?

22    A    Yes.

23    Q    What color are my eyes?

24    A    Blue.

25    Q    You got that right.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

574

1    A    I have good vision.

2    Q    You have good vision.  It wasn't as light on the night in
3  question, was it?

4    A    I wasn't going to see the color of his eyes.

5    Q    Pardon?

6    A    I wasn't going to see the color of his eyes.

7         THE COURT:  Can we move on?

8         MR. BLACKER:  I'm moving on now, Judge.

9  BY MR. BLACKER:

10   Q    Now, they asked you to identify Exhibit 28 as a photo
11  exhibit; is that right?  They showed you that, correct?

12   A    Yes.

13   Q    Which one of those looked like the lady that jumped into
14  your car?  All of them?

15   A    This one.

16   Q    Which one is that, ma'am?  Which one, ma'am?  The bottom
17  left?  And how about the others?  Did that look like her?

18   A    Yes, but it was -- the hair was that color.

19   Q    I see.  And after you identified -- by the way, was your
20  friend, Lesbia, in the room when you were looking at the
21  photographs?

22   A    No.

23   Q    Was your friend, Lesbia, in the room when the police were
24  talking to you?

25   A    No.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    Q    They didn't explain their presence or anything in front

2 of Lesbia?

3    A    No.

4    Q    Do you remember the police officer telling Lesbia you had

5 identified the right person?

6    A    No.

7    Q    Did Lesbia identify the photographs right after you?

8    A    We didn't talk.

9    Q    That's not the question.  Did she identify the

10 photographs right after you?

11    A    Yes.

12    Q    And after you identified them, you -- do you know what

13 the police officer said to Lesbia?

14    A    No.

15        MR. BLACKER:  May I have a moment, Your Honor?

16        THE COURT:  Yes.

17        MR. BLACKER:  I do have one other area.  I'm sorry.

18 BY MR. BLACKER:

19    Q    You told us about when you left the scene, about how the

20 man was in pursuit of you; is that correct?

21    A    Yes.

22    Q    You didn't know that he was in pursuit of you at that

23 time, did you?  You didn't see him?

24    A    No.

25    Q    No?  You never saw him?

1   A   No.

2   Q   Now, in your life in Miami -- let me just ask you this:

3 When you first came in contact in your car with a woman who you

4 later identified in State's Exhibit 27 -- I believe 28, excuse

5 me.  I'm sorry.  How did she look?

6   A   Her hair was blonde.

7   Q   Well, was -- did she have a -- did she look -- seem to

8 you to be inebriated?

9   A   More or less.

10   Q   Do you know what "inebriated" is?  I'm sorry I used a bad

11 word.  I didn't mean to.

12   A   No.  More or less.

13   Q   Have you ever seen anybody that was high?

14   A   Yes.

15   Q   And did she look high to you?

16   A   By her looks, yes.  It seemed like.

17   Q   Did you see any black and blue marks on her?

18   A   Yes.

19   Q   You did?  Page 23.  I could be wrong.  I'm sorry.  24.

20       "Did she have any black and blue marks?" was the

21 question.  And you answered, back in March of 2004:  "At that

22 very moment, I didn't see any black and blue marks.

23       MR. GROSS:  Objection, Your Honor.  Your Honor, if we

24   could have the previous two questions read.

25       MR. BLACKER:  Sure.

1      MR. GROSS:. Start from Line 7.

2      MR. BLACKER:  That is objectionable.

3      MR. GROSS:  Perhaps we could have a sidebar.

4      (Thereupon, counsel for the respective parties approached

5 the bench, and the following proceedings were had outside the

6 hearing of the jury panel:)

7      MR. GROSS:  Your Honor, the State raised the objection

8    because defense read the witness to Line 15, "Did she have

9    any black and blue marks?"  The reason why he brought it up,

10    I think he asked that on cross, and the witness said, "I

11    don't believe so."  Now, she says yes and --

12      THE COURT:  You can bring it up on redirect.  You know,

13    guys, let's move it along.  You guys, we are falling asleep.

14    Let's go.

15      (Thereupon, the sidebar conference was concluded, after

16 which, the following proceedings were had in open court:)

17      MR. BLACKER:  For the record, Your Honor, the reason I

18    didn't go back to the line of the question is because there

19    is hearsay in there of what someone told her.  I didn't want

20    to read it into the record.  It's improper.

