*L07-1-20451*

601

```
 1                          IN THE CIRCUIT COURT OF THE ELEVENTH
 2                          JUDICIAL CIRCUIT, IN AND FOR
 3                          MIAMI-DADE COUNTY, FLORIDA
 4                          CRIMINAL DIVISION
 5                          CASE NO. F03-16995
 6
 7
 8    THE STATE OF FLORIDA,    )
 9                            )
10         Plaintiff,         )
11                            )
12    vs.                     )          VOLUME 4
13                            )
14    PABLO DIAZ,             )
15                            )
16         Defendant.         )
17    _____  )
18
19
20
21
22
23
24
25
```



RECEIVED

APR 1 6 2008

ATTORNEY GENERAL
MIAMI OFFICE



DOCKETED
APR 1 6 2008
ATTORNEY GENERAL

MATZ, TRAKTMAN, FELDMAN AND WILDNER

602

1    Q   She is still a friend of yours, is she not?

2    A   Of course.  A very good friend.

3    Q   A very good friend.  And I imagine the day that you

4  identified the photographs, there was a police officer present,

5  and you and Johanna spoke with the officer, correct?  And you

6  reviewed your memory of the events with the police officer in

7  Johanna's presence on that night?

8    A   Yes.

9    Q   Now, we have two occasions, yesterday, and when you

10  identified the photographs?

11   A   Yes.

12   Q   Did you ever speak on the telephone with any of the

13  prosecutors about this case or their staff?

14   A   With their secretary, yes.

15   Q   The secretaries were just setting up schedules; is that

16  correct?

17   A   Yes, the appointments.

18   Q   And when you went on the prior proceedings, when you gave

19  sworn statements, you went on the same day that Johanna went,

20  didn't you?

21   A   Yes.

22   Q   And you traveled with Johanna, I imagine, to the

23  deposition; isn't that correct?

24   A   Yes.

25   Q   And you traveled to the depositions with Johanna, didn't

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 you?

2  A   Yes.

3  Q   And I imagine that you had some conversation with Johanna
4 about this case, did you not?

5  A   Remembering.

6  Q   Remembering.  And let's go back to the night in question.
7 When you drove by the first time, you didn't even observe
8 anything that was happening; is that correct?

9  A   Correct.

10  Q   And Johanna drove around the block, and you wound up back
11 going up west on Flagler Street; is that correct?

12  A   Yes.

13  Q   And this time you looked?

14  A   Yes.

15  Q   And how -- when you looked, you were prepared to look
16 before you even made the turn onto Flagler, weren't you?

17  A   Yes.

18  Q   Was it dark in the area?

19  A   A little bit.

20  Q   And street lights were lit, or no?

21  A   Yes.

22  Q   Street lights were on; you remember that particularly?

23  A   Yes.

24  Q   And how about the interior of the car?  Was it dark or
25 was the interior light on in the car?

1    A    Whose car?

2    Q    The car in which the activity was occurring, was the

3 light on in the interior or not?

4    A    No.

5    Q    It was dark in the car?

6    A    Yes.

7    Q    And when you came around the corner, you paid special

8 attention to what was occurring, because you had been told

9 something by  Johanna, correct?

10   A    Yes.

11   Q    And when did you first see some activity occurring in the

12 left rear passenger's side of that vehicle?

13   A    In the front seat, no.  In the rear seat.

14   Q    Did I not say that?  I'm sorry if I misspoke.  What I'm

15 saying is --

16        MR. BLACKER:  Could you ask her the question again?

17   I'm sorry.  Could you repeat it, please?  I will withdraw it.

18   Let's move on.

19 BY MR. BLACKER:

20   Q    The activity that was occurring, was this the left rear

21 driver's side of the car; is that correct?

22   A    The rear, the rear seat of the car on the left side.

23   Q    That is what I just said.  OK.

24   A    Yes.

25   Q    And that's the side where, if you open the door, you

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 could open the door to the traffic coming west on Flagler; is

2 that right?

3    A   Yes.

4    Q   Are you sure it was on the left side and not on the right

5 side, where the sidewalk was?

6    A   Yes, I'm sure.

7    Q   And so you are paying attention, and my question is: How

8 many times did you have to view the events that were occurring

9 on that left side from the time you turned the corner onto

10 Flagler till the time you passed the car, when you couldn't see

11 it anymore? How much time did you view these events?

12    A   When we turned, and I don't remember the time. I looked

13 fast. I only observed what was happening, and that's when

14 Johanna parks the car.

15    Q   So you said you looked fast. What's fast? One second?

16 Two seconds? Ten seconds? Three seconds? What's fast?

17    A   A second. I passed and looked, so the -- saw the man

18 attacking.

19    Q   You saw -- and in one second, you saw the man attacking?

20 What was he doing?

21    A   He was on top of the girl, hitting her.

22    Q   Pardon?

23    A   Hitting her.

24    Q   How many times did you see him hit her?

25    A   The moment I go by, he was hitting her. He was on top

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 of her, hitting her.

2   Q   Right.  How many times did you see his arms hitting her?

3   A   I did not look.  I did not see how many punches.  I can't

4 tell you.

5   Q   You described that it was about a second, correct?

6       MR. BLACKER:  Didn't she say it was a second?  Didn't she

7   say it was a second a minute ago?

8       THE WITNESS:  I don't remember.  I saw it.  I can't

9   measure the time right now.

10 BY MR. BLACKER:

11   Q   Was it -- was it -- you viewed him as you drove by the

12 car and you saw his back moving in a direction of being on top

13 of the girl; is that what you are saying?

14   A   Yes.

15   Q   Was the door open or was it closed?

16   A   The door was open.

17   Q   And he was leaning into the car -- correct? -- like I'm

18 leaning in, except it was dark, wasn't it, in the -- inside?

19 I'm sorry?

20   A   Dark, but you could see.

21   Q   And as you were driving up to the left side of the car,

22 before you got there, you didn't see anything?  You glanced

23 over as you passed the car; is that correct?  Is that correct?

24   A   Well, I see -- but it wasn't a glance.  I just saw.

25   Q   You saw?

1   A   I saw.

2   Q   A quick glance?

3   A   Yes.

4   Q   And you can't tell us how many times you saw him move his

5   body, right?

6   A   I can't tell you, because at that moment, I did not

7   measure.

8   Q   And you got out of the car?  You parked very close to his

9   -- I'm sorry, withdrawn.  Johanna parked very close to his car?

10   A   Yes.

11   Q   You got out of the car to walk back -- correct? -- and as

12   you started walking back, he noticed you?

13   A   The guy, yes.

14   Q   Yes.  And he started towards you?  Where did you two

15   meet; in the front of his car?

16   A   Near his car.

17   Q   Near his car.  On the left or right side of his car?

18   A   On the left, because I was going back to where I was, and

19   he's coming out from his left side where he was.  He goes

20   around the car to come toward me.

21   Q   OK.  So you walk on the sidewalk, and made a turn, and

22   went towards his left side, and he was starting towards you; is

23   that correct?

24   A   Yes.

25   Q   And he was wearing a shirt, you say, with sleeves, like

MATZ, TRAKTMAN, FELDMAN AND WILDNER

608

1   what we call an undershirt, which has the little strap on the

2   top that men wear?

3   A   Yes.

4   Q   Is that correct?  I wouldn't wear one, because people

5   would laugh, but other people wear them.  Right?

6   A   Yes.

7   Q   And you are certain he was wearing a shirt?

8   A   Well, if I remember correctly, yes.

9   Q   And you say that as he got close to you, he's wearing a

10  shirt; it's not an undershirt, but it's a similar shirt?  Isn't

11  it a tight shirt around your waist?  Would you show us -- would

12  you show us?  Because I was not really aware.  Would you show

13  us how, in fact, you say that he showed you the gun underneath

14  his shirt?  Show us one more time, please.  Stand up.

15      MR. BLACKER:  Could she, Your Honor?  May I -- thank you.

16      THE WITNESS:  OK.

17  BY MR. BLACKER:

18  Q   Be careful.

19  A   I tripped.

20  Q   Be careful.

21  A   He had the pistol here.  When I'm coming, he says, "Look,

22  don't get in trouble."  And he does this.  It was -- it's a

23  couple's problem.  He showed me the handle of the gun.

24  Q   The handle of the gun?  What color was the handle?

25  A   I don't remember.

1   Q   Was it shiny?

2   A   It was a pistol.

3   Q   Let me try and refresh your recollection.  Was it shiny

4 or was it dark in color?

5   A   To be honest with you, I don't remember.  I don't know if

6 it was shiny.  I don't remember.

7   Q   Well, you've told us -- I mean, the problem -- I will --

8 withdrawn.  Is this the only time in your entire life that

9 you've been confronted with someone that had a pistol in their

10 waistband?

11   A   Yes.

12   Q   And this one was a moment that you remember that is

13 engraved in your memory forever?

14   A   Yes.

15   Q   And you can't remember whether or not it was dark, or

16 shiny, or white or anything else; is that right?

17   A   No.

18   Q   All right.  Now, you've told us under oath before that he

19 pretended to have a weapon.  You've used that word.  Remember?

20   A   No.

21   Q   You didn't?  Were you given your prior testimony to study

22 yesterday?

23   A   Yes.

24   Q   Did you read it?

25   A   To be honest, some words I understood, because I don't

MATZ, TRAKTMAN, FELDMAN AND WILDNER

610

1  speak English, and was -- it was given to me in English.   And

2  now, I'm -- I'm now answering as I remember.

3    Q   I understand that fully.   I can understand that it's a

4  language problem.   But nonetheless, Page 14.   You were asked--

5  it was in reference to the gun.

6       "Question:   He did not pull it out?   Did he show it to

7   you, or did he" --

8       And then you answered:

9       "Answer:   He pretended to have a weapon on his waistband,

10   in the waist, where he threatened me.   In the -- and if he

11   had it here, and if he had it here in front -- in front of

12   his shorts, in front of his underwear."

13       Do you remember that?

14   A   No, I don't remember.

15   Q   Do you remember giving testimony on March 2, 2004?

16   A   Yes.   You can imagine, it's a long time.

17   Q   And in March of 2004, was your memory more clear of the

18  events as they occurred, or is your memory more clear today?

19   A   I can't tell you but -- well -- could be clearer now.

20   Q   Clearer now.   OK.   Your memory hasn't faded with time a

21  little bit?

22   A   Imagine, it's been four years.

23   Q   Well, I understand that.   All right.   Let's move on.

24  Ms. Morales, during the encounter with the girl that you saw,

25  did the girl say anything that you can remember when the man

MATZ, TRAKTMAN, FELDMAN AND WILDNER

611

1  was over here, as you have described?

2  A   No.  No.

3  Q   And now, let's talk about what he looked like.  First of

4  all, how long did the encounter that you had with the gentleman

5  when he pretended to show you the weapon and you walked away?

6  A   I'm sorry?

7  Q   When he said to you, it's between lovers, and you turned

8  around and walked away, how long did you actually face him and

9  encounter him?  What period of time?

10  A   It was seconds.

11  Q   Seconds.  Can you tell us approximately how many?

12  A   You know, going, went towards the person, talked a couple

13  of words and to see that he's armed and come back.  It's just

14  seconds.

