1    A    Well, I found the hole, and I went through to see if

2  I could continue finding -- continue finding where that

3  hole continued.

4    Q    Did it stick out in your --

5         Did it stick out to you right away?

6         You know, did it take a while to find the hole?

7    A    It took a while from the beginning.

8    Q    Once you removed the sound -- the sound insulation

9  material?

10   A    No, sir.

11        It wasn't hard to find, because I knew the general

12  area I was looking at.

13   Q    How many holes were you looking for when you pulled

14  away the sound --

15   A    When I pulled the sound insulation back, it was one

16  hole.

17   Q    Flashlight?

18   A    Yes, sir.

19   Q    Now, what is this right here?

20        What do you have there?

21   A    That is actually the flashlight up against the hole,

22  showing that it made it all the way through.

23        That is the actual pavement below the car.

24   Q    This is under the car?

25        Correct?

687

1    A    Yes, sir.  It is.

2    Q    And this is the right driver's side tire?

3         Correct?

4    A    No.

5         That is the rotor and break system.

6    Q    You took off the tires?

7    A    The tires were inside the car.

8    Q    Junkyard car?

9    A    Yes.

10   Q    Yes, sir?

11   A    No tires.

12   Q    Does that mean that, in fact, that this hole went

13   straight through to the pavement?

14        Is that correct?

15   A    There was probably nothing to find at that point.

16        That hole was the only thing I was going to find.

17   I wasn't going to find anything that went through --

18        It went through it.

19        There was no place where it landed that I could find

20   it.

21   Q    Thank you.

22        All right.

23        Now, let's talk about that hole.

24        First of all, that particular hole, is there anything

25   remarkable about that hole?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1       Did it merge either inward or outward?

2  A  I imagine outward, towards the rear of the car.

3  Q  Can you describe that more for the jury?

4  A  If you take a piece of paper and throw it over a --

5  excuse me -- volting system.

6       If you take a piece of paper and if the volt -- and

7  you go through it, the paper opens outward.  Right.

8       Same as the volting in a bullet.

9       Once you make that hole, now it punches.

10      Now, something went through the metal, opening it,

11  creating a metal -- which is a seal to open up.

12  Q  And is that consistent with this hole that you found

13  in this investigation of that Chevy Cavalier?

14      Is that consistent?

15  A  Yes, it is.

16  Q  All right.

17      Does that mean that a very small person underneath

18  the car did -- didn't shoot upward into that vehicle?

19  A  That hole was coming --

20      MR. BLACKER:  Objection.

21      Assuming facts not in evidence.

22      THE COURT:  Overruled.

23      THE WITNESS:  That hole was opening towards the

24      bottom, exiting the car.

25

1   BY MR. GROSS:

2      Q   All right.

3          So it had to have been shot from which direction?

4          MR. BLACKER:   Objection to the assuming facts not in

5      evidence.

6          THE COURT:   Overruled.

7          THE WITNESS:   From the interior, the angle --

8   BY MR. GROSS:

9      Q   All right.

10         We will get to the angle in just a moment.

11         What we're going to do is use this chair as a prop,

12     so to speak, for the jury.

13         And if I could have you step down, with His Honor's

14     permission.

15         Now, this being a rear seat, now, you remove which

16     cushion in looking for that hole?

17     A   The cushion you actually sit on.

18         MR. GROSS:   Let the record reflect that the witness

19     is pointing to the bottom, not the back portion of the

20     seat.

21   BY MR. GROSS:

22     Q   All right.

23         First of all, let's describe the rear of the '94

24     Cavalier.

1        Do you remember if it's buckets in back, or a bench

2    seat?

3    A    Bench seat.

4    Q    All right.

5        Can you describe what is a bench seat to the jury?

6    A    Just one long seat.

7    Q    As opposed to?

8    A    As opposed to two separate seats that some sports

9    cars have.

10   Q    All right.

11       Do you recall if it is a bucket seat or bench in the

12   front?

13   A    Bucket in the front.

14   Q    Bucket in the front, bench in the rear?

15   A    Yes.

16   Q    And since it is a bench seat in the rear,

17   approximately what was the length of the --

18       If this was the passenger's side and that was the

19   driver's side --

20       And pretend there was no arm-rest, and there was one

21   continuous chair.

22       Where was that actual hole?

23   A    Towards the center.

24   Q    All right.

25       So it was in the center?

1    A    Yes.

2    Q    Directly in front of that hole, if you were going to

3    go towards the windshield, towards the front of that car

4    would be bucket or just a console?

5    A    Console.

6    Q    So there is no seat in front of that area?

7    A    No, sir.

8    Q    All right.

9         Now, let's talk about that hole.

10        Now, what did it have to --

11        That hole penetrated how many items?

12   A    The cloth fabric of the exterior, the foam, and the

13   interior of the seat.

14        And then it passed through the sound heat insulation,

15   and then went through the metal.

16   Q    And that, as you said, was the only hole that you

17   found?

18        Is that correct?

19   A    Yes, sir.

20   Q    All right.

21        And how fast do you believe in your experience would

22   an object -- not only even a bullet -- have to travel to

23   tear through those four levels of insulation, sound

24   depleter and metal?

25   A    It would have to be a high velocity to do the damage

1    that it did.

2    Q    So you are not saying not only to make the hole, but

3    you are saying to do the damage?

4    A    Yes, sir.

5    Q    All right.

6         In your experience, before we get there, from the

7    angle, all right, or trajectory, was that --

8         Whatever that was right now --

9         Did that go through that particular hole?

10        Did that fire or shot travel from the front of the

11   car or outside the car?

12   A    From the front area of the car.

13   Q    Is it possible --

14        Also, did you see any holes in the wind-shield, if

15   you recall?

16   A    No, sir.

17   Q    Do you feel that that happened --

18        Do you feel that had to come from the interior of the

19   car?

