735

```
1        IN THE CIRCUIT COURT OF THE 11TH
2        JUDICIAL CIRCUIT, IN AND FOR
3        MIAMI-DADE COUNTY, FLORIDA
4        CRIMINAL DIVISION
5        CASE NO. F03-16995
6
7
8   THE STATE OF FLORIDA,        )
9                                )
10        Plaintiff,             )
11                               )
12  vs.                          )
13                               )
14  PABLO DIAZ,                  )
15                               )
16        Defendant.             )
17  _____    )
18
19
20
21
22
23
24             Richard E. Gerstein Justice Building
25             1351 Northwest 12th Street
26             Miami, Florida
27             May 10, 2007
28             10:30 a.m.
29
30
31
32
33
34
35  Trial in the above-entitled cause was resumed before the
36  Honorable Julio Jimenez, Circuit Judge, pursuant to
37  Adjournment.
38
39
40  APPEARANCES:
41
42        KATHERINE FERNANDEZ-RUNDLE, State Attorney, by
43        CAROLINA CORONA, Assistant State Attorney and
44        ROBERT GROSS, Assistant State Attorney,
45        on behalf of the State
46
47        MICHAEL BLACKER, Esq.,
48        on behalf of the Defendant
49
50
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

736

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Det. Marie Morin | 738 | 769 | 796 | |
| Frank Acosta | 814 | | | |
| Moises Velazquez | 821 | | | |
| Olga Diaz | 826 | 840 | | |

MATZ, TRAKTMAN, FELDMAN AND WILDNER

737

1        (Thereupon, the following proceedings were had)

2        MR. BLACKER:  I need one quick ruling.

3        THE COURT:  After you bring the jury, take this to

4    Judge Diaz.

5        MR. BLACKER:  We have the first witness already in the

6    courtroom.

7        Ms. Abud told us yesterday she heard two shots.  Way

8    back when, when the case was first investigated, she said,

9    "I heard one shot."

10       I need that witness.  I'm asking the Court to order

11   and get him over here.  I want to ask him two or three

12   questions about what she said, and that's it.

13       Sometimes, we don't see everything, Judge.  It's a big

14   file, and I'm sorry.

15       THE COURT:  After you are done, you will make a call

16   and make sure he gets in here.

17       (Thereupon, the jury panel entered the courtroom,

18   after which, the following proceedings were had in open

19   court:}

20       THE COURT:  Let the record reflect that the defendant

21   is present.

22       State, call your next witness.

23       MS. CORONA:  The State calls Detective Morin.

24

25

738

1   Thereupon:

2                          DETECTIVE MYREE MORIN

3   was called as a witness, and having been first duly sworn,

4   was examined and testified as follows:

5                          DIRECT EXAMINATION

6   BY MS. CORONA:

7      Q   Good morning.  Please introduce yourself to the

8   members of the jury.

9      A   Marie Morin Fernandez.  City of Miami Police

10  Department.

11     Q   How long have you been with the City of Miami Police

12  Department?

13     A   Nine years in September.

14     Q   And where are you currently assigned to; what

15  department?

16     A   I'm a field duty patrol sergeant.

17     Q   Which means?

18     A   I am the people you see on the street in marked

19  police vehicles, the supervisor.

20     Q   And what are your special duties as a supervisor?

21     A   I supervise a squad of five to six individual police

22  officers.

23         I just make sure that the day to day calls for

24  service are being answered, and take care of personnel

25  issues.

1  Q  What department were you assigned to in June of 2003?

2  A  I was a homicide detective.

3  Q  And as a homicide detective, what is your role?

4  A  I investigate homicide cases.

5  Q  Specifically, what do you do as a homicide detective?

6  A  When there is a death and not necessarily a homicide,

7  we investigate all kinds of cases, including homicide.

8     The department sends one of the detectives out there

9  from homicide, and that's what I do; go out and investigate

10  a case.

11  Q  June 8, 2003 or somewhere around June 8, 2003, you

12  became involved in a case involving a victim by the name of

13  Catherine Ruiz that was not a homicide case.

14     How did you become involved in the case?

15  A  Homicide cases --

16     Homicide detectives often handle serious assault

17  cases, kidnapping cases or cases such as Ms. Ruiz', which

18  is a serious case, and it was on June 11th when I became

19  involved.

20  Q  How did you become involved?

21  A  I received --

22     MR. BLACKER:  Objection, Your Honor, and it's an

23  unfair characterization.  It may be a serious case, but

24  at this point, it's objectionable for her to characterize

25  it as such.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

```
 1          THE COURT:  Overruled.

 2   BY MS. CORONA:

 3     Q  Go ahead and tell me how you became involved in this

 4   case on --

 5     A  On June 11ᵗʰ, I reported to work at 3 o'clock in the

 6   afternoon, and I wasn't even there a minute when the phone

 7   rang, and it was the mother of Catherine Ruiz, and brought

 8   this case to my attention.

 9     Q  What did Catherine Ruiz' mother tell you on that date,

10   June 11ᵗʰ?

11     A  The mother introduced --

12          MR. BLACKER:  We need -- we need a sidebar.

13          (Thereupon, counsel for the respective parties

14   approached the bench, and the following proceedings were

15   had outside the hearing of the jury panel☺

16          MR. BLACKER:  I'm just being cautious.  We had

17          discussed me asking the detective -- I would like to

18          know what they are going to elicit under this

19          hearsay, because it is truly hearsay.

20          MS. CORONA:  He asked me to have the detective

21   testify as to what the mother told him.

