801



```
 1                        IN THE CIRCUIT COURT OF THE
 2   ELEVENTH
 3                        JUDICIAL CIRCUIT, IN AND FOR
 4                        MIAMI-DADE COUNTY, FLORIDA
 5                        CRIMINAL DIVISION
 6                        CASE NO. F03-16995
 7
 8
 9   THE STATE OF FLORIDA,    )
10                           )
11        Plaintiff,          )
12                           )
13   vs.                     )          VOLUME 5
14                           )
15   PABLO DIAZ,             )
16                           )
17        Defendant.          )
18   _____     )
19
20
21
```

COPY



DOCKETED
APR 16 2008
ATTORNEY GENERAL

RECEIVED

APR 16 2008

ATTORNEY GENERAL
MIAMI OFFICE

MATZ, TRAKTMAN, FELDMAN AND WILDNER

802

1     MS. CORONA:  Right.

2     MR. BLACKER:  I would like to get that information

3  that she stabbed two men before, two boyfriends.

4     THE COURT:  How is that relevant?

5     MR. BLACKER:  It's relevant to the fact that it

6  alarmed him so that --

7     THE COURT:  His state of mind is not an issue.

8     MR. BLACKER:  Well, it is if he's going to reach

9  over, and he's not going to get rubber bands to protect

10  himself if he knows that she has stabbed people.

11     THE COURT:  It is not an issue, the state of mind.

12     Guys, pay attention so we don't have to repeat.

13     The state of mind is not an issue, unless the defense

14  makes it an issue.

15     So if he doesn't testify, I don't see how his state

16  of mind becomes an issue.

17     MR. BLACKER:  Let me talk to him about the

18  stipulation and about his testimony.

19     THE COURT:  All right.

20     Is the State going to be resting now in front of the

21  jury?

22     MS. CORONA:  Yes, Judge.

23     THE COURT:  So you want to make your motion for

24  judgment of acquittal at this time?

25     MR. BLACKER:  Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1      THE COURT: You want to renew all prior motions and

2  objections?

3      Same ruling as to those.

4      And your motion for judgment of acquittal, you need

5  to say anything?

6      MR. BLACKER: Can I make just a small argument?

7      THE COURT: Go ahead.

8      MR. BLACKER: Let me get my --

9      THE COURT: You don't need a record. The record will

10  speak for itself.

11      It's a pretty long record.

12      MR. BLACKER: Real quickly, the attempted felony --

13  felony murder, Judge, is that --

14      The charges are that he -- you know what the charges

15  are.

16      THE COURT: Right. I'm familiar with everything.

17      MR. BLACKER: Actually attempted to kill Catherine

18  Ruiz.

19      The evidence is pretty clear here.

20      When this --

21      THE COURT: Actually, you know, the way I see it, I

22  have reviewed it and you can say whatever you want for

23  the record.

24      There is a factual question whether his actions

25  constituted an attempted murder or any lesser, and

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    whether his actions constituted a kidnapping, or false

2    imprisonment, and whether his actions constituted an

3    aggravated assault on Mr. Flores.

4         I think it's all pretty clear.

5         The record will speak for itself.

6         Is there anything else you are saying that the facts

7    are insufficient?

8         MR. BLACKER:  Yes.

9         Would you preserve all my other objections for

10   purposes of 3.380 motions?

11        THE COURT:  Yes.

12        MR. BLACKER:  I did reserve a motion, so I want to

13   make it a part of the record.

14        Officer Morin, she came in here, and that's why I had

15   a sidebar.

16        She was going to say that Catherine Ruiz was afraid

17   of the defendant.

18        And then I was going to lead into that she was there

19   for 12 days at his home, or 13 days.

20        It turns out that Officer Morin voluntarily, without

21   me knowing this, said that she was afraid of him, because

22   he had threatened her mother, or father, and her child,

23   and she said on a few occasions.

24        And I couldn't object, because I didn't know it was

25   coming.

1    But I did preserve, and I think the Court on one

2    occasion, you limited it, and on two, you didn't --

3    She made three statements to that effect.

4    Conclusionary remarks that had to be hearsay.

5    She didn't have any of this information, itself.  In

6    fact, she didn't continue on the case until June 11th.

7    I seek a mistrial at this time.

8    THE COURT:  All right.

9    Your motion is denied.

10    I think the record is quite clear as to what her

11    testimony was, the cross-examination and her reason for

12    looking for this woman that has disappeared.

13    She was concerned for the woman's safety, and the

14    safety of the child, and that was invited in cross-

15    examination, I felt.

16    MS. CORONA:  For the record, that information that

17    she got from the defendant's spoken messages, which she

18    did listen to herself, that the threats were contained in

19    that phone message to the daughter, the brother, the

20    father, the mother.

21    MR. BLACKER:  Judge, I do want to make one comment

22    about the aggravated assault.

23    Dennis Flores was testifying on direct.

24    He did say that he was afraid; wasn't really clear

25    what he was afraid of, but it was at the time when the

1   gun was being waved around and pointed.

2       On cross-examination, he clearly admitted the

3   following:

4       That his deposition two years prior to the --

5       His testimony two days ago was fresher in his mind;

6   that if it conflicted with his testimony on direct today,

7   he said then he would stand by his prior testimony.

8       I read him directly from Page 14 and 19 of his

9   deposition, where he said:

10      "I wasn't threatened.  I never felt threatened.  I

11  was afraid for the girl."

12      The case law is clear that in aggravated assault, you

13  cannot have a vicarious fear.  The fear has to be

14  imminent to you and not imminent to someone else, and I

15  ask for a judgment of acquittal.

16      THE COURT:  I think, yes, it was an issue, you know,

17  when you're not seeing stars or anything, but it was an

18  issue that came up.

19      The witness said he was afraid that a bullet would go

20  off and he would be injured, and I think --

21      Well, your motion for judgment of acquittal as to all

22  counts is denied.

23      Now, at the conclusion of the State's case, the Court

24  will also find that based on testimony that I heard, even

25  though no motion to suppress photographic identification

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1  was suggested, was filed, but if one had been filed, the

2  Court finds that the photo identification procedures used

3  in the case were not overly suggestive or in any way

4  improper.

5      In fact, having reviewed the photo lineup myself, I

6  didn't find -- don't find them suggestive at all.   I

7  think they're pretty good photo lineups.

8      And I don't find that any of the actions of the

9  police officers, based on the testimony that I've heard

10  of the witnesses, were improper.

11      So if a motion to suppress had been filed regarding

12  any of the photographic identifications, it would have

13  been denied.

14      MR. BLACKER:  One last thing I forgot to do.

15      I am moving for a disqualification of Catherine Ruiz

16  as a witness pursuant to 90.603.

17      THE COURT:  One second.  Excuse me.

18      MR. BLACKER:  Sure.

19      Judge, Catherine Ruiz is incapable of understanding

20  the importance of a witness to tell the truth.

21      You've heard that she gave four statements.

22      The only thing that she told the truth about

23  yesterday on the stand was that she recanted her other

24  three statements, and she admitted that she had been on

25  Olga Diaz' farm for a period of 13 days.

1   Prior to yesterday or the day before when she

2   testified, the 8th of May, 2007, for the last three years,

3   11 months, she has continued to say that she spent one

4   night, two at the most at the farm.

5   Other than that, she lied about every single thing

6   she testified about.

7   I'm asking you to disqualify her as a witness.

8   THE COURT:  All right.

9   Denied.

10  Are we ready?

11  MR. BLACKER:  We are.

12  THE COURT:  Your motion for judgment of acquittal has

13  been made.

14  You don't need to make it after the State rests, and

15  we'll go right into your witnesses.

16  They're here?

17  Jimmy, where are you?

18  Call Jimmy.

19  MR. BLACKER:  We have stipulations that you said you

20  would read.

21  Atalia Bello --

22  Judge, when you take your next break, can you give me

23  two minutes to run out to see if they found her?

24  Can you colloquy the defendant to see if he wants to

25  testify or not testify before the defense opens the

1   case?

2          THE COURT:  Aren't you about to start your case?

3          MR. BLACKER:  We could do it before, during or after.

4          THE COURT:  Do you want me to read the stipulation

5   first, or what do you want done first?

6          MR. BLACKER:  Yes.  Please read it first.

7          And I would like to put two pieces of evidence in,

8   too, that we have stipulated to.

9          One is the phone records, and I'm going to have mom

10  testify as to the phone records --

11         THE COURT:  You can do that through the witnesses,

12  no?

13         MR. BLACKER:  The other one is not through witnesses.

14         THE COURT:  So you have got to do it.

15         Jimmy, bring the jury in.

16         So I will start with the stipulation.

17         After the State has rested, I will call you, and you

18  ask me:

19         "Judge, would you please read the stipulation?"

20         MR. BLACKER:  In our case in chief?

21         THE COURT:  Yes.

22         Or would you like to read it --

23         It's your stipulation.  You can read the stipulation

24  to them.

25         That goes to evidence, no?

810

1        (Thereupon, the jury panel entered the courtroom,

2    after which, the following proceedings were had in open

3    court:)

4        THE COURT:  Thank you.

5        Please have a seat.

6        Let the record reflect that the defendant is present,

7    as he has been throughout the case.

8        State, do you have an announcement?

9        MS. CORONA:  Judge, the State rests at this time.

10       THE COURT:  The State has rested its case, ladies and

11   gentlemen.

12       Mr. Blacker.

13       MS. CORONA:  Judge, can we go sidebar before with the

14   court reporter?

15       MR. BLACKER:  We don't need a sidebar.

16       THE COURT:  All right.  Mr. Blacker.

17       MR. BLACKER:  Judge, we have a stipulation, an

18   agreement with the parties that I would like to read into

19   the record if I could.

20       Good afternoon, ladies and gentlemen.

21       Stipulation:

22       The State of Florida and Pablo Manuel Diaz agree and

23   stipulate if Atalia Bello were called to testify in this

24   case, she would testify as follows:

25       On June 7, 2003, Atalia Bello and her boyfriend,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

811

1    Armando went to the condominium of Catherine Ruiz to

2    visit Catherine and her boyfriend, Pablo Diaz.

3        Atalia and her boyfriend socialized with Catherine

4    and Pablo for approximately 36 hours.

5        On June 8, 2003, around 10 p.m., they all drove in

6    Atalia's boyfriend's car to Miami Beach to continue

7    socializing.

8        Around 11 p.m., Atalia punched Catherine Ruiz in the

9    face and mouth area several times, causing Catherine to

10   bleed from her nose and mouth.

11       Atalia and her boyfriend then departed, taking with

12   them all of Catherine's personal effects, including her

13   purse, wallet, sunglasses, identification and numerous

14   other effects.

