1        She said:

2        "We have three or four pillows on the bed."

3        They are still there.

4        We asked the crime scene --

5        Remember the little lady that came in here,

6    Ms. Broadnax that's now working with another division in

7    the City of Miami?  She was the crime scene investigator.

8        Isn't it true that you want to keep this pristine?

9        You want to keep it that nothing is touched, so that

10   the evidence will come back in the way it was left?

11       Yes.

12       Well, where is the pillow?

13       I don't see one.

14       There's a black garbage bag laying there.

15       If they ran out the apartment and the door slammed

16   shut behind them, where is the pillow?

17       You think Pablo ate the pillow?

18       So we know there is no pillow.

19       We know Catherine Ruiz can't tell the truth about

20   anything.

21       So I'm going to tell you what really happened.

22       She saw the gun.

23       How about -- let me just take you forward a little

24   bit, and then we will go back.

25       How about when Pablo calls?

1        And he --

2        Listen.  He has no fury like that of a lover

3    scorned.  You know that, all of us.

4        Maybe not you, youngster, but all of us have had to

5    live with the hell of jealousy, and losing a loved one.

6    It's a terrible thing.

7        And for some reason, this man loved this girl.

8        What happened four years ago, being that he was in

9    love with her and -- but he was -- five weeks, and he

10   spent his hard earnings on her, and he's buying her

11   dinners.

12       And he has this 1994 Chevy Cavalier, and he is

13   living in this lovely apartment on Brickell.

14       And daddy is taking care of her, but he is also

15   supporting her.

16       You think she ate McDonald's?

17       No.

18       He fell in love with her, and they were living nice.

19       And then this night occurs.

20       Everything is fine, but listen to what he says on

21   those messages.  They are not pretty.  They are not

22   pretty, and he wishes he --

23       He probably wishes he could take every single thing

24   back, and we're going to talk about that in a minute.

25       He tells her:

1    "Hey, I know what you are going to do with my

2    $3600."

3         He tells her:

4         "You are going to smoke crack with it."

5         You can read those.  You are going to get them.

6    Read them now in the jury room.  Take your time with

7    them.

8         He says:

9         "You're going to smoke my money up in crack."

10        That's what she looked like to me, a crack addict.

11        MS. CORONA:  Objection, Judge, as to counsel's --

12        THE COURT:  Overruled.

13        This is argument.

14        MR. BLACKER:  That is what he said.

15        He wants his money back.  He worked hard for that

16   money.

17        And he knows that all she's going to do is spend it

18   on crack.  He isn't rich.

19        I guess she could spend it on a Chanel bag.

20        Daddy pays for the apartment.

21        Pablo pays for everything else.

22        One man to the next, that's her life.

23        So on June 8th, he didn't go.

24        She didn't go kick him out, because he is her money

25   right now.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1    He's got the booty, and she isn't kicking him out

2    until she gets someone else.

3        But when she saw the money, the crack -- she is a

4    crack addict.  You know a little bit about that.

5        We told you not to leave your common sense at the

6    door.  We just told you to leave your bias and prejudice

7    at the door.  Don't bring that in the jury room with you.

8        But you know about crack.  You know how devastating

9    it is.

10       There's people that are on the street that have been

11   addicted to crack, and don't smoke it anymore, and they

12   go in and rob a McDonald's because they just get so nuts.

13       Now, you know, I only know what I read, and she saw

14   that $4,000, and her nose was hurting, and she was

15   bleeding.  It was broken, there is no question about

16   that.

17       And he --

18       The tongue ring was ripped out, and she said -- she

19   made up this thing.

20       She went and she got this knife.

21       But nobody pulls a knife on a gun.  You have to be

22       out of your mind to do that.

23       Use your common sense.

24       You think he had a gun behind the pillow, and she

25   went and got a knife, took a chance with a knife?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

893

1       Come on.

2       She got this knife, and he was laying in the bed,

3  counting the money.

4       And she told him to get out.

5       And he jumped out of the bed.  He realized he wasn't

6  afraid, because he knew she's a woman, he's a man.  He

7  just wasn't afraid, because he knew what she wanted, his

8  money, and he wasn't about to give it to her.

9       And he chased her out in the hall.

10       And you know how you know that?

11       Because I told you, there's some gems in here that

12  we are sifting.

13       Remember, I told you about archeologists.

14       How do they know that?

15       Stay with me for a minute.

16       Remember, she said:

17       "I pushed the 6th floor."

18       She couldn't tell the truth in a million years, but

19  we know she went to the 6th floor, because of the security

20  cameras.

21       She went to the 6th floor, because she knew about the

22  cameras, so she goes to the 6th floor.

23       And remember that there was crime scene that went

24  there that night; Broadnax and other photographers.

25       You know that they talked to security guards.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

894

1       The security guards told you that under oath.

2       Those guys said:

3       "You know, we told crime scene where they had been."

4       Why don't you see a picture of the gymnasium, of the

5   porcelain with all the blood?  Why?

6       Because there was none.  There is no blood, not one

7   scintilla, not one drop.

8       And we --

9       How do we know that?

10      Because all of the guards said when they got off the

11  elevator, she looked fine.

12      She had a little scratch or scrape on her chest from

13  her night with Attie.

14      She didn't fight with Pablo upstairs.

15      She fought with Attie.

16      She told you she was kicking at Attie when he got

17  out of the car.

18      Attie punched her, and scratched her.

19      She lost a nail in the process.

20      They all said she was fine.

21      No one guard came in here and told you she wasn't

22  fine.

23      So she came down to the bottom floor, and she's

24  thinking money.

25      And he's thinking:

MATZ, TRAKTMAN, FELDMAN AND WILDNER

895

1        "Oh, my god, where have I been for five weeks?

2        "How do I get out of this?

3        "This girl is nuts."

4      So he picks up the phone, and he starts calling

5  Attie.

6        "Get this girl her stuff."

7      He's trying to get a hold of the girl, right?

8      She says -- the State's key witness:

9        "I got out of the elevator.  I yelled, 'call the

10  police.'"

11      Well, we know that's not true, right?

12      The first witness came out and said --

13      How long was that?

14      I think he said 20 minutes before something

15  happened.

16      All of them said between 15 and 20 minutes.  20

17  minutes and total calm.

18      Not one mark on this woman.

19      No blood.

20      No evidence of any struggle.

21      Nothing.

22      And they are on the phone, trying to get her stuff

23  back, nice and calm.

24      All of a sudden, something kicks in her brain, her

25  idea that she is going to smoke some crack.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1        Now, she jumps over the counter.

2        And bear with me on this one, because this is real

3   important.

4        And what does he do?

5        He realizes this is going to be bad.

6        He pulls her back over the counter.

7        And then one of the guards comes in and verbalizes

8   what she had said about the police or something to that

9   effect within those 20 minutes after they are downstairs.

10        "Do you call the police yet?" he says.

11        What does Pablo do?

12        Is he looking for trouble?

13        Is he looking to commit a crime?

14        Is he looking to kidnap somebody?

15        Is he looking to murder somebody?

16        Is he looking to assault somebody?

17        Is he looking to harm anybody?

18        Absolutely not.

19        What does he do?

20        Two witnesses told you.

21        What does he do?

22        Remember, think along with  me.

23        He runs over to the front door to try and get out.

24        He realizes, better get out now, because this girl

25   is a bad one.

1        And what happens?

2        The buzzer wasn't pushed, because it was after

3        12 o'clock at night, and then you've got that whole

4    thing that happens down there.

5        Let's talk a little bit about the elements of the

6    crime, and then as we go along, we will continue with the

7    evidence, the truth of what you heard, or at least a way

8    for you to look at things.

9        All of the attempted felony murder charges say that

10   Pablo Manuel Diaz either attempted to kill Catherine

11   Ruiz, or did some act which could have or would have

12   resulted in her death.

13       That is shooting at her.

14       Let's talk about that for a minute.

15       The only witness that says he shot at her is her.

16   You know that.

17       Now, can we believe her?

18       I don't know.

19       We're talking about reasonable doubt.

20       The Judge is going to tell you, you have to believe

21   that element beyond and to the exclusion of every

22   reasonable doubt.

23       And he's going to tell you that reasonable doubt is

24   an abiding conviction.

25       And when Judge Jimenez told you in the beginning of

898

1    the trial, he read you that instruction, what he told

2    you, you probably don't remember, because, you know, I do

3    this all the time, and you don't.

4         What did he tell you?

5         He said:

6         "Oh, there's a bunch of lawyers that got together

7    and really came up with a doozy this time," and it's

8    right.

9         It's hard to follow the instruction, but I could

10   tell you, even back from here in the federal courthouse,

11   if the victim doesn't have an abiding conviction,

12   reasonable doubt says that, and it is not the instruction

13   here --

14        MS. CORONA:   Objection, Judge.

15        MR. BLACKER:   I'm allowed to do it.

16        I'm talking about an abiding conviction in the

17   federal court.

18        It's evidence of such a convincing nature that you

19   would rely upon it in the most personal of your affairs,

20   without hesitation.

21        Would you ever rely on Catherine Ruiz without

22   hesitation in the most personal of your affairs?

23        Would you be leaving your heirs your assets, your

24   children and grandchildren on what Catherine Ruiz says?

25   That would be your personal affairs.

899

1       Would you let her in your home?

2       That's what it says in the federal court.

3       Here, it says abiding conviction.  Well, that's what

4  an abiding conviction is.  It is something you would not

5  hesitate to jump on.

6       And if there is a reason not to believe it, you

7  don't believe it.

8       All you have to do is have a reason.  That is what

9  reasonable doubt is.

10      So let's talk about whether or not Mr. Diaz

11  attempted to kill Catherine Ruiz.  She says he did.

12  Let's examine it.

13      There's another witness in the case that I think

14  defiled the courtroom, and he's an officer, and I'm going

15  to tell you why.

16      As -- I was a little tired yesterday, and he got

17  away with a little bit, but not today.

18      I will tell you what this man did.  Let me tell you

19  why he defiles this system.

20      Because he was not honorable, and I will tell you

21  why I think you're going to be a little disturbed with

22  his testimony when I get done.

23      He came in here, and he told you that he's 22 years

24  on the force, and that means an expert in one case, in 22

25  years.

900

1       Mister expert.

2       And he's an expert where he uses dowel rods to show

3   different angles of trajectory.

4       Didn't he tell you that?

5       And you know what?

6       He treated you like you were stupid.

7       He said I -- he --

8       They asked him on direct, does he testify much here.

9   He says:

10      "I hardly ever get out of the courthouse."

11      Well, he defiled his oath, because he told you that

12   he testifies in 12 cases a year.  That's one a month.

13   That's two hours in one month.

14      What does he like to cover?

15      The cafeteria?

16      Hard to -- hardly gets out of here.

17      What?

18      Is he kidding with his expertise?

19      You're going to go in there, and you remember that

20   testimony.

21      Let me tell you what a real expert would do with

22   that to determine whether or not there was a bullet hole

23   in that car, and listen carefully, because it's the

24   truth.

25      An expert would come and look at that hole, and take

901

1    the bullet that he thinks is involved in this case, and

2    take it and see, first of all, if it fits there.

3         And if the hole was too big, he would know it didn't

4    fit.  If it was too small, he would know it didn't fit.

5         He wouldn't have stuck his finger in the hole and

6    made a bigger hole.  That's not what an expert would have

7    done.

8         He would have looked at the place from under the

9    chassis, and put a light up in there.