21      THE COURT:  All right.  Move along.

22 BY MR. BLACKER:

23    Q   The question on Line 7 is:

24      "Question:  What kind of injuries did she have?"

25      You said:  "Answer:  Wounds, like cuts.

578

1        "Question:  Was she bleeding a lot?

2        "Answer:  A lot, no.

3        "Question:  Did she have black and blue marks?

4        "Answer:  At that very moment, I didn't see black and

5  blue marks."

6        MR. BLACKER:  And I won't go on, counsel.

7        MR. GROSS:  Thank you.

8  BY MR. BLACKER:

9    Q   Ms. Rodriguez, is it your testimony that after seeing the

10  profile of the defendant for two seconds, you were able to

11  identify a photo lineup immediately and pick out a picture?

12   A   Yes.

13   Q   Is that because the other five pictures look so different

14  than the one you picked out?

15   A   Yes.

16        MR. BLACKER:  Thank you.  I reserve a motion.

17        MR. GROSS:  Two questions, Your Honor.

18        THE COURT:  Go ahead.

19                    REDIRECT EXAMINATION

20  BY MR. GROSS:

21   Q   I won't use the big words, OK?  Now, you picked that

22  particular photo out of the lineup because that, indeed, was

23  the person on that night; is that right?

24   A   Yes.

25   Q   Not -- did you pick him out because of the hair style?

579

1   A   No.

2   Q   Did you pick him out because his face on that photo was

3   the same one from that night?

4   A   Yes.

5   Q   Are you 100 percent sure?

6   A   More or less.

7       MR. GROSS:  No further questions.

8       MR. BLACKER:  Nothing further.

9       THE COURT:  Thank you, Ms. Rodriguez.

10      Jimmy, you made coffee, right?  Jimmy, coffee and Oreos

11  for the jury.

12      Ladies and gentlemen, go into the jury room.  Do not

13  discuss the case amongst yourselves.  We will take a ten

14  minute recess.

15      (Thereupon, the jury panel exited the courtroom, and the

16  following proceedings were had outside the presence of the jury

17  panel:)

18      THE COURT:  All right.  Ten minutes.

19      (Thereupon, a brief recess was taken, after which, the

20  following proceedings were had:)

21      MS. CORONA:  Judge, now that we are going to this, there

22  is another interpretation of the 9-1-1 tape that hopefully we

23  are agreeing to again without the use of the interpreter that

24  actually interpreted this 9-1-1 tape.

25      THE COURT:  There is another 9-1-1 tape?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

580

1      MS. CORONA:  9-1-1 call.

2      THE COURT:  Of the one that's coming up, by Lesbia; is

3  that correct?  Is that correct?  Both sides stipulate to that

4  translation?

5      MR. BLACKER:  Correct.

6      THE COURT:  That translation will actually go into

7  evidence, and the jury will have it during deliberations.

8      MR. BLACKER:  That is the one we spoke about where we

9  redacted out the portion about the black Mustang and the

10  rape.

11      MS. CORONA:  It is the part of the --

12      THE COURT:  Let me repeat my question.  This will be

13  going into evidence, and the jury will get -- it will go into

14  the jury room, correct?

15      MR. BLACKER:  I'm going to object to that, but I know

16  what your ruling is going to be.  But that I have to object

17  to.

18      MS. CORONA:  That is the English version.  The jury

19  actually needs to be instructed that they are to rely on the

20  English translation and not the -- what they hear in the

21  Spanish translation so as to not create inequity on the jury

22  as to some knowing Spanish and some not knowing Spanish.

23      THE COURT:  You are agreeing to the translation.  There

24  is no issue regarding that.  If you have an issue, you bring

25  it up before the trial, but there is no issue.  There is no

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    issue, whatsoever.  The translation is what's in evidence.

2         MR. BLACKER:  I know how you are going to rule, but I

3    have to lay a record.  You know that.

4         THE COURT:  It will be admitted into evidence.  You can

5    admit it in front of the jury.

6         MR. BLACKER:  I have stipulated to a lot of stuff.  I

7    cannot stipulate to this.  I can stipulate that this

8    interpreter interpreted faithfully the 9-1-1 tape.