15  Q   Time is made up of seconds.  How many, approximately?

16  A   I can't tell you, because I can't remember.

17  Q   Let's approximate.  Less than five?

18  A   Yes, less than five.

19  Q   Less than three?

20  A   Is that -- I will be lying if I tell you.

21  Q   But less than five.  Out of the four seconds at the most

22  that you saw this gentleman, how many seconds did you spend

23  looking at a pretended weapon in his waistband?

24  A   I just looked at it and came back.

25  Q   So would you say that you spent about three seconds

MATZ, TRAKTMAN, FELDMAN AND WILDNER

612

1 looking at his face?

2   A  The face.

3   Q  The face of the man?

4   A  No.  I spoke a little with him.  It was a matter of

5 seconds.  I went -- it wasn't a long time with him.

6   Q  I'm asking you how many seconds do you think you had

7 where you were talking to him, looking at him?

8   A  Not exactly, but -- you can gauge.

9   Q.  Approximate.  These folks weren't there that night.

10   A  Maybe two minutes.  How can I -- how can I -- two, five

11 minutes.

12     MR. GROSS:  Objection.  Badgering.  Argumentative.

13     THE COURT:  Overruled.

14     THE WITNESS:  If I can't tell you the time, it will be

15   lying.

16 BY MR. BLACKER:

17   Q  I know.  I'm asking you to approximate.  Are you saying

18 now it was two minutes that you had the confrontation when you

19 encountered the gentleman that said he had the firearm or

20 pretended to show it to you?  Is that what you are saying?

21   A  Yes, because he's asking me how many minutes, and I can

22 -- I would guess about one or two minutes.

23   Q  So when you arrived at the front of the car and the man

24 came to you and he pretended to show you the firearm --

25     MS. CORONA:  Objection to counsel's mischaracterization

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    of the evidence, "pretending to show you a firearm."

2        THE COURT:  Overruled.

3   BY MR. BLACKER:

4    Q   And he showed you the firearm under his shirt and said,

5   "This is between lovers," and you turned around and walked back

6   to the car to be with Johanna?

7    A   Uh-huh.

8    Q   And that was two minutes?

9    A   Well, could be two minutes.  Let's say it that way,

10  because everything was so quick.  I get out.  I see the guy

11  armed.  I come back.  I wasn't going to wait for him to hit me.

12  I -- I had to find my way back to the car.

13   Q   So could it have been five seconds or less?

14   A   Could have been, like I said now, two minutes, three

15  seconds, but I cannot measure the time.

16   Q   So you don't know how long.  Can you approximate how much

17  time that it took for this to happen?

18       MS. CORONA:  Objection.

19       THE COURT:  Sustained.  I think it's been covered.  It is

20   just so much that can be done on that.

21       MR. BLACKER:  I hear you, Judge.  You're right.

22  BY MR. BLACKER:

23   Q   You said he had a tattoo, correct?

24   A   Yes.

25   Q   Where was it?

614

1    A    I don't remember.  I don't remember which arm, but I do

2  remember he had a tattoo.

3    Q    On his arm?

4    A    Yes.

5    Q    No other tattoos?

6    A    No.

7    Q    Do you remember if he was white?

8    A    No, I don't remember.

9    Q    You don't remember if he was white.  Do you remember if

10 he had any glasses on?

11   A    No, I don't remember.

12   Q    Do you remember if he had a moustache?

13   A    No.  He had a beard.

14   Q    He had a beard?

15        THE COURT:  You need to answer.

16        THE WITNESS:  He had a beard, but not -- how should I

17 say?  A small beard.

18        MR. BLACKER:  Page 20.

19 BY MR. BLACKER:

20   Q    You were talking to the other attorney about the

21 description of this person, and he asked you a question.  Did

22 he have a moustache?  Withdrawn.

23        The question was:  He had a beard?

24        And you said:  "I don't remember."

25        MS. CORONA:  Objection, Judge.  I ask that he read two

615

1    lines before where he started.

2       MR. BLACKER: Fine. That's perfect. You want me to

3    start on Page 20?

4 BY MR. BLACKER:

5   Q  "Did he have a moustache?

6     "No, a beard. No, a beard.

7     "He had a beard?

8     "I don't remember."

9     You remember now that he had a beard, but you didn't

10 remember in March of 2004?

11  A  Yes.

12  Q  OK. Ms. Morales, did Johanna identify a photo lineup

13 before you did on the day that it was done?

14  A  The same day that I arrived, she was one person that was

15 with another.

16  Q  It was being done at the same time?

17  A  Yes.

18  Q  So it was two police officers?

19  A  Yes.

20  Q  And they had a package of photographs with them, didn't

21 they? Not just these, but numerous other photographs with

22 them, didn't they?

23  A  Yes.

24  Q  And they showed you some photographs, did they not?

25  A  Yes.

616

1   Q   And those photographs that they showed you were single

2 photographs, were they not?

3   A   Single pages?

4   Q   Yes.

5   A   Yes.

6   Q   And they showed you not six photographs, not each one had

7 six, like this.  Some photographs were standing alone; isn't

8 that correct?

9   A   I don't remember.

10   Q   Did they talk to you about what you were about to do?

11   A   Yes.

12   Q   And they told you that they believed that the person that

13 you were going to identify was on that page; isn't that right?

14   A   No.  That I had to identify.  It might be possible that

15 the person would be on that page.

16   Q   It might be possible?

17   A   That I could recognize him now.

18   Q   Did they ask you to identify any other photos except for

19 this one page?

20   A   Yes.

21   Q   And the photos that they asked you to identify other than

22 that were on this page were photos -- single photos, not six

23 people but one person; isn't that right?

24   A   No.  It was the six different persons.

25   Q   On each page.  And was Mr. Diaz on any of the other

617

1  pages?

2  A   I don't remember.  The only thing I remember is that in

3  that page that you have is where I identified -- is where I

4  identified him.

5  Q   How quickly were you able to identify Mr. Diaz?

6  A   Not so quickly.  But when I saw him I -- I went back.   I

7  can't tell you how long it took me, but I knew it was him.

8  Q   On the night in question, did the individual that you

9  encountered, did he have any hair?

10  A   Him?

11  Q   The individual that you say you encountered at the car on

12  the night in question, did he have any hair?

13  A   I don't remember.

14  Q   Did you pick out the individual in this photograph

15  because he is the only one without hair covering his entire

16  head?  State's Exhibit 30?

17  A   I don't know.  My intuition tells me it's him.

18  Q   The question is:  Did you pick him out because he is the

19  only one in this photograph that doesn't have hair?

20  A   I identified him because it's him.

21  Q   And when you did so, did the police tell you that you

22  were correct?

23  A   No.  They didn't say absolutely anything.

24      MR. BLACKER:   Thank you.  I will tender the witness.

25

1                    REDIRECT EXAMINATION

2  BY MS. CORONA:

3    Q   Ms. Morales, when you were -- you approached the man

4  while he was beating the woman, did you actually see the

5  weapon, or did you see the man implying that he had a weapon?

6    A   No.

7    Q   Did he imply that he had a weapon?

8    A   No.  He's the one that showed me the weapon.

9    Q   And you, yourself, saw the weapon, itself?

10   A   Yes.

11   Q   And it wasn't that he was pretending to have a weapon,

12 but he actually had a weapon?

13   A   How was he going to be pretending?  He had -- he showed

14 it and he is saying, "Don't get mixed up with problems," and he

15 shows me the weapon.  He did not show me the whole thing, but

16 he showed it to me.

17        MS. CORONA:  Thank you.  No further questions.

18        THE COURT:  Thank you, Ms. Morales.

19        Now, State, your next witness.

20        MR. GROSS:  The State calls Officer Broadnax.

21        THE COURT:  We are going to need the interpreter.  Let

22   me see the lawyers sidebar without the reporter.

23        (Discussion off the record.)

24        THE COURT:  We need the interpreter.  Mr. Blacker, at

25   this time, we're going to call a defense witness out of

                   MATZ, TRAKTMAN, FELDMAN AND WILDNER

619

1    order.

2        MR. BLACKER:  I will request of the Court to allow me

3    for the convenience of this witness to call a witness out of

4    order for her benefit.

5        THE COURT:  Her name is -- we're going to be calling a

6    defense witness out of order.  Please come forward.

7 Thereupon:

8                            ILUSION ABUD

9 was called as a witness, and having been first duly sworn, was

10 examined and testified through the interpreter as follows:

11       THE COURT:  Please have a seat over here, and ma'am, your

12   name?

13       THE WITNESS:  Ilusion Abud.  Ilusion Abud.

14                       DIRECT EXAMINATION

15 BY MR. BLACKER:

16   Q  Ms. Abud, my name is Michael Blacker.  You and I have

17 never spoken, have we?

18       THE INTERPRETER:  Can you -- may the interpreter instruct

19   the defense counsel to instruct the witness to speak out

20   loud?

21       THE COURT:  All right.  Ms. Abud, answer out loud, OK?

22       THE WITNESS:  OK.

23 BY MR. BLACKER:

24   Q  Ms. Abud, I'm going to ask you a few questions about an

25 event that occurred in June 2003, and these people want to hear

MATZ, TRAKTMAN, FELDMAN AND WILDNER

620

1 your answers.  If you understand the question, please answer

2 truthfully and correctly.  Thank you.

3       Ms. Abud, you worked in June of 2003 in a cafeteria

4 around 17th Avenue and Flagler Street in Miami, did you not?

5    A    Yes.

6    Q    And one night in June of 2003, there was an incident

7 which occurred when you were at the cafeteria; is that correct?

8    A    Yes.

9    Q    And Mr. Baldizin was there?

10   A    Yes.

11   Q    You were there?

12   A    Yes.

13   Q    and other workers were there?

14   A    Yes.

15   Q    How many other workers?

16   A    We were three or four.

17   Q    And there was a loud commotion outside the restaurant at

18 some point; is that right?

19   A    Yes.

20   Q    Did you see what was happening, or you just heard what

21 was happening?

22   A    I heard.

23   Q    You could hear voices, loud voices?

24   A    Well, yes.  We heard, but we did not go outside.

25   Q    Right.  But you heard human voices?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

621

1   A   I heard voices of Mr. Baldizin saying for us to go

2 inside.

3   Q   But there was a -- sort of like an argument outside; is

4 that correct?

5   A   Yes.

6   Q   You could hear that?

7   A   I heard the noise, but I didn't pay much attention.

8   Q   But at some point, you heard what was a shot from a gun,

9 did you not?

10   A   Two.

11   Q   Two shots.  And how -- how soon -- how soon after the

12 first one did you hear the second one?

13   A   Well, I don't know.  It must have been seconds, because

14 we were inside -- because we were hiding.  We thought it was a

15 gang fighting outside.

16   Q   Are you certain that there were two shots, or two loud

17 noises?

18   A   Two, because I think that the detectives found some caps.

19 It was two.

20   Q   You are saying that there was -- were two, because you

21 think that the detective found two caps?

22   A   Yes.  The detectives, yes.

23   Q   All right.  So you had a discussion with the detectives

24 after the detectives arrived there on the scene; is that right?