20   A    Yes, sir, I do.

21   Q    And just by the hole that you found underneath the

22   car, how can you ascertain that that came from the front of

23   the car and not an angle?

24   A    Well, from the position it went through the seat, all

25   the way out the hole from the seat all the way out at an

693

1   angle, coming from the front, high front, which if it could

2   come from anywhere, from that hole, to infinity.

3       And I cannot say where along the way, but it came   .

4   from that hole somewhere towards the front of the car up.

5   Q   All right.

6       Now, this being the --

7       Where you found the bullet hole, how close to the

8   back cushion was that hole found?

9   A   I believe it was about four, maybe five inches.

10  Q   Five inches from the back cushion?

11  A   Yes, sir.

12  Q   I don't know if you know, but do you know the degree

13  of trajectory offhand?

14      If you know.

15  A   No, sir.

16  Q   All right.

17      Would you be able to estimate at this point now if

18  the bullet or projectile was from very high or from -- or

19  low?

20  A   Sir, I would have to say that the path came from --

21  made it towards the top of the windshield, with the roof

22  meeting the windshield anywhere from -- anywhere from there

23  to there, sir.

24  Q   I want you to just have a seat, if you can.

25      All right.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1        This chair will simulate; that seat you are in, the

2    front seat, OK?

3        You are actually in the driver's seat, the driver's

4    seat right now, OK?

5        All right.

6        Now, if you could just demonstrate at what

7    trajectory, if you turned around and simulated a firing of

8    a weapon was that trajectory.

9    A    If I'm a right-handed person, I would have to shoot

10   like this.

11       (Witness indicating.)

12   Q    Do that again.

13   A    Like this or like this.

14       (Witness indicating.)

15   Q    Well, if you were a left-handed person, how would you

16   do it?

17   A    Left hand.

18       I would reach over.  I would shoot down.

19       (Witness indicating.)

20   Q    So it is consistent again.

21       All right.

22       But both of these things are feasible?

23   A    Yes, sir.

24   Q    Thank you very much.

25       You can have a seat.

1      Now, there are certain tests, if I'm not mistaken,

2   that people in your line of work perform on certain types

3   of holes to determine if it is actually coming from the

4   gun.

5      Is that right?

6   A   Yes, sir.

7   Q   Did you actually have the opportunity to do something

8   called a GSR test?

9   A   No, sir.  I didn't.

10   Q   What does "GSR" stand for?

11   A   Gunshot residue.

12      It is what happens whenever a firearm is fired.  The

13   residue is left behind, and it could be collected.

14   Q   Now, this was your case, right?

15   A   I was assisting on it; yes, sir.

16   Q   But you are the supervisor?

17   A   Yes, sir.

18   Q   All right.

19      And you knew that this would get some exposure?

20   A   Yes, sir.

21   Q   And did you do everything you could?

22   A   Yes, sir.

23   Q   Why didn't you do the GSR residue on it?

24   A   I knew you were going to ask that, sir.

25   Q   I knew you would answer.

1    THE COURT:  I didn't hear that.

2    MR. BLACKER:  Why didn't he perform the GSR test on

3  it?

4    THE COURT:  What was the answer?

5    THE WITNESS:  I mumbled.  I'm sorry.

6    THE COURT:  Why is it?

7    THE WITNESS:  I'm going to answer.

8    When I pulled everything out of the back seat, all

9  the garbage, all the junk, there was dirt on the seat.

10    GSR, using the short term, is very fragile.  You can

11  start losing it within two hours without touching it.

12    Once you start touching it or handling it in any way,

13  it drops even higher.

14    Your chances are lower.

15    I'm sorry.  You lose a higher amount of GSR.

16    So at that point, I felt that there was no need to do

17  a GSR test.

18  BY MR. GROSS:

19  Q  All right.

20    Also, was there any doubt in your mind --

21    Did you think this was possibly caused by running

22  over a glass bottle, or a thumb tack or something like

23  that?

24  A  No, sir.

25    Q  There are also other tests you could have

697

1   performed

2      Isn't that right?

3   A  Yes, sir.

4   Q  And what would that be?

5   A  Well, there are kits that --

6      There are kits that determine if it is copper or

7  lead; the two basic metals used in projectiles to see if

8  something struck -- if the projectile struck a surface.

9      You actually look for what might be left behind.

10   Q  And you have been with CSI 22 years?

11      Is that correct?

12   A  Yes.

13   Q  And you have witnessed many investigations?

14   A  Yes, sir.

15   Q  And a supervisor for the last six?

16   A  Yes.

17   Q  Now, you have a test that is called the copper lead

18  swab test that the Miami CSI has used in certain cases.

19      Have you seen that?

20   A  Yes.

21   Q  All right.

22      And about how many times have you seen that test

23  used?

24   A  A handful.

25   Q  A handful? Four?

698

1    A    Four or five times.

2         Q    Why do you believe that in those situations --

3         Let's start with that question first.

4         Why did they use them in those circumstances?

5    A    Because we had them then.

6    Q    You had them then.

7         What does that mean?

8    A    We don't always carry these.

9         They are very expensive and a very short shelf life.

10   We don't always have the kits.

11        GSR kits are simple.  GSR kits are just anything that

12   is residue sticking to the surface.

13        Q    All right.

14        And when is the last time that you saw a copper lead

15   swab kit?

16   A    I don't remember, sir.

17   Q    You don't remember?

18   A    Yes, sir.

19   Q    All right.

20        And does that explain why you didn't do it in this

21   particular case?

22   A    Yes, sir.

23        I just stuck with the dowel rod and determined the

24   path.

25   Q    All right.

699

1          And using that dowel rod, even though you don't

2     figure out to the exact trajectory, you were still able to

3     determine what?

4     A    I didn't figure out the angle, because --

5          I didn't figure out the angle, because I felt it

6     wasn't necessary.