22     I'm going to have her testify to it.

23          MR. BLACKER:  I was going to do it, but, OK, I mean,

24   if that is what she was going to say, if she's worried

25   that he confined the daughter, that is on the 8ᵗʰ.  We are
```

1    talking about the 20th.

2         THE COURT:  No.  The 11th.

3         MR. BLACKER:  She is talking about on the 18th and

4    19th, and she says, "I'm afraid she is hiding out because

5    of Pablo."  She's afraid of Pablo.

6         MS. CORONA:  I'm asking about this, because you asked

7    me to.

8         MR. BLACKER:  I didn't know where it was going.

9         Thank you.

10        (Thereupon, the sidebar conference was concluded,

11   after which, the following proceedings were had in open

12   court)

13   BY MS. CORONA:

14   Q   Go ahead, Detective.  Tell me what Ms. Ruiz' mother

15   told you that day.

16   A   She advised that she was informing me that her

17   daughter had been a victim of a kidnapping, and an assault,

18   and she wanted to speak to the lead investigator on the

19   case.

20   Q   Was there a lead investigator at that time?

21   A   No, not at that time.

22   Q   Why hadn't there been a lead investigator assigned?

23   A   It was not determined at that point, because the

24   information she was giving me was that this had taken place

25   on June 8th.  Now, this is June 11th, three days later, so it

742

1   was never determined.  But because, again, it's an

2   important case, we immediately jumped on it, and I was

3   assigned.

4       Q   Does Ms. Ruiz' mother know where her daughter was at

5   that point?

6       A   No, she did not.

7       Q   Was she concerned for the safety of her daughter?

8       A   She explained to me that not only was she concerned

9   for the safety of her daughter, but the offender had made

10  death threats.

11      It had come to her attention that the offender had

12  made death threats against her grandchild and her two

13  children -- other two children.

14      Q   And once you got this information, what do you do?

15      A   Immediately tried to find additional information in

16  the case, which at that point would be the offense/incident

17  report -- reports that were written if anything happened on

18  the case.

19      If this is truly a City of Miami case, there has to

20  be a report written, and that's what I did.

21      Q   Were you able to track down the offense/incident

22  report of the officers that actually responded to the crime

23  scenes on this night?

24      A   Yes, ma'am.

25      Q   And what did you do with that information?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

743

1    A    Then I --

2         Based on that investigation, we start to investigate.

3    The first step in this investigation is, of course, speak

4    to the two officers, the two lead officers in patrol, get

5    their information, and then from that point, what I did was

6    I watched a tape that was taken at the hotel.

7         Well, it's a condominium/hotel/residence.  There was

8    a tape available, according to one of the detectives, and

9    so we sat down and watched that multiplex tape.

10   Q    And the tape, it wasn't actually broken down, scene

11   by scene?

12        Is it actually a tape that shows about 20 scenes a

13   second?

14   A    Yes, it's like a --

15   Q    Is that the tape that you saw?

16   A    Yes.  A time lapse for it.

17   Q    And it is a difficult tape to watch, but you  could

18   actually -- you know --

19        Do you see what's happening?

20        MS. CORONA:  Judge, at this point, I move State's

21   Exhibit 2Q into evidence without objection by the

22   defense.

23        THE COURT:  It will be admitted.

24        MR. BLACKER:  That is the Fortune House tape?

25        MS. CORONA:  Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

744

1        MR. BLACKER:  No objection.

2        THE CLERK:  State's Exhibit marked for Identification

3    purposes, 2Q will now become State's Exhibit

4    Number 37.

5        (Thereupon, the exhibit referred to was marked as

6    State's Exhibit Number 37 and was received in Evidence.)

7    BY MS. CORONA:

8      Q   What were you able to see on the tape when you viewed

9    it for the incident that day?

10     A   Two individuals exit an elevator.  One is a male, one

11   a female.

12       You see some activity transpiring in the lobby.

13       MR. BLACKER:  Objection.  The best evidence is the

14   tape, itself.

15       For someone to see what's truly going on, to see a

16   video that's chopped up like a multiplex is improper.

17       The best evidence is a video.

18       If they want to play the video, fine.

19       For the witness to talk about what she viewed is

20   improper.

21       THE COURT:  Are you going to play the video?

22       MS. CORONA:  I wasn't planning on playing it right

23   now, Judge.

24       THE COURT:  All right.  Overruled.

25       She's going to tell us and then you're going to play

MATZ, TRAKTMAN, FELDMAN AND WILDNER

745

1    it?

2         MS. CORONA:   Sure.

3    BY  MS. CORONA:

4    Q   Tell me.

5    A Basically, you see a female and a male in the lobby of

6    this condo.

7         There is violence.

8         The male is grabbing the female.

9         At one point, you could see the male dragging the

10   female out of the lobby and up some stairs away from the

11   area.

12        At one point, you see this person pointing a gun at

13   the individuals in the lobby, because at that time, the

14   lobby --

15        You have a concierge and two security guards.

16   Q   When you got all this information, did you know the

17   name of the person who had -- who was seen on that video,

18   the person that was dragging Catherine Ruiz?

19   A   At that point, yes, because it was included in the

20   offense/incident report.

21   Q   How did they get the name?

22        Do you know how somebody got the name of the

23   offender?

24   A   Well, Ms. Ruiz provided the name.

25        MR. BLACKER:   Excuse me.   I'm sorry, counsel, to

746

1      interrupt.

2           Judge, I need to reserve a motion based upon our

3      sidebar.

4           I'm sorry.   Thank you.

5           THE COURT:   All right.

6    BY MS. CORONA:

7    Q    What did you do after you saw the video surveillance

8    and met with the officers to get some more information

9    about the case?

10   A    Well, based on the offense/incident report, there

11   were witnesses identified.

12        So what I do as a lead detective, I assign my team.

13   We have a team of three to four detectives that I assign my

14   team different tasks, and those tasks include making

15   contact with these individuals, these witnesses, and

16   interviewing them.

17   Q    So did you interview all of the witnesses, you or

18   somebody from your team interviewed all of the witnesses

19   that were listed in those reports?

20   A    Yes.

21   Q    And did you also create a photo lineup with the

22   photograph of the person that you believed to have

23   committed these crimes?

24   A    Yes, ma'am.

25   Q    How do you go about creating a photo lineup?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

747

```
 1    A    Well, I ask again --
 2         That's the task that I gave to one of my co-
 3    detectives, and the way you do that, you choose six
 4    individuals that resemble each other.  You don't want
 5    anything that's different, anything that's strikingly
 6    different, and --
 7         MR. BLACKER:  Excuse me, ma'am.  I'm sorry to
 8    interrupt you.
 9         Did I hear the witness say she did not create the
10    photo identification lineup in the case?
11         MS. CORONA:  That's what she said.
12         MR. BLACKER:  Yes.
13         So you don't know how it was done, do you?
14         May I voir dire?
15         May I voir dire if she didn't do it?
16         THE COURT:  No.  Let's have the prosecutor ask her.
17    You could do cross.
18    BY MS. CORONA:
19    Q    Can you tell me how you do it?  Would you put, for
20    example, a white man, a white Hispanic male in the same
21    lineup?
22    A    Absolutely.
23    Q    Why is that?
24    A    Because you want to be fair.  You don't want to show
25    -- be biased against the offender, you know, if the
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

748

1    offender, you know, if the offender that attacked you is a

2    -- victim is a white male, you're not going to put a black

3    male or, you know, an Asian male there, because, you know,

4    the guy who got you was a white male, so you want to be

5    fair to everybody involved.

6    Q    Do you also try to keep the other photographs in the

7    same age range as the person that you are investigating?

8    A    Same age range, same hair style, if there is a

9    moustache, a beard, they should have the same complexion

10   come into play.

11   Q    And even though you didn't create the lineup, you

12   actually used the lineup and showed the lineup to a couple

13   of witnesses, correct?

14   A    Absolutely.

15   Q    And what procedure do you use when you go about

16   showing witnesses a photo lineup?

17   A    There is a form.  It's called an admonition form, and

18   in that -- any case --

19        Not everyone does it this way, but because I was

20   fairly new as a homicide detective, and I wanted to do

21   things the right way, I actually read it verbatim to the

22   victim, the admonition, telling them things like what --

23   Q    What you have to tell the witnesses who will be

24   making an identification?

749

1    A    The group may or may not contain the person who

2    committed the crime.

3         You may keep in mind that hair styles may change, the

4    person may have had a beard and doesn't have a beard now.

5    The complexion is different, because the photos are

6    different, you know, the color of the photos.

7         So that's the admonition.

8         But when --

9         What I'm telling you is what I could think of, but I

10   don't like to make those mistakes, so I read it off the

11   form.

12   Q    Do most detectives use the same procedure when they

13   show witnesses or victims photo lineups?

14   A    Yes, they should, yes.

15   Q    And the ones that you did show the photo lineups to,

16   were they able to identify anybody out of those series of

17   photographs?

18   A    Yes, ma'am.

19   Q    Who were they able to identify?

20   A    The offender, Mr. Diaz.

21   Q    Did you show the same photo lineup to all of the

22   witnesses?

23   A    Yes, ma'am.

24   Q    Did you show it to them together?

25   A    Absolutely not.

750

1   Q  How did you go about doing that?

2   A  You make it a point that you tell the witnesses that

3  you separate them and you go through whatever process.

4      It is normally why you have a pre-interview -- I'm

5  sorry.  I pre-interview the lineup and then you have the

6  interview, and you  make sure that you tell them that they

7  are not to discuss, you know, either the contents of the

8  interview or the identification that they made.

9   Q  After you have gotten the offender identified by all

10  the witnesses, what do you do?

11      What do you do in your investigation, in the course

12  of your investigation?

13   A  Well, then, if we know where the offender is, we go

14  and make the arrest.

15      If not, then we get a warrant.

16   Q  And in this particular case, you had some trouble

17  contacting the victim, Catherine Ruiz; is that correct?

18   A  Yes, ma'am.

19   Q  What efforts did you make to contact her after June

20  11th?

21   A  Well, the only contact that I had with her was either

22  through her mother, because she was calling her mother, and

23  at one point in time, she had hired an attorney, actually

24  two or three attorneys -- two or three different attorneys,

25  not all the same time, but I had contact with two or three

MATZ, TRAKTMAN, FELDMAN AND WILDNER

751

1   of her attorneys, but always asking to get -- you know, to

2   call me, but she evidently was -- evidently was very

3   afraid, and did not want to contact me.

4       Q   So for how long were you trying to contact her until

5   she actually or until you actually were able to contact

6   with -- make contact with her?

7       A   My actual face to face contact with Catherine was on

8   June 19th.

9       Q   So for eight days, from June 11th to June 19th, how

10  many times would you say you actually reached out to her?

11      A   Well, there was no way directly to reach out to her,

12  but indirectly, on a regular basis.

13      Q   Did you know where she was at that time?

14      A   No.

15      Q   And what efforts did you  make to find or locate her?

16      A   The only thing I could do is to let the people who

17  she was having contact with know that I need to talk to

18  her; that it was imperative; that her life was in danger,

19  and also make contact --

20          MR. BLACKER:  Objection.  Reserve a motion.

21          THE COURT:  All right.

22          MR. BLACKER:  Can I ask the Court to instruct the

23      jury to disregard that last statement?