15       This is the extent of the stipulation.  Thank you.

16   THE COURT:  OK.

17       MR. BLACKER:  Can I make it part of the record,

18   Judge?

19   THE COURT:  Yes.

20   THE CLERK:  Court Exhibit 1.

21       (Thereupon, the exhibit referred to was marked as

22   Court's Exhibit Number 1 and was received in Evidence.)

23   THE COURT:  All right.

24       And ladies and gentlemen, a stipulation, you receive

25   the same way as live testimony.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

812

1    When they stipulate, you accept that as the witness'

2   testimony as true.

3    MR. BLACKER:  I would like to call --

4    I have one more piece of evidence that we have agreed

5   to enter into the record.

6    THE COURT:  Go ahead.

7    MR. BLACKER:  Judge, I would like to have this

8   marked, please.

9    Kathy.

10    THE COURT:  How was the stipulation marked?

11    THE CLERK:  Court Exhibit 1.

12    THE COURT:  All right.

13    MR. BLACKER:  Judge, now I'm going to read it.

14    THE COURT:  All right.  That one will be marked, as

15   well.

16    THE CLERK:  Defense Exhibit marked for Identification

17   purposes A16.

18    THE COURT:  It will be admitted by stipulation.

19    THE CLERK:  Defense Exhibit marked for Identification

20   purposes A16 will now become Defense Exhibit "P."

21    "P," as in "Peter."

22    (Thereupon, the exhibit referred to was marked as

23  Defense Exhibit "P," and was received in Evidence.)

24    THE COURT:  Let me ask you, the stipulation that you

25   marked, that Court Exhibit 1, can you mark that as a

MATZ, TRAKTMAN, FELDMAN AND WILDNER

813

1    defense exhibit?

2        MS. CORONA:  That doesn't go back to the jury.  That

3    is as live testimony.

4        We agreed previously.

5        THE COURT:  I see.

6        So leave it as a Court exhibit.

7        Thank you for reminding me.

8        MR. BLACKER:  Ladies and gentlemen, this is a piece

9    of evidence, and it's an incident narrative report

10   prepared by --

11       THE COURT:  Before you read that, that one, Defense

12   Exhibit "P" does go to the jury?

13       MR. BLACKER:  It does go to the jury.  I'm not

14   reading.  I just want to tell them what it is.

15       THE COURT:  One second.

16       The other stipulation was read about Atalia's Bello's

17   testimony.

18       That will not be going back to you.

19       That is just the rules of evidence.

20       You won't be getting that piece of paper.  It was

21   just read to you.

22       MR. BLACKER:  This is an incident narrative report by

23   City of Miami Officer Christian Alvarez-Vega that will

24   get to go in the jury room.

25       It's in evidence.

814

1        Thank you.

2        THE COURT:  All right.

3        Thank you.

4        Call your first witness.

5        MR. BLACKER:  Defense will call Frank Acosta.

6    Thereupon:

7                         FRANK ACOSTA

8    was called as a witness, and having been first duly sworn,

9    was examined and testified as follows:

10                      DIRECT EXAMINATION

11   BY MR. BLACKER:

12       Q    Good afternoon, sir.  Can you please state your name

13   for the record, please?

14       A    My name is Frank Acosta.

15       Q    Frank Acosta.  Mr. Acosta, what do you do for a

16   living?

17       A    I'm a plumbing contractor.

18       Q    And you work for somebody, or you have your own

19   company?

20       A    Me and my brother own a company.

21       Q    How long have you been doing that kind of work?

22       A    About 12 years.

23       Q    And do you know a person by the name of Pablo Manuel

24   Diaz?

25       A    Yes, I do.

1  Q  And did you know Mr. Diaz back in June or the summer

2  of 2003?

3  A  Yes, I did.

4  Q  And do you remember there came a time that Mr. Diaz

5  was arrested in June of 2003?

6  A  Yes.

7  Q  And do you remember, did you socialize with him prior

8  to his arrest?

9  A  Yes.

10  Q  Were you in some type of commercial enterprise with

11  him at that time, as well?

12  A  I had a piece of land rented out.

13  MS. CORONA:  Objection as to relevance.

14  THE COURT:  What was the question again?

15  MS. CORONA:  Was there a commercial enterprise with

16  which the defendant was involved with him.

17  THE COURT:  Overruled.

18  THE WITNESS:  Yes.

19  I had a piece of land where we raised show birds.

20  He worked there, and I paid him for working there.

21  BY MR. BLACKER:

22  Q  OK.  And do you remember seeing him prior to his

23  arrest?

24  A  Yes.

25  Q  And where did you see him, sir?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

816

| | | |
|---|---|---|
| 1 | A | At the farm. |
| 2 | Q | And the farm, do you know whose farm that is? |
| 3 | A | Yes. |
| 4 | Q | Whose farm is that? |
| 5 | A | The owner of the farm, his name was Orlando, and I |

6  knew him for a long time, also.

| | | |
|---|---|---|
| 7 | Q | Do you know Olga Diaz, Pablo's mom? |
| 8 | A | Yes. |
| 9 | Q | Does she live near the farm? |
| 10 | A | Yes. |
| 11 | Q | Is that where you saw Pablo? |
| 12 | A | I would see him at the farm. |
| 13 | Q | Did you also see him at Olga's house? |
| 14 | A | Also at the house. |
| 15 | Q | Was he staying there, or just visiting? |
| 16 | A | That is where he lived. |

17          MR. GROSS:  Objection.  All of those are leading

18     questions, Your Honor.

19          THE COURT:  Overruled.

20   BY  MR. BLACKER:

21     Q   And did you ever see, prior to his arrest --

22     withdrawn.

23          Do you know a woman named Catherine Ruiz?

24     A   Yes, I do.

25     Q   And how do you know that woman?

817

| | | |
|---|---|---|
| 1 | A | She was Pablo's girlfriend. |
| 2 | Q | And did you see Catherine Ruiz at Olga Diaz' house |
| 3 | | prior to Pablo's arrest? |
| 4 | A | Yes. |
| 5 | Q | How much prior to Pablo's arrest did you see her |
| 6 | | there? |
| 7 | A | Well, like once a week, I would see her. |
| 8 | Q | Let's talk in days, so we can define the period. |
| 9 | | I'm sorry if I wasn't articulate. |
| 10 | | Let's say the two weeks before Pablo's arrest. |
| 11 | A | Yes. |
| 12 | Q | Did you see Catherine Ruiz at Olga Diaz' home before |
| 13 | | then? |
| 14 | A | Yes, I think prior to the arrest, I had seen her, her |
| 15 | | daughter, Pablo's daughter. |
| 16 | Q | Whose daughter? |
| 17 | A | Pablo Diaz' daughter. |
| 18 | Q | Pablo's daughter? |
| 19 | A | Yes. |
| 20 | Q | Was Catherine Ruiz' daughter with Pablo's daughter? |
| 21 | A | Yes.  Everybody was together. |
| 22 | Q | In what context did you see them? |
| 23 | A | Everything looked fine to me. |
| 24 | Q | What I mean by "in context," Catherine Ruiz, was she |
| 25 | | visiting? |

MATZ, TRAKTMAN, FELDMAN AND WILDNER

818

| | | |
|---|---|---|
| 1 | | Was she living there with Pablo? |
| 2 | | Was she just stopping by to say hello? |
| 3 | A | At the time, she was staying there. |
| 4 | Q | She was staying at the Diaz home? |
| 5 | A | The daughter was not, but she was. |
| 6 | Q | Did you talk to Catherine Ruiz? |
| 7 | A | Every now and then, briefly. |
| 8 | Q | Do you know whether or not Catherine Ruiz ever left |

9   Olga Diaz' residence, if you know?

10       If you don't, you don't.

11   A   I don't.

12   Q   Did Catherine Ruiz ever indicate to you that she did

13   not want to be at Olga Diaz' residence, that she was

14   somehow held there against her will?

15   A   Not at all.

16   Q   Did she seem -- with whom was she --

17       Was she withdrawn?

18       Was she involved in a romantic relationship that you

19   were aware of?

20   A   Of course.

21   Q   Who was she with?

22   A   Pablo.

23   Q   And was there any indication to you that she wasn't

24   there willfully, knowingly?

25   A   She was there willfully.

819

1    Q   That is what you felt?

2    A   That is how I feel.

3    Q   Did you get any indication that she had any fear of

4 being there?

5    A   Not at all.

6          MS. CORONA:  Objection, Judge.  Speculation.

7          THE COURT:  Overruled.

8          MR. BLACKER:  Can I have a moment, Your Honor?

9          THE COURT:  Yes.

10 BY MR. BLACKER:

11   Q   You said that Pablo Diaz was working on these birds

12 with you?

13   A   Yes.

14   Q   Was he making any money?

15       Were you paying him?

16   A   Yes, I would pay him.

17   Q   When you would make a sale, you would pay him?

18   A   Yes.

19   Q   What was he doing?

20       What was his functions?

21   A   He had to feed the birds daily, and water them.  You

22 know, feed them, tend to them.

23       Sometimes, he would have to switch cages.

24       You know, he had a good job there.  He had work to

25 do.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

820

1  Q  Are these birds that are delicate in nature, or they

2  require a lot of care?

3  A  Yes.  These are show birds.

4     MS. CORONA:  Objection to this line of questioning.

5     THE COURT:  You know, I have allowed too much.

6     Sustained for now.

7     MR. BLACKER:  That was the end.

8  BY MR. BLACKER:

9  Q  Did you ever see Catherine Ruiz away from the mom,

10  Olga Diaz' house?

11     Did you see her where the birds were, or walking down

12  the street?

13  A  Oh, yes.

14  Q  You saw her?

15  A  She was at the farm with the birds.

16  Q  Did you ever see her when she was alone, or taking a

17  walk by herself without Pablo?

18  A  Around the farm, yes.

19  Q  Anywhere?

20  A  Yes.

21  Q  Like, she was walking like anyone would want to walk

22  around the farm and look around?

23  A  Yes.

24  Q  You saw her individually?

25  A  Yes.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

821

1      Sometimes, I would see her before I got to the house.

2  She would be in the yard.

3          MR. BLACKER:  Thank you.

4          I have nothing further.

5          Counsel, that witness is here.  Can we call him out

6      of turn?

7          MS. CORONA:  I have no cross-examination.

8          THE COURT:  Thank you, Mr. Acosta.

9          Call your next witness.

10         MR. BLACKER:  The defense would call Moises

11     Velazquez.

12  Thereupon:

13                      MOISES VELAZQUEZ

14  was called as a witness, and having been first duly sworn,

15  was examined and testified as follows:

16         MR. BLACKER:  Sorry, Mr. Velazquez.  Something came

17     up and we needed you.  Thank you for being here.

18                      DIRECT EXAMINATION

19  BY MR. BLACKER:

20   Q   Mr. Velazquez, my name is Michael Blacker.  Have you

21  ever seen me in your life?

22   A   Never seen you.

23   Q   Thank you.

1          I'm going to show you a report, because I know you

2     are not prepared for any of this, so I will let you look at

3     this.