10        And then this guy insulted you even further.

11        Not only did he rip a hole in there, he took the

12   cotton, he talked about the heavy cotton, and he ripped

13   that out, too.

14        And he said that the hole in the bottom went all the

15   way through.

16        But mister dowel rod didn't do one thing.  He didn't

17   put a dowel rod in there.

18        He told you the bullet came from the front of the

19   car to the back, but did he put a dowel rod --

20        You all know what a dowel rod is?

21        It's a wooden rod, so it would have to go straight

22   down.

23        What did he do?

24        He told you, with the 22 years of experience, he was

25   never qualified about projectiles.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

902

1       That -- that was -- that the bullet probably came in

2   here.  Well --

3       MR. GROSS:  Objection, Your Honor.  Statement not in

4   evidence.

5       THE COURT:  Overruled.

6       MR. BLACKER:  You can watch that film.

7       After he ripped the seat apart, after he pulled it

8   apart, he pulled his flashlight out to the bottom chassis

9   and instead of putting his flashlight on the top to see

10  if the hole went through -- even that would have done it

11  -- he needed a dowel rod to tell you why --

12      MR. GROSS:  Objection.

13      THE COURT:  Overruled.

14      This is argument.

15      MR. BLACKER:  You think about it.

16      You know I'm telling you exactly how it was.

17  Exactly --

18      He's just trying to interrupt my train of thought.

19  It won't happen.

20      Well, this is what happened:

21      He never used -- he supposedly tells you that he --

22      And the only time he was an expert is when he put

23  the dowel rod in the hole, and he didn't even do it in

24  this case, like how he insulted your intelligence -- look

25  at the last picture there.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

903

1        You are going to see how far the flashlight --

2        He shows the hole goes all the way through.

3        How do we know that is the same hole?

4        This was an old car.

5        They could have had that hole in there the whole

6    time.

7        So he takes the flashlight, and there is a hole over

8    there in that door.

9        It could be a straight line.

10        It could get to that -- the light will come out that

11    door, because like space, it doesn't -- space enclosure.

12        See what I'm saying?

13        That flashlight that you put through the hole --

14        And then I said:

15        "Listen, tell me" --

16        I will be honest with you.  I let him push me, and

17    because he filed the report in this case that was only

18    one paragraph, and he made himself look like --

19        And, you know, he just made himself look like this

20    important witness, so I wasn't really ready for him, and

21    I was tired.

22        I have two grandchildren that keep me up all night,

23    and I was tired.

24        MR. GROSS:   Objection, Your Honor.

25        THE COURT:   Overruled.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

904

1        MR. BLACKER: He did something terrible here.

2        I asked him:

3        "What about the copper and lead test?"

4        You know, ladies and gentlemen, if you have a cloth

5    in the seat and you shoot a bullet there, it is -- you

6    could get from the cloth the residue of the residue test.

7        Well, he was right about that.

8        Sometimes, the residue test dies in a few days, a

9    few months. Some of it could be 20 years long, but

10   mostly that dissipates, the residue, because it is

11   residue powder. That's how the bullet is.

12       But when the bullet, projectile goes through

13   something hard, he did tell the truth about that, about

14   concrete.

15       He said that if it was concrete, you would find a

16   bullet if there was one shot at the cafeteria.

17       Oh, no, it could have gone in the tire. All that.

18       Well, yes.

19       Let me tell you something. When you shoot a bullet

20   through the seat, soft part, it goes through quickly, but

21   then when it hits the metal part, it tears through the

22   metal part, but it is hard getting through.

23       So as it goes through and it pushes the holes out,

24   what happens?

25       The hole is here, and the prongs are here. That's

MATZ, TRAKTMAN, FELDMAN AND WILDNER

905

1    what happened.  It pushed it out.

2         That process of pushing it out leaves silver -- I

3    mean lead or copper that the bullets are all made out of,

4    and that is how they determine if it is a bullet hole.

5         Let's talk about the factory.

6         After you carefully, carefully examine it, you take

7    it back to the factory.

8         You look at it in the microscope.  You can't see it

9    with your eyes.  You take a look at that film.  That is

10   what he states.

11        That is an embarrassment.

12        MR. GROSS:  Objection, Your Honor.

13        THE COURT:  This is argument.

14        MR. BLACKER:  That is an embarrassment.

15        He doesn't know if that hole was made from a bullet.

16        He didn't even have a dowel rod, and he didn't take

17   it back to the factory.

18        MR. GROSS:  Same objection as before; facts not in

19   evidence.

20        THE COURT:  Overruled.

21        MR. BLACKER:  Then he takes the stuff back to the

22   lab, where they could look at that piece of metal in a

23   microscope and determine that it was a bullet.

24        But ladies and gentlemen, even if he was right, it

25   may have been a bullet, nobody knows when it was fired or

906

1    where it was fired.

2         We know it wasn't fired with Catherine Ruiz.

3         You know why?

4         Because I can prove it to you.

5         When you look at the film, you are going to see the

6    hole in the seat which he put his finger in and ripped

7    out -- it's about three, or four, or five inches from the

8    bottom part of the seat.

9         You all saw it a couple of times.

10        Where did she say her injury was?

11        Remember, she came up.

12        I need the mirror.

13        Right.  She needed a mirror.  She needed a mirror,

14   ladies and gentlemen.

15        But she told you her injury was here.

16        Is it possible to graze somebody with a bullet --

17        We all know that we're not stupid.

18        If she was grazed, if her back -- with a bullet,

19   sitting in the back seat like she said she was --

20        But who could believe this girl, right?

21        But I asked her this on purpose, because I knew it

22   was coming.

23        If she was sitting like this, it is impossible for

24   the hole to be there?

25        How could she get the shot near her back and the

907

1    hole get there?

2        Come on.

3        We have a magic bullet that killed John Kennedy?

4        No.

5        Look where she -- where she had to have been for the

6    bullet to graze her back and get the hole in this car.

7        That is why we know it was no bullet shot at her in

8    the car.

9        And we know from Lesbia, we know from Johanna --

10   they saw the whole thing -- that he was never in the car.

11       They saw him leave, take off.  They followed him.

12       He was not even in the car.  They never saw him in

13   the car.

14       How about Mr. Baldizin?

15       Did he ever see Pablo Manuel in the car?

16       Never.

17       He was always out.

18       And if there was a shot, it was shot into the air,

19   not at her.

20       So all of these charges about killing and attempting

21   to kill, they are bogus.  They are not there.  They

22   didn't ring true.

23       He is mischarged on that.  It is improper to charge

24   him on this.  It is improper, because it didn't fit the

25   evidence.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

908

1    They charged him, but the evidence wasn't there,

2    because they believed their witnesses until they got

3    cross-examined, and that's what happened.  Think about

4    it.

5    Here is the hole.  Here is the hole, ladies and

6    gentlemen, right there.  And you're going to see that on

7    the film.

8    Think about how her right side could possibly get

9    burned.

10    How would she have to be laying?

11    How would she have to be laying to get burned on

12    this side?

13    She would have to be in the car like this.

14    Watch this.

15    She would have to have her belly to the seat; belly

16    and face away from the front seat in order for the bullet

17    to graze her back and burn her back a little bit.

18    So what do we know?

19    If she did get shot in the back, that's not the

20    bullet.

21    But she didn't get shot in the back.  She is just

22    making it up.

23    Two shots.

24    How do we know there was one shot?

25    Pablo Manuel was never in the car.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

909

1    But more importantly, Baldizin -- Baldizin says that

2    there was one shot.

3    And his wife comes in yesterday, and she says

4    there's two shots.

5    But I want you to think about today, when we had

6    Mr. Moises Velazquez who came in.

7    Four days after the event, he went and interviewed

8    Ilusion Abud, the wife of Baldizin.  You heard it today.

9    What did he say?

10   A single shot, a single shot.

11   They would love to have two shots.

12   This so called Infante that said:

13   "Oh, if it went through the metal" --

14   You know what?

15   He wanted you to believe that as soon as the bullet

16   pierces the metal, it somehow disappears.

17   No, it doesn't.  It does one of many things, but it

18   still exists.

19   It could split up.

20   Some of it could hit a place where you're not going

21   to find it.

22   Go into the concrete.

23   But you're going to find some of it, and they

24   secured the area.

25   So the photographs that the State introduced with

910

1    the Number 1, where they cover it up in the little

2    plastic thing, the casing that they found, if there was a

3    shot, second shot, they would have found some part of it,

4    because they use very powerful flashlights.

5        And they look on the ground.  That's how they secure

6    a scene.

7        So all the evidence in the case, except for

8    Mr. Infante --

9        And even if it was a bullet and that means it was

10    fired in the night, could not have been fired that night,

11    because for a bullet to be fired, it's a bullet --

12        If it is a bullet, she would have that -- have been

13    lying facing the seat, across the seat, and it would have

14    been the bench seat.

15        How did she get like that?

16        She never once said one word that she was lying

17    facing the back seat.

18        She said she was moving and afraid, but she never

19    once said she was facing the back seat.

20        Baldizin has no reason to lie.  He's the cafeteria

21    owner.  He saw the whole thing.  He was very articulate.

22    I was a little surprised.

23        And his wife, she was mistaken.  She said--

24        You told this jury there were two bullets, because

25    there were two pieces of cardboard, one and two, the

911

1    casing.

2        She said yes.

3        But the officer cleared it up today. One shot. The

4    shot in the air.

5        No killing, no attempted killing. You can't attempt

6    to kill somebody by shooting a bullet in the air.

7        Let's switch gears for a little bit.

8        Pablo Diaz dragged her out of the place against her

9    will.

10        But you know what?

11        She's a monster. She is a monster woman. She let

12    the man fall in love with her, and then for no reason,

13    even with his actions, she got beaten by some girl and

14    who knows what she did to deserve it.

15        And then she tried to get Pablo's money, his hard

16    earned money that he has been spending on her, that he

17    had in the house.

18        What kind of person would do something like that?

19        I'm not saying she deserved what she got.

20        He overreacted, but he did not attempt to kill her,

21    absolutely not, because if he was attempting to kill her,

22    he would have killed her right there in the vestibule

23    downstairs in the lobby.

24        He could have killed her for two hours if he wanted

25    to kill her.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

912

1    He didn't kill her. He didn't even attempt to kill

2    her.

3    So he gets to the cafeteria, and you know what

4    happens at the cafeteria.

5    She's crazy. She's going from calm to nuts. She's

6    going nuts. She won't calm down.

7    This guy knows that he's dealing with a lunatic, and

8    she is going to --

9    She is going to steal his money, and she is stuck on

10   the money, and she is stuck on being wild and crazy, and

11   screaming, and it's just a horrible scene.

12   And he makes some terrible decisions, but not -- the

13   decision he makes has nothing to do with the crimes here,

14   and I will tell you why.

15   We know -- we know the lesser offenses are -- they

16   are not established, because when you read all of the

17   elements, you're going to see here attempted second-

18   degree murder.

19   Pablo Diaz attempted to commit an act which would

20   have resulted in the death of Catherine Ruiz.

21   What act is that? What?

22   Shooting in the air, is that going to result in the

23   death?

24   Yes, maybe shooting up in the sky with God, that

25   might.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

913

1    If she was in a plane, maybe that would kill her.

2    But what act?

3    All of these lesser-included offenses, attempted

4    felony murder, whatever this crime is, cannot be met.

5    They can't be met.

6    So you go over it carefully.

7    You know, I want to say something about you.

8    Normally, in every trial I am --

9    I love what I do, I really do, and I see some

10   jurors, and they are not paying attention, and I call

11   them out on it.