9         THE COURT:  You are still under oath.  You are in

10   agreement with your attorney's stipulation here?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Get the jury.

13        (Thereupon, the jury panel entered the courtroom, after

14   which, the following proceedings were had in open court:)

15        THE COURT:  Swear in the official court interpreter.

16        (Thereupon, the Official Court Interpreter was duly

17   sworn.)

18        THE INTERPRETER:  Julio Fernandez.

19        THE COURT:  Both sides stipulate to his qualifications?

20        MS. CORONA:  Yes, Judge.

21        MR. BLACKER:  We do.

22        THE COURT:  The jury may have a seat.

23        Swear in the witness.

24

25

582

1  Thereupon:

2                              LESBIA MORALES

3  was called as a witness, and having been first duly sworn, was

4  examined and testified as follows:

5          THE COURT:  Have a seat over there.

6                              DIRECT EXAMINATION

7  BY MS. CORONA:

8      Q   Good afternoon.  Can you please introduce yourself to the

9  members of the jury?

10     A   Good afternoon.  My name is Lesbia de la Santos Morales.

11     Q   What do you do for a living, Ms. Morales?

12     A   Clean houses.

13     Q   And how long have you -- where were you originally born?

14     A   Nicaragua.

15     Q   How long have you been here?

16     A   Eight years.

17     Q   Do you know somebody by the name of Johanna Rodriguez?

18     A   Yes.

19     Q   And on June 8th of 2003, were you out with Johanna

20  Rodriguez?

21     A   Yes.

22     Q   Where had you guys gone that night?

23     A   We had been in Johanna's brother's home.

24     Q   What time were you heading home?

25     A   I don't remember the time.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

583

1   Q   Did something happen as you were driving home?

2   A   Yes.

3   Q   Let me ask you, who was driving and what car were you in?

4   A   We were in my friend Johanna's car.

5   Q   And who was driving that car?

6   A   Johanna.

7   Q   Was anybody else in the car besides you and Johanna?

8   A   No, no.

9   Q   What did you see when you were driving down the street in

10 the car?

11   A   At the moment, nothing.

12   Q   When did you first see something happening?

13   A   We -- initially, Johanna initially saw the problem.  Who

14 initially saw the problem was my friend, Johanna.

15   Q   And what does Johanna do?

16      MR. BLACKER:  Objection, Your Honor.  If I might, for the

17      interpreter, I would like to ask before he's translating

18      anything that Johanna might have said, give me a chance to

19      object.

20      THE COURT:  All right.

21 BY  MS. CORONA:

22   Q   I asked what Johanna did.  What did Johanna do?

23   A   What did she do?  She saw a person attacking another one.

24      MR. BLACKER:  Objection.  That's hearsay.

25      THE COURT:  Sustained.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

584

1        MR. BLACKER:  And I move for --

2        THE COURT:  Disregard the witness' last answer.

3 BY MS. CORONA:

4    Q    Did you see something happen when Johanna saw something

5 happen?

6    A    No, initially, who saw the problem was her initially or--

7        THE COURT:  Why don't you tell us what you saw.  Let's

8    move it along.

9        THE WITNESS:  When Johanna saw the problem, I told her,

10    let's go around the block, so I could see the problem.

11 BY MS. CORONA:

12    Q    What did you see?

13    A    That Mr. Diaz was attacking the lady.

14    Q    You call him Mr. Diaz today, but did you know his name at

15 the time?

16    A    No.

17    Q    Had you ever seen him before that day?

18    A    No.

19    Q    Had you ever seen the woman that he was attacking that

20 day?

21    A    No, no, I did not know.  No, no.

22    Q    Explain to the jury when you say -- what you mean when

23 you say the man was attacking the woman.

24    A    When I saw he was on top of the girl, hitting her.

25    Q    How far away from the car with the man on top of the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  girl were you at that point?

2  A    Well, I wasn't -- I told Johanna to stop, and she said:

3  We're going to call 9-1-1.

4       MR. BLACKER:  Excuse me, mister interpreter.  Sorry.  It

5  is hearsay, what Johanna said to her.