25   A   Well, the detectives arrived there and they asked -- I

622

1 know through Baldizin, because he talked to us, to his wife.

2 But I, myself, did not see anything.

3    Q    I know that, but what I'm asking is, is that what you are

4 saying -- you are saying you heard two shots because the

5 detectives discovered two caps; is that right?

6    A    I heard two shots, and later on, when the detectives

7 arrived, they asked us questions, and then the detectives were

8 with the flashlight, looking, and they found two caps.

9    Q    They found two caps and they told you they found two

10 caps?

11   A    Yes.  We were outside.

12   Q    And they showed you that there were two caps?

13   A    They put some things --

14   Q    Right.  And if I told you that only one cap was found,

15 would you say that you only heard one shot?

16   A    No.  I heard two.

17   Q    You heard two.  How did you know to come here today?

18   A    From their -- I don't know nothing else.  I did not see

19 anything.  I just heard the shots.  We thought it was gang

20 fighting, because there is always gang fighting in that area.

21 But that's the extent of it.

22   Q    How did you know to come today?

23   A    Because Mr. Baldizin called me and asked me if I could

24 come, and I said, "Why should I go?  I don't know nothing."

25 And he said, "You're going to be picked up if you don't come."

623

1  So.

2     MR. BLACKER:  Well, thank you very much for coming.

3     THE WITNESS:  OK.

4     THE COURT:  All right.

5     MR. GROSS:  No.  Thank you.  No further questions.

6     THE COURT:  Ms. Abud, thank you very much for coming, and

7  please thank Mr. Baldizin for us.  We don't need the

8  interpreter for -- to the lawyers, we don't need the official

9  court interpreter for any of the other witnesses today?

10    MS. CORONA:  No, Judge.

11    MR. BLACKER:  On my side we will, but I don't know that

12 we're going to get to them.

13    THE COURT:  We might.  Let's see.  How late is someone in

14 your office?

15    THE INTERPRETER:  5 o'clock.  We could have somebody

16 stand by if you want to.

17    THE COURT:  Can we have somebody stand by?

18    MR. BLACKER:  My witness, certainly they are standing--

19    THE COURT:  No.  The interpreter.

20    MR. BLACKER:  I'm sorry.

21    THE COURT:  Let me see the lawyers sidebar for one

22 second.

23    (Discussion off the record.)

24    THE COURT:  We won't need the interpreter tonight.  Thank

25 you very much.  We appreciate it.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

624

1      MR. BLACKER:  Thank you very much.

2      THE COURT:  Ladies and gentlemen --

3      State, call your next witness.

4      MR. GROSS:  The State calls Officer Broadnax.

5      THE COURT:  Ladies and gentlemen, I was talking to the

6      lawyers, whether we could finish this case tonight or not.  I

7      don't think so.  If we were to finish it tonight -- we could,

8      but I don't do it that way, and I'm sure you guys don't in

9      your line of work, either, because it would require that we

10     stay here probably till 11 or so.  We'll come back tomorrow.

11     Tomorrow is another day.  We all have lives, and today would

12     be the results from American Idol, right?  Jordan, that's my

13     favorite, too.

14     A JUROR:  At what time tomorrow?

15     THE COURT:  Tomorrow in the morning, 9:30.  Be here at

16     9:30.  Yes, I have the -- I find 9:30 is usually a good time.

17     You beat traffic.  I know for me, I come from Coral Gables.

18     It takes me 15 minutes to get here.  I used to start at 9,

19     but this court reporter asked me to start at 9:30, and we've

20     been doing it.  It's been a great time to start court in the

21     morning.  This one time, the court reporter was right.

22     All right.  Who is the next witness?  Please come forward

23     and put her under oath.  Please come over here.  Have a seat.

24

25

MATZ, TRAKTMAN, FELDMAN AND WILDNER

625

1  Thereupon:

2

3                    OFFICER TARKEKA BRAODNAX

4  was called as a witness, and having been first duly sworn, was

5  examined and testified as follows:

6        THE COURT:  Your name.

7        THE WITNESS:  Tarkeka Broadnax.  Tarkeka Broadnax.

8        THE COURT:  Can you repeat that, the last name?

9        THE WITNESS:  B-R-O-A-D-N-A-X.

10                    DIRECT EXAMINATION

11  BY MR. GROSS:

12    Q   Good evening.  I couldn't help but notice today when you

13  came to court, it says "police service aide."  I just want to

14  get that out of the way.  When you took that report back in

15  2003, were you also a police service aide?

16    A   No.  I was a crime scene technician.

17    Q   And going back to June of 2003, do you recall working on

18  a particular case at the Fortune House Condo?

19    A   Yes.

20    Q   And before you came here today, did you have an

21  opportunity to speak to myself about this case?

22    A   Yes, I did.

23    Q   And what I'd like to do is ask you a few questions in

24  relation -- what did you do in relation to that case?

626

1   A   According to my report, I took photographs of the crime

2   scene.  I took photographs of a 9 -- .9 millimeter that was in

3   the bedroom, and also in the garage, near the garage door.  I

4   mean garbage door.

5   Q   I just want to stop you.  You said a .9 millimeter.  Do

6   you mean the actual gun?

7   A   No.  The casing.

8   Q   What do you mean?

9   A   The casing.

10  Q   The casing?

11  A   Yes.

12       MR. GROSS:  One moment.  Your Honor, may I approach?

13       THE COURT:  Yes.

14  BY MR. GROSS:

15  Q   I now show you what has been previously marked as State's

16  Exhibit 2N, 2O, K -- 2K, rather; A6, 1X -- I'm sorry, some of

17  these are actually in evidence already.  Let me just work this

18  out.  Let's try it again.  I'm now showing you what has been

19  previously marked as State's Exhibit I -- actually, this is in

20  evidence as "I."

21       THE COURT:  No.  It's got a number.

22       MR. GROSS:  Looks like -- madam clerk, can you tell me

23  what number this is?

24       THE CLERK:  Defense Exhibit I.

25       MR. GROSS:  Defense's I.  OK.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

627

1 BY MR. GROSS:

2   Q   I now show you Defense Exhibit I, and I now show you

3 what's been marked as State's Exhibit 2, Defense Exhibit F, and

4 what's been previously marked as 2E for Identification, and I

5 also show you 2O, what's been previously marked as State's

6 Exhibit 2O for Identification, and what's been previously

7 marked as 2N for Identification.  Let's start with these three.

8 Do you recognize this particular photograph, 2N?

9   A   Yes.

10  Q   And what is that?

11      MR. BLACKER:  Objection.  Not in evidence.

12      THE COURT:  All right.  You need to speak up.

13      THE WITNESS:  Yes, it's the live round, the nine

14  millimeter.

15      MR. BLACKER:  Judge, he's asked her about a photograph

16  that is not in evidence, to describe it.

17 BY MR. GROSS:

18  Q   Do you recognize this?

19  A   Yes.

20  Q   And what is it?

21      MR. BLACKER:  Again, Judge.

22      THE COURT:  Overruled.

23      THE WITNESS:  It's a ruler with the -- it's on the ground

24  and it's --

25 BY MR. GROSS:

MATZ, TRAKTMAN, FELDMAN AND WILDNER

628

1    Q    Did you take this photo?

2    A    Yes.

3    Q    How do you know you took this photo?  Do you recall?

4    A    The ruler.

5         MR. GROSS:   OK.   State's moves what's been previously

6    marked as 2N for Identification into evidence.

7         THE COURT:  Any objection?

8.        MR. BLACKER:  Can I voir dire the witness on that?

9         THE COURT:  Yes.

10        MR. BLACKER:  Do you know where that photograph was

11   taken?  Do you remember where that photograph was taken?

12        THE WITNESS:  Yes.   It's like outside where the garbage

13   was, in the garbage little area.

14        MR. BLACKER:  In the garbage area?

15        THE WITNESS:  Yes.

16        MR. BLACKER:  And do you -- did you see any other nine

17   millimeter .9 millimeters that evening in any of your other

18   duties in the bedroom?

19        THE WITNESS:  Yes, the bedroom.

20        MR. BLACKER:  And did you compare that to the one in the

21   bedroom?

22        MR. GROSS:  Your Honor, this is outside the scope.

23        MR. BLACKER:  I'm sorry.   I got ahead a little bit.

24   Please excuse me.

25        MR. GROSS:  The State moves what's been previously marked

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    2N into evidence.

2         MR. BLACKER:  I will object and put it on the record

3    later.  Can I reserve the reason why?

4         THE COURT:  Yes.

5         THE CLERK:  State's Exhibit 2N for Identification now

6    becomes State's Exhibit 31.

7         (Thereupon, the exhibit referred to was marked as State's

8    Exhibit Number 31 and was received in Evidence.)

9    BY MR. GROSS:

10   Q    Showing you now what's been previously marked as 2O for

11   Identification, do you recognize this photo?

12   A    Yes.

13   Q    Who took this photo?

14   A    I did.

15   Q    And can you just describe the photos?  What's that?

16   A    It's a live round in the garbage, like near the garbage.

17        MR. GROSS:  The State moves what's been previously marked

18   as 2O for Identification into State's evidence.

19        THE COURT:  OK.

20        THE CLERK:  State's Exhibit 2O for Identification will

21   now becomes State's Exhibit 32.

22        THE COURT:  OK.  Without objection?

23        MR. BLACKER:  Reserve the same objection.

24        (Thereupon, the exhibit referred to was marked as State's

25   Exhibit Number 32 and was received in Evidence.)

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 BY MR. GROSS:

2    Q    Showing you what's been previously marked for

3 identification as State's Exhibit 2K, do you recognize this

4 photo?

5    A    Yes.

6    Q    What is it?

7    A    It's a live round.  Looks like it's in -- near the door.

8    Q    Who took this photo?

9    A    I did.

10       MR. GROSS:  State moves what has been previously marked

11 for identification as State's Exhibit 2K into evidence.

12       THE COURT:  Any objection?

13       MR. BLACKER:  I will reserve the objection.

14       THE COURT:  It will be admitted.

15       MR. BLACKER:  I will object and reserve.

16       THE COURT:  Do me a favor.  I know you were doing some-

17 thing else, but where were all of there things found?  Can

18 you go over that again?  Let me see the exhibits.

19       MR. GROSS:  There were two scenes.  Thank you.

20       THE COURT:  All right.  Go back to Exhibits 31, 32 and 33

21 and --

22       THE CLERK:  I didn't publish it, Your Honor, 33.

23       THE COURT:  31, 32 and 33.

24       THE CLERK:  Give me 2K.  That's the one that's 33.

25 State's 2K for Identification will now become State's

631

1   Exhibit 33.

2

3       (Thereupon, the exhibit referred to was marked as State's

4   Exhibit Number 33 and was received in Evidence.)

5       THE COURT:  Now the Court and the jury need to know where

6   those were found.

7       MR. GROSS:  I'm going to do that now.

8       THE COURT:  Before you move on to anything else.

9       MR. GROSS:  I will do that.

10  BY MR. GROSS:

11  Q   Now showing you State's Exhibit 31 through 33.  This

12  photo right here, you took that photo?

13  A   Yes.

14  Q   And can you describe the location of what is in the

15  center of the photograph?