7          I just determined the path itself.

8     Q    What did you determine from your experience as an

9     expert?

10         What did you determine?

11    A    That a projectile --

12         MR. BLACKER:  Objection.

13         Same objection made at sidebar.

14         THE COURT:  Overruled.

15         MR. BLACKER:  Is that your ruling, Your Honor?

16         Is that your ruling?

17         THE COURT:  Yes.

18         THE WITNESS:  That a projectile traveled through the

19         fabric, the cushion, the floor mat, or the actual heat

20         insulation through metal.

21    BY MR. GROSS:

22    Q    Projectile.  That is a fancy word.

23         But what is a projectile?

24    A    A round that's fired out of the weapon, which is made

25    of different components in the gun.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

700

1    Q  Could it be a nine millimeter?

2    A  Yes, sir.

3    Q  Is that consistent, the hole that you saw in the '94

4  Cavalier, is that consistent with a nine millimeter

5  projectile?

6    A  It is consistent.

7      Yes, sir.

8    MR. GROSS:  No further questions.

9    MR. BLACKER:  May it please the Court, counsel,

10  Mr. Diaz, ladies and gentlemen.

11              CROSS-EXAMINATION

12  BY MR. BLACKER:

13    Q  Mr. Infante, when you went out to test the car, did

14  you know anything about the case in terms of the

15  projectiles used?

16    A  No, sir.

17    Q  No one told you that they believed that a nine

18  millimeter casing was found that might be evidence in the

19  case at 1741 West Flagler Street?

20    A  I was told that a shot was fired inside the car.

21    Q  Pardon?

22    A  I was told that a shot was fired inside the car.

23    Q  All right.

24      No one told you about a nine millimeter or anything

25  like that?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

701

1    A    Not that I remember.

2    Q    Did you have any bullets with you when you went to

3    test the car?

4    A    No, sir.

5    Q    All right.

6         And if someone told you that they thought a nine

7    millimeter bullet was shot in this case, you would want to

8    see if that one was consistent with the hole, wouldn't you?

9    A    Well, as far as the velocity --

10   Q    The velocity?

11        So when you told counsel his last question you

12   answered is consistent with a nine millimeter bullet, it

13   could have been actually any caliber of bullet, couldn't

14   it?

15        Isn't that correct?

16   A    It could have been a different caliber, yes, sir.

17   Q    All right.

18        And there are multiple calibers other than a nine

19   millimeter that could have been consistent with that hole.

20        Isn't that correct?

21   A    Yes, sir.

22   Q    Do you know when that hole was made?

23   A    No, sir.

24   Q    The 1994 Cavalier --

25   A    I don't remember the year of the car, but --

MATZ, TRAKTMAN, FELDMAN AND WILDNER

702

1    MR. BLACKER:  Counsel, do we have a stipulation that

2    the car is a 1994?

3    MR. GROSS:  Yes, we do.

4    MR. BLACKER:  '94.

5    THE WITNESS:  Thank you, sir.

6  BY MR. BLACKER:

7    Q   You went out there in 2004.

8        Is that -- 2003, July?

9    A   Yes.

10   Q   All right.

11       So a nine year old car, you don't know when that hole

12   was made?

13   A   No, sir.

14   Q   You don't know who made that hole, do you?

15   A   No, sir.

16   Q   And who told you that there was a shot fired from the

17   -- from within the car?

18   A   There was a shot fired, a bullet was --

19       I think Detective Morin.

20   Q   Detective Morin.

21       And did Detective Morin -- did she order you to do

22   any scientific test?

23   A   She didn't order me to do anything, sir.

24   Q   All right.

25       So when you tell us that you have been classified in

MATZ, TRAKTMAN, FELDMAN AND WILDNER

703

1    a court of law as an expert, not only in the determination

2    of whether or not a projectile made a hole, but on the

3    angle and the trajectory flight pattern -- correct?

4        A    Yes, sir.

5        Q    And so having never been an expert in the area before

6    you went out to determine whether or not it was a bullet

7    hole -- right? -- or whether you could get some evidence

8    out of the car --

9        A    Correct, sir.

10       Q    And this gunpowder test, the GSR, when a bullet

11   pierces a cloth -- which generally you can find gunpowder,

12   don't we, on a soft cloth?

13       A    Not always, sir.

14       Q    Not always.

15            But you can generally find it.

16            Isn't that right?

17       A    Not generally.

18            I don't know what the percentage is.

19       Q    All right.

20            Are you saying that you do not know what the

21   percentage is?

22       A    I'm telling you I don't know the percentage.

23       Q    But wouldn't you expect to find gunpowder if it was

24   shot through a cloth?

25       A    Possibly at some time.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    Q    And you talked abut the life expectancy of the

2    residue test, the GSR.

3         Correct?

4    A    Yes, sir.

5    Q    What would the harm have been if you had taken the

6    GSR test kit with you, and tried to do it, and failed?

7         Would that have been harmful?

8    A    No, sir.

9    Q    How expensive is the kit, sir?

10   A    I don't know.

11   Q    You work for Miami-Dade County?

12   A    No, sir.

13   Q    Do you work for Metro?

14   A    No, sir.

15   Q    Who do you work for?

16   A    City of Miami.

17   Q    City of Miami Police.

18        Excuse me.   I'm sorry.

19        City of Miami, could they afford GSR kits?

20   A    Yes.

21        We have plenty of them.

22   Q    All right.

23        So there would have been no harm had you taken the

24   kit, would there?

25   A    No, I guess not.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    Q   All right.

2        How about your copper and lead test?

3        You know what bullet is shot.

4        Generally, it's a bullet --

5        Well, the projectile is made out of copper or lead,

6    or a combination.

7        And they leave a copper or lead line, correct?

8    A   Not always, sir.

9    Q   Not always.

10       "Not always" means what, in your experience?