24          THE COURT:  The objection was sustained.  Disregard

25      the last answer.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

752

1      MR. BLACKER:  And I reserve a motion, and I ask you

2      to admonish the witness, this experienced witness to

3      make --

4      THE COURT:  Have a seat, Mr. Blacker.

5      MR. BLACKER:  Pardon?

6      THE COURT:  Have a seat.

7      Let's continue.

8  BY MS. CORONA:

9      Q    How did you finally find her?

10     A    One of the instructions --

11          One of the things that I did was I went to the hotel,

12     the Fortune House, because evidently, she had been coming

13     in and out to pick up some belongings, you know, her

14     clothing.

15          And I had given the instructions to the security

16     personnel to contact me if she did come to the location, no

17     matter what time, to definitely give me a call, and that's

18     what happened.

19          She went to her condo, and they called and said that

20     she was there.

21     Q    OK.  And what did you do when you found out she was

22     there?

23     A    I responded over to the condo.

24          By the time I got there, she had already left, so --

25     but I had a description of the vehicle.  We saw the vehicle

MATZ, TRAKTMAN, FELDMAN AND WILDNER

753

1    driving away, and we stopped the vehicle.

2    Q   So you actually conducted a stop with lights and

3    sirens?

4    A   Yes, we did, because she was in the company of two --

5        remember, I think it was two males, and at that

6    point, the offender wasn't in custody yet, so we won't --

7        We don't know if he was one of the people in the

8    vehicle.

9    Q   So you made serious efforts to try to find her.

10       Why was it so important for you to find this person

11   and to actually speak to her and have a conversation with

12   her about what happened on June 8th?

13   A   Well, she is the victim of a crime, and I needed to

14   make, you know, get the facts from her, you know, and to

15   protect her.

16   Q   With the information that you had before speaking to

17   her, was that enough for you to already charge the

18   defendant with the crime that you eventually charged him

19   with?

20   A   Yes, ma'am.

21   Q   Even though you already had enough information, based

22   on the witnesses' testimony, and the video that you saw,

23   why was it so important for the victim to cooperate with

24   you?

25       MR. BLACKER:  Objection as to what was important for

MATZ, TRAKTMAN, FELDMAN AND WILDNER

754

1    an arrest, Your Honor.

2         THE COURT:  Sustained.  Why don't you ask the

3    question.

4    BY MS. CORONA:

5    Q    Given the information that you already had of the

6    witness from the witnesses and the video, why was it so

7    important for you to have the victim cooperate with you?

8    A    Because she is the -- she is the victim of the crime.

9         She -- you know, we need to know from her.

10        Again, it's very important to be fair, to have all of

11   the facts of the case.  She is a major and important factor

12   in the case.

13   Q    When you finally made contact with her, was she

14   cooperative and willing to come down and talk to you?

15   A    She appeared very nervous, and I wouldn't say that

16   she was uncooperative.

17        But my experience has been that a person in an

18   abusive relationship, for a person who has experienced

19   situations that she had just experienced, which is

20   allegedly kidnapping, they often become depressed, and it's

21   very difficult for them, if not impossible for them to make

22   an independent decision.

23        She really was confused.

24        She didn't know what to do.

25        She appeared in distress, in a lot of distress.

755

1          She wanted to cooperate, but at the same time, she

2    appeared to be so scared that she didn't know if she could

3    talk to me.

4      Q    And did she eventually end up talking to you that

5    night?

6      A    Yes, she did.

7      Q    In the course of your interviewing her, did you ever

8    tell her what she had to say?

9      A    Absolutely not.

10     Q    Did you ever suggest to her what story she should

11   tell as to what happened on that night?

12     A    Absolutely not.

13     Q    When you started talking to her, was she consistent

14   in her stories?

15         And how do you go about conducting an interview with

16   her?

17     A    Well, all interviews are the same, whether it's done

18   on a witness or not.  All of the interviews are the same.

19         You do a pre-interview.

20         You talk about the case.

21         You know what happened.

22         Tell me the story.  It's a story, basically.

23   Basically, it's a story.

24         If I have any questions, at that point, I ask

25   questions to get additional information.

756

1      And then after that, we get permission and then we go

2   on tape.

3      Q   So was she consistent?

4          Did she finally give you a taped statement?

5      A   Yes, she did.

6      Q   Was she consistent in the interview that night as to

7   the facts that she said happened on June 8, 2003?

8      A   Yes, she was.

9      Q   Once you got a statement from Ms. Ruiz, what did you

10  do?

11     A   Well, after that, you know, our whole goal is to make

12  the arrest.

13     Q   Were you involved in the arrest of Pablo Diaz?

14     A   Yes.

15     Q   Were you present when he was actually arrested?

16     A   I wasn't present.

17         I was at the location, but I wasn't present when he

18  was actually taken into custody because I was --

19         The location consisted of two different structures.

20  There's at least one -- a house and one is like a farm type

21  area.  And I was at the house, at the residence.

22     Q   Where was it that he was found?

23     A   I think the location is in the Redlands.

24     Q   Is that his home or his parents' home?

25     A   His parents' home, as I understand it.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

757

1    Q    What day was it that he was arrested?

2    A    I would have to refer to my report.

3    Q    You can look at your report and refresh your

4    recollection.

5    A    Yes.  June 21st, Saturday.

6    Q    And did you ever recover a firearm from this case?

7    A    No.

8    Q    The firearm that was allegedly used?

9    A    No, ma'am.

10   Q    Did you have contact with the defendant even though

11   that day you were not involved in this actual detention of

12   Pablo Diaz?

13   A    Yes, I did.

14   Q    Showing you what has been marked as State's Exhibits

15   1O, 1P and 1Q for Identification, do you recognize these

16   photographs?

17   A    Yes, ma'am.

18   Q    Is that a fair and accurate representation of what

19   Pablo Diaz' body looked like on June 21, 2003, when he was

20   arrested?

21   A    Yes, ma'am.

22        MS. CORONA:   The State moves State's Exhibit 1O, 1P

23   and 1Q into evidence.

24        MR. BLACKER:   May we have a sidebar?

758

1        (Thereupon, counsel for the respective parties

2    approached the bench, and the following proceedings were

3    had outside the hearing of the jury panel:}

4        MR. BLACKER:  We have made no issue of identity.  We

5    have only cross-examined two witnesses as to the photo

6    lineup, because of the lack of time that they saw him,

7    just for impeachment purposes; not as to the identity of

8    Pablo.  We made it no issue this whole trial.

9        The trial is now nearing an end.

10        At no time have we ever made identity an issue.

11        In addition, these are inflammatory pictures.  If

12    people hate tattoos like I personally hate them --

13    hopefully, they could forget that they do hate them and

14    know they are on the jury and --

15        Well, Judge, there is no reason for it.

16        THE COURT:  Why?

17        Some of the best appellate Judges have tattoos I've

18    seen.

19        All right.

20        MR. BLACKER:  It is not an issue.

21        MR. GROSS:  Do you concede it?

22        THE COURT:  Do you have one without this whole thing?

23        MS. CORONA:  Let me see.  Let me see.

24        MR. BLACKER:  While we are here, I need to ask you

25    two things.

759

1        THE COURT:  Wait for her.

2        MS. CORONA:  There's none without that, without that

3   arm.

4        THE COURT:  Do you have any of the left arm?

5        MS. CORONA:  Not without that on it.

6        THE COURT:  Let me see.

7        MR. GROSS:  Don't want the necklace.

8        THE COURT:  All right.  Now, the ones that you have

9   are these.

10       MS. CORONA:  Those are not marked for evidence.

11       THE COURT:  There has been testimony in questioning,

12   was it with tattoos, like Exhibit O, the right arm with

13   tattoos, and then it's the one of the back.

14       There hasn't been any testimony of tattoos on the

15   back, on the arm.

16       The one with the tattoo on the back is 1Q, and the

17   one with 1P is a tattoo on the left arm.

18       I don't see a problem with 1P and 1O.  There are

19   tattoos on the arm and there has been testimony on one of

20   the arms he had a tattoo.

21       MS. CORONA:  Your Honor, It's shown on the video, the

22   tattoo.

23       MR. BLACKER:  I need to say something to the Court

24   now.