4          When we talk, if you need it, just ask.

5          Do you remember around the summer of 2003, June 12,

6     2003, you were asked to go to a -- what was a crime scene

7     on June 12th at 1745 West Flagler, and interview some

8     witnesses, and you went there with Sergeant Sholasky

9     (phonetic)?

10    A    Yes.   That was my supervisor at the time.

11    Q    And do you remember when you went there, you went to

12    inquire about a Mr. Antonio Baldizin, the owner of the

13    cafeteria that was located at 1745?

14    A    I don't know if he was the owner, but he was supposed

15    to be there.

16         He managed the location.

17         I can't remember.

18    Q    And it turned out that you met at that point with a

19    person named Ilusion Abud, a woman, and you asked her if

20    she knew the whereabouts of Mr. Baldizin?

21    A    Yes.

22    Q    And do you remember what she indicated to you?

23    A    She indicated either she was his wife, or she lived

24    with him, or they were boyfriend and girlfriend, or husband

25    and wife, if I recall.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

823

1    Q   And you made it clear to her that you were looking

2  for Mr. Baldizin; is that correct?

3    A   That was the name we were provided, yes.

4    Q   And she told you that she didn't really witness

5  anything, but she knew a little bit about what had occurred

6  with the incident that you were inquiring about; is that

7  right?

8    A   I believe so, because we told her what it was about.

9        And she indicated that she was in the place, but she

10  mentioned that she was either working at the time, or knew

11  something about it.

12    Q   Wow, what a memory.

13        Have you reviewed any documents?

14    A   When I ran into the courtroom, they handed me the

15  court case reference to this, and clock-in sheet.

16        So while I was waiting outside, I was reading

17  quickly.

18    Q   So you have had a chance to review it?

19    A   The first paragraph and a couple paragraphs of my

20  report.

21    Q   And so when she indicated to you that she had some

22  familiarity with the facts, you interviewed her, didn't

23  you?

24    A   Yes, I did.

25    Q   And during the interview, she stated to you that she

MATZ, TRAKTMAN, FELDMAN AND WILDNER

824

1    heard a single --

2        MS. CORONA:  Objection as to leading.

3        THE COURT:  Sustained.

4    BY MR. BLACKER:

5      Q   All right.

6        Did you ask her about whether or not she heard any

7    shots?

8      A   At this point, I haven't read that far in my report,

9    so I would have to indicate in the report.

10       But what I can say, anything that was told to me is

11   indicated in my report.

12     Q   Sure.

13       Take a look and read it to yourself, please, sir.   In

14   the center of the page.

15       MR. BLACKER:  Sorry for the delay, Your Honor, but I

16     will take the blame.

17       Sorry, ladies and gentlemen.

18       THE WITNESS:  OK.

19   BY MR. BLACKER:

20     Q   You were making an inquiry as to her, and I will try

21   to be generic.

22       If you want to get into it, I would be happy to

23   listen.

24       But she indicated that she didn't see much, that she

25   was in the back of the restaurant, but that she did hear

825

1  something; is that correct?

2  A   That's generally what she said.

3  That's correct.

4  Q   And when you asked her if she heard any shots, she

5  said, yes, she heard a single shot; is that correct?

6  A   That's what I wrote down.

7  That's correct.

8  MR. BLACKER:  I have nothing further.

9  MS. CORONA:  I have no cross-examination.

10  THE COURT:  Thank you, Officer.

11  Thank you, Sergeant.  We appreciate it.

12  MR. BLACKER:  The defense calls Olga Diaz, please.

13  THE COURT:  Swear in the interpreter.

14  (Thereupon, the Official Court Interpreter was duly

15  sworn.)

16  THE CLERK:  State your name for the record.

17  THE INTERPRETER:  Raul Blanco.

18  Thereupon:

19                    OLGA DIAZ

20  was called as a witness, and having been first duly sworn,

21  was examined and testified through the interpreter as

22  follows:

23  THE COURT:  Thank you.  You may have a seat.

24  Does everyone stipulate to the qualifications of the

25  Official Court Interpreter?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

826

1        MR. BLACKER:  Yes, sir.

2        MS. CORONA:  Yes.

3                          DIRECT EXAMINATION

4    BY MR. BLACKER:

5        Q    Good afternoon.

6        A    Good afternoon.

7        Q    Would you tell us your name, please.

8        A    Olga Diaz.

9        Q    And where do you live, Mrs. Diaz?

10       A    19300 Southwest 194th Avenue, Miami, Florida, 33187.

11       Q    Mrs. Diaz, is Pablo Manuel Diaz your son?

12       A    Yes, sir.

13       Q    Do you remember back in 2003, he got arrested?

14       A    Yes, sir.

15       Q    In the summer?

16       A    Yes, sir.

17       Q    Let me take you back to that period -- before that

18   period.

19            Just a few weeks, OK?

20       A    OK.

21       Q    All right.

22            Do you know a person named Catherine Ruiz?

23       A    Yes, sir.

24       Q    Did you see Ms. Ruiz during the --

25            Let's call it the two- or three-week period, just to

                    MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    be safe, prior to June 20, 2003?

2    A    I met her on May 20th.

3    Q    May what?

4    A    May 20, 2003, around 8 o'clock that night.

5    Q    And approximately the first week, June 8th or June

6    9th, did you have an opportunity to meet with her again?

7    A    From May 20th, I would see her.

8    Q    Did there come a time when either you called her, or

9    she called you to pick her up at Brickell Avenue?

10   A    On June the 8th, around noon.

11   Q    Tell us what happened.

12   A    She called me.

13        She called and Pablo Manuel picked up the phone.  He

14   said she said --

15        And then he told me:

16        "She wants me to go pick her up, but I don't have a

17   car."

18        And he gave me the phone.  He gave the phone to me.

19   Q    Catherine wanted Pablo to go pick her up, but he

20   didn't have a car?

21   A    He didn't have a car, because he had had an accident

22   in my car, and I had a rental car which it could not --

23        He was not allowed to drive, because he was not on

24   the policy.

25   Q    So what did you say when she asked you to pick her up

1   on Brickell?

2   A   That I could not do it, because I was in a rented

3   car, and my husband would not allow me to go.

4   Q   And so were there any arrangements made to go meet

5   with her to go get her or anything of that nature?

6   A   About an hour later, she called me, and she asked me

7   if I could go to Dadeland to the Metrorail Station to pick

8   her up.

9       And I spoke with my husband, and he said if it's to

10   the Metrorail, yes, because that was closer to my house.

11   Q   And so what did you tell Ms. Ruiz?

12   A   About what time would she be at the Metrorail.

13   Q   So you made arrangements to pick her up?

14   A   We agreed to meet at Dadeland in about an hour, about

15   an hour and something minutes.

16   Q   And you went --

17       You picked her up; is that correct?

18   A   I picked her up at Houligan's.

19   Q   At Houligan's?

20   A   Yes.

21   Q   And did you drive with anyone on the way to pick her

22   up?

23   A   With Pablo; Pablo, my son.

24   Q   He was in the car?

25   A   Yes, with me.

829

1    Q    And you went to pick her up at Houligan's?

2    A    At Houligan's.

3    Q    That is across the street from the Dadeland Station?

4    A    On U.S. 1, crossing over.

5    Q    And when she came to the car, did she in any way say

6    she didn't want to come?

7    A    To go where?

8    Q    When she saw Pablo was in the car, did she indicate

9    in any way that she did not want to get in the car?

10   A    No.

11        She opened the door and she hugged Pablo.

12   Q    She hugged Pablo?

13   A    Yes.

14   Q    And did she get in the car?

15   A    Of course.

16   Q    Of course.

17        And who was driving?

18   A    I was.

19   Q    And where did you go?

20   A    Back home.

21   Q    Did she bring any overnight clothes with her or

22   personal effects?

23   A    A little bag with her belongings; liquid for her

24   hair, fake nails and clothing, a toothbrush, shoes, all of

25   the things that a person needs when that person is going to

830

1   stay at a place visiting.

2    Q  Had she told you on the phone that she was going to

3  come and stay or that she was going to come for a few

4  minutes, a few hours, or she was going to come stay?

5    A  She didn't tell me she was going to stay.

6       What she told me is, she asked me if I could go pick

7  her up at Dadeland.

8    Q  I see.

9       And so she just took it upon herself to pack up some

10  personal effects; is that correct?

11    A  Of course.

12       She had a bag with her.

13    Q  Where did you go when you picked her up?

14       Where did you drive to?

15    A  We went into Winn-Dixie, because I needed to buy a

16  few things for my meal, and then we went on home.

17    Q  You went home to your house?

18    A  This was mealtime.

19    Q  Did she stay there?

20    A  At my home?

21    Q  Yes.

22    A  Yes.

23       Ten days.

24    Q  She stayed in your house ten days?

25    A  Yes, through the 18th, which was a Wednesday.

1    Q    And when she got to your house -- how many bedrooms

2    do you have in your house?

3    A    That was the other house, the previous house, and it

4    had two bedrooms, Pablo's and mine, with my husband.

5    Q    The house that you -- that you -- sorry.  Are you

6    saying that two -- there's two homes?

7    A    OK, that time, when she went to my house, I was

8    living on 157th.

9         And now, I'm living on 194th, towards 194th.

10   Q    Let's confine ourselves to what you did back in 2003.

11   A    OK.

12        In that house.

13   Q    I didn't mean to confuse you.

14   A    I'm sorry.

15   Q    How many bedrooms was in the house that you had in

16   2003?

17   A    Two.

18   Q    And you and your husband stayed in one?

19   A    In one, and Pablo had his bedroom.

20   Q    And where did she stay?

21   A    In the room with Pablo.

22   Q    Had she ever stayed in that room with Pablo before

23   that time she came to visit you with some clothing?

24   A    No.

25        She would go to her house, or I don't remember.

832

1              The truth is, I don't remember.

2              Maybe she stayed there once, but I don't remember.

3      If it happened, actually, I don't --

4              MR. BLACKER:  May I have a moment with counsel,

5          please, Judge?

6      BY MR. BLACKER:

7      Q    So it's in the beginning of June 2003 that now she is

8      staying in your home and she --

9              You said she stayed there for ten days; is that

10     correct?

11     A    Yes, sir.

12     Q    Did she indicate in any way that she did not want to

13     be there?

14     A    She was at home, because supposedly, she had her

15     little girl at her mom's, and supposedly, she --

16             This one wanted that, too, because she would get

17     there, and she was always on him.

18     Q    And did she ever leave your house to take trips

19     anywhere, or day trips, and return in the evening, or

20     return the next day, during that period of time in June of

21     2003?

22     A    She was here in Miami, and I brought her to the

23     Metrorail like today, and the following day, she called me,

24     also, to go pick her up at Dadeland, because supposedly,

25     she told me that she was here to pick up some money that

833

1   her mother was going to give her.

2   Q   So during, let's say, the ten days before Pablo got

3   arrested she --

4   A   I'm sorry, she left on the 18th.

5   Q   OK.

6   A   And Pablo was arrested on the 21st.

7   Q   How many occasions did she leave your house to go

8   somewhere and come back?