12   I know all of your names, and I call them out on it.

13   I have nothing but praise for this jury.  You guys

14   were attentive.  You watched the people walk over here.

15   All the heads, it was like a tennis match.  You guys

16   were going back and forth.

17   And you guys, when you take the instructions, look

18   at the elements.

19   Talk about it.  Talk about everything here that

20   we're talking about.

21   Don't forget, you have to be able to rely upon

22   these people's testimony with an abiding conviction;

23   something that you would, without hesitation, in your

24   most personal affairs rely upon.

25   Who in this case can you rely upon?

914

1      Think.   There isn't only one witness.

2      Let's talk about the kidnapping now, because we know

3  for sure, none of these lesser-included offenses

4  concerning the felony murder have been proven.

5      When you look at it, you will know what I'm talking

6  about.

7      They all -- they said:  Did something that could

8  cause Catherine's death.

9      She said he pulled her hair.

10      That can't cause death.

11      The only thing that could cause death is the shot,

12  and they know that he didn't shoot at her.

13      Mr. Gross is telling you about this expert.  You

14  heard about that expert.

15      Mister dowel rod, didn't even have one.  Give me a

16  break.

17      And you know why he didn't have one?

18      Because the -- he put it in and it wouldn't have

19  gone in the hole.

20      He's not stupid.  He had one.

21      If he put it in, it wouldn't have gone in the hole,

22  and you would have known instantly it was a bullet or it

23  wasn't a bullet that was fired that night.

24      He told you when he got the car, it was full of junk

25  in the back seat.

915

1    And he said in his place of business, he hardly gets

2    out of the courthouse.

3    Yes, once a month for two hours.

4    No dowel rod.

5    Why?

6    Because what he told you about the bullet was B.S.

7    Now, let's talk about this kidnapping here.  Let's

8    talk about the elements of the kidnapping.

9    Please excuse me.  I'm trying to work with these.

10   We just got there.

11   I think Pablo Diaz did forcibly confine and take

12   her.  I think he did.

13   I think the evidence shows that's against her will.

14   But what's her will?

15   Her will was to steal his money.

16   Her will was to get him out of her life, steal his

17   money, and because she wanted to smoke some crack with

18   his money, that you heard it on the tape.

19   He was trying to get away from this woman, and he

20   realized he had made a stupid decision.

21   But it's not kidnapping.

22   One of the elements, that when he took her, he had

23   to have the intent to -- the intention, and that is a

24   specific intent, crime.

25   Kidnapping is not obviously just be a bad guy and

MATZ, TRAKTMAN, FELDMAN AND WILDNER

916

1    grab her.  No, no, no.

2        That is a specific intent crime.

3        The Judge is going to tell you that --

4        What does that mean?

5        He has to act to inflict bodily harm on her.

6        He has to intend when he takes her.

7        You think that is what he intended?

8        No.

9        He intended to take her, calm her down and get his

10   money back.

11       And remember, he could not get out, because the door

12   was locked, but he wanted to at least, and he dragged her

13   up those stairs.

14       And, you know, listen.  I'm not making light of it,

15   because we're talking about serious crimes here.

16       He had to want to terrorize her.

17       He didn't want to terrorize her.

18       You think he terrorized her?

19       He didn't.

20       She terrorized this courtroom.  She terrorized him,

21   without even moving.  People can do that.

22       She terrorized his soul, his love that which he had

23   given her, the love that he showed her.

24       She was the terror, not Pablo.

25       He dragged her up, and he did wrong, and you --

MATZ, TRAKTMAN, FELDMAN AND WILDNER

917

1        He took her against her will.

2        All right.

3        But wait a second.

4        So much against her will, she didn't want to

5   prosecute.  She really didn't.

6        She wanted to live with this guy the next day.

7        Was she treated bad?

8        Was she so terrorized?

9        She went and moved in with him for ten days.  You

10  guys know that.  A million witnesses told us that.

11       And you know what?

12       The one thing she told the truth about was that

13  she--

14       At the end of the case, she came clean about that,

15  after four years of lying and saying, "I was only there

16  for one night."

17       You heard me cross-examine her.  That is what cross-

18  examination is.  It's to discern facts.  It's to manifest

19  facts so that people can't just get away with just saying

20  things.

21       He has had no intent to commit any crime with her.

22  He just wanted to find out what it was all about, and get

23  his money back.

24       She is the one that created the scene.

25       He kept having to deal with her, because she kept

918

1   the scene.

2       She's a nut.  She is a nut.  You saw it.  Every one

3   of you saw it.

4       You couldn't stand it.  Not one of you could stand

5   that woman.  I feel sorry for her parents.  I'm saying

6   that again, but I do.

7       And then they've charged him with --

8       Believe me, ladies and gentlemen, I think when you

9   look at the facts of this case, you're going to realize

10   that when he took her up those stairs, he just wanted to

11   get his money.

12       He could have killed her.

13       He could have harmed her.

14       He could have really terrorized her.

15       You know he didn't shoot in that car.

16       One bullet was shot in the air.

17       Let's talk about Dennis Flores, because it is

18   interesting, and I think you are going to realize now

19   what I'm trying to point out to you.

20       Pablo Diaz is charged with aggravated assault on

21   Dennis Flores.

22       Dennis Flores came in here -- was the valet,

23   remember, and he said he's the one that's standing here

24   in the counter.

25       MR. GROSS:  Objection.

919

1    Facts not in evidence.

2    THE COURT:  Overruled.

3    Not the valet.  The desk clerk.

4    MR. BLACKER:  Sorry.

5    He's the desk clerk.  Sorry.

6    I'm confused.

7    And he came in here, and on direct examination, and

8    Ms. Corona got up there, and she had him say, boy, he

9    felt threatened.

10   He said on direct, right?

11   And that's my job, to examine his testimony and see

12   if it really rings true.

13   So I had to see if it's right.

14   A JUROR:  Can we have a break?

15   THE COURT:  Let's take a five minute bathroom break.

16   You're not to discuss this case amongst yourselves.

17   All right.

18   (Thereupon, the jury panel exited the courtroom, and

19   the following proceedings were had outside the presence

20   of the jury panel:)

21   THE COURT:  Let's take a break.

22   (Thereupon, a brief recess was taken, after which,

23   the following proceedings were had:)

24   THE COURT:  All right.

25   Get the jury.

920

1          (Thereupon, the jury panel entered the courtroom,

2     after which, the following proceedings were had in open

3     court:)

4          THE COURT:  Thank you.  Please have a seat.

5          Mr. Blacker, please continue.

6          MR. BLACKER:  Thank you.  I needed that.

7          We were talking about Mr. Dennis Flores.

8          Dennis Flores came in and said:

9          "Yes, I was threatened."

10         So I got up there and I said:

11         "Mr. Flores, do you remember giving a deposition to

12    the other attorney, discussions that you had with him?"

13         And I read to him the -- Page 14.

14         "Question:  You didn't feel threatened by the gun at

15    all?

16         "Answer:  No.  When he was fighting with her, moving

17    around, I was like, I don't know if he" --

18         And remember, he said that his aggression was

19    towards her.

20         "Answer:  His aggression was towards her.

21         "Question:  The aggression was not towards you?

22         "Answer:  Never.  Never."

23         Then he talks about pulling her down, and they went

24    to the garage, OK?

25         Page 19:

MATZ, TRAKTMAN, FELDMAN AND WILDNER

921

1        "Question:  And his aggression was basically towards

2    her?

3        "Answer:  Yes.

4        "It was like their problem.

5        "He never threatened me, personally.  He never

6    threatened me, personally."

7        You are going to see --

8        You know, you are now real scientists in this.  You

9    are scientists of the facts, and let me tell you why.

10       Because you are to apply what you heard from the

11   stand, and what these exhibit tell you, and what you

12   conclude from them and compare them to the elements of

13   each crime.

14       So for example, in the aggravated assault of Dennis

15   Flores, you guys have to find that Pablo Diaz pointed a

16   firearm at him.

17       If he did or -- if he pointed it at Dennis Flores,

18   it had to create in Dennis Flores' mind a well founded

19   fear that violence was about to take place.

20       What did I just read to you?

21       Did you feel threatened?

22       Dennis had to feel threatened.  The Judge is going

23   to tell you that.

24       No, he didn't feel that, that he was going to get

25   threatened (sic).

922

1    He's the one that is charged as a victim of the

2  aggravated assault; not Catherine Ruiz.

3    Read it carefully.

4    It says on the first element:

5    Pablo Diaz intentionally, either by word or act, to

6  do violence to Dennis Flores.

7    Dennis Flores just told you on three separate

8  occasions under oath --

9    And remember, this is interesting, what I did say to

10 him.  I said:

11    "Mr. Flores, you told us on direct that you were

12 threatened."  And I said:

13    "How about this testimony I just read to you?"

14    And it was back from two and a half years ago.

15    "When were the facts of this case fresher in your

16 mind?

17    "When were they truer?"

18    What did he say, ladies and gentlemen?

19    Back then in 2004.

20    He didn't feel threatened in 2004.  He didn't feel

21 threatened until he came in here to trial.  That's when

22 he was threatened.

23    Would you rely upon that without hesitation, his

24 testimony in the most personal of your affairs?

25    Would you have an abiding conviction in your heart

923

1    and soul today that beyond a reasonable doubt, there is

2    no reasonable doubt --

3         The facts in his testimony changed on two occasions.

4         Does maybe that create a reasonable doubt in your

5    mind?

6         It should.

7         You shouldn't be able to rely upon it.

8         You know, this is an ugly case.

9         This is a guy that is in love with this girl, and it

10   is just terrible what happened here.

11        But these crimes that are charged are not proven,

12   have not been proven.

13        That is your duty. You may not like 00

14        As much as you may not like it, that's not what

15   you're here for.  You are not here to like or dislike.

16        You are the judges of the facts, and you have to be

17   honest.

18        You swore under oath that -- to your God and to His

19   Honor, this Court, that you would be fair and impartial.

20        Don't dishonor this Court like Catherine Ruiz did.

21        She could have come in and been clean from day one,

22   and we would have been fine.

23        What she did was nauseating.

24        It was defiling, what she did.  It defiles --

25        His Honor doesn't understand "defile," but these

924

1    young prosecutors do.

2        So ladies and gentlemen, you're not going to hear

3    from me anymore.

4        I know you are -- thank God.  All right.

5        You know, I could live with that.  I could survive

6    with that.

7        But you're going to hear from Ms. Corona, and when

8    she is talking to you, I want you to think about really

9    the testimony that you heard.

10       There is no bolstering of Catherine Ruiz.  What she

11   did here is unconscionable.  It should make you sick in

12   the pit of your stomach if you have any sensibilities,

13   and I know you do.

14       I watched you in this trial.  I think you're good

15   people.  You are good and you are following your

16   instructions.

17       Listen, you could only do what you could do, but

18   when she starts to bolster by telling you that Morin says

19   that's domestic violence, come on.

20       Catherine Ruiz is a mess, and she is not a great

21   victim, and I feel sorry for them.

22       You have a job to do.  You have a job to determine

23   whether or not the elements of each and every crime have

24   been proven, and you have to do that beyond and to the

25   exclusion of every reasonable doubt.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

925

1    And if you have a reasonable doubt that any element

2    has not been proven beyond that doubt, you have no

3    choice.

4        You must do the right thing.  You must feel when you

5    leave here that you did the right thing.

6        Don't vindicate Catherine Ruiz.  She's not worthy of

7    it.