6       THE COURT:  Overruled.

7  BY MS. CORONA:

8  Q    Go ahead.

9  A    May I continue?

10      THE COURT:  Yes.

11      THE WITNESS:  And I said:  No, wait a minute.  I'm going

12  to get out and maybe if you see somebody -- he sees some-

13  body, he will stop attacking the girl.

14  BY MS. CORONA:

15  Q    What was your plan to do when you went to see the man and

16  the woman?

17      MR. BLACKER:  Objection.  Irrelevant.

18      THE COURT:  Overruled.

19      THE WITNESS:  At that moment, I did not think about the

20  circumstance.  My intuition said I need to go and help her.

21  BY  MS. CORONA:

22  Q    Did you actually go back to where the man was attacking

23  the woman?

24  A    Yes.  I got out of the car.

25  Q    Where did you go?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

586

1   A   I went to him, to his car.

2   Q   How far was Johanna's car parked from the car with the

3 man attacking the woman?

4   A   About a yard.

5   Q   So it was relatively close?

6   A   It was very close.

7   Q   You actually got off of the car?

8   A   Yes.

9   Q   And did you walk towards the man and the woman?

10   A   Yes.

11   Q   Were they in the front seat or the back seat of the car?

12   A   They were in the front.  No.  They were in the back seat.

13   Q   And do you know if they were on the passenger's side, or

14 the driver's side?

15   A   On the side of the driver, on that door.

16   Q   Could you see the woman inside the car as you were

17 walking towards the car?

18   A   No.

19   Q   Did there come a point when you actually saw the face of

20 the woman?

21      THE INTERPRETER:  Would you repeat that?

22 BY MS. CORONA:

23   Q   Did there come a point when you actually saw the woman?

24   A   Yes.  At the end.

25   Q   So tell the jury what happened as you walked towards the

587

1  car.

2      THE INTERPRETER:  Clarifying something.

3      THE WITNESS:  I went to the person, towards the person in

4  the car.  I walked towards the person and he came to my --

5  towards me.  As I was walking, he was getting out of the car,

6  coming towards me, and he said, "Don't get mixed up in

7  couple's problems."

8  BY MS. CORONA:

9   Q   Did he say this to you in Spanish or English?

10  A   No, in Spanish.

11  Q   Did he threaten you in any way as he was coming towards

12  you?

13      MR. BLACKER:  Objection.  Leading.

14      THE COURT:  Overruled.

15      THE WITNESS:  No, he did not threaten me, but he showed

16  me a gun.

17  BY MS. CORONA:

18  Q   Were you able to see the gun entirely?

19  A   No.

20  Q   Which part of the gun did you see?

21  A   The handle.

22  Q   Where was the gun?

23  A   Inside the pants.

24  Q   And did he point to the gun or something like that when

25  he said to you don't get involved in problems --

MATZ, TRAKTMAN, FELDMAN AND WILDNER

588

1    A   He pointed -- he showed it.  He did not point.  He

2 showed.

3    Q   How did he shot it to you?

4    A   Can I do like he did?

5    Q   Yes.

6    A   Like this is -- he said, "Don't get mixed up in couple's

7 problems," and he -- yes.

8    Q   So he had his hand exactly how you had it right now,

9 holding your stomach?

10   A   Yes.

11   Q   Did you see the woman at that point, as he's walking

12 towards you?

13   A   No.  I saw the shadow of her peeking out the window, but

14 it was seconds.  I returned immediately frightened, and that's

15 it.

16   Q   Do you know what the woman was doing while this was going

17 on when he went towards you?

18   A   No, no.  I did not see anything.

19   Q   So after the man showed you the gun, what did you do?

20   A   I went to Johanna's car, and I said that there was --

21 that the person was armed.  That's when I was told that we had

22 to call 9-1-1.

23   Q   Did you call 9-1-1?

24   A   Johanna.

25   Q   And what did you guys do after that?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

589

1    A    9-1-1, when we told the problem that was happening, we

2 were told to go around again to get the tag of the car.

3    Q    Were you able to do that?

4    A    We went around again.  When we got to the place, the

5 person was no longer there.

6    Q    Did you see where the car had gone?

7    A    We followed the car.  In other words, he was already

8 moving, but we had already seen it.

9    Q    Were you able to follow the car?

10   A    Johanna, yes, to give 9-1-1 the tag number.

11   Q    What happened while you were following that car?

12   A    Well, the light turned red.  The girl gets out of the

13 car.