16  A   Where is it?

17  Q   What is that in the center of the photograph?

18  A   The live round.

19  Q   OK.  When you say "a live round," what does that mean,

20  for the members of the jury?

21  A   It's like a bullet that's from a gun.

22  Q   When you say "bullet," does that mean it's already been

23  fired or not fired?

632

1    A    I haven't been with crime scene in a while, and the last

2 time I checked a live round, I don't think it's where someone

3 shot, shot it.

4    Q    So it's live, meaning it's still -- you still are able

5 to fire it?

6    A    Right.  That is correct.

7    Q    So it has not been fired?

8    A    Right.

9    Q    And that is in State's Exhibit 32.  And this photo that

10 I'm showing you now, State's Exhibit 33, what is in the center

11 of the photograph there?

12   A    Another live round.

13   Q    OK.

14   A    Another nine millimeter live round.

15   Q    Do you recognize or do you recall from that night,

16 judging by this photograph, where this photograph was taken?

17   A    Yes.  I believe that's in the -- in the apartment.

18   Q    Do you remember what floor or apartment that was?

19   A    The apartment number?

20   Q    If you recall.  I know you don't have any paperwork in

21 front of you.

22   A    No, I don't remember what apartment number it was.

23   Q    Perhaps in a few moments, I will try to refresh your

24 recollection.  Now, finally showing you what has been marked as

25 State's Exhibit 31.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

633

1      THE COURT:  Excuse me for one second, Robert.  Go ahead.

2  BY MR. GROSS:

3    Q   In State's Exhibit 31, OK, you said earlier that you do

4  recognize this photo?

5    A   Yes, sir.

6    Q   What is in the center of that photograph?

7    A   A ruler, also, with the live -- another live round.

8    Q   The live round, that one has not been fired?

9    A   Correct.

10   Q   And where was that photograph taken, exactly?

11   A   In the garage near the garbage area -- garbage container.

12   Q   Is this of the Fortune House Condominium?

13   A   Yes.

14   Q   Now, you went to how many scenes that night to do this?

15   A   I don't recall.

16   Q   On this particular job, so to speak, at the time that you

17  were at the Fortune House, how many scenes did you go to?

18   A   That particular day, I wouldn't know.

19   Q   You have photos from the basement?

20   A   Yes.

21   Q   And there are photos from the apartment, correct?

22   A   That is correct.

23   Q   Did you go anywhere else and find live rounds?

24   A   No, I did not.  I was supposed to --

634

1    Q    Now, do you recall those actual scenes where you took

2 those photos?

3    A    Without seeing the photo, no, I do not.  I just -- once I

4 see the photo, I remember.

5    Q    Well, I'm going to -- can you describe perhaps that

6 garbage area for the jury, and how you perhaps are able to get

7 there from the lobby?  Do you recall that?

8    A    From the lobby, there's a little alleyway where you --

9 like a hallway, and you walk through the hallway and there is a

10 garage with cars.  And on the side of it is where people could

11 drop off trash.

12   Q    Let me ask you, this alleyway leading to the garage, is

13 that level with the lobby?

14   A    Yes.

15   Q    In other words, you don't have to climb a flight of

16 stairs to get there?  It's on the same level?

17   A    As I recall, yes.

18   Q    OK.  How large is that area?

19   A    It's short.  Not very long.

20   Q    OK.  And you said it's a .9 millimeter?

21   A    Yes, sir.

22   Q    And what does that mean, for those members of the jury

23 that aren't familiar with guns and bullets?

24   A    That's the type of bullet it is, I guess.  Excuse me.

25 It's the kind of brand it is.

635

1  Q  It's not the weight of the --

2  A  It could be that, too.

3  Q  Were both the -- the live round you found in the basement

4  and the live round that you found in the apartment, were they

5  both nine millimeter rounds?  Do you recall?

6  A  No, I don't.

7  Q  All right.  Now, I'm going to talk to you about the

8  apartment, OK?  Do you remember going upstairs and taking

9  photos?

10  A  Yes, sir.

11  Q  First of all, before you got to this job or I don't know

12  how you call it, this particular scene, what were you told or

13  what were you looking for?  What were your duties?

14  A  Well, usually, the dispatcher would dispatch you to the

15  location and give you the unit number, and give you the offense

16  it is.

17  Q  And in this particular instance, what were you looking

18  for in this apartment?

19  A  To take photographs.  I wasn't looking for anything

20  specific.

21  Q  So just photographs of anything that you thought was of

22  evidentiary value?

23  A  Yes.  I believe I recall when I got on the scene, I spoke

24  to a particular officer and advised that there were several

25  rounds in the house, and another location.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

636

1   Q   Now, I'm showing you what has been marked as Defense

2 Exhibit I.   What is this photo?   Where is this taken?

3   A   That's the apartment of the victim.

4   Q   Can you be more specific?   Do you see the front door?

5   A   Yes.

6   Q   And can you just point to that?

7   A   The front door is here.

8       MR. GROSS:   For the record, she's pointing to the right

9   as the front door, and I will publish these photos in a

10   moment.

11       THE COURT:   There's two doors.   Let her point for the

12   jury.

13 BY MR. GROSS:

14   Q   Can you come down, please?   Thank you. Now, so everyone

15 can see --

16       THE COURT:   They can't see behind you.

17       MR. GROSS:   Sorry.

18 BY MR. GROSS:

19   Q   Now, just again, what is this depicting?

20   A   This is the living room area of the apartment.   This is

21 the front door.   The kitchen is here, and the living room.

22   Q   OK.

23   A   And the hallway right there.

24   Q   Now, can you describe -- well, do you see the live round

25 in this particular photo?

1   A   Yes, it's right here.

2   Q   And do you know what this is right here, what it's in
3 front of?

4   A   No, I don't.  It's a door, but I don't know where.

5   Q   And that's a live round?

6   A   Yes.

7   Q   Did you impound that particular round?

8   A   Yes.

9   Q   Now, you are the one that collected it?

10  A   Yes.

11  Q   And can you describe -- you can have a seat.  Thank you.
12 Can you describe the actual physical description of the
13 apartment?  Do you recall?

14  A   I believe it was ransacked.  Everything was everywhere.
15 Everything was pushed aside.  It wasn't in a normal setting.

16  Q   Were some parts of the apartment very neat and others
17 were ransacked, or was the whole apartment ransacked?

18      MR. BLACKER:  I'm going to object to the word,

19  "ransacked."

20      THE COURT:  Overruled.

21 BY  MR. GROSS:

22  Q   Please answer the question.

23  A   I'm not -- I don't remember.  I know that I could say the
24 living room and the bedroom was.  You know, everything was
25 everywhere, ransacked.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

638

1   Q   Now, how many bedrooms were in this house or this

2 apartment; do you recall?

3   A   No, I do not recall.

4   Q   May I ask you just to stand up one more time and point to

5 the live round in this photograph?  Now showing the witness

6 Defense Exhibit F.  Now, what exactly is in this photo?  What

7 is that that you are pointing to?

8   A   The live round.

9   Q   Is that shown from a different angle?

10  A   Yes.

11  Q   Where is the photographer standing?

12  A   The photographer is standing -- which is standing at the

13 beginning of the hallway that is in front of that door.

14  Q   In front of that door?

15  A   Yes.

16  Q   Oh, I see.  And don't move.  Now showing you a photo of

17 State's Exhibit 2, OK?  And showing you this photo, can you

18 describe what is here?

19  A   The live round.

20  Q   Now, that's the live round?

21  A   Yes.

22  Q   All right.  Now, where is the bedroom; do you recall from

23 this angle of the photograph?  Do you recall where the bedroom

24 was?

25  A   No.  No.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

639

1   Q   All right.  Thank you very much.  Can you describe how

2   the bedroom was, if that was also neat or ransacked?

3   A   As I recall or remember, it was ransacked.  Something was

4   -- clothes were on the bed.

5   Q   Clothes were on the bed?

6   A   Yes.

7   Q   Do you recall anything else being on the bed?

8   A   No.

9       MR. GROSS:  All right.  May I publish these to the jury,

10  one by one?

11      THE COURT:  They are all in evidence, right?

12      MR. GROSS:  Yes, Your Honor.

13      THE COURT:  All right.  Let's go.

14  BY MR. GROSS:

15  Q   Officer Broadnax, OK, I am now showing you what has been

16  previously marked for identification as State's Exhibit 2A.  Do

17  you recognize this particular package?

18  A   No.

19  Q   Is there something here that might refresh your -- or is

20  there something here that you  might identify?

21  A   The case number.

22  Q   Would you happen to know if that is the actual case

23  number?

24  A   Yes.  It's on my report.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

640

1    Q   Would you like to see your report to refresh your

2  recollection of that report?

3    A   Yes.

4    Q   Please look at it and then you could turn it over when

5  you see that number.

6    A   OK.  It's 15910763.

7    Q   And can you read out loud the case number on the

8  envelope?

9    A   15910763.

10   Q   And did you impound two live rounds from the scenes?

11   A   Yes.

12   Q   At the Fortune House?

13   A   Yes.

14       MR. GROSS:  Your Honor, at this time, the State wishes to

15  move what has been previously marked into evidence -- I'm

16  sorry -- for identification as 2A into evidence.

17       THE COURT:  Any objection?

18       MR. BLACKER:  Yes.  I will develop the reasons on cross-

19  examination.

20       THE COURT:  It will be admitted.

21       MR. GROSS:  Your Honor, at this time, the State requests

22  to open --

23       THE COURT:  First let's have it marked.

24       THE CLERK:  State's Exhibit 2A for Identification will

25  now becomes State's Exhibit Number 34.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

641

1        (Thereupon, the exhibit referred to was marked as State's

2   Exhibit Number 34 and was received in Evidence.)

3        MR. GROSS:  Thank you.  At this time, the State is

4    cutting the top of the envelope which has been sealed.

5   BY  MR. GROSS:

6    Q   Officer Broadnax, I want you to take out the contents

7   of the envelope, please.  Everything.

8        THE COURT:  Put the scissors away.

9   BY MR. GROSS:

10   Q   Do you recognize those boxes?

11   A   Yes, I recognize my handwriting and my initials with my

12  IBM.

13   Q   And that is more or less your number?

14   A   Yes.

15   Q   And do you recognize this envelope?

16   A   Yes.

17   Q   And why do you recognize that envelope?

18   A   The envelope has my name on it.

19   Q   Officer Broadnax, what I would like to do right now is

20  open up one of the packages at this time.  Can you do that,

21  please?  Is it sealed?  Can you take out one of the contents of

22  that box, please?

23   A   Take out that?

24   Q   Yes.  Take it out.  Can you read to me the bottom of that

25  live round for the jury?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

642

1   A   It says nine millimeter Luger, and it says CP33.

2   Q   Does it say anything else?  I think nine millimeter Luger

3 is the actual size of the weapon.  There might be another --

4   A   No.

5   Q   Can you read the CP--read that again.

6   A   CP99 (sic).

7   Q   And now I'm going to ask you to do the same with this

8 box, please.

9       THE COURT:  Why don't you pass the other one to the

10   jurors.  Open it.