11       What does that mean?

12   A   I find it to be more chances that we --

13       The chances are that we're not going to find lead or

14   copper on a surface, depending on the surface.

15   Q   Fine.

16       What surfaces could we think of that are the most --

17   the best possible surface to find lead or copper on?

18   A   Like a brick wall.

19   Q   Something very hard, correct?

20   A   Very hard, that would ricochet off.

21   Q   Correct.

22       Did you ever go to the crime scene at 1741 West

23   Flagler?

24   A   No, sir.

25   Q   Did you ever talk with anyone on the crime scene?

706

1    A    Not -- I think --

2         No, sir.

3    Q    Did you know when you went out to look at this car

4    that if it was a bullet, it had been shot while the car was

5    parked right in front of 1741 --

6         MR. BLACKER:  May I have the picture?

7         Here it is.

8         Thank you.

9    BY MR. BLACKER:

10   Q    That if it was --

11        If it was a bullet, if that was the bullet hole, it

12   was shot on that street?

13   A    OK, sir.

14   Q    And would you -- would you think that if a bullet was

15   shot on that street, you might have been able to do it, a

16   copper and lead kit on the street, itself?

17   A    Not necessarily, sir.

18        I would say the chances would be very poor on that,

19   sir.

20   Q    We talked about what the bullet went through.

21        You told us it went through cloth?

22   A    Yes, sir.

23   Q    And then went through something you described like

24   some kind of wool?

25        Is that correct?

1   A   Yes, sir.

2   Q   And then it went through a metal part of the car,

3   correct?

4   A   Yes, sir.

5   Q   All right.

6       How about that metal part?

7       Why not do a little scratching of copper or lead from

8   the metal part?

9   A   Probably not, sir.

10  Q   Probably not?

11  A   Because --

12  Q   Why?

13  A   When projectiles normally hit a car and hit the

14  paint, the projectile knocks the paint off, which is where

15  it made that contact, so the transfer that you get would be

16  on the paint, not necessarily on the metal.

17  Q   But that part of the metal that it went through on

18  the underneath, not the part that is exposed to the ground,

19  but the part inside the car isn't painted, sir.

20      It's pure metal.

21      It's not painted.

22  A   It is primer.

23  Q   It is primer?

24      It's not painted?

25  A   Can we see the TV?

708

1    Q    Sure.

2         (Thereupon, the recording referred to was further

3    published in open court.)

4    BY MR. BLACKER:

5    Q    How about on the --

6    A    On what?

7    Q    The underneath part where the projectile might have

8    come in at the very end.

9         That's not painted under the car?

10   A    It wouldn't touch that, sir.

11   Q    Pardon?

12   A    It wouldn't touch.

13   Q    I didn't hear you.

14   A    It wouldn't touch under the side of the car at all.

15   Q    Yes, it made --

16   A    No, it opens up.

17        It doesn't go down and come back up.

18   Q    And the part from the metal, that opened up at the

19   very beginning, on the end of the crown?

20        Correct?

21   A    The crown?

22   Q    The crown might have picked up some lead and copper,

23   would it not?

24   A    Not where the paint is missing.

25   Q    All right.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

709

1         You didn't run a test, did you?

2   A   No, sir, I did not.

3   Q   You told counsel how expensive it was.

4         Can the City of Miami afford a test like that test,

5  sir?

6   A   Sir, I said that we don't always have it all the

7  time.

8   Q   You don't always have it?

9   A   The copper and lead test, we don't always have it.

10   Q   All right.

11        Is there another test that counsel didn't discuss

12  with you?

13        Isn't there a swab test?

14   A   Swabbing of what?

15   Q   Swabbing of the area.

16   A   For the GSR?

17   Q   Yes.

18   A   We talked about GSR.

19   Q   You didn't swab anything, did you?

20   A   No, sir.

21   Q   Isn't there any other test that you could use to

22  determine whether or not a projectile or a hole in an

23  object was created by a bullet?

24   A   Not to my experience.

25   Q   All right.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

710

1       Did you ever learn that there was only one --

2       Strike that.

3       If a bullet were shot there on the street, 17th Avenue

4  and Flagler, from what you saw, would the underpinning of

5  the car have somehow shaped the bullet, the projectile that

6  was coming through it so that some residue of the bullet,

7  some physical part of that bullet might be laying on the

8  street, or may have made a hole in the street?

9    A   There is a lot of variables in that question, sir,

10  but depending on how much the round slowed down as it is

11  traveling past the metal, it might not even scratch that

12  pavement at all.

13      It might have just fell.

14   Q   Might have been laying there.

15      Isn't that right?

16   A   Might have laid there or might have ricocheted with

17  very low velocity and ended up anywhere.

18      Projectiles can hit something and their flight

19  pattern could change totally, depending on the area and the

20  objects around.

21   Q   All right.

22      And it can end up in pieces, and various pieces going

23  to various areas?

24   A   Yes, sir.   They can.

25   Q   All right.

711

1      So in this particular one which is shot through a

2 seat, through wool, through metal, you would expect, would

3 you not, some residue of that bullet would have been either

4 lodged, or laid, or laying on 1741 West Flagler where it

5 was shot, if it was shot there?

6  A  Again, sir, not necessarily.

7  Q  Not necessarily?

8      What would have happened to it?

9      Disappeared?

10     Poof?

11  A  No.  It could have gone below the car, hit the

12 pavement, bounced anywhere, ricocheted.  It could ricochet

13 and hit a car, hit -- not a car.

14     It could have bounced and ricocheted from an object

15 and changed the flight pattern and the direction.

16     And you have two problems with projectiles:  That

17 they are very, very light, very easy to kick around, drive

18 over, step on.

19     And a lot of times, we have had to check to see if it

20 might have stuck in the groove of different objects.