25       Judge, the most critical part of my case occurred

MATZ, TRAKTMAN, FELDMAN AND WILDNER

760

1       yesterday from a report from the police officer about

2   Ilusion Abud hearing a single shot.

3           THE COURT:  We already covered that.

4           MR. BLACKER:  And I need this officer, before she

5       walks from the courtroom, when we dismiss the jury to

6       make the call here in open court to find that officer.

7           I don't want to hear that he is on vacation, he went

8       to his mother's house, because it's especially tiring to

9       ask the Court to do it now.

10          (Thereupon, the sidebar conference was concluded,

11  after which, the following proceedings were had in open

12  court:}

13          MS. CORONA:  The State moves State's Exhibits 1O and

14      1P into evidence.

15          THE COURT:  Over objection, it will be admitted.

16          THE CLERK:  State's Exhibits marked for

17      Identification, 1O and 1P will now become State's

18      Exhibits 38 and 39, consecutively.

19          Do you need to see them, Judge?

20          THE COURT:  I saw them already.

21          (Thereupon, the exhibits referred to were marked as

22  State's Exhibit Numbers 38 and 39, respectively, and were

23  received in Evidence.)

24  BY MS. CORONA:

25      Showing you what has been marked in evidence as

MATZ, TRAKTMAN, FELDMAN AND WILDNER

761

1   State's Exhibits 38 and 39, what are these photographs of?

2   A   These are photographs of the defendant.

3   Q   And I am also showing you what has been marked into

4   evidence as State's Exhibits 5 and 6.

5       Do you recognize the tattoos shown on these

6   photographs in the still photographs of the video or the

7   surveillance video of the Fortune House?

8   A   Yes, ma'am.

9   Q   Can you point out to the jury exactly what you see

10  and where?

11  A   This is the reason why we took these photos.

12      MR. BLACKER:  Objection.  Non-responsive.

13      She was asking her to point something out and not

14  make a discussion.

15      I don't know what she's going to say.

16      THE COURT:  What was the question?

17      MS. CORONA:  If she could find the tattoos shown in

18  the photographs in the still video.

19      THE COURT:  Overruled.

20      THE WITNESS:  We took these photos because you could

21  plainly see it's the same tattoo that matches on the same

22  arm as the person in the lobby matches the offender.

23  BY  MS. CORONA:

24  Q   And in this photograph, you also see the tattoos?

25  A   Yes, ma'am.

762

1    Q   And that is the same arm?

2    A   Same arm, yes.

3    Q   Do you see the person that you arrested on June 22nd

4    here in court today?

5    A   Yes, ma'am.

6    Q   Can you identify him by an article of clothing?

7    A   He has a blue shirt on.

8        MS. CORONA:  Let the record reflect that the witness

9    has identified the defendant.

10       THE COURT:  All right.

11       MS. CORONA:  At this time, I ask to play the video in

12   its entirety.

13       MR. BLACKER:  Your Honor, could I have a moment with

14   counsel?

15       THE COURT:  Yes.  My suggestion is that you play

16   parts, speed up parts and --

17       MR. BLACKER:  Can we go sidebar without the court

18   reporter for one second?

19       Thank you.

20       (Thereupon, counsel for the respective parties

21   approached the bench and conferred with the Court outside

22   the hearing of the court reporter and the jury panel, after

23   which, the following proceedings were had in open court:}

24       THE COURT:  Ladies and gentlemen, I understand from

25   the parties, and they have asked me to announce to the

763

1    jury, that this is a -- the whole surveillance tape, that

2    the portions that you saw yesterday and the day before in

3    the little DVD, that those are the parts that the State

4    felt were important, and they separated those parts, so

5    as not to have to every time go through a 45 minute tape.

6          Now, they are going to play little parts, so you know

7    what it is, but it is rather slow, I understand.

8          MS. CORONA:  Fast.

9          THE COURT:  They're just going to show you so you

10   have some idea, and I am sure the State will be asking

11   the witness why it is. the way that it is after parts of

12   it have played.

13         The tape will speak for itself.  It is in evidence.

14         You can play whatever parts you want, and if you want

15   to, ask some questions.

16   BY MS. CORONA:

17   Q    Can you explain to the jury why the tape that we are

18   watching now is the way that it is?

19   A    I am not an expert in tapes, but from what I

20   understand --

21         And I have never seen it that fast, but from what I

22   understand, this is multi-cameras all over this particular

23   location, and now they are all playing together.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

764

1        Normally, when I've watched it, it's like probably

2   one every three seconds to five seconds, so it's a lot

3   slower than that.

4        But this is, if you just keep in mind, they have a

5   security office with like ten or 15 television sets.  Each

6   television set, it's focused on a camera, and it just goes

7   one location; second camera; third camera.

8        And the security officers watch that combination of

9   all of them together.  Time lapse.

10   Q    Some of these frames, you could see the defendant --

11   the victim appear at the front desk.  Is that what we are

12   seeing here?

13   A    Wow.  It's difficult.  Let me see.

14        THE COURT:  If I may suggest to the jury, maybe the

15   first time as a lawyer, I had to watch one of these, and

16   I found it helpful to blink a lot.  Just kidding.

17        Anyway, the whole tape is like that?

18        MS. CORONA:  Yes, Judge.  The whole tape is like

19   that.

20        THE COURT:  And you just wanted to give the jury a

21   flavor of the whole tape?

22        MS. CORONA:  Right.

23        THE COURT:  And then from there, how did it get to --

24   to the other one that you have?

25        MS. CORONA:  Each frame --

MATZ, TRAKTMAN, FELDMAN AND WILDNER

765

1      I'm going to ask you, Detective.

2  BY MS. CORONA:

3    Q    How did we get the actual DVD?  You've seen the DVD

4  that's slowed down?

5    A    The DVD from the television program?

6    Q    No.  The one that was played -- that is played and is

7  in evidence of the slowed down version that is one camera.

8    A    Well, we take it to our IT investigation technology

9  people.

10      And in this particular case, I think I brought it to

11  the State Attorney's Office, and they -- you know, they had

12  equipment that slows it down.

13      I have never seen it that fast, you know, because

14  usually, it is some type of button on -- mechanism on the

15  sets that we watch, and you could actually slow it down.

16      THE COURT:  Let me have the jury go into the jury

17    room.

18      Do not discuss the case amongst yourselves.

19      (Thereupon, the jury panel exited the courtroom, and

20  the following proceedings were had outside the presence of

21  the jury panel:}

22      THE COURT:  All right.

23      The reason why I asked the jury to go out is because

24    the Detective mentioned something about in the TV

25    program.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

766

1      Obviously, no one has an idea what that means, but

2    perhaps -- and you are not supposed to mention anything

3    about a TV program.

4      THE WITNESS: Sorry, sir. I didn't know.

5      THE COURT: And nothing about the defendant's prior

6

7    criminal record, or the fact that he is in jail.

8    Nothing.

9      He invoked his rights. Nothing. That he invoked his

10    rights or anything like that.

11      But what I would suggest, just to cover it up, when

12    we come back --

13      They don't know why I recessed. I didn't do it at

14    the moment

15      As to why I sent them into the jury room that you

16    say: OK, Detective you mentioned something about a TV

17    program?

18      And she could say: Yes, just like the TV programs,

19    how they split scenes, and they take out scenes and put

20    it there.

21      That's what the State Attorney's Office did.

22      MR. BLACKER: To deflect the fact that there may have

23    been a TV program.

24      THE COURT: Both sides satisfied with that?

25      So I will just say, yes, just like in the TV program,

1    where scenes are taken and put together, the same thing

2    happened here.

3        They took the surveillance tape, and they cut out

4    scenes and put on the scenes that the prosecutor actually

5    wanted on the DVD.

6        THE WITNESS:  But that's not the actual 48 Hours,

7    referring to the one that I -- was showed to me

8    yesterday.

9        MS. CORONA:  That is it.

10       THE COURT:  Is that?

11       THE WITNESS:  Is that the TV program?

12       MR. GROSS:  We're not going to refer to it as the TV

13    program.

14       It is a portion of that program.

15       THE COURT:  Just like on the TV shows where they take

16    and put scenes together, the State Attorney's Office does

17    that.

18       They -- and from there, they select the parts that

19    they want to show.  OK?