9   A   Here in Miami, one occasion alone.

10      Only once alone.

11  Q   And did she travel by herself?

12      You dropped her off at this station and she would

13  travel by herself?

14  A   Yes, sir.

15  Q   Did she ever visit your home with her daughter during

16  that period?

17  A   No.  Before June 8th.

18  Q   And did it seem --

19      How did Pablo and Catherine seem to you as a couple?

20      Did they seem -- tell us about that.

21      Were they lovers?

22      Were they friends?

23      Were they --

24  A   Catherine and Pablo seemed, it looked like a couple,

25  but not normal, normal, because --

MATZ, TRAKTMAN, FELDMAN AND WILDNER

834

```
 1              (Comment made in the Spanish language.)

 2         MS. CORONA:  Objection, Judge.

 3         THE COURT:  Sustained.

 4    BY MR. BLACKER:

 5    Q    Was Catherine free to use the telephone at your home?

 6    A    Of course.

 7         She would call her mom.

 8         She would call Coral Gables Police, and she had the

 9    brother of her stepfather was a lieutenant.  She spoke to

10    Morin.

11    Q    She spoke to Detective Morin?

12    A    Yes.

13    Q    At your house?

14    A    Yes, on the telephone.

15         On the list that I got from Bell South, you have the

16    telephone numbers.

17         She spoke -- check on the list.  The mother's phone

18    is 305 --

19    Q    Speak in Spanish only, please.

20    A    Sorry.

21         MR. BLACKER:  May I -- this is marked.  May I

22    introduce the phone toll records, please?

23         THE COURT:  Any objection?

24         MS. CORONA:  No, Judge.

25         THE COURT:  It will be admitted.
```

MATZ, TRAKTMAN, FELDMAN AND WILDNER

835

1     THE CLERK:  Defense Exhibit marked for Identification

2    purposes as A17 will now become Defense Exhibit "Q."

3     (Thereupon, the exhibit referred to was marked as

4    Defense Exhibit "Q," and was received in Evidence.)

5     MR. BLACKER:  Thank you.

6    BY MR. BLACKER:

7    Q  Mrs. Diaz, let me present you with Defense Exhibit

8    "Q."

9     Can you tell us what that is?

10   A  This part here in the front, this is the -- under

11   whose name the telephone bill to my house was.

12   Q  So what was the number of your telephone at the

13   house, your telephone?

14   A  305-255-1217.

15   Q  And is that the telephone toll records for that very

16   number, 255-1217?

17   A  Let me check the number here.

18   Q  Can you look at that document and see if you

19   recognize any numbers that you know were numbers that --

20   A  This is the telephone number to Catherine's house.

21   Q  What is that?

22   A  305-579-0060.

23   Q  And do you know what Catherine's mother's number is?

24   A  One moment.

25    The mother's or the dad's is 305-219-4111.

836

1   Q  That's the mother of Catherine Ruiz; is that correct?

2   A  Yes.

3   Q  Look at the back of the exhibit, the last few pages,

4  and tell us the last date in which there was a telephone

5  call to the mother of Catherine Ruiz.

6   A  Let me see what day it was.  This was the 21st.  On

7  the 18th.

8   Q  On the 18th?

9   A  The day she left, the last day.

10   Q  Yes, the last day.

11     What date do you see a call to Catherine's mother on

12  that toll record?

13   A  I see one here.

14   Q  What is the date of the call, please; the date of the

15  call?

16   A  One moment.

17     MR. BLACKER:  May I assist her, Judge, in pointing at

18  something without saying anything?

19     THE WITNESS:  Date, yes, it's here.  18th.  This is

20  the --

21     Catherine's mom's phone number.

22  BY MR. BLACKER:

23   Q  And what is the date that that phone call is made?

24   A  June 10th.

25   Q  How about this call?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

837

1    A    Oh, yes, 12th.

2    Q    The 12th of June?

3    A    One, two --

4         One, two, three, four, five.

5         Five calls.

6    Q    Let's keep going.

7         How about this call?

8    A    On the 14th.

9    Q    The 14th of June?

10   A    Let me check.  Let me check.

11   Q    But I want you to answer a few questions.

12   A    The time when she called, which was before Father's

13   Day.

14   Q    Mrs. Diaz, did you ever call Catherine Ruiz' mother's

15   number, you?

16   A    Never.

17        I don't even know her.

18   Q    Do you know whether or not your husband knows the

19   Ruizes; Catherine Ruiz' parents?

20   A    My husband?

21   Q    Yes.

22   A    No.

23   Q    OK.

24   A    Never.

25   Q    Do you know whether or not Pablo was speaking on the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

838

1   phone to Ms. Ruiz?

2    A   I don't know, but I don't think so, because they

3   didn't know each other.

4      They had no bonding.

5    Q   And let me ask you this:

6      You said you knew the date that she left was the 18th.

7   How do you know that?

8    A   Because I —

9    Q   I'm sorry?

10    A   On the 14th, Maitay (phonetic), which is Jessica's

11  mother--

12    Q   Who is Jessica?

13    A   Pablo's daughter.

14    Q   The mother of Jessica.

15      OK, what happened?

16    A   We went to take the girl, because it was Father's Day

17  the following day, and she told Maitay to take her to

18  Miami.

19    Q   Who is she?

20    A   Maitay?

21    Q   No.

22      Who told Maitay to take her to Miami?

23    A   Catherine.

24    Q   Fine.

25      Go ahead.

839

1  A    She told Maitay to take her to Miami.

2       Maitay took her to Miami to get some money, clothing.

3  I don't know.

4  Q    OK.

5  A    She wanted to go back, and she would call Pablo.

6       Pablo had gone to bed with the little girl, and he

7  didn't want her to go back.  He wanted her to stay over

8  there where she was.

9       So he called Maitay on her cell phone and told her:

10      Leave her in Miami.  Don't bring her over here.  I

11 want to spend the day with the little girl.

12      And she had Maitay take her back to where I live, the

13 Redlands.

14 Q    So you remember the date because it was Father's Day

15 in that weekend?

16 A    Because it was Father's Day.

17      Pablo wanted her to go to Miami.

18 Q    I understand that.

19 A    And I said, on Wednesday, I'm going to Miami.  If

20 anybody wants to, they could come along with me, because

21 I'm not going back the rest of the week at all.

22 Q    Take a look at Defense Exhibit "Q" and take a look,

23 and see if --

24      See the last call that was made to the number that

25 you've said was Dr. and Mrs. Ruiz.

1    A    How is that again?

2    Q    The last call that was made to Catherine Ruiz'

3    mother.

4    A    17th.  One moment.  17th.

5    Q    And what month is that?

6    A    June.

7    Q    Did Catherine Ruiz, when she spent that ten days with

8    you, did she participate in the activities that the family

9    was participating in?

10   A    No.

11   Q    She didn't?

12        She didn't eat with you as a family?

13   A    Not at the table, because she had great respect for

14   my husband, because my husband didn't like her so well.

15        MS. CORONA:  Objection, Judge.

16        THE COURT:  Sustained.

17        MR. BLACKER:  I have nothing further of this witness.

18                     CROSS-EXAMINATION

19   BY MS. CORONA:

20   Q    Good afternoon, Mrs. Diaz.

21   A    Good afternoon.

22   Q    Let me show you here these phone records beginning on

23   June 8th of 2003.

24        Correct?

25   A    How is that?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

841

1    Q    June 8th of 2003, the first call, right?

2    A    Yes.

3    Q    These numbers -- right? -- 579-0060, whose number is

4    that?

5    A    That's Catherine's house.

6    Q    So that is at 2:13 a.m. that that call is made to

7    Catherine's house on June 8th?

8    A    Yes, at 7 p.m.

9    Q    No.

10        2:13.

11        That is what it says, right?  2131?

12   A    Is that 7 p.m.?

13        7:55 -- at seven fifty-five minutes.

14   Q    And the next call is made at what time?

15   A    2003, June, 4:10.

16   Q    And that's somebody from your house calling Catherine

17   Ruiz' house, right?

18   A    Yes.

19   Q    And the next phone call is at what time?

20   A    On the 8th at 4 --

21        14 minutes after 4.

22   Q    No.

23        The next call to Catherine Ruiz' house, that 579

24   number.

25   A    That is for three thirty-four minutes, 4 a.m.

842

1    Q   And the next phone call, what time is that made to

2    Catherine Ruiz' house?

3    A   9:49.

4    Q   And at 9:51, there was another call made to another

5    phone number.

6        Whose phone number is that?

7    A   That's Catherine's cell phone number.

8    Q   And at 9:53, there is another call -- wait -- 9:56.

9    9:56, whose phone number is that?

10   A   9:56.  Cathy.

11   Q   At 10:04?

12   A   Cathy's house.

13   Q   10:22?

14   A   Cathy's cell phone number.

15   Q   10:23?

16   A   Cathy's cell phone.

17   Q   And then at 2:38?

18   A   Cathy's house.

19   Q   And at 2:40?

20   A   Cell phone.

21   Q   2:41?

22   A   Home.

23   Q   2:47?

24   A   Her cell phone.

25   Q   And so all of these --

843

1   Let me ask you --

2   One, two, three, four, five, six, seven, eight, nine,

3 ten, 11, 12, 13.

4   13 phone calls from 4 o'clock in the morning to 2

5 o'clock in the afternoon that day.  Who made all of these

6 phone calls?

7  A I don't know.  I don't know.

8  Q Was it --

9  A I picked up Cathy around the noon hour, lunch hour.

10  Q Is your testimony still today that Catherine called

11 you at 9 o'clock in the morning?

12   Does that refresh your recollection that you, in

13 fact, called Catherine between --

14  A No.

15   Catherine called me around the noon hour.  I cannot

16 have control over my --

17   There were three telephones there.

18  Q You are saying that you were not the person that made

19 these 13 phone calls to Catherine?

20  A No, I didn't call her.

21   I didn't call her.

22  Q Somebody from your house, though, made those phone

23 calls to Catherine's house and cell phone repeatedly?

24  A I don't know who did.

25   I don't know.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

844

1        MS. CORONA:  I have nothing further.

2        THE COURT:  All right.  Thank you.  All right.

3        THE WITNESS:  I came here to speak the truth.

4        THE COURT:  Thank you, Mrs. Diaz.  Watch your step,

5     all right?

6        Ladies and gentlemen, let me have you go into the

7     jury room.

8        Do not discuss the case amongst yourselves.

9        (Thereupon, the jury panel exited the courtroom, and

10    the following proceedings were had outside the presence of

11    the jury panel:)

12       MR. BLACKER:  One word.  I need a cup of coffee.  Can

13    I get a quick cup?

14       THE COURT:  Is your client going to testify?

15       MR. BLACKER:  No, Your Honor.

16       THE COURT:  All right.  Mr. Diaz --

17       We're on the record.

18       You realize, sir, that you have a constitutional

19     right to remain silent?