8        Don't vindicate mister expert.  He's not worth of

9    it.

10       You are worthy of it.  You are worthy of carrying on

11   the importance of your Constitution.

12       None of these people are worthy of it.

13       Ms. Morin was using words like, "offender," and this

14   and that.

15       She doesn't even know about this case.

16       She didn't even know that Catherine Ruiz went to

17   live with this man and that's four years later, and she

18   is the lead detective.  She didn't even know.

19       This is the manipulation that this woman can do to

20   you.  Catherine Ruiz, that is.

21       So I leave it in your hands.  I leave it in your

22   able hands to follow the law, to follow your oath that

23   you swore to.

24       Be honorable.  Make right choices.

25       God bless.

926

1      THE COURT: Thank you. I think you need the chair

2  back.

3      MR. BLACKER: Still looking for a dowel rod.

4      THE COURT: Ms. Corona, anything you want to say?

5      MS. CORONA: Just a couple of things, Judge.

6      What should make you nauseous, what should make you

7  sick to your stomach is the actions of that defendant on

8  June 8, 2003. Catherine Ruiz is not on trial here.

9  Catherine Ruiz is not accused of kidnapping somebody, of

10  shooting -- of pointing a gun at several people, of

11  shooting a gun in a public place, of dragging a woman up

12  the stairs, beating her profusely, putting her in the

13  back seat of a car and taking her to a place, causing her

14  to jump out of the car.

15      What should nauseate you and sicken you is his

16  actions. Catherine Ruiz was not the only person

17  terrorized that night.

18      Who else was terrorized?

19      Dennis Flores.

20      Jose Bigotti.

21      Tomas Roberts.

22      Antonio Baldizin, his wife, Ilusion Abud.

23      Three cafeteria workers that were there.

24      Lesbia Morales.

25      Johanna Rodriguez.

927

1          And countless others on the street that could have

2     been driving by when the defendant decided to shoot in

3     the air that we know for sure that happened.

4          This case is not about Catherine Ruiz.

5          This case is about Pablo Diaz and his actions on June

6     8, 2003.

7          So what matters here is not whether you like

8     Catherine Ruiz.

9          What matters here is not whether you believe every

10    single detail that comes out of her mouth.

11         What matters here are the facts, and luckily, we

12    don't have to rely on just Catherine Ruiz' testimony,

13    because we have other evidence in the case.

14         And what is the other evidence that we have?

15         We have a video.

16         We have still photographs from a video.

17         There is no arguing about what happened in this

18    video.

19         Now, counsel wants to tell you that he did confine --

20    he did confine her, but he didn't terrorize her.

21         Is pulling a woman up the stairs, a whole flight of

22    stairs against her will --

23         You see her on the floor -- by her hair.

24         You tell me if that's terrorizing somebody.

25         And once he's done dragging her up the stairs,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

928

1     pushing her into the back seat of the car, because that

2     is what was more convenient for him, and driving her to

3     wherever he feels like going, is that terrorizing her?

4         Ladies and gentlemen, you determine that.

5         Of course, that's terrorizing.

6         He didn't only terrorize Catherine that night, he

7     terrorized all these people.

8         What else do we have?

9         We have Dennis Flores.  Dennis Flores tells you what

10     happened that day.

11         Dennis, Jose and Tomas tell you.

12         Catherine was fearing him.

13         Do we like that maybe she was going to keep the

14     money, did not want to give it back?

15         Does that merit what he did?

16         Does she now deserve what happened to her?

17         Is that what counsel wants you to do, disregard his

18     actions, because she wanted to keep the money?

19         Is it ever OK for somebody to do what you saw on that

20     video, what luckily you get to see on your own?

21         You don't have to believe what she said.

22         You don't have to believe what Dennis said, or what

23     Jose said, or what Thomas said.  You could see it for

24     yourself.

25         You are going to argue that that is not kidnapping?

929

1    You are going to argue that that is not terrorizing a
2  woman?

3    Counsel wants to say that the defendant tried to
4  leave before any of this violence happened.

5    He pulled out the gun before he left, and he heard --
6  and he said to the witness when he heard Tomas Roberts
7  came and said:  "I called the police."

8    "If you call the police, I will kill you."

9    After he couldn't leave, he knew he had to leave at
10  some point, because he knew the way out.  He was able to
11  get Catherine out the same way.

12    He dragged her.  He decides to drag Catherine over
13  the counter, beat her on the floor repeatedly, as was
14  shown to you by Jose Bigotti, and then dragged her up the
15  stairs.

16    It is where his car was; exactly how he knew how to
17  get out.

18    We have a 9-1-1 tape by Dennis Flores, another form
19  of evidence that you could rely on, where Dennis Flores
20  sees that nine millimeter gun.

21    "He's going to kill us.  Get somebody here
22  quickly.  He's going to kill her."

23    You hear the terror in Dennis Flores' voice.

24    You saw how he spoke to you.  It wasn't exactly the
25  same way he was talking on that 9-1-1 tape.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1          You will hear for yourself.  Take the tape back there

2      and listen to it.

3          What Dennis Flores says on the tape, he is terrified,

4      and he is terrified badly.

5          He just saw he had a gun pointed three feet away from

6      him, he said.

7          The man says:

8          "If you call the police, I'm going to kill you."

9          And he is struggling with this woman, beating her and

10     pulling her by the hair up the stairs.

11         Of course, he is terrorized.  Of course, he's

12     terrified.

13         Was he threatened personally?

14         When he was asked was he threatened personally, no.

15         Was he afraid for his own life?

16         No.

17         The gun three feet away from him could shoot a bullet

18     and hit him.

19         Of course, counsel wants you to believe that because

20     he said he wasn't threatened, but he didn't use the word,

21     "threatened."  He used the word, "afraid."

22         "I was afraid.  I was afraid that even though the

23     problem wasn't with me, I could get shot."

24         He's three feet away from a man with a gun that's

25     struggling with a girl right next to him.

931

1     What else do we have?

2     We see two bullets that's found at the Fortune House.

3     One bullet was found near the garage.

4     One bullet was in the apartment.

5     And we have a spent casing that was found in the --

6     in front of the cafeteria where Antonio Baldizin said he

7     shot.

8     All three bullets, coincidentally, are the same make

9     and brand, and from the same gun.

10    Counsel makes an argument about we shouldn't believe

11    her because of -- there is no pillow.

12    Showing you what has been marked as an actual defense

13    exhibit -- the State didn't introduce it -- Defense

14    Exhibit "J."

15    And as I was looking at these, I noticed that on the

16    bottom, there is a pillow in the hallway.

17    That is the hallway leading up to Ms. Ruiz' bedroom.

18    I hadn't noticed that before, but I think that's

19    consistent with Ms. Ruiz' story that he came out the

20    bedroom with the pillow and gun, dropped the pillow along

21    the way.

22    She grabbed the knife.

23    She ran out the apartment.

24    What else do we have?

25    We have Antonio Baldizin's testimony.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

932

1    And counsel wants you to believe Antonio Baldizin's

2    testimony, and the State wants you to believe Antonio

3    Baldizin's testimony, because Antonio Baldizin has no

4    reason to lie.

5    And Antonio Baldizin said when it came to his

6    attention that he saw this man struggling with a woman

7    outside, he looked.

8    He was paying attention, and he saw the defendant

9    fire one shot in the air, and he said he saw the woman

10   get out of the car and try to escape.

11   And what did the man do?

12   What did that man do?

13   He caught up with her, dragging her back, and he was

14   trying to push her in the car.

15   But before he got her in the car, he shot up in the

16   air.

17   When a bullet goes up, it's got to come down.

18   So let's say we only have that, and we're only going

19   to believe Antonio Baldizin's testimony.

20   He told you she was still outside of the cafeteria

21   when this gun was fired.

22   If we're only going to believe Antonio Baldizin's

23   testimony, he still discharged that weapon feet from that

24   woman.

25   Where do you think that bullet was going to go?

933

1          Antonio Baldizin also told you --

2          MR. BLACKER:  Excuse me, counsel.

3          I need to object.

4          THE COURT:  Overruled.

5          This is argument.

6          MS. CORONA:  Antonio Baldizin also tells you that

7     after he shot this bullet, he pushed her back in the car.

8          He was physically pushing her back in the car,

9     because she was struggling to get out.

10         And you are going to hear Antonio Baldizin's 9-1-1

11    tape that you already heard, and if you listen to --

12         Again, you have the transcript there in evidence

13    about Antonio Baldizin's terrorized yelling for the cops

14    to come right away, right away, because the man was going

15    to kill this woman.

16         He already shot a -- fired a shot.

17         And we know that there --

18         We know for a fact that at least when counsel

19    stipulates that that was, in fact, what happened, that is

20    what happened.

21         And Mr. Baldizin told you that.

22         Now, Antonio Baldizin doesn't know what happened in

23    the car before or after that shot was fired.

24         And what we know is that there's a hole in the seat

25    of the car, in the back seat of the car; the same place

934

1   where, coincidentally, Catherine told you that she was

2   shot at.

3       Now, counsel demonstrates sitting in a chair, just

4   like that, calmly.

5       Do you think that Catherine Ruiz was --

6       Do you think while she was sitting in the back of the

7   car, while she was pushed in the back of the car, do you

8   think she was sitting there calmly, just like counsel sat

9   in the chair?

10      Do you think she was sitting just like that, or was

11  she struggling to get out, moving away?

12      We have a man pointing a gun at her from the front

13  seat.

14      Do you think she is just sitting calmly there,

15  waiting for him to shoot at her?

16      Or do you think she is struggling to get out?

17      Or do you think she is laying down on the car seat?

18      She doesn't know.

19      She told you: "I have no idea how the bullet got to

20  where it was, but I know it grazed me."

21      And you know it grazed her, and you take a look at

22  that for yourself.

23      I know counsel spent a whole lot of time talking

24  about the crime scene investigator, Mr. Infante, who does

25  have 22 years on the force.

935

1    I'm not sure why he wants to disparage his testimony,

2    because I did hear him say that even though he didn't

3    have the number of the angle, he did use a dowel rod.  He

4    said that in the testimony.

5    You remember for yourself.

6    But he say that, but he said:  "I didn't get a

7    specific angle, but, yes, I put a dowel rod in there and

8    made a determination of where it came from."

9    And he told you where it came from.  It came from

10   between the windshield and the level area.

11   He showed you where it came from.

12   And you could determine for yourselves, and you can

13   take a look at the video and determine whether it's a

14   bullet hole.

15   If it's not a bullet hole, I ask you, where did that

16   come from?

17   Incidentally, in the same place where Catherine told

18   you she was shot at, a hole that resembles a bullet hole,

19   that's going to be the hole.  That's going to be the car.

20   Where did that come from?

21   Is it possible he stepped over a -- ran over a rock,

22   a pipe or whatever, and it went through the seat?

23   Of course, it is possible.

24   But what a coincidence -- right? -- that she tells

25   you this is how it happens, and then the bullet appears,

936

1    a hole appears in the car, in the same exact place where

2    she told you she got shot at.

3        Ladies and gentlemen, you don't have to believe

4    Catherine Ruiz by herself.

5        You have so much, so much other evidence that

6    corroborates her story that it is impossible for you to

7    find that these events didn't occur as she said they did,

8    or all -- as all of them put together said that they did.

9    Look at the totality of the evidence.  Look at what you

10   have before you, and you make a determination of whether

11   that man committed the acts that we say he did.