14   Q    How does she get out of the car?

15   A    Well, she was -- well, she was running very slowly,

16 because she had damaged legs, and she came towards our car, and

17 when we noticed she was already inside, but I was with 9-1-1.

18   Q    Did you see her actually get out of the car?

19   A    No, we didn't see her get out of the car.  She was

20 looking for somebody to open the car doors.

21   Q    And she saw that your car was open and just went in?

22   A    No.  When we saw her, she was in the car already.

23   Q    And what did she do when she got into the car?

24   A    She was coming very, very confused, yelling, saying the

25 man was going to kill her, to help her, and we were with 9-1-1.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  And that's when 9-1-1 was listening to what was happening

2  inside the car.

3  Q   Who was talking to 9-1-1 at that point?

4  A   I was.

5  Q   And had you had an opportunity to listen to that 9-1-1

6  call before today?

7  A   No.

8  Q   Do you remember listening to a tape with me yesterday of

9  a 9-1-1 call where you identified your voice?

10  A   Yes.

11  Q   And that was your voice on the 9-1-1 tape that I played

12  for you?

13  A   Yes.

14      THE COURT:  What exhibit is it?

15      MS. CORONA:  This is State's Exhibit 19.  It's already

16  been entered into evidence, Judge, and I ask that I be

17  allowed to play it now, her portion of the exhibit.

18      THE COURT:  You have different 9-1-1 tapes on the same

19  exhibit?

20      MS. CORONA:  Right.  And at this point, Judge, I would

21  ask to move State's Exhibit 2R for Identification into

22  evidence, and hand copies to the jury, as the tape is in

23  Spanish, and that the translation is in English.

24      THE COURT:  Ladies and gentlemen, we have what will be

25  admitted over objection, the translation.  Let's mark it.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1        THE CLERK:  2R marked for I.D. purposes now becomes

2   State's Exhibit Number 29.

3        (Thereupon, the exhibit referred to was marked as State's

4   Exhibit Number 29 and was received in Evidence.)

5        MR. BLACKER:  Just for the record, could we call 19 a

6   composite exhibit so there is no confusion, perhaps?

7        THE COURT:  For the record, 19 is a cassette that

8   contains all the different 9-1-1 tapes that you've been

9   playing.

10       MS. CORONA:  That's correct, Judge.

11       THE COURT:  All right.  And this is the transcript of the

12   English translation of the 9-1-1 tape, and the -- both

13   parties have stipulated to the accuracy of the translation;

14   is that correct?

15       MR. BLACKER:  Yes, sir.

16       MS. CORONA:  That's right, Judge.

17       THE COURT:  And ladies and gentlemen, when you hear the

18   tape and see the transcript, the transcript in this case

19   will be in evidence of this tape, and if there is any

20   difference between -- if any of you know Spanish and there

21   is any difference between the tape and the transcript, the

22   official translation that both sides have stipulated to is

23   the one before you in that transcript.  State's Exhibit 29.

24   So you must rely on the official translation that the

25   parties have stipulated to.  Now, that's not what you will

1    hear on the tape.  They are saying it is an accurate

2    translation, and both sides have agreed.  So what are we--

3    who are we to question them, I guess.  Go ahead.

4         (Thereupon, the tape recording referred to was published

5 in open court.)

6 BY MS. CORONA:

7    Q   Is that your voice on the tape, Ms. Morales, what you

8 just heard?

9         THE COURT:  Can she identify who that is and what she is

10   saying?

11 BY MS. CORONA:

12   Q   Is that your voice on the 9-1-1 tape?

13   A   Yes.

14   Q   And at what point is this phone call, this recording?

15   A   That recording was made initially when we gave 9-1-1 the

16 tag number.  9-1-1 was -- 9-1-1 was with us since we gave them

17 the tag.  The girl was in the car all the way till we joined

18 the police.

19   Q   And this --, this portion, is that when the girl is

20 already in the car with you?

21   A   Yes.

22   Q   And that's -- the condition that you are in, is that the

23 same condition that everybody in the car was in?  You sound

24 hysterical on this tape.

25   A   Everybody, all three of us.

1   Q   And that was the same condition that you were in before

2   she got in the car?