11      MR. GROSS:  Can I just pass the round, Your Honor?

12      THE COURT:  Just pass the box.

13      MR. GROSS:  Just like that.  Just pass it.

14 BY MR. GROSS:

15   Q   Can you read the contents, what it says on the inside of

16 that live round, the cartridge?

17   A   Luger again, and CP99.  And it says nine millimeter.

18   Q   Is what you are looking at right now, is that the same

19 identical writing on the other live round?

20   A   Yes.

21   Q   And are they both nine millimeter rounds?

22   A   Yes.

23   Q   And were they both found in the same building?

24   A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

643

1   Q   Just put that back.  And if we could just publish to the
2 jury the second box.

3       MR. GROSS:  One moment, Your Honor.  Maybe two moments.

4 BY MR. GROSS:

5   Q   Did you have an opportunity -- what else did you do
6 besides impound these rounds?

7   A   Before I impound them, I process them.  That's why
8 there's black stuff on the --

9   Q   Let's get to that right now.  Did you process--what did
10 you process on the scene?

11  A   On the scene?

12  Q   Yes.

13  A   I don't recall me doing anything but taking photographs
14 and collecting the live rounds on the scene.

15  Q   All right.  And processing those two live rounds?

16  A   Right.

17  Q   And when you say processing those live rounds, what does
18 that entail?

19  A   I use the Super Glue procedure, and the Super Glue
20 enhances the fingerprints of the live rounds.  And I use the
21 black powder for the prints to appear.

22  Q   When you say you use the Super Glue, you use the strips
23 and you leave them open?  What exactly does that process
24 entail?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

644

1  A  As I recall and remember, you put them in a container.

2 First, you -- it's like a process. You have two different

3 containers and you light it, and then you put the live round

4 there, and you close it up in the container so you -- it can

5 absorb or get some kind of fingerprints on the rounds.

6  Q  Now, do you recall if you were able to get any latents of

7 value? Do you know what that means, "latents of value"?

8  A  Yes. That's fingerprints.

9  Q  Can you describe what that term means to the jury?

10  A  It's to see if I got any fingerprints on the object, so I

11 could put it on a latent card, put the prints on a latent card

12 and see if a technician -- another technician can look through

13 the computer and see those -- these prints are -- is the prints

14 in the computer.

15  Q  OK.

16  A  In the system.

17  Q  Now, it's not your job to compare, is it?

18  A  No.

19  Q  You are only lifting prints of value?

20  A  Yes.

21  Q  Were you able to actually -- to get prints of value?

22  A  No.

23  Q  And how do you recall that? Would it be on your report?

24  A  Yes.

1    Q    May I give you your report to refresh your recollection

2 where they might say that? And when you look at it, turn it

3 over when you are done. And there is another report. Would it

4 be on that report if there were latents of value?

5    A    Yes, it would be. And, no, it's not.

6    Q    The fact that there are no latents of value, does that

7 automatically discount one individual from touching that round?

8 What does it mean when you have no latents of value?

9    A    There were no prints observed on the objects.

10    Q    And why could someone handle a live round, smooth

11 subject, non-porous and not leave a fingerprint?

12    A    Could have been sweating. They could have been -- used

13 their -- the handle. They could have used a napkin or anything

14 like that.

15    Q    And how long does the oil or something from your hands

16 last on the fingerprint on a live round?

17        MR. BLACKER:  If the witness knows.

18        THE COURT:  I'm not sure. I'm not sure.

19 BY MR. GROSS:

20    Q    And are there other factors perhaps where the round was

21 found that would contribute to the lack of a print of value?

22    A    I really can't answer that question. I don't know.

23    Q    Would you know if a round was rolling on the floor by a

24 garbage, would that take away the chances of a latent of value?

646

1   A   Yes.  If, you know, somebody walking by and kicked it or

2 anything like that, yes, it's -- anything is possible.

3   Q   Are prints delicate?

4   A   Yes, they are.  And on my report, it does have no

5 latents, so I didn't get any prints, so.

6        MR. GROSS:  One moment.  Thank you, Officer Broadnax.

7   No further questions at this time.

8        THE COURT:  Any cross-examination?

9        MR. BLACKER:  Please.

10

11                    CROSS-EXAMINATION

12 BY MR. BLACKER:

13   Q   Hi, Officer.  My name is Michael Blacker.  You've never

14 spoken to me, have you?

15   A   No, sir.  I haven't.

16   Q   When you arrived that night, you knew that there was a

17 video of the areas in which -- where the actions took place;

18 isn't that correct?

19   A   No, I wasn't aware of that.

20   Q   You weren't aware of that?

21   A   No.

22   Q   Were you asked by anyone to photograph anything on the 6th

23 floor, the gymnasium, the bathroom and the toilet room on the

24 6th floor?

25   A   No.

647

1    Q    Did you go on the 6th floor to photograph anything?

2    A    No.

3    Q    Were you told that some of the activity took place on the

4  6th floor?

5    A    No, I was not aware.  I was not advised.

6    Q    No one from -- did you speak to any of the personnel that

7  worked at the Fortune House?

8    A    I believe I spoke to a security guard.

9    Q    Did the security guard tell you that you might be able to

10  find some evidence in the gymnasium that was on the 6th floor?

11    A    No.

12    Q    And who did you speak to from law enforcement that night?

13    A    Officer -- it's on the report.

14    Q    Were you the only crime scene technician?

15        MR. BLACKER:  Can I see the report, counsel?  May I see

16    the report for a second?

17        MR. GROSS:  Yes.  Here it is.  Let me find it.

18  BY MR. BLACKER:

19    Q    Were you the only crime scene technician on the scene?

20    A    On the scene, I don't recall.

21    Q    As a crime scene technician, you told us two of your

22  duties --

23        MR. BLACKER:  Thank you very much.

24  BY MR. BLACKER:

MATZ, TRAKTMAN, FELDMAN AND WILDNER

648

1  Q   You told us two of your duties in relationship to this

2  case.  You took some photographs and you dusted for or taped

3  the live rounds that you found in the garage and in the

4  apartment for the existence of fingerprints, latents, correct?

5  A   Yes.

6  Q   Did anyone tell you that certain activity took place in

7  certain places and that you should pay more attention and look

8  for certain things?

9  A   No.

10  Q   No.  Now, you told Mr. Gross that there was -- rooms were

11  in disarray, that there were a couple of rooms in disarray?

12  A   Yes.

13  Q   Were you the first person in, for example, the apartment

14  subsequent to the actual events which gave rise to us being

15  here?  Do you know whether or not you were?

16  A   I believe the officers were there, the responding

17  officers but --

18  Q   And you are trained if you are responding officer to wait

19  for crime scene before anything is moved; isn't that correct?

20  A   Yes.

21  Q   No good officer would walk into the crime scene and start

22  moving things around unless there was an emergency situation;

23  isn't that correct?

24  A   Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   Q   And it was quite clear when you walked into the apartment

2 that there wasn't anybody in the apartment, that there was no

3 extreme circumstances that were there?

4   A   I remember there -- only one -- the victim wasn't --

5   Q   The victim was in the apartment?

6   A   No.  The victim wasn't.

7   Q   There was no one in the apartment that was there that was

8 a civilian other than law enforcement, correct?

9   A   Right.

10   Q   And so therefore, you could take your time and photograph

11 and do whatever you had to do without rushing and perhaps

12 moving things maybe of evidentiary value, correct?

13   A   Correct.

14   Q   And so you certainly didn't move anything to get a better

15 picture of it, did you?

16   A   No.

17   Q   You wouldn't do that, because you weren't trained like

18 that, were you?

19   A   No, I was not, sir.

20   Q   So when you walked into that apartment --

21      MR. BLACKER:  Let me see the exhibits of the apartment,

22   please.

23 BY MR. BLACKER:

24   Q   The interior, when you walked into the -- the photographs

25 that we have for us to view now and for these folks to review,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

650

1 that was -- is what it looked like when you walked in; is that

2 correct?

3    A    That is correct.

4    Q    And as far as you know, nobody had disturbed that

5 apartment?  Sorry.  I just need a moment.

6         Let me show you what has been marked -- sorry.

7         MR. BLACKER:  Sorry, Judge.  I should have prepared

8    this beforehand.

9 BY MR. BLACKER:

10   Q    All right.  Let me show you State's Exhibit -- it's not

11 in.

12        MR. BLACKER:  Can we introduce this as a composite

13   exhibit, Judge, the interior of the bedroom and the

14   interior of the apartment other than --

15        MS. CORONA:  They have already been admitted.

16        THE COURT:  Those have already been admitted.

17        MR. BLACKER:  Oh, I see it.  It is admitted.  It is just

18   part of the initial.  I couldn't read it.

19 BY MR. BLACKER:

20   Q    Now, here is State's Exhibit O -- H.  Take a look at all

21 of these photos, all of them, and all of the bedroom -- this is

22 the interior of the apartment, and as I'm turning them over for

23 you, that's the way it looked to you in the bedroom, is it not?

24 You don't move anything, did you?

25   A    No, sir.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  Q   And you wouldn't have gone and taken, for example, a

2  pillow that might have been laying near the front door and

3  removed that pillow, and taken it to the bedroom, because it

4  belonged on the bed, would you?

5  A   No, sir.

6  Q   If it had been near the front door, you would have -- not

7  have moved it?

8  A   Yes.

9  Q   And had the pillow been in the hallway, which is

10 reflected here in Defense Exhibit E, had it been in the middle

11 of the floor, you certainly wouldn't have moved it to the

12 bedroom, because it belongs on the bed, would you?

13 A   No, sir.

14 Q   As crime scene investigator, you are to photograph things

15 exactly and precisely as you see them, right?

16 A   Yes, sir.

17 Q   And you didn't move anything until a supervisor comes in

18 or the person who owns the place comes in, and you are done

19 with your photographic -- your photography; isn't that right?

20 A   That is correct, sir.

21 Q   And you know these exhibits as 31, 32 and 33, about the

22 bullet, you know the bullet that you showed to the jury, so if

23 it lands on the ground, so if there was a fingerprint, you

24 would have retained that for evidentiary value, wouldn't you,

25 ma'am?  You understand what I'm saying?

652

1    A    Yes, I understand what you are saying, but I'm not sure.

2    Q    Well, if someone had touched the bullet, we wouldn't want

3  to find --

4        MR. BLACKER:  Can I see the exhibit, please?  Thank you.

5  BY  MR. BLACKER:

6    Q    If someone touched the bullet, we wouldn't expect to find

7  a fingerprint on the bottom edge of the bullet, would we,

8  because that would be too on the line, wouldn't it?

9    A    Yes.

10   Q    So if we're going to examine this for fingerprints and

11  try to raise a latent, we would hope that someone touched it,

12  like touching it with an elongated end; isn't that correct?

13   A    Yes, sir.

14   Q    And if the bullet wound up on the ground and rolled, it

15  wouldn't roll -- it would not -- wouldn't knock off the

16  fingerprint, because the bottom side of it is bigger than the

17  bullet itself, and would maintain its fingerprints, wouldn't

18  it, ma'am, as it rolls?

19   A    I'm not sure.  I don't know.

20   Q    Well, you told counsel that the fingerprints -- first of

21  all, let me ask you about fingerprints.  There are some

22  fingerprints that are found 25 years later, aren't there?