21  Q  And that was the only hole that you tested.

22     Isn't that right?

23  A  Yes, sir.

24  Q  You didn't test any other hole?

25     You didn't see any other holes?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

712

1    A    I did not.

2    Q    So you expect that the bullet hit the ground and

3    popped back up into the car, and would there be another

4    hole, wouldn't it, or a dent?

5    A    Sir, if it slowed down enough that it didn't damage

6    the asphalt, it probably would have left another mark, and

7    again, this car didn't even have tires.

8        This was dragged and dropped on the pavement at a

9    processing area.

10   Q    But you told us that the bullet was shot from the

11   center of the car through the center of the back seat, and

12   it went through the center of the car of the underneath

13   chassis.

14       Isn't that correct?

15   A    That is correct.

16   Q    You wouldn't expect the bullet that hit the center of

17   the car to have the expectation to hit any of the tires,

18   would you?

19   A    No, sir.

20       Could be a tire from any car in the area.  I'm giving

21   you possibilities of what could have happened.  It could

22   have hit the gas tank.

23   Q    In your 22 years of experience, if a bullet was shot

24   down through -- if it was a bullet that shot down through

25   the center of the car, and it's an angle that you say it

1   was shot, even though you didn't measure the angle, would

2   you expect that there would be some residue of the bullet

3   somewhere on the street, or lodged in the car?

4   A   I wouldn't expect it, sir.

5   Q   You wouldn't?

6   A   No, sir.

7   Q   You wouldn't?  It would just disappear?

8   A   No, sir.  You could hit something -- you've laid your pad

9   down several times.  You don't expect to see any marks from

10  that pad.  You could touch something and not leave a mark.

11  This projectile could have slowed down enough where it could

12  have just bounced off.

13  Q   Can we see the film again?

14  A   If you'd like, sir.

15  Q   You told us how powerfully and how fast it went through

16  this piece of metal, and you showed us -- do you need that?  If

17  it's a piece of paper and it may bruise going out, and then it

18  was going fast, and as soon as it hits decides to become -- it

19  might be very soft, and not make any imprint or anything else;

20  is that what you are telling the jury?

21  A   Yes.

22  Q   You are telling the jury it may pass this metal and slow

23  down just like the example that I used with the piece of paper?

24  It can slow down the momentum, after it went through that

25  paper, and the same thing through metal?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

714

1   A   It can slow down.

2   Q   I want to look at the mark it made underneath the

3 chassis.  While we're doing that, have you ever -- I imagine

4 that you've -- can you stop it anywhere?  I will tell you where

5 I want it to stop, please.  Right there.  That hole that you

6 are placing the dowel through, how big was it, this hole right

7 here that you stuck your finger in?  Did you measure it?

8   A   No, sir.

9   Q   When a bullet comes out from a gun, a nine millimeter

10 bullet -- this is a nine millimeter bullet?

11   A   I can't tell from here, sir.

12   Q   You have to look and read it, don't you, to tell if it is

13 a nine millimeter bullet?

14   A   I'm getting older, sir.  My eyesight is getting worse.

15   Q   You  have to get it from the bottom?  You can't tell?

16   A   Not from that distance.

17   Q   When a nine millimeter projectile comes out of a weapon,

18 a nine millimeter weapon, is it larger than this bullet or

19 smaller than the bullet that's --

20   A   Can I see that again so I can show you?

21   Q   Yes.

22   A   Obviously, it's the same width.

23   Q   Diameter?

24   A   Diameter.  And it extends about this far inside the

25 casing.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

715

1   Q   And you did not measure that hole; is that correct?

2   A   Correct.

3   Q   If a nine millimeter -- would you expect normally a hole

4   from a -- let's say a nine millimeter would make a larger hole

5   than the nine millimeter in a soft cloth?

6   A   When it goes through the cloth, the hole is normally

7   smaller than --

8   Q   Smaller than?

9   A   Yes.

10  Q   And you have your entire finger in that hole, don't you,

11  sir?

12  A   It stretched when I put my finger through it.  It

13  stretched open.

14  Q   And you didn't even measure it to see if a nine

15  millimeter would fit there?

16  A   I said it was consistent with it.

17  Q   Consistent with it.  And you are testifying as an expert,

18  and you don't even take a measurement or ruler -- you had a

19  ruler with you?

20  A   I'm testifying on the flight pattern, the flight path.

21  Q   I thought you were testifying --

22  A   In my experience in dealing with thousands of bullet

23  holes, yes, sir.

24  Q   So to determine -- to be scientific, to determine whether

25  or not it was a type of bullet, you made -- perhaps in this

716

1 case maybe now you should have measured the hole, don't you

2 think?

3    A    Sir, the fabric and the stretching --

4    Q    I understand that it stretches.

5    A    It's upward.

6    Q    And you stretched -- you testified that you stretched --

7         MR. GROSS:   Objection.   Argumentative.

8         THE COURT:   Sustained.   Let's get somewhere on this.

9         MR. BLACKER:   Can we continue.

10 BY MR. BLACKER:

11    Q    Press it again to stop.   How far from the vertical part

12 of the back seat was the hole that you found coming out towards

13 the front?   About how many inches?

14    A    I don't recall, sir.

15    Q    About how many inches, sir?

16    A    I don't recall, sir.

17    Q    Looking at the film right now, you can't tell this jury?

18    A    You can't tell on the television, sir.

19    Q    Why?   It isn't distorting there?   Is it distorted?   Why

20 can't you tell on the television?   Is it distorted?

21    A    No, sir.   I would say --

22    Q    Is there a photograph of the underneath of the car?

23    A    I wouldn't be able to get underneath the car, sir.

24    Q    I'm talking about for the chassis.

1    A    I photographed it the best I could from the limited space

2 I had.

3    Q    So you are telling this jury that you don't -- you don't

4 think the bullet could have gone in the chassis and landed on

5 the street, and you didn't even get under there is what you are

6 saying?