20       That way, we will cover it.

21       Are both sides satisfied with that?

22       MR. BLACKER:  Yes, if it comes out like that.

23       THE COURT:  Mr. Diaz, are you satisfied with that?

24       THE DEFENDANT:  Yes, sir.  Thank you very  much, Your

25    Honor.

768

1          (Thereupon, the jury panel entered the courtroom,

2    after which, the following proceedings were had in open

3    court:}

4          THE COURT:  Thank you.  Please have a seat.

5    BY MS. CORONA:

6      Q    Detective, when you made some reference as to the TV

7    show, something that you saw yesterday, can you explain to

8    the jury what you meant by that?

9      A    Yes.

10         When I was here yesterday, and I was able to view in

11   order to make what you just saw more viewable, what the

12   State Attorney -- I would imagine the State Attorney did

13   was split scenes up, just like the TV show, where you could

14   make it slow and/or faster; in this case, obviously, much,

15   much slower, and was able to view that yesterday.

16         And it may be -- it's quite better to see what they -

17   - what's happening.

18     Q    Did you have an opportunity to see it yesterday?

19     A    Yes, ma'am.

20         THE COURT:  For the record, what you are playing now

21   is State's Exhibit 20?

22         MS. CORONA:  Right.

23         THE COURT:  You need to stop and ask the Detective

24   anything, go ahead.

25

769

1    BY MS. CORONA:

2      Q   Let me ask you, the scenes, how you see them spliced

3    together, have they been put out of order from what you

4    recall seeing the video when you saw it in slow motion?

5      A   No, ma'am.

6      Q   Is there anything of importance that the State might

7    have taken out or edited?

8      A   No, ma'am.

9          MR. BLACKER:  There has been no suggestion that the

10   State has doctored the video, Your Honor, if that is what

11   counsel is getting at.

12         THE COURT:  Thank you, Mr. Blacker.

13         MS. CORONA:  Thank you, Detective Morin.

14         I have no further questions, Sergeant Morin.

15         THE COURT:  Cross-examination.

16         MR. BLACKER:  Thank you.

17                        CROSS-EXAMINATION

18   BY MR. BLACKER:

19     Q   Is it Detective Morin?

20     A   Yes, sir.

21     Q   Detective, you are the lead investigator in this

22   case; is that correct?

23     A   Yes, sir.

24     Q   So you directed people to do various things, took

25   various statements and coordinated the entire matter, did

770

1  you not?

2    A   Yes, sir.

3    Q   And I'm sorry, I'm just getting myself together.

4        So you were looking for Catherine Ruiz after June 8th,

5    correct?

6    A   After June 11th.

7    Q   After June 11th.  I'm sorry.  And you had various

8    contacts with her, did you not?

9    A   Yes.

10   Q   And you had contact with her mother; isn't that

11   correct?

12   A   Yes, sir.

13   Q   And you --

14       You also did an investigation, did you not, of

15   Ms. Ruiz?

16       Did you do a little background on Ms. Ruiz?

17   A   Yes, sir.

18   Q   And talked with people she knew, and stuff like that?

19   A   Yes, sir.  One of two, yes.

20   Q   Found out a little information about her daily

21   activities, didn't you, ma'am?

22   A   Yes.

23   Q   Found out a little information about her character?

24   A   Yes, sir.

25   Q   And you actually said that you got to a point where

771

1   you said that you were going to arrest her for -- as a

2   material witness if she didn't show up to the department?

3   You told people that?

4       A   Yes, sir.

5           I had to carry out my duty as a law enforcement

6   officer.

7       Q   And you also told her, did you not, and others, that

8   you might seek to take away her child, didn't you?

9       A   Absolutely.

10      Q   And the basis for material witness, regarding the

11  material witness was that --

12          Let's talk about elements.  She knew that she was an

13  alleged victim, and that you wanted to talk to her as a

14  witness in this pending case; isn't that correct?

15      A   Yes, sir.

16      Q   And you knew that she knew that?

17      A   Yes, sir.

18      Q   And based on that, that you could go to a Judge, like

19  you are here, we are here before today, and swear to a

20  material witness bond?

21      A   Yes, sir.

22      Q   And when it came time, based on that bond, you could

23  have someone actually go and you could put out, if you

24  wanted to, and go arrest her and have her incarcerated in

25  lieu of putting up a bond?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

772

1      I mean not in lieu of.

2      In addition to putting up a bond for her release; is

3  that correct?

4  A  Yes, sir.

5  Q  And you told her mother that, didn't you?

6  A  Yes, sir.

7  Q  And you got the word to those attorneys, didn't you?

8  A  Yes, sir.

9  Q  And you knew that she was in touch with her

10  attorneys, didn't you?

11  A  Yes, sir.

12  Q  And the word that her mother gave back to you was her

13  mother thought that she was hiding, because she was so

14  afraid of Pablo; isn't that right?

15      Between June 11th and June 20th, when she came in?

16  A  Yes, sir.

17  Q  And as a result --

18      And the child, let's talk about the child and put

19  that word out.

20      We can't take children from people because they don't

21  want to come in and talk to us?

22      MS. CORONA:  Objection.  Relevance.

23      THE COURT:  I'm sorry, what was the question?

24      MR. BLACKER:  I said:  We cannot take --

25      We can't have a court order the removal of the child

MATZ, TRAKTMAN, FELDMAN AND WILDNER

773

1     from the family just because someone doesn't want to

2     testify, can we?

3          THE COURT:  Overruled.

4          THE WITNESS:  No, no, we can't.

5     BY MR. BLACKER:

6     Q   There has to be some character flaw, something that

7     we go before a court if we want to take the child and take

8     her away or him away.

9          We have to have something, some basis on which to

10    base that request, don't we?

11    A   Yes.  Not necessarily a character flaw, not in this

12    case.

13    Q   I see.

14         And have you ever written about this, in this entire

15    matter -- how many pages?

16         Would you say your reports are complete where your

17    reports, that you made reports of (sic)?

18    A   Sorry, say that again.

19    Q   In the case as the lead investigator, how many pages

20    have you -- have you written as the investigator in the

21    case?

22    A   My report is in front of me.  May I see how many

23    pages?

24    Q   Approximately.  We don't need --

25    A   It's about 30 pages.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

774

1    Q   About 30 pages?

2       You have only written one report?

3    A   Yes, sir.

4    Q   You haven't written --

5    A   I have written -- yes, there's other reports

6  associated with the case, yes.

7    Q   And you know as a good investigator when you have --

8       When you tell, for example, a lawyer or you tell a

9  mother that you're going to have her daughter arrested or

10  take her child away that that is part of the case file,

11  isn't it?

12    A   That is part of the case.

13    Q   OK.

14    A   Facts of the case.

15    Q   And you know that on all relevant and material

16  matters, as an investigator, especially someone in

17  homicide, as you say you are, that you are supposed to

18  report all of the important and relevant matters; isn't

19  that correct?

20    A   Yes, sir, you are supposed to report the relevant

21  matters.

22    Q   Would you think it is relevant that you would

23  threaten your lead -- your alleged victim in the case with

24  taking away her daughter and arresting her?

25       Do you think it is relevant to the reporting in the

775

1  case?

2    A    It would be relevant if she would have been arrested

3  about this.

4         You know, this is something that I mentioned, and I

5  have done it in the past, where I had arrested witnesses,

6  and it's certainly part of the case file.

7    Q    You didn't have any idea between the 11th and the 20th

8  that Catherine Ruiz was living as the lover of Pablo Diaz

9  at Olga Diaz' house, did you?

10   A    And I don't have this information now.

11   Q    You still don't have it now?

12   A    No, sir.

13   Q    No one has ever told you that?

14   A    She did not tell me that, no, and I really haven't

15  spoken to anybody else about the case as far as somebody

16  giving me this information, anything that was a fact --

17  they could prove as a fact, no.

18   Q    We'll get to that.

19        We will get over to that in a minute.  All right.

20  And you --

21        And your investigation was part and parcel of your

22  threat to have her child taken away from her -- to have her

23  taken away from her; is that what it was?

24   A    Yes.

25   Q    Was that part and parcel of that, was her usage of

MATZ, TRAKTMAN, FELDMAN AND WILDNER

776

1   drugs?

2       MS. CORONA:  Objection, Judge.

3       THE COURT:  Overruled.

4       THE WITNESS:  No.  The whole -- I'm -- the whole

5   reason that I told her that I was going -- considering

6   taking her child away from her is because I felt from the

7   facts of the case, her child was in danger and she wasn't

8   protecting her child in danger of the defendant.

9   BY  MR. BLACKER:

10  Q   Well, you know that her child had not even been

11  living with her?