20       THE DEFENDANT:  Yes.

21       THE COURT:  And let's put him under oath.

22       (Thereupon, the defendant was duly sworn.)

23       THE COURT:  Your name and your age.

24       THE DEFENDANT:  Pablo Diaz, 31.

25       THE COURT:  Your lawyer says that you wish to remain

MATZ, TRAKTMAN, FELDMAN AND WILDNER

845

1    silent.

2         Is that correct?

3         THE DEFENDANT:  Yes.

4         THE COURT:  Whose decision is that?

5         THE DEFENDANT:  Both of ours.

6         THE COURT:  Well, your lawyer can advise you, but at

7    the end, it has to be your decision.

8         And you have a constitutional right to remain silent.

9         He tells me that you wish to exercise that.

10        So do you wish to testify?

11        THE DEFENDANT:  No.

12        THE COURT:  All right.  And at the end, whose

13   decision is that?

14        THE DEFENDANT:  Mine.

15        THE COURT:  All right.

16        And you realize that if you wanted to testify, you

17   would have the opportunity to do that right now?

18        THE DEFENDANT:  I do.

19        THE COURT:  OK.  All right.

20        You want to do that?

21        THE DEFENDANT:  No.

22        THE COURT:  You want to remain silent?

23        THE DEFENDANT:  Yes.

24        THE COURT:  All right.

25        And are you --

846

1    You say that you are presenting something else?

2    MR. BLACKER:  I have one more exhibit.

3    The knife.

4    THE COURT:  The knife?

5    MR. BLACKER:  By stipulation, we will put that in.

6    THE COURT:  All right.

7    MS. CORONA:  I can agree by stipulation, but I don't

8    want counsel to get up and testify about the knife when

9    it --

10   MR. BLACKER:  I will just enter it as an exhibit.

11   THE COURT:  Once it is evidence, he could talk about

12   it.

13   MS. CORONA:  In closing or whatever, but testimony --

14   THE COURT:  Right.

15   Now, Mr. Diaz, your lawyer says that all that remains

16   is for him to introduce the knife.

17   Are you satisfied with the defense as presented and

18   with the witnesses presented?

19   THE DEFENDANT:  Yes.

20   THE COURT:  After that, it is just going to be the

21   closing argument, the jury instructions, and that is the

22   end of the case.

23   Do you understand?

24   THE DEFENDANT:  OK.

25   THE COURT:  Obviously, your lawyer is an excellent

1    lawyer.  I see --

2      All I do is trial work, and I see a lot of good

3    lawyers.

4      Michael stands over and above the majority of the

5    lawyers.  He is quite a lawyer.

6      I have always known him to be an excellent lawyer,

7    but actually, to now preside over one of his cases has

8    been a pleasure and honor for me as a Judge.

9      Are you in agreement that you have an excellent

10    lawyer here?

11      THE DEFENDANT:  Yes.

12      THE COURT:  And you are in agreement with his

13    strategy, his theory of defense in the case?

14      THE DEFENDANT:  Yes.

15      THE COURT:  Now, let's go over the jury instructions.

16      We gave you a new packet, and we have statement of

17    the charges.

18      Introduction to attempted homicide.

19      No objection?

20      MS. CORONA:  No objection.

21      MR. BLACKER:  Hold on a second, Judge.

22      I'm so sorry.

23      I'm trying to compare my notes that I took with my --

24    if you could just give me --

25      THE COURT:  I would like to do this as quickly as

1    possible, especially in light of the fact that we have

2    already gone over it in chambers.

3        MR. BLACKER:  We have an objection -- no, we do not

4    have an objection to that.

5        THE COURT:  Attempted felony murder.

6        Any objection?

7        MR. BLACKER:  Yes.

8        Pursuant to Thompson versus State at 814 So.2d 1103,

9    and Gray, I won't cite the case, because the Court is

10   well aware of them.

11       This instruction, the law requires an intentional

12   act, which is not an essential element of the felony that

13   was part of the attempted murder.

14       And in this case, the fact that the charge is that

15   Pablo Diaz shot, discharged a firearm at Catherine Ruiz

16   or which could have caused her death, that also could be

17   construed essential element of the kidnapping, because of

18   the terrorization portion of that charge.

19       THE COURT:  All right.

20       Your objection is noted.

21       It's overruled, because kidnapping doesn't need the

22   shooting.

23       By the way, going on the Information, Count I, we

24   discussed in chambers when I met briefly with the lawyers

25   just to --

849

1           We met off the record just to review the

2      instructions, that the State was going to amend Count I,

3      where it says:

4           By shooting at Ms. Ruiz.

5           They were going to amend it to:  By shooting at

6      Catherine Ruiz.

7           The defense stated that they have no objection; is

8      that correct?

9           MR. BLACKER:  No objection.

10           THE COURT:  So amend Count I, Ms. Corona.

11           Where it says "Ms.," you are substituting the word,

12      "Catherine."  All right.

13           No objection, Mr. Diaz?

14           THE DEFENDANT:  No, no.

15           THE COURT:  All right.

16           MR. BLACKER:  Judge, let me just do this.

17           I don't want to get into any trouble.

18           Let me object for the record, and you make your

19      ruling.

20           THE COURT:  You said before that you were not

21      objecting; that it was just a matter of form that she

22      forgot to put in the Information.

23           At that point, she did mention right before Catherine

24      Ruiz, by shooting at Ms. Ruiz, and her amendment is just

25      "by shooting at Catherine Ruiz."

MATZ, TRAKTMAN, FELDMAN AND WILDNER

850

1      MR. BLACKER:  I believe it is a form, and I believe

2  that the objection will be sustained, but because I

3  objected to the other charges that were committed --

4      THE COURT:  That was a different count.

5      MR. BLACKER:  I agree.  I'm going to stick to -- with

6  my word.

7      I'm not going to object to that, because I don't

8  think --

9      The objection would be sustained.

10     THE COURT:  All right.

11     Kidnapping.

12     Any objections?

13     MR. BLACKER:  No.

14     THE COURT:  Aggravated assault.

15     Any objection?

16     MR. BLACKER:  Yes.

17     Can I say it quickly?

18     THE COURT:  Yes, of course.

19     MR. BLACKER:  I would like Paragraph 3 to say that in

20  the mind -- in the second line --

21     Well, let me just read the sentence.

22     The act of Pablo Diaz pointing a firearm at Catherine

23  Ruiz -- Dennis Flores repeated, in the mind of Dennis

24  Flores, a well founded fear of imminent bodily injury to

25  him.

851

1     THE COURT:  All right.

2     That's how you want it.

3     Your objection is noted.

4     Overruled.

5     I will leave it the way that it is, which it says:

6     "In the mind of Dennis Flores, a well founded fear

7    that the violence was about to take place," which is the

8    standard language in the standard jury instructions.

9     When there are lesser-included crimes.

10    And the defense said that they did not want lesser-

11   included crimes.

12    The State wanted lesser-includeds; is that correct?

13    MS. CORONA:  Correct.

14    MR. BLACKER:  I object to any lesser-includeds.

15    THE COURT:  When either side requests, I have to give

16   them.

17    And the lesser-includeds for attempted felony murder

18   are attempted second-degree murder, attempted voluntary

19   manslaughter, aggravated battery and battery.

20    The lesser-included crimes for kidnapping:

21    False imprisonment.

22    The lesser-included crime indicated in the definition

23   of kidnapping is false imprisonment.

24    The lesser-included crime indicated in the definition

25   of aggravated assault is assault.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

852

1        Now, attempted second-degree murder.

2        Any objections?

3        MR. BLACKER:  Yes.

4        You said attempted second-degree murder?

5        THE COURT:  Yes.

6        MR. BLACKER:  Objection.

7        THE COURT:  What is the objection?

8        MR. BLACKER:  The lesser-included.

9        THE COURT:  Other than that?

10       MR. BLACKER:  And I'm sorry, Judge, there is no

11   depravity here in the case whatsoever in terms of --

12       THE COURT:  Attempted voluntary manslaughter.

13       Any objection?

14       MR. BLACKER:  Yes.

15       It doesn't fit the facts of the case.

16       THE COURT:  Aggravated battery.

17       Any objection?

18       MR. BLACKER:  Yes, because it's a lesser.

19       THE COURT:  Battery.

20       Any objection?

21       MR. BLACKER:  Same objection.

22       THE COURT:  False imprisonment as a lesser-included

23   offense of Count II, kidnapping.

24       Any objection?

25       MR. BLACKER:  Yes.

853

1    THE COURT: Just the fact that it is a lesser?

2    MR. BLACKER: Yes.

3    THE COURT: Assault as a lesser-included of Count

4    III.

5    Any objection?

6    MR. BLACKER: Yes; that it is a lesser.

7    THE COURT: All right.

8    Plea of not guilty, reasonable doubt and burden of

9    proof.

10    Any objection?

11    MR. BLACKER: No.

12    THE COURT: Weighing the evidence.

13    And the way it reads, either paragraphs.

14    Any objection?

15    MS. CORONA: No, Judge.

16    MR. BLACKER: No.

17    THE COURT: Expert witnesses.

18    Any objections?

19    MR. BLACKER: No, other than I have made my

20    objections to the expert previously, and will ask that

21    you carry it over.

22    In other words, I ask that you under --

23    I ask that you strike his testimony under the rules

24    and --

25    Not strike his testimony, but strike the fact that

854

1      you found him to be an expert.

2          His testimony revealed that he is not an expert and

3      didn't act as an expert.

4          THE COURT:  I did not find him in front of the jury,

5      as everybody noted.

6          To be an expert, it is up to the jury to decide; not

7      up to the Court.

8          I simply allowed him to render his opinion.

9          And, you know, I think this is taken care of easier

10     with a closing argument, because an expert witness is

11     like any other witness.

12         You can tell the jury to disregard their testimony.

13         Defendant not testifying.

14         We will take that one.

15         Let's take out defendant testifying.

16         Defendant's statement.

17         I didn't hear any.

18         Post-arrest statement, I think we could take that one

19     out.

20         Are both sides in agreement?

21         Rules for deliberation.

22         Cautionary instructions.

23         Single defendant, multiple counts.

24         The verdict.  You have the verdict form.

25         Any objection?

1    MR. BLACKER:  Yes.

2    I would like the substantive count to -- which Mr.

3  Diaz is charged -- to be separated from any of the

4  enhancements counts and/or the discharge count.

5    They should be on separate papers.

6    Let the jury find whether he committed any of the

7  substantive crimes.

8    And then the other one.

9    THE COURT:  I will do it the way it is.  That's the

10  way I normally do it, and the jury never had a problem

11  with it -- with the -- where they actually mark what

12  applies.

13    Other than that objection, any other objections?

14    MR. BLACKER:  No.

15    THE COURT:  All right.

16    How long do you need for closing?  Hopefully less

17  than an hour apiece.