12       Counsel also talked about why there was no gunshot

13   residue test done.  I mean the -- Officer Infante

14   explained to you, gunshot residue is very fragile.  The

15   car was found a month later.  I'm not going to talk about

16   this anymore.  You could make the determination for

17   yourself.  You look at the video.  Look at the hole.  You

18   decide whether you think that is a bullet hole or not.

19   I'm just submitting to you all what a coincidence that

20   this happened in this manner.

21       Counsel essentially told you in his argument that he

22   believed that Catherine Ruiz was confined, that he agrees

23   that Catherine Ruiz was confined, but that you shouldn't

24   find him guilty, because she is a monster.  You shouldn't

937

1    find him guilty, because she defiles the courts, and you

2    should be sickened by her testimony.

3        You should be sickened by the actions of the defendant

4    that night. You should be sickened by what he did to all

5    of these people that night, including Catherine,

6    especially Catherine.

7        That Catherine went back to him after that, so what?

8        That Catherine didn't want to prosecute, so what?

9        If Catherine didn't even come in yesterday, this case

10   would have still gone forward, because there is one, two,

11   three, four, five -- seven other people that would have

12   told you what happened that day, including that video.

13       So what?

14       The charges remain the same.

15       The incident remains the same.

16       What he did does not become less of a crime because

17   you don't like her, or because she did some things that

18   you didn't agree with, or that I didn't agree with

19   necessarily.

20       It doesn't make what he does any better.

21       Was Dennis Flores afraid for his life?

22       Of course, he was. Dennis Flores was afraid that a

23   bullet that was three feet away from him was going to hit

24   him.

25       We also have Lesbia Morales and Johanna Rodriguez, who

938

1    just happened to be going by at that time.

2        He wants to say that they didn't see what they think

3    they did.

4        You listen to the hysterics on that 9-1-1 tape, the

5    hysterics.  That is the only way describe it.

6        You listen to the voice on that 9-1-1 tape and you

7    tell me whether or not that woman was terrorized.

8        She wasn't even in the car when he is beating her, and

9    shooting, and all of this was going on.

10       You tell me that Lesbia's voice on that 9-1-1 tape

11   isn't pure hysterics.

12       How do you think Catherine was?

13       What do you think the condition of Catherine was?

14       Do you think she was not being terrorized, or that she

15   had to jump out of the car and run into the car with

16   women she has no idea, she has never met, jump inside the

17   car, the vehicle, screaming, "He's going to kill me, he's

18   going to kill me"?

19       And then later that night, he calls her and tells her:

20   "I'm going to bury you."

21       He reminded her, "I'm going to kill you," actually.

22       "I'm going to kill you.  I'm preparing your picture.

23   Call me."

24       Very intense.

25       "And I'm preparing your picture so they can bury you."

MATZ, TRAKTMAN, FELDMAN AND WILDNER

1       Ladies and gentlemen, this case is not about Catherine

2   Ruiz.

3       When you go back in the jury room, you're going to

4   follow the law, and you're going to know that it's never

5   OK, and you're going to tell this man that it's never OK

6   to pull a gun on anybody; that it's never OK to do the

7   things that he did that day; that it's never OK to shoot

8   a gun in a public place, to scare somebody.

9       When you go back in the jury room, it's not what

10  Catherine Ruiz' actions were that -- even were --

11      It's unconscionable what counsel would like you to

12  think.

13      It was the defendant's actions that were

14  unconscionable.

15      And when you go into the jury room, you're going to

16  find the defendant guilty, as charged, because you know

17  that he committed these crimes.

18      And I am confident that you will follow the law, and

19  you will find the defendant guilty.

20      Thank you.

21      THE COURT:   Jimmy, please pass these out.

22      While I'm reading the jury instructions, I don't want

23  any --

24      Mr. Gross, while I'm reading the jury instructions, I

25  don't want any talking, whatsoever from anyone.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

940

1        Anyone in the audience that leaves, don't come back.

2    I don't want anybody walking in and out while I'm

3    reading.

4        Ladies and gentlemen, I passed out a copy of the jury

5    instructions.  I'm going to read them to you.  I need for

6    you to read along with me.

7        Please do not get ahead of me, and some parts may seem

8    repetitive, but by law, I have to read them the same way

9    they are printed here.

10       In the Circuit Court of the Eleventh Judicial Circuit,

11   in and for Miami-Dade County, Florida.

12       Case Number F03-16995.

13       State of Florida, plaintiff, versus Pablo Diaz,

14   defendant.

15       Judge Jimenez.

16       Jury instructions.

17       Introduction to final instructions.

18       Members of the jury, I want to thank you for your

19   attention during this trial.

20       Please pay attention to the instructions I am about to

21   give you.

22       Statement of charges.

23       Pablo Diaz, the defendant in this case, has been

24   accused of the crimes of:

25       Attempted felony murder.

941

1    Kidnapping.

2    And aggravated assault.

3    Introduction to attempted homicide.

4    In this case, Pablo Diaz is accused of attempted first

5    degree felony murder in Count I of the Information.

6    An attempted killing that is excusable or was

7    committed by the use of justifiable deadly force is

8    lawful.

9    If you find that there was an attempted killing of

10   Catherine Ruiz by Pablo Diaz, you will then consider the

11   circumstances surrounding the attempted killing in

12   deciding if it was attempted first degree felony murder,

13   attempted second-degree murder, attempted voluntary

14   manslaughter, aggravated assault or battery, or whether

15   the attempted killing was excusable or resulted from

16   justifiable use of deadly force.

17   Justifiable attempted homicide.

18   The attempted killing of a human being is justifiable

19   and lawful if necessarily done while resisting an attempt

20   to murder or commit a felony upon the defendant, or to

21   commit a felony in any dwelling house in which the

22   defendant was at the time of the attempted killing.

23   Excusable attempted homicide.

24   The attempted killing of a human being is excusable

25   and therefore lawful under any one of the three following

942

1    circumstances:

2    One, when the attempted killing is committed by

3    accident and misfortune in doing any lawful act by lawful

4    means with usual ordinary caution and without any

5    unlawful intent.

6    Or two, when the attempted killing occurs by accident

7    and misfortune in the heat of passion, upon any sudden

8    and sufficient provocation.

9    Or three, when the attempted killing is committed by

10   accident and misfortune, resulting from a sudden combat,

11   if a dangerous weapon is not used and the attempted

12   killing is not done in a cruel and unusual manner.

13   A dangerous weapon is any weapon that, taking into

14   account the manner in which it is used is likely to

15   produce death or great bodily harm.

16   I now instruct you on the circumstances that must be

17   proved before the defendant may be found guilty of

18   attempted first degree felony murder.

19   Attempted felony murder.

20   Before you can find the defendant guilty of attempted

21   felony murder, as charged in Count I of the Information,

22   the State must prove the following two elements beyond a

23   reasonable doubt:

24   One, Pablo Diaz committed a kidnapping.

25   Two, Pablo Diaz committed, aided or abetted an

943

1    intentional act, that is, shooting at Catherine Ruiz and

2    which could have but did not cause the death of Catherine

3    Ruiz.

4        In order to convict of attempted felony murder, it is

5    not necessary for the State to prove that the defendant

6    had a premeditated design or intent to kill.

7        If you find the defendant guilty of attempted felony

8    murder, it will be necessary for you to determine in your

9    verdict whether the defendant actually possessed or did

10   not actually possess a firearm during the commission of

11   the crime, and if so, you must further determine whether

12   the defendant discharged a firearm or not during the

13   commission of the crime.

14       A firearm is legally defined as any weapon, including

15   a starter gun, which will, is designed to, or may readily

16   be converted to expel a projectile by the action of an

17   explosive; the frame or receiver of such weapon; any

18   firearm muffler or firearm silencer or any machine gun.

19       It is not an attempt to commit felony murder if the

20   defendant abandoned the attempt to commit the offense or

21   otherwise prevented its commission under circumstances

22   indicating a complete and voluntary renunciation of his

23   criminal purpose.

24       The elements for kidnapping as used in this

25   instruction are:

MATZ, TRAKTMAN, FELDMAN AND WILDNER

944

1    One, Pablo Diaz forcibly, secretly or by threat,

2    confined, abducted or imprisoned Catherine Ruiz against

3    her will.

4    Two, Pablo Diaz had no lawful authority.

5    Three, Pablo Diaz acted with the intent to inflict

6    bodily harm upon or to terrorize the victim, or another

7    person.

8    Kidnapping.

9    To prove the crime of kidnapping, as charged in Count

10   II of the Information, the State must prove the following

11   three elements beyond a reasonable doubt:

12   One, Pablo Diaz forcibly, secretly, or by threat,

13   confined, abducted or imprisoned Catherine Ruiz against

14   her will.

15   Two, Pablo Diaz had no lawful authority.

16   Three, Pablo Diaz acted with the intent to inflict

17   bodily harm upon or to terrorize the victim or another

18   person.

19   If you find the defendant guilty of kidnapping, it

20   will be necessary for you to determine in your verdict

21   whether the defendant actually possessed a firearm or

22   not, and if so, you must further determine whether the

23   defendant discharged a firearm or not during the

24   commission of the crime.

25   A firearm is legally defined as any weapon, including

945

1    a starter gun, which will, is designed to or may readily

2    be converted to expel a projectile by the action of an

3    explosive; the frame or receiver of such weapon; any

4    firearm muffler or firearm silencer, or any machine gun.

5       Aggravated assault.

6       To prove the crime of aggravated assault, as charged

7    in Count III of the Information, the State must prove the

8    following four elements beyond a reasonable doubt:

9       One, Pablo Diaz intentionally and unlawfully

10   threatened, either by word or act to do violence to

11   Dennis Flores.

12      Two, at the time, Pablo Diaz appeared to have the

13   ability to carry out the threat.

14      Three, the act of Pablo Diaz pointing a gun at

15   Catherine Ruiz and/or Dennis Flores created in the mind

16   of Dennis Flores a well founded fear that the violence

17   was about to take place.

18      Four, the assault was made with a deadly weapon.

19      A weapon is a deadly weapon if it is used or

20   threatened to be used in a way likely to produce death or

21   great bodily harm.

22      It is not necessary for the State to prove that the

23   defendant had an intent to kill.

24      If you find the defendant guilty of aggravated

25   assault, it will be necessary for you to determine in

1    your verdict whether the defendant actually possessed a

2    firearm or not during the commission of the crime.

3       A firearm is legally defined as any weapon, including

4    a starter gun, which will, is designed to or may readily

5    be converted to expel a projectile by the action of an

6    explosive; the frame or receiver of such weapon; any

7    firearm muffler or firearm silencer, or any machine

8    gun.

9       When there are lesser-included crimes.

10      In considering the evidence, you should consider the

11   possibility that although the evidence may not convince

12   you that Pablo Diaz committed the main crimes of which he

13   is accused, there may be evidence that he committed other

14   acts that would constitute a lesser-included crime.

15      Therefore, if you decide that the main accusation has

16   not been proved beyond a reasonable doubt, you will next

17   need to decide if Pablo Diaz is guilty of any lesser-

18   included crime.

19      The lesser-included crimes indicated in the

20   definition of attempted felony murder are:

21      Attempted second-degree murder.

22      Attempted voluntary manslaughter.

23      Aggravated battery.

24      And battery.

25      The lesser-included crime indicated in the definition

947

1    of kidnapping is false imprisonment.

2        The lesser-included crime indicated in the definition

3    of aggravated assault is assault.