3   A   No.

4   Q   Was she in that condition that's exhibited on this tape

5   when you -- when she got in the car?

6   A   Hysterical, yes.

7   Q   And is that what made you that hysterical?

8   A   Yes.

9   Q   Was there anything else happening during this time that

10  also caused you to be hysterical and nervous?

11  A   Because this guy was after us, behind us, following us.

12  Q   Could you see him following you?

13  A   No, because I was with 9-1-1.  The one that was -- the

14  girl was telling Johanna the guy was behind us.

15          (Thereupon, the tape recording referred to was further

16  published in open court.)

17  BY MS. CORONA:

18  Q   When you saw the police, all right, at that point when

19  you were talking to the 9-1-1 operator, how long did it take

20  you to see the police officers before the woman got into the

21  car?

22  A   I don't remember, because from where we were, we --

23  Johanna called her brother, and he said go to where he is,

24  where he was, but since I'm with 9-1-1, talking, I see that the

25  police officer was at the same address that Johanna's brother

594

1 had said, and I told Johanna, "Don't stop, don't stop, just go

2 to where the police is," so we would be more protected.

3    Q   And at that portion of the tape, had you already seen the

4 police officers, marked police cars where you were?

5    A   Yes.

6       (Thereupon, the tape recording referred to was further

7 published in open court.)

8 BY MS. CORONA:

9    Q   Once you saw the police, Ms. Morales, what happened?

10       MR. BLACKER:  I'm sorry, I did not hear that question.

11       THE COURT:  Collect the transcripts.

12       Once you saw the police, what happened?

13       THE WITNESS:  The police asked us what problem we had.

14 BY MS. CORONA:

15    Q   Did you tell the police?

16    A   We told them what had happened, and we give them the girl

17 that was very beaten up.

18    Q   Tell the jury what kind of injuries the girl had.

19    A   She looked very, very damaged, very beaten.  Her foot --

20 she had like she couldn't walk.  If I remember correctly, the

21 short time that I was with her, before we gave her to the

22 police, she was very hysterical and very beaten up.

23    Q   What do you mean by "beaten up"?

24    A   She had a bruise over here, if I remember correctly.

25       MR. BLACKER:  I'm sorry, I didn't see that.  Over where?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1      MS. CORONA:  She is indicating her right back area.

2      THE WITNESS:  Yes.

3 BY MS. CORONA:

4   Q   What other injuries did she have?

5   A   I don't remember.  Just that.

6   Q   Did she have blood on her at that point?

7   A   Yes.

8   Q   And did she -- the woman that we're talking about is the

9 same woman that you saw here yesterday, that came into court?

10  A   Yes.

11  Q   At some point, did the police ask you if you could

12 identify the man that was beating the woman that night?

13  A   No.

14  Q   Were you shown photographs of people and asked to see if

15 you could pick out the person that you had seen that night?

16  A   Yes.

17  Q   And when you were asked to see those photographs, were

18 you able to identify the person that you saw beating the woman

19 that night?

20  A   Yes.

21  Q   And the person that you identified from those

22 photographs, is that -- how certain were you that that was, in

23 fact, the same person that you saw beating the woman?

24  A   I don't know.  I saw six or eight photographs.  But my

25 intuition told me that it was that person.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

596

1    Q    And did detectives ever suggest to you who the person

2  that you should pick out was?

3    A    No, no.

4    Q    Showing you what has been marked as State's Exhibit 2G

5  for Identification, do you recognize that?

6    A    Yes.

7    Q    Is that your sign on this page?

8    A    Yes.

9    Q    Is this the same page of photographs that the detective

10  showed to you and asked you to identify somebody?

11   A    Yes.  I -- yes.

12        MS. CORONA:  The State moves State's Exhibit 2G for

13   Identification into evidence.

14        THE COURT:  Any objection?

15        MR. BLACKER:  I will deal with it on cross-examination,

16   if the Court will permit.

17        THE CLERK:  State's Exhibit 2G marked for I.D. purposes

18   now becomes State's Exhibit Number 30.

19        (Thereupon, the exhibit referred to was marked as State's

20  Exhibit Number 30 and was received in Evidence.)

21  BY MS. CORONA:

22   Q    And this person on this photograph, is that the same

23  person that you saw that showed you the gun in his waistband

24  that you saw beating the woman in the car?