23   A    Yes.

24   Q    On metal as well as other objects, including glass; isn't

25  that correct?

1  A  Yes.

2  Q  It all depends upon the person who touches it, if he
3 touches it and it's maintained in that condition in which the
4 fingerprint can last; isn't that right?

5  A  Yes.

6  Q  You know from school that they have given the examples
7 that fingerprints are found 25 and 30 years later to exist;
8 isn't that correct?

9  A  Yes.

10  Q  So time isn't necessarily a function as to the lasting of
11 the fingerprint, is it?

12  A  Yes.

13  Q  Is it?  It is a function, but it's not necessarily the
14 only function, isn't it?

15  A  That is correct.

16  Q  You know that if this bullet had been touched -- for
17 example, I'm touching this bullet now, and if you came in here
18 and you used your tape right now on it, you'd probably get a
19 latent from it, wouldn't you?

20  A  Yes.

21  Q  So the point is if someone would have touched that, that
22 night, three or four hours before you took the latent, you
23 would have been able to find a latent on it, wouldn't you?
24 Unless they were wearing a glove or put it in their clothes so
25 that no latents would be there; isn't that correct?

654

1    A    That is correct.

2    Q    You would expect on this kind of material that this

3  bullet is made out of, which is a copper, you would expect to

4  find a fingerprint on that, wouldn't you?

5    A    That is correct.

6    Q    If it is touched, if I touched it now and you use your

7  tape, you'd get a fingerprint off of it, wouldn't you, ma'am?

8    A    It is possible, yes.  Probably.

9    Q    Now, you raised no latents off of any of the bullets; is

10  that correct?

11    A    That is correct, sir.

12    Q    So you can't tell us who might have put those bullets

13  where they were, or how they got there, can you?

14    A    No, sir.  I cannot.

15    Q    And you told me that you were speaking to someone on the

16  scene --

17        MR. BLACKER:  Can I approach, Your Honor?

18  BY MR. BLACKER:

19    Q    Would you take a look at your report?  Because you can do

20  it a lot quicker than I can.  And tell me who from law

21  enforcement you may have been in contact with that was advising

22  you of what the crime scene -- what you wanted to do as a

23  technician.

24    A    Officer LeDuke.

25    Q    LeDuke?

1   A   Yes.

2       MR. BLACKER:   And can I have one moment?

3 BY MR. BLACKER:

4   Q   Did you take any photographs of the lobby area of the

5 Fortune House?

6   A   No, I don't recall.

7   Q   Did you take any photographs whatsoever in your entire

8 crime scene investigation in which you thought you found serum,

9 blood serum, blood?

10   A   It's not in my report and I don't recall any blood.

11   Q   In looking at those photographs, you didn't see any

12 blood, did you?

13   A   No.

14   Q   How about in the vestibule outside of the apartment right

15 near the elevators?  Did you find any blood on the floor or is

16 it carpeted?  I don't know.

17   A   I don't recall any blood in the hallway.

18       MR. BLACKER:  Thank you.  I have nothing further.  Thank

19   you very much, Officer Broadnax.

20       THE COURT:  Mr. Gross, anything further?

21       MR. GROSS:  No, Your Honor.

22       THE COURT:  Thank you, Officer.

23       MS. CORONA:  State calls Officer Theye.

24       THE COURT:  Is this a quick witness?  Let's take like a

25   five minute bathroom break.  Do not discuss the case amongst

1    yourselves.  Go into the jury room.  OK, five minutes.

2        (Thereupon, a brief recess was taken, after which, the

3 following proceedings were had:)

4        THE COURT:  Bring in the jury.

5        (Thereupon, the jury panel entered the courtroom, after

6 which, the following proceedings were had in open court:)

7        THE COURT:  Please have a seat.  Call your next witness.

8        MS. CORONA:  The State calls Officer Theye.

9 Thereupon:

10                     OFFICER FRANCISCO THEYE

11 was called as a witness, and having been first duly sworn, was

12 examined and testified as follows:

13                     DIRECT EXAMINATION

14 BY MS. CORONA:

15   Q   Good afternoon, sir.  Can you introduce yourself to the

16 jury?

17   A   Good afternoon.  Francisco Theye.

18   Q   What do you do for a living?

19   A   Crime scene investigator for the City of Miami Police

20 Department.

21   Q   How long have you been a crime scene investigator with

22 the City of Miami?

23   A   A little over six years.

24   Q   What kind of training do you have as a crime scene

25 investigator?

657

1    A    I have over 240 hours accumulated with forensic

2 photography and other crime scene classes.

3    Q    What specifically do you do as a crime scene

4 investigator?

5    A    Specifically, as a crime scene investigator, we

6 photograph, document, collect evidence, preserve it for

7 preparation of case files.

8    Q    On this particular date, June 8, 2003, were you called to

9 a crime scene?

10    A    Yes, I was.

11    Q    Do you recall where you were called out to?

12    A    Yes.

13    Q    And where was that?

14    A    1741 West Flagler.

15    Q    And what is at that location?

16    A    Basically, it's a business district.  It's the front of a

17 cafeteria.

18    Q    Were you told specifically who to meet there?

19    A    No, not necessarily.

20    Q    Who was there when you got there?

21    A    When I got there, I spoke with Officer Suarez, who was

22 securing the scene there for me.

23    Q    Did he give you an update of what had gone on in the

24 scene?

25    A    Yes, he did.

658

1    Q    And what were you looking for at that particular scene?

2    A    Apparently, there was possibly ammunition from gunshots,

3 and there was a camera that was on the sidewalk also there.

4    Q    Was there also a person, a witness that said that --

5 directed you where to look for this possible ammunition?

6    A    That would be Officer Suarez.

7    Q    He had spoken to somebody that told you where to look for

8 these things?

9    A    Correct.

10   Q    Where did you finally start looking?

11   A    Well, basically, it was pointed out to me in the case,

12 because it was being secured by the officer who was -- and he

13 pointed out the spent shell casings and camera.

14   Q    Showing you -- let me ask you, when you say "spent shell

15 casings," what do you mean by that?

16   A    Basically, you shoot a weapon, when you shoot a gun, the

17 spent shell falls out of the gun while the bullet or projectile

18 goes straight forward.

19   Q    Do you know what direction it usually --

20   A    All depends on the weapon.

21   Q    Does that happen for all guns?

22   A    No.  This would be from usually a semiautomatic weapon.

23   Q    And can you tell by looking at the spent casing what kind

24 of gun it was?

25   A    No, I could not.

659

1  Q   Can you tell by looking at the ammunition what kind of

2  gun was used?

3  A   Not specifically.

4  Q   Not specifically what brand, but whether it was a semi-

5  automatic, revolver, or whatever it was?

6  A   No.  Specifically, no.

7  Q   Showing you what has been marked into evidence as State's

8  Exhibit 25, and what's been marked for identification as

9  State's Exhibit 2M, let's talk about 2M.  Do you recognize that

10 photograph?

11 A   Yes.

12 Q   And did you take this photograph?

13 A   Yes.

14 Q   Is that a fair and accurate representation of the

15 photograph that you took on the crime scene on June 8, 2003?

16 A   Yes, it is.

17     MS. CORONA:  The State would seek to introduce State's

18     Exhibit 2M into evidence.

19     THE COURT:  Any objection?  It will be admitted.

20     THE CLERK:  State's Exhibit 2M for Identification will

21     now become State's Exhibit 35.

22     ((Thereupon, the exhibit referred to was marked as

23 State's Exhibit Number 35 and was received in Evidence.)

24 BY  MS. CORONA:

660

1   Q  As to State's Exhibit 35, can you show me what you did on

2 this crime scene?

3   A  Basically, upon arrival, again, I spoke with the officer

4 who was there; pointed out to where the spent shell casing is,

5 where I have it marked as Number 1 on the street.  I

6 photographed and collected it.

7   Q  And what has now been introduced as State's Exhibit 35,

8 is that a close up of that same Number 1 with the spent shell

9 casing there?

10   A  Yes.

11   Q  What did you do once you photographed this?

12   A  Collected it.

13   Q  Which means what?

14   A  Put it into a cardboard pillbox and transported it to my

15 station.

16   Q  How do you do that?  With gloves?

17   A  Absolutely.  Put on gloves, pick it up by the side,

18 because there might be prints on the side of it.

19   Q  What are the chances that a spent casing like that has

20 prints, somebody's prints left on it?

21   A  I, myself, have never been able to collect prints from a

22 casing.