7    A    Sir, there is a piece that we just saw there where my

8 flashlight is going right through where it would have been the

9 pavement had the car had four wheels on the 17th Avenue and

10 Flagler.

11    Q    Now, can I --

12        THE COURT:  Anything further?

13        MR. BLACKER:  Yes.

14 BY MR. BLACKER:

15    Q    Now, you don't know when that hole was made; is that

16 correct?

17    A    Correct, sir.

18    Q    The only thing you can tell us is that the hole was

19 consistent with it being made from the front of the car to the

20 back, correct?

21    A    Correct.

22    Q    And if someone had, for example, a gun in the front seat,

23 and they were in the driver's seat, they would have had to have

24 gone like this, correct?

25    A    Correct.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

718

1   Q   And if they were a lefty, it would have been a little

2   easier; is that what you are saying?

3   A   Yes, sir.

4   Q   And there was nothing in the car, nothing in this hole of

5   any lead or copper that you could see?

6   A   Correct.

7   Q   And besides, you didn't measure any of the holes in the

8   car near the hole in the front of the top of the seat; is that

9   correct?

10   A   Correct.

11   Q   Neither the hole in the wool of the seat, the part we

12   call wool, correct?

13   A   Correct.

14   Q   Nor the whole size of the hole in the under chassis,

15   which was the metal part of the seat?

16   A   I don't know.  I might have taken a photograph of it with

17   a scale.

18   Q   Do you have it?

19   A   No, sir.  I don't have it in my photographs.  I don't

20   have custody of them.

21   Q   But had you done so, if you would have measured the hole,

22   you might have been able to tell whether or not a nine

23   millimeter could go through this, wouldn't you?

24   A   Yes, sir.

25   Q   On all of the holes; isn't that correct?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

719

1    A    No, sir.

2    Q    Pardon?

3    A    Fabric, foam and cloth, any type of cloth opens.  We all

4 have this generally in our clothing.  They stretch and they

5 close up again, so I would not have been able to get an

6 accurate measurement on any of the items that are, I guess,

7 liable, might be stretchable.

8    Q    So you have -- other than the fact that it might have

9 been a bullet in your opinion that made the hole, you can't

10 tell us anything else about it except the angle of entry; is

11 that correct?  Can't tell us who, what, why, when, where or

12 anything else to explain to us how this hole occurred, other

13 than that angle of entry and that you believe it was a bullet?

14   A    Yes, sir.

15        MR. BLACKER:  Thank you.

16        MR. GROSS:  Very quick redirect.

17                    REDIRECT EXAMINATION

18 BY MR. GROSS:

19   Q    All right.  You called homeland security for this

20 investigation?

21   A    No, sir.

22   Q    Did you call in the German shepherd ballistics dogs?

23   A    No, sir.

24   Q    This wasn't like a Seduco (phonetic) puzzle?  You kind of

25 knew -- I mean were you in a quandary as to what happened with

MATZ, TRAKTMAN, FELDMAN AND WILDNER

720

1   this thing?

2   A   I was told that the vehicle was used in a crime, and a

3   shot was fired inside the car, and there were times when we

4   tried to keep the information limited, not to taint.

5   Q   But what I'm trying to say here, this didn't require

6   like a brain stretch?

7       You didn't have to call your former supervisors?

8       Did you know right away what this was?

9   A   Yes, sir.

10  Q   Now, counsel showed you a nine millimeter.

11      If I'm aware, it's made of the cartridge and

12  projectile?

13  A   Yes, sir.

14  Q   What type of projectiles are usually contained in a

15  nine millimeter round?

16  A   The type of points and so forth?

17  Q   Yes, sir.

18  A   There's a jacketed hollow point, hollow point, full

19  metal jacket lead.

20      There's a wide variety, including inside tips.

21  Q   Any one of those that you described does something

22  different upon the striking of a hard surface.

23      Correct?

24  A   Yes, sir.

25  Q   If it strikes something like cement, what would

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    happen to a full metal jacket round --

2         OK, if it just hits a very hard surface?

3    A    If it hits a hard surface at that angle I --

4         It will --

5         The angle will just flatten or it will shorten up,

6    mushroom, as they call it.

7    Q    Are there any rounds that would hit that would just

8    disintegrate?

9    A    Yes, sir.

10   Q    And what would that be?

11   A    That's called frangical (phonetic) rounds.  Some

12   police departments use them.

13   Q    Are they popular in Miami?

14   A    Some people have them.

15        Yes, sir.

16   Q    All right.

17        And tell me, how many brands of nine millimeter

18   ammunitions are there?

19   A    I don't know, sir.

20        It has to be an incredible amount.

21        There's a new company popping every day and another

22   one closing.

23   Q    Thousands?

24   A    Could be, sir.

25   Q    Could it be more than thousands?

722

1    A    I know that they are bringing ammunition in from

2    Russia, so now we have the Russian market to deal with

3    also.

4    Q    Do these rounds made by all those thousands of

5    companies, do they actually stamp their trademark or

6    numerical marks on the nomenclatures on the back or bottom

7    of each cartridge?

8    A    On the casing, sir.

9         Yes, sir.

10   Q    Where it would say on the bottom, "nine millimeter

11   Luger," and so on?

12   A    Yes, sir.

13        As I looked at the casing here a little while ago, I

14   looked at the bottom where it said, "nine millimeter

15   Luger."

16   Q    So in your experience, if you found three rounds from

17   two different crime scenes with the same ammunition, it

18   couldn't be an exact indication, but it would be one of

19   those factors.