12      For over a year, she had been living with the

13  grandmother, didn't you?

14  A   Absolutely not.

15  Q   The mother didn't tell you the child was living with

16  her and the doctor, the father?

17      MS. CORONA:  Objection.

18      THE COURT:  Overruled.

19  BY MR. BLACKER:

20  Q   So are you telling this jury that between June 11,

21  2003 and June 20, 2003, you didn't know the whereabouts of

22  that child?

23      Is that what you are telling this jury?

24  A   No.

25      I knew the whereabouts of the child; that the child

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1   was with the grandmother while Catherine wasn't with --

2       You know, we didn't know where Catherine was, but not

3   that the child was with the grandmother for a year.

4   Q   How about the five weeks prior to June 8th, Detective

5   Morin?

6       Did you learn before --

7       MS. CORONA:  Objection, Judge, as to anything that

8   happened five weeks prior to the incident.

9       MR. BLACKER:  Let me finish the question, please.

10      THE COURT:  Go ahead.

11  BY MR. BLACKER:

12  Q   Didn't you learn that Pablo Diaz and Catherine Ruiz

13  were lovers in the five-week period leading up to June 8th,

14  and had been living together?

15  A   In my report, she told me, and it's in the report

16  that she had known him for a year.

17      A whole year, they had a relationship.  Whether he

18  was living together with her, no, I never got that from

19  her.

20      I did get from the hotel employees that he was a

21  frequent visitor to the condo.

22  Q   How about mom?

23      Mom Ruiz, the wife of the doctor, she didn't tell you

24  that she had met Pablo, and they were living together, and

25  he had clothes in her apartment, in Catherine's apartment?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

778

1    A    That he would come and go, and, in fact, he would go

2    to family functions.

3    Q    Didn't she tell you that during the five weeks, the

4    child never lived with them?

5    A    Absolutely not.

6    Q    So if the child was living with them, you were -- if

7    the child was living with them, you were misunderstanding -

8    - not misapprehending -- they either misrepresented to you

9    or they didn't tell you something; isn't that correct?

10    A    I don't understand.  Say it again.

11    Q    You never --

12        Are you telling this jury that you never determined

13    that that child was living with grandma and grandpa for the

14    five-week period to June 8th?

15    A    Absolutely --

16    Q    Yes or no?

17    A    Absolutely not.

18        I was not aware, was never made aware, either by

19    grandmother or by Catherine that that little girl was

20    living anywhere but with Catherine.  Never.

21        As a matter --

22    Q    So if it turns out that the little girl was not with

23    Catherine Ruiz for that five-week period, you don't know

24    that; is that right?

25    A    I wouldn't know that unless someone told me.  No one

MATZ, TRAKTMAN, FELDMAN AND WILDNER

779

1    told me.

2          Mom didn't tell me.

3          Catherine didn't tell me.

4    Q    Did you ask mom?

5    A    No, because it was understood that the child --

6          You know, the information that I got is that she has

7    a child, and that child lives with her.

8          Never was I told that that child did not live with

9    her.

10   Q    Really?

11         How about between June 11th and June 20th?

12         Did mom tell you that the child was with Catherine,

13   hiding out?

14   A    No, no.

15         Remember, supposedly, Catherine was with Pablo Diaz

16   on the date when this happened, and after that, they didn't

17   know where Catherine was.

18         The child was with grandma, but the thing was that he

19   was going to get the child anyway, so regardless of where

20   the child was, whether it was with mom or Catherine, you

21   know, in my opinion, my professional opinion, she's in

22   danger.

23         If someone is making threatening remarks on the child

24   or threatening the child, she is in danger wherever she is.

25   Q    The fact that, in your opinion, you wanted the -- her

MATZ, TRAKTMAN, FELDMAN AND WILDNER

780

1  to be with her mom, you -- that she was taking good care of

2  the child?

3  A  No.

4  What I wanted is for Catherine to cooperate, so I

5  could have this individual -- you know, so we could make

6  this case, have this individual arrested, because of the

7  danger.

8  He committed a crime, not only against her, but

9  against other people, and then he is threatening not only

10  her child, but her brothers, and sisters, and her family,

11  so this is a person who is dangerous.

12  We need to get this person off the streets.

13  Q  I see.

14  And you learned that --

15  MR. BLACKER:  Your Honor, I would like to reserve a

16  motion, OK?

17  THE COURT:  Go ahead.

18  MR. BLACKER:  Thank you.

19  BY MR. BLACKER:

20  Q  You finally confronted her on the 19th; is that

21  correct?

22  A  Yes.

23  Q  And she agrees to make a statement to you; is that

24  right?

25  A  Yes, sir.

781

1   Q   Had you already determined whether or not she was

2   heavily involved in drug usage?

3        MS. CORONA:   Objection.

4        THE COURT:   Sustained.

5        The objection is sustained.

6   BY MR. BLACKER:

7   Q   When you saw her, did she tell you that she had been

8   out partying with Pablo, and a City of Miami detective, and

9   another woman, and that there was an altercation between

10  her and the woman and that the other woman held her down --

11  I mean that Pablo held her down while the woman punched

12  her?

13  A   What she told me is that on the day of the incident,

14  she went out on a double date with -- it's not a City of

15  Miami detective.  Possibly a police officer.  She wasn't

16  able to tell me what department.

17       She was able to tell me not even his name, if I

18  remember correctly, but the vehicle that he drove, it was a

19  Lexus.  I do remember that.

20       And there was a fight where she got hurt, and Pablo

21  Diaz held her down, and allowed her to be punched.

22  Q   And as a result of that, and it's -- he did nothing

23  to help her; is that correct?

24  A   That is what she told me.

25  Q   He held her, and the other girl punched her, and

MATZ, TRAKTMAN, FELDMAN AND WILDNER

782

1    broke her nose?

2       A    That is what she told me, yes.

3       Q    And when they got back in the apartment, she told

4    him, "You have to leave," because of that?

5       A    Yes.

6            She was very upset and said, "I don't want you here.

7    You have to leave."

8       Q    And when they got down to the 6th floor, he pummeled

9    her head into the toilet, and caused her to bleed

10   profusely?

11           She told you that, didn't she?

12           I'm sorry.  I didn't understand your words.  Go

13   ahead.

14      A    She told me that she was beaten by him in the gym on

15   the 6th floor.

16      Q    And that she was beaten to where she was a bloody

17   pulp?

18      A    I don't remember her saying that she was a bloody

19   pulp, but I do remember she said she was beaten, and her

20   head dumped in the toilet.

21      Q    At that time, is it already June 20th, and you

22   probably had photographs from the 6th floor, did you not?

23      A    No, we did not.

24      Q    Crime scene didn't go to the 6th floor?

25      A    No, they did not.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

783

1    Q    The film that we saw just a piece of has the 6th floor

2    gym in it, does it not?

3    A    We never got anything from the 6th floor, because we

4    didn't learn of that information until later when we got a

5    hold of her.

6    Q    Didn't security tell crime scene and you, as the lead

7    investigator, didn't security from the Fortune House tell

8    crime scene that they had film of her being on the 6th

9    floor?

10   A    No, sir.

11        I'm not aware of that.

12   Q    And didn't she tell you that when they went

13   downstairs to the 1st floor, finally, that the minute she

14   got off the elevator, she yelled for someone to call the

15   police?

16   A    No, sir.

17   Q    What did she say?

18   A    She said that once she realized what type of danger

19   she was in --

20   Q    In terms of timing, when did she say to call the

21   police is what the question is.

22   A    When she exited the elevator, they made --

23        They went to the phone that was on the west wall of

24   the lobby.  That would have been actually the elevator to

25   the right.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

784

1        There's a phone there.

2        Pablo Diaz made a phone call at her request to get a

3   Louie Vitan purse returned to her that was an expensive

4   purse.

5        She told me she was doing this to make the situation

6   calm.  She knew that he was out of control.

7        So when he agreed to do that, she then took the

8   opportunity to step away from him.

9        He was engaged in the conversation, and she went to

10   the concierge and mouthed the words to him, "Call the

11   police."

12   Q   And did she tell you that when she mouthed the words

13   -- that the concierge mentioned to someone else, "Did you

14   call the police?" out loud and alerted Mr. Diaz?