18    MR. BLACKER:  Judge, for the record, you told me

19  before that I didn't have to physically make a second

20  JOA; that you were going to let the record reflect that

21  it was made, all of the objections were renewed.

22    THE COURT:  No.

23    Let's do that now.  Let's do that.

24    That was before -- after the State rested.

25    Now, you will rest your case in front of the jury

1      after you introducing that remaining knife.

2          And State, you are not presenting a rebuttal, are

3      you?

4          MS. CORONA:  No, Judge.

5          THE COURT:  All right.

6          So at this time, you may make your motion for

7      judgment of acquittal and renew all prior motions and

8      objections.

9          MR. BLACKER:  Yes.

10         THE COURT:  As to the prior motions and objections,

11     same ruling.

12         As to motion for judgment of acquittal, anything else

13     that you need to say?

14         MR. BLACKER:  You've heard one additional piece of

15     the evidence as to the aggravated assault and the

16     lessers.

17         That is, you heard a police officer who, on three

18     days after the alleged event, four days, went and

19     interviewed the witness, who said that she heard two

20     shots.

21         She said she heard one shot.

22         If there was one shot, we know where that shot was,

23     and it was outside of the car, and was not at Catherine

24     Ruiz, and therefore --

25         I'm sorry.

1    Yes. Therefore, I move to dismiss the felony, the

2    attempted felony murder.

3    And the other evidence, you haven't heard any

4    additional evidence as to Dennis Flores, so I'm just

5    going to renew my argument as to the other two counts.

6    THE COURT: Motion for judgment of acquittal as to

7    all counts is denied.

8    As to the jury instructions, is the defendant

9    satisfied with your lawyer's choice of jury instructions?

10    THE DEFENDANT: Yes.

11    THE COURT: And Michael, are you conceding any

12    element of the crime?

13    Are you conceding any lessers or anything? Because

14    if you are, in closing argument, I need to know now so I

15    could go over it with your client and make sure he is in

16    agreement.

17    MR. BLACKER: I'm not going to concede any lessers,

18    but I might concede some elements.

19    But, Judge, it would take me longer to do that right

20    this second.

21    THE COURT: You are going to argue to the jury that

22    the defendant should be found not guilty of all charges?

23    MR. BLACKER: I am.

24    THE COURT: And there might be facts and elements

25    that you may concede?

858

1     MR. BLACKER:  Hold on one second.

2         Can I have a second with him, please?

3     THE COURT:  Mr. Diaz --

4     MR. BLACKER:  We are not going to concede any crime

5     unless the assault is lesser assault of the aggravated

6     assault does not carry the discharging of the firearm.

7     THE COURT:  No, it's a misdemeanor.

8     MR. BLACKER:  Pardon?

9     THE COURT:  It's a misdemeanor.

10    MR. BLACKER:  We might concede the misdemeanor, yes, and,

11    yes, sir.

12        And I want to ask the Court, is there any other

13    count, lesser count in which the defendant is not going

14    to be enhanced as by discharging a firearm, possessing

15    the firearm or by a PERP, or HVO?  Are there any other

16    counts that --

17        THE COURT:  The only one that I would think would

18    be --

19        State, the only one that I would think, if he doesn't

20    get enhanced in any way, is assault.

21    MS. CORONA:  Misdemeanor assault, not if they find he

22    had a firearm.

23        If he --

24        If they find he carried a firearm, it is a first-

25    degree felony.

859

1  The aggravated assault, if they find him--

2  THE COURT:  Will be.

3  MS. CORONA:  If they find him to have carried a

4 firearm, it is a three-year minimum mandatory under the

5 ten/twenty/life, and it is --

6  He is facing up to ten years.

7  MR. BLACKER:  On the assault --

8  MS. CORONA:  If they find with a firearm.

9  THE COURT:  If they find him guilty --

10  Where is the verdict form?

11  Let me see it.

12  MR. BLACKER:  Judge, I can't think of any -- how

13 could that be?

14  THE COURT:  The aggravated assault count, if he is

15 found guilty of aggravated assault, that is a third-

16 degree felony.

17  If he is found guilty of that, with a firearm, it's a

18 three-year minimum mandatory.

19  MR. BLACKER:  And it goes to 15, does it not?

20  MS. CORONA:  Ten.

21  It just doubles it, because HVO.

22  THE COURT:  It may not, because it's a crime that

23 requires the use of a firearm.

24  MS. CORONA:  They have to find the aggravated

25 assault, that he carried a firearm.

860

1      THE COURT:  And if he is found guilty of aggravated

2      assault as an HO, he is facing ten years with a three-

3      year minimum mandatory.

4         All right.  Yes.

5         But it --

6         When you use a firearm in other crimes, it will

7      double, except that one, because that one requires the

8      use of the firearm.

9      MS. CORONA:  Right.

10     THE COURT:  So the only one that does not enhance in

11    any way is the assault and aggravated assault.

12       The max would be ten.

13    MR. BLACKER:  Could I have a moment?

14      Judge, we may --

15      I wouldn't totally concede, but we may argue to the

16    jury perhaps the aggravated assault is a lesser of the

17    attempted felony murder, and the simple assault is a

18    lesser of the aggravated assault.

19    THE COURT:  Let me tell you something.  Let me make

20    sure we understand.

21      On the lesser of the attempted murder is aggravated

22    battery, and so no surprise, it carries a 20-year minimum

23    mandatory.

24    MR. BLACKER:  But aggravated assault is a second

25    degree, and that is a 30-year, which we will not agree to

MATZ, TRAKTMAN, FELDMAN AND WILDNER

861

1       that.

2            The aggravated assault, I --

3            You were talking about is a lesser aggravated assault

4       of kidnapping.

5            It is a crime, itself.

6            THE COURT:   Aggravated assault, Count III, the

7       aggravated assault on Mr. Flores, that one carries up to

8       ten years.

9            MR. BLACKER:   We are not conceding that in the least.

10           We may concede the assault, but probably not, if that

11      is for Flores.

12           All right.

13           Judge, may I please get a cup of coffee?

14           THE COURT:   Yes.

15           Wait till Jimmy comes back.

16           OK.  So, Mr. Diaz, we are still on the record.

17           Are you in agreement that your lawyer may argue to

18      this jury that they go ahead and find him guilty of

19      assault?

20           THE DEFENDANT:   Yes.

21           THE COURT:   All right.   All right.   Great.   Great.

22      Let's take a ten minute break.

23           (Thereupon, a brief recess was taken, after which, the

24      following proceedings were had outside the presence of the

25      jury panel:)

862

1    THE COURT:  Ready for the jury?

2    Anybody that's going to come in, come in now.

3    All right.

4    Let's have the family sit on this side.

5    No reaction to anything that's said.

6    Bring in the jury.

7    (Thereupon, the jury panel entered the courtroom, after

8    which, the following proceedings were had in open court:)

9    THE COURT:  Let the record reflect that the defendant

10   is present, as he has been throughout the trial.

11   And Mr. Blacker, is there something you wanted to

12   introduce?

13   MR. BLACKER:  There is, Your Honor.

14   We would like to introduce as a defense exhibit --

15   it's marked as State's exhibit, but it's a defense

16   exhibit.

17   THE COURT:  Please change it, Kathy.

18   THE CLERK:  I will renumber it when it goes to

19   evidence.

20   MR. BLACKER:  We would like to introduce this object.

21   THE COURT:  For the record, that's a knife, and it

22   becomes --

23   THE CLERK:  State's Exhibit marked for Identification

24   purposes 2C will now becomes Defense Exhibit "R."

25

863

1    (Thereupon, the exhibit referred to was marked as Defense

2    Exhibit "R," and was received in Evidence.)

3         MR. BLACKER:  Thank you.

4         THE COURT:  All right.

5         MR. BLACKER:  At this time, Judge, Pablo Manuel Diaz

6    would rest.

7         THE COURT:  All right.

8         And same ruling.

9         Ladies and gentlemen, both the State and the defense

10   have now rested their cases.

11        The attorneys now will present their final arguments.

12        Please remember that what the attorneys say is not

13   evidence.  However, do listen closely to their arguments.

14   They are intended to aid you in understanding the case.

15        Each side will have equal time, but the State is

16   entitled to divide its time between an opening argument

17   and a rebuttal argument after the opponent has spoken.

18        State.

19        MR. GROSS:  Good evening again.

20        I want to thank you first for your patience.  This

21   trial has lasted quite a long time, and it means a lot to

22   the defense and the State.

23        I want to start out by saying that what appears to be

24   a month ago was actually only two weeks ago.

25        I came up here and I said some -- euphemistically

864

1    said you may not like the State's witness, the victim,

2    Catherine Ruiz.

3    I think the light in which language I used was you

4    would not embrace her.

5    Well, as you can see, I'm sure some of you were

6    feeling that's just the tip of the iceberg.

7    I mean, if we could remember, Catherine Ruiz sat in

8    this chair, and she had a very large Chanel bag on that

9    stand.

10    She came in here, and she's not working.  Right.

11    Her dad, who is a doctor, is supporting her.

12    She has a child.  The child is not with her.  The

13    child is being taken care of by her mom while she goes to

14    South Beach and parties.

15    Some of you were thinking, "Man, I don't like her."

16    Well, I will tell you right now, I don't know if I

17    like her.

18    But you know what?  It doesn't matter.

19    First and foremost, the law says, and co-counsel

20    during voir dire said that it is not about who you like,

21    about liking the witness, not liking the witness.

22    It's about following the law.

23    Clearly, Ms. Catherine Ruiz has a problem.  She's a

24    victim.

25    We can all agree that Catherine Ruiz has a problem.

865

1       As a matter of fact, Detective Morin took the stand,

2    and she is a detective -- sergeant.  She has seen many,

3    many victims in her years and years as a police officer.

4       And she said victims of domestic violence -- this is

5    a clear case of someone who is a victim of domestic

6    violence, and someone who would go back to someone after

7    they do such traumatic events.

8       This is not crazy.  This is how they act.

9       This is why that man took advantage of her.

10      It's not her fault, OK?

11      She's the victim here.

12      You do not have to like her.

13      Now, with that said, I also promised -- I said that

14    this-- these facts would be something of a made for TV

15    thriller.

16      Well, I apologize, because I don't think this case

17    was all that exciting.

18      But with that being said, what is going to be

19    exciting is the defense attorney, when he comes up here

20    after me, and will try to defend his case, because I

21    can't wait, and you should hang on every word.

22      Now, as the Judge said and defense said during

23    opening of voir dire, they could just sit there and read

24    the newspaper.

25      Well, the State submits to you they won't.

866

1    They will be very creative, and we could just guess

2    what they are going to do.

3        What can the defense say?

4        Well, as a matter of fact, we learned that you can't

5    have your cake and eat it, too.