4        Attempted second-degree murder.

5        Before you can find the defendant guilty of attempted

6    second-degree murder, as a lesser-included offense of

7    Count I of the Information, the State must prove the

8    following two elements beyond a reasonable doubt:

9        One, Pablo Diaz intentionally committed an act which

10   would have resulted in the death of Catherine Ruiz,

11   except that someone prevent Pablo Diaz from killing

12   Catherine Ruiz, or he failed to do so.

13       Two, the act was imminently dangerous to another, and

14   demonstrated a depraved mind without regard for human

15   life.

16       An act includes a series of related actions arising

17   from and performed pursuant to a single design or

18   purpose.

19       An act is imminently dangerous to another and

20   demonstrating a depraved mind if it is an act or series

21   of acts that:

22       One, a person of ordinary judgment would know is

23   reasonable certain to kill or do serious bodily injury to

24   another.

25       And two, is done from ill will, hatred, spite or an

948

1    evil intent.

2        And three, is of such a nature that the act itself

3    indicated an indifference to human life.

4        In order to convict of attempted second-degree

5    murder, it is not necessary for the State to prove the

6    defendant had an intent to cause death.

7        It is not an attempt to commit second-degree murder

8    if the defendant abandoned the attempt to commit the

9    offense or otherwise prevented its commission under

10   circumstances indicating a complete and voluntary

11   renunciation of his criminal purpose.

12       If you find the defendant guilty of attempted second-

13   degree murder, it will be necessary for you to determine

14   in your verdict whether the defendant actually possessed

15   a firearm or not during the commission of the crime, and

16   if so, you must further determine whether the defendant

17   discharged a firearm or not during the commission of the

18   crime.

19       A firearm is legally defined as any weapon, including

20   a starter gun, which will, is designed to or may readily

21   be converted to expel a projectile by the action of an

22   explosive; the frame or receiver of such weapon; any

23   firearm muffler or firearm silencer or any machine gun.

24       You may find yourself repeating that in your sleep.

25       Attempted voluntary manslaughter.

949

1    Before you can find the defendant guilty of attempted

2    voluntary manslaughter, as a lesser-included offense of

3    Count I, the State must prove the following element

4    beyond a reasonable doubt:

5    Pablo Diaz committed an act which was intended to

6    cause the death of Catherine Ruiz, and would have

7    resulted in the death of Catherine Ruiz, except that

8    someone prevented Pablo Diaz from killing Catherine Ruiz

9    or he failed to do so.

10   However, the defendant cannot be guilty of attempted

11   voluntary manslaughter if the attempted killing was

12   either excusable or justifiable, as I have previously

13   explained those terms.

14   It is not an attempt to commit manslaughter if the

15   defendant abandoned the attempt to commit the offense or

16   otherwise prevented its commission under circumstances

17   indicating a complete and voluntary renunciation of his

18   criminal purpose.

19   In order to convict of attempted voluntary

20   manslaughter, it is not necessary for the State to prove

21   that the defendant had a premeditated intent to cause

22   death.

23   If you find the defendant guilty of attempted

24   voluntary manslaughter, you must determine in your

25   verdict if he carried, displayed, used, threatened to use

950

1  or attempted to use a firearm at the time.

2  A firearm is legally defined as any weapon, including

3  a starter gun, which will, is designed to, or may readily

4  be converted to expel a projectile by the action of an

5  explosive; the frame or receiver of such weapon; any

6  firearm muffler or firearm silencer or any machine gun.

7  Aggravated battery.

8  To prove the crime of aggravated battery, as a

9  lesser-included offense of Count I, the State must prove

10  the following two elements beyond a reasonable doubt:

11  One, Pablo Diaz intentionally touched or struck

12  Catherine Ruiz against her will.

13  Two, Pablo Diaz, in committing the battery,

14  intentionally or knowingly caused great bodily harm

15  and/or used a deadly weapon.

16  A weapon is a deadly weapon if it is used or

17  threatened to be used in a way likely to produce death or

18  great bodily harm.

19  If you find the defendant guilty of aggravated

20  battery, it will be necessary for you to determine in

21  your verdict whether the defendant actually possessed a

22  firearm or not, and if so, you must further determine

23  whether the defendant discharged a firearm or not during

24  the commission of the crime.

25  A firearm is legally defined as any weapon, including

MATZ, TRAKTMAN, FELDMAN AND WILDNER

951

1    a starter gun, which will, is designed to or may readily

2    be converted to expel a projectile by the action of an

3    explosive; the frame or receiver of such weapon; any

4    firearm muffler or firearm silencer or any machine gun.

5    Battery.

6        To prove the crime of battery as a lesser-included

7    offense to Count I, the State must prove the following

8    element beyond a reasonable doubt:   Pablo Diaz

9    intentionally touched or struck Catherine Ruiz against

10   her will.

11       False imprisonment.

12       To prove the crime of false imprisonment, as a

13   lesser-included offense of Count II, the State must prove

14   the following two elements beyond a reasonable doubt:

15       One, Pablo Diaz forcibly, secretly or by threat

16   confined, abducted, imprisoned or restrained Catherine

17   Ruiz against her will.

18       Two, Pablo Diaz had no lawful authority.

19       If you find the defendant guilty of false

20   imprisonment, you must determine in your verdict if he

21   carried, displayed, used, threatened to use or attempted

22   to use a firearm at the time.

23       A firearm is legally defined as any weapon, including

24   a starter gun, which will, is designed to or may readily

25   be converted to expel a projectile by the action of an

MATZ, TRAKTMAN, FELDMAN AND WILDNER

952

1   explosive; the frame or receiver of such weapon; any

2   firearm muffler, or firearm silencer, or any machine gun.

3       Assault.

4       To prove the crime of assault as a lesser-included

5   offense of Count III of the Information, the State must

6   prove the following three elements beyond a reasonable

7   doubt:

8       One, Pablo Diaz intentionally and unlawfully

9   threatened, either by word or act, to do violence to

10  Catherine Ruiz.

11      Two, at the time, Pablo Diaz appeared to have the

12  ability to carry out the threat.

13      Three, the act of Pablo Diaz created in the mind of

14  Catherine Ruiz a well founded fear -- I'm sorry.  Hold on

15  for a second.  I need to see the lawyers sidebar.  Hold

16  on.

17      Sidebar.

18      (Thereupon, counsel for the respective parties

19  approached the bench, and the following proceedings were

20  had outside the hearing of the jury panel:)

21      THE COURT:  I need to change that and put:

22      Catherine Ruiz, the victim; Dennis Flores and the

23  assault, as a lesser.

24      I'm going to --

25      Both sides are in agreement?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

953

1        I will correct it and re-read them that instruction.

2        And the one that's going to go into the jury room is

3    my original instruction.

4        I will take the ones that they are reading from

5    them.

6        MR. BLACKER:   Tomorrow, you will retype it before it

7    goes in?

8        THE COURT:   I will send it in now, like this, with my

9    corrections and put my initials.

10        Dennis Flores.

11        I don't know how late I'm going to.

12        Any objections to the corrections?

13        MR. BLACKER:   No.

14        THE COURT:   All right.

15        Let's go.

16        (Thereupon, the sidebar conference was concluded,

17    after which, the following proceedings were had in open

18    court:)

19        THE COURT:   I need to re-read the assault

20    instruction, because I made a mistake.

21        The victim listed in the assault instruction was

22    Catherine Ruiz.

23        And the person alleged as the victim in that count

24    would be Dennis Flores.

25        So I'm going to read it -- re-read it at this time.

954

1   Assault.

2   To prove the crime of assault, as a lesser-included

3   offense of Count III of the Information, the State

4   must prove the following three elements beyond a

5   reasonable doubt:

6   One, Pablo Diaz intentionally and unlawfully

7   threatened, either by word or act, to do violence to

8   Dennis Flores.

9   I need to correct the instructions.

10   My original instruction is the ones you are going to

11   take into the jury room, and I have initialed them.

12   Two, at the time, Pablo Diaz appeared to have the

13   ability to carry out the threat.

14   Three, the act of Pablo Diaz created in the mind of

15   Dennis Flores a well founded fear that violence was about

16   to take place.

17   And again, I made that correction.  Go on to the next

18   instruction.

19   Plea of not guilty.

20   Reasonable doubt.

21   And burden of proof.

22   The defendant has entered a plea of not guilty.  This

23   means you must presume or believe the defendant is

24   innocent.

25   The presumption stays with the defendant as to each

MATZ, TRAKTMAN, FELDMAN AND WILDNER

955

1  material allegation in the Information through each stage

2  of the trial unless it has been overcome by the evidence

3  to the exclusion of and beyond a reasonable doubt.

4  To overcome the defendant's presumption of innocence,

5  the State has the burden of proving the following:

6  The crime with which the defendant is charged was

7  committed, and the defendant is the person who committed

8  the crime.

9  The defendant is not required to present evidence or

10  prove anything.

11  Whenever the words, "reasonable doubt" are used, you

12  must consider the following:

13  A reasonable doubt is not a mere possible doubt, a

14  speculative, imaginary or forced doubt.

15  Such a doubt must not influence you to return a

16  verdict of not guilty if you have an abiding conviction

17  of guilt.

18  On the other hand, if after carefully considering,

19  comparing and weighing all the evidence there is not an

20  abiding conviction of guilt, or if having a conviction,

21  it is one which is not stable, but one which wavers and

22  vacillates, then the charge is not proved beyond every

23  reasonable doubt, and you must find the defendant not

24  guilty because the doubt is reasonable.

25  It is to the evidence introduced in this trial and to

MATZ, TRAKTMAN, FELDMAN AND WILDNER

956

1   it alone that you are to look for the proof.

2       A reasonable doubt as to the guilt of the defendant

3   may arise from the evidence, conflict in the evidence or

4   a lack of evidence.

5       If you have a reasonable doubt, you should find the

6   defendant not guilty.

7       If you have no reasonable doubt, you should find the

8   defendant guilty.

9       And for the lawyers, in that I'm going to cross out

10  the next to the last sentence, the word, "the" and put

11  "a," and I'm going to put my initials.

12      Any objection?

13      MR. GROSS:  No, Your Honor.

14      THE COURT:  Mr. Blacker?

15      MR. BLACKER:  No, sir.

16      THE COURT:  Weighing the evidence.

17      It is up to you to decide what evidence is reliable.

18  You should use your common sense in deciding which is the

19  best evidence and which evidence should not be relied

20  upon in considering your verdict.

21      You may find some of the evidence not reliable or

22  less reliable than other evidence.

23      You should consider how the witnesses acted as well

24  as what they said.

25      Some things you should consider are:

MATZ, TRAKTMAN, FELDMAN AND WILDNER

957

1    One, did the witness seem to have an opportunity to

2 see and know the things about which the witness

3 testified?

4    Two, did the witness seem to have an accurate memory?

5    Three, was the witness honest and straightforward in

6 answering the attorneys' questions?

7    Four, did the witness have some interest in how the

8 case should be decided?

9    Five, does the witness' testimony agree with the

10 other testimony and other evidence in the case?

11    Six, did the witness at some other time make a

12 statement that is inconsistent with the testimony he or

13 she gave in court?

14    Seven, was it proved that the witness had been

15 convicted of a crime?

16    Eight, had any pressure or threat been used against

17 the witness that affected the truth of the witness'

18 testimony?

19    You may rely upon your own conclusion about the

20 witness.

21    A juror may believe or disbelieve all or any part of

22 the evidence or the testimony of any witness.

23    Expert witnesses.

958

1    Expert witnesses are like other witnesses with one

2    exception. The law permits an expert witness to give his

3    or her opinion.