25   A    Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

597

1   MS. CORONA:  And I have no further questions.

2   THE COURT:  Cross-examination.

3   MR. BLACKER:  Thank you, Judge.  May it please the Court,

4 counsel, Mr. Diaz, ladies and gentlemen.

5        CROSS-EXAMINATION

6 BY MR. BLACKER:

7 Q Ms. Morales, on the night in question, was there a party

8 at -- was it your brother's home?

9 A Not my brother's.  Johanna's brother.

10 Q Was there a party?

11 A No.

12 Q Just a gathering?

13 A The family, family gathering, but not a party.

14 Q Was -- did anybody have any drinks?

15 A No.

16 Q No drinking, whatsoever?

17 A No.

18 Q And it was dark, nighttime when you were coming down

19 Flagler Street and 17th Avenue?

20 A Yes.

21 Q And as you passed the area where to which Johanna brought

22 your attention, approximately how fast do you think you were

23 going?

24 A It was -- she was going slow.  We were talking, and she

25 was going slow.

598

1  Q   If you had to guess, what would you say?

2  A   Maybe 35, 30 miles.

3  Q   All right.  And you are telling us that when you first

4  passed, you would not have known that there was anything out of

5  the ordinary unless Johanna hadn't mentioned it to you?

6  A   Yes.

7  Q   Do you still see Johanna?  She's still a friend of yours?

8  A   Yes.

9  Q   Have you discussed this case with Johanna since the night

10 of the events of when it occurred?

11 A   To be honest with you, no, until now -- but it was

12 something very ugly that we lived.  It wasn't worth

13 remembering.

14 Q   All right.  You ever come and spoken to the prosecuting

15 attorneys in this case prior to today?

16 A   Yes.

17 Q   On how many occasions?

18 A   Talking about the subject of the trial, or about the fact

19 that I had come to the trial?

20 Q   Talking about this case.  When you reviewed your

21 discussions about this case with the State Attorney, how many

22 times had you met with the State Attorney prior to today?

23 A   Once.  Yesterday.  Monday, yes.

24 Q   And never before then?

25     THE COURT:  I'm sorry.  You need to answer.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1        THE WITNESS:  Oh, OK.

2        MR. BLACKER:  Did she answer?

3  BY MR. BLACKER:

4    Q   You only met with the State Attorney on one occasion

5  prior to today, and that was yesterday?

6    A   Yes.

7    Q   And was Johanna with you when you met with the State

8  Attorney yesterday?

9    A   Yes.

10   Q   And you discussed your testimony with the State Attorney?

11   A   No.

12   Q   You didn't talk about this case?

13   A   Of course.

14   Q   Well, that's what I'm asking you.  Did you talk about

15  this case yesterday?

16   A   I'm sorry.

17   Q   Is this difficult for you?

18   A   A little bit.

19   Q   It didn't seem to be difficult when the prosecutor was

20  asking you questions.  Has it become incredibly difficult for

21  you?

22       MS. CORONA:  Objection.  Argumentative.

23       THE COURT:  Sustained.

24  BY MR. BLACKER:

25   Q   Is it more difficult now that I'm asking you questions?

1   A   No.

2   Q   OK.

3   A   It's OK.   It's OK.

4   Q   Thank you.   I will try and make it as easy as possible.

5 Listen carefully.   If you need me to -- if you need me to ask a

6 question in a different form, I would be happy to do so.

7   A   OK.

8   Q   But when you answer, we will assume that when you answer

9 a question that you understood it and that your answers are

10 true and correct to the best of your knowledge that you know,

11 OK?   All right?

12   A   OK.

13   Q   You spoke to the prosecutor yesterday, and that was the

14 only time you spoke with her, correct?

15   A   Yes.

16   Q   And Johanna -- was Johanna with you?

17   A   Yes.

18   Q   Have you ever gone with Johanna -- for example, when you

19 identified the photographs, was Johanna there on the night that

20 you identified the photographs?

21   A   Yes.

22   Q   And when we speak about Johanna, we're talking about

23 Johanna Rodriguez, the woman that just left the courtroom and

24 testified right before you; is that correct?

25   A   Yes.