23   Q  How many casings would you say you have tried to collect

24 prints from in your career as a six-year crime scene

25 investigator?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

661

```
 1   A   A lot.

 2   Q   Over 100?

 3   A   Way over 1,000.

 4   Q   And in all of those thousands that you have tested,

 5 you've never collected prints from a spent casing?

 6   A   Correct.

 7   Q   You have never recovered prints from a live round of

 8 ammunition?

 9   A   No.

10   Q   You have tested those also for prints?

11   A   Yes.

12   Q   And how many times have you tested those?

13   A   Numerous.  I couldn't give you an exact amount.

14   Q   Hundreds?

15   A   Thousands.

16   Q   In your expert opinion, why do you think that there's not

17 latent fingerprints that could be recovered off of viable items

18 such as spent casings and live ammunition?

19       MR. BLACKER:  Objection.  Assuming facts not in evidence.

20       THE COURT:  Overruled.

21       THE WITNESS:  As far as the spent shell casing goes, in

22   my experience and my understanding from speaking to numerous

23   technicians, the heat generated from the shooting of the

24   weapon burns off any latent prints, any fingerprints that

25   might be on that casing.
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 BY MS. CORONA:

2   Q  And in this particular case, were you the one that

3 actually looked for prints on that casing?

4   A  Yes, I did.

5   Q  What procedure did you go about using?

6   A  Normal procedure.  We Super Glue it, a common nickname

7 for it, where the fumes adhere to any moisture being the

8 fingerprint that would be on the spent shell casing.  First, we

9 fume it, and then we throw some black powder on there, charcoal

10 black powder, very fine powder which would adhere to prints so

11 you would be able to see it and lift it from there.

12   Q  And what were the results of that procedure?

13   A  Negative results.  Nothing.

14   Q  Which means that you were not able to recover anything

15 that even looks like a fingerprint?

16   A  Correct.

17   Q  So just because a person touches a particular object,

18 does that necessarily mean that fingerprints are going to be

19 left and be able to be recovered from that object?

20   A  Absolutely not.  It's very hard to get a latent

21 fingerprint.

22   Q  Just because, let's say, I touch this right here, does

23 that mean that if you come up here, you will be able to recover

24 fingerprints off of this surface?

25   A  Absolutely not.

663

1   Q   Even after you saw me physically touch this, does that

2   mean --

3   A   Absolutely not.

4   Q   Showing you what has been marked as State's Exhibit 2B

5   for Identification, do you recognize that?

6   A   Yes, I do.

7   Q   Is that your name on the outside of that --

8       MR. BLACKER:  No objection to the chain of custody.

9       MS. CORONA:  I seek to admit State's Exhibit 2B for

10      Identification into evidence.

11      THE COURT:  It will be admitted without objection.

12      THE CLERK:  State's Exhibit 2B for Identification will

13      now become State's Exhibit Number 36.

14      (Thereupon, the exhibit referred to was marked as State's

15  Exhibit Number 36 and was received in Evidence.)

16  BY MS. CORONA:

17  Q   Can you tell me what it says on the outside of this box?

18  A   It says nine millimeter Luger spent casing.  Case number,

19  my initials, my badge number and where it was located from,

20  which is 1741 West Flagler.

21  Q   Who determined that to be a nine millimeter?

22  A   The back of the casing has a lead stamp basically telling

23  you exactly what it is.

24  Q   And let me try to open this.

25  A   That's some good tape.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

664

1   Q   Can you show on the bullet where you determined this to

2   be a nine millimeter?

3   A   This back part here.

4   Q   Does it actually say it on there?

5   A   Yes, it does say nine millimeter Luger.

6   Q   Does it have a brand on there?

7   A   Yes, it does.  It says Luger, and there is also, in

8   addition to that, it says CP99.

9   Q   So Luger is the type of brand of ammunition?

10   A   Correct.

11   Q   Showing you what has already been entered into evidence

12   as State's Exhibit 34, can you look at the bullet, the live

13   rounds that are actually in here and determine if they are

14   actually the same as the ones recovered -- the spent casing

15   that was recovered from the scene that you processed at 1741?

16   A   Yes.  Exactly the same head stamp.  Nine millimeter

17   Luger.  CP99.  Same nine millimeter Luger, CP99.

18   Q   About that head stamp, what can you tell us about that?

19   A   Basically, it tells you the make, tells you the caliber

20   and also might tell you in some cases the amount of powder that

21   might be inside there.  It would tell you how potent the bullet

22   might be.

23        MS. CORONA:  I have no further questions.

24                         CROSS-EXAMINATION

25   BY MR. BLACKER:

MATZ, TRAKTMAN, FELDMAN AND WILDNER

665

1  Q   Officer Theye, how are you?  Michael Blacker.  I'm so

2  tired.  I'm going to lean.  Tell me about this CP99.  You know

3  how many different CP's there are for a nine millimeter Luger?

4  A   I do not.

5  Q   Do you know how many -- excuse me.  I'm sorry.  I've been

6  coughing a lot -- contained with a CP99 brand on it?

7  A   No, I do not.

8  Q   When you were asked to compare the live round with the

9  spent round and to compare whether or not they come from, for

10 example, a single box of bullets, you couldn't tell us that,

11 could you?

12 A   Right.

13 Q   Isn't that right?

14 A   Correct.

15 Q   There might be -- do you know whether or not CP99 is the

16 only mark on the nine millimeter Luger?

17 A   No.

18 Q   You don't even know that, do you?

19 A   No, I do not.

20 Q   So the fact that the spent casing that says CP99 on it is

21 compared to an unspent bullet which has CP99 brand on it means

22 absolutely nothing in terms of identification, does it?

23 A   Your question is?

24 Q   The question is that you can't tell us that that -- that

25 the spent bullet, CP99, has anything to do with the unspent

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1 bullet, except that they both contain the letters, CP99 on

2 them; is that correct?

3    A    I'm sorry, I'm just not following you.

4    Q    Well, I'm sorry.  Maybe I'm -- let me try to be a little

5 more articulate for you.  It's late, but I'm going to try.

6    A    Thank you.

7    Q    You are not saying under oath that the CP, the fact that

8 the CP99 marking on the spent bullet brings it into the

9 relationship with the CP99 on the unspent bullets on the live

10 round, other than the fact that the marking is the same?

11    A    Correct.

12    Q    It could be the only marking that the nine millimeter

13 Luger has; isn't that correct?

14    A    The only nine millimeter Luger where?  I'm sorry.  That's

15 the --

16    Q    What is CP99 to you?

17    A    That is the mark on the head stamp of the actual casing.

18    Q    So you don't know whether the CP99 is the only marking

19 that a nine millimeter Luger has in the entire world; is that

20 correct?

21    A    No.  I have seen many different head stamps, and many

22 different letters, and numbers on them.

23    Q    Does it have any special meanings, a CP99?

24    A    I do not know.

1   Q   Does it tell you how much powder or anything of that

2 nature?

3   A   Sometimes it does.  In this case --

4   Q   CP99 --

5   A   In this case, to actually find out exactly what the CP99

6 means, you would have to -- an expert would --

7   Q   You are not an expert in that realm?

8   A   Correct.  I'm not.

9   Q   And the fact that a CP99 -- you don't know how many

10 millions of bullets might contain the CP99 as to compare to

11 just by that marking; is that correct?

12   A   Correct.  I do not.

13   Q   Sorry I was a little inarticulate.  You will have to

14 forgive me.  C.S. investigator, correct?

15   A   Correct.

16   Q   And you don't go to the crime scene and start moving

17 things around there?  As a matter of fact, you generally don't

18 touch the crime scene in case you notice something that might

19 be of importance, you could photograph it, or collect it and do

20 other things?

21   A   Correct, yes.

22   Q   You wear gloves?

23   A   Yes.

24   Q   You don't move anything that you see unless someone tells

25 you to; is that correct?

668

1    A    Correct.

2    Q    And if you move an item that you think might be of

3 importance, you actually take a tweezer on some objects to pick

4 up, so it won't get your fingerprints on it?

5    A    Correct.

6    Q    Or glove prints?

7    A    Correct.

8    Q    And the only crime scene you did in this case was the

9 spent casing at 1741?

10   A    As far as I know at this time, yes.

11   Q    It is not a trick question.  I just want to know if that

12 limits your work.  And what time did you arrive on the scene?

13   A    I believe it was early morning.

14   Q    OK.

15   A    Possibly 1, little bit after 1, maybe.

16   Q    Can you tell us what time crime scene had been secured?

17   A    I do not know.

18   Q    And you did a search of the area for spent casings,

19 right?

20   A    Yes, I did.

21   Q    And you found one spent casing, correct?

22   A    Correct.

23   Q    Do you know how many officers were on the scene when you

24 arrived?

25   A    One that I recall.

1    Q    One. Do you know how many had been there before you had

2  arrived?

3    A    I do not.

4    Q    The scene was secured; is that correct?

5    A    Yes, it was.

6    Q    When you talk about secure, we mean that no one from the

7  -- member from the public, no civilian was able to walk in the

8  area before law enforcement did its crime scene investigation?

9    A    Correct.

10   Q    And so that makes it sort of pristine, if you get there

11 early enough; isn't that correct?

12   A    Correct.

13   Q    So you know that the evidence is going to be there for

14 you, if it exists. It will be there untouched, unmoved,

15 because you have secured the scene for the privacy of your --

16 do you understand what I mean?

17   A    That's correct. Hopefully, yes.

18   Q    All right. And you searched this area that you were told

19 to search around 1741?

20   A    Yes.

21   Q    And you searched the entire area for shell casings,

22 because you were told that you might find some?

23   A    Yes, I did.

24   Q    And the only thing that you found was one shell casing;

25 is that correct?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

670

1    A    That is correct.

2         MR. BLACKER:  I have nothing further.

3         THE COURT:  All right.

4         MS. CORONA:  No redirect.

5         THE COURT:  Thank you, Officer.

6         You have another short witness?

7         MS. CORONA:  Yes, Judge.

8         THE COURT:  Your next witness.

9         MR. GROSS:  Officer Infante.

10 Thereupon:

11                    OFFICER HECTOR INFANTE

12 was called as a witness, and having been first duly sworn, was

13 examined and testified as follows:

14

15                    DIRECT EXAMINATION

16 BY MR. GROSS:

17    Q    Good evening.

18    A    Good evening, sir.

19    Q    Can you state your name and occupation?

20    A    Hector Infante, crime scene investigation supervisor for

21 the Miami Police Department.

22    Q    Do you recall doing some type of investigation in

23 relation to a crime that took place on June 8, 2003?

24    A    Yes, sir.

25    Q    And what was your role in that particular case?

671

1    A    I did some follow-up work on the Chevy Cavalier at

2    the station.

3    Q    All right.

4         And you used the term, "follow-up work."

5         What exactly were you to do on that car?

6    A    Follow-up work means work that has been done after

7    the original scene has been finished.

8         So in July, which was well after the scene, the car

9    was brought to me to be examined.

10    Q    What year do you recall seeing that automobile?

11    A    2003.

12    Q    The crime happened June 8, 2003?

13    A    This was July 18th.

14    Q    So it's the same year that you saw the car?

15    A    Yes, sir.

16    Q    What exactly did you do to that car?

17    A    I took --

18    Q    What were you looking for?

19    A    Anything of evidentiary value.

20         I was told that it was possibly a gunshot fired

21    inside the car, so I photographed the car and then examined

22    the car to see if there was any --

23         MR. BLACKER:   Objection.

24         So I don't waste any time, I have something I have to

25    say sidebar.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

672

1          Can we please do it now in case of the ruling that I

2     anticipate?

3          (Thereupon, counsel for the respective parties

4     approached the bench, and the following proceedings were

5     had outside the hearing of the jury panel:)

6          MR. BLACKER:   Judge, I interviewed Infante for the

7     first time, and he told me that he qualified as an expert

8     on one occasion his entire career.

9          It's not on whether or not a projectile exists or

10    made a hole.

11         It was on a dowel rod trajectory.

12         That's not what he is testifying to today.  He is

13    going to testify that a hole he saw, he determined was a

14    bullet hole.

15         He has never been an expert on that.

16         He's coming in there as a lay witness.

17         As to 90.701, the witness cannot readily and with

18    equal accuracy and adequacy communicate what he or she

19    has perceived to the trier of fact without testifying in

20    terms of inferences or opinions.

21         And the witness' use of inferences or opinions will

22    not mislead the trier of fact to the prejudice of the

23    objecting party.

24         And the opinions, inferences do not require a special