20        Is that right?

21   A    Yes, sir.

22        MR. GROSS:   OK.

23        MR. BLACKER:   Outside the scope of cross-examination.

24        THE COURT:   Overruled.

25        Anything further?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

723

```
 1        MR. GROSS:  No.

 2        No further questions.

 3        Thank you.

 4        THE COURT:  Thank you, Officer Infante.

 5        All right.

 6        Ladies and gentlemen, we're coming to the end of the

 7   day.

 8        I know it's been a short day.

 9        I hope you weren't disappointed.

10        I've been asked to cover for another Judge tomorrow

11   between 9 and 10, because he had an emergency, and I'm

12   going to take care of his cases.

13        So I'm going to ask you to come to the 7th floor at

14   10, and we should bring you down shortly thereafter.

15        OK?

16        Remember, you are not to discuss the case amongst

17   yourselves.

18        and tomorrow, we'll get you lunch.

19   OK?  We will treat you guys for lunch.

20        And so tomorrow on the 7th floor at 10 a.m.

21        And do not discuss the case.

22        And watch your step when you come out of the jury

23   box.

24        (Thereupon, the jury panel was excused for the

25   evening, and the following proceedings were had outside the
```

724

1    presence of the jury panel:)

2         THE COURT:  Why don't you make sure the jurors leave

3    safely.

4         Just watch to make sure they leave safely and nobody

5    bothers them.

6         LIAISON OFFICER:  OK, Judge.

7         THE COURT:  All right.

8         Yes?

9         MR. BLACKER:  Judge, we need --

10        Just for the record, so there's no surprises, we

11   need -- and it's going to be like three minutes--

12   Catherine Ruiz and her mother tomorrow.

13        We held her.

14        I have two questions for them.

15        I mean, not two questions, but two areas, short, less

16   than five minutes.

17        MS. CORONA:  I would like to know what it is.

18        I don't know if it's going to be admissible to bring

19   her back in tomorrow.

20        I had trouble bringing her in.

21        MR. BLACKER:  It's admissible.

22        MS. CORONA:  What are you going to call her for?

23        You cross-examined her for three hours.

24        MR. BLACKER:  I understand His Honor kept her, and I

25   want to use her now.

1     It's my part of the case tomorrow, and I want to use

2  her, and I need to use the mother, unless we could come

3  to a stipulation as to the phone number and to what she

4  told Officer Morin, which was:

5     "My daughter is afraid.  I can't get a hold of her.

6  She is afraid for her life."

7     And there is a ten-week period that she is living

8  with Pablo.

9     Another way we could probably do this is stipulate to

10 the mom, because it goes to the toll records.

11    MS. CORONA:  I have a problem stipulating as to what

12 she told Officer Morin, who is coming tomorrow.

13    MR. BLACKER:  I would prefer to have the mom.

14    I know that the mom told her --

15    I haven't spoken to Detective Morin about that, but I

16 am --

17    I'm relatively sure we could start with Morin first,

18 and if she --

19    If I have a problem, then I would need the mom.

20    We will stipulate that phone number and Morin

21 answered the questions.

22    But I do want Catherine Ruiz here.

23    And I do ask, please, to get copies of the

24 Information on Count III about the aggravated assault,

25 how it was changed the first time, and the second time

1   and how it is now; how it exists in its present form.

2        MS. CORONA:  What do you need Catherine for?

3        What do you need her for if you are going to

4   stipulate that --

5        She has already been asked --

6        She has been here all day yesterday.

7        What do you need her for?

8        MR. BLACKER:  I just want to ask her a few questions.

9        I told you less than five minutes.

10       MS. CORONA:  I don't --

11       THE COURT:  What areas do you want to explore with

12  Ms. Ruiz?

13       MR. BLACKER:  Ms. Ruiz' prior statement to the

14  defendant, Judge.

15       MS. CORONA:  Judge, he had three hours yesterday on

16  cross-examination.  More than that.

17       She was here the entire day, from 9:30 in the morning

18  until 5:30 in the afternoon to cross-examine her.

19       Now, he wants to bring her back in because he missed

20  a few questions, Judge.

21       This is unfair to the victim at this point.

22       There is no rebuttal.

23       There is no reason for--

24       There is nothing that has come out in any testimony

25  that would need to cause him to call her again to bring

1   her to -- through this again.

2       I would ask defense counsel what he needs to rebut,

3   because the only reason he would be allowed to call her

4   is for rebuttal or something of a State's witness,

5   something a State witness said.

6       And there is no witness that has said anything

7   contrary to what Ms. Ruiz has said to date.

8       MR. BLACKER:  Well, no, that's not the only reason.

9       I could call her in my case in chief.

10      I asked the Court to keep her as a Court witness.

11      The Court agreed.  He kept her.  He told her to be

12  available.

13      THE COURT:  Not as a Court witness.  You did reserve

14  the right to call her.

15      MR. BLACKER:  I asked you to preserve that subpoena.

16      You did.

17      And I am entitled to call her, and it has to do with

18  some violence that she was involved in.

19      Previously, she told Mr. Diaz about her use of a

20  knife.

21      MS. CORONA:  Judge, that is not admissible evidence.

22      We are not going to get into prior bad acts.

23      THE COURT:  Tell me exactly.

24      MR. BLACKER:  She told Mr. Diaz --

25      You know, our theory, our theory is that Mr. Diaz is

1    not the aggressor.

2        We are saying --

3        Our defense is that she came out of the kitchen, saw

4    the money, went back to -- in the kitchen.

5        She produced a knife, a sharp knife, and started to

6    threaten him.

7        And she had told him that on two previous occasions,

8    she cut two of her previous boyfriends.

9        It alarmed him.

10       He jumped out of bed.

11       He opened the door.

12       And she ran out with the knife and ran to the

13   vestibule, and the door slammed shut.

14       That's admissible.

15       MS. CORONA:  They are alleging self-defense in the

16   case.