15   A   Yes, but it was one of the security officers, and

16   Mr. Diaz overheard that, yes, the police had been called.

17   Q   And did she tell you at that time that, that officer

18   said, "Did you call the police?" that Mr. Diaz attempted to

19   exit the building, but it was locked, and they didn't open

20   up the door for him to allow him out, because it was after

21   12 o'clock?

22   A   Yes, sir.

23   Q   She told you that that was before any alleged gun was

24   produced?

25   A   Yes, sir.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

785

1   Q  He tried to exit the building?

2   A  That he attempted to exit the building at that point,

3  but he was not buzzed out.

4   Q  Now, did she tell you that on the 9th of June that she

5  wound up going to Olga Diaz' house, or farm, whatever you

6  want to call it, the Redlands?

7    Did she tell you that?

8   A  No, I don't recall that.

9   Q  Didn't you ask her where she had been for the last

10  ten days?

11   A  Yes.

12   Q  And did she tell you?

13   A  She told me she was with different friends.

14    She wouldn't disclose whom.  She wouldn't disclose

15  where.

16   Q  She didn't even tell you that she went to Pablo's

17  house for a night?

18   A  No, not that I can recall.

19    MR. BLACKER:  Can I have a moment, Your Honor?

20    Thank you.

21  BY MR. BLACKER:

22   Q  Did she tell you that he had discharged a weapon two

23  times while at the cafeteria on 17th Street?

24   A  Yes.

25   Q  And while discharging that weapon --

786

1      While he was discharging that weapon, he was in the

2  interior of the vehicle?

3      A    No.

4      And she wasn't real clear about that, but from what I

5  was able to ascertain, one shot was outside of the vehicle

6  into the air, and the other shot was while she was sitting

7  in the vehicle.

8      He turned around and shot from inside the vehicle,

9  shot at her thigh, I think it was.

10     Q    Did she say that she had been burned or hit?

11     A    She said one shot was so close to her head that she

12 lost hearing temporarily, and the other shot was close to

13 her thigh, that it actually made her thigh hot.

14     Q    And let's talk about the shot from the head.

15         You are a lead detective.

16         You probably found out where he was when the shot was

17 fired so that you could put the report together, correct?

18     A    I tried to the best of my ability, and you do that by

19 interviewing the witnesses who were there.

20     Q    And what did she say about that shot that whizzed by

21 her?  Where was it?

22     A    Where was he?

23     Q    Yes, where was he standing or sitting?

24     A    He was outside the vehicle.

25 She tried to escape and she--

MATZ, TRAKTMAN, FELDMAN AND WILDNER

787

1      She was like running away from him, trying to escape,

2  away from him.

3    Q   And so when she was escaping away, he aimed the gun

4  at her, and shot at her; is that what --

5    A   I guess she --

6      No, because what she said was that she couldn't see

7  him.

8      Her back was to him, but that it was so close -- at

9  least what she told me -- it was so close that she lost

10  temporary hearing.

11   Q   And she told you --

12     You are telling the jury today what Catherine Ruiz

13  said on the 20th of June, are you not?

14   A   Yes, sir.

15   Q   And you are reviewing the statement before testifying

16  here today, correct?

17   A   Yes, sir.

18   Q   And so you just told us that her -- you are saying

19  her thighs -- is that what you said?

20   A   She said one of the shots was so close that -- to her

21  thigh that it actually made it hot, or burned her, or, yes,

22  it was so close that she felt the heat.

23   Q   And she also told you that the one that went by her

24  ear, she heard a "pow," and the gun was discharged towards

25  her, didn't she?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

788

1    A    I don't remember.  I would have to look at my report

2   and her actual words.

3    Q    Why don't you look at the report on Page 45.

4        MS. CORONA:  I ask that she be able to look at the

5    actual statement that the victim gave.

6   BY MR. BLACKER:

7    Q    You don't have the statement?

8        I'm sorry.  Top of 46.

9        Just read it to yourself, please.  Read the bottom of

10   45, but it carries on, and read the next page, 46, and tell

11   me, if you would, whether or not she told you that the gun,

12   in fact, discharged towards her, and that's the one that

13   went, "pow," right by her ear, according to her.

14   A    What was your question, sir?

15   Q    The question was:

16       Didn't she tell you that the gun was discharged

17   towards her?

18   A    Just right to her ear.

19   Q    Yes.

20   A    Yes.

21   Q    Let me see.  Right.  She said, "It went right to my

22   ear"; is that correct?

23   A    Yes, sir.

24   Q    Wouldn't that be discharged towards her, ma'am?

25   A    I'm sorry?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

789

1    Q    "Right towards my ear," would that mean that it went

2    towards her?

3    A    Of course.

4         MR. BLACKER:   Thank you.

5         Now, may I have a moment, Your Honor?

6    BY MR. BLACKER:

7    Q    So on June 20th, you were not aware that Catherine

8    Ruiz even spent one night at Pablo Diaz' house?

9    A    Absolutely not.

10   Q    And you didn't know that she was with Pablo Diaz for

11   about 11 days as his lover, did you?

12   A    I did not.

13   Q    And you didn't have any information that, not only

14   was she with Pablo Diaz for 11 days as his lover, but she

15   was there freely, voluntarily, and willingly, and knowingly

16   what she was allegedly -- alleged had occurred on June 8th?

17        You didn't know that, did you?

18   A    I did not know.

19        The only information that I had that she had any

20   contact with Pablo Diaz was on June 8th, and the time that I

21   spoke with her is that she went to meet with the mother,

22   agreed to meet with the mother at Sunny's (sic) Barbecue

23   parking lot, because she felt badly for the mother.

24   Q    Ma'am, did you ask why she went --

25        I asked you --

790

1    A    That is the only information I had, the only contact

2    that she had with Pablo Diaz was that she met the mother,

3    she went to meet with the mother at the Sunny's Barbecue.

4    Q    And did she tell you that Pablo Diaz was in the car

5    when she went to meet the mother?

6    A    Yes.  She didn't.

7    Q    Because she told you, "I didn't even talk to him,"

8    didn't she?

9    A    I don't remember that she said she didn't talk to

10   him, but that he was there.

11   Q    If she was -- he was there, this was the night after

12   the alleged incident, correct?

13        The morning after.  Excuse me.

14   A    I would have to refer to my report, but it was close

15   to the time of the incident, yes.

16   Q    And if I were wrong, the State would help you out.

17   This was the next morning?

18   A    OK.

19   Q    Just assume that.

20        So the next morning after all of this feeling by you,

21   now you have made a conclusion that she is so afraid, and

22   she is so in danger, correct?

23   A    Yes, sir.

24   Q    Now, you know that --

25        Did you learn this for the first time today that she

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    went and lived with Pablo for ten, 11 days with the Diaz

2    family?

3    A    On the day of his arrest --

4         And remember, we were in two separate locations, my

5    partners and I, but when we came together, my partner --

6         One of my partners told me that the mother was alleging

7    that Catherine had been there on and off, she was living

8    there.

9         Now, you know, victims -- the victim's mother, I'm

10   sorry -- the offender's mother and the offender, the mother

11   can say just about anything.

12        I didn't see any indication at that property,

13   because, of course, that would be a red light to me that

14   she was there.

15        I looked for clothing.

16        I looked for makeup.  There was no indication.

17        So, yes, the mother said it, but there was no --

18   nothing, based on fact, that she was there.

19   Q    And to this day -- you know, she testified here a

20   couple of days ago.

21        Are you aware of that?

22   A    Yes, sir.

23   Q    Did you help prepare her for the testimony at all?

24   A    No, sir.

25   Q    You left that up to the State Attorneys?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

792

```
 1    A    If they did, I don't know, but that would be their

 2   job.

 3    Q    Have you spoken to her lately?

 4    A    No.

 5    Q    Did you ever ask her what about the allegations that

 6   Olga Diaz made about her living there for two weeks?

 7    A    No.

 8    Q    Never asked her?

 9    A    Never asked her.

10    Q    All right.

11         Now, you told the prosecutor that, by the way --

12   withdrawn.

13         Have you reviewed Ms. Ruiz' September 29, 2004

14   deposition?

15    A    I may have reviewed it, you know, a couple of years

16   back, but not recently.

17    Q    How about her April 11, 2006 depo that she took with

18   me?

19    A    No, sir.

20    Q    You haven't seen that?

21    A    No, sir.

22    Q    Didn't know what she said?

23    A    No, sir.

24    Q    Would it surprise you if she now says that at no

25   time --
```

793

1        MS. CORONA: Objection, Judge. Improper impeachment.

2        THE COURT: Sustained.

3  BY MR. BLACKER:

4   Q  Have you ever been told that Mr. Diaz did not hold

5  Ms. Ruiz in a full Nelson on June 8th?

6        MS. CORONA: Objection, Judge. Hearsay.

7        THE COURT: Sustained.

8  BY MR. BLACKER:

9   Q  Now, you told the jury today that Catherine Ruiz came

10  to you and said, "Oh, I'm so scared, I don't even want to

11  talk to you."