6        The defense attorney stood before you and went like

7    this, and asked Lesbia Morales -- I'm sorry -- and said

8    to Antonio Baldizin, the owner of the cafeteria:

9        Did he shoot the gun like this?

10       How did he shoot and fire the gun?

11       You can't have your cake and eat it, too.

12       When Lesbia Morales was on the stand, he said:

13       Well, you-- did he pretend?

14       Did he pretend to show you the gun, or not pretend to

15   show you the gun?

16       You can't have your cake and eat it, too.

17       That man had a gun.  There is no doubt about it.

18       And this attorney is a very good attorney, and he

19   tried very, very hard for his client, but the facts are

20   the facts.

21       Now, will the defense say that someone else committed

22   these crimes?

23       I want you to listen to him when he comes up here.

24       There can be no question that Pablo Diaz committed

25   these crimes.

1       What about self-defense?

2       There is not going to be anything about self-defense.

3   I want you to listen for that, too.

4       What about this one?

5       All this was a hoax.

6       Now, you saw Catherine Ruiz.  She took the stand.

7   I want you to think about this:

8       Is it possible that Ms. Ruiz was so upset about this

9   $3600 that --

10      You met Ms. Ruiz.

11      Now, did she hire someone and they fabricated this

12  surveillance video, and got someone that looks just like

13  her and someone that looks just like him, painted tattoos

14  on the arm and paid off these good Samaritans?

15      Is that possible?

16      No.

17      This really happened.  This case is not about --

18      Well, it is about Catherine Ruiz.

19      But this trial, OK, not only is about Catherine Ruiz'

20  credibility, but there are eight other witnesses that the

21  State brought forward.  You need to weigh theirs, too.

22      Independent witnesses.

23      Physical evidence.

868

1      Good Samaritans who have nothing to do with Pablo

2   Diaz' family, who have nothing to do with this person,

3   Attie, in South Beach, and doing drugs.  Nothing.

4      They all saw this man, Pablo Diaz, terrorize

5   Catherine Ruiz.

6      Now, also, how will the defense explain not only the

7   9-1-1 tapes, which co-counsel will go through, but these

8   machine calls?

9      Now, the transcript was read to you, with words such

10  as:

11     "I wonder how much skin I could take off Kasiana

12  (phonetic).  I wonder how much skin that he could take

13  off someone's daughter.

14     Why would someone say those words?

15     What about:

16     "Wake your ass up.  I'm going to give you till

17  tomorrow night to bury you."

18     You heard the tape.

19     "You know what I'm capable of doing.  Don't mess with

20  me.  I'm preparing your picture to bury you -- to bury

21  you tonight."

22     Why would someone say those words?

23     Does that answering machine message have anything to

24  do with whether Catherine Ruiz grabbed a knife?

25     Does it have anything to do with Catherine Ruiz going

MATZ, TRAKTMAN, FELDMAN AND WILDNER

869

1    to Pablo Diaz' farm for a couple of days afterwards?

2        Let's talk about the bullet hole.

3        Mr. Infante got on the stand, and he showed you --

4    shortly, I will go through it.

5        And you will see again him pointing out the bullet

6    hole.

7        And he said in his years as -- 22 years, I believe it

8    was -- as a CSI expert and supervisor.

9        He said:  "Yes, that's a bullet hole."

10       He said:  "Yes, it was a bullet hole."

11       Now, can you imagine the bad luck?

12       I mean, just picture this.

13       What kind of bad day Pablo Diaz must have had.

14       You are accused of all of these crimes.

15       Get into a car, and you make a getaway, and right

16   where the person called the police and says:  "Oh, I got

17   shot, it hit me right here," there's an actual hole, a

18   bullet hole.

19       That is some bad luck, right?

20       What are the odds of that happening?

21       I'm sure that happens all the time.

22       You get accused of something.

23       They check, and there it was.

24       That was a bullet hole.

25       That's like winning the Lotto; that is, if you

870

1 discounted everything that that expert said.

2     But you won't, because it makes sense, that

3 trajectory where it came from.  Everything is consistent

4 with the State's case.

5     Now, also, as co-counsel stated to you about

6 inconsistencies, now, Catherine Ruiz was very

7 inconsistent.  I mean, there were parts of her testimony

8 that just didn't jibe.

9     Why was she --

10     At some time, you think, whoa, she made up some

11 portions.

12     What was her motivation not to keep a consistent

13 story?

14     First and foremost, right, she's not --

15     She's not ultimately lying.

16     She doesn't recall.

17     She could have easily that day memorized her

18     deposition and just said what it was that day.  That

19 is first and foremost.

20     The second thing is she was protecting Pablo Diaz.

21     She still cares for him, probably.

22     And if it had not been for the fact that the police

23     department pulled her over, she would never have

24 gotten involved with this case.

25     The only reason she did is because her parents got

871

1    involved, stepped in, and the State Attorney's Office got

2    involved.

3    She still loves this man. She wants him --

4    MR. BLACKER: No evidence of that in the record.

5    THE COURT: This is argument.

6    The jury will rely on its own recollection.

7    This is argument by the lawyers, made by Mr. Gross.

8    MR. GROSS: After Pablo Diaz tried to kill her and

9    terrorized her, what did she do?

10    Right after going to Jackson Memorial Hospital, she

11    went right back to him.

12    That is her comfort zone. She is comfortable.

13    If she was that interested in proceeding with this

14    case, this would have been very different.

15    She would have gone right to the police, and there

16    would have been a different type of case.

17    But the evidence speaks for itself.

18    The other witnesses came in, and you will hear

19    testimony.

20    And I'm sure defense will bring up whether it's one

21    gunshot or two gunshots.

22    Well, we know there are two.

23    But you will see in the charging instructions you

24    don't have to try to kill someone two, three or six

25    times.

872

1    It's like kissing someone at a wedding.

2    There are many inconsistencies here; inconsistencies

3  such as David Roberts, the elder security man.  He was

4  lying.

5    Well, I think there were basically four people in the

6  lobby.

7    Or Mr. Bigotti.  I think there were three people, and

8  I was outside, and I was inside.

9    But they all saw the gun.

10   Did he hold the gun at me?

11   Did he wave it?

12   Does that mean that there is no gun?

13   This person, Pablo Diaz, had a loaded nine millimeter

14  gun pointed at someone.

15   Plus it was four years ago.

16   Does that mean it did not happen because of minor

17  inconsistencies?

18   There are things that every witness agreed on.

19   I want you to think about that, too.

20   The State easily met its burden and proved each and

21  every element beyond a reasonable doubt.

22   If I can, the Fortune House.  The State proved every

23  element of aggravated assault with a firearm or with a

24  deadly weapon.

25   The State proved to you Pablo Diaz, on June 8, 2003,

873

1    did unlawfully and feloniously, intentionally, by word or

2    act to do violence to the person of another, Dennis

3    Flores.

4        Now, Dennis Flores took that stand, and he said he

5    was scared for his life when that firearm was pointed at

6    Catherine Ruiz.

7        He was scared for his life when the gun waved towards

8    him.

9        Coupled with an apparent ability to do so, and did

10   some act, to wit, pointed a firearm at Catherine Ruiz,

11   which created a well founded fear in such other person

12   that such violence was imminent, and that during the

13   commission of the offense, said defendant possessed a

14   firearm or destructive device.

15       As you can see --

16       Where is the video?

17       Where is the surveillance video?

18       This was not created, not by any witness here.

19       This was the Fortune House.

20       There is Mr. Roberts, he testified, and we will get

21   to the stairway in a moment.

22       The second charge, the State proved beyond a

23   reasonable doubt every -- each and every element.

24       The kidnapping with a weapon.

25       Now, some people think or I used to think that

874

1    kidnapping means you get thrown in the back of your car,

2    and get taken to a location, and you are blindfolded.

3        The legal definition, and what Pablo Diaz is being

4    charged with is on June 8, 2003, Pablo Diaz, without

5    lawful authority, kidnapped; that is forcibly, secretly

6    or by threat confined, abducted or imprisoned another

7    person, to wit, Catherine Ruiz.

8        Abduct or imprison.

9        The State submits to you we don't know if she is

10   unconscious right now, but she clearly is not running up

11   those steps.

12       And there is nothing that the defense will tell you

13   that she went up there on her own, freely, and she could

14   leave at any time.

15       And when there is a firearm and you are being dragged

16   up those stairs by your hair, that is the classic case

17   for abduction.

18       Also, the State has to prove the intent to inflict

19   bodily harm upon, or to terrorize the victim or any other

20   person during the course of the offense.

21       And at the same time, said defendant, Pablo Diaz

22   possessed a firearm or destructive device.

23       And that defendant discharged that firearm.

24       And as you recall, the defense attorney, Mr. Blacker

25    came up here and said he shot.

875

1       He didn't shoot up in the air.

2       Those are his words.

3       The State did prove each and every element of

4   kidnapping with a weapon.

5       And finally, the State did prove to you each and

6   every element of attempted felony murder.

7       That sounds tremendously serious, and it is, OK?

8       Pablo Diaz, the State did prove that Pablo Diaz, on

9   June 8, 2003, did unlawfully and feloniously perpetrate

10  or attempt to perpetrate a felony.

11      What was that felony?

12      That was kidnapping.

13      And did commit, aid or abet an intentional act that

14  was not an essential element of the felony.

15      And what was that?

16      What did Mr. Diaz do that was not part of the

17  kidnapping?

18      Well, the State submits to you that he shot at

19  Catherine Ruiz, and could have, but did not cause the

20  death of another.

21      Well, the State submits to you if there is anyone

22  here that thinks that being shot at twice while sitting

23  in a car could not kill you, the State submits to you

24  that you could die from gunshots from a nine millimeter.

25      One moment.

876

1    Mr. Infante took the stand, like I said before, and

2    he did testify.

3    And he said that it was a back bench seat of this '94

4    Cavalier.  It was a '94 Cavalier.

5    It was a bench seat, and that hole, which is caused

6    by a bullet came from --

7    Where did it come from?

8    It came from the inside of the car.

9    Mr. Diaz was driving that car.

10   He turned around over to the center console, just

11   like Mr. Infante demonstrated, he turned and shot one

12   time.

13   As a matter of fact, I believe when Catherine Ruiz

14   jumped in Lesbia Morales' car --

15   What did she do?

16   She climbed in, and the first thing out of her mouth,

17   and Lesbia Morales told you that she felt that there was

18   burning or she got -- there was an injury right on her

19   back where she said this took place.

20   Johanna Rodriguez and Lesbia Morales were witnesses

21   in the case.

22   They are heroes, giving up their time, their work, to

23   tell you what?

24   That they saw a gun.

25   They were terrorized by Mr. Diaz.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

877

1       They didn't have a relationship with him.

2       They didn't love him.

3       They went around the block.

4       They risked their lives.

5       They got chased by Pablo Diaz, and for what?

6       They came here, were put on the stand, and the

7   defense attorney did an excellent job of cross-examining.

8       Well, we now know that Mr. Blacker has blue eyes.   I

9   want you to listen to the defense, and listen to the

10  magic.

11      And finally, there are times that the defense

12  attorney made light of domestic violence, and whether it

13  is.