4    However, an expert's opinion is only reliable when

5    given on a subject about which you believe him or her to

6    be an expert.

7    Like other witnesses, you may believe or disbelieve

8    all or any part of an expert's testimony.

9    Defendant not testifying.

10    The Constitution requires the State to prove its

11    accusations against the defendant.

12    It is not necessary for the defendant to disprove

13    anything, nor is the defendant required to prove his

14    innocence.

15    It is up to the State to prove the defendant's

16    guilty by evidence.

17    The defendant exercised a fundamental right by

18    choosing not to be a witness in this case.

19    You must not view this as an admission of guilt or

20    be influenced in any way by his decision.

21    No juror should ever be concerned that the defendant

22    did or did not take the witness stand to give testimony

23    in the case.

24    Rules for deliberation.

25    These are some general rules that apply to your

MATZ, TRAKTMAN, FELDMAN AND WILDNER

959

1    discussion.

2        You must follow these rules in order to return a

3    lawful verdict.

4        One, you must follow the law as it is set out in

5    these instructions.

6        If you fail to follow the law, your verdict will be

7    a miscarriage of justice.

8        There is no reason for failing to follow the law in

9    this case.

10       All of us are depending upon you to make a wise and

11   legal decision in this matter.

12       Two, this case must be decided only upon the

13   evidence that you have heard from the testimony of the

14   witnesses and these instructions.

15       Three, this case must not be decided for or against

16   anyone because you feel sorry for anyone or are angry at

17   anyone.

18       Four, remember, the lawyers are not on trial.  Your

19   feelings about them should not influence your decision

20   in this case.

21       Five, your duty is to determine if the defendant has

22   been proven guilty or not, in accord with the law.

23       It is the Judge's job to determine a proper sentence

24   if the defendant is guilty.

25       Six, whatever verdict you render must be unanimous;

960

1     that is, each juror must agree to the same verdict.

2     Seven, it is entirely proper for a lawyer to talk to

3     a witness about what testimony the witness would give if

4     called to the courtroom.

5     The witness should not be discredited by talking to

6     a lawyer about his or her testimony.

7     Eight, your verdict should not be influenced by

8     feelings of prejudice, bias or sympathy.

9     Your verdict must be based on the evidence and on

10     the law contained in these instructions.

11     Cautionary instruction.

12     Deciding a verdict is exclusively your job. I cannot

13     participate in that decision in any way.

14     Please disregard anything I may have said or done

15     that made you think I prefer one verdict over another.

16     Single defendant, multiple counts.

17     A separate crime is charged in each count of the

18     Information, and while they have been tried together,

19     each crime and the evidence applicable to it must be

20     considered separately and a separate verdict returned as

21     to each.

22     A finding of guilty or not guilty as to one crime

23     must not affect your verdict as to the other crimes

24     charged.

25     Verdict.

961

1    You may find the defendant guilty as charged in the

2    Information, or guilty of such lesser-included crime as

3    the evidence may justify, or not guilty.

4    If you return a verdict of guilty, it should be for

5    the highest offense which has been proven beyond a

6    reasonable doubt.

7    If you find that no offense has been proven beyond a

8    reasonable doubt, then, of course, your verdict must be

9    not guilty.

10   Only one verdict may be returned as to each crime

11   charged.

12   This verdict must be unanimous; that is, all of you

13   must agree to the same verdict.

14   The verdict must be in writing, and for your

15   convenience, the necessary form of verdict has been

16   prepared for you.  It is as follows:

17   I'm going to read you the verdict form.  If you go

18   past the next instruction, you will have the verdict

19   form.

20   Pass that one, submitting the case to the jury, and

21   there you have the verdict form.

22   And I need to go over it with you.

23   In the Circuit Court of the Eleventh Judicial

24   Circuit, in and for Miami-Dade County, Florida.

25   The State of Florida, plaintiff versus Pablo Diaz,

MATZ, TRAKTMAN, FELDMAN AND WILDNER

962

1       defendant.

2           Criminal Division.

3           Case Number F03-16995.

4           Verdict.

5           We, the jury, find as follows as to Count I of the

6       Information.

7           Now, look up here.

8           You have to make a choice between "A," "B," "C," "D,"

9       "E" or "F," OK?

10          You only check one, whatever your verdict is.

11          "A," the defendant is guilty of attempted felony

12      murder.

13          If that is your verdict, then you need to continue.

14      And the defendant -- you need to check only one --

15      actually possessed a firearm, and the defendant -- check

16      only one -- discharged a firearm or did not discharge a

17      firearm, or did not possess a firearm.

18          So if "A" is your choice, then you need to make a

19      sub-choice, whether he actually possessed a firearm or

20      not, and if he did possess a firearm, whether he did

21      discharge it or not.

22          If "A" is not your choice, then "B."

23          The defendant is guilty of attempted second-degree

24      murder, and the defendant -- again, you make the choice -

25      - check only one.  -- actually possessed a firearm, and

1   the defendant -- check only one -- discharged a firearm,

2   did not discharge a firearm or did not possess a firearm.

3       Or "C," the defendant is guilty of attempted

4   voluntary manslaughter, as a lesser offense, and the

5   defendant -- check only one -- carried, displayed, used,

6   threatened to use or attempted to use a firearm, or did

7   not carry display, use, threaten to use or attempt to use

8   a firearm.

9       Or "D," the defendant is guilty of aggravated

10  battery, as a lesser-included offense, and the defendant

11  -- check only one-- actually possessed a firearm, and the

12  defendant, if that is your choice -- check only one --

13  discharged a firearm, did not discharge a firearm, or did

14  not possess a firearm.

15      "E," the defendant is guilty of battery, as a lesser-

16  included offense.

17      Or "F," the defendant is not guilty.

18      Now, we, the jury, find as follows as to Count II of

19  the Information.

20      You can check "A," "B" or "C."

21      You can only check one, whichever one is your choice.

22      "A," the defendant is guilty of kidnapping, and the

23  defendant, if that is your choice -- check only one --

24  actually possessed a firearm, and the defendant -- check

25  only one -- discharged a firearm, or did not discharge a

964

1    firearm, or did not possess a firearm.

2        Or "B," the defendant is guilty of false

3    imprisonment, as a lesser-included offense, and the

4    defendant -- check one -- carried, displayed, used,

5    threatened to use or attempted to use a firearm, or did

6    not carry, display, use, threaten to use or attempt to

7    use a firearm.

8        And "C," the defendant is not guilty.

9        Finally, we, the jury, find as follows as to Count

10   III of the Information.

11       You check "A," "B" or "C."

12       "A," the defendant is guilty of aggravated assault

13   and the defendant -- check only one -- actually possessed

14   a firearm, did not possess a firearm.

15       "B," the defendant is guilty of assault as a lesser-

16   included offense.

17       Or "C," the defendant is not guilty.

18       You only check one, and these sub-choices have a

19   legal significance.

20       You just make whatever choice you need to make.

21       So say we all, this blank day of blank, 2007, at

22   Miami-Dade County, Florida.

23       The foreperson signs and dates it.

24       So the foreperson needs to fill out the 10th day of

25   May, 2007, and sign it.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

965

1      Now, once the foreperson has filled out the verdict,

2   you fold it and hold onto it, OK?

3      Now, let's go to the last instruction, submitting the

4   case to the jury.

5      In just a few moments, you will be taken to the jury

6   room by the bailiff.

7      The first thing you should do is elect a foreperson

8   who will preside over your deliberations like the

9   chairperson of a meeting.

10      It is the foreperson's job to sign and date the

11   verdict form when all of you have agreed on a verdict in

12   this case and to bring the verdict back to the courtroom

13   when you return.

14      Your verdict finding the defendant either guilty or

15   not guilty must be unanimous.

16      The verdict must be the verdict of each juror, as

17   well as of the jury as a whole.

18      In closing, let me remind you that it is important

19   that you follow the law spelled out in these instructions

20   in deciding your verdict.

21      There are no other laws that apply to this case.

22      Even if you do not like the laws that must be

23   applied, you must use them.

24      For two centuries, we have agreed to a Constitution

25   and to live by the law.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

966

1       No one of us has the right to violate rules we all

2   share.

3       Julio Jimenez, Circuit Court Judge.

4     Now, Jimmy, will you please collect their copies that

5   they were following along with?

6       To the lawyers, did I give the instructions I said I

7   would give?

8       MS. CORONA:  Yes, Your Honor.

9       MR. BLACKER:  Yes.

10      THE COURT:  All right.

11      Now, I'm going to give Jimmy the-- my original jury

12   instructions, the verdict form, a pad of paper and  a

13   pen.

14      Please hand that to one of the jurors.

15      Let me tell you what the pad of paper and pen are

16   for.

17      If you need to communicate with us in any way, you

18   need to do it in writing.

19      The foreperson will write out the question, date it

20   and sign it and then the foreperson will knock on the

21   jury room door.

22      Jimmy will be seated out here, listening to his

23   radio.

24      For your privacy, he puts on the oldies but goodies.

25   He will knock, and then when he knocks, you hand him the

MATZ, TRAKTMAN, FELDMAN AND WILDNER

967

1    question or the communication, and he will bring it to

2    me, and I will see if I can answer it.

3        Let me caution you now that if you have a question

4    regarding the facts of this case, the answer that we give

5    is that the jury must rely upon its own recollection of

6    the evidence.

7        We cannot interpret the facts for you.

8        We can't tell you what the facts are.  That is the

9    jury's job.

10       So if you have a question regarding the facts, the

11   answer will be the jury must rely upon its own

12   recollection of the facts.

13       This was a short trial.  We do not have simultaneous

14   transcripts of the proceedings, so we don't have anything

15   like that to give you.

16       The answer will be:

17       You must rely upon your own recollection of the

18   facts.

19       If you have a question regarding the law, the normal

20   answer that I give is that the jury has all the law that

21   pertains to this case in those instructions.

22       There are no other laws that apply to this case.  The

23   only laws that apply to this case are in those

24   instructions.

25       Now, once you reach a verdict, the foreperson will

968

1    fill out the form, the verdict form, fold it, knock on

2    the jury room door.

3    Do not give the verdict to Jimmy.  Simply tell him

4    that you have a verdict.

5    At that point, we will reconvene.  I will get a lot

6    of security in here to bring you out to receive your

7    verdict, OK?

8    If you --

9    The lawyers are going to have to review the evidence

10   and make sure that that's all the evidence that pertains

11   to this case, and then we will be sending it in.

12   If you need a tape player, we have a tape player.  We

13   can always send it in.

14   If you need to see the video, the DVD player, we can

15   always send it in.  It can be wheeled in there.  If you

16   need the video player, that can be wheeled in.

17   Whatever you need, you request it, and we will have

18   Jimmy do it.  We'll have Jimmy send it in.

19   I'm going to ask --

20   And do the lawyers have any objection to Jimmy,

21   without reconvening, if there is a note from the jurors

22   that they need a tape player, DVD player, video player,

23   coffee, anything that Jimmy can obtain these things for

24   them without having to consult with the lawyers?

25   Does the defendant have a problem with that?

969

1    MR. BLACKER:  Absolutely not.

2    THE COURT:  No objection?

3    MR. BLACKER:  No problem, Judge.

4    MS. CORONA:  I have no problem, Judge.

5    THE COURT:  All right.

6        Now, I'm going to ask the jurors to please take out

7    your cell phones and turn them off so Jimmy can collect

8    them.