25    knowledge, skill, experience or training.

673

1    He's admitted to it that they do require a special

2  skill, knowledge, experience or training that a bullet

3  existed, and he does not have it.

4    THE COURT:  State?

5    MS. CORONA:  He's necessarily been qualified as an

6  expert, with qualification as an --

7    THE COURT:  You could qualify him.

8    MS. CORONA:  He's not been qualified in the past.

9    THE COURT:  He has on one occasion.

10    MS. CORONA:  Not as to this specifically.

11    MR. BLACKER:  Trajectory expert, not projectile

12  expert.

13    You could qualify him.  Fine.

14    But otherwise, I'm objecting to his testimony.

15    THE COURT:  You know, if he's qualified as an expert,

16  he can give his opinion that that is a bullet hole.

17    If he is not qualified as an expert, he can, as crime

18  scene, say:

19    "I checked this car.  It was after the scene.

20  I found this."

21    And don't ask him for his opinion.

22    (Thereupon, the sidebar conference was concluded,

23  after which, the following proceedings were had in open

24  court:)

25    THE COURT:  The jury may find yourself when you're at

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    home asking your loved ones for a sidebar.  It happens.

2        A JUROR:  More like a side bed.

3  BY MR. GROSS:

4    Q  Is it Officer Infante?

5    A  C.S.I.

6    Q  Real C.S.I.

7        And how long have you been doing that?

8    A  22 years.

9    Q  And how long have you been a supervisor?

10    A  The last six and a half.

11    Q  And as a supervisor, what are your duties?

12    A  My responsibilities are making sure that everything

13  is running smoothly, and that the shift calls are being

14  handled, the work is being done.

15        I review the work product.  I instruct --

16        From here, I'm actually going to teach new police

17  officers about crime scene investigation.

18    Q  Excellent.

19        What type of training have you had specifically in

20  CSI involving ballistics, and bullet holes and things of

21  that nature?

22    A  It's several classes in the Miami-Dade Police

23  Department that involve crime scene investigation, how to

24  investigate shooting scenes.

25        I've also been --

675

1    In 22 years, I have responded to numerous --

2    I can't even mention the number of scenes where

3 shootings have occurred.

4    Some up to over 200 shots fired, where I have to

5 investigate where the projectiles have hit and where they

6 have gone.

7    Also, I am an avid gun collector, myself, and have my

8 personal experiences of shooting.

9    Q   Have you ever testified in a court before?

10   A   Yes, sir.

11   Q   Approximately how many times have you testified in

12 court?

13   A   There are days it seems like I can't get out of this

14 building, sir.

15   Q   Like today?

16   A   Like today.

17    I would like to say that maybe 12 times, 15 times a

18 year.

19    Homicide cases, mostly.

20   Q   Times 22?

21   A   Yes.

22   Q   And have you ever testified as an expert in any

23 courts in your career?

24   A   Once, sir.

25   Q   And in the actual ballistics?

676

1    A    In the flight path of bullets.

2    MR. GROSS: At this time, Your Honor, the State would

3    move CSI Infante as an expert in projectile --

4    THE COURT: Mr. Blacker, would you like to voir dire

5    Officer Infante on his qualifications?

6    MR. BLACKER: I would.

7    Officer Infante, in your 22 years, have you always

8    been a CSI investigator?

9    THE WITNESS: Yes, sir.

10    MR. BLACKER: And in 22 years, you've been qualified

11    as an expert in one trial.

12    Is that correct?

13    THE WITNESS: Yes, sir.

14    MR. BLACKER: And that trial was not a trial in

15    identifying and rendering opinions as an expert as to

16    whether or not the projectile existed?

17    It was merely the flight path, the flight -- the

18    projectile -- pattern of a projectile.

19    Isn't that correct?

20    THE WITNESS: Yes, sir.

21    MR. BLACKER: And we do our flight projectile with a

22    dowel -- we will deal with the dowel later on.

23    What you do is take the path of certain holes to

24    determine the angle of entries and exits?

25    THE WITNESS: Yes, sir.

677

1      MR. BLACKER:  You don't determine whether it was from

2  a particular projectile, because that is not what your

3  expertise is, is it?

4      THE WITNESS:  Correct.

5      MR. BLACKER:  And so at no point in 22 years have you

6  ever been classified as an expert, other than on that

7  occasion.

8      Is that correct?

9      THE WITNESS:  Correct, sir.

10     MR. BLACKER:  You said you had training, two classes

11 and 22 years experience, and personal experience, because

12 you are an avid gun collector.

13     Is that correct?

14     THE WITNESS:  Yes.

15     MR. BLACKER:  As a shooter at a range, you don't go

16 and ever determine whether or not you shot a target and

17 it was a bullet or not, do you?

18     THE WITNESS:  I've shot cars to have to be able to

19 teach future CSI's what bullet holes look like, and how

20 they would travel through objects, and they could

21 actually deflect or move, and how you could be able to

22 determine.

23     MR. BLACKER:  I see.

24     So you, having never been an expert in court?

25     You are an expert for the police department

678

1    on whether or not a bullet has been shot into this car is

2    what you are telling this Court?

3        THE WITNESS:  Sir, I'm telling you that I was ruled

4    as an expert on however it classified in court

5    proceedings as to the flight path of the bullet.

6        The projectile travels in a certain path to make

7    these holes.

8        MR. BLACKER:  But you are not here to testify as to

9    the flight path of projectiles today.

10       You are here to tell us whether or not you believe,

11   in your opinion, if, in fact, it was a bullet that made a

12   particular hole.

13       Isn't that correct?

14       THE WITNESS:  Sir, I'm here to testify on my work

15   product.

16       MR. BLACKER:  Is that what your opinion is; that

17   you're going to be asked to render an opinion on?

18       Yes or no?

19       THE WITNESS:  I guess I have to wait to see what the

20   questions will be, sir.

21       THE COURT:  If I may interject.

22       Do you feel you have any expertise to identify bullet

23   holes in cars?

24       THE WITNESS:  I can only give you my opinion, sir,

25   that it might be consistent with being a bullet hole.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

679

1    THE COURT: You feel you have that degree of

2    expertise, and you can assist the jury?

3    THE WITNESS: Through real life experiences, yes,

4    sir.

5    THE COURT: Any further questions based on the

6    Court's questions?

7    MR. BLACKER: Have you ever made a determination that

8    a hole in a vehicle --

9    Have you ever been asked to make such a determination

10   that a hole in a vehicle is not a bullet hole?

11   THE WITNESS: No, sir.

12   MR. BLACKER: Have you ever been asked to make a

13   determination that the hole in a vehicle in a court of

14   law is a bullet hole?

15   THE WITNESS: I've testified in a similar case that

16   was had in Orange County as to the attempted murder of a

17   police officer, that the hole in the car was consistent

18   with it being fired from the officer in the location

19   where he was standing, yes.

20   MR. BLACKER: It was consistent --

21   THE WITNESS: And because of the characteristics, all

22   that, of that hole, and the damage that it created, the

23   path and the detection, how it ricocheted was consistent

24   with a bullet hole.

25   MR. BLACKER: And in that case in Orange County, were

MATZ, TRAKTMAN, FELDMAN AND WILDNER

680

1    you qualified as an expert, or were you qualified as a

2    lay witness?

3        THE WITNESS:  I've never seen an attorney move that

4    quick.

5        THE COURT:  Especially an old one.

6        MR. BLACKER:  What I am saying to you, in that case,

7    you weren't qualified as an expert?

8        THE WITNESS:  If I remember, I was.

9        MR. BLACKER:  I thought you told us that the only

10    time that you qualified as an expert --

11        Correct me if I'm wrong -- was to determine the angle

12    of projectiles traveling.

13        THE WITNESS:  I'm sorry, sir.

14        It was on the path of the bullet; not on bullet

15    holes.

16        Yes, sir, you are correct.

17        MR. BLACKER:  You have not been qualified as an

18    expert to determine whether or not it was a bullet, but

19    just the path of the bullet?

20        THE WITNESS:  Correct.

21        MR. BLACKER:  Objection to the qualification, Judge.

22        THE COURT:  All right.

23        Go ahead.

24        Continue.  Ask the question.

25        MR. GROSS:  All right.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

681

1          Right now, I'm going to actually ask to play

2    something for you.

3          THE COURT:  You can play it from there.

4          Everybody can see it?

5    BY MR. GROSS:

6    Q   Officer Infante, I will be playing something for you.

7    I want you to describe to the Court what it is when it

8    starts.

9          (Thereupon, the recording referred to was published

10   in open court.)

11   BY MR. GROSS:

12   Q   Who is that?

13   A   That's me.

14   Q   And what is that?

15       Not that, but what is this?

16       Exactly what is this?

17   A   The Chevrolet Cavalier.

18   Q   Is that the automobile you're going to do the

19   investigation on?

20   A   Yes, it is.

21   Q   Is that the very car?

22   A   That very car.

23   Q   And what is this?

24   A   That's a view from the -- where the driver would be;

25   front corner.

1    Q    Now, I'm going to ask you why this car looks like

2    this.

3         Can you give the Court --

4    A    I was informed that that car actually had been

5    junked.

6         It was in a junkyard.

7    Q    How much of --

8         After the fact, I think you testified that the day

9    before --

10        I just want to clarify how much length of time this

11   car was actually in the junkyard to your knowledge.

12   A    I believe this is like a month, about a month and a

13   half.

14   Q    What are you doing now?

15   A    I was searching the car.

16        First, I had to remove all the junk that was in it,

17   bumper and tires.

18        So I had to pull that out first to be able to get to

19   the interior of the car.

20   Q    Is that what you are doing in this scene right here?

21   A    Yes, sir.

22        In fact, you could see how --

23        THE COURT:  What we are looking at here is State's

24   Exhibit 20, right?

25        MR. GROSS:  I believe so.

683

1   BY MR. GROSS:

2      Q   And if you could just tell the jury, for the record,

3   you are in the rear seat?

4      A   Yes, in the rear passenger's area.

5      Q   Why do you have a flashlight?

6      A   We use a flashlight for everything.

7          It doesn't matter what time of day or night.   The

8   flashlight helps us with a range of light.

9          And when you are searching, you may need a flashlight

10  in a particular location.

11         This is brightly lit.

12     Q   I notice that you are also wearing gloves.

13         Why is that?

14     A   Well, one, not to contaminate myself.

15         I don't want to take home anything you don't bring to

16  work, so not to cut myself, and be able to examine the car

17  without possibly contaminating anything that I might find.

18     Q   Now, I notice also you are pointing or putting your

19  finger in something.

20         Why do you do that at that moment?

21     A   That was a hole that I found in the back seat that --

22  on the outside.

23         I just needed to investigate further on the hole at

24  that point.

25     Q   Can you describe that hole?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   A   It was a -- pretty much, when a projectile goes

2   through fabric.

3   Q   Just describe the hole.

4   A   The hole?

5   Q   Yes.

6   A   Like semi-circular.

7       Q   Let's see what else.

8       And what is this right here?

9   A   That's --

10      At that point, after determining that it had --

11  that the hole continued going deeper, I then started to dig

12  through the seat to see if I could find hopefully a

13  projectile.

14  Q   So you actually made this laceration, so to speak?

15  A   Yes, with a scalpel.

16  Q   That is below the cloth or cotton top?

17  A   It's a yellowish cushy foam.

18  Q   Foam?

19  A   Yes.

20  Q   Again, the flashlight?

21  A   Always.

22  Q   Now, what are you doing now?

23  A   The car was well made, sir.

24      I need to find some better tools, and I need to go

25  actually to my personal car to get my tools, to be able to

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    move the back seat, which was bolted down to that car.

2        Q    Why did you want to remove the back seat?

3        A    I was digging and I couldn't find anything to --

4             I had to remove the seat to see if it actually went

5    through the interior seat, if the hole continued.

6        Q    Is that a normal course of investigation?

7        A    Yes, sir.

8             We tear a lot of things open.

9             Yes, sir.

10       Q    Were you successful in getting the rear seat cushion

11   out?

12       A    Yes, sir, I was.

13       Q    And what do you see here?

14       A    That's a foam that a lot of vehicles have.

15            It's a brown foam.

16            I think it's sound insulation and possibly for heat,

17   also.

18            It's underneath most seats and the carpet in your

19   car.

20       Q    Can you describe for us the texture, thickness of

21   that foam?

22       A    Close to being a wool type of fabric.

23       Q    So it's tough?

24       A    Yes, sir.  It's tough.

25       Q    What are you doing here?

MATZ, TRAKTMAN, FELDMAN AND WILDNER