17       The actual kidnapping and the attempted felony murder

18   doesn't begin until they are in the lobby, or at least

19   until the 6th floor of the apartment.

20       What happened before that is irrelevant.

21       It's not admissible.

22       THE COURT:  You had her on the stand, and you

23   questioned her regarding everything, including the knife.

24       And she said where she dropped it, and how she got

25   it, and where she dropped it.

1    Now, it is --

2    If your client gets on the stand or you somehow bring

3    out what you just said happened inside the apartment,

4    that she threatened your client with a knife, and that's

5    why he got a gun, that's why he ran out, if all that

6    comes out, then you may have the right to recall her to

7    bring out what was his state of mind and the prior

8    problems that she had with the other boyfriends about

9    attacking.

10   But at this point, you don't have the right unless

11   you present that defense.

12   MR. BLACKER:  Judge, are you saying that I cannot

13   argue in closing that she's not telling the truth; that

14   she admits producing this knife and the same sequence,

15   she is not telling the truth?

16   THE COURT:  You can argue whatever you want, as long

17   as it's supported by the evidence somehow, by the wildest

18   stretch of the imagination.

19   But what you just said here, that part of your

20   defense is that she has told your client that in the

21   past, she has cut a couple of boyfriends, and that that

22   day, she produced a knife and your client --

23   And that is why your client grabbed the weapon and

24   ran out.

25   If that comes out, then, you know, if your client

1     were to say all that and now becomes an issue of defense,

2     you might be able to bring her back, but at this point,

3     you can't.

4          MR. BLACKER:  Can I inquire what if he admitted that

5     she told him that on two occasions --

6          THE COURT:  Well, it has no relevance at this point

7     unless you -- unless what you said the defense was -- was

8     actually the defense.

9          Then it may become relevant.  But at this point, it's

10    irrelevant.

11         MR. BLACKER:  May I argue --

12         THE COURT:  What she did to other boyfriends is

13    irrelevant at this point.

14         MR. BLACKER:  If it is part of his state of mind that

15    she has cut two people, and now she has a knife and may

16    cut a third, he might factor that in as an aggressive

17    matter, like get a gun rather than not get a gun.

18    THE COURT:  If he says that is his state of mind, because

19    of that, and she pulled the knife, and that is the story,

20    we will revisit the issue of whether you could recall her

21    and bring that out.

22         You might very well be able to.

23         But at this point, because you haven't presented any

24    defense like that, you are trying to bring her in,

25    cross-examine her and not have to put on your client for

1    a defense witness.

2         So there is no defense presented.

3         And, you know, you can't all of a sudden bring up

4    what she did to a couple of other boyfriends, OK?

5         So that will be the ruling of the Court, unless I

6    hear otherwise.

7         And if there is case law or something like that, or

8    anything like that, that you want to present,

9    Mr. Blacker, you can.  Otherwise, based on the proffer

10   here, it is denied.

11        MR. BLACKER:  Two seconds.

12        Give me the evening to get some law.

13        But at least have her available.

14        And if your ruling continues, fine.

15        She doesn't have to come to court.  She was told to

16   remain available, and reachable.

17        THE COURT:  We will go over the jury instructions

18   tomorrow and look at it, Michael.

19        I'm going to ask both sides --

20        You have a copy of the jury instructions.

21        Look at them tonight, and if you have any

22   instructions that you want, I want you to give them to me

23   first thing in the morning.

24        We're going to be doing it at 3 o'clock, so first

25   thing in the morning.

732

1      I've been asking about the jury instructions since

2      day one.

3          MR. BLACKER:  Since my secretary is not there, can I

4      write them out and have her --

5          THE COURT:  Whatever you do in the morning, I want

6      the jury instructions by 10 o'clock.

7          THE DEFENDANT:  Excuse me, Your Honor.  May I speak

8      to you for one moment?

9          THE COURT:  You want to speak to me?

10         THE DEFENDANT:  Yes.

11         Yesterday, I think my lawyer spoke to you about the

12     incident in the hallway, that I bumped into the victim in

13     my '06 case.

14         THE COURT:  Yes.

15         He mentioned something here in court with the

16     Corrections present.

17         THE DEFENDANT:  In order to avoid that, what if I'm

18     brought around 8 or 9 o'clock, to avoid being placed

19     there?

20         Tomorrow, you said the Court is going to start around

21     10:30, something like that.

22         And in lieu of that, is there any way to ask

23     Corrections to bring me the same way so I won't have -- I

24     could avoid those situations?

25         THE COURT:  Where are you housed at?

733

1    THE DEFENDANT:  Right here across the wall.

2    THE COURT:  The main jail.

3    Yes.

4    Corrections, I don't know what can you do to get any

5    information to Louie.  You really can't.  He's gone.

6    So Jimmy, talk to Louie in the morning and tell him

7    to bring him over like after 9.

8    THE DEFENDANT:  What he did was put on before he left

9    yesterday, he put for -- my card to be brought, and then

10   he got me.

11   THE COURT:  So he will probably be doing the same

12   thing, because he knows about it.

13   All right.

14   Thank you, officer.

15   Good night.

16   (Thereupon, the proceedings were adjourned until May 10,

17   2007.)

734

1                          CERTIFICATE

2
3     STATE OF FLORIDA              )
4     COUNTY OF MIAMI-DADE          )
5
6
7          I, PAMELA Y. KILPATRICK, Notary Public for the State of Florida at Large, do

8     hereby certify that I was authorized to and did stenographically report the foregoing

9     proceedings and that this transcript is a true and complete record of my stenographic notes.

10         DATED this 30th day of January, 2008.
11
12
13
14                          _____
15                          PAMELA Y. KILPATRICK,
16                          Shorthand Reporter and Notary Public,
17                          State of Florida at Large
18
19    My commission expires:
20    August 19, 2009

MATZ, TRAKTMAN, FELDMAN AND WILDNER