12        Was that part of your impression that you described

13  here today?

14   A  Oh, that she was very scared.

15        She didn't know which way to turn, didn't know if she

16  should talk to us or not.

17   Q  She gave you the impression that she had not had --

18  not even seen Pablo after that day she had seen Olga Diaz?

19   A  She was very forthright about the Sunny's Barbecue.

20  She had not seen -- spoken with him or had seen him at all.

21   Q  And she told you how scared she was, still, and she

22  wanted protection, didn't she?

23   A  Yes.

24   Q  And based on that, you took certain actions, didn't

25  you?

794

1    A    Yes.

2    Q    You didn't know that she had been living with Pablo,

3    did you?

4    A    I didn't know she was living with him, no.

5    Q    You didn't know that she wasn't in fear of Pablo, his

6    mother or family, did you?

7    A    I didn't have that information, no.

8    Q    And you didn't know that she came and went at her

9    pleasure from the Redland property back to Miami during

10   this entire period, July 11th through July 20th, did you?

11   A    I did not have that information.

12   Q    Were you present when Detective Infante did his

13   search for a bullet in the car?

14   A    Not the entire time, but I did go see the -- you

15   know, the bullet hole in the car, but I wasn't there when

16   he did the search.

17   Q    You weren't there when he went -- when he did his

18   expert examination of that vehicle?

19   A    We spoke.

20        You know, we get the car in.  We speak about it.  I

21   went downstairs.

22        We hold it in this -- a bay downstairs in the police

23   department, and we spoke.  It was not for the entire

24   examination.

25   Q    The back seat, what did it have --

795

1   A   The car, it was in really poor shape. It was even

2  missing the tires at that point. It was just in disarray.

3  It had a back seat.

4   Q  Was the stuff piled up in the back seat, or no?

5   A  I don't recall if the stuff was piled up.

6   Q  After speaking with Catherine Ruiz, your testimony is

7  that the first time you found out that she was living with

8  Pablo Diaz on the farm, the Redland Farm for July 11th --

9  June 9th through June 20th was today?

10   A  On the day of the arrest, again, the mother informed

11  one of the detectives -- that wasn't me -- that Pablo Diaz

12  -- I'm sorry -- that Catherine Ruiz had been in and out

13  with -- you know, being there with her son.

14     The mother did inform one of the detectives of that,

15  but she is a mom.

16     What I did, to be able to collaborate that, was see

17  if there was anything in that house, and she gave me

18  consent to look everywhere in that house to see if I found

19  anything that would give me that indication.

20     There was nothing.

21   Q  What I'm saying, other than that -- you already

22  testified to that --

23     Other than that, June 21, 2003, between June 21, 2003

24  and today, you didn't know that she was living on his -- on

25  the ranch or the farm?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1        MS. CORONA:  Objection.

2        Asked and answered.

3        THE COURT:  Sustained.  She -- I think she said many

4    times.  Go ahead.

5        MR. BLACKER:  That she did not know.  I didn't get an

6    answer out of it.

7        THE COURT:  Sustained.  She has answered before, she

8    didn't know.

9        MR. BLACKER:  All right.  May I have a moment,

10   please?

11       Judge, at this time, I tender the witness.

12       THE COURT:  Anything further?

13                   REDIRECT EXAMINATION

14   BY MS. CORONA:

15   Q   Would it have made a difference to you if you knew

16   for a fact that Catherine Ruiz had spent June 9th through

17   June 20th with Pablo Diaz in your investigation of the case?

18   A   I do not have the luxury of picking my victims.  Only

19   the offenders pick the victim.

20       I have to bring the defendant to justice whether she

21   wanted to live with him after she was a victim of that

22   crime or not.

23       Whether she did or not, that is up to her.

24       He committed a crime.

25       I bring him to justice.

1   Q  So if you found out that it was, in fact, true that

2  she had been living with him for 11 days, and you'd known

3  that for a fact before today, after Pablo Diaz' arrest,

4  would you have decided not to arrest him for the crime?

5  A  Absolutely not.

6  Q  Would you have disregarded all of the other facts

7  that you had heard?

8      Let me just ask you this:

9      Her behavior, the behavior of her going back to live

10  with the offender, who allegedly committed this offense, is

11  that, in your experience, the behavior of a person that's

12  been abused?

13      MR. BLACKER:  Objection.

14      THE COURT:  Overruled.

15      THE WITNESS:  Absolutely.

16      That is not uncommon at all.

17      It is very frequently that victims even refuse to

18  press charges.  Very frequently, victims become

19  aggressive, and even abusive to people that try to help.

20  BY MS. CORONA:

21  Q  And because a victim --

22      MR. BLACKER:  Objection as to that comment.

23      THE COURT:  Overruled.

24  BY MS. CORONA:

25  Q  Just because a victim decides not to press charges

798

1  and tell you they don't want to prosecute, does that mean

2  that you are not -- it's OK for you to now drop the

3  charges?

4       I mean, what procedures do you use?

5  A   No.

6       The witness has absolutely no right, one way or the

7  other, whether we file charges or whether we do not file

8  charges.  They have no bearing on that, whatsoever.

9       Oftentimes, people want to -- the flip side, to

10  charge someone with something.

11       If the evidence is not there, if the crime is not

12  there, we cannot do that.

13       MR. BLACKER:  Objection, Your Honor.

14       THE COURT:  Overruled.

15       MS. CORONA:  I have nothing further.

16       THE COURT:  All right.  Thank you, Detective.

17       Ladies and gentlemen, the pizza has arrived, so

18  please go into the jury room.  Jimmy will be delivering

19  it.

20       Make sure that they --

21       You know, and you are not to discuss the case amongst

22  yourselves.

23       (Thereupon, a lunch recess was taken, after which,

24  the following proceedings were had outside the presence of

25  the jury:)

799

1          MR. BLACKER:  We have Catherine Ruiz on stand-by.  I

2    can't get the knife in, so we have to call her.

3          I can't get a stipulation out of them.  I want her,

4    so call her.

5          MS. CORONA:  The defense could have introduced the

6    knife during cross-examination.

7          THE COURT:  It's his case in chief now.  Can you call

8    the lady?

9          MS. CORONA:  I don't know if she is going to come in.

10         THE COURT:  She has to.

11         She has been ordered by me.

12         MR. BLACKER:  On the knife, yesterday, we argued -- I

13    said I wanted to ask --

14         THE COURT:  Your client is not here, so --

15         MR. BLACKER:  I will waive his presence for this.

16         THE COURT:  No.

17         Get the lady on the phone.

18         We're on the record.  Let's go, guys.  We're on the

19    record.

20         Yes, what's happening?

21         MR. BLACKER:  OK.

22         MS. CORONA:  Judge, I'm trying to get her on the

23    phone, and I got nothing.

24         THE COURT:  Have your co-counsel go outside and call

25    her.

1    MR. BLACKER: Yesterday, we argued there were two

2    prior occasions on which I have information that

3    Catherine Ruiz stabbed two prior boyfriends.

4    You felt that since it was a self-defense that the

5    defendant needed to put that in issue.

6    I would like --

7    Remember, you said that you wouldn't permit those

8    questions that she stabbed two prior boyfriends until it

9    became an issue.

10    Judge, it's not a self-defense that I'm looking to

11    seek here, not at all, from the facts in this case.

12    What I'm seeking to do here is to establish that when

13    she pulled the knife, argue to the jury that she is a

14    liar, she pulled the gun (sic) first, because it doesn't

15    make sense to pull a knife when someone has a gun on you.

16    It's like playing silly putty in a way.

17    She pulled the knife.

18    He reached over.

19    She ran into the room.

20    And he was afraid when he saw the knife, because

21    she's stabbed prior people.

22    MR. GROSS: After speaking to co-counsel, the State

23    will now stipulate the knife coming in.

24    THE COURT: The State is willing to stipulate to the

25    knife coming in?