14      Oh, you are so scared, you are so scared.

15      Oh, just a little blood.

16      It isn't like that.

17      Domestic violence is very serious, and we see the

18  toll and the effects it had on Catherine Ruiz.

19      That's why the system is put in place to take -- to

20  help those people that can't help themselves.

21      That is why we are here.

22      He acted --

23      The defense acted as if she deserved it.

24      Well, the State submitted to you whatever happened in

25  that apartment, even if there was not a kitchen chopping

878

1    knife but a Samurai sword, and held it right up to Pablo

2    Diaz' head, not for a minute, but for a half hour and

3    then ran out, even if there was a Samurai sword, then ten

4    minutes later, whatever it is, went down to the lobby,

5    nothing would take place, not that $3600, as if she

6    needed the money.

7         You may not like her for whatever happened with this

8    $3600, but she could have asked her dad for $3600.

9         It seems like she gets all the money she wants from

10   her dad.

11        Even if there was a Samurai sword, it would not

12   warrant what Pablo Diaz did to her and the witnesses at

13   the Fortune House.

14        That old man works as security.

15        A gun was pointed at him.

16        The valet, the parker, even was scared that night,

17   because of this man's actions.

18        And once they were done in the lobby, defense brought

19   out that things were calm, as if that erases everything.

20        Well, I submit to you if they made porno movies right

21   there in the lobby, what's the difference?

22        Right after that, this whole thing took place.

23        You see him with the gun.

24        He held it to everyone.

25        He dragged her up the stairs.

879

1        No matter what took place before, before he took out

2   that gun, does not matter, and that's not what is being

3   tried here.

4        We don't care what happened before.

5        It does not warrant self-defense.

6        And let's talk about what happened after.

7        There are witnesses that took the stand today.

8        Well, she went to his house after.

9        Now, the credibility of those witnesses, well, that's

10  family.

11       And you can determine for yourself what you know that

12  mothers will do for their sons.

13       THE CLERK:  One minute, counsel.

14       MR. GROSS:  What happened after the fact is not on

15  trial here.

16       We know she's a victim, whether she went one minute

17  or ten years.

18       And Detective Morin told you.  She took the stand and

19  said:

20       "Even if I knew, even if I knew that she was there,

21  it would not have changed the investigation and an arrest

22  would have been made."

23       Well, the State knows that you go into those -- in

24  the -- into the jury room and use your common sense, and

25  you will come back with the only just verdict that you

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    can.

2        You will look at the evidence and you will remember

3    the testimony.

4        And you will find the defendant, Pablo Diaz, guilty

5    of one count of aggravated assault with a firearm or

6    deadly weapon; one count of kidnapping with a weapon and

7    finally, one count of attempted felony murder.

8        I thank you.

9        THE COURT:  Thank you, Mr. Gross.

10       Mr. Blacker.

11       MR. BLACKER:  May it please the Court, counsel,

12   Mr. Diaz, and finally, ladies and gentlemen of the jury.

13       We began here a few days ago.

14       The first thing out of Judge Jimenez' mouth was:

15       You need to treat this like an utter part of the

16   democratic system.

17       And it works, and I hope --

18       I spent my life trying to be a good lawyer, and I

19   worked hard, and I hope that we've lived up to that.

20       I know these two young prosecutors work hard, and I

21   can tell you that Judge Jimenez used to be a lawyer in

22   the town, and he was bright enough and good enough to get

23   nominated to be a Judge.  He spent his life protecting

24   and enhancing, and expanding our Constitution.

25       And I hope I have, and I'm not going to talk much

881

1     about myself.

2          I hope my performance of trying to get the truth

3     out to each and every one of you so you see the truth is

4     what to judge it on.

5          If you like me, it's meaningless.

6          If you don't like me, don't hold it against

7     Mr. Diaz.

8          Ladies and gentlemen, we talked about this being a

9     journey of truth.

10         And we talked about the honor involved.

11         And it's true, they don't pick their victims.

12         But this victim defiled and dishonored the

13    Constitution.

14         Let's take a look at what she did, and what she

15    said, and her actions here.  Think about her personally.

16          This is not about sadness or personal --

17         MR. GROSS:  Objection, Your Honor.

18         THE COURT:  Overruled.

19         MR. BLACKER:  This case is not about that.

20         I feel sorry for her.

21         This case is about the law and what the truth of

22    the evidence revealed from that stand, and what the

23    physical evidence was.

24         This is a woman that came in on June 8th and told

25    Officer Alvarez --

1    And you are going to see it here.

2    Please read it. It's his report.

3    We introduced it.

4    I didn't read it to you, but it's in there.

5    It's in evidence. It's a defense exhibit. Please
6  read it.

7    She told him that Pablo Diaz put her in a full
8  Nelson, and this other girl punched her in the nose on
9  June 8th, and he held her.

10    He was her boyfriend, and he tripped her, and that
11  all took place at her apartment as she was running down
12  the hall.

13    This is on June 8th.

14    She didn't even get admitted to Jackson Memorial
15  Hospital that night.

16    She talked about medication they gave her.

17    If they give you medication, that they admit you
18  in the circumstances.

19    She has no excuse to lie to this man on that night.
20  He is there to help her.

21    Oh, but it gets far worse than that.

22    Not only did she tell him a funny story about how
23  this occurred, she said:

24    "Well, I kicked Pablo Diaz out after that."

25    Well, we know it's a lie, because she came in here

1    and recanted, and told you the truth.

2         "Pablo helped me.  He helped push me out of harm's

3    way.

4         "He took his shirt, he wiped the blood off my nose

5    and mouth.

6         "And he called his friend to take us back in the

7    apartment."

8         So we know she recanted.

9         So she lied on June 8th,  when she is finally caught

10   by Detective Morin, and that took her a while.

11        But Detective Morin was brought in.  She didn't know

12   any of the facts in the case.

13        She didn't start the case till June 11th.

14        Everything was already done.

15        They brought her in here for what?

16        To bolster this victim.  This is a victim.

17        The most dishonorable witness I have ever seen.  I

18   feel sorry for her parents.  This poor girl.

19        And again, I say, poor girl.  She can't tell the

20   truth.

21        June 20th, she's caught by Morin.

22        That she is going to lose her daughter is obviously

23   when she becomes a witness.

24        Let's tell the truth.  All she has to do is tell the

25   truth.

884

1    She tells Morin a total lie.

2    We talked about her June 20th statement under oath.

3    We cross-examined her about it.  She said Pablo held

4    her.

5    She gives a sworn statement on September 29, 2004.

6    She lies to that attorney about everybody.

7    Do we need to go into details about what Ms. Ruiz

8    said and did?

9    What we need to do is examine the evidence here,

10   because, you know, in your heart, when the Judge read you

11   the instructions on weighing the evidence, and you think

12   about it, you're going to have this with you.

13   Correct, Judge?

14   THE COURT:  Yes.

15   MR. BLACKER:  You are going to have this with you,

16   and there's eight things that you should look at in a

17   witness.

18   And you know what, ladies and gentlemen?

19   I'm not going to read them to you.

20   But I can tell you, when you compare Catherine Ruiz,

21   the inconsistencies -- you saw me.

22   his wasn't a show.

23   Counsel says I asked the witness if he had a gun.

24   Each witness needs to tell the truth.

25   That's my job.

885

1    And you saw some funny things happen here.

2    Remember that handsome guy, Mr. Bigotti, who was

3    bald?  A real gentleman.

4    He came in here.  He spoke only a little bit of

5    English.

6    Remember, he said he heard them arguing.

7    He was asking for $4,000 back.

8    And he said he saw her -- him pull her over the

9    counter, and he punched her, and punched her, and punched

10   her.

11   Remember that?

12   But on cross-examination, Mr. Bigotti wasn't even in

13   the place.

14   And when I cross-examined him from his prior sworn

15   testimony, I said:

16   "When was your mind fresher?"

17   He said:  "Back then, 2004."

18   You all remember that.

19   So it's my job to examine the testimony of these

20   people.

21   Some of them come in here thinking that they can

22   just say anything.

23   Here's the funny thing about this case:

24   I don't know if you have the same feeling as me.

25   You know who the most forthright, intelligent witness was

886

1       in this whole case?

2           Little Mr. Baldizin.  He answered the questions

3       directly.

4           He had an accurate memory.

5           He corrected anybody who was wrong.

6           And what did he say?

7           He saw the whole thing.

8           Excuse me.

9           He placed the picture -- he looked at the picture,

10      and he said they were 15 feet close.  He knew everything.

11      He answered.

12          He didn't make anything up.

13          Let's go back a little bit and reconstruct here.

14          There are three charges in the case:

15          Attempted felony murder.

16          Kidnapping.

17          And aggravated assault.

18          There is no dance, as counsel wants to tell you, and

19      we mesh everything together.  No.

20          You heard from the beginning, there are elements to

21      each case.

22          The Judge is going to instruct you --

23          Excuse me --

24          You are going to hear the evidence almost in a

25      package of law.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1       You are to follow this law.

2       It doesn't matter what happened with Bigotti, that

3 he was scared.

4       Let's go back to June 8th.

5       One thing we have to know.  If you think it's

6 important --

7       And I don't think it's important to go and talk to

8 you about Catherine Ruiz' inconsistencies and the

9 fact that you cannot believe her, because we know that

10 you can't believe almost anything she says.

11       And counsel talks about two shots.  He just

12 mentioned it.  We will get to all of that.

13       Let's start at the beginning.

14       Catherine Ruiz gets beat up by this girl.

15       We don't know why, because the girl, Atalia Bello,

16 is here by stipulation, because we couldn't serve her.

17       We don't --

18       We couldn't find her.

19       So the sides agreed that she had testified properly,

20 and we had stipulated to things, that she punched this

21 girl.

22       We don't know why she punched her, but you can think

23 she just punched her out of the blue.

24       Is that what you think?

25       You think she just reached from the seat --

888

1      They were out for 36 hours together socializing.

2  Had to be something going on.

3      I don't know what it was, and I'm not going to

4  speculate for you.

5      Catherine Ruiz has got a broken nose.

6      Pablo brings her back to the place -- to her place.

7  He's caring for her.

8      She's getting a little crazy.

9      What does she say when I cross-examined her?

10      "I was missing my Chanel sunglasses."

11      It was her objects that she was angry about.  She

12  got angry at him for her objects, because she said that

13  she kicked him out.

14      Now, think about this for a minute.

15      Let's just go over this.

16      And she said he grabbed the gun, and she said:

17      "I grabbed the knife."

18      If someone has a gun on you with a pillow behind it,

19  and she said, "I was afraid he was going to kill me," how

20  easy would it have been to pull the trigger if he has a

21  gun?

22      And if he had a gun --

23      And where's the pillow in the pictures?

24      You are going to have this all back there.  All of

25  these interior pictures, you have seen them all.

MATZ, TRAKTMAN, FELDMAN AND WILDNER