9        All right.

10       Again, remember, if you have a question regarding the

11   facts, you must try to hash it out amongst yourselves.

12       I cannot resolve those factual issues for you.

13       And all of the law that pertains to this case are in

14   those instructions.

15       Now, it's 6:30.

16       I would suggest, because everybody has a life,

17   including the Judge, that if by 7:30 -- and you can take

18   as little or as long to decide your verdict here.

19       If by 7:30 you didn't have a verdict, I will suggest

20   that we call it quits and send everybody home, and bring

21   you back tomorrow morning.

22       And you can, again, take as long or as little time.

23   Verdicts are quick sometimes, and there are verdicts that

24   take longer.  It's up to you.

25       If you communicate with us in writing, please do not--

MATZ, TRAKTMAN, FELDMAN AND WILDNER

970

1    If there is any numerical division, do not write any

2    numerical division on your written note, OK?

3    Like, let's say if it's five to one or something like

4    that on a certain count, don't write that on the note,

5    OK?

6    What happens in the jury room should remain private

7    until you guys have reached a verdict, OK?

8    And so if there is no objection, at this time, you

9    may retire to deliberate.

10   (Thereupon, the jury panel retired to consider its

11   verdict, after which, the following proceedings were had

12   outside the presence of the jury panel:)

13   THE COURT:  I will ask the people in the audience to

14   wait outside, and we're still on the record.

15   Again, Mr. Diaz, I believe that Michael did an

16   excellent job for you.

17   You could see what kind of lawyer you have here.

18   Are you fully satisfied with his job?

19   THE DEFENDANT:  Yes, I am.

20   THE COURT:  I think you and your family should be,

21   because he is an excellent lawyer.

22   There is a knock on the jury room door.

23   THE BAILIFF:  Write whatever you need.

24   THE COURT:  All right.

25   Now the lawyers -- where is Carolina?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

971

1    What were they saying, Jimmy?  They need to put it in

2    writing.

3        THE BAILIFF:  They need the tape recorder, and you

4    interrupted and I didn't hear that last thing they said.

5        THE COURT:  I suggest that you leave it in the

6    machine.  That's OK.  They can put it in.

7        Look over the evidence and make sure that is the

8    evidence, and there is no extraneous material.

9        You need to look at the evidence.

10       We need the tape player and 9-1-1 tape.

11       Hold on, Jimmy.  You can send them more.

12       Here, madam clerk.  Make this a court exhibit.  Make

13   sure the court exhibit does not go in.

14       Look at everything.  Make sure the proper reports are

15   in and all that.

16       Give everything to Jimmy.

17       How about the reports?  You got those in?

18       MR. BLACKER:  I got one report in.

19       Did we have two or one?

20       MS. CORONA:  Yes, just one.

21       That's the court exhibit.  They do not go to the

22   jury.

23       THE COURT:  Madam clerk, the court exhibits, are they

24   out?

25       They are not over there?

972

1    The court exhibits, they don't go to the jury.  Put

2    those away, then.

3        We're ready now.  We are still on the record.  The

4    defendant is present.

5        Are the lawyers satisfied with that as the exhibits,

6    that Jimmy has all of the exhibits in the case, and that

7    there is no extraneous material there?

8        MS. CORONA:  Yes, Judge.

9        MR. BLACKER:  So, Judge --

10       THE COURT:  Well, this is the time.

11       MR. BLACKER:  I have no knowledge that it isn't, but

12   I mean --

13       THE COURT:  You just went over it with the

14   prosecutor.  The answer is "yes" or "no."

15       MR. BLACKER:  OK.  Yes.

16       THE COURT:  Jimmy, hand all that to the jury.

17       And now, let's go.

18       Don't leave.  Hold on.

19       We need to go over some other stuff.  Don't leave.

20       All right.

21       Now, give one to each side and one to the court

22   reporter.

23       Let's go over the other instructions.  Take a seat.

24   Let's go over them quickly.

25       This is if we need to have them decide the remaining

MATZ, TRAKTMAN, FELDMAN AND WILDNER

973

1     charge, all right?

2        Cover sheet.

3        Introduction.

4        Statement of the charge.

5        Any objection to that instruction?

6        The last paragraph of this instruction covers the

7     minimum mandatory.

8        Any objections?

9        MS. CORONA:  No objection.

10       THE COURT:  Michael?

11       MR. BLACKER:  Is it the same reasonable and burden of

12    proof instruction that you gave before?

13       THE COURT:  Yes.

14       How about the possession?

15       MR. BLACKER:  Possession is fine.

16       THE COURT:  Then weighing the evidence.

17       The same one.

18       Expert witnesses.

19       Defendant not testifying.

20       By the way, the defendant can decide if he wants to

21    testify, so we have both.

22       We have both, with or without.

23       Rules for deliberations, the same.

24       Single defendant, multiple counts.

25       The cautionary instruction.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

974

1        Verdict.

2        Submitting case to the jury.

3        And the verdict form.

4        Any objection to the verdict form?

5        MS. CORONA:  No, Judge.

6        THE COURT:  So now the way that I normally have it,

7    if they find Counts I and II in favor of the State, they

8    usually will nolle-pross Count IV here.

9        But if they get a lesser that they are not satisfied

10   with, or they find him not guilty, then we need to have

11   them decide the remaining charge.

12       You need to decide at this point if you want to

13   testify or not.

14       And at this point, I have copies of the instructions.

15   All we need to do is take out whether he testifies or

16   doesn't testify.

17       We will take that out.

18       All right.

19       And by the way, the possession, you say Count I, as

20   we discussed earlier, both sides stipulate to that

21   element?

22       MR. BLACKER:  Right.

23       THE COURT:  That way, the jury doesn't get them or

24   what they are for.

25       MR. BLACKER:  Could I have just a minute?

MATZ, TRAKTMAN, FELDMAN AND WILDNER

975

1          I'm sorry.

2          The only question I have is this count, possession, I

3    don't think there is evidence in the case anyway, but

4    we're taking it out.

5          Possession, maybe we could take this out.

6          THE COURT:  Let me find it.

7          MR. BLACKER:  Fourth paragraph from the bottom, Your

8    Honor.

9          MS. CORONA:  OK, we will take that out.

10         MR. BLACKER:  I don't think there is any evidence

11   that there was joint possession of anything.

12         I mean, of the firearm, let's put it that way.

13         THE COURT:  All right.

14         Could I bother Carolina to make changes on my

15   computer screen, since my secretary is gone?

16         MS. CORONA:  Does Carolina get a say in it?

17         THE COURT:  Or Robert, either one.

18         MR. BLACKER:  I'm going to step out.

19         THE COURT:  We're in recess.

20         (Thereupon, a brief recess was taken, after which,

21   the following proceeding were had outside the presence of

22   the jury panel:)

23         THE COURT:  We got a note from one of the --

24         I don't know if you saw it -- from one of the jurors

25   to call her relative to wait for her downstairs.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

976

1    We did, and we had Maria, the intern, call. Mark it

2    as a court exhibit.

3    All right.

4    We told them we're going to send them home, and I

5    want the family to remain in the courtroom.

6    I would like the officers up here by the railing, the

7    Metro officers, please.

8    We're going to send them home, and I want the family

9    to remain in the courtroom for at least ten minutes after

10   the jury has left, OK?

11   And tell them to send a note out -- tell them to send

12   a note out if they need a few more minutes. Close the

13   door.

14   (Thereupon, a brief recess was taken, after which,

15   the following proceedings were had outside the presence

16   of the jury panel:)

17   THE COURT: Back on the record.

18   The jury says they almost have a verdict.

19   We need to decide on what you want to do on the other

20   one if your client wants to testify.

21   Talk to him.

22   OK. It says: We need to come back tomorrow, May

23   11th.

24   Mark it as an exhibit.

25   MR. BLACKER: Judge, it's been a long day.

977

1    We promised them 7:30.

2         THE COURT:  All right.

3         I'm sending them back the note:

4         Do you want to stay another 30 minutes or come back

5    tomorrow?

6         They'll answer.

7         Knock on the jury room door and hand them that.

8         MR. BLACKER:  I object.

9         THE COURT:  OK.  At 9:30.

10        They put 9:30.  Tomorrow at 9:30 a.m., I guess they

11   mean.

12        We're sending them home.

13        Here you go.

14        All right.

15        Come on -- tell them to come on out.

16        (Thereupon, the jury panel entered the courtroom,

17   after which, the following proceedings were had in open

18   court:)

19        THE COURT:  Please have a seat.

20        All right.

21        All the evidence is in the jury room.  We will get

22   it from there.

23        Ladies and gentlemen, please have a seat.

24        Let the record reflect that the defendant is

25   present, as he has been throughout the trial.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

978

```
1        We are going to recess for the evening until
2    tomorrow at 9:30 a.m.
3        In fact, if you could be here a little bit earlier,
4    because I would like to address you at 9:30.
5        What needs to happen tomorrow is I need to meet with
6    the lawyers to review the evidence and make sure we give
7    you the evidence in the case, and that it is all there,
8    and just greet you and put you in the jury room to
9    deliberate.
10       And if by --
11       And you can take as little or as long as you want.
12       If by 11 you don't have a verdict, send out a note,
13   and we will get you lunch.
14       And I have to tell you, I have a lunch engagement
15   tomorrow, so when I go to lunch, I probably won't be back
16   like till 2:30 or something.
17       Now, it's very important that you not discuss the
18   case amongst yourselves, whether it's on your way home or
19   by telephone.
20       You can't discuss the case anymore amongst
21   yourselves.
22       Even when you see one another tomorrow, you cannot
23   discuss the case; not until I meet and greet you, go over
24   the evidence and send you into the jury room, OK?
25       Very important.
```

979

1       And we're going to have --

2       I'm going to ask everyone in the courtroom to --

3       Everyone in the audience, please wait in the

4  courtroom until ten minutes after all the jurors have

5  left.

6       OK, officers.

7       At this time, we are all excused.

8       (Thereupon, pursuant to an evening recess, the jury

9  panel exited the courtroom, after which, the following

10  proceedings were had outside the presence of the jury

11  panel:)

12       THE COURT:  We're in recess until tomorrow.  Hold

13  everybody here for ten minutes.

14       Thank you.

15       MR. BLACKER:  I have a 10 o'clock but I will come

16  here at 9.

17       THE COURT:  All right.

18       As long as you are here at 9 and you can review the

19  evidence.

20       Please ask the clerk to come down earlier than usual.

21  I think she will, because they are fixing upstairs, so

22  she can review the evidence.

23       All right.

24       And I need to go on the record with you to know that

25  that's all the evidence.

MATZ, TRAKTMAN, FELDMAN AND WILDNER

980

1        And then -- and then, I can say good morning to the

2    jury.

3        All right.

4        (Thereupon, the proceedings were adjourned.)

981

1

2                                CERTIFICATE
3
4    STATE OF FLORIDA              )
5    COUNTY OF MIAMI-DADE          )
6
7
8         I, PAMELA Y. KILPATRICK, Notary Public for the State of Florida at

9    Large, do hereby certify that I was authorized to and did stenographically report the

10   foregoing proceedings and that this transcript is a true and complete record of my

11   stenographic notes.

12        DATED this 14th day of February, 2008.
13
14
15
16
17
18   _____
     PAMELA Y. KILPATRICK,
19   Shorthand Reporter and Notary Public,
20   State of Florida at Large
21
22   My commission expires:
23   August 19, 2009
24

25

26


                MATZ, TRAKTMAN, FELDMAN AND